IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| ASSOCIATED BUILDERS AND CONTRACTORS FLORIDA FIRST COAST CHAPTER, AND ASSOCIATED BUILDERS AND CONTRACTORS, | § § § § § § | |
| Plaintiffs | § | |
| v. | § § | CASE NO. |
| WILLIAM F. CLARK, DIRECTOR, OFFICE OF GOVERNMENT-WIDE ACQUISITION POLICY, OFFICE OF ACQUISITION POLICY, OFFICE OF GOVERNMENT-WIDE POLICY, GENERAL SERVICES ADMINISTRATION, | § § § § § § § § | |
| CHRISTINE J. HARADA, FAR COUNCIL CHAIR, SENIOR ADVISOR TO THE DEPUTY DIRECTOR FOR MANAGEMENT, OFFICE OF FEDERAL PROCUREMENT POLICY, OFFICE OF MANAGEMENT AND BUDGET, | § § § § § § § § § | |
| JOHN M. TENAGLIA, PRINCIPAL DIRECTOR, DEFENSE PRICING AND CONTRACTING, UNITED STATES DEPARTMENT OF DEFENSE, | § § § § § § | |
| KARLA S. JACKSON, ASSISTANT ADMINISTRATOR FOR PROCUREMENT, NATIONAL AERONAUTICS AND SPACE | § § § § | |

1

ADMINISTRATION,                                    §
                                                   §
JEFFREY A. KOSES, SENIOR                            §
PROCUREMENT EXECUTIVE,                              §
GENERAL SERVICES                                   §
ADMINISTRATION,                                    §
                                                   §
SHALANDA YOUNG, DIRECTOR                            §
OF OFFICE OF MANAGEMENT                             §
AND BUDGET,                                         §
                                                   §
  In their official capacities,                    §
                                                   §
     Defendants.

## PLAINTIFFS' COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1.     Plaintiffs ASSOCIATED BUILDERS AND CONTRACTORS, FLORIDA FIRST COAST CHAPTER ("ABCFFC"), and ASSOCIATED BUILDERS AND CONTRACTORS ("ABC") (collectively "Plaintiffs"), by and through their undersigned counsel, for their Complaint against WILLIAM F. CLARK, CHRISTINE J. HARADA, JOHN M. TENAGLIA, KARLA S. JACKSON, JEFFREY A. KOSES, and SHALANDA YOUNG (collectively "Defendants"), herein state as follows:

## NATURE OF THE ACTION

2.     Plaintiffs bring this action to have declared unlawful and set aside Executive Order 14063 (the "EO"), "Use of Project Labor Agreements for Federal Construction Projects," issued by President Joe Biden on Feb. 4, 2022, 87 Fed.

Reg. 7363 (Feb. 9, 2022); as implemented by the Final Rule having the same title, promulgated by the Federal Acquisition Regulatory ("FAR") Council, 88 Fed. Reg.88708 (Dec. 22, 2023) (the "PLA Rule") and by the Office of Management and Budget's ("OMB") Guidance Memorandum M-24-06 ("Memorandum").

3.    The FAR Council issued the PLA Rule expressly for the purpose of implementing the EO. The PLA Rule took effect on January 22, 2024. *See* 88 Fed Reg. 88708. The OMB Memorandum purports to guide federal agencies in implementing the PLA Rule.

4.    The PLA Rule makes a mockery of federal procurement laws and is unprecedented in its exercise of executive authority over matters previously controlled by Congress. Under the guise of increasing "economy and efficiency" and "full and open competition" in federal contracting, as required by the Procurement Act, the Competition in Contracting Act, and other federal laws, the PLA Rule has the opposite effect. It will inflate costs, reduce efficiency, and stifle competition from the majority of construction contractors (89% of the industry) whose employees have chosen not to be represented by labor unions. Judicial intervention is urgently needed to enjoin this blatant act of political favoritism.

5.    As further explained below, the PLA Rule for the first time in U.S. history compels federal agencies to mandate union-favoring project labor agreements on all federal construction contracts valued at $35 million or more. As

further specified in the PLA Rule, the terms of the mandated PLA require all bidders and subcontractors to sign a collective bargaining agreement with specified terms with one or more labor unions as a condition of being awarded a contract to perform work on the federal construction project.

6.      The PLA Rule is unlawful and must be vacated. Together and separately, the EO, PLA Rule, and OMB Memorandum are *ultra vires* actions that exceed the Executive Branch's authority under and/or directly conflict with the Federal Property and Administrative Services Act ("FPASA" or the "Procurement Act"), 40 U.S.C. § 121, *et seq.*, as well as the Competition in Contracting Act ("CICA"), 41 U.S.C. § 3301, the National Labor Relations Act, 29 U.S.C. § 151, *et seq.*, and the First Amendment. The PLA Rule further violates the Office of Federal Procurement Policy ("OFPP") Act, 41 U.S.C § 1301, *et seq.*, Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, the Regulatory Flexibility Act ("RFA"), as amended by the Small Business Regulatory Enforcement Act ("SBREFA"), 5 U.S.C. § 601, and the Small Business Act ("SBA"), 15 U.S.C. § 644. In sum, the EO, PLA Rule, and OMB action are arbitrary and capricious, an abuse of agency discretion, and in violation of law, and must be set aside.

## Parties and Standing

7.     Headquartered in Jacksonville, Florida, Plaintiff ABCFFC is comprised of 180 members in the construction industry, many of whom regularly perform construction contracts for the federal government exceeding $35 million dollars, or perform subcontracts to contractors who engage in such work. ABCFFC is a separately incorporated affiliate of the national construction industry trade association Plaintiff ABC, which represents more than 23,000 member contractors and related firms both in Florida and throughout the country.

8.     Together, the Plaintiffs and their members share the belief that work in the construction industry should be awarded and performed on the basis of merit, without regard to labor affiliation. Relatedly, ABCFFC and ABC share the mission of protecting the right of their members to engage in free and open competition for construction contracts, including contracts with the federal government, regardless of labor affiliation.

9.     ABC members won 54% of the $205.56 billion in total value of direct prime construction contracts exceeding $35 million awarded by federal agencies during fiscal years 2009-2023. [1] ABC member federal contractors provided subcontracting opportunities to large and small subcontractors in the specialty

---

[1] *ABC Members Won the Majority of Large-Scale Federal Contracts > $35M, FY2009-FY2023*, Associated Builders & Contractors, https://thetruthaboutplas.com/wp-content/uploads/2023/12/ABC-Members-Won-A-Significant-Number-of-Large-Scale-Federal-Contracts-of-35M-FY09FY23-030524.png (last visited, Mar. 8, 2024).

trades, many of whom are likewise ABC members, and many of whom are small businesses. Together, ABC member contractors and subcontractors for decades have delivered taxpayer-funded construction projects on time and on budget for their federal government customers, without need for any PLA mandates on such work. Indeed, Defendant General Services Administration ("GSA") recently announced a construction award to a contractor member of ABCFFC for successfully performing GSA contracts.[2]

10.    Like more than 89% of the nation's construction industry, most ABC and ABCFFC members are not signatory to union collective bargaining agreements (CBAs), and their employees have chosen not to be represented by unions. ABC and ABCFFC members' business model depends on the greater economy and efficiency permitted by their non-union status. For this reason, as further discussed below, the general contractor and subcontractor members of ABCFFC locally and ABC nationally are being unfairly deprived of significant contracting opportunities by the unprecedented PLA Rule, and they will otherwise be further irreparably harmed if the PLA Rule is allowed to remain in effect.

