**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ASSOCIATED BUILDERS AND
CONTRACTORS FLORIDA FIRST
COAST CHAPTER, AND
ASSOCIATED BUILDERS AND
CONTRACTORS,

     Plaintiffs

v.

WILLIAM F. CLARK, DIRECTOR,
OFFICE OF GOVERNMENT-WIDE
ACQUISITION POLICY, OFFICE OF
ACQUISITION POLICY, OFFICE OF
GOVERNMENT-WIDE POLICY,
GENERAL SERVICES
ADMINISTRATION, *et al.*

     Defendants.

**Case No. 24-cv-318-WWB-MCR**

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**
**AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

Plaintiffs Associated Builders and Contractors Florida First Coast Chapter ("ABCFFC") and Associated Builders and Contractors ("ABC" or "ABC National") (collectively "Plaintiffs"), pursuant to Federal Rule of Civil Procedure 65 and Middle District of Florida Local Rule 6.02,[1] by and through its undersigned attorneys, move for a preliminary injunction against William F. Clark, Christine J. Harada, John M. Tenaglia, Karla S. Jackson, Jeffrey A. Koses, and Shalanda Young (collectively "Defendants").

Specifically, Plaintiffs move to enjoin the implementation and enforcement of Executive Order 14063 (the "EO"), "Use of Project Labor Agreements for Federal Construction Projects," issued by President Joseph Biden on Feb. 4, 2022, 87 Fed.

---

[1] Plaintiffs do not seek security under Rule 65(c) or Local Rule 6.01(a)(4).

1

Reg. 7363 (Feb. 9, 2022); as implemented by the Final Rule having the same title, promulgated by the Federal Acquisition Regulatory ("FAR") Council, 88 Fed. Reg. 88708 (Dec. 22, 2023) (the "PLA Rule"), and by the Office of Management and Budget's ("OMB") Guidance Memorandum M-24-06 ("Memo"). The FAR Council issued the PLA Rule expressly to implement the EO. The PLA Rule took effect January 22, 2024.

The EO, PLA Rule, and OMB Memo (collectively the "PLA Mandate") for the first time (ever) compel federal agencies to mandate union-favoring project labor agreements (PLAs) on all federal construction contracts valued at $35 million or more. Imposition of the PLA Mandate is an *ultra vires* action that exceeds the Executive Branch's authority under and/or directly conflicts with the Federal Property and Administrative Services Act ("FPASA" or the "Procurement Act"), 40 U.S.C. § 121, *et seq.*, the Competition in Contracting Act ("CICA"), 41 U.S.C. § 3301, the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(d), and the First Amendment. The PLA Rule further violates the Office of Federal Procurement Policy ("OFPP") Act, 41 U.S.C § 1301, *et seq.*, Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, Regulatory Flexibility Act ("RFA"), as amended by the Small Business Regulatory Enforcement Act ("SBREFA"), 5 U.S.C. § 601, and the Small Business Act ("SBA"), 15 U.S.C. § 644. For these reasons, and as further explained below, Defendants must be preliminarily enjoined from further implementing the PLA Mandate.

## MEMORANDUM OF LAW

## I.    STATEMENT OF FACTS

### A.    Discriminatory Impact of the Government-Mandated Project Labor Agreements Under the Challenged Rule

As noted above and in Plaintiffs' Complaint (ECF No. 1), the PLA Rule mandates that all federal construction projects valued at more than $35 million must require all contractors and subcontractors bidding for such work to be bound by a PLA as a condition of performing the work. The Rule defines a PLA as "a pre-hire collective bargaining agreement with one or more labor organizations" that outlines specified terms for a construction project. (*See* Ex. 2B, 88 Fed Reg. 88723). Under the guise of increasing "economy and efficiency" and "full and open competition" in federal contracting, as required by the Procurement Act, the CICA, and other federal laws, the PLA Rule plainly has the opposite effect. It stifles competition from the majority of construction contractors (those employing 89% of the industry nationally; 97% of the industry in Florida) whose employees have chosen not to be represented by labor unions, as well as contractors that have signed bargaining agreements with unions disfavored by the PLA Rule, thereby reducing economy and efficiency and irreparably injuring full and open competition. (Ex, 14, Brubeck Aff. ¶ 10; Ex. 1, ABC Comments at 21-24).

Plaintiff ABCFFC is a Florida corporation headquartered in Jacksonville, FL. Its primary mission is to advocate for fair and open competition for construction work, including federal construction projects, on behalf of its 180 member companies. (Ex. 15, Karin Tucker Aff. ¶ 2). ABCFFC shares this mission with ABC National, which

represents more than 23,000 contractors in Florida and nationwide. (Ex. 14, Brubeck Aff. ¶ 1).[2]

The PLA mandate at issue here requires non-union contractors and subcontractors to give up their right not to associate with labor unions who do not represent their employees, as a condition of performing covered contracts. As explained in the numerous attached affidavits submitted by contractors and subcontractors who are members of ABCFFC and/or ABC,[3] the restrictive PLA mandate irreparably harms them in the bidding process by erecting barriers making it more difficult for ABCFFC's and ABC's members to fairly compete for and be awarded government contracts.

As one of many examples, ABCFFC member **Haskell,** which "typically performs work exceeding $50 million in revenue" from federal projects exceeding $35 million, is aware of numerous upcoming federal projects requiring a PLA under the new Rule. (Ex. 4, ¶¶ 1-5). These include the NAVFAC SE MACC program in Jacksonville, the Marine Corp. Support Facility Blount Island Command, FL; and Fort Liberty, NC. Haskell wants to bid on these projects but believes that the PLA Rule has made it irreparably "inefficient and costly" to do so. (*Id.* ¶¶ 6-7). Haskell surveyed its subcontract partners,

---

[2] *See also* ABC First Coast > About > The ABC Story (last visited March 26, 2024); *ABC and the Merit Shop Philosophy*, Associated Builders and Contractors, https://www.abc.org/About-ABC/About-ABC/ABC-Philosophy (last visited Mar. 8, 2024).

