# EXHIBIT "1"



VIA ELECTRONIC SUBMISSION

October 18, 2022

William F. Clark
Director
Office of Government-wide Acquisition Policy
General Services Administration
1800 F Street NW
Washington, DC 20405

**RE:    Docket No. FAR-2022-0003, Notice of Proposed Rulemaking on Federal
Acquisition Regulation (FAR); FAR Case 2022-003, Use of Project Labor
Agreements for Federal Construction Projects [RIN: 9000-AO40]**

Dear Mr. Clark:

Associated Builders and Contractors hereby submits the following comments in response to
the above-referenced proposed rule published in the Federal Register on Aug. 19, 2022, at 87
Federal Register 51044.

## About Associated Builders and Contractors

ABC is a national construction industry trade association representing more than 21,000 member
companies. ABC and its 68 chapters help members develop people, win work and
deliver that work safely, ethically and profitably for the betterment of the communities in which
ABC and its members work.

ABC's membership represents all specialties within the U.S. construction industry and is
comprised primarily of general contractors and subcontractors that perform work in the
industrial and commercial sectors for government and private customers.[1]

The vast majority of ABC's contractor members are small businesses. This is consistent with
the U.S. Census Bureau and U.S. Small Business Administration's Office of Advocacy's
findings that the construction industry has one of the highest concentrations of small
businesses (82% of all construction firms have fewer than 10 employees)[2] and industry
workforce employment (more than 82% of the construction industry is employed by small
businesses).[3] In fact, construction companies that employ less than 100 construction

---

[1] For example, see ABC's 32nd Excellence in Construction Awards program from 2022:
https://www.abc.org/Portals/1/2022%20Files/32ND%20EIC%20program--Final.pdf?ver=2022-03-25-115404-167.
[2] U.S. Census Bureau 2019 County Business Patterns:
https://data.census.gov/cedsci/table?q=CBP2019.CB1900CBP&n=23&tid=CBP2019.CB1900CBP&hidePreview=true and
https://www.census.gov/programs-surveys/cbp/data/tables.2019.html.
[3] 2020 Small Business Profile, U.S. Small Business Administration Office of Advocacy (2020), at Page 3,
https://cdn.advocacy.sba.gov/wp-content/uploads/2020/06/04144224/2020-Small-Business-Economic-Profile-US.pdf.

professionals compose 99% of construction firms in the United States; they build 63% of U.S. construction, by value, and account for 68% of all construction industry employment.[4] The vast majority of small businesses in the construction industry are not unionized.

In addition to small business member contractors that build private and public works projects, ABC also has large member general contractors and subcontractors that perform construction services for private-sector customers and federal, state and local governments procuring construction contracts subject to respective government acquisition policies and regulations.

Specific to this rulemaking, ABC members won 57% of the $128.73 billion in direct prime construction contracts exceeding $25 million awarded by federal agencies during fiscal years 2009-2021. Winning ABC member federal contractors provided subcontracting opportunities to large and small contractors in the specialty trades and delivered taxpayer-funded construction projects safely, on time and on budget for their federal government customers.

ABC's diverse membership is bound by a shared commitment to the merit shop philosophy in the construction industry. The philosophy is based on the principles of nondiscrimination due to labor affiliation and the awarding of construction contracts through open, competitive bidding based on safety, quality and value.

For these reasons, ABC's membership is heavily invested in the FAR Council's proposed rule impacting federal contracting opportunities for taxpayer-funded construction contracts and is vigorously opposed to government-mandated PLAs and PLA preferences on federal government and federally assisted construction projects, as well as state and local government infrastructure projects.

## Background

On Feb. 4, President Joe Biden signed Executive Order 14063, "Use of Project Labor Agreements for Federal Construction Projects."[5] It requires federal agencies to mandate controversial PLAs on federal construction projects that are $35 million or more in total value.

In addition, independent of EO 14063 and the FAR Council's proposed rule, ABC identified more than $95 billion[6] worth of federal agency grants for infrastructure projects procured by state and local governments subject to language and policies promoting PLA mandates and preferences that will increase costs and reduce competition on federally assisted construction projects. Together, the Biden administration's pro-PLA policies will needlessly increase costs, chill competition and steer hundreds of billions of dollars worth of federal and federally assisted construction projects funded by taxpayers to well-connected special interests, i.e., construction unions and contractors signatory to specific construction unions party to a PLA.

---

[4] U.S. Census County Business Patterns by Legal Form of Organization and Employment Size Class for the U.S., States, and Selected Geographies: 2019, available at https://thetruthaboutplas.com/wp-content/uploads/2021/07/Construction-firm-size-by-employment-2019-County-Business-Patterns-Updated-071321.xlsx.

[5] https://www.federalregister.gov/documents/2022/02/09/2022-02869/use-of-project-labor-agreements-for-federal-construction-projects.

[6] A list of federal agency infrastructure competitive grant programs for state and local governments seeking federal dollars to build key construction projects containing pro-PLA language can be found at www.abc.org/PLAgrants.

In response, ABC issued a press release,[7] authored an op-ed in *The Wall Street Journal*[8] and signed coalition letters to the White House opposing EO 14063 and other Biden administration pro-PLA policies.[9] On April 6, more than 1,200 ABC member contractors signed a letter to the White House opposing the Biden administration's anti-competitive and costly pro-PLA policies.[10] ABC members sent more than 14,400 letters to their representatives in Congress urging them to pass legislation protecting fair and open competition on federal and federally assisted construction projects by restricting government-mandated PLAs.[11] In addition, ABC applauded letters of opposition to the White House's pro-PLA policies from governors[12] and members of the U.S. House[13] and Senate.[14]

Furthermore, Congress recently passed the Infrastructure Investment and Jobs Act, a bipartisan law authorizing nearly $550 billion in additional spending for federal and federally assisted infrastructure projects.[15] By choosing not to include language conditioning this funding on government mandated PLAs, Congress has clearly indicated it did not intend to require controversial PLAs on these construction contracts. President Biden's Executive Order 14063 therefore directly contradicts congressional intent when it passed the IIJA and other laws funding infrastructure without pro-PLA language.

Nevertheless, on Aug. 19, 2022, the FAR Council issued a proposed rule that requires PLAs on all federal construction contracts valued at $35 million or more, which affects ABC members and other industry stakeholders performing work on taxpayer-funded federal contracts. ABC immediately issued a press release in opposition to the proposed rule[16] and has been actively educating lawmakers, the public and industry stakeholders about the illegal and inflationary aspects of the Biden administration's pro-PLA policies on both federal and federally assisted infrastructure projects. On Oct. 13, ABC joined 21 other organizations representing thousands of companies employing millions of professionals in the construction industry in a coalition

---

[7]ABC press release, President Biden's Pro-PLA Executive Order Will Increase Costs to Taxpayers and Exacerbate Skilled Labor Shortage, Says ABC, Feb. 3, 2022.
[8] Ben Brubeck, Infrastructure Law Becomes a Biden Union Giveaway, *The Wall Street Journal*, Feb. 9, 2022.
[9] Feb. 15, 2022, coalition letter to the White House opposing EO 14063 available at: https://buildamericalocal.com/wp-content/uploads/sites/18/2022/02/Coalition-Letter-to-President-Biden-Opposing-Government-Mandated-Project-Labor-Agreement-EO-14063-021522.pdf.
[10] ABC press release, ABC Sends Letter to White House with 1,200 Signatures Opposing Biden's PLA Mandate, April 6, 2022, available at: https://www.abc.org/News-Media/News-Releases/entryid/19354/abc-sends-letter-to-white-house-with-1-200-signatures-opposing-biden-s-pla-mandate.
[11] ABC supports the Fair and Open Competition Act (S. 403/H.R. 1284), sponsored by Sen. Todd Young, R-Ind., and Rep. Ted Budd, R-N.C., which would prevent federal agencies and recipients of federal assistance from requiring or encouraging contractors to sign a controversial PLA as a condition of winning a federal or federally assisted, taxpayer-funded construction contract.
[12] RGA, 18 GOP Governors Oppose Joe Biden's Attempts to Interfere with America's Construction Industry, April 26, 2022.
[13] March 8, 2022, letter signed by 59 U.S. House members available at: https://buildamericalocal.com/wp-content/uploads/sites/18/2022/03/59-Members-of-Congress-Sign-Letter-Opposing-White-House-PLA-Policy-3822.pdf.
[14] March 7, 2022, letter signed by 43 U.S. senators available at: https://buildamericalocal.com/wp-content/uploads/sites/18/2022/03/43-U.S.-Senators-Sign-Letter-Opposing-White-House-PLA-Policy-3722.pdf.
[15] https://www.congress.gov/bill/117th-congress/house-bill/3684.
[16] ABC press release, President Biden's Inflationary PLA schemes Hurt Taxpayers and Construction Job Creators, Aug. 18, 2022, available at: https://www.abc.org/News-Media/News-Releases/entryid/19556/president-bidens-inflationary-pla-schemes-hurt-taxpayers-and-construction-job-creators.

comment letter opposing the FAR Council's proposal.[17] ABC members submitted more than 2,400 individual comments to the FAR Council opposing the proposed rule's harmful impact on their businesses.

The FAR Council estimates that the proposed rule could affect up to 119 direct federal contracts on an annual basis, valued at an average of $114 million each.[18] In total, the FAR Council estimates this rule covers $13.56 billion worth of federal construction projects per year, which is a significant portion of all federal construction contracts. For example, the annual value of federal construction put in place in 2021 was $24.837 billion, so the rule could affect more than 54% of all federal construction put in place by annual value.[19]

Once final, the proposed rule will rescind and replace President Barack Obama's Executive Order 13502, signed Feb. 6, 2009, which encourages—but does not require—federal agencies to mandate PLAs on large-scale federal construction projects exceeding $25 million in total cost on a case-by-case basis and permits recipients of federal assistance to mandate PLAs on state and local public works projects.[20] The Biden proposed rule also establishes circumstances where federal agencies can require PLAs on federal construction projects below the proposed $35 million threshold. The FAR Council proposal does not prohibit a federal agency from requiring PLAs on projects receiving any form of federal financial assistance.

Due to the significant harm the proposed rule will have on federal government procurement officials, federal contractor stakeholders, taxpayers, ABC members and other construction businesses pursuing contracts and building federal construction projects, on Aug. 23, ABC asked the FAR Council to extend the 60-day comment period deadline of Oct. 18 to provide adequate time to analyze the proposal, solicit member feedback and provide meaningful input on the proposal.[21]  The extension request was arbitrarily and capriciously denied by the FAR Council, [22]  in violation of the Administrative Procedure Act.

## Summary of ABC's Response to the Proposed Rule

ABC strongly opposes the proposed rule and its imposition of anti-competitive and inflationary government-mandated PLAs on federal contracts.

---

[17] Construction Coalition Opposes Biden's Pro-PLA Proposal, ABC Newsline, Oct. 12, 2022. Of note, the coalition's website, BuildAmericaLocal.com, features a number of educational resources such as studies, op-eds, letters, talking points and a social media kit exposing problems with government-mandated PLAs and the Biden administration's policies promoting anti-competitive and inflationary PLA schemes.
[18] "Based on Federal Procurement Data System (FPDS) data from fiscal year (FY) data from 2019 through FY 2021, the average number of construction awards, including orders against indefinite-delivery indefinite-quantity contracts valued at $35 million or more, were approximately 119 annually. The average cost of each award is approximately $114 million," at https://www.federalregister.gov/d/2022-17067/p-30.
[19] U.S. Census Bureau, Construction Spending Historical Value Put in Place, accessed Oct. 4, 2022, available at: https://www.census.gov/construction/c30/historical_data.html.
[20] https://www.gpo.gov/fdsys/pkg/FR-2009-02-11/pdf/E9-3113.pdf.
[21] https://www.regulations.gov/comment/FAR-2022-0003-0005.
[22] https://www.abc.org/Portals/1/2022%20Files/PLA%20Extension.pdf?ver=mva5r_nbZe7y2emr2wreCg%3d%3d.

The Biden administration's rule has been proposed at a time when the U.S. construction industry faces significant headwinds in the form of severe supply chain disruptions,[23] unprecedented materials cost inflation of 40.5% since the onset of the COVID-19 pandemic,[24] declining investment[25] and a widespread shortage of 650,000 skilled workers in 2022 alone.[26] By needlessly restricting the pool of qualified bidders and excluding experienced and qualified nonunion construction workers, the proposal would exacerbate these issues and further increase costs for contractors and taxpayers.

In September 2022, ABC conducted a survey of its contractor members about government-mandated PLAs and the FAR Council's proposed rule.[27] Ninety-eight percent of respondents said they would be less likely to begin or continue bidding on federal contracts if the proposed rule is finalized and 97% said that government-mandated PLAs decrease economy and efficiency in government contracting.[28]

A PLA is a multiemployer, multi-union, pre-hire collective bargaining agreement that all general contractors and subcontractors on a jobsite must agree to in order to win a contract to build a federal construction project. Proponents argue PLAs serve as a tool to systemize labor relations between multiple construction trade unions and contractors on a specific construction site. While differences may exist in the specific language of each PLA document, PLAs typically contain provisions with anti-competitive and costly effects our comments will outline in detail.

As discussed in Section I of ABC's comment letter (pp. 7-16), ABC and the federal contracting community broadly oppose government-mandated PLAs as these schemes needlessly restrict competition, discriminate against nonunion employees and place nonunion general contractors and subcontractors at a significant competitive disadvantage. Government-mandated PLAs will exacerbate the construction industry's skilled labor shortage by discouraging participation from more than 87% of the U.S. construction industry workforce who do not belong to a union. In addition, certain unionized contractors and unionized workers are also prohibited from working on PLA projects because they interfere with existing collective bargaining agreements. Likewise, typical government-mandated PLAs are anti-competitive in nature and severely restrict fair and open bidding on taxpayer-funded projects from the best union and nonunion contractors, including small and disadvantaged contractors and their employees

As discussed in Section II of ABC's comment letter (pp. 16-33), the Biden administration and FAR Council's arguments justifying the proposed rule and the widespread use of government-mandated PLAs in federal contracting are unsubstantiated and run counter to a robust record of evidence supporting the benefits of fair and open competition free from PLA mandates. In contrast to the Biden administration's reasoning, evidence outlined in these comments establishes that government-mandated PLAs harm economy and efficiency in federal

---

[23] Sam Barnes, "Missing Links," *Construction Executive*, April 2022.
[24] "Monthly Construction Input Prices Dip in August, But Are Up 17% From a Year Ago, Says ABC," ABC, September 2022.
[25] "Nonresidential Construction Spending Down 0.4% in August, Says ABC," ABC, October 2022.
[26] "ABC: Construction Industry Faces Workforce Shortage of 650,00 in 2022," ABC, February 2022.
[27] Survey: 97% of ABC Contractors Say Biden's Government-Mandated Project Labor Agreement Policies Would Make Federal Construction More Expensive, ABC Newsline, Sept. 28, 2022.
[28] Additional results from the survey are shared in greater detail throughout these comments.

contracting, as government-mandated PLAs increase costs by 12% to 20% per construction project, expose federal agencies to bid protests and litigation and cause unnecessary delays during the procurement and construction phases of a PLA project. In addition, PLAs are a solution in search of a problem with respect to strikes caused exclusively by unions and will not achieve better safety, quality or project delivery outcomes for the federal government.