11.    As trade associations representing federal government contractors in this District and around the country, ABC and ABCFFC each have standing to

---

[2] *GSA celebrates first biennial Construction Award winner*, U.S. General Services Administration, https://www.gsa.gov/about-us/newsroom/news-releases/gsa-celebrates-first-biennial-construction-award-w-02282024 (last visited, Mar. 8, 2024).

bring this action on behalf of their members under the three-part test of *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977), because (1) Plaintiffs' members would otherwise have standing to sue in their own right; (2) the interests at stake in this case are germane to Plaintiffs' organizational purposes; and (3) neither the claims asserted nor the relief requested requires the participation of Plaintiffs' individual members. *See also America's Health Ins. Plans v. Hudges*, 742 F.3d 1319, 1326 n.5, 1327-28 (11th Cir. 2014) (finding that trade association had standing to challenge law on behalf of its members); *Associated Builders & Contractors of SE. Texas v. Rung*, No. 1:16-CV-425, 2016 WL 8188655, at *6 (E.D. Tex. Oct. 24, 2016) (finding that ABC had standing to challenge certain Federal Acquisition Regulations and guidance from the Department of Labor threatening injury to the association's many government contractor members); *see also Am. Sec. Ass'n v. U.S. Dept. of Labor*, 2023 U.S. Dist. LEXIS 24076 (M.D. Fl. Feb. 13, 2023) (finding "little question" of standing where association members are the "objects of the [challenged] regulation").

12.    Plaintiffs' members certainly have standing to sue in their own right to challenge the EO, PLA Rule, and OMB Guidance, all of which erect a barrier—the PLA mandate—which makes it much more difficult for ABC member contractors/subcontractors to compete on an equal footing in the bidding process. *See Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of*

*Jacksonville*, 508 U.S. 656, 666 (1993) (finding standing of group members to challenge barriers erected by the government making it more difficult for the group's members to compete in the process of bidding for government contracts).

13.    The PLA Rule inevitably deters identifiable ABC and ABCFFC members from bidding on federal construction projects over $35M, though they are qualified and desire to seek awards of such projects, and would otherwise do so, if not for the federal government's unlawful PLA requirement. This is so not only because many member contractors and subcontractors object to signing government-mandated PLAs and associating with unions without the consent of their employees, but also because it will be extremely burdensome for such contractors to submit accurate and competitive bids for applicable project contracts under the PLA Rule. *Id*. at 666 (explaining that it is the "inability to compete on an equal footing in the biding process, not the loss of a [specific] contract" that constitutes the injury-in-fact necessary for standing).

14.    The following members of ABC and ABCFFC have consented to being identified as directly, imminently, and irreparably harmed by the unlawful PLA Rule, as it is now being applied to a wide variety of large projects, both within this jurisdiction and elsewhere: Prime contractors The Haskell Company (member of ABC and ABCFFC), The Cianbro Companies (member of ABC and ABCFFC), Hensel Phelps Construction Co. (member of ABC and ABCFFC),

Robins & Morton (member of ABC and multiple chapters), Brasfield & Gorrie, L.L.C. (member of ABC and ABCFFC); along with prime and subcontractor M.C. Dean, Inc. (member of ABC and multiple chapters), subcontractor American-Electrical Contracting, Inc. (member of ABC and ABCFFC); and small business prime and subcontractor Interstate Sealant & Concrete (member of ABC and WI chapter). [3]

15.     Each of the contractors listed above, and many more represented by the Plaintiffs, regularly bid on >$35M federal construction contracts (a fact confirmed by publicly available data on federal contracting). The subcontractors listed, and many more represented by the Plaintiffs, regularly bid to and perform work for the contractors who perform the prime contracts. As further alleged below, Plaintiffs' members have identified numerous large-scale federal projects on which they are ready, willing, and able to bid as they have regularly done until now; but they are deterred from bidding and irreparably harmed by virtue of the restrictive condition of contract award unlawfully being imposed by the Defendants on projects within this District and around the country, *i.e.*, the PLA mandate.

---

[3] Identification of the foregoing association members, together with the specific allegations below supported by attestations from such members, meets and exceeds the requirements of *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009), calling for identification of only one such member to support association standing to represent all members.

16.    Plaintiffs' members attest that since the PLA Rule has gone into effect, federal agencies have imposed the PLA mandate across the board, without exemptions which the PLA Rule purports to recognize. Plaintiffs' members attest that multiple federal agencies have either failed to conduct any market research into the availability of union workers where the projects are being performed, or else have ignored information from the contractors and others demonstrating that the PLA mandate will drastically reduce competition from non-union contractors who are qualified to perform the work.

17.    ABC national staff have further been informed by numerous agency officials that the inherent structure of the EO, PLA Rule and OMB guidance pose insurmountable obstacles to exempting projects from the PLA mandate, even in markets that are known to contain few if any unionized workers. As further discussed below, under the previous Executive Order "encouraging" PLAs on federal projects, procurement officials found exemptions to be appropriate on 99% of all construction projects exceeding $25M. The new PLA Mandate in effect imposes PLAs on virtually *all* federal projects exceeding $35M.

18.    Federal agency project solicitations have already been issued for construction services under the PLA Rule that require PLAs without any apparent consideration of exemptions from PLA requirements or any market research into the need for such PLAs or their impact on competition in the area. For example, a

PLA mandate has been announced on the $2B NAVFAC SE MACC program in the Jacksonville, Florida area, even though multiple contractors have informed the government agency that the condition is both unnecessary due to the absence of any significant union presence in the market area, and will injure competition by deterring non-union contractors and subcontractors from bidding for work they otherwise would be qualified to perform.

19.     The PLA mandates are by no means confined to federal construction projects in Jacksonville. On numerous projects throughout the South and across the country, the PLA mandate is being imposed on projects of the types that ABC and ABCFFC members have previously performed successfully without any need for PLAs. As in Jacksonville, the PLA mandate is being imposed virtually without exception, regardless of undisputed information presented by ABC members and other contractors as to overwhelming market share of non-union or mixed-use construction prevalent in the area where the PLA mandates are being imposed. Among other examples of large-scale projects with announced PLA mandates in the mid-Florida area, ABC/ABCFCC members are aware of upcoming PLA-mandated projects at the Patrick Space Force Base and the MacDill Air Force Base.

20.     Additional examples of the PLA Rule harming members of ABC and ABCFFC include the $500M - $750M Anniston, Alabama Army Depot ANAD, on

which the Department of Defense U.S. Army Corps of Engineers ("USACE") issued a Solicitation for construction containing a PLA mandate. Similarly, USACE's pre-solicitation for the Missile Defense Agency Ground Test Facility Infrastructure at Redstone Arsenal in Alabama that requires offerors to submit a PLA. Another Alabama project identified by members of ABC and ABCFFC, announced as imposing the PLA mandate, is the USDA Lab Annex at Auburn University. Again, agency officials either did no market research or deliberately ignored conclusive evidence that imposing a PLA mandate on the project would adversely impact economy and efficiency on the project and drastically reduce competition in a market dominated by non-union construction firms.

21.    As another example, this time in Texas, the GSA has issued a Request for Proposal ("RFP") for the Brownsville Gateway Modernization in Brownsville, Texas on February 2, 2024. (RFP Phase 1, at 1, 7).  The RFP specifically explains that "proposals not containing a draft PLA will be deemed nonresponsive and will not be evaluated by GSA." (Phase 1, at 8). Nothing in the RFP indicates that GSA conducted market research or considered any exemption from the PLA requirement before issuing the RFP. ABC members familiar with the Brownsville area report that union presence is small to non-existent, and that competition for the project has been dramatically reduced as a result of the PLA mandate.