[3] **The Haskell Company**, member of ABCFFC and ABC ("Haskell") (Ex. 4, Ferguson Aff.); **Brasfield & Gorrie, LLC**, member of ABCFFC and ABC ("B&G") (Ex. 5, Murray Aff.); **Hensel Phelps Construction Co.**, member of ABCFFC and ABC ("Hensel Phelps") (Ex. 6, Starnes Aff.); **The Cianbro Companies**, ABC member ("Cianbro") (Ex. 7, Bennett Aff.); **American-Electrical Contracting, Inc.**, member of ABCFFC and ABC ("American-Electrical") (Ex. 8, Yencarelli Aff.); **MC Dean, Inc.**, member of ABC ("MC Dean") (Ex. 9, Pattee Aff.); **Interstate Sealant & Concrete, Inc.**, member of ABC ("Interstate Sealant") (Ex. 10, Sment Aff.); **JCM Associates, Inc.**, ABC member ("JCM") (Ex. 12, McReady Aff.); **Environmental Chemical Corp.**, ABC member ("ECC") (Ex. 13, Laurie Aff.).

73% of whom said they would not be interested in bidding on a PLA-covered project. (*Id.* ¶ 7). The "extreme...reduction of subcontractor participation" renders Haskell's "risk of failure...extreme" and would require it to submit bids with increased prices to account for "administrative burdens, lack of subcontractor competition," as federal projects are "firm-fixed price leaving no ability to clarify or revise pricing after award."[4] (*Id.*). Because Haskell's employees have never voted to unionize, forcing Haskell to associate with unions also infringes its constitutional freedom of association.[5] (*Id.* ¶ 8).

**B&G**, another contractor member of both ABCFFC and ABC, has "secured over $2 billion in federal contract awards" and has recently contracted to complete fifteen federal projects with contracts exceeding $35 million. (Ex. 5 ¶¶ 1-4)[6]. B&G planned to bid for numerous upcoming similar projects; but they now require PLAs, including the Brownsville Texas Land Port of Entry (GSA), the NAVFAC Southeast multiple award project (Navy); the Auburn University USDA ARS Lab, and the Anniston Army Depot. But B&G "will not be able to confidently submit bids/proposals and will be forced to include significant contingency sums to account for uncertainties that union contractors and subcontractors do not face." (Ex. 5 ¶ 10). B&G further observes unions hold significant leverage in PLA negotiations, which further "must be reflected by a contingency in our bid/proposal pricing"; indeed, under the PLA Rule unions need not execute PLAs at all nor "treat all contractors the same." (*Id.*).

---

[4] (*See also* Ex. 5 ¶ 9); (Ex. 6 ¶ 16.
[5] (*See also* Ex. 6 ¶ 10); (Ex. 8 ¶ 9); (Ex. 9 ¶ 8).
[6] The General Services Administration recently named B&G as its first "biennial Construction Award" winner. *GSA celebrates first biennial Construction Award winner*, https://www.gsa.gov/about-us/newsroom/news-releases/gsa-celebrates-first-biennial-construction-award-w-02282024 (last visited, Mar. 8, 2024).

Similarly, **Hensel Phelps**, which typically performs contracts on four government contracts exceeding $35 million each year in the SE Region, is aware of upcoming projects on which it would bid absent a PLA mandate. (Ex. 6 ¶¶ 1-6). These include the Jacksonville NAVFAC MACC, the USDA Lab Annex at Auburn University, and projects at Patrick Space Force Base. (*Id.* ¶¶ 5-6). But Hensel Phelps believes bidding would be futile because it "would not be able to meaningfully estimate how the PLA would impact our cost calculations." [7] (*Id.* ¶ 8-9). Because Hensel Phelps' Southeast Region typically spends approximately 700 hours on each bid, it "does not have the capacity to submit bids when doing so would be futile."[8] (*Id.* ¶ 7).

**Cianbro**, an ABC member with a subsidiary, R.C. Stevens, that belongs to ABCFFC, further shares concerns about the PLA Rule. (Ex. 7). Cianbro has bid on and been awarded five federal projects since 2020 that exceeded $35 million but believes a PLA mandate will disqualify it from securing work on future similar projects. (*Id.* ¶¶ 2-5). Another ABC member, **ECC**, attests to similar irreparable harm on upcoming government projects exceeding $35 million, including Fort Liberty, NC, Cherry Point, NC (two projects), Key West, FL, Camp Eisenhower, GA, Eareckson AFB, AK (Ex. 13). ECC has been informed by the agencies that there will be no exemptions on these projects, even though no area unions have offered any PLA terms needed to comply, and the contractor lacks sufficient subcontractors willing to work under a PLA. (*Id.*)

---

[7] (*See also* American-Electrical Ex. 8 ¶¶ 7-8); (MC Dean Ex. 9 ¶¶ 6-7).
[8] (*See also* B&G Ex. 5 ¶ 8) (B&G "typically spends one to two years planning for specific pursuits and then four to six months and hundreds of man-hours on each bid or proposal we submit.").