Section III of ABC's comments demonstrates how Executive Order 14063 and the FAR Council's proposed rule violate numerous federal laws and must be withdrawn. First, the proposed rule clearly violates the Competition in Contracting Act, which states that when awarding federal contracts federal agencies "shall obtain full and open competition through the use of competitive procedures."[29] By discriminating against nonunion contractors and employees who have freely chosen not to associate with a union, the proposed rule's PLA mandate would drastically restrict competition and give an unfair advantage to unionized businesses and employees. [See discussion in Section III. A. on page 34]

The proposed rule, and EO 14063 on which it is based, also exceed the authority of the executive branch under the Federal Property and Administrative Services Act.[30] Congress has never authorized across-the-board PLA mandates such as those being proposed here. As opposed to increasing economy or efficiency in federal procurement, the proposed rule's PLA mandates will increase costs and delay contract procurement and construction performance. [See discussion in Section III. B. on page 34].

The proposed rule also violates the arbitrary and capricious standard of the Administrative Procedure Act and/or other statutes governing the FAR, because the proposed rule changes course without adequate justification, in a manner contrary to the record of evidence, without addressing important aspects of the problems created by the proposed mandate, and without addressing reasonable alternatives or the longstanding reliance interests of the regulated community. [See discussion in Section III. C. on page 35].

The proposed rule will also impose significant obstacles to Congress's requirement that federal agencies encourage and give preference to small and disadvantaged businesses in procurement of government contracts. Therefore, the proposed rule is in violation of the Small Business Act.[31] [See discussion in Section III. D. on page 36].

The proposed rule's Expected Impact and Initial Regulatory Flexibility Analysis vastly underestimates the economic impact of the proposed rule, which is likely to exceed $100 million per year. [See discussion in Section III. E. on page 38].

The proposed rule directly interferes with and discriminates against rights of construction contractors and their employees that are protected by the National Labor Relations Act, ERISA and the National Apprenticeship Act, including the forced taking of nonunion workers' pay for

---

[29] 41 U.S.C. § 253. The Competition in Contracting Act of 1984 (41 U.S.C. 253) (FAR Subpart 6.1 "Full and Open Competition") is a public law enacted for the purpose of encouraging the competition for the award of all types of government contracts. The purpose was to increase the number of competitors and to increase savings through lower, more competitive pricing. CICA became law in 1984 as a foundation for the Federal Acquisition Regulation.
[30] 40 U.S.C. § 101.
[31] 15 U.S.C. § 637(d).

the benefit of union pension plans, without just compensation. [See discussion in Section III. F. on page 39].

The proposed rule improperly declares that "this rule is not a major rule under 5 U.S.C. § 804" and thereby violates the Congressional Review Act. [See discussion in Section III. G. on page 40].

Finally, the proposed rule's blanket PLA policy establishes no meaningful criteria for federal agencies to follow in considering whether to grant exceptions to PLA requirements. Therefore, the resulting agency decisions will be inherently arbitrary and capricious and will delay construction projects. ABC has made recommendations concerning PLA inclusion and exception language and procedures [See discussion in Section III. H. on page 40 and I. on page 42].

**I. Government-Mandated PLAs Required by the Proposed Rule Will Discriminate Against and Otherwise Deter the Majority of Construction Contractors and Their Employees From Bidding or Performing Work on Government Contracts**

Typical government-mandated PLAs discourage competition from nonunion contractors, who employ the overwhelming majority of all construction workers, and deny jobs to their existing workforce through several common PLA provisions summarized in these comments.

**A. PLA Mandates Force Contractors to Replace Most or All Existing Employees With Workers From Union Hiring Halls**

First, under typical PLAs, nonunion companies must obtain most or all of their employees from union hiring halls. Most often, PLAs prevent contractors from using their existing nonunion workforce. This provision is problematic because firms cannot use most or all of their existing employees whose safety, training, productivity and quality is already quantified so contractors are able to submit an accurate bid and timeline. This provision excludes more than 87% of the U.S. construction workforce from working on federal construction projects.



In some PLAs, a nonunion contractor is permitted to use a small number of its existing nonunion workforce, but they must send these employees to the union hiring hall and hope the union dispatches the same workers back to the PLA jobsite, and/or the PLA requires existing nonunion employees to join a union within 10 days of employment on the project and/or pay union dues and fees as a condition of employment.[32] Survey responses by ABC contractors report that unfamiliar union workers may be of unknown quality and may delay time- and cost-sensitive construction schedules, making delivery of a quality, on-time and on-budget construction product less certain.

**B. PLA Mandates Require Companies to Obtain Apprentices From Union Apprenticeship Programs, Undermining Workforce Development Strategies**

Second, PLAs typically require nonunion companies to obtain apprentices exclusively from union apprenticeship programs.[33]

Therefore, apprentices enrolled in federal and state government-registered nonunion apprenticeship programs provided by employers, trade associations, schools and community stakeholders—including more than 300 government-registered apprenticeship programs provided by ABC chapters—cannot work on a job covered by a PLA. This means future construction industry workers enrolled in qualified government-registered apprenticeship programs will be excluded from working in their own community simply because these

---

[32] See TheTruthAboutPLAs.com, Understanding Core Workforce Provisions in Project Labor Agreements, April 7, 2014.
[33] See www.TheTruthAboutPLAs.com, Biden's Project Labor Agreement Schemes Exacerbate Construction Industry's Skilled Labor Shortage, June 29, 2022.

programs are not affiliated with construction unions. This strangles opportunities and career pipelines into the construction industry.

Respondents to ABC's recent survey of contractor members said PLAs negatively affect company workforce development efforts, with 96% stating that a PLA's union apprenticeship requirements harm their existing workforce development investments.[34]

Of note, in rare and limited instances, PLAs can contain language permitting participants from union and nonunion government-registered apprenticeship programs when permitted by local union CBAs. However, data demonstrates the government-registered apprenticeship system is not meeting the industry's demand for skilled labor and any government-registered apprenticeship participation requirements disparately favor union programs.[35]

According to data from the DOL,[36] in FY 2021, the construction industry's federal government-registered apprenticeship system produced 24,822 completers of its four-to-five-year apprenticeship programs. In addition, construction industry apprenticeship programs registered with state governments produced an estimated 15,000 to 20,000 completers in FY 2021.[37] At current rates of completion, it would take 14 years for all government-registered construction industry apprenticeship program completers to fill the estimated 650,000 vacant construction jobs needed just in 2022.

In addition, a 2015 report issued by construction unions[38] claims that, "among [government registered program] construction apprentices, 74% are trained in the unionized construction sector known as the joint apprenticeship training committee (JATC) system," according to DOL Employment and Training Administration data from 2014 referenced in the report.[39] If accurate, this means that roughly a quarter of all registered apprentices are enrolled in nonunion government-registered apprenticeship programs and a government-registered apprenticeship program requirement in a PLA would disproportionately favor unionized firms and participants in union programs.

Both concerns undermine federal apprenticeship investments and legal requirements for full and open competition and are key reasons why federal agencies do not require government-registered apprenticeship policies in federal solicitations for construction services. Simply put,

---

[34] Survey: 97% of ABC Contractors Say Biden's Government-Mandated Project Labor Agreement Policies Would Make Federal Construction More Expensive, ABC Newsline, Sept. 28, 2022.

[35] See data tables in www.TheTruthAboutPLAs.com, Biden's Project Labor Agreement Schemes Exacerbate Construction Industry's Skilled Labor Shortage, June 29, 2022.

[36] According to the DOL Office of Apprenticeship's Registered Apprenticeship Partners Information Data System, in FY 2021 the construction industry's 6,573 federal government-registered apprenticeship programs had 239,107 active apprentices and produced just 32,068 completers. There are a handful of states that do not contribute to the RAPIDS program, roughly 40,000 to 45,000 apprentices completed programs in 2021. See data at https://thetruthaboutplas.com/wp-content/uploads/2022/08/Registered-Apprenticeship-Participants-Completers-and-Programs-for-Construction-Industry-in-RAPIDS-States-FY17-to-FY21-081722.xlsx.

[37] ABC: Government-Registered Apprenticeship System Woefully Inadequate to Meet Construction's Skilled Workforce Shortage, ABC, June 30, 2022.

[38] See page 6 of Construction Apprenticeship, The "Other Four-Year Degree," by the North American Building Trades Unions available at https://partners.aflcio.org/system/files/2_bctd-appren-four-yr-degree-2015.pdf.

[39] Note: The DOL does not provide data of union vs. nonunion apprentices enrolled in registered apprenticeship programs to the public in an aggregate version/report. It is unclear if the DOL shared this data or if additional assumptions were made by report authors based on DOL data requested and calculated.

a PLA's union-only apprenticeship or government-registered apprenticeship requirements are likely to exacerbate the construction industry's skilled labor shortage and undermine industry, company and community investments in workforce development that relies on an all-of-the-above mix of upskilling in the construction industry, including government-registered apprenticeship programs.[40]

### C. PLA Mandates Force Contractors to Follow Inefficient Union Work Rules

Third, PLAs require contractors to follow union work rules specified in each CBA of each construction union party to the PLA, which changes the way contractors otherwise would assign employees to specific job tasks—requiring contractors to abandon an efficient labor utilization practice called "multiskilling" and instead assign work based on inefficient and archaic union craft jurisdictional boundaries defined in each craft's relevant CBA. Open shop contractors achieve significant labor cost savings through multiskilling, in which workers possess a range of skills that are appropriate for more than one work process and are used flexibly across multiple trades on a project or within an organization. This practice has tremendous labor productivity advantages for contractors, but it is forbidden by typical union work rules in union CBAs and, by extension, PLAs.[41]

Contractors forced to work under a PLA's restrictive work rules complain about the complexity of interpreting and matching each union's CBA/work rules to a corresponding construction activity on a jobsite. In addition, ABC contractors consistently raise concerns about how a PLA forces them to hire multiple workers from different unions with different and often conflicting CBAs to complete simple tasks across trade jurisdictions that can be performed by one of their existing employees or a smaller crew of existing employees.

### D. PLA Mandates Force Contractors to Pay Employee Benefits Into Union Plans, Exposing Workers to Wage Theft and Employers to Multiemployer Pension Plan Liabilities

Fourth, PLAs require nonunion companies to pay their workers' health and welfare benefits to union trust funds, even though these companies may have their own bona fide benefits plans. Workers cannot access any of their benefits accrued during the life of the PLA project in union plans unless they decide to leave their nonunion employer, join a union, work for union-signatory contractors and receive enough work and remain in good standing with the union until vested. Research suggests this loss in wages and benefits reduces nonunion employees' paychecks by 34% on PLA projects.[42] Because few nonunion employees choose to join a

---

[40] Learn more about ABC's all-of-the-above approach to workforce development at www.workforce,abc/org.

[41] See www.TheTruthAboutPLAs.com, Understanding the Merit Shop Contractor Cost Advantage, May 17, 2010.

[42] An October 2021 report by Dr. John R. McGowan, Government-Mandated Project Labor Agreements Result in Lost and Stolen Wages for Employees and Excessive Costs and Liability Exposure for Employers, finds that employees of nonunion contractors that are forced to perform under government-mandated PLAs suffer a reduction in their take-home pay that is conservatively estimated at 34%. PLAs force employers to pay employee benefits into union-managed funds, but employees will never see the benefits of the employer contributions unless they join a union and become vested in these plans. Employers that offer their own benefits, including health and pension plans, often continue to pay for existing programs as well as into union programs under a PLA. The McGowan report found that nonunion contractors are forced to pay in excess of 35% in benefit costs above and beyond existing prevailing wage laws as a result of "double payment" of benefit costs. See further

union after working on a PLA project, companies typically end up paying benefits twice: once to the union plans and once to the existing company plans to ensure employees have direct access to earned retirement and benefits assets and to keep their existing employees happy with their current employer in the face of a competitive labor market. Nonunion contractors must factor this double benefits cost into their bid, which research suggests increase nonunion contractors' wage and benefits costs by an estimated 35%,[43] needlessly putting them at a competitive disadvantage against union contractors that are not saddled with these unnecessary costs.

In addition, paying into underfunded and mismanaged union-affiliated multiemployer pension plans may expose merit shop contractors to massive pension withdrawal liabilities.[44] Depending on the health of a union-managed multiemployer pension plan, signing a PLA could bankrupt a contractor or prevent it from qualifying for construction bonds needed to build future projects for the federal government and other clients.[45]

### E. PLA Mandates Force Employees to Join a Union and/or Pay Union Dues/Fees as a Condition of Employment

Finally, nonunion employees must pay nonrefundable union dues and/or fees and/or join a union to work on many PLA projects, even though they have decided to work for a nonunion employer[46] and have freely chosen not to affiliate with a union. PLAs require unions to be the exclusive bargaining representative for workers during the life of the project. When agreeing to participate in a PLA project, union representation is elected by the employer rather than the employees.[47] Construction employees often argue that forced unionization and/or representation—even for one project—is an infringement of their workplace rights and runs contrary to their intentional decision not to join a union.[48]

---

analysis at www.TheTruthAboutPLAs.com, Nonunion Workers Suffer Up to 34% in Wage Theft Under Government-Mandated Project Labor Agreements, Oct. 22, 2021.