22.    Additional examples have been attested to by identified ABC members throughout the country, and the list of federal projects subject to unjustified government-mandated PLAs grows daily as a direct result of the unlawful PLA Rule.

23.    The PLA Rule also harms merit shop members of ABC and ABCFFC who have signed CBAs with unions. Most construction industry CBAs are areawide, meaning that such agreements typically cover all work in a specific area set forth in the CBA. Therefore, unionized merit shop contractors, to comply with the PLA Rule, must either sign a PLA with a new union with which they have no relationship or negotiate a new and different agreement with their current union. Either way, unionized merit shop contractors are compelled by the PLA Rule to enter new agreements under which they will have reduced bargaining power. Therefore, even ABC and ABCFFC members who do have union agreements are being deprived of contracting opportunities and irreparably harmed if the PLA Rule is allowed to stay in effect.

24.    ABC members have indicated they are ready, willing and able to bid on the projects being awarded by the federal government, as they have successfully done in the past; but they will be severely disadvantaged by PLA mandates or simply cannot engage in the futile act of bidding on such projects due to the wholly

unjustified PLA requirements, especially since submitting a responsive bid costs potential bidders tens of thousands of dollars to do so.

25.     The PLA Rule makes such bids futile because non-union contractors cannot be *awarded* such contracts unless they agree to sign a PLA and agree that they and all of their subcontractors will be bound by its terms. ABC and ABCFFC members are thereby forced to associate with unions and to compel their employees to accept unwanted representation by the unions as a condition of performing the government's construction work. And as further discussed below, the mandated PLAs impose unjustified burdens on the ABC and ABCFFC members who want to perform such projects, discussed below, putting them at a severe disadvantage in the bidding process. Therefore, ABC and ABCFFC members who otherwise want to submit bids on projects covered by the PLA Rule are being irreparably harmed by the PLA Rule, so long as it is allowed to remain in effect.

26.    As noted above, identified above are ABC and ABCFFC subcontractor members who have regularly participated on projects above $35M. The PLA Rule is causing such subcontractors to lose access to large-scale federal construction projects, as the subcontractors work exclusively with non-union general contractors, who will be deterred from bidding, or the subcontractors will be unable to perform work for general contractors who sign PLAs mandated by the

PLA Rule, without the subcontractors themselves entering into the PLAs on such projects.

27.    All of the foregoing plainly establishes that ABC and ABCFFC member contractors and subcontractors have standing in their own right to bring this action based on irreparable harms, including but not limited to those discussed above, directly and imminently caused by the PLA Rule now in effect. *See, e.g.*, *Associated Builders and Contractors of Southeast Texas v. Rung*, 2016 U.S. Dist. LEXIS 155232 (E.D. TX 2016).

28.    ABC and ABCFFC meet the second test for associational standing in that the present action is clearly germane to each association's organizational purposes. As noted above, ABC and ABCFFC's stated missions are to advocate for fair and open competition for construction work, including federal construction contracts. The PLA Rule is antithetical to their goal of promoting and defending fair and open competition in the construction industry.[4]

29.    ABC and ABCFFC meet the third and final test for associational standing in that neither the claims asserted nor the relief requested requires the participation of Plaintiffs' individual members. This complaint raises questions of law, based upon the Administrative Record of the rulemaking proceeding, and

---

[4] *See* ABC First Coast > About > The ABC Story (last visited March 26, 2024); *ABC and the Merit Shop Philosophy*, Associated Builders and Contractors, https://www.abc.org/About-ABC/About-ABC/ABC-Philosophy (last visited Mar. 8, 2024).

publicly available information regarding the imposition of PLA mandates on many projects in this District and around the country impacting identified ABC and ABCFFC members.

30.    For all the reasons alleged above, ABC and ABCFFC have associational standing to bring this action on behalf of their irreparably harmed members, and therefore do not have to establish direct standing. *Hunt*, 432 U.S. at 343. ABC and ABCFFC nevertheless each have direct standing to bring this action because the EO, PLA Rule, and OMB action are directly and currently harming their organizational interests by requiring ABC and ABCFFC to divert their attention away from other activities, such as management training, workforce development, jobsite safety, and advancement of free and open competition throughout the construction industry, in order to challenge the unlawful PLA Rule and EO, as well as to advise and assist members as to their (limited) options with regard to compliance with the PLA Rule. *See Plaintiffs v. Kemp,* 2023 U.S. Dist. LEXIS 144918, at *55-56 (N.D. Ga. Aug. 18, 2023) (plaintiff organization established organizational injury because it had to divert its resources).

31.    The dispute here is also ripe for review as it raises pure questions of law that are fit for judicial review, and Plaintiffs are already suffering hardship that will continue absent judicial relief. *See Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1380 (11th Cir. 2019). Indeed, the Eleventh Circuit has

concluded that a claim may be ripe even where some future contingent event could cause the plaintiff to not suffer an injury. *See Mulhall v. United Here Local 355*, 618 F.3d 1279, 1291 (11th Cir. 2010). In any event, Plaintiffs' members are being injured now and are entitled to injunctive relief.

32.    Defendant William F. Clark is Director, Office of Government-wide Acquisition Policy, Office of Acquisition Policy, Office of Government-wide Policy at the General Services Administration. Defendant Clark is chair of the Civilian Agency Acquisition Council, which aids the Administrator of General Services by reviewing or developing all changes to the FAR. Defendant Clark signed the PLA Rule in the Federal Register. Defendant Clark is sued in his official capacity and the relief sought extends to all of his successors.

33.    Defendants Christine J. Harada, John M. Tenaglia, Karla S. Jackson, and Jeffrey A. Koses are members of the FAR Council.  The FAR Council is a federal agency charged with assisting in the direction and coordination of Government-wide procurement policy and Government-wide procurement regulatory activities in the Federal Government, in accordance with the Office of Federal Procurement Policy ("OFPP") Act, 41 U.S.C § 1301, *et seq*.  As noted above, the FAR Council published the PLA Rule in the Federal Register. Defendants Harada, Tenaglia, Jackson, and Koses are sued in their official

capacities and the relief sought extends to all of their successors and all FAR Council employees, officers, members, and agents.

34.    Defendant Shalanda Young is Director of the Office of Management and Budget. Defendant Young is sued in her official capacity and the relief sought extends to all her successors and all OMB employees, officers, members, and agents.

## **Jurisdiction and Venue**

35.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) because the Plaintiffs' causes of action arise under and allege violations of federal law, including: the U.S. Constitution, the CICA, 41 U.S.C. § 253, the NLRA, 29 U.S.C. § 158(d), the APA, 5 U.S.C. §§ 701-706 (APA jurisdiction to review agency actions), the RFA, as amended by the SBREFA, 5 U.S.C. § 601, the SBA, 15 U.S.C. § 644, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief), as further discussed below.

36.    This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-02 and the APA, 5 U.S.C. §§ 701-06.

37.    Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because Plaintiff ABCFFC maintains its principal place of business in Jacksonville, within the judicial district of this Court, and because facts and

circumstances relating to the enforcement of the challenged PLA mandate are taking place in this district, as set forth above.