Additionally, numerous subcontractors and small business members of both association plaintiffs are being harmed by the PLA Rule. As a non-exclusive example, **American-Electrical**, an ABCFFC and ABC member, has performed electrical work on federal projects exceeding $35 million in value as a subcontractor. (Ex. 8 ¶ 2). American-Electrical attests merit shop contractors would ask it to participate on an upcoming $35 million-plus project in Jacksonville, FL, were it not for the PLA mandate; and further attests that as a subcontractor, it would not have the opportunity to negotiate PLA terms. (*Id.* ¶¶ 4, 6,14). **MC Dean**, a national electrical subcontractor, attests the general contractors with which it normally works will not bid for PLA-covered projects and union contractors will not consider it as a subcontract partner. (Ex. 9 ¶¶ 1-5). **JCM Associates**, an ABC member, has executed a CBA with a union unaffiliated with the North American Building Trades Union ("NABTU") and is concerned it cannot serve as a subcontractor on identified projects requiring PLAs because the general contractors it knows have entered PLAs with NABTU-affiliated unions. (Ex. 12 ¶¶ 2-3). Similarly, **Interstate Sealant**, an ABC member and 2010 Small Business Person of the Year for Wisconsin, attests to the adverse impact of the PLA Rule on her small business, noting harms similar to other ABC and ABCFFC members, exacerbated by the PLA Rule's failure to address small business concerns under the RFA and APA. (Ex. 10 ¶ 10).

Although the PLA Rule purports to recognize limited exemptions from the federal PLA mandate, ABC and ABCFFC members in Jacksonville and around the country have attested that federal agencies are repeatedly imposing the PLA mandate on

solicitations issued since the PLA Rule went into effect, without any exemptions.[9] (*E.g.*, Haskell Ex. 4 ¶ 6; Hensel Phelps Ex. 6 ¶ 5; American-Electrical Ex. 8 ¶ 5; MC Dean Ex. 9 ¶ 3); (*see also* Ex. 14, Brubeck Aff. ¶¶ 7, 12-14).

As Plaintiffs' attached affidavits further attest, PLAs typically require contractors and subcontractors to agree to restrictive union hiring hall requirements, inefficient work rules, and seniority-based wage scales without regard to merit of experience, productivity, or safety performance; and require costly payments into union fringe benefit plans without regard to whether such benefits will vest with non-union workers whose coverage under the PLA is limited to the scope of the project. (Ex. 14, Brubeck Aff. ¶ 3; Ex, 1, ABC Comments at 7-8, 10-11).

ABC conducted a survey of its contractor members about government-mandated PLAs and the proposed version of the PLA Rule: 99% of respondents said they would be less likely to begin or continue bidding on federal contracts if the proposed rule is finalized and 97% said that government-mandated PLAs decrease economy and efficiency in government contracting. (Ex. 14, Brubeck Aff. ¶ 11; Ex. 1, ABC Comments at 15). 97% of respondents "who self-identified as small businesses said they would be less likely to bid on contracts if the rule is finalized" and "73% of small businesses stated PLAs decrease hiring of minority, women, veteran and disadvantaged business enterprises." (Ex. 1, at 37).

---

[9] Contracting officers have further "refused to either produce, share and/or acknowledge the market research they are supposed to examine." (B&G Ex. 5 ¶ 11). The EO and FAR Rule announced creation of a website where exemptions would be posted. But no exemptions have been posted there as of this filing. *See* Project Labor Agreements (PLA) | Acquisition Gateway (Ex. 14, Brubeck Aff. ¶¶ 12-14).

**B.**     **Federal Government PLA Policies Prior to the PLA Rule**

Prior to the PLA Rule, no President claimed authority to require federal construction contractors to sign PLAs with unions as a condition of performing work on federal contracts. Rather, Congress enacted laws, beginning with the FPASA, requiring federal agencies to consider competitive proposals from private contractors and to "award a contract with reasonable promptness to the responsible source whose proposal is most advantageous to the Federal Government, considering only cost or price and the other factors included in the solicitation." 41 U.S.C. § 3703.[10]

In 1984, Congress passed the CICA, 41 U.S.C. § 3301, requiring all federal agencies awarding contracts for services—including construction contracts—"shall obtain full and open competition through the use of competitive procedures." The law's purpose was and remains to *increase* competitors for government contracts and savings through more competitive pricing.[11] Since enactment of the CICA in 1984, no President has attempted to impose an across-the-board mandate of PLAs on federal contracts, until now. (*See* ABC Comments Ex. 1, at 35).

Under the previous Executive Order 13502 "encouraging" - but not mandating - PLAs on federal projects above $25 million between fiscal years 2009 and 2024, just 12 federal contracts valued at $1.26 billion contained a PLA out of 3,222 contracts of $25 million or more valued at a total of $238 billion. This means federal procurement officials saw no benefit or need to impose PLAs in order to increase economy or efficiency on

---

[10] The specific rules governing the federal government's acquisition processes are set forth in the Federal Acquisition Regulations System ("FARS").  48 C.F.R. § 1, *et seq.*

[11] For a full discussion of CICA's requirements, *see* Kate M. Manuel, *Competition in Federal Contracting: An Overview of the Legal Requirements*, CONGRESSIONAL RESEARCH SERVICE (April 2009).

more than 99% of federal construction contracts of $25 million or more. (*See* Ex. 14, Brubeck Aff. ¶ 15; Ex. 1, at 18). During this same period ABC members won and successfully performed 54% of the $205.56 billion in total value of direct prime construction contracts exceeding $35 million awarded by federal agencies during fiscal years 2009-2023. (*Id.* ¶ 15).

### C.    President Biden's Executive Order 14063

President Biden issued the challenged EO on February 4, 2022, which states federal agencies "shall" require contractors and subcontractors to negotiate or become parties to PLAs for federal construction contracts valued at $35 million or more. (Ex 2A, EO 14063, §§ 2-4). The PLAs must prohibit strikes, lockouts, and other comparable job disruptions; include labor dispute resolution procedures; provide for labor-management cooperation on relevant issues; and otherwise comply with applicable law. (Ex. 2A § 4). Only "senior agency procurement officials" may grant exceptions to the requirement after finding a PLA would not advance the government's interest in economy and efficiency; would "substantially reduce" bidders "as to frustrate full and open competition"; or would otherwise be inconsistent with applicable law. *(*Ex. 2A § 5).