[43] See McGowan report, *ibid.*

[44] See discussion of this concern in the McGowan report and an example of multiemployer pension plan liability extended to a firm performing work on a PLA project in New Jersey in *Third Circuit Joins Sister Circuits in 'Employer' Definition Under Multiemployer Pension Plan Amendments Act,* JD Supra, April 15, 2022, available at https://www.jdsupra.com/legalnews/third-circuit-joins-sister-circuits-in-9647788/.

[45] See www.TheTruthAboutPLAs.com, Taxpayer Bailout of Multiemployer Pension Plans and Government-Mandated Project Labor Agreements, March 17, 2021.

[46] The legality of clauses in typical PLAs that require compulsory union membership and payment of union dues and fees to unions by workers in order to work on a PLA project depend on the state's right to work law status. See www.TheTruthAboutPLAs.com, Understanding PLAs in Right to Work States, July 20, 2009. *See also Janus v. AFSCME*, 138 S. Ct. 2448 (2018) (finding a constitutional violation in government action forcing employees to pay union dues or fees).

[47] While employed by a nonunion company, workers normally are permitted to choose union representation through a card check process or a federally supervised private ballot election. PLAs are called pre-hire agreements because they can be negotiated before the contractor hires any workers or employees vote on union representation. The National Labor Relations Act generally prohibits pre-hire agreements, but an exception in the act allows for these agreements only in the construction industry. In short, PLAs strip away the opportunity for construction workers to choose a federally supervised private ballot election or a card check process when deciding whether union representation is right for them.

[48] Barriers to joining a union in the construction industry are relatively low. Any construction worker can go to the nearest union hiring hall and request to join a union. If admission is accepted by a union hiring hall, a worker typically pays initiation fees, regularly scheduled dues and must maintain good standing with the local union's rules in order to be dispatched to a union-signatory contractor's job. Union members may work for one or dozens of union-signatory contractors in a year or a career, depending on the trade, scope and volume of work and length of time a union-signatory company is going to be on a construction jobsite.

### F.  PLA Mandates Discourage Competition From Unionized Contractors and Union Labor By Interfering with Existing Union Collective Bargaining Agreements

Most ABC member general contractors and subcontractors are not signatory to construction union CBAs. However, some ABC member general contractors and subcontractors are signatory to CBAs with construction unions, which requires them to hire unionized labor only from union hiring halls they are signatory to and follow the CBA's work rules and pension/benefits obligations. Many of these unionized contractors report that PLAs interfere with existing CBAs with unions and prevent unionized firms from competing to build projects funded by taxpayer dollars.[49]

Union-signatory firms commonly argue that they invest substantial amounts of time and resources negotiating and executing a CBA with a specific union or unions they are signatory to. Yet a PLA will increase costs and stifle contracting opportunities by reintroducing inefficient and unfamiliar work rules, pay and benefits requirements that are not part of its existing CBA with a union(s).

In addition, union-signatory firms complain that, in order to work on a PLA project, they are required to sign an agreement with a union designated in a PLA that the contractor is not signatory to. This would take away work traditionally performed by its existing union member employees. In this example, signing such a PLA would be in direct violation of its existing CBA and would expose the firm to litigation for breaching its CBA. Therefore, contractors with CBAs with certain unions not designated in a specific PLA are contractually unable to pursue contracts subject to PLA mandates.

For these reasons, the proposal will injure competition from certain qualified unionized contractors and their unionized employees from union hiring halls.

### G.  PLA Mandates Are Likely to Decrease Hiring of Local, Minority, Women, Veteran and Reentering Construction Workers and Minority, Women, Veteran and Disadvantaged Business Enterprises

By discriminating against the 87.4% of the U.S. construction workforce that chooses not to belong to a union and discouraging competition from diverse and small contracting businesses predominantly unaffiliated with unions,[50] PLA mandates are likely to decrease opportunities for local, minority, women, veteran and reentering construction workers and minority, women, veteran and disadvantaged businesses that perform taxpayer-funded work in the construction industry.

In ABC's recent member survey,[51] 94% of respondents said government-mandated PLAs would result in worse local hiring outcomes on a project while 5% said PLA mandates would

---

[49] See examples at TheTruthAboutPLAs.com, Union Leaders and Contractors Oppose Government-Mandated Project Labor Agreements Too, March 1, 2021, including a March 16, 2021 op-ed syndicated in USA Today by Kevin Barry, director of the construction division of the United Service Workers Union based in Queens

[50] See discussion on the impact of government-mandated PLAs on federal contractor small businesses in Section III. D. of this comment letter.

[51] Ibid.

have no impact. Fully 68% of respondents said PLA mandates decrease hiring of minority, women, veteran and reentering construction workers while 28% said PLA mandates would have no impact. Finally, 70% of respondents said government-mandated PLAs will result in decreased hiring of minority, women, veteran and disadvantaged businesses while 27% said PLA mandates would have no impact.

In contrast, PLA advocates frequently claim that government-mandated PLAs ensure a steady supply of local labor and more jobs for minority, women, veteran and reentering construction workers. They also claim PLAs can be a tool to increase hiring of minority, women, veteran and disadvantaged business enterprises.

However, there is no credible evidence to support this erroneous claim. Likewise, there is no evidence that local and disadvantaged business and workforce hiring outcomes are better on government-mandated PLA projects compared to projects benefiting from fair and open competition free from PLA mandates.

Anecdotal evidence strongly indicates that government-mandated PLAs harm rather than benefit local and diverse workforce hiring and contract awards. Such harm has been documented by members of the local and minority construction workforce and contracting communities in Baltimore;[52] Boston;[53] Chicago;[54] Detroit;[55] Des Moines, Iowa;[56] Jersey City, New Jersey;[57] Las Vegas;[58] Los Angeles;[59] Meriden, Connecticut;[60] New Bedford, Connecticut;[61] New York City;[62] Oakland, California; [63] Philadelphia;[64] San Diego;[65] San

---

[52] See www.TheTruthAboutPLAs.com, Minority Contractor Speaks Out Against Proposed Baltimore City PLA Requirement, April 8, 2010.

[53] Boston Construction Sites Still Have Very Few Black Workers. Who's To Blame For That? WGBH.org, Paul Singer, Aug 1, 2022.

[54] Rahm Emanuel Blames Unions For Lack of African-American Jobs, NBC Chicago, Oct. 3, 2012.

[55] Detroiters Get 30% Fewer DPS Construction Jobs Than Promised, Detroit Free Press, July 15, 2011.

[56] See www.TheTruthAboutPLAs.com, Project Labor Agreement on Iowa State Penitentiary Fails to Fulfill Local Hiring Promises, Oct. 16, 2013, and Much Work on Prison Went to Non-Iowans, Des Moines Register, Oct. 11, 2013.

[57] See www.TheTruthAboutPLAs.com, Jersey City Project Labor Agreement Policies Fail to Deliver Local Jobs, Jan. 28, 2013.

[58] Ironworkers Union Settles Dispute Over 'Traveling', Las Vegas Review-Journal, May 14, 2010.

[59] See www.TheTruthAboutPLAs.com, Minority Contractors and Business Associations Take Leadership Role in Fighting Project Labor Agreements in California Coastal Cities, March 9, 2011.

[60] See www.TheTruthAboutPLAs.com, No Surprise: Big Labor Fails to Meet Meriden PLA Hiring Goals, May 19, 2014

[61] Dredging union struggles to provide local workers to South Terminal, SouthCoast Today, Sep. 14, 2013.

[62] See www.TheTruthAboutPLAs.com, Project Labor Agreement Fails On Tappan Zee Bridge Construction; Jobs Outsourced to Robots, June 9, 2014.

[63] Black Contractors Call Oakland's Proposed Project Labor Agreement 'Modern Day Slavery', San Francisco Bay View, Aug. 15, 2019. Black construction workers in Bay Area say employers don't stop abuse, San Francisco Chronicle, Sept. 28, 2020.

[64] See www.TheTruthAboutPLAs.com, National Black Chamber of Commerce Blasts Lack of Diversity in Construction Trade Unions, July 29, 2013.

[65] See www.TheTruthAboutPLAs.com, San Diego Unified School District PLA Fails to Meet Local Hiring Goals, July 11, 2011.

Francisco;[66] Seattle;[67]  Washington, D.C.;[68] and other communities across America.[69] Local and minority construction industry leaders have complained that government-mandated PLAs and construction union hiring halls fail to deliver jobs for local and minority construction workers and contractors,[70] despite promises by pro-PLA lawmakers and construction trade unions.

Minority and small business advocates have long argued PLAs disproportionately harm minority- and women-owned contractors and their diverse workforces[71] because the vast majority of these firms are not signatory to a union[72] and minority craft labor employees are unlikely to belong to a union[73] due to a variety of factors, including historical[74] and institutional racism in the construction unions.[75]

One such advocate, the National Black Chamber of Commerce, opposes PLA mandates[76] because:

> "African American workers are significantly underrepresented in all crafts of construction unions. The higher incidence of union labor in the construction industry, the lower African American employment will be realized. This is constant throughout the nation. Also, and equally important, the higher use of union shops brings a correlated decrease in the amount of Black owned businesses being involved on a worksite."

Likewise, in a 2020 letter to Virginia Gov. Ralph Northam (D), NBCC CEO Harry Alford wrote:[77]

---

[66] See www.TheTruthAboutPLAs.com, Construction Fatalities and Protest by Minority Contracting Community Plague New 49ers Stadium Project, Oct. 15, 2013.
[67] See www.TheTruthAboutPLAs.com, Project Labor Agreement on Seattle Tunnel Mega-Project Fails to Deliver on Many Promises, Jan. 23, 2014.
[68] See Broken Promises, Big Losses: The Story of DC Workers Watching from the Dugout as the $611 Million Washington Nationals Ballpark is Built, District Economic Empowerment Coalition, Oct. 2, 2007, and The True Cost of the Washington Nationals Ballpark Project Labor Agreement, DC Progress, November 2009, In addition, data collected by Del. Eleanor Holmes-Norton, D-D.C., on federal projects subject to PLA mandates located in the District of Columbia under the Obama administration's pro-PLA policy demonstrated that PLAs delivered worse local hiring outcomes for District of Columbia residents than other large-scale federal projects not subject to a PLA in the region. See TheTruthAboutPLAs.com, Data Busts Myth That Project Labor Agreements Result in Increased Local Hiring, March 11, 2013.
[69] See www.TheTruthAboutPLAs.com, Project Labor Agreements and Big Labor Fail at Local Job Creation, Aug. 5, 2010.
[70] Many PLA projects experiencing issues with minorities and women are documented in ABC General Counsel Maury Baskin's report, Government-Mandated Project Labor Agreements: The Public Record of Poor Performance (2011 Edition).
[71] See testimony of Anthony W. Robinson, president of the Minority Business Enterprise Legal Defense and Education Fund linked in Congressional Testimony Says Project Labor Agreements Harm Minority Contractors and Employees, Oct. 26, 2010, and How Union-Only Labor Agreements Are Harming Women- and Minority-Owned Businesses, U.S. House Committee on Small Business hearing, Aug. 6, 1998.
[72] BLS and other government data sources do not track the union-signatory status of small and disadvantaged businesses. However, various trade associations and interest groups representing minority contractors and construction workers raise these concerns in public policy debates. See the National Black Chamber of Commerce's Policy Statement on Project Labor Agreements and other statements on PLAs here.
[73] Union Construction's Racial Equity and Inclusion Charade, Stanford Social Innovation Review, Travis Watson, June 14, 2021.
[74] Prevailing Wage Legislation and the Continuing Significance of Race, George Mason Law and Economics Research Paper No. 18-14, David E Bernstein, June 1, 2018.
[75] Why Are Philly's Construction Unions So White? Six Takeaways From Our Reporting On Racism In The Building Trades, The Philadelphia Inquirer, Sept. 1, 2022.
[76] See NBCC's Policy Statement on Project Labor Agreements and other statements on government-mandated PLAs here.
[77] Letter from NBCC CEO Harry Alford to Gov. Northam requesting veto of pro-PLA legislation, March 17, 2020.

> "African American-owned contracting firms are typically small businesses and employ their own core workforce of skilled construction workers who are not unionized and are generally more diverse than construction workers coming from union hiring halls. Despite efforts of various construction trade unions to diversify their membership over the years, they simply are not recruiting enough African American members into the trades. In addition, claims that a PLA can be a tool to ensure minority construction workers and businesses are used on a public project is a farce. These goals can be achieved via contracting and workforce requirements independent of a discriminatory PLA mandate."

As noted by the NBCC, many private owners and municipalities have local hiring goals for construction projects independent of a government-mandated PLA, which can be problematic when construction unions have few local union members or not enough available union labor to meet a project's workforce needs. When demand for union construction workers is greater than supply, union hiring halls frequently call workers from out-of-area union halls called "travelers" or "boomers" to address a union-signatory contractor's labor needs. Under PLAs and typical union hiring hall rules, these union travelers/boomers receive hiring preference over qualified local nonunion workers—who comprise more than 80% of the local construction workforce in almost all markets across the country.

For these reasons, the proposal is likely to undermine construction industry efforts to attract a local, diverse and inclusive workforce and pool of contractors.

### H. Mandating PLAs Under the Proposed Rule Will Otherwise Harm Competition

Because of the significant adverse impact of PLAs on nonunion and some union general contractors and subcontractors and their nonunion and union employees described in these comments, the inevitable result of the proposed rule will be to limit competition for federal construction projects by significantly reducing the number of bidders for such projects in direct violation of federal statutes discussed in Section III. A. of these comments.

In response to ABC's recent survey,[78] ABC member contractors overwhelmingly opposed the proposed rule, with 99% stating they would be less likely to begin or continue to bid on federal construction contracts if the proposed rule is finalized and 97% agreeing that PLAs reduce competition from subcontractors. Among active federal contractors who responded to the survey, 93% stated the proposal would result in less competition from subcontractors. Additionally, 97% of respondents who self-identified as small business federal contractors said they would be less likely to bid on contracts if the proposed rule is finalized, potentially affecting the federal government's small business procurement goals. Likewise, 99% of respondents who currently do not perform federal contracting work said they would be discouraged from beginning to do so by the proposed rule, indicating the proposal would likely suppress competition from new federal contractors if finalized.

---

[78] Ibid.

Individual comments by survey participants repeatedly mention problematic terms and conditions in typical PLAs discussed in Section I. These comments are compelling reasons why PLA mandates injure competition for federal construction projects.