### Government-Mandated Project Labor Agreements Defined

38.    As defined in the PLA Rule, a PLA is "a pre-hire collective bargaining agreement with one or more labor organizations that establishes the terms and conditions of employment for a specific construction project."[5]   As further stated in the PLA Rule: "Requiring a PLA means that every contractor and subcontractor engaged in construction on the project agree, for that project, to negotiate or become a party to a project labor agreement with one or more labor organizations."[6]

39.    PLAs originated at a time when the overwhelming majority of construction projects were performed by union workforces, which accounted for more than 80%of the industry prior to and during World War II.[7] Project-wide labor agreements were sometimes needed when most, if not all, of a project's construction workers belonged to different union trades, and jurisdictional disputes and strikes relating to disputes between the trades were common.

40.    After World War II, however, the unionized sector of the construction industry began a long, steady decline, to the point where less than 11% of the

---

[5] *See* 88 Fed Reg. 88723
[6] *Id*.
[7] Herbert Northrup, *Open Shop Construction Revisited* (1984).

construction industry's workforce is now unionized, according to the government's own Bureau of Labor Statistics.[8] More than 89% of the U.S. construction industry workforce do not belong to a union and are employed by contractors who are not signatory to any union agreements.[9] In Florida, the unionized share of construction is even smaller, *i.e.*, less than 3%.[10] According to additional ABC analysis of government data on state construction union membership published by UnionStats.com, in 2023 at least 90% of workers in the private construction industry do not belong to a union in 29 states, up from 24 states in 2021.[11]

41.    Therefore, government-mandated PLAs no longer serve their original intended purpose of securing labor peace amongst primarily unionized construction workers. Instead, government-mandated PLAs blatantly discourage competition and discriminate against the overwhelming non-union majority of the construction industry workforce and their employers and serve to promote government favoritism towards labor unions.[12]

---

[8] *See BLS: A Record 89.3% of the U.S. Construction Industry Is Not Part of a Union*, The Truth About Project Labor Agreements, https://thetruthaboutplas.com/2024/01/31/bls-a-record-89-3-of-the-u-s-construction-industry-is-not-part-of-a-union/ (last visited Mar. 8, 2024).

[9] *See Table 3, Union affiliation of employed wage and salary workers by occupation and industry,* U.S. BUREAU OF LABOR STATISTICShttps://www.bls.gov/news.release/union2.t03.htm (last visited Dec. 14, 2023).

[10] *See Union Membership, Coverage, Density, and Employment by State: 2022,* UNIONSTATS.COM, www.unionstats.com (last visited Dec. 14, 2023).

[11] *See* Union Membership, Coverage, Density and Employment by State: 2023, UNIONSTATS.COM, unionstats.com/state/htm/state_2023.htm (last visited Mar. 8, 2024).

[12] *See* Administrative Record ("AR"), ABC Comments opposing the PLA Rule at 34.

42.    When agreeing to the terms of a government-mandated PLA, non-union general contractors must give up their right to honor the wishes of their employees not to vest exclusive authority in a labor union to represent their interests. Instead, the contractors and/or subcontractors must agree to be bound on all covered projects by the terms of the PLA—a special type of collective bargaining agreement, without regard to whether subcontractors and their employees desire such representation and without any opportunity for the employees to vote on such representation.[13]

43.    In addition, PLAs typically require contractors or subcontractors to agree to restrictive union hiring hall requirements, inefficient work rules, and seniority-based wage scales without regard to merit of experience, productivity or safety performance; and they require costly payments into union fringe benefit plans without regard to whether such benefits will vest with non-union workers whose coverage under the PLA is limited to the scope of the project.[14]

44.    As further explained in the administrative record, government-mandated PLAs on average increase construction costs by 12-20%, reduce the number of competitive prime bidders and pool of potential subcontractors, and needlessly discriminate against non-union contractors, subcontractors, and their

---

[13] AR, ABC Comments opposing the PLA Rule at 5-7, 11.

[14] AR, ABC Comments at 7-8, 10-11.

employees pursuing federal government contracts, all without any demonstrable increase in economy and efficiency in government contracting.[15]

45.    In September 2022, ABC conducted a survey of its contractor members about government-mandated PLAs and the FAR Council's proposed rule.[16] 99% of respondents said they would be less likely to begin or continue bidding on federal contracts if the proposed rule is finalized and 97% said that government-mandated PLAs decrease economy and efficiency in government contracting.

46.    97% of respondents "who self-identified as small businesses said they would be less likely to bid on contracts if the rule is finalized" and "73% of small businesses stated PLAs decrease hiring of minority, women, veteran and disadvantaged business enterprises."[17]

### Federal Government PLA Policies
### Prior To The PLA Rule

47.    Prior to the issuance of the PLA Rule, no President had ever claimed authority to impose a restrictive government-wide mandate requiring federal

---

[15] AR, ABC Comments at 5, 15, 22. *See also Government-Mandated PLA Studies*, BUILD AMERICA LOCAL, https://buildamericalocal.com/learn-more/#gmpla-studies (last visited Mar. 8, 2024).

[16] *Survey: 97% of ABC Contractors Say Biden's Government-Mandated Project Labor Agreement Policies Would Make Federal Construction More Expensive*, ABC NEWSLINE, Sept. 28, 2022, https://www.abc.org/News-Media/Newsline/survey-97-of-abc-contractors-say-bidens-government-mandated-project-labor-agreement-policies-would-make-federal-construction-more-expensive (last visited Dec. 14, 2023).

[17] *See* ABC Comments at 15, 37. Additional results from the survey are shared in greater detail throughout ABC's comments.

construction contractors to sign project labor agreements with labor unions as a condition of performing work on federal contracts. To the contrary, Congress has enacted laws, beginning with the Federal Property and Administrative Services Act ("FPASA"), 40 U.S.C. § 121, *et seq.*, that require federal agencies seeking to retain services from private contractors to consider competitive proposals from private contractors and to "award a contract with reasonable promptness to the responsible source whose proposal is most advantageous to the Federal Government, considering only cost or price and the other factors included in the solicitation." 41 U.S.C. § 3703. The specific rules governing the federal government's acquisition processes are set forth in the Federal Acquisition Regulations System ("FARS"). 48 C.F.R. 1, *et seq.*

48.    In 1984, Congress passed the CICA, 41 U.S.C. § 253, requiring that all federal agencies awarding contracts for services—including construction contracts—"shall obtain full and open competition through the use of competitive procedures." The stated purpose of the law was and remains to increase the number of competitors for government contracts and to increase savings through lower, more competitive pricing.[18] Of particular significance to the proposed rule, CICA expressly bars federal agencies from using restrictive bid specifications to

---

[18] For a full discussion of CICA's requirements, *see* Kate M. Manuel, *Competition in Federal Contracting: An Overview of the Legal Requirements*, CONGRESSIONAL RESEARCH SERVICE (April 2009).

effectively discourage or exclude contractors from the pool of potential bidders or offerors. As the CICA states, agencies must solicit bids and offers "in a manner designed to achieve full and open competition" and "develop specifications in such a manner as is necessary to obtain full and open competition."[19]

49.    Consistent with CICA, Congress has long prohibited the federal government from requiring employers to enter into any project labor agreement or specific term thereof in Section 8(d) of the NLRA. *See H.K. Porter v. NLRB*, 397 U.S. 99, 102-109 (1970) (holding that the National Labor Relations Board ("NLRB") does not have the power to compel employers to agree to any substantive contractual provision of a collective bargaining agreement).