### D.    The New PLA Rule

On December 22, 2023, following notice and public comment (including by ABC), the FAR Council published the final PLA Rule. (Ex. 2B*,* 88 Fed. Reg. 88708). The PLA Rule requires contractors and subcontractors to enter PLAs as a condition of being awarded work on federal construction projects valued at more than $35 million, absent extremely narrow exceptions. (*See id.* at 88709).

10

### E.    The OMB Memo

On December 18, 2023, OMB issued - without notice and comment - the OMB Memo, purporting to provide guidance to agencies regarding exceptions to the PLA Rule, with the force and effect of law. (*See* Ex. 3, Memorandum M-24-06). The OMB Memo acknowledges "many PLAs require contractors to use the union's hiring hall for referrals," and appears to acknowledge PLAs could create "unintended barriers to entry." (Ex. 3 at 4-5). The OMB Memo indicates "[a] likely reduction in the number of potential offerors is not, by itself, sufficient to except a contract from coverage" and shockingly states: "two or more qualified offers is sufficient to provide adequate price competition for negotiated contracts." (Ex. 3, at 6-7).

## II.    ARGUMENT

### A.    Legal Standard

To obtain a preliminary injunction, a movant must demonstrate: (1) substantial likelihood of success on the merits; (2) substantial threat of irreparable injury; (3) the threatened injury outweighs any damage the injunctive order might cause the non-moving party; and (4) the order will not be adverse to the public interest. *Georgia v. Biden*, 46 F.4th 1283, 1291 (11th Cir. 2022); *Sierra Club v. Norton*, 207 F. Supp. 2d 1310, 1317 (S.D. Ala. 2002).

### B.    Plaintiffs Have Standing, the Case is Ripe, and Venue is Proper

As set forth in attached affidavits, Plaintiffs are a Jacksonville, Florida trade association and a national trade association, both of whose members regularly bid on and are awarded government contracts exceeding the threshold amounts covered by the PLA Mandate. As trade associations representing federal contractors in this District

and nationwide, ABCFFC and ABC National have standing to bring this action on behalf of their members under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977),[12] because (1) Plaintiffs' members would otherwise have standing to sue in their own right; (2) the interests at stake are germane to Plaintiffs' organizational purposes; and (3) neither the claims nor relief require the participation of Plaintiffs' individual members.

More specifically, as set forth above, ABCFFC and ABC have identified in their complaint and have attached affidavits to this motion from numerous members who are being irreparably harmed by the PLA Mandate and have standing to sue in their own right. These are by no means the exclusive list of irreparably harmed members but are identified solely in order to establish the standing of the plaintiff associations of which they are members. *See Summers v. Earth Island Inst.*, 555 U.S. 488 (2009).

In sum, Plaintiffs' members - contractors and subcontractors - have standing to challenge the PLA Mandate, as the PLA mandate makes it much more difficult for ABC and ABCFFC members to compete on equal footing. *See Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (group members have standing to challenge barriers erected by the government making it more difficult for them to compete for government contracts). And although the PLA

---

[12] *See also America's Health Ins. Plans v. Hudges*, 742 F.3d 1319, 1326 n.5, 1327-28 (11th Cir. 2014) (trade association had standing to challenge law on behalf of its members); *ABC of SE. Texas v. Rung*, No. 1:16-CV-425, 2016 WL 8188655, at *6 (E.D. Tex. Oct. 24, 2016) (ABC had standing to challenge certain Federal Acquisition Regulations and guidance threatening injury to the association's government contractor members); *see also Am. Sec. Ass'n v. U.S. Dept. of Labor*, 2023 U.S. Dist. LEXIS 24076 (M.D. Fl. Feb. 13, 2023) ("little question" of standing where association members are the "objects of the [challenged] regulation").

Rule purports to recognize certain exemptions, ABC's members attest that federal agencies are so restricted by the text of the EO, the Rule and the OMB Memo, that as a practical matter the exemptions have proved to be a dead letter. On multiple identified projects, PLA mandates have been imposed without any justification based on need or availability of unionized construction. (*E.g.*, Ex. 14, Brubeck Aff. ¶¶ 12-14; Ex. 4 ¶ 6; Ex. 6 ¶ 5; Ex. 8 ¶ 5; Ex. 9 ¶ 3).

Plaintiffs also meet the second and third requirements for associational standing, as the present action is clearly germane to each association's organizational purposes of advocating for fair and open competition for construction work, including federal construction contracts (Ex. 14, Brubeck Aff. ¶ 8; Ex. 15, Tucker Aff. ¶ 3, 6; Ex. 1, at 1-2); and Plaintiffs' individual members need not participate as the Complaint seeks only injunctive relief based on the administrative record.[13]

Plaintiffs further have organizational standing on their own behalf because the PLA Mandate is directly and currently harming their organizational interests by requiring ABC and ABCFFC to divert their attention away from other activities, such as management training, workforce development, and jobsite safety. (Ex. 14, Brubeck Aff. ¶ 5; Ex. 15, Tucker Aff. ¶ 9). *See Plaintiffs v. Kemp,* 2023 U.S. Dist. LEXIS 144918, at *55-56 (N.D. Ga. Aug. 18, 2023) (organization injured by diverting resources).

---

[13] *Schalamar Creek Mobile Homeowners' Ass'n v. Adler*, 855 Fed. App'x 546, 553 (11th Cir. May 7, 2021) ("[G]ermaneness requirement is 'undemanding' and requires 'mere pertinence' between the litigation at issue and the organization's purpose."); *Fla. Auto. Dealers Ass'n, Inc. v. Ford Motor Co.*, 2024 U.S. Dist. LEXIS 50834, at *8 (N.D. Fla. Jan. 25, 2024) ("[T]he Eleventh Circuit has held that the third prong...was satisfied where an organization's members sought prospective injunctive relief.").