ABC's September 2022 survey results should be concerning to federal agency construction contracting officers and the Biden administration. From fiscal year 2009-2021, ABC member prime contractors performed 51.1% of all federal construction contracts over $25 million, including 57% of the total value of all large-scale contracts.[79] Given that the vast majority of ABC general contractor members would be discouraged from bidding on federal contracts under the proposed rule, it is undeniable that "full and open competition" would be impossible to achieve with this proposal.

### ABC MEMBERS WON MAJORITY OF LARGE-SCALE FEDERAL CONTRACTS >$25M, FY2009-FY2021

|  | # of Contracts | Percent of # of Contracts | Value (in $ billions) | Percent of Total Value |
|---|---|---|---|---|
| ABC | 1,061 | 51.11% | $73.46 | 57% |
| Non-ABC | 1,014 | 48.9% | $55.27 | 43% |
| Total | 2,075 | 100% | $128.73 | 100% |

Source: USASpending.gov (accessed 2/22/22) cross-referenced with ABC membership as of 12/20/21

## II. The Asserted Justifications for the Proposed Rule Run Counter to the Record Evidence

President Biden's EO 14063 and related sections of the proposed rule rationalize the use of government-mandated "project labor agreements in connection with large-scale construction projects to promote economy and efficiency in federal procurement."[80] However, the proposal fails to provide any quantitative or qualitative research supporting these broad generalizations in support of government-mandated PLAs.

---

[79] Federal contract award data downloaded from usaspending.gov compared to list of general contractors with membership in ABC, December 2021, available at: https://tinyurl.com/3ahjye7e. This data does not count general contractors who are not signatory to a union and are not members of ABC. This data does not include work performed by ABC member subcontractors because the federal government does not track this data.
[80] See Section 1 (c) of EO 14063: https://www.federalregister.gov/d/2022-02869/p-4.

In contrast, strong evidence presented in these comments illustrates how government-mandated PLAs and the Biden administration's pro-PLA policies will injure competition, harm the economy and reduce efficiency in federal procurement.

As discussed throughout these comments, the EO and proposed rule's rationale used to justify PLA mandates on federal construction contracts ranges from factually incorrect to preposterous.[81]

For example, Section 1 of the EO justifies the use of government-mandated PLAs because "Construction employers typically do not have a permanent workforce, which makes it difficult to predict labor costs when bidding on contracts and to ensure a steady supply of labor on contracts being performed."[82] The proposal and EO offer no support for this claim. In contrast, as discussed in these comments, ABC contractors assert that nonunion contractors do have a permanent workforce and a PLA's requirement to replace most or all of its existing workforce with unfamiliar workers from union hiring halls and obey unfamiliar union work rules will result in unpredictable labor costs and expose a firm to additional productivity, quality and safety risks that would not otherwise exist on a project subject to fair and open competition standards free from government-mandated PLAs.

In fact, unionized contractors are the parties that typically do not have a permanent workforce—they build projects in a geographic region and receive labor from various signatory union halls containing local and out-of-area traveler workers with union cards. Unionized firms are more likely to have concerns with a steady supply of labor because union hiring halls may not have enough labor to meet a project's needs in a tight labor market. This is consistent with the fact that less than 13% of the U.S. construction industry workforce is unionized and less than 10% of the construction industry workforce is unionized in 24 states.

As further discussed in these comments, the EO and proposal repeatedly make unsubstantiated claims that a PLA mandate will "advance the interests of project owners, contractors, and subcontractors, including small businesses." But the truth is that PLAs address areas of concern unique to union-signatory contractors and inefficiencies in union CBAs.[83] The PLA's solutions to these "union problems" chill efficiencies and robust competition by nonunion firms. In addition, many of the alleged benefits of PLAs related to workforce development, drug testing, targeted local and diverse hire and contracting goals, safety and labor dispute avoidance are routinely handled on large-scale federal, state, local and private construction projects without the need for discriminatory and costly language in typical PLAs. In short, to quality nonunion contractors, government-mandated PLAs are a solution in search of a problem.

Finally, contractors have always been able to negotiate and enter into PLAs with labor unions independent of this policy, as guaranteed by the NLRA. If PLAs are beneficial to a contractor and its government client, they can negotiate and execute one independent of a disruptive

---

[81] See policy rationale for Section 1 (a) and (b) of EO 14063.
[82] See https://www.federalregister.gov/d/2022-02869/p-2.
[83] See discussion on the impact of government-mandated PLAs on costs in Section II. A. of this comment letter.

government-mandated PLA. The EO and proposed rule are not needed to ensure the use of voluntary government-mandated PLAs.

As such, the EO and proposed rule offer no factual justification for its claim that PLAs "promote economy and efficiency in federal procurement" and are necessary because "large-scale construction projects pose special challenges to efficient and timely procurement by the federal government."[84]

The truth is the federal government's pro-PLA policy of the last 12 years that encourages—but does not require—federal agencies to mandate PLAs provides the public with a comprehensive real-world demonstration that the proposed rule's assertion that PLAs "may provide structure and stability needed to reduce uncertainties for all parties connected to a large-scale construction project" has no basis in fact.[85]

In February 2009, President Barack Obama signed EO 13502, which encourages—but does not require—federal agencies to mandate PLAs on large-scale federal construction projects exceeding $25 million in total cost.[86] Notably, this policy allowed federal agency contracting officers to make decisions about PLA mandates on a case-by-case basis. It is not surprising that PLAs were rarely required.

Between fiscal years 2009 and 2021, 2,075 federal contracts worth $128.73 billion were subject to the Obama policy, but just 12 federal contracts worth a total of $1.25 billion were issued with a PLA mandated by a federal agency.[87] More than 99% of all federal construction contracts of $25 million or more during this time period were not subject to a government-mandated PLA.

---

[84] See Section 1 of EO 14063: https://www.federalregister.gov/d/2022-02869/p-2.

[85] See quoted language in the proposed rule preamble: https://www.federalregister.gov/d/2022-17067/p-10 and Section 1(b) of EO 14063: https://www.federalregister.gov/d/2022-02869/p-3.

[86] See https://www.gpo.gov/fdsys/pkg/FR-2009-02-11/pdf/E9-3113.pdf. EO 13502 also permits recipients of federal assistance to mandate PLAs on state and local public works projects.

[87] Chart available at: https://thetruthaboutplas.com/wp-content/uploads/2022/04/PLA-Mandates-on-Federal-Contracts-FY2009-FY2021-033022.png.



## PLA MANDATES ON FEDERAL CONTRACTS

**Total value of PLA mandate/preference contracts greater than $25M, FY2009-FY2021**

- Non-GMPLA contracts far outnumber GMPLA contracts by value (99.02%) and number of contracts (99.42%) on $128.73B of fed. projects greater than $25M.
- There were no fed. GMPLAs during the Trump White House.

*Source: USASpending.gov (accessed 2/22/22) cross-referenced with known list of federal government-mandated PLAs*

These data[88] illustrate that federal procurement officials—when given the freedom to assess whether government-mandated PLAs will benefit a large-scale construction contract—almost universally decided against requiring PLAs.

In addition, from 2001 to its repeal by the Obama policy, President George W. Bush's Executive Orders 13202 and 13208[89] prohibited government-mandated PLAs on $147 billion worth of direct federal construction projects.[90]

Yet for more than 20 years there have been no widespread reports of federal construction projects suffering from increased costs,[91] strikes,[92] labor shortages,[93] safety issues[94] or poor quality specifically attributable to the lack of a government-mandated PLA, which undermine common arguments PLA proponents use to justify PLA schemes.

---

[88] This data is confirmed in the proposed rule, "According to the data collected by OMB, between the years of 2009 and 2021, there were a total of approximately 2,000 eligible contracts and the requirement for a PLA was used 12 times," at https://www.federalregister.gov/d/2022-17067/p-29.

[89] Executive Order 13202: Preservation of Open Competition and Government Neutrality Towards Government Contractors' Labor Relations on Federal and Federally Funded Construction Projects, Feb. 17, 2001, and Executive Order 13208: Amendment to Executive Order 13202, Preservation of Open Competition and Government Neutrality Towards Government Contractors' Labor Relations on Federal and Federally Funded Construction Projects, April 6, 2001, also prohibited government-mandated PLAs on federally assisted construction projects procured by state and local governments.

[90] See research in Project Labor Agreements on Federal Construction Projects: A Costly Solution in Search of a Problem, The Beacon Hill Institute, August 2009: "One would expect there to be dozens of tales about labor strife, slowdowns and significant cost overruns that characterized this PLA-free world. Yet, we found no record of such tales."

[91] Government-Mandated Project Labor Agreement Failures on Federal and Federally Assisted Construction Projects, March 10, 2021, https://tinyurl.com/3fefedna.

[92] See www.TheTruthAboutPLAs.com, Do Project Labor Agreements Stop Strikes on Construction Jobsites?, March 29, 2022.

[93] See www.TheTruthAboutPLAs.com, Biden's Project Labor Agreement Schemes Exacerbate Construction Industry's Skilled Labor Shortage, June 29, 2022.

[94] See www.TheTruthAboutPLAs.com, Setting the Record Straight: Do Government-Mandated Project Labor Agreements Really Improve Safety Performance? March 16, 2021, https://tinyurl.com/2fyyjkdm.

In addition, there have been no widespread reports of similar problems attributable to a lack of PLA mandates on public works construction projects in the 24 states that have passed laws restricting government-mandated PLAs on state, state-assisted and local construction projects to some degree—totaling almost $925 billion worth of public works construction put in place over the last 12 years.[95]



Data Source: Total U.S. State and Local Construction Capital Outlay, U.S. Census Bureau

In fact, of the few federal construction projects subjected to government-mandated PLAs under the "PLA optional" Obama policy, many projects experienced delays,[96] poor local hire outcomes,[97] reduced competition and increased costs[98] as described in these comments.

Despite this evidence, the Biden EO 14063 and proposed rule's default pro-PLA mandate assumes a project procured with a PLA mandate will result in superior outcomes compared to a project procured via fair and open competition. As further discussed in Section II of this comment letter, the claimed justifications for the EO and proposed rule are contrary to the record of evidence and fail to justify PLA mandates at all.

---

[95] See ABC analysis of U.S. Census Bureau data on value of state and local public construction projects at https://thetruthaboutplas.com/wp-content/uploads/2022/10/Cap-Outlay-for-Construction-in-PLA-Reform-States-through-2021-ABC-Update-080322.xlsx and related map at https://thetruthaboutplas.com/wp-content/uploads/2022/09/State-Map-Cap-Construction-Outlay-Protected-from-PLAs-Via-State-FOCA-Laws-Through-2021-080122.png.

[96] See www.TheTruthAboutPLAs.com, Delays and Increased Costs: The Truth About the Failed PLA on the GSA's 1800 F Street Federal Building, March 5, 2013.

[97] Data collected by Del. Eleanor Holmes-Norton, D-D.C., on federal projects subject to PLA mandates located in the District of Columbia under the Obama administration's pro-PLA policy demonstrated that PLAs delivered worse local hiring outcomes for District of Columbia residents than other large-scale federal projects not subject to a PLA in the region. See TheTruthAboutPLAs.com, Data Busts Myth That Project Labor Agreements Result in Increased Local Hiring, March 11, 2013.

[98] See www.TheTruthAboutPLAs.com, Government-Mandated Project Labor Agreement Failures on Federal and Federally Assisted Construction Projects, March 10, 2021, and GSA Wasted Millions on Union Handout, Where's the Outrage? April 10, 2012.

**A. PLAs Will Not Achieve Economy But Will Instead Increase Costs Significantly**

The proposed rule fails to identify any factual justification to support the claim that government-mandated PLAs reduce the cost of construction on large-scale federal construction contracts. There is no factual basis for claims that PLAs will reduce costs on federal construction projects.[99]

In contrast, recent surveys of federal contractors, robust academic studies and overwhelming evidence from the few PLA mandates on federal projects subject to the Obama administration's pro-PLA policy strongly suggests that PLA mandates needlessly increase costs that will be ultimately shouldered by taxpayers.

For example, a DOL Job Corps Center in Manchester, New Hampshire, was originally bid with a PLA mandate in 2009. After nearly three years of PLA-related delays and litigation, the project was bid with a PLA in January 2012 and then rebid without a PLA in October 2012. Results of bids without a PLA requirement prove PLAs increase costs and reduce competition. Without a PLA, there were more than three times as many bidders (nine versus three) and the low bidder's offer was $6,247,000 (16.47%) less than the lowest PLA bidder. In addition, firms that participated in both rounds of bidding submitted an offer that was nearly 10% less than when they submitted a bid with a PLA. Without a PLA, a local firm from New Hampshire won the contract and performed it safely, on time and on budget to the satisfaction of the DOL. In contrast, the low bidder under the PLA mandate was from Florida.[100]

In another example of increased costs and litigation[101] on a federal PLA project, in 2010, the General Services Administration awarded a $52.3 million contract to a general contractor to build the federal Lafayette Building in Washington, D.C., but then forced the contractor to sign a change order post-award and build it with a PLA. The PLA requirement needlessly cost taxpayers an additional $3.3 million.[102]

Another GSA project awarded in 2010, the GSA Headquarters at 1800 F St. in Washington, D.C., suffered a 107-day delay when members of a local construction trade council refused to accept the terms of a PLA the contractor presented for negotiations post award of the federal contract that had already been signed by the carpenters union not affiliated with the local

---

[99] For example, the Beacon Hill Institute for Public Policy research has thoroughly debunked misleading claims and reports that PLA mandates reduce construction costs in Belaboring PLAs: A Critique of the Seeler Reports, Oct. 15, 2021, Affidavit of Prof. David G. Tuerck, PhD, before the Government Accountability Office, concerning Protests of Eckman Construction, Turnstone Corporation and Wu & Associates, Inc. No., B-406526.1; Solicitation DOL121RB20457, June 2012, and Pages 43-62 of Tuerck's Cato Journal article, Why Project Labor Agreements Are Not in the Public Interest, Winter 2010. It should be noted that in virtually every instance when PLA apologists have attempted to demonstrate how PLAs can reduce construction costs, they do so by comparing the costs of an already unionized project workforce with and without a PLA. There is no comparison of cost savings on a project with and without a PLA if the project was dominated by nonunion contractors and workers, as is the case in most markets across America.

[100] See www.TheTruthAboutPLAs.com for full details on the project, Union's Criticism Misses Mark on U.S. Department of Labor's New Hampshire Job Corps Center Project Labor Agreement Scheme, Sept. 3, 2013.