50.    Since enactment of the CICA in 1984, no President has attempted to impose an across-the-board mandate of PLAs on federal contracts, until now.

51.    President George H.W. Bush issued the first Executive Order dealing with PLAs, EO 12818 (Oct. 23, 1992), *prohibiting* government agencies from requiring the use of PLAs by any parties to federal construction projects.

52.    President Clinton revoked the Bush Executive Order in 1993 and issued a Presidential Memorandum in 1997 to "encourage" the use of PLAs on a case-by-case basis.

53.    In 2001, President George W. Bush issued EO 13202 and EO 13208.

---

[19] *Id.* at 18, citing 10 U.S.C. § 2305(a)(1)(A) and 41 U.S.C. § 253a(a)(1)(A-C); *see also* William S. Cohen, *The Competition in Contracting Act*, 14 Pub. Con. L. J. 19 (1983/1984).

The EOs enacted a new federal government policy of PLA neutrality, which prohibited government-mandated PLAs on federal and federally assisted construction projects, but made it clear that contractors were free to voluntarily enter into a PLA without government interference.

54.     President Obama revoked the Bush EOs in 2009 and replaced them with EO 13502 which again "encouraged" federal agencies to mandate PLAs on federal construction projects of $25 million or more on a case-by-case basis but did not mandate federal agencies to impose PLAs on federal projects.

55.     President Trump did not modify the Obama EO during his administration. However, no Trump administration federal agencies mandated PLAs on any known federal construction contracts. In fact, PLAs were mandated on just 12 federal construction contracts (at a total of $1.26 billion) out of 3,322 federal contracts (valued at a total of $238.45 billion) of $25 million or more from fiscal year 2009 to fiscal year 2023, under the Obama policy of encouraging but not mandating PLAs across the government.

**President Biden's Executive Order 14063**

56.     As noted above, President Biden issued the challenged EO on February 4, 2022.  The EO purports to "increase efficiency and cost savings in the work performed by parties who contract with the Federal Government," but provides no factual basis for this claim. Without further justification, the EO states

for the first time ever that federal agencies "shall" require contractors and subcontractors to negotiate or become parties to PLAs for federal construction contracts valued at $35 million or more. EO 14063, §§ 2-3.

57.    The EO further requires such PLAs to bind all contractors and subcontractors on an applicable project. The EO purports to allow all contractors and subcontractors to compete for contracts and subcontracts regardless of whether they have previously negotiated collective bargaining agreements, but only if they agree to sign a PLA covering all their workers in the project as a condition of being awarded the work. The mandated PLAs must prohibit strikes, lockouts, and other comparable job disruptions; include labor dispute resolution procedures; provide for labor-management cooperation on relevant issues; and otherwise comply with applicable law. EO 14063, § 4.

58.    According to the EO, only senior agency procurement officials may grant exceptions to the PLA requirement and then only where they make specific findings that a PLA would not advance the government's interest in economy and efficiency; where PLAs would "substantially reduce" the quantity of bidders "as to frustrate full and open competition"; or where requiring a PLA would otherwise be inconsistent with applicable law. EO 14063, § 5.

### The New PLA Rule

59.    On Aug. 19, 2022, the FAR Council published in the Federal

Register its Notice of Proposed Rulemaking to implement the President's EO. *See* 87 Fed. Reg. 51044. On December 22, 2023, following public comment, including opposition filed by ABC on behalf of its chapters and members, the FAR Council published in the Federal Register a largely unchanged version of the original proposal as the final PLA Rule that is being challenged in this Complaint. 88 Fed. Reg. 88708 (Dec. 22, 2023).

60. As called for by the EO, but in violation of the Constitution and other applicable laws, the FAR Council's new PLA Rule requires federal contractors and subcontractors for the first time to enter into PLAs as a condition of being awarded work on federal construction projects valued at more than $35 million.

61. Section 22.505 of the PLA Rule makes clear that upon notification from the agency of intent to place an order covered by the EO, "[t]he Contractor shall... [n]egotiate or become a party to a project labor agreement with one or more labor organizations for the term of this construction contract." The PLA Rule further requires that the PLA shall "[b]ind the Contractor and subcontractors engaged in construction on the construction project to comply with the project labor agreement."

62. Contrary to a claim by Defendants in the Rule that non-union contractors "may compete for contracts" under the PLA Rule, the Rule does not allow a non-union contractor to compete for a covered project unless they agree to

the terms and conditions of a PLA, which effectively prevents contractors from preserving their nonunion status during the life of a PLA project and unfairly subjects them to the many burdens and disadvantages described above. The preamble to the Rule concedes that "union contractors...are more likely to work on PLA-covered projects." 88 Fed. Reg. 88713.

63.    The PLA Rule provides inadequate support for Defendants' broad generalizations that PLA's "promote economy and efficiency in federal procurement." 88 Fed. Reg. 88711. The Rule ignores overwhelming evidence in the Administrative Record that PLAs reduce economy and efficiency.[20]

64.    In response to Comments that Defendants did not provide data on costs and benefits of the PLA rule, the preamble to the Rule claims Defendants have relied on the President's "judgment," citing to only a few studies. 88 Fed. Reg. 88711.

65.    The truth is the federal government's pro-PLA policy from fiscal year 2009 to fiscal year 2023 encouraging—but not requiring—federal agencies to mandate PLAs provides a real-world demonstration that there is no factual basis for the Rule's economy and efficiency claims. As noted above, between fiscal years 2009 and 2023, just 12 federal contracts—valued at a total of $1.26 billion—

---

[20] AR, ABC Comments at 21-24.

out of 3,222 contracts of $25 million or more—worth a total of $238.45 billion—contained a PLA mandated by a federal agency.[21] This means that the federal government's professional procurement officials saw no need to impose PLAs in order to increase economy or efficiency on more than 99% of all federal construction contracts of $25 million or more during this time period. In other words, the federal government's own professional procurement officers overwhelmingly found that none of the "economy and efficiency" grounds asserted in the new Rule justified mandating PLAs on large-scale federal projects during the previous decade, due to their obvious inflationary, discriminatory, and restrictive effects.

66.    Contrary to the new Rule, numerous studies and testimonies establish that government-mandated PLAs reduce competition, increase costs and in general defeat the goal of greater economy and efficiency set forth in the FPASA.[22]

67.    In response to Comments that PLAs will reduce competition, the PLA Rule cites only one study to support an assertion that PLAs do not reduce competition. 88 Fed. Reg. 88709. Defendants have ignored overwhelming academic and real-world evidence provided by ABC and others, that a government-mandated PLA inherently discourages non-union contractors from

---

[21] *PLA Mandates on Federal Contracts*, ABC, https://thetruthaboutplas.com/wp-content/uploads/2022/04/PLA-Mandates-on-Federal-Contracts-FY2009-FY2021-033022.png (last visited Dec. 14, 2023).

[22] *See* AR, ABC Comments at 21-24; *see also* THE TRUTH ABOUT PROJECT LABOR AGREEMENTS, www.thetruthaboutplas.com; and https://buildamericalocal.com/learn-more/#gmpla-studies.

bidding on covered projects, thereby reducing competition and increasing costs.[23]

68.    Defendants' reliance on exceptions to the PLA Rule is further problematic because, as Comments noted, the PLA Rule does not present "meaningful criteria" for agencies to use in determining whether exceptions are appropriate. 88 Fed. Reg. 88712. In response, Defendants cite back to the EO, which provided little guidance on exceptions, and to the rest of the rule, without identifying what parts of the PLA Rule provide guidance to agencies. 88 Fed. Reg. 88712.