The dispute is ripe for review as it raises pure questions of law and Plaintiffs are suffering hardship that will continue absent judicial relief.[14] *See Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1380 (11th Cir. 2019). Finally, venue is proper under 28 U.S.C. § 1391(e) because Plaintiff ABCFFC maintains its principal place of business in this District and, alternatively, because facts and circumstances relating to the enforcement of the challenged PLA mandate are taking place in this District.[15] Accordingly, Plaintiffs have standing to sue, the case is ripe, and venue is proper.

**C.    Plaintiffs Meet the Standard for Preliminary Injunction**

      1.    **The Likelihood That Plaintiffs Ultimately Will Prevail on the Merits of Their Claims**

Considering the likelihood of success on the merits, "the most important preliminary-injunction criterion," "requires the court to consider the merits of plaintiffs' claim under the appropriate legal standard for review of that decision." *See Georgia*, 46 F.4th at 1301; *Sierra Club*, 207 F. Supp. 2d at 1318.  As set forth below, it is likely Plaintiffs will succeed on their claims.

      a.    *The EO, PLA Rule, and OMB Memo Exceed the Authority of the Executive Branch Under the FPASA*

The EO, PLA Rule and OMB Memo are impermissible *ultra vires* actions by the President, that are being carried out by other executive officers, *i.e.*, the FAR Council and OMB. The FPASA is designed "to provide the Federal Government with an

---

[14] A claim may be ripe even where a future contingent event could cause the plaintiff to suffer no injury. *See Mulhall v. United Here Local 355*, 618 F.3d 1279, 1291 (11th Cir. 2010).

[15] Plaintiffs have identified numerous ABCFFC members who would have standing to sue in their own right. (*E.g.*, Exs. 4-6, 8). Those members have further identified federal projects in the Jacksonville area where the PLA mandate is being imposed despite reported union market share of less than 6%. *See* www.unionstats.com.

economical and efficient system" for procurement activities. *See* 40 U.S.C. § 101; *Georgia v. Biden*, 46 F.4th 1283, 1298 (11th Cir. 2022). "[T]he President's authority should be based on a 'specific reference' [in] the [FPASA]." *Georgia*, 46 F.4th at 1294, 1297-98, 1301 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 304 n.34 (1979)) (Plaintiffs likely to succeed on the merits of claim President exceeded authority under the FPASA where "no statutory provision" contemplated mandate).[16] Here, like in *Georgia*, Defendants have pointed to no "specific reference" in FPASA allowing Defendants' actions; instead, Defendants cite various general provisions regarding procurement. This Circuit has expressly held "[a]n executive order cannot rest merely on the 'policy objectives of [a statute].'" *Georgia*, 46 F.4th at 1298.

Analysis under the major questions doctrine further reveals the President, FAR Council, and OMB lacked authority to issue the EO, PLA Rule, and OMB Memo, as the PLA Rule and EO assert issues of "economic and political significance," and therefore require "clear congressional authorization." *See West Virginia v. EPA*, 142 S. Ct. 2587, 2595 (2022).[17] Major questions appear where, as here, government action impacts contracts and solicitations "across broad procurement categories" in an unprecedented way. *See Georgia*, 46 F.4th at 1295-96.

---

[16] *See also Florida v. Nelson*, 576 F. Supp. 3d 1017, 1038 (M.D. Fla. 2021) (Plaintiff "demonstrate[d] a substantial likelihood that [executive order] exceed[ed] the President's authority under FPASA" because "FPASA confers no 'blank check for the President to fill in at his will' and requires power to 'be exercised consistently with the structure and purposes' of FPASA.").

[17] *See also Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021); *FDA v. Brown & Williamson* (2000); *Georgia*, 46 F.4th at 1295-96 (applying major case doctrine to Presidential actions restricting government contractor rights under the FPASA); *Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022) (same).

Thus, in issuing the EO, the President has ignored the boundaries of the FPASA and invalidly seeks and exercises authority Congress explicitly refused to grant him. The President's EO has been enforced by his officers: the FAR Council[18] and OMB. *E.g.*, 88 Fed. Reg. 88708; (Ex. 3). Therefore, Plaintiffs may challenge the EO.  *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1324 (D.C. Cir. 1996) (permitting challenge to executive order based on executive agency's implementation of a rule enforcing the executive order); *see also ABC SE Tex.*, 2016 WL 8188655, at *15 (enjoining Executive Order and FAR Council rule unlawfully imposing labor reporting requirements on federal government contractors). Accordingly, Plaintiffs are likely to succeed in showing the PLA Mandate exceeds the Executive Branch's authority under the FPASA.

> b.    *The EO and PLA Rule Violate the CICA*

Congress passed the CICA, 41 U.S.C. § 3301, to require federal agencies awarding contracts to "obtain full and open competition through ... competitive procedures." CICA bars federal agencies from using restrictive bid specifications to "effectively exclude" potential bidders or offerors.[19] "[I]mposing more criteria than necessary works against the... oft-repeated priority of achieving 'full and open competition' in the procurement process." *Georgia,* 46 F.4th at 1297.

Contrary to a claim by Defendants that non-union contractors "may compete for contracts" under the PLA Rule, (Ex. 2B, 88 Fed. Reg. 88709), non-union contractors

---

[18] The FAR Council's rulemaking authority is prescribed within the confines of the OFPP Act and the FPASA, which establish the limited rulemaking power within which the FAR Council must operate.  No delegation of authority to issue the presently challenged Rule can be presumed by the agency. *Georgia*, 46 F.4th at 1297-1301.