[101] Of note, prior to award, the project was delayed during the bidding process because the GSA was forced to remove a PLA mandate after a contractor filed a bid protest with the Government Accountability Office. See TheTruthAboutPLAs.com, GSA admits Jumping the Gun With PLA Gift to Unions, Dec. 29, 2009, Updated Feb. 2010.

[102] See TheTruthAboutPLAs.com, GSA Wasted Millions on Union Handout, Where's the Outrage? April 10, 2012.

construction trade council.[103] Following the impasse, the GSA instructed the prime contractor to proceed without a PLA with the trades council. This delay increased costs by millions of dollars and affected the project significantly. A subsequent review of documents related to change order negotiations between the GSA and the contractor revealed the GSA clawed back millions of dollars from the contractor built into its original bid related to the added costs associated with performing the project under a PLA.[104]

In addition to these real-world examples of added costs on federal construction projects under the Obama administration's pro-PLA policy, multiple academic studies of thousands of taxpayer-funded affordable housing[105] and school construction projects[106] found that government PLA mandates increase the cost of construction by 12% to 20% compared to similar non-PLA projects when all projects are subjected to prevailing wage regulations.[107]

In addition to these studies, PLA mandates on federally assisted construction projects procured by state and local governments,[108] as well as state and local government public works projects built without federal assistance, have revealed many instances in which PLAs have failed to achieve promised cost savings, and have instead led to cost overruns, delays,

---

[103] See www.TheTruthAboutPLAs.com, Delays and Increased Costs: The Truth About the Failed PLA on the GSA's Headquarters at 1800 F Street, March 5, 2013.

[104] On March 16, 2011, the House Oversight and Government Reform Committee's Regulatory Affairs, Stimulus Oversight and Government Spending Subcommittee held the hearing Regulatory Impediments to Job Creation: The Cost of Doing Business in the Construction Industry. GSA officials testified that the prime contractor on the 1800 F St. building could not finalize a PLA with numerous trade unions in the area. The contractor could only reach an agreement with the local carpenters' union, leading to delays and increased costs on the project. The financial impact of this delay has not been accurately calculated but is estimated to be in the millions of dollars.

[105] Ward, Jason M., The Effects of Project Labor Agreements on the Production of Affordable Housing: Evidence from Proposition HHH. Santa Monica, CA: RAND Corp., 2021. https://www.rand.org/pubs/research_reports/RRA1362-1.html.

[106] See multiple studies measuring the impact of PLA mandates on public school construction already subject to state prevailing wage laws in Connecticut, Massachusetts, New Jersey, New York and Ohio by the Beacon Hill Institute (http://beaconhill.org/labor-economics/); an October 2010 report by the New Jersey Department of Labor and Workforce Development, Annual Report to the Governor and Legislature: Use of Project Labor Agreements in Public Works Building Projects in Fiscal Year 2008 (https://www.nj.gov/labor/forms_pdfs/legal/2010/PLAReportOct2010.pdf); and a 2011 study by the National University System Institute for Policy Research, Measuring the Cost of Project Labor Agreements on School Construction in California (http://www.nusinstitute.org/assets/resources/pageResources/Measuring-the-Cost-of-Project-Labor-Agreements-on-School-Construction-in-California.pdf).

[107] With or without a PLA, all federal projects are subject to federal labor and employment laws, including federal Davis-Bacon prevailing wage regulations, which require government-determined wages for building, heavy and highway projects that are typically union-scale wages where PLAs are most likely to be mandated. The research conducted looked at affordable housing and school construction projects subject to prevailing wage laws regardless of whether a PLA was required, which undermines arguments by PLA proponents that PLAs are needed to ensure high wages and savings from non-PLA projects are a result of undercutting wages and benefits.

[108] See www.TheTruthAboutPLAs.com, Government-Mandated Project Labor Agreement Failures on Federal and Federally Assisted Construction Projects, March 10, 2021.

local hire failures and safety incidents,[109] on such diverse public projects as stadiums,[110] convention centers,[111] civic centers,[112] power plants[113] and airports.[114]

In addition, ABC has collected more than a dozen examples of projects that were bid both with and without PLA mandates. In every instance, fewer bids were submitted under the PLA mandate than were submitted without it, or the costs to the public entity went up or both.[115]

Finally, according to a September 2022 survey of ABC member contractors,[116] 97% of survey respondents said a construction contract that required a PLA would be more expensive compared to a contract procured via free and open competition. Survey respondents generally commented that PLA mandates increase construction costs by:

- Reducing competition from general contractors and subcontractors and their employees, including small and diverse subcontractors required to meet federal agency small business contracting goals;
- Imposing inefficient union work rules unique to union CBAs on nonunion contractors who use multiskilling strategies to increase labor productivity;
- Requiring contractors to contribute into union benefits programs, resulting in double benefits costs solely paid by nonunion contractors, as well as multiemployer pension plan withdrawal liability risk; and
- Added attorney costs and administrative staff costs needed to negotiate/understand a PLA, comply with the PLA and applicable CBA requirements and facilitate payments into unfamiliar benefits plans.

In light of the evidence in demonstrating how and why PLAs increase costs to taxpayers, there can be no rational claim that government-mandated PLAs will achieve greater "economy" in the federal procurement process.

### B. PLAs Will Not Achieve Efficiency But Will Instead Cause Contract Procurement and Project Construction Delays

---

[109] Many problematic PLA projects are documented in ABC General Counsel Maury Baskin's report, Government-Mandated Project Labor Agreements: The Public Record of Poor Performance (2011 Edition).

[110] Nationals Park Costs Rise, Sports Commission Struggles, Washington Examiner, Oct. 21, 2008. Similar cost overruns were experienced on PLA-covered stadiums in Cleveland, Detroit and Seattle. See "Mayor's Final Cost at Stadium 25% Over," Cleveland Plain Dealer, June 24, 2000; "Field of Woes," Crain's Detroit Business Magazine, June 18, 2001; and "New Seattle Stadium Battles Massive Cost Overruns," ENR, July 27/Aug. 3, 1998, at 1, 9. By contrast, Baltimore's Camden Yards and Washington's FedEx Field, among many other merit shop stadiums built around the country over the past two decades, were built without any union-only requirements, with no cost overruns.

[111] Washington Business Journal (March 2003).

[112] "Troubled Center Moves Ahead," Des Moines Register, July 12, 2003; "Say No to Project Labor Agreement," Des Moines Register, July 23, 2003; "Civic Center Bids Exceed the Budget," Post-Bulletin, Sept. 28, 1999.

[113] "Power Plant Costs to Soar," Pasadena Star-News, March 21, 2003.

[114] "SFO Expansion Project Hundreds of Millions Over Budget," San Francisco Chronicle, Dec. 22, 1999.

[115] See www.TheTruthAboutPLAs.com, Great Scott: Projects Bid With and Without PLA Mandates Show PLAs Increase Costs and Reduce Competition, April 18, 2013.

[116] Survey: 97% of ABC Contractors Say Biden's Government-Mandated Project Labor Agreement Policies Would Make Federal Construction More Expensive, ABC Newsline, Sept. 28, 2022.

According to a September 2022 survey of ABC member contractors,[117] 97% of respondents said that government-mandated PLAs decrease economy and efficiency in government contracting. Eighty-five percent said PLA mandates decrease the likelihood of completing a project on time and on budget, with just 9% saying there would be no impact.

As discussed already in ABC's comments, survey responses to open-ended questions illuminated compelling reasons why the Biden administration's EO and proposed rule is likely to result in delays during a federal agency's procurement of a federal contract subject to a PLA mandate, in addition to delays during the actual construction of the federal project subject to a PLA requirement.

This is particularly true for indefinite-delivery, indefinite-quantity contracts where the use of a PLA will for the first time be required on an order-by-order basis or for an entire contract, without any rational justification. Alternate III of the FAR Council's proposal gives contracting officers seemingly unbridled discretion to order IDIQ contracts to include PLA mandates with the order offer, prior to award or after award, thereby increasing the level of confusion and potential for delay in IDIQ construction projects.[118]

### C. The Government Should Not Be Involved in Establishing the Terms of a PLA or Any PLA Negotiations Between Contractors and Unions

ABC is concerned that federal agency involvement in establishing the terms and conditions of a PLA—and the negotiation of a PLA in general—can harm competition and lead to needless delays and increased costs.

The proposed rule addresses the federal agency's involvement in PLA negotiations between a contractor and labor unions:[119]

> "FAR 22.504(c) is revised to remove direction that allowed agencies to specify terms and conditions of the PLAs and to engage in efforts to identify the appropriate terms and conditions for a particular construction project. DoD, GSA, and NASA believe the language at 22.504(b)(6), which authorizes agencies to ensure the PLA includes any additional requirements as the agency deems necessary to satisfy its needs, is sufficient. Further, the E.O. directs that an agency may not require contractors or subcontractors to enter into a PLA with any particular labor organization. The proposed rule replaces the current text at FAR 22.504(c) with this direction. Conforming changes are made in the provision at FAR 52.222-33, Notice of Requirement for Project Labor Agreement, and the clause at FAR 52.222-34, Project Labor Agreement."[120]

While it appears the FAR Council recognizes the perils of having federal agency representatives with insufficient expertise in construction industry collective bargaining insert themselves into PLA negotiations with specific language, ABC requests that the FAR Council

---

[117] Ibid.
[118] See 22.504(d)(3) and 22.505(b)(3). See also https://www.federalregister.gov/d/2022-17067/p-127.
[119] See Sec. 4 of EO 14063 to review the general requirements of a PLA: https://www.federalregister.gov/d/2022-02869/p-12.
[120] https://www.federalregister.gov/d/2022-17067/p-20.

clarify this position by explicitly stating that federal agencies are prohibited from suggesting language and engaging in the PLA negotiation process in any form. Clarity is needed because a PLA's minimum terms still appear in the revised Alternate I[121] at FAR 52.222-34.[122]

ABC believes that if a PLA is to be required on a federal solicitation, its terms and conditions should be negotiated solely and directly by contractors with employees working on the PLA project and the labor unions representing workers covered by the PLA. It should only be these parties engaged in negotiating the terms of a PLA because they are the parties engaged in an employer-employee relationship, they may have appropriate experience and expertise to conduct such negotiations and they are the only parties explicitly authorized to enter into a PLA agreement under the NLRA.

In addition, ABC strongly urges the FAR Council to explicitly clarify that under no circumstances shall a contracting agency require contractors to adopt a PLA that was unilaterally written by a labor organization or negotiated in part or in whole by the federal agency or by a contractor (or group of contractors) not employing covered workers on the project. This is necessary in order to avoid reduced competition, litigation and delays, as ABC contractors frequently complain that solicitations containing a partially completed or final PLA that cannot be changed—in which they had no input—discourages them from submitting bids on a project.

### D. The Timing of When a Federal Agency Requires an Executed PLA to Be Submitted During a Solicitation Can Create Delays and Increased Costs

ABC is concerned about the timing and mechanics of how a federal agency requires a PLA in a federal solicitation for construction services because all of the options in the FAR Council's proposal can result in needless delays, inefficiencies and increased costs for contractors, labor unions and federal agency contracting officers.

The proposed rule's changes to FAR provision at 52.222-33, Notice of Requirement for Project Labor Agreement,[123] provides a basic provision and two alternative provisions for the contracting officer to select from when including a PLA requirement in the solicitation. The basic provision says "(b)(1) [*all*] *offerors* shall negotiate or become a party to a project labor agreement with one or more labor organizations for the term of the resulting construction contract."[124] Alternate I says "(b)(1) *the apparent successful offeror* shall negotiate or become a party to a project labor agreement with one or more labor organizations for the term of the resulting construction contract."[125] Alternate II says, "(b)(1) *If awarded the contract, the Offeror* shall negotiate or become a party to a project labor agreement with one or more labor organizations for the term of the resulting construction contract."[126] (Emphasis added.)

---

[121] https://www.federalregister.gov/d/2022-17067/p-140.
[122] https://www.federalregister.gov/d/2022-17067/p-133.
[123] https://www.federalregister.gov/d/2022-17067/p-117.
[124] https://www.federalregister.gov/d/2022-17067/p-119.
[125] https://www.federalregister.gov/d/2022-17067/p-122.
[126] https://www.federalregister.gov/d/2022-17067/p-125.

Each of these options requiring either—all offerors; the apparent successful offeror; or offerors awarded the contract, to submit an executed PLA during a project's solicitation process—create problems that may lead to delays when contractors negotiate and execute PLAs with labor organizations.

For example, federal agency language requiring all offerors on a particular project to negotiate a PLA with one or more unspecified labor organization and to submit an executed PLA with their bids is problematic. This inefficient practice wastes bidders' and labor unions' time and resources. It also wastes resources of federal agencies when a contracting officer reviews all of the PLA proposals from offerors.

In addition, ABC contractors complain that in geographic areas where merit shop contractors have dominant market share and unions have little or no presence, merit shop contractors have no idea which unions to contact to start required PLA negotiations as labor unions may not be local or have authorization to represent workers performing work in the project's geographic location. These factors are likely to result in needless delays and ultimately deter many qualified contractors from bidding on the project, in violation of federal statutes requiring full and open competition.

Moreover, ABC contractors cannot control whether they are able to fulfill the proposal's negotiation obligation with unions because they have no means to require union organizations to negotiate with them.

During ABC's September 2022 survey of members about PLAs and the proposal, ABC contractors raised concerns with a federal agency's requirement for contractors to execute a PLA with unions and submit it with a bid as a condition of winning a federal contract because it gives unions incredible leverage during PLA negotiations and undue influence in which contractors can be awarded a federal contract.

For example, if a prospective offeror successfully identifies correct representatives of appropriate labor organizations and attempts to contact them to request negotiations for a PLA, the contractor has no recourse if the labor unions do not respond or refuse to negotiate. Unions have no legal obligation to negotiate with any particular contractor and have no legal obligation to negotiate in a good-faith, nondiscriminatory and timely manner, absent an established collective bargaining relationship with the contractor under Section 9(a) of the NLRA.