69.    In response to Comments that PLAs will cause delays, the preamble to the Rule partially concedes that PLAs could cause delays, noting only that "there is no conclusive evidence to support that specifically requiring a PLA will be the *sole* reason for additional delays or litigation." 88 Fed. Reg. 88172 (emphasis added). To the contrary, there is clear and compelling evidence that PLA mandates result in delay, increased costs, and injured competition.

70.    As cited in ABC's AR Comments, a vivid example of the impact of PLAs on federal projects occurred when the U.S. Department of Labor Job Corps Center in Manchester, New Hampshire, was originally bid with a PLA mandate in 2009, only to be re-bid without the PLA after 3 years of delay due to litigation. Without a PLA, there were more than three times as many bidders (nine versus

---

[23] ABC Comments at 7, 12, 15-16 25.

three) and the low bidder's offer was $6,247,000 (16.47%) less than the original

lowest PLA bidder. In addition, firms who participated in both rounds of bidding

submitted offers that were nearly 10% less than when the same firms submitted

bids with a PLA. Without a PLA, a local firm from New Hampshire won the

contract and performed it without incident to the satisfaction of the DOL.[24]

71.     In response to numerous concerns in the AR about the impact of PLA

mandates on non-union contractors, the Defendants improperly sought to minimize

such concerns by stating that parties can simply negotiate for certain provisions in

PLAs and by stating that PLAs may not necessarily include objectionable

provisions. *E.g.*, 88 Fed. Reg. 88710, 88713-88716. Defendants contended that

"there is no data to suggest...bad-faith bargaining by unions." 88 Fed. Reg. 88712.

This claim ignores the reality of the leverage granted to unions by the PLA

mandate. The bidding contractors are obligated to reach agreement with the unions

short period of time in order to bid and/or receive an award of the contract; while

the unions are under no obligation to reach an agreement, even if acting in good

faith, and need not enter PLAs or accede to any specific demands by employers in

PLAs.

72.     For example, in 2010 when a contractor was awarded a federal

---

[24] *Union's Criticism Misses Mark on U.S. Department of Labor's New Hampshire Job Corps Center Project Labor Agreement Scheme*, The Truth About Project Labor Agreements, https://thetruthaboutplas.com/2013/09/03/unions-criticism-misses-mark-on-u-s-department-of-labors-new-hampshire-job-corps-center-project-labor-agreement-scheme/ (last visited Mar. 10, 2024).

construction contract by the General Services Administration in Washington, D.C., they were asked to negotiate and execute a PLA with labor unions post contract award. When the PLA negotiation came to an impasse because various unions knew the contractor could not start construction until agreeing to the unions' terms and conditions, the start of the project was 107 days delayed and increased costs to the contractor and the GSA by millions of dollars.[25]

### The OMB Memorandum

73.    On December 18, 2023, OMB, through Defendant Young, issued its Memorandum for the Heads of Executive Departments and Agencies M-24-06, which purports to provide guidance to agencies regarding exceptions to the PLA Rule and reporting. *See* Memorandum M-24-06. OMB provided no public notice or opportunity for comment prior to issuing its Memorandum, which has the force and effect of law.

74.    The OMB Memorandum acknowledges that "many PLAs require contractors to use the union's hiring hall for referrals," and appears to acknowledge that PLAs could create "unintended barriers to entry." *Id.* at 4-5. The OMB Memorandum nevertheless falsely asserts that contractors may negotiate certain PLA terms, again ignoring the fact that unions need not agree to any terms that

---

[25] See *Delays and Increased Costs: The Truth about the Failed PLA on the GSA's Headquarters at 1800 F Street*, The Truth About Project Labor Agreements, https://thetruthaboutplas.com/2013/03/05/delays-and-increased-costs-the-truth-about-the-failed-pla-on-the-gsas-1800-f-street-federal-building/ (last visited Mar. 10, 2024).

contractors propose. *Id.*

75.    In apparent violation of the CICA, the OMB Memorandum indicates that "[a] likely reduction in the number of potential offerors is not, by itself, sufficient to except a contract from coverage" and further indicates that generally, "two or more qualified offers is sufficient to provide adequate price competition for negotiated contracts." Memorandum M-24-06, at 6-7.

## COUNT ONE

### The EO, the New PLA Rule, and the OMB Memorandum, Separately and Together, Are Unlawful Because They Exceed The Authority of the Executive Branch Under the Procurement Act

76.    The previous paragraphs 1-75 are incorporated by reference as if set forth fully herein.

77.    The EO, PLA Rule and OMB Memorandum are impermissible *ultra vires* actions by the President, that are being carried out by other executive officers, *i.e.*, the FAR Council and OMB here.

78.    The FPASA, also known as the Procurement Act, is designed "to provide the Federal Government with an economical and efficient system" for procurement activities. *See* 40 U.S.C. § 101; *Georgia v. Biden*, 46 F.4th 1283, 1298 (11th Cir. 2022). The FPASA does not authorize the Executive Branch to engage in social engineering of the sort imposed by the PLA Rule. Rather, "the President's authority should be based on a 'specific reference' within the Act."

*Georgia*, 46 F.4th at 1294 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 304 n.34 (1979)); *see also Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996).

79.   This Circuit has further concluded that "[t]he President must stay within the confines of [FPASA], of course; but his actions must also be consistent with the policies and directives that Congress included in the statute," which "include the rule that agencies must 'obtain full and open competition' through most procurement procedures." *See Georgia,* 46 F.4th at 1294. "[I]mposing more criteria than necessary works against [FPASA's] oft-repeated priority of achieving 'full and open competition' in the procurement process." *See id.* at 1297.

80.   Analysis under the major questions doctrine further reveals that the President, FAR Council, and OMB lacked authority to issue the EO, PLA Rule, and OMB Guidance, as the PLA Rule and EO assert issues of "economic and political significance," and therefore require "clear congressional authorization." *See West Virginia v. EPA*, 142 S. Ct. 2587, 2595 (2022).

81.   As noted above, no president has previously claimed the authority under the FPASA to mandate PLAs on federal construction projects throughout the government. Such an unprecedented arrogation of authority to the Executive Branch violates the Constitution in a manner squarely prohibited by the U.S. Supreme Court in *West Virginia v. EPA*, 142 S. Ct. 2587 (2022); *see also Alabama*

*Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021); *FDA v. Brown & Williamson* (2000); *Georgia*, 46 F.4th at 1295-96 (applying major case doctrine to Presidential actions restricting government contractor rights under the FPASA); *Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022) (same).

82.    Major questions appear in the federal contractor context where, as here, a government action impacts contracts and solicitations "across broad procurement categories" and "is no everyday exercise of federal power." *See Georgia*, 46 F.4th at 1295-96.

83.    In issuing the EO, the President has ignored the boundaries of the authority Congress delegated him in the FPASA; and invalidly seeks and exercises authority Congress explicitly refused to grant the President. Such action exceeds the President's statutory authority and is therefore contrary to law and invalid.

84.    The President's unlawful EO has been enforced by his officers. The FAR Council, a federal agency operating within the Executive Branch, has implemented the President's unlawful EO by issuing the new Rule. Further, OMB has implemented the unlawful EO by issuing the OMB Memorandum. Therefore, the EO may be challenged by Plaintiffs. *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1324 (D.C. Cir. 1996) (permitting a challenge to the constitutionality of an executive order based on the DOL's implementation of a rule enforcing the unconstitutional executive order); *see also Associated Builders and Contractors of*

*Southeast Texas v. Rung*, 2016 U.S. Dist. LEXIS 155232 (E.D. TX 2016) (enjoining Executive Order and FAR Council rule unlawfully imposing labor reporting requirements on federal government contractors).