[19] *Competition in Federal Contracting: Legal Overview*, Congressional Research Service, p. 19, Jan 21, 2015.

cannot do so *unless* they give up their non-union status and accept various other costly burdens. (*E.g.*, Exs. 4-10). The Rule's preamble concedes "union contractors...are more likely to work on PLA-covered projects." (Ex. 2B, 88 Fed. Reg. 88713). And the OMB Memo acknowledges "many PLAs require contractors to use the union's hiring hall for referrals" and appears to acknowledge PLAs could create "unintended barriers to entry." (*See* Ex. 3 at 4-5).

The existence of potential exemptions to the PLA Mandate compels no different result. Numerous federal projects are proceeding without any exemption, even in areas (such as Jacksonville) where few (if any) union contractors are available to perform the work. (*E.g.*, Ex. 4 ¶ 6; Ex. 6 ¶ 5; Ex. 8 ¶ 5; Ex. 9 ¶ 3). Further, the OMB Memo undermines the exemption process by stating: "[a] likely reduction in the number of potential offerors is not, by itself, sufficient to except a contract from coverage" and "two [or three] qualified offers is sufficient to provide adequate price competition…." (Ex. 3, at 6-7). In other words, exemptions will not apply *even where agencies have not achieved "full and open competition" consistent with the CICA. See* 41 U.S.C. § 3301. This case is very much like *Georgia*, where the Eleventh Circuit found the President exceeded his authority after his executive order "impos[ed] more criteria than necessary" on contractors, contrary to the CICA. *See Georgia*, 46 F.4th at 1294.

        c.     *The PLA Rule and OMB Memo Violate the APA and OFPP*

The APA, 5 U.S.C. § 706(2)(A), (D) directs reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found. . .  arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law," and "found to

be...without observance of procedure required by law."[20] An agency "must...provide good reasons" for changing positions. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41–43 (1983); *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). An agency's action is arbitrary and capricious where it fails to consider important aspects of the problem, offers explanations counter to evidence, and relies on factors it should not have considered. *State Farm*, 463 U.S. at 41-43; *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913; *see also FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). The agency must also consider costs and reliance interests for regulated parties *Encino Motorcars v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016); *Brackeen v. Haaland*, 994 F.3d 249 (5th Cir. 2021) (*en banc*).

Defendants have failed to give an adequate explanation (other than political favoritism) for imposing a PLA mandate. Defendants have offered explanations for the PLA mandate that run counter to the evidence, claiming without support that a PLA mandate will "promote economy and efficiency in federal procurement." (Ex. 2B, 88 Fed. Reg. 88711). To the contrary, PLAs discourage bidding from the employers of 89% of the construction industry, and thereby *reduce* economy and efficiency, facts which the PLA Rule ignored. (Ex. 1, at 21-24). In response to Comments that Defendants did not provide data on costs and benefits of the PLA rule, Defendants conceded that they relied on the President's "judgment." (Ex. 2B, 88 Fed. Reg. 88711).

---

[20] The APA's substantive requirements, including its directive courts must set aside arbitrary and capricious agency actions, apply to FAR Council actions. *See Texas v. Biden*, 328 F. Supp. 3d 662 712-13 (S.D. Tex. 2018); *ABC SE Tex.*, 2016 WL 8188655, *12 (examining whether FAR Council action was arbitrary and capricious under the APA). The PLA Rule and OMB Memo are not exempt from the APA's procedural requirements. *See Louisiana v. Becerra*, 577 F. Supp. 3d 483, 499 (W.D. La. 2022).

The results of the federal government's pro-PLA policy from fiscal year 2009 to fiscal year 2023, encouraging—but not requiring—federal agencies to mandate PLAs, conclusively shows no factual basis for the PLA Rule. Between fiscal years 2009 and 2024, just 12 federal contracts valued at $1.26 billion contained a PLA mandated by a federal agency out of 3,222 contracts of $25 million or more valued at a total of $238 billion. This means procurement officials saw no need to impose PLAs to increase economy or efficiency on more than 99% of federal construction contracts of $25 million or more. (*See* Ex. 14, Brubeck Aff. ¶ 15; Ex. 1, at 18). During this same period ABC members won and successfully performed 54% of the $205.56 billion in total value of direct prime construction contracts exceeding $35 million awarded by federal agencies during fiscal years 2009-2023. (Ex. 14 ¶ 15).

Defendants also failed to meaningfully consider important aspects of the problems with a PLA mandate, ignoring overwhelming academic and real-world evidence provided by ABC and others that a government-mandated PLA inherently discourages non-union contractors from bidding on covered projects, reducing competition and increasing costs. (Ex. 1 at 7, 12, 15-16 25). Indeed, Defendants cite only one (refuted) study to support an assertion that PLAs do not reduce competition. (Ex. 2B, 88 Fed. Reg. 88709). Defendants further failed to meaningfully engage with concerns about delays and costs from PLAs (*see* Ex. 1, at 21-22), noting only "there is no conclusive evidence to support that specifically requiring a PLA will be the *sole* reason for additional delays or litigation." (Ex. 2B, 88 Fed. Reg. 88172) (emphasis added).

19

Defendants also did not meaningfully consider the impact of the PLA Rule on non-union contractors. In response to numerous concerns expressed in the administrative record, Defendants stated parties can simply negotiate for less objectionable provisions. (*E.g.*, Ex. 2B, 88 Fed. Reg. 88710, 88713-88716; Ex. 3, at 4-5). Defendants further contended "there is no data to suggest...bad-faith bargaining by unions." (Ex. 2B, 88 Fed. Reg. 88712). But Defendants miss the point. The PLA mandate grants unwarranted leverage to unions: bidding contractors must reach agreement in short periods to bid or receive awards; while the unions, even if acting in good faith, have no corresponding incentive to reach agreement on any but their own terms.