Therefore, federal agency language requiring offerors to negotiate with labor unions—a party with which the contractor offeror has no authority to compel negotiations—effectively grants labor unions the power to prevent certain contractors from submitting an acceptable offer. Such a requirement enables the labor organizations to determine which contractors can submit a successful offer to federal agencies (by discriminating against contractors they do not want to negotiate with, i.e., because they are nonunion and compete with existing union-signatory contractors). The requirement also enables unions to determine which contractors will submit a competitive offer to federal agencies (i.e., by giving more favorable PLA terms to one contractor over another). Such a requirement violates EO 14063's directive that the PLA "allow

all contractors and subcontractors on the construction project to compete for contracts and subcontracts without regard to whether they are otherwise parties to collective bargaining agreements."[127]

The proposal's PLA submission alternatives are not a solution for these concerns. For example, if a federal agency requires only the apparent successful bidder to execute a PLA after offers have been considered (Alternate I), or if it requires a bidder to execute a PLA after the contract has been awarded (Alternate II), then it puts offerors in an untenable position of submitting a bid on a project without knowing its likely labor costs on a project because the PLA has not been finalized prior to submitting a cost estimate. Ultimately, this can increase the likelihood of cost overruns and delays on the project in the long-term. In addition, once again, these options grant labor unions excessive bargaining leverage over contractors where labor unions can demand anything or the contractor risks losing the federal contract. This is exactly what happened on the GSA's 1800 F St. project, referenced previously, that led to a 107-day delay and increased costs and wasted resources for contractors, unions and contracting officers.

ABC urges the FAR Council to amend the proposal to explicitly confirm that parties involved in PLA negotiations shall never be required to reach an agreement with unions but should be required only to engage in good faith bargaining to impasse, consistent with the requirements of the NLRA.

### E. PLA Mandates Will Result in Bid Protests, Litigation and Related Delays During the Procurement Process

Federal agencies will be exposed to costly bid protests, litigation and related delays if they mandate or use a PLA preference on federal construction projects. During the early years of the Obama administration's optional pro-PLA policy, federal contractors, with the support of ABC, filed five Government Accountability Office bid protests against PLAs mandated by four different federal agencies on large-scale federal construction projects. In each of the five GAO bid protests, federal agencies abandoned the PLA requirements after GAO officials suggested they violate federal contracting laws in specific circumstances.[128] In addition to GAO bid protests on individual projects, the Biden administration's pro-PLA policies are likely to be subject to broader litigation by ABC and/or other construction industry and taxpayer-advocate stakeholders seeking full and open competition and the best outcome for taxpayers, which is likely to delay any federal projects subject to PLA requirements and preferences.

### F. PLA Mandates Will Lead to Delays During the Construction of Federal Projects

If a project were able to overcome legal challenges and move forward with a PLA requirement, the impact of a PLA on the performance of a contract may lead to delays.

---

[127] https://www.federalregister.gov/d/2022-02869/p-14.
[128] See www.TheTruthAboutPLAs.com, Legal Challenges Against Federal Government-Mandated Project Labor Agreements During President Obama's First Term, Jan. 22, 2013.

According to ABC's September 2022 survey of ABC member contractors, 85% said PLA mandates decrease the likelihood of completing a project on time and on budget, with 9% saying there would be no impact. Respondents repeatedly referenced the following general reasons why a PLA mandate would specifically lead to delays during the construction phase of a project:

- PLAs reduce the pool of general contractors and subcontractors willing and able to compete for contracts to build a project. Less competition may exclude the best firms and/or result in weaker companies performing projects that can lead to delays related to inefficient use of labor, poor scheduling and construction quality.
- PLAs force contractors to replace its existing workforce with unfamiliar union labor that may harm a contractor's productivity, safety and quality construction practices that can lead to delays on a project.
- PLAs can artificially exacerbate the construction industry's skilled labor shortage by eliminating 87.4% of the industry's construction workforce because they have chosen not to affiliate with a union.
- PLAs will harm inclusion of small and disadvantaged businesses needed to meet federal agency prime and subcontracting goals because these firms are not unionized.

### G. Strikes Are Rare in Today's Construction Industry, But Have Occurred on PLA Projects

The proposal and EO claim that PLA mandates are important tools to avoid project delays by preventing strikes and labor disputes on a project:

> "Challenges also arise because construction projects typically involve multiple employers at a single location, and a labor dispute involving one employer can delay the entire project. A lack of coordination among various employers, or uncertainty about the terms and conditions of employment of various groups of workers, can create friction and disputes in the absence of an agreed-upon resolution mechanism. These problems threaten the efficient and timely completion of construction projects undertaken by Federal contractors. On large-scale projects, which are generally more complex and of longer duration, these problems tend to be more pronounced.
>
> (b) Project labor agreements are often effective in preventing these problems from developing because they provide structure and stability to large-scale construction projects. Such agreements avoid labor-related disruptions on projects by using dispute-resolution processes to resolve worksite disputes and by prohibiting work stoppages, including strikes and lockouts. They secure the commitment of all stakeholders on a construction site that the project will proceed efficiently without unnecessary interruptions."[129]

However, the proposal presents no evidence of strikes and/or labor unrest on large-scale federal construction projects. ABC is unaware of any strikes or labor unrest on a federal

---

[129] See Section 1 of EO at https://www.federalregister.gov/d/2022-02869/p-2.

agency project subject to a PLA since ABC started monitoring federal contracts for such issues in 2001 through 2022, when PLA mandates were not used on more than 99% of hundreds of billions of dollars' worth of federal construction projects (as discussed in Section II of this comments letter).

In addition, the proposal fails to recognize other strategies to mitigate union-orchestrated strikes, work stoppages, slowdowns and other labor unrest through strong contracting language and other best practices commonly employed on projects independent of PLAs and their anti-competitive and costly provisions.

Historically, strikes and labor unrest executed by rank-and-file union members can shut down a jobsite and delay the opening of a project, potentially costing public and private construction owners time and money and harming the project end user's bottom line. In fact, one of the key reasons PLAs were originally developed in the 1930s was as a solution to prevent costly strikes on important large-scale public works projects like dams during an era when more than 80% of the U.S. construction workforce belonged to a union.

However, today, just 12.6% of the U.S. construction workforce belongs to a union, according to the U.S. Bureau of Labor Statistics[130]—a total reversal.

In addition, nonunion construction workers do not strike and there have been no reports of nonunion construction workers striking in the construction industry on federal projects.

PLA advocates display a classic case of "firefighter-arson syndrome" when promoting PLAs as a tool to prevent labor unrest. Unions offer lawmakers PLAs as a solution to a problem they create in exchange for a labor monopoly on taxpayer-funded construction projects. But the truth is that strikes in today's construction marketplace are relatively rare, and there have been strikes on PLA projects, which calls into question the value of these agreements preventing labor unrest.

In 2021, ABC reviewed the most recent data available from the U.S. Bureau of Labor Statistics' Work Stoppages Program, which tracks major work stoppages involving 1,000 or more workers, and found there were just 10 major work stoppages in the construction industry on public and private projects between 2010 and 2019.[131]

In addition, in 2021 ABC reviewed the most recent data available from the Federal Mediation and Conciliation Service[132] on historical construction industry work stoppages through FY 2019 and found there were just 45 construction industry work stoppages from 2015 to 2019 and 101 work stoppages from 2010 to 2014 on public and private projects.[133]

---

[130] "Union Members – 2021," Bureau of Labor Statistics, January 2022.
[131] See https://www.bls.gov/web/wkstp/annual-listing.htm and ABC data at: https://thetruthaboutplas.com/wp-content/uploads/2021/03/BLS-Work-Stoppages-Over-1000-Employees-Data-Downloaded-031221.xlsx.
[132] See https://www.fmcs.gov/resources/documents-and-data/.
[133] See https://thetruthaboutplas.com/wp-content/uploads/2021/03/Construction-Industry-Work-Stoppages-1984-FY19-downloaded-from-FMCS-013021-V-022421.xls.

Likewise, a labor action tracker provided by Cornell University's School of Industrial and Labor Relations shows just six labor actions specific to the construction industry from January 2020 through October 2022.[134]

In the words of an ABC survey respondent, "Why lawmakers continue to rob taxpayers with a 20% cost premium markup on construction contracts because of a solution to a problem that is rare and rewards the party that creates the problem is baffling."

It's even more puzzling after examining the public record of union strikes on nonfederal public and private projects subjected to PLA mandates, despite promises that PLAs prevent strikes. For example, Joseph Hunt, who retired from serving as the president of the Ironworkers Union in 2011, devoted an entire column in a membership publication urging Ironworkers Union members not to strike on PLA projects:[135]

> "Once again, it is my duty to inform you there has been an increase in work stoppages on jobs governed by project labor agreements. A No Work Stoppage-No Lock Out clause is the most important because it is the foremost reason owners and contractors are willing to use the agreement [a PLA] to commit to an all-union job. They [owners] have a choice, and they know that the nonunion do not have jurisdictional disputers, nor do they have strikes."

Hunt's admission that government-mandated PLAs result in an all-union job, that nonunion workers don't disrupt jobsites and that ironworkers have been striking on PLA projects undermines decades of misinformation told by PLA advocates and sympathetic lawmakers who attempt to disguise what PLAs really are: schemes whereby government cronies cut competition from quality local nonunion contractors and union-signatory firms not affiliated with the unions favored in the PLA and steer contracts to political donors—in this case union-signatory contractors and union labor—at inflated costs shouldered by hardworking taxpayers.

Examples of strikes and walkouts on notable private and taxpayer-funded PLA projects across the country call into question the value of PLAs and their controversial no-strike promise.[136]

Media reports have called the federal, state and local taxpayer-funded Highway 99 tunnel mega-project underneath Seattle's downtown waterfront[137] the "West Coast's Big Dig,"[138] noting parallels to Boston's notoriously delayed and budget-busting series of tunnels and highway improvements.[139] The Seattle project has been plagued by delays, cost overruns, featherbedding, union strikes and labor disputes, a poor safety record, employees working on the jobsite while drunk, sexual harassment allegations and violations of state and federal

---

[134] Search for construction in the Cornell ILR's tool at https://striketracker.ilr.cornell.edu/.
[135] See Hunt's President's Page column, Ironworkers Have Tradition and Honor in Project Labor Agreements, The Ironworker, February 2008.
[136] A chapter in ABC General Counsel Maury Baskin's report, Government-Mandated Project Labor Agreements: The Public Record of Poor Performance (2011 Edition), documents construction delays and cost overruns caused by strikes on more than a decade of various PLA projects across the country.
[137] https://www.fhwa.dot.gov/ipd/project_profiles/wa_alaskan_way.aspx.
[138] Seattle confronts prospect of its own long-delayed Big Dig, The Washington Post, Reid Wilson, Dec. 30, 2014.
[139] Editorial: Construction plans show state learned little from Big Dig, Gloucester Times, June 22, 2010.

minority contracting rules.[140] Both projects were procured with controversial government-mandated PLAs.

In 2018, the National Labor Relations Board imposed a settlement requiring that the Steamfitters Union stop illegal strikes and job actions against firms working at the $20 billion Hudson Yards multibuilding private development in New York City, which was subject to a PLA.[141] In 2015, the project was also subjected to a PLA-violating strike that impacted 30 other NYC jobsites and was resolved after a judge issued a restraining order against striking workers.[142]

Federally assisted projects that were part of the World Trade Center reconstruction following the 9/11 attacks in New York City suffered strikes in 2015,[143] 2013[144] and 2011,[145] despite no-strike promises contained in these projects' PLAs. Of note, the 4 World Trade Center jobsite suffered a crane accident in February 2012. In August 2012, the *New York Post* reported the Port Authority cracked down on drinking by construction union members following a series of accidents and reports of excessive workday boozing by union tradespeople employed at various World Trade Center construction projects, including 4 World Trade Center.[146]

In addition, Chicago was a relative hotbed of strikes on PLA projects in 2010,[147] but the most famous private project subjected to a strike in the city occurred on the $850-million Trump International Hotel and Tower in downtown Chicago. In June 2006, the Trump company developing the $850-million project in downtown Chicago sued three labor organizations for breaching the terms of a PLA after union members walked off the project during a strike.[148]

The Trump development company eventually settled the suit against the Chicago and Cook County Building and Construction Trades Council, the Construction and General Laborers' District Council of Chicago and Vicinity and Laborers' International Union Local 6.

Joseph Gagliardo, managing partner of the firm Laner, Muchin, Dombrow, Becker, Levin and Tominberg Ltd., represented 401 North Wabash in the action and told the media that the unfortunate lesson emerging from this strike and suit was to question the real value of PLAs with Chicago's construction unions.

---

[140] See www.TheTruthAboutPLAs.com, The West Coast's Bid Dig Boondoggle Woes Continue: Seattle's Tunnel PLA Job Dangerous for Workers, March 22, 2016, and Despite Project Labor Agreement, Union Dispute Shuts Down Seattle Tunnel Job For Four Weeks, Sept. 18, 2013.

[141] Labor Board Requires Hudson Yards Unions to Stop Strikes, New York Post, Carl Campanile, July 31, 2018.

[142] Judge points to PLA in ordering union workers to end strike, Real Estate Weekly, July 6, 2015.

[143] See www.TheTruthAboutPLAs.com, NYC Union Strike Shuts Down Project Labor Agreement Jobsites Again, July 13, 2015.

[144] See www.TheTruthAboutPLAs.com, NYC Carpenters Union Breaks Project Labor Agreement's No-Strike Promise at 4 WTC Jobsite, July 2, 2013.

[145] See www.TheTruthAboutPLAs.com, Another PLA Myth Busted: PLAs Fail to Prevent Strikes on NYC Projects, Aug. 2, 2011.

[146] Port Authority cracking down on drinking by WTC construction crews, New York Post, Josh Margolin, Aug. 6, 2012.

[147] See www.TheTruthAboutPLAs.com, PLA Projects Delayed by Chicago Construction Union Strike: Another PLA Myth Busted, July 17, 2010.

[148] See case 401 North Wabash Venture LLC v. Chicago and Cook County Building and Construction Trades Council, N.D. Ill., No. 06-CV-3077, 6/5/06.

31

"The whole purpose of the project labor agreement is to prevent interruption and prevent delay and have labor peace," he said. "So the question this strike raises is—and I don't know the answer to it—what impact will this strike have on the willingness of other building owners to engage in a project labor agreement?"

This government data on the scarcity of construction industry strikes and examples of strikes on PLA projects undermine the proposal and EO's assertions that PLAs are needed to prevent strikes and labor unrest on large-scale federal projects.