85.    The FAR Council's rulemaking authority is prescribed within the confines of the OFPP Act and the FPASA, which establish the limited rulemaking power within which the FAR Council must operate.  No delegation of authority to issue the presently challenged new Rules can be presumed by the agency. *Georgia*, 46 F.4th at 1297-1301.

86.    In promulgating the PLA Rule, the FAR Council has ignored the boundaries of the authority Congress delegated it in the OFPP Act; and invalidly seeks and exercises authority Congress explicitly refused to grant Defendants. Such action exceeds the FAR Council's statutory authority and is therefore contrary to law and invalid.

## **COUNT TWO**

### **The EO and PLA Rule Violate the Plain Language of the CICA**

87.    The previous paragraphs 1-75 are incorporated by reference as if set forth fully herein.

88.    As noted above, Congress passed the CICA, 41 U.S.C. § 3301, to require that all federal agencies awarding government contracts "shall ...obtain full and open competition through the use of competitive procedures." Of particular

significance to the proposed rule, CICA expressly bars federal agencies from using restrictive bid specifications to "effectively exclude" contractors from the pool of potential bidders or offerors.[26] As the Act states, agencies must solicit bids and offers "in a manner designed to achieve full and open competition" and "develop specifications in such a manner as is necessary to obtain full and open competition." *Id*.; *see Georgia,* 46 F.4th at 1294, 1297.

89.    Contrary to the CICA, it is clear that the EO, PLA Rule, and OMB Memorandum mandate the government-wide imposition of restrictive bid specifications – requiring that all prospective bidders agree to enter into PLAs as a condition of being awarded and performing the work being bid. This unauthorized restrictive bid specification unquestionably discourages and/or excludes a significant percentage of contractors from the pool of potential bidders or offerors, and defeats CICA's goal of achieving full and open competition.

90.    The OMB Memorandum is further contrary to CICA, as it states "[a] likely reduction in the number of potential offerors is not, by itself, sufficient to except a contract from coverage" and further indicates that generally, "two or more qualified offers is sufficient to provide adequate price competition for negotiated contracts." Memorandum M-24-06, at 6-7.

---

[26] *Competition in Federal Contracting: Legal Overview*, Congressional Research Service, p. 19, Jan 21, 2015.

## COUNT THREE

**The PLA Rule and OMB Guidance are Arbitrary and Capricious in Violation of the APA and/or Independently Violate the OFPP**

91.    The previous paragraphs 1-75 are incorporated by reference as if set forth fully herein.

92.    The APA, 5 U.S.C. § 706(2)(A) and 2(D), directs reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law," and "found to be...without observance of procedure required by law."

93.    The APA's substantive requirements, including its directive that courts must set aside arbitrary and capricious agency actions, apply to FAR Council actions. *See Texas v. Biden*, 328 F. Supp. 3d 662 712-13 (S.D. Tex. 2018); *Associated Builders and Contractors, S.E. Tex. v. Rung*, 2016 U.S. Dist. LEXIS 155232, **37-38 (E.D. Tex. 2016) (examining whether FAR Council action was arbitrary and capricious under the APA). The PLA Rule and OMB Memorandum are not exempt from the APA's procedural requirements. *See Louisiana v. Becerra*, 577 F. Supp. 3d 483, 499 (W.D. La. 2022).

94.    Under the APA, an agency "must...provide good reasons" for changing policy positions, including rescissions of rules. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41–43 (1983); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891,

1913 (2020). An agency's action is arbitrary and capricious where it fails to consider important aspects of the problem and offers explanations for its new rule that run counter to the evidence and where it relies on factors that it should not have considered. *State Farm*, 463 U.S. at 41–43; *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913; *see also FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). The agency must also consider the reliance interests of the regulated parties. *Encino Motorcars v. Navarro*, 579 U.S. 211, 221-22 (2016).

95.   The challenged PLA Rule and OMB Memorandum have failed to give an adequate explanation for imposing a government-wide mandate requiring discriminatory and restrictive bid specifications on federal government contracts in the form of PLAs. More specifically, the PLA Rule and OMB Memorandum fail to meaningfully consider the adverse impact of the PLA Rule and OMB Memorandum on small and large businesses in the construction industry and restricts the number of competitive bidders at a time of a severe labor shortage in the construction industry. The FAR Council's and OMB's explanations for its change in course run counter to the evidence, both as to the benefits likely to be achieved by the unlawful PLA mandate and the damage caused to the procurement process and to the industry as a whole. And the PLA Rule and OMB Guidance rely on factors Congress prohibited the federal government from considering in the award of government contracts, *i.e.*, labor relations and willingness to enter into

collective bargaining agreements as a condition of being awarded work by the federal government.

96.    OMB promulgated the OMB Memorandum without providing notice and opportunity for public comment, in violation of the plain language of the OFPP Act. *See Louisiana v. Biden*, 575 F. Supp. 3d 680, 694 (W.D. La. 2021) (finding OMB violated the APA where it issued binding guidance to the FAR Council without following the notice and comment requirements of the OFPP).

97.    For these reasons as well, the PLA Rule must be held unlawful and set aside.

## COUNT FOUR

### The PLA Rule and EO Violate Plaintiffs' Free Association Rights Under the First Amendment

98.    The previous paragraphs 1-75 are incorporated by reference as if set forth fully herein.

99.    First Amendment protections apply to government contractors. More specifically, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests," such as "his constitutionally protected ... associations". *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *Associated Builders & Contrs. of S.E. Tex. v. Rung*, 2016 U.S. Dist. LEXIS 155232, at *32 (E.D. Tex. Oct. 24, 2016). *White v. Sch. Bd. of Hillsborough County*, 2009 U.S. App. LEXIS 1532, at *7 (11th Cir. Jan. 27, 2009); *Martin v.*

*Wrigley*, 540 F. Supp. 3d 1220, 1229 (N.D. Ga. 2021).

100.   Further, the government may not restrict First Amendment rights "as the price of maintaining eligibility to perform government contracts." *See Associated Builders & Contrs. of S.E. Tex.*, 2016 U.S. Dist. LEXIS 155232, at *32

101.   The Supreme Court has concluded that union association is a type of protected expressive association under the First Amendment. *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2463-66 (2018). "Just as '[t]he First Amendment clearly guarantees the right to join a union...it presupposes a freedom not to associate' with a union." *See Mulhall v. United Here Local 355*, 618 F.3d 1279, 1287 (11th Cir. 2010); Thus, compelled association with a union implicates the First Amendment's freedom not to associate. *See Mulhall*, 618 F.3d at 1287.

102.   "[M]andatory associations are permissible only when they serve a 'compelling state interes[t]...that cannot be achieved through means significantly less restrictive of associational freedoms.'" *See Knox v. SEIU, Local 1000*, 567 U.S. 298, 310 (2012).

103.   The challenged PLA Rule infringes on Plaintiffs' freedom of association by requiring ABC and ABCFFC members to associate with unions as a prerequisite to bidding on and/or performing contracts that the PLA Rule covers. In addition, the PLA Rule requires ABC and ABCFFC members to compel their employees to associate with unions as a condition of award of construction work,

thereby forcing them to aid and abet the infringement of employee rights under the Constitution.