Defendants rely heavily on their supposed exemptions to the PLA Mandate, but the exemptions do not salvage the Rule because they are improperly narrow on their face, posing numerous arbitrary obstructions, and the PLA Mandate does not present any meaningful criteria for agencies to use in determining whether an exemption is appropriate. (Ex. 2A and B, 88 Fed. Reg. 88712); *see also East Bay Sanctuary Covenant v. Biden*, 2023 U.S. Dist. LEXIS 128360, at *38, 42-43 (N.D. Cal. July 25, 2023) (rule arbitrary and capricious where plaintiffs argued government was relying on rule's exceptions to justify it). Further, since the PLA Rule went into effect, the exemptions have proved to be a dead letter, as agencies have declined to conduct meaningful market research, or have ignored contractor information demonstrating that PLAs impose needless and unlawful injuries to competition, and/or relied on the unlawful OMB Memo to reject all exemption requests to date. (*E.g.*, Ex. 4 ¶ 6; Ex. 6 ¶ 5; Ex. 8 ¶ 5; Ex. 9 ¶ 3); *see also East Bay, 2023 U.S. Dist. LEXIS 128360*, at *55-56 (rule

arbitrary and capricious where "record suggests [the] exceptions will not be meaningfully available to many [parties'] subject to the Rule").

Finally, OMB promulgated the OMB Memo without providing notice and opportunity for public comment, in violation of the plain language of the OFPP Act. *See Louisiana v. Biden*, 575 F. Supp. 3d 680, 694 (W.D. La. 2021) (OMB violated the APA when it issued binding guidance without following OFPP notice and comment requirements). Accordingly, Plaintiffs will likely succeed in showing the EO, PLA Rule, and OMB Memo – separately and together - violate the APA and OFPP.

   d.  *The PLA Rule, EO, and OMB Memo Violate Plaintiffs' First Amendment Free Association Rights*

First Amendment protections apply to government contractors. The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests" such as "his constitutionally protected ... associations," and the government may not restrict First Amendment rights as "the price of maintaining eligibility to perform government contracts." *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *ABC*, 2016 WL 8188655, at *8; *White v. Sch. Bd. of Hillsborough County*, 2009 U.S. App. LEXIS 1532, at *7 (11th Cir. Jan. 27, 2009); *Martin v. Wrigley*, 540 F. Supp. 3d 1220, 1229 (N.D. Ga. 2021).

Union association is a type of protected expressive association under the First Amendment. *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2463-66 (2018). "Just as '[t]he First Amendment clearly guarantees the right to join a union...it presupposes a freedom not to associate' with a union." *See Mulhall*, 618 F.3d at 1287. "[M]andatory associations are permissible only when they serve a 'compelling state interes[t]...that

cannot be achieved through means significantly less restrictive of associational freedoms.'" *See Knox v. SEIU, Local 1000*, 567 U.S. 298, 310 (2012).

Here, the challenged PLA mandate infringes on Plaintiffs' freedom of association by requiring Plaintiffs' members to associate with unions in order to bid on and/or perform contracts that the PLA Rule covers. (*See also* Ex. 4 ¶ 8, Ex. 6 ¶ 10, Ex. 7 ¶¶ 6-7, Ex. 8 ¶ 9, Ex. 9 ¶ 8).[21]  But the PLA Rule does not serve the government's claimed interest in increased efficiency. Further, the government has previously encouraged (not required) PLAs, and Defendants have not shown the previous approach was insufficient to meet any compelling government interest "that cannot be achieved through means significantly less restrictive of associational freedoms.'" *See Knox*, 567 U.S. at 310.

> e.    *The PLA Rule, EO, and OMB Memo Violate Section 8(d) of the NLRA.*

Consistent with CICA, Congress has long prohibited the federal government from requiring employers to enter into any labor agreement or specific term thereof in Section 8(d) of the NLRA. *See H.K. Porter v. NLRB*, 397 U.S. 99, 102-109 (1970) (holding that the federal government's National Labor Relations Board ("NLRB") does not have the power to compel employers to agree to any substantive contractual provision of a collective bargaining agreement). That is exactly what the PLA Rule unlawfully does as a condition of awarding federal contracts, thereby violating the NLRA.[22]

---

[21] In addition, the PLA Rule requires Plaintiffs' members to compel their employees to associate with unions as a condition of award of construction work, forcing them to aid and abet the infringement of employee rights under the Constitution.

[22] The Supreme Court expressly excluded Section 8(d) from its ruling in the *"Boston Harbor"* case that the NLRA does not preempt state PLA requirements. *Bldg. & Const. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./RI* 507

      *f.    The PLA Rule, EO, and the OMB Memo Fail to Comply with the RFA and SBA, in Violation of the APA*

Under the SBA, "[i]t is the policy of the United States" that small businesses "have the maximum practicable opportunity to participate" in federal contracts and federal agencies must set percentage goals for awarding contracts to small businesses. 15 U.S.C. § 637(d), 644(g). Here, most ABC members are small businesses (Ex. 1, at 36), and a PLA mandate will drastically reduce the participation of small businesses, most of which are not unionized (Ex. 11, SBA Comments, at 2-3).

Relatedly, the RFA, as amended by SBREFA, 5 U.S.C. §§ 601-611, requires agencies issuing rules under the APA publish a final regulatory flexibility analysis ("FRFA") assessing the negative impact of a rule on small businesses, considering less burdensome alternatives, and responding to "any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule." 5 U.S.C. § 604(a). *See Southern Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1436-37 (M.D. Fla. 1998), and 55 F. Supp. 2d 1336 (M.D. Fla. 1999) (enjoining portion of regulations that did not comply with RFA).