### H. PLAs Will Not Achieve Greater Efficiency in Terms of Safety, Quality or Project Delivery

There is no evidence to support claims that PLAs guarantee better safety, quality or construction project delivery. As demonstrated in Section II of these comments, ABC federal contractors have continued to win the majority of large-scale federal contracts and deliver quality work safely, on time and on budget without harmful government-mandated PLAs.

In addition, the majority of ABC's September 2022 survey respondents said PLA mandates would either result in construction projects that are less safe (65%) or have no impact on safety (34%). Three-quarters (75%) said PLAs would result in poorer quality or have no impact on quality (24%). Fully 85% said PLA mandates decrease the likelihood of completing a project on time and on budget, with 9% saying there would be no impact. [149]

Improved safety has been frequently cited as a justification for PLA mandates. However, there is no evidence to suggest that PLAs improve safety. Contractors are already required to follow all applicable federal, state and local safety regulations whether a project is built with or without a government-mandated PLA. Construction superintendents and others responsible for jobsite safety are required to comply with safety regulations that are constantly being issued and updated by the DOL's Occupational Safety and Health Administration.

Many states also have state and local workplace safety regulations that may be more expansive than federal OSHA regulations, and these also must be followed as a condition of complying with a government contract. These measures remain in place on jobs built with and without government-mandated PLAs.

Many construction contractors have additional internal company safety education programs, jobsite safety plans and in-house safety departments and rely on third-party experts and external safety professionals to bolster jobsite safety. ABC believes maintaining world-class safety is no accident and created the STEP Safety Management System, a program that helps industry contractors improve jobsite safety.[150] STEP measures how much leading indicators—proactive injury and hazard elimination tools on the jobsite—improve safety performance.

---

[149] Survey: 97% of ABC Contractors Say Biden's Government-Mandated Project Labor Agreement Policies Would Make Federal Construction More Expensive, ABC Newsline, Sept. 28, 2022.
[150] http://www.abcstep.org/.

ABC's Safety Performance Report[151] captures data on nearly a billion hours of construction work from STEP participants and identifies the best practices and core leading indicators that had the biggest impact on safety performance. In 2021, those included the use of personal protective equipment, supervisor safety meetings, pre-planning for project safety and employee participation in safety reporting and processes, among others. The findings of ABC's 2022 Safety Performance Report show that safety processes and planning are the keys to project safety. Top-performing STEP companies achieved incident rates 645% safer than the BLS industry average in 2021 by focusing on safety through a companywide commitment to safety as a core value.

Creating an effective company safety culture and formal process for tracking these leading indicators and acting on them has produced positive and meaningful safety outcomes without the necessity for a government-mandated PLA.

In addition, BLS data suggests that government-mandated PLAs do not measurably improve safety. The 2019 BLS Survey Occupational Injuries and Illnesses and the BLS Census of Fatal Occupational Injuries show that states with laws prohibiting government-mandated PLAs had average of 2.4 total recordable construction incidents, while states that allow and encourage government-mandated PLAs had an average of 3.5 total recordable construction incidents.[152]

In fact, a government-mandated PLA can undermine a company's safety culture by replacing all or most of its existing workforce with construction workers from union hiring halls with unknown safety education and no familiarity with a company's existing safety program and culture.

Likewise, a government-mandated PLA can also undermine a project's quality by requiring that contractors get most or all of their labor from union hiring halls and follow inefficient union work rules. ABC contractors raise concerns that both factors are likely to result in the performance of a project that fails to meet a company's quality standards. ABC contractors say the use of existing employees and multiskilling helps ensure quality work and consistent labor costs, but those are undermined when a PLA is mandated.

Based on the lack of evidence for improvements to safety, quality or project delivery, there is no "efficiency"-based justification for mandating a PLA on federal construction projects.

---

[151] ABC 2022 Safety Performance Report: Top-Performing STEP Members Are Six Times Safer Than Industry Average, ABC, April 29, 2022.
[152] See www.TheTruthAboutPLAs.com, Setting the Record Straight: Do Government-Mandated Project Labor Agreements Really Improve Safety Performance? March 16, 2021, https://tinyurl.com/2fyyjkdm.

**III. Based on the Facts Set Forth Above, the Executive Order and the Proposed Rule Implementing It Violate Numerous Federal Laws and Must Be Withdrawn**

### A. The Proposed Rule Violates CICA's Mandate of "Full and Open Competition" in the Award of Federal Construction Contracts

The foundation for the federal government's procurement requirements is the Competition in Contracting Act of 1984.[153] CICA was enacted to assure that all interested and responsible parties have an equal opportunity to compete for and win federal government contracts. Full and open competition means that all responsible sources are permitted to submit competitive proposals on a procurement action, without favoritism or discrimination in the procurement process. CICA requires, with certain limited exceptions, that the federal government promote full and open competition in awarding contracts.[154]

Of particular significance to the proposed rule, CICA expressly bars federal agencies from using restrictive bid specifications to effectively discourage or exclude contractors from the pool of potential bidders or offerors. As the act states, agencies must solicit bids and offers "in a manner designed to achieve full and open competition" and "develop specifications in such a manner as is necessary to obtain full and open competition."[155]

As discussed above, the proposed rule conflicts directly with CICA by requiring federal agencies to impose PLAs which discriminate against and injure competition among potential bidders, i.e., those contractors who are not signatory to certain favored union labor unions and corresponding CBAs.[156] By demonstrating a preference toward a narrow class of contractors, this proposal and government-mandated PLAs clearly do not "obtain full and open competition" and are therefore unlawful under CICA.

### B. The Proposed Rule and Executive Order Exceed the President's Authority Under the Federal Property Administrative Services Act

The sole statutory authority for the proposed rule, and the president's EO 14063 cited therein, is the Federal Property and Administrative Services Act of 1949.[157] That FPASA is intended to "provide the Federal Government with an economical and efficient system" of government procurement. The act gives the president the authority to "prescribe policies and directives that [the President] considers necessary to carry out" the act, only so long as such policies are "consistent with" the act and with other laws, such as CICA. Unless President Biden has acted

---

[153] 40 U.S.C. §471 *et seq.* and 41 U.S.C. §251 *et seq.*
[154] For a full and recent discussion of CICA's requirements, *see* Manuel, *Competition in Federal Contracting: An Overview of the Legal Requirements* (Congressional Research Service April 2009).
[155] *Id.* at 18, citing 10 U.S.C. § 2305(a)(1)(A) and 41 U.S.C. § 253a(a)(1)(A-C); *see also* Cohen, *The Competition in Contracting Act,* 14 Pub. Con. L. J. 19 (1983/1984).
[156] More than 87% of the U.S. construction industry workforce do not belong to a union and are employed by contractors who are not signatory to any union agreements, according to U.S. Bureau of Labor Statistics Table 3, Union affiliation of employed wage and salary workers by occupation and industry, accessed Oct. 4, 2022, available at: https://www.bls.gov/news.release/union2.t03.htm.
[157] 40 U.S.C. § 101, *et seq.*

in a manner consistent with this statutory authority, neither the proposed rule nor EO14063 is valid.[158]

No president has previously claimed the authority under the FPASA to mandate PLAs on federal construction projects throughout the government. Such an unprecedented arrogation of authority to the executive branch violates the Constitution in a manner squarely prohibited by the U.S. Supreme Court in West Virginia v. EPA.[159] In contrast, President Obama's EO 13502 only "encouraged" federal agencies to consider and, if appropriate, adopt PLAs if specific criteria were met. As discussed in ABC's comments, very few federal contracts were actually subjected to PLA mandates under the Obama EO 13502, which itself is proof that the government procurement officials recognized the harms caused by imposing PLAs on federal construction procurements across the board.

ABC's comments present overwhelming evidence of problems on projects subject to government-mandated PLAs which, in concert with the federal government's limited use and negative experiences with PLA mandates under President Obama's EO 13502 and related FAR regulations[160] since 2009, thoroughly undermines EO 14063 and the proposed rule's justifications for PLA mandates on federal construction contracts. As a result, the EO and the proposed rule cannot be found to be authorized by the FPASA.[161]

## C.  By Overturning Previous Regulations Governing PLAs Without Adequate Justification, The Proposed FAR Rule Is Arbitrary and Capricious in Violation of the Administrative Procedure Act

The Supreme Court has repeatedly held that agencies act arbitrarily when they change course without dealing with the important aspects of the problem addressed by the rule they purport to reconsider.[162] Here, the proposed FAR Council rule fails to address the injuries to competition, discrimination, increased costs and greater likelihood of delays in construction caused by PLA mandates, as demonstrated throughout ABC's comments in this document.

Agency reversals of policy have also been vacated where they rely on factors that they should not have considered, and where they offer explanations for new rules that run counter to the evidence.[163] As shown throughout ABC's comments, the proposed FAR Council rule offers explanations for the PLA mandate that run counter to the evidence. The use of internally

---

[158] *See Liberty Mut. Ins. Co. v. Friedman*, 639 F. 2d 164, 169-171 (4th Cir. 1981) ("[A] court must reasonably be able to conclude that the grant of [legislative] authority contemplates the regulations issued.").

[159] 142 S. Ct. 2587, 2608 (2022) (refusing to permit the executive branch to exercise powers of vast economic and political significance unless Congress has spoken clearly to authorize the agency to exercise such powers.). See also Georgia v. President of the U.S., 46 F. 4th 1283 (11th Cir. 2022) (rejecting president's claimed authority to impose vaccine mandates on government contractors under the FPASA).

[160] See FAR Case 2009-005, Use of Project Labor Agreements for Federal Construction Projects, published April 13, 2020, effective May 13, 2010, and EO 13502, *Use of Project Labor Agreements for Federal Construction Projects*, signed Feb. 6, 2009, (https://www.govinfo.gov/content/pkg/FR-2009-02-11/pdf/E9-3113.pdf).

[161] Because of the president's failure to justify his executive order with facts demonstrating a close nexus between government-mandated PLAs and increase economy and efficiency of federal procurement, such cases as *AFL-CIO v. Kahn*, 618 F. 2d 784 (D.C. Cir. 1979) are distinguishable.

[162] *See, e.g., DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1910 (2020); *State Farm*, 463 U.S. at 43 (1983) ("An agency's action is arbitrary and capricious, … where it fails to consider important aspects of the problem.").

[163] *Id.*; *see also FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009).

contradictory reasoning also indicates arbitrary action.[164] As shown throughout ABC's comments, the FAR Council's rationales plainly contradict themselves, as the PLA mandates do not promote greater efficiency or reduced cost but the exact opposite instead.

As the Supreme Court has also held, an agency that purports to be changing longstanding policies, as is certainly occurring here, must also consider costs to regulated parties, as well as the reliance interests of the regulated parties.[165] Government contractors in the construction industry have long relied on the principle of government neutrality in procurement to provide competitive, responsive and responsible bids. The proposed rule upends these longstanding principles without any consideration of the reliance interests of the regulated parties.[166]

In sum, the FAR Council's proposed PLA mandate rule is arbitrary and capricious because the agency has relied on factors which Congress did not intend it to consider, entirely failed to consider important aspects of the problem, offers explanations for its decision that run counter to the evidence before the agency and/or fails to address the costs and reliance interests of the regulated parties. For all of these reasons, the proposed PLA mandate rule violates the APA, as a federal court is likely to find, and the proposed rule should be immediately withdrawn.

## D. The Proposed Rule Discourages Small and Disadvantaged Businesses From Bidding on Federal Construction Projects, Thereby Violating the Small Business Act

The adverse economic impact of PLAs on small businesses in the construction industry directly contravenes Congress's repeatedly expressed intent to promote and encourage federal procurement to small businesses.[167] In 1978, Congress amended the Small Business Act to require all federal agencies to set percentage goals for the awarding of procurement contracts to small businesses.[168]

As referenced throughout these comments, the majority of ABC's contractor members are classified as small businesses. The companies represent the backbone of the construction industry. Unfortunately, the proposed rule would continue a trend of policies that have reduced small business participation in federal contracting. Small businesses have suffered a 60% decline in the number of firms awarded federal contracts from 2010-2020, according to SBA data.[169]

---

[164] See Southwestern Elec. Power Co. v. EPA, 920 F.3d 999, 1030 (5th Cir. 2019) ("[T]he agency's rationales contradict themselves...and therefore cannot stand.").

[165] Encino Motorcars v. Navarro, 136 S. Ct. 2117, 2125-26 (2016); Brackeen v. Haaland, 994 F.3d 249 (5th Cir. 2021) (en banc).

[166] See also Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n, 989 F.3d 368, 387 (5th Cir. 2021).

[167] See discussion in An Overview of Small Business Contracting, Congressional Research Service, updated July 29, 2022.

[168] P.L. 95-507 (1978), 15 U.S.C. 644 (g).

[169] Chart available at: https://thetruthaboutplas.com/wp-content/uploads/2022/09/60-percent-decline-of-small-businesses-awarded-federal-construction-contracts-2010-to-2020.png. The data was prepared by an SBA economist who said, "The charts represent data on vendors who have received obligations. The definition of 'small' comes from the contracting officer's determination when the contract was awarded. The COs follow the NAICS size standards." Data is from FPDS that can be publicly accessed through SAM.gov: https://sam.gov/reports/awards/standard.



The decline in small business participation in federal contracts directly correlates with increasing federal regulatory burdens. Small business contractors may choose to bid on private sector and state/local government contracts when increased regulatory clarity and lower regulatory burdens reduce costs related to the need for expertise from attorneys and compliance professionals.

The proposed rule's imposition of government-mandated PLAs represents another burden for small businesses, despite EO 14063's erroneous claim that "the use of project labor agreements is fully consistent with the promotion of small business interests."[170]

The truth is the discriminatory nature of government-mandated PLAs in the proposed rule will have a disparate impact on federal small business general contractors and subcontractors, many of whom are minority-, women-owned and disadvantaged businesses and employ a diverse workforce. The majority of these firms are not unionized and would be disenfranchised by the costly requirements of government-mandated PLAs, which larger construction firms are more capable of absorbing because a greater proportion of larger firms are unionized, although the majority of large contractors are not signatory to a union and would also be harmed by government-mandated PLAs and this proposal.

Responses to ABC's September 2022 survey of federal contractors support this point. Ninety-seven percent of respondents who self-identified as small business owners said they would be less likely to bid on contracts if the proposed rule is finalized, and 73% of these respondents stated that PLAs decrease the hiring of minority, women, veteran and disadvantaged business enterprises.

---

[170] See discussion in EO 14063: https://www.federalregister.gov/d/2022-02869/p-3.