104.   As previously shown, the PLA Rule does not serve the government's claimed interest in increased efficiency or decreased uncertainty and delay. But in any event, the PLA Rule provides only broad generalizations in support of PLAs, while numerous studies and testimonies establish that government-mandated PLAs reduce competition, increase costs and in general defeat the goal of greater economy and efficiency. It is thus not the case that the PLA Rule "serve[s] a 'compelling state interes[t]...that cannot be achieved through means significantly less restrictive of associational freedoms.'" *See Knox*, 567 U.S. at 310.

105.   Indeed, the government's interest here could still be achieved in ways less restrictive of associational freedom. The government has previously encouraged, but not required, PLAs, and there has been no showing by the Administration that the previous policy of encouraging PLAs was insufficient to meet the government's interest.  For these reasons as well, the PLA Rule and EO must be set aside.

## COUNT FIVE

### The EO, PLA Rule, and OMB Memorandum Violate The National Labor Relations Act.

106.   The preceding paragraphs 1-75 are incorporated by reference as if set forth fully herein.

107.    Section 7 of the National Labor Relations Act, 29 U.S.C. 157, states that the federal government shall protect the right of employees to refrain from supporting collective bargaining. Section 8(d) of the Act, 29 U.S.C. 158(d), prohibits the federal government from requiring employers to agree to any CBA with a union. *See H.K. Porter v. NLRB*, 397 U.S. 99, 102-109 (1970) (holding that the NLRB does not have the power to compel employers to agree to any substantive contractual provision of a collective bargaining agreement). *See also* Section 8(f), allowing construction industry employers to enter into "pre-hire" agreements with unions if, but only if, such agreements are strictly voluntary without coercion.

108.    The PLA Rule plainly has the effect of coercing employers seeking to perform work on construction projects above $35M to agree to CBAs with unions covering such projects as a condition of being awarded such work, in violation of the Act.

## COUNT SIX

**The PLA Rule, EO, and the OMB Memorandum Fail to Comply with the RFA, as amended by the SBREFA, as well as the SBA, in violation of the APA**

109.    The preceding paragraphs 1-75 are incorporated by reference as if set forth fully herein.

110.    The RFA requires that agencies issuing rules under the APA must publish a final regulatory flexibility analysis assessing the negative impact of the

rule on small businesses and to consider less burdensome alternatives. This analysis also requires the agency to respond to "any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule." 5 U.S.C. § 604(a)(3). The final regulatory analysis must "demonstrate a 'reasonable, good-faith effort' to fulfill [the Regulatory Flexibility Act's] requirements." *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88-89 (D.C. Cir. 2001); *see also Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997) ("Congress, in enacting section 604, intended to compel administrative agencies to explain the bases for their actions.").

111. Defendants here have failed to conduct an adequate cost-benefit analysis that complied with the RFA, as amended by SBREFA, 5 U.S.C. §§ 601-611, which is a factor showing that the agency unreasonably assessed social costs and benefits to be arbitrary and capricious under the APA.

112. For example, Defendants have grossly underestimated the time it will take parties to negotiate a PLA, the cost of attorney assistance, and the amount of time it will take subcontractors to read and understand PLA requirements. Defendants further failed to meaningfully examine alternative approaches.

113. Under the SBA, "[i]t is the policy of the United States" that small businesses "have the maximum practicable opportunity to participate" in federal contracts and federal agencies must set percentage goals for awarding procurement

contracts to small businesses. 15 U.S.C. § 637(d), 644(g).

114.   The majority of ABC members are small businesses, yet, the PLA Rule, as implemented by the OMB Memorandum, will drastically reduce the participation of small businesses on large-scale federal construction contracts, Specifically, the PLA rule imposes additional burdens on small businesses and disparately impacts small businesses, as most small contractors and subcontractors are not unionized. ABC members identifying as small businesses have indicated that the PLA Rule would deter them from bidding on large-scale federal construction contracts. ABC Comments. *See also* SBA Comments, at 2-3.

115.   The PLA Rule also violates the Regulatory Flexibility Act by failing to properly respond to the comments filed by the Small Business Administration in response to the proposed rule as required under 5 U.S.C. § 604(a)(3).

116.   The Small Business Administration's Office of Advocacy noted the following concerns with the PLA Rule in its Comments: that it would deter small businesses from bidding on contracts that the PLA Rule covers; that it raises compliance costs; that the PLA Rule underestimates the small business impact of the PLA Rule; that it requires small businesses to unionize even though small businesses cannot absorb such costs; that it conflicts with President Biden's goal of increasing the number of small business owners in the federal marketplace; and

that Defendants offered no alternatives to the PLA Rule.[27]

117.   Defendants did not properly respond to SBA's concerns; rather, in response to the concerns, Defendants merely stated (falsely) that there were no reasonable alternatives and that they would plan to work with SBA to help small entities (without further explanation of how they will work with SBA). 88 Fed. Reg. 88725.

118.   Defendants concede that "an average of 15 percent" of "large-scale construction awards...were awarded to an average of 16 unique small entities annually" and estimate that the "number of small entities impacted by the [PLA] [R]ule is 15 percent of the 120-215 entities." 88 Fed. Reg. 88726.

119.   Defendants improperly dismissed numerous alternatives to the PLA Rule advanced in the opposing comments, including ABC's comments, with minimal analysis. 88 Fed. Reg. 88716-88717. And although Defendants claim PLAs can somehow help small businesses, they offer no evidence to support this specific assertion. 88 Fed. Reg. 88725.

120.   Defendants declined to meaningfully address the U.S. Small Business Administration Office of Advocacy's concerns. The SBA Office of Advocacy, which drafted comments in response to the FAR's Final Rule, has reported they

---

[27] U.S. Small Business Administration Office of Advocacy, Comment Letter on Proposed Rule, Use of Project Labor Agreements for Federal Construction Projects, at 3 (Oct. 18, 2022), https://www.regulations.gov/comment/FAR-2022-0003-8301.

have not been contacted by the FAR Council, OMB or DOL concerning this matter.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court:

121.  Enter a preliminary injunction pending a final decision on the merits, enjoining Defendants from further implementing the challenged EO, PLA Rule, and OMB Memorandum;

122.  Enter a declaratory judgment as to each of the Counts set forth above declaring that the challenged EO, PLA Rule, and OMB Memorandum are invalid;

123.  Enter an order vacating the challenged EO, PLA Rule, and OMB Memorandum and permanently enjoining Defendants from implementing them;

124.  Award Plaintiffs their costs and expenses, including reasonable attorneys' fees under the Equal Access to Justice Act or otherwise;

125.  Award such other further and additional relief as is just and proper.

Dated March 28, 2024                    Respectfully submitted,

                                        */s/Kimberly J. Doud*
                                        Kimberly J. Doud
                                        LITTLER MENDELSON, P.C.
                                        111 N Orange Ave.,
                                        Suite 1750
                                        Orlando, FL 32801
                                        407-393-2951
                                        407-641-9263 (Fax)
                                        kdoud@littler.com

                                        Maurice Baskin (*pro hac vice* pending)
                                        LITTLER MENDELSON, P.C.
                                        815 Connecticut Ave., N.W.
                                        Ste. 400
                                        Washington, D.C. 20006
                                        (202) 772-2526
                                        (202) 842-0011 (Fax)
                                        mbaskin@littler.com

                                        ATTORNEYS FOR PLAINTIFFS