The SBA Office of Advocacy noted multiple concerns with the PLA Rule, which the PLA Rule failed to address. (Ex. 11, at 3). Defendants also improperly dismissed numerous alternatives to the PLA Rule advanced in comments, including ABC's comments, with minimal analysis. 88 Fed. Reg. 88716-88717; *see also Southern Offshore*, 55 F. Supp. 2d at 1340 (RFA analysis of a few pages inadequate).

    2.   **The Irreparable Nature of the Threatened Injury**

---

U.S. 218, n.2 (1993). That case has no application to the present challenge to the federal PLA Rule, which is independently barred by Section 8(d).

"This Circuit has recognized that unrecoverable monetary loss," including costs associated with complying with a government requirement, "is an irreparable harm." *See Georgia*, 46 F.4th at 1301-02. Further, this Court has acknowledged lost contract opportunities as an irreparable harm. *See Florida*, 576 F. Supp. 3d at 1039. Here, Plaintiffs have explained the PLA mandate will expose its members to various costs. For example, if Plaintiffs' members bid for PLA-covered projects, they will suffer costs from complying with the PLA mandate. (*E.g.*, Ex. 5 ¶ 16, Ex. 9 ¶¶ 11-13, Ex. 10 ¶ 10); *see also Georgia*, 46 F.4th at 1302 (irreparable harm present where employers would lose employees and would need to devote "time and effort" to comply with mandate). Similarly, Plaintiffs' members will lose contract opportunities because the PLA mandate will either deter them from bidding and/or prevent them from equally competing with other bidders. (*E.g.*, Exs. 4-10); *see also Florida*, 576 F. Supp. 3d at 1039. Accordingly, Plaintiffs will suffer irreparable harm absent injunctive relief.

### 3.    The Harm that Will Result Absent Injunction

When a plaintiff shows a likelihood of success on the merits and irreparable harm absent injunctive relief, the balancing of potential harms favors the plaintiff when "[a]n injunction poses little injury" to a defendant. *See Florida*, 576 F. Supp. 3d at 1040. Here, as discussed above, Plaintiffs have shown a likelihood of success on the merits and that they will suffer irreparable harm absent injunctive relief. Any injury Defendants suffer does not tip the balance to them. Even the government's interest in combating COVID-19 (a much greater harm than a non-union workforce) did not justify unlawful agency action. *See Georgia*, 46 F.4th at 1303. And if the Court grants injunctive relief, Defendants "retain the right to recommend [PLAs] among contractors and to seek

contractual remedy for delay or failure to perform a contract." *See Florida*, 576 F. Supp. 3d at 1040. Accordingly, the balance of potential harms weighs toward injunctive relief.

### 4.    The Nature and Extent of Any Public Interest Affected

The public interest favors "maintaining the integrity of the procurement process and ensuring fair and open competition," *see Mark Dunning Indus. v. Perry*, 890 F. Supp. 1504, 1518 (S.D. Ala. 1995), and supports protecting parties from "likely-unlawful government action." *See Florida*, 576 F. Supp. 3d at 1040; *see also Georgia*, 46 F.4th at 1303. As discussed above, Defendants' actions here are unlawful and inconsistent with open competition; accordingly, an injunction serves the public's interest.

### D.    <u>Nationwide Injunctive Relief is Appropriate</u>

Plaintiffs pray the Defendants be preliminary enjoined from implementing and enforcing the PLA Mandate in all jurisdictions where Plaintiffs' members and the U.S. government do business, *i.e.*, nationwide. *See Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015); (authorizing nationwide injunctions against unlawful federal regulations and/or executive orders). Nevertheless, even if the Court concludes nationwide injunctive relief is not appropriate, Defendants should still be enjoined "from enforcing the mandate against...members of [ABC]." *See Georgia*, 46 F.4th at 1308.

### III.    CONCLUSION

Plaintiffs request the Court grant this Motion.  A proposed Order is submitted herewith pursuant to M.D. Fla. L. R. 6.02(a)(1) incorporating Rule 6.01(a)(6).

Dated this 26th day of April, 2024.

Respectfully submitted,

*/s/Kimberly J. Doud*
Kimberly J. Doud
LITTLER MENDELSON, P.C.
111 N Orange Ave.,
Suite 1750
Orlando, FL 32801
407-393-2951
407-641-9263 (Fax)
kdoud@littler.com

Maurice Baskin (*pro hac vice* pending)
LITTLER MENDELSON, P.C.
815 Connecticut Ave., N.W.
Ste. 400
Washington, D.C. 20006
(202) 772-2526
(202) 842-0011 (Fax)
mbaskin@littler.com

*ATTORNEYS FOR PLAINTIFFS*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 26th day of April, 2024, I electronically filed the foregoing with the Clerk of the Courts by using the ECF system, which will send a notice electronically to the following:  None.  I further certify that a true and correct copy of the foregoing was Delivered by certified mail to all Defendants, the Attorney General, and the U.S. Attorney for the Middle District of Florida, as follows:

Christine J. Harada
Office of Management and Budget
725 17th St., NW
Washington, DC, 20503

William F. Clark
General Services Administration
1800 F. St., NW
Washington, DC, 20405

Shalanda Young
Office of Management and Budget
725 17th St., NW
Washington, DC 20503

Jeffrey A. Koses
General Services Administration
1800 F. St., NW
Washington, DC 20503

John A. Tenaglia
Department of Defense
3060 Defense Pentagon, Rm 3B93B
Washington, DC 20301-3060

Karla S. Jackson
NASA Headquarters
300 E. St., SW
Washington, DC 20546

Roger Handberg
U.S. Attorney's Office for the Middle District of Florida
400 North Tampa St., Ste. 3200
Tampa, FL 33602

27

Merrick Garland
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

*/s/Kimberly J. Doud*
Kimberly J. Doud