### E.  The Proposal's Expected Impact and Initial Regulatory Flexibility Analysis Vastly Underestimates the Economic Impact of the Proposed Rule

The proposed rule's Expected Impact section estimates an impact of only $549,136 annually,[171] and the rule's Initial Regulatory Flexibility Analysis states that the FAR Council "[does] not expect this rule to have a significant economic impact on a substantial number of small entities."[172] However, these assessments are based on a number of deeply flawed assertions, and the IRFA should be redone prior to any finalization of the proposed rule. This is especially important as a corrected analysis is likely to find that the proposed rule will have an impact on the economy greater than $100 million per year, qualifying the rule as a major rule under the Congressional Review Act.[173]

First, the analysis estimates that between 40 and 80 hours will be spent by each party involved in negotiating a PLA on behalf of a contractor.[174] Given the protracted nature of PLA negotiations, as demonstrated throughout ABC's comments, it is likely that this is a significant underestimation.

As well as relying on a flawed estimate of the hours spent on negotiations, the analysis also underestimates attorney fees by calculating attorney costs at $71.17 per hour.[175] Reports indicate that lawyers specializing in employment/labor matters charge an average of $319 to $341 per hour,[176] again indicating that the FAR Council has massively understated costs associated with PLA negotiations.

The FAR Council also estimates that each prime contractor submitting a PLA for a construction contract of $35 million or more is likely to have approximately two subcontractors.[177] It is highly unlikely that the vast majority of prime federal contractors at this scale would hire so few subcontractors. In ABC's 2022 survey, 93% of respondents disagreed with the proposed rule's inaccurate estimate. Respondents most frequently stated that such a project would require 10 to 15 subcontractors, illustrating that the estimate is seriously flawed.

Further, the proposed rule estimates that subcontractors will only take one to 10 hours to read, understand and implement PLAs negotiated by prime contractors.[178] Given the lengthy and complex nature of PLAs, this estimate is unrealistically low and further undermines the accuracy of the analysis.

Given the significant inaccuracies and underestimations outlined above, the FAR Council must reconduct its analysis of the rule's expected impact and its IRFA to obtain an accurate

---

[171] See preamble: https://www.federalregister.gov/d/2022-17067/p-34.
[172] See preamble: https://www.federalregister.gov/d/2022-17067/p-40.
[173] 5 USC § 804(2).
[174] See preamble: https://www.federalregister.gov/d/2022-17067/p-32
[175] Ibid.
[176] "2022 Legal Trends Report," Clio, Oct. 10, 2022.
[177] See preamble: https://www.federalregister.gov/d/2022-17067/p-48.
[178] See preamble: https://www.federalregister.gov/d/2022-17067/p-34.

understanding of the impact this proposed rule will have on small businesses, federal procurement and the overall construction industry.

### F. The Proposed Rule Constitutes Regulatory Interference With Private Employment Rights Under the NLRA, ERISA and National Apprenticeship Act

Although the proposed rule purports to serve the federal government's proprietary interests, its establishment of a new governmentwide policy requiring PLAs constitutes unlawful regulation which interferes with private sector labor relations and fringe benefit programs in violation of the NLRA and ERISA. The proposed rule is not protected from challenge by the Supreme Court's limited holding in Building and Construction Trades Council of the Metropolitan District v. Associated Builders and Contractors of Massachusetts/Rhode Island, Inc. ("Boston Harbor"),[179] because it is not limited in its scope to a single project.[180]

In addition, the proposed rule violates Section 8(d) of the NLRA, which was not addressed in Boston Harbor, because it imposes labor agreements on construction contractors over their objection.[181] The proposed rule is also inconsistent with Sections 8(e) and 8(f) of the NLRA, which the Supreme Court referred to as exempting public entities from NLRA preemption, solely to the extent that such entities acted in a manner that was authorized for private construction users under the NLRA. Sections 8(e) and 8(f), however, only authorize PLAs to be entered into by "employers in the construction industry" and even then, only in the "context of collective bargaining" on a voluntary basis, uncoerced by either unions or governments.[182]

The proposed rule likewise violates ERISA[183] by encouraging federal agencies to mandate employer participation in union benefit programs covered by that act, which ERISA has long declared to be voluntary, not mandatory. In addition, the proposed rule discriminates against nonunion benefit programs that are supposed to be protected by ERISA, including nonunion apprenticeship training programs. Employees of nonunion contractors who are forced by federal agencies to sign PLAs will no longer receive credit toward their existing apprenticeship programs, and such employees will be forced to enroll in union apprenticeship programs (or alternatively, the nonunion contractors will be forced to hire existing union apprentices instead of their own). Such government-mandated discrimination violates the National Apprenticeship Act, which has been previously found to prohibit union versus nonunion discrimination.[184]

---

[179] 507 U.S. 218 (1993).
[180] *See Chamber of Commerce v. Brown*, 522 U.S 60 (2008) ("In finding that the state agency had acted as a market participant, we stressed [in *Boston Harbor*] that the challenged action "was specifically tailored to one particular job," and aimed "to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost."
[181] *See* 29 U.S.C. § 158(d), which expressly states that neither party to collective bargaining can be compelled by the government to agree to a proposal. *See also H.K. Porter v. NLRB*, 397 U.S. 99, 103 (1970).
[182] *See Glen Falls Building and Construction Trades Council*, 350 NLRB 417 (2007) (Invalidating a PLA imposed by an owner on construction contractors outside the context of the owner's collective bargaining).
[183] 29 U.S.C. § 1001, *et seq.*
[184] *Associated Builders and Contractors, Inc. v. Reich*, 963 F. Supp. 35, 38 (D.D.C. 1997).

## G. The Proposed Rule Violates the Congressional Review Act

The proposed rule incorrectly states that "this rule is not a major rule under 5 U.S.C. 804."[185] ABC disagrees. The Congressional Review Act (as codified at 5 U.S.C. §804(2)) defines a major rule as including any rule likely to result in:[186]

> (A) an annual effect on the economy of $100,000,000 or more;
> (B) a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; or
> (C) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of the United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

As discussed above, the imposition of PLAs on federal agency construction projects will have significant adverse effects on competition, will cause major increases in construction costs for federal agencies and are likely to have an annual effect on the economy of $100 million or more. In addition to added regulatory costs to the federal contracting community discussed in ABC's comments in Section III. E., if federal agencies mandate PLAs on just 10 federal construction projects, the CRA's $100 million annual effect on the economy threshold will be reached.[187] This means that the FAR Council is required to conduct a proper cost benefit analysis of the proposed rule and government-mandated PLAs, and otherwise comply with the "major rule" requirements of the CRA.

For each of these reasons, ABC believes that the FAR Council must reclassify the proposed rule as a major rule and comply with all of the requirements of the Congressional Review Act.

## H. The Proposed Rule Fails to Establish Any Meaningful Criteria for Federal Agencies to Apply in Considering Whether to Impose PLAs

The proposed rule amends the FAR[188] to require federal agencies to mandate a PLA on all large-scale federal construction contracts of $35 million or more. This ABC-opposed blanket PLA requirement fails to establish any meaningful criteria or analysis about why a PLA is appropriate for a specific project. The proposal presumes that all government-mandated PLAs will lead to economy and efficiency in federal contracting, despite overwhelming evidence that PLA mandates injure competition and undermine economy and efficiency in federal contracting, as discussed in ABC's comments on the proposal. In addition, the proposal fails to

---

[185] See proposed rules' preamble VI. Congressional Review Act: https://www.federalregister.gov/d/2022-17067/p-39.
[186] See U.S. Government Accountability Office resource and FAQs on the CRA at: https://www.gao.gov/legal/other-legal-work/congressional-review-act and The Congressional Review Act (CRA): Frequently Asked Questions, Congressional Research Service, Updated Nov. 21, 2021.
[187] The FAR Council's proposal says the rule will cover roughly 120 projects annually, at an average cost of $114 million per project, totaling more than $13 billion worth of federal construction per year. The FAR Council's proposal says that not all of these projects are likely to have PLAs mandated on them. Academic research suggests that PLA mandates increase the cost of construction by between 12% and 20% per project. Therefore, it would take less than 10 federal construction projects—at an average of $114 million per project—to be subjected to PLA mandates to exceed the CRA's $100,000,000 major rule economic impact threshold if each of these PLA projects experienced a conservative 12% cost inflation resulting from the PLA mandate.
[188] See revisions to FAR 22.503 at: https://www.federalregister.gov/d/2022-17067/p-amd-8.

assess the stronger likelihood that a PLA mandate will have a greater negative impact in certain regions and construction markets across America where union contractor market share and union labor membership is insignificant.

Instead, the onus is placed on federal contracting officers to plead with federal agency senior procurement officials to opt out of the PLA mandate for a particular construction project. The proposed rule's revisions to the FAR at 22.504[189] allows senior procurement officials to approve exceptions to the blanket PLA mandate policy[190] "by providing a specific written explanation of why at least one of the following conditions exists with respect to the particular contract":[191]

- Requiring a PLA would not achieve "economy and efficiency" in federal procurement;[192]
- Requiring a PLA would substantially reduce the number of potential bidders so as to frustrate full and open competition, i.e., where adequate competition at a fair and reasonable price could not be achieved;[193] or
- Requiring a PLA would be inconsistent with statutes, regulations, other EOs or presidential memoranda.

While ABC appreciates that the FAR Council's proposal may allow for some exceptions to inflationary and anti-competitive PLA mandates, the rationale for a blanket PLA requirement on all federal construction projects of $35 million or more—regardless of its schedule, complexity or location—is unfounded despite the existence of this exception procedure.

In addition, the proposed rule establishes five "factors in deciding whether the use of a project labor agreement is appropriate for a construction project where the total cost to the Federal Government is less than that for a large-scale construction project [$35 million]."[194] ABC strongly urges the FAR Council to remove this provision from the proposal as there is no evidence suggesting that PLA mandates are useful for projects below the $35 million project

---

[189] See the proposals amended FAR language particular to exceptions to project labor agreement requirements at: https://www.federalregister.gov/d/2022-17067/p-96.
[190] See discussion in the proposed rule here: https://www.federalregister.gov/d/2022-17067/p-21.
[191] See FAR language at: https://www.federalregister.gov/d/2022-17067/p-96.
[192] The revised FAR language says the exception for this factor shall be based on one or more of the following factors:
    (A) The project is of short duration and lacks operational complexity.
    (B) The project will involve only one craft or trade.
    (C) The project will involve specialized construction work that is available from only a limited number of contractors or subcontractors.
    (D) The agency's need for the project is of such an unusual and compelling urgency that a project labor agreement would be impracticable.
[193] The revisions to the FAR at 22.504 say "(ii) Market research indicates that requiring a project labor agreement on the project would substantially reduce the number of potential offerors to such a degree that adequate competition at a fair and reasonable price could not be achieved. (See 10.002(b)(1) and 36.104). A likely reduction in the number of potential offerors is not, by itself, sufficient to except a contract from coverage under this authority unless it is coupled with the finding that the reduction would not allow for adequate competition at a fair and reasonable price" at https://www.federalregister.gov/d/2022-17067/p-102 and "(2) When determining whether the exception in paragraph (d)(1)(ii) of this section applies, contracting officers shall consider current market conditions and the extent to which price fluctuations may be attributable to factors other than the requirement for a project labor agreement ( *e.g.,* costs of labor or materials, supply chain costs). Agencies may rely on price analysis conducted on recent competitive proposals for construction projects of a similar size and scope," at https://www.federalregister.gov/d/2022-17067/p-104.
[194] https://www.federalregister.gov/d/2022-17067/p-86.

threshold. Eliminating the option for PLA mandates on smaller federal construction projects—including those procured under IDIQ—will support the inclusion of small and diverse businesses pursuing federal contracts, among other cost and inclusion benefits of fair and open competition discussed in these comments.

## I.  ABC Recommendations on PLA Inclusion and Exception Language

Of note, ABC supports the proposal's directive that such exceptions must be granted for a particular contract by its solicitation date—as opposed to after the solicitation has been issued with a PLA requirement. Submitting a bid on a federal construction contract costs federal contractors' time and money and additional opportunity costs of not pursuing other contracting opportunities. Compressing a bidding schedule to accommodate a project that is now free from an anti-competitive PLA mandate will deter full and open competition, even if the PLA is removed at some point in the solicitation process. For these reasons, ABC recommends that the FAR Council's proposal explicitly state that a PLA cannot be required by a federal agency after a project's solicitation date. ABC observed that federal agencies mandate PLAs at various phases of the procurement process following the issuance of a federal construction project's solicitation, which created a number of problems for contractors and was very disruptive to the procurement process in general under the Obama pro-PLA policy.

In addition, ABC recommends that when federal agencies conduct market research through a Request for Information advertised on SAM.gov to determine if a project should be exempt from a PLA mandate that federal agencies use a governmentwide uniform survey or set of questions with consistent formatting for federal contractors to respond to.

ABC also recommends that the FAR Council require contracting officers to give contractors at least two weeks to respond to the survey. ABC members have completed thousands of responses to hundreds of federal agency PLA surveys under the Obama PLA policy used to determine if a PLA is appropriate for a federal construction project of $25 million or more. ABC contractors broadly complain that each federal agency—and even regional offices within an agency—asked different PLA assessment questions (as many as 23 questions) and had different RFI formats. In most instances, federal agencies also gave contractors less than a week to respond to the surveys once published on SAM.gov, which is not enough time to respond to a survey with meaningful research and information.

Both of these factors undermine contractor participation and strategies to alleviate paperwork burdens that can be gained by establishing a uniform process and response time to determine if a PLA is appropriate or not appropriate for a project.

## Conclusion

For all of the reasons discussed in this comment letter, ABC strongly urges the FAR Council to immediately withdraw the proposed rule. Instead of needlessly restricting the pool of eligible bidders and construction workforce, increasing costs, causing delays and exposing the Biden administration and individual federal construction projects to litigation, the federal government

should seek fair and open competition to ensure all of the construction industry can continue to safely provide taxpayers with the best possible construction product at the best possible price.

Thank you for the opportunity to submit comments on this matter.

Respectfully submitted,

Ben Brubeck
Vice President of Regulatory, Labor and State Affairs
Associated Builders and Contractors
brubeck@abc.org

Of Counsel:  Maurice Baskin, Esq.
             Littler Mendelson, P.C.
             815 Connecticut Ave. NW
             Washington, DC 20006