# EXHIBIT "2B"

**88708** Federal Register / Vol. 88, No. 245 / Friday, December 22, 2023 / Rules and Regulations

# DEPARTMENT OF DEFENSE

# GENERAL SERVICES ADMINISTRATION

# NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

## 48 CFR Chapter 1

[Docket No. FAR–2023–0051, Sequence No. 7]

## Federal Acquisition Regulation; Federal Acquisition Circular 2024–02; Introduction

**AGENCY:** Department of Defense (DoD), General Services Administration (GSA), and National Aeronautics and Space Administration (NASA).

**ACTION:** Summary presentation of a final rule.

**SUMMARY:** This document summarizes the Federal Acquisition Regulation (FAR) rule agreed to by the Civilian Agency Acquisition Council and the Defense Acquisition Regulations Council (Councils) in this Federal Acquisition Circular (FAC) 2024–02. A companion document, the *Small Entity Compliance Guide* (SECG), follows this FAC.

**DATES:** For effective dates see the separate documents, which follow.

RULES LISTED IN FAC 2024–02

| Subject | FAR case | Analyst |
|---|---|---|
| Use of Project Labor Agreements for Federal Construction Projects ................................................................... | 2022–003 | Bowman. |

**ADDRESSES:** The FAC, including the SECG, is available at *https://www.regulations.gov.*

**SUPPLEMENTARY INFORMATION:** A summary for the FAR rule follows. For the actual revisions and/or amendments made by this FAR rule, refer to the specific subject set forth in the document following this summary. FAC 2024–02 amends the FAR as follows:

### Use of Project Labor Agreements for Federal Construction Projects (FAR Case 2022–003)

This final rule amends the Federal Acquisition Regulation (FAR) to implement Executive Order (E.O.) 14063, Use of Project Labor Agreements for Federal Construction Projects. E.O. 14063 expands the definition of ''construction,'' raises the threshold for a large-scale construction project from $25 million to $35 million and establishes a series of exceptions to the PLA requirements. Additionally, the E.O. mandates that Federal Government agencies require the use of project labor agreements (PLAs) for large-scale Federal construction projects, where the total estimated cost of the construction contract to the Government is $35 million or more, unless an exception applies. The final rule is not expected to have a significant economic impact on a substantial number of small entities participating on a project that requires a PLA because the E.O. limits the requirement for mandatory PLAs to

projects exceeding $35 million, unless an exception applies.

**William F. Clark,**

*Director, Office of Government-wide Acquisition Policy, Office of Acquisition Policy, Office of Government-wide Policy.*

Federal Acquisition Circular (FAC) 2024–02 is issued under the authority of the Secretary of Defense, the Administrator of General Services, and the Administrator of National Aeronautics and Space Administration.

Unless otherwise specified, all Federal Acquisition Regulation (FAR) and other directive material contained in FAC 2024–02 is effective December 22, 2023 except for FAR Case 2022–003, which is effective January 22, 2024.

**John M. Tenaglia,**

*Principal Director, Defense Pricing and Contracting, Department of Defense.*

**Jeffrey A. Koses,**

*Senior Procurement Executive/Deputy CAO, Office of Acquisition Policy, U.S. General Services Administration.*

**Karla Smith Jackson,**

*Assistant Administrator for Procurement, Senior Procurement Executive/Deputy CAO, National Aeronautics and Space Administration.*

[FR Doc. 2023–27735 Filed 12–21–23; 8:45 am]

**BILLING CODE 6820-EP-P**

# DEPARTMENT OF DEFENSE

# GENERAL SERVICES ADMINISTRATION

# NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

## 48 CFR Parts 1, 7, 22, 36, and 52

[FAC 2024–02; FAR Case 2022–003; Docket No. 2022–0003, Sequence No. 1]

## RIN 9000–AO40

## Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects

**AGENCY:** Department of Defense (DoD), General Services Administration (GSA), and National Aeronautics and Space Administration (NASA).

**ACTION:** Final rule.

**SUMMARY:** DoD, GSA, and NASA are issuing a final rule amending the Federal Acquisition Regulation (FAR) to implement an Executive Order pertaining to project labor agreements in Federal construction projects.

**DATES:** Effective January 22, 2024.

**FOR FURTHER INFORMATION CONTACT:** Ms. Dana Bowman, Procurement Analyst, at 202–803–3188 or by email at *dana.bowman@gsa.gov,* for clarification of content. For information pertaining to status or publication schedules, contact the Regulatory Secretariat Division at 202–501–4755 or *GSARegSec@gsa.gov.* Please cite FAC 2024–02, FAR Case 2022–003.

**SUPPLEMENTARY INFORMATION:**

**FOR FURTHER INFORMATION CONTACT:** The analyst whose name appears in the table below in relation to the FAR case. For information pertaining to status or publication schedules, contact the Regulatory Secretariat Division at 202–501–4755 or *GSARegSec@gsa.gov.*

## I. Background

DoD, GSA, and NASA published a proposed rule in the **Federal Register** at 87 FR 51044 on August 19, 2022, to amend the FAR to implement Executive Order (E.O.) 14063, Use of Project Labor Agreements for Federal Construction Projects, issued February 4, 2022 (87 FR 7363, February 9, 2022). E.O. 14063 mandates that Federal Government agencies require the use of project labor agreements (PLAs) for large-scale Federal construction projects, where the total estimated cost to the Government is $35 million or more, unless an exception applies. Agencies still have the discretion to require PLAs for Federal construction projects that do not meet the $35 million threshold. The E.O. also directs the Office of Management and Budget (OMB) to issue implementation guidance to agencies on exceptions and reporting. The preamble to the proposed rule contained detailed information on the use of PLAs.

DoD, GSA, and NASA received comments on the proposed rule from 8,334 respondents.

## II. Discussion and Analysis

The Civilian Agency Acquisition Council and the Defense Acquisition Regulations Council (the Councils) reviewed the public comments in the development of the final rule. A discussion of the comments and the changes made to the rule as a result of those comments are provided as follows:

### A. Summary of Significant Changes

The final rule removes proposed text that was intended to clarify direction that prevented agencies from requiring a contractor or subcontractor to enter into a PLA with any particular labor organization when there were multiple signatory labor organizations representing the same trade. While an agency still cannot require a contractor or subcontractor to enter into a PLA with any particular labor organization, the clarifying language added to the proposed rule did not reflect how PLAs are established. When a PLA is established by one or more labor organizations for a project, all entities are required to enter into that PLA as there are not multiple PLAs on a project. As a result, the text was removed at 22.504(c), Labor organizations.

The final rule also removes similar text that prevented contractors from requiring subcontractors to enter into a PLA with any particular labor organization at FAR provision 52.222–33, Notice of Requirement for Project Labor Agreement, and Alternates I, II,

and III, and FAR clause 52.222–34, Project Labor Agreement, and Alternates I and II. The final rule text requires all subcontractors to become a party to the PLA negotiated by the prime contractor.

### B. Analysis of Public Comments

1. Effects on Competition and Marketplace Diversity

*Comment:* Numerous respondents raised concerns that the policy shift reflected in E.O. 14063, from discretionary use of PLAs to a mandate, will have a negative impact on agencies' ability to use competition to achieve best value for the taxpayer. A respondent raised concerns that even if a solicitation is open to all contractors, a Government mandate for use of a PLA will limit the number of competitors able or willing to compete on a project, especially with respect to non-unionized contractors and small businesses. Based upon the results of a survey conducted of the construction industry, a respondent indicated that reduced participation would increase costs to the Government and, ultimately, the taxpayers. Another respondent requested the Government remain competitively neutral to open competition and to reduce barriers to marketplace entrants. Similarly, another respondent requested that the market dictate whether businesses will be successful. Numerous others support ''open competition.''

*Response:* Section 5 of the E.O. provides agencies with the authority to grant an exception, and specifically section 5(b) of the E.O. provides an exception to the requirement for a PLA if the requirement would substantially reduce the number of potential bidders so as to frustrate full and open competition. Agencies may consider criteria in FAR 22.504(d) to determine if the use of a PLA is appropriate for the construction project. In determining whether fair and reasonable pricing may be achieved, FAR 36.104(c)(2) directs contracting officers to undertake a current and proactive examination of the market conditions in the project area to determine national, regional, and local entity interest in participating on a project that requires a PLA, and to understand the availability of unions, and unionized and non-unionized contractors.

While many respondents expressed concerns about competition, several other respondents argued that the E.O. and rule are consistent with competitive bidding. Several respondents cited a study of education construction spending indicating no statistically significant difference in bids between

surveyed projects requiring PLAs and those that did not. See Emma Waitzman & Peter Philips, UC Berkeley Labor Ctr., Project Labor Agreements and Bidding Outcomes: The Case of Community College Construction in California 3, 48 (2017)).

*Comment:* Some respondents were concerned that the rule limits non-union contractors bidding on Federal projects and requested justification for only allowing union contractors to bid on Federal contracts over $35M.

*Response:* Under the E.O., both union and non-union prime contractors and subcontractors may compete for contracts and subcontracts without regard to prior participation in collective bargaining agreements (CBAs).

*Comment:* Numerous respondents asserted that the rule violates the requirement for full and open competition in the Competition in Contracting Act of 1984 (CICA) because PLAs discriminate and injure competition among potential bidders who are not signatories to CBAs. Another respondent added that the rule is arbitrary and capricious because it requires Federal agencies to impose PLAs on bidders or contractors without knowing the PLAs' terms.

*Response:* The E.O. and final rule do not violate CICA, which generally requires full and open competition through competitive procedures that are best suited under the circumstances of the procurement, 41 U.S.C. 3301(a). CICA defines full and open competition as meaning ''that all responsible sources are permitted to submit sealed bids or competitive proposals on the procurement.'' See 41 U.S.C. 107. Neither the E.O. nor final rule bar any responsible sources from submitting sealed bids or competitive proposals, nor do they provide a preference for contractors already a party to a CBA. Section 4 of the E.O. requires a PLA to allow all contractors and subcontractors to compete without regard to whether they are otherwise parties to CBAs.

The E.O. and the final rule require PLAs to contain various terms that guarantee against strikes, lockouts, and similar job disruptions. In addition, under the final rule, an agency maintains the authority to ensure that the PLA includes any additional terms that the agency deems necessary to satisfy its needs. As a result, an agency will know the material terms of any resulting PLA when it issues a solicitation that requires a PLA.

2. Cost

*Comment:* Numerous respondents expressed concerns that mandatory

PLAs and compliance would increase the cost of construction projects and undermine taxpayer investments in infrastructure projects, resulting in fewer infrastructure improvements, less job creation, and higher state and local taxes. Several respondents cited studies that indicate the increase in cost is estimated at 12–20 percent. These respondents relied on two reports from the Beacon Hill Institute, which found that PLAs raised construction costs on Massachusetts construction contracts by 12 percent or raised construction costs on Connecticut contracts by about 20 percent. Other respondents expressed concerns about costs and cited a report from the New Jersey Department of Labor & Workforce Development, Annual Report to the Governor and Legislature: use of Project Labor Agreements in Public Works Building Projects in Fiscal Year 2008, which estimated that average costs per square foot were higher for PLA projects than for non-PLA projects.

Alternatively, some respondents cited analyses that compared projects built with PLAs to those built without and found that there was no statistically significant difference in project costs after controlling for factors such as the size and complexity of the project. See, *e.g.*, Dale Belman et al., Project Labor Agreements' Effect on School Construction Costs in Massachusetts, 49 Indus. Rels. 44, 60 (2010)). Some respondents asserted that PLAs are effective mechanisms for providing structure and stability to construction contracts, controlling construction costs, ensuring efficient completion of quality projects, and establishing fair wages and benefits for all workers. Another respondent asserted that there is no reason to assume union workers lead to higher costs because they are typically more productive. Higher wage rates also may induce contractors to substitute capital and other inputs for labor, which would mitigate the effects of higher labor costs.

*Response:* As expressed in the E.O., PLAs may help mitigate challenges to the efficient completion of quality construction projects, such as a shortage in the supply of labor or labor dispute delays. PLAs may provide structure and stability to construction projects by securing the commitment of all stakeholders on a construction project. There have been numerous studies which found that there is no definitive and compelling evidence to support the assertion that PLAs increase costs on Federal construction projects. In 2012, the Congressional Research Service report, R41310 Project Labor Agreements, studied the effects of PLAs

on costs and found that the evidence was "inconclusive." A study commissioned by the Department of Labor, Implementation of Project Labor Agreements in Federal Construction Projects: An Evaluation, was conducted in 2011 and concluded that the research supporting the New Jersey Department of Labor and Workforce Development report may be misleading, because it relied on bid costs without taking into consideration other key variables, like geographic location, project type, or work site environment. Subsequent research revisited the Massachusetts school construction contracts discussed in the Beacon Hill studies and concluded that, once additional variables were taken into account, the effects were not statistically significant. Dale Belman et al., The Effect of Project Labor Agreements on the Cost of School Construction (2005) and Dale Belman et al., Project Labor Agreements' Effect on School Construction Costs in Massachusetts (2010). Other research, that found no statistically significant difference in cost between projects that utilized PLAs and those that did not, includes Emma Waitzman & Peter Philips, UC Berkeley Labor Ctr., Project Labor Agreements and Bidding Outcomes: The Case of Community College Construction in California (2017) and an analysis of 130 affordable housing projects in Los Angeles, California, "Did PLAs on LA Affordable Housing Projects Raise Construction Costs?" conducted by Peter Philips & Scott Littlehale, (Univ. of Utah Dep't of Econ., Working Paper No. 2015–03, 2015).

If it appears that a PLA will significantly raise costs on a particular Federal construction project and the Government could not obtain and determine a fair and reasonable price, the FAR would prohibit the award of the contract. The final rule provides an exception at FAR 22.504(d)(ii) in the event that market research indicates that requiring a PLA on a project would substantially reduce the number of potential offerors to such a degree that the Government could not meet its requirements at a fair and reasonable price.

*Comment:* Numerous respondents expressed concerns that employers and employees will incur additional costs for fringe benefits and union dues that are unnecessary and duplicative. The respondents were concerned that non-union employees paying union dues will never realize the benefits provided by the unions due to union vesting standards.

*Response:* Neither the E.O. nor the final rule require non-union employees

to pay union dues or join a union. Non-union contractors are free to negotiate provisions in PLAs to accommodate existing fringe benefits. For example, a PLA may allow non-union contractors to opt out of contributing to health and welfare funds designated under the PLA, if the benefits provided by the non-union contractor are equal in value to those provided under the PLA.

*Comment:* Numerous respondents expressed concerns that inefficient union work rules limit an employer's ability to effectively manage employee skill sets and work assignments. The respondents claim that union rules prohibit productivity practices employed by non-union contractors such as multiskilling on contracts with PLAs. Numerous other respondents asserted that PLAs prevent disputes and ensure a steady workforce. Those respondents indicate that PLAs provide several important benefits when coordinating work performed by multiple contractors on complex projects, such as uniform work rules and project schedules, expeditious dispute resolution, craft and subcontractor jurisdictional alignment, and project scheduling trade sequencing.

*Response:* Generally, PLAs govern the work rules for all contractors and subcontractors on a project, regardless of whether the contractor or subcontractor has previously been party to a collective bargaining agreement. Contractors can negotiate PLAs that include flexibility in how work is assigned or to allow exceptions to generally applicable work rules to meet unique needs.

*Comment:* Numerous respondents expressed concerns that the proposed rule will increase the cost to the taxpayer for public works projects passed by Congress, such as those funded under the Infrastructure Investment and Jobs Act (IIJA) of 2021, which did not include PLA requirements. Another respondent is concerned that the PLA requirement contradicts the Congressional intent in the IIJA.

*Response:* The majority of projects funded by the IIJA will be conducted under federally funded grants, rather than FAR-based contracts. This final rule applies to FAR-based contracts; however, nothing in this rule or the IIJA precludes contractors working on grant-funded projects from entering into PLAs.

*Comment:* A respondent expressed concerns that the Government has not provided data on the costs or benefits of the PLA mandate. The respondent is concerned that the data does not justify

that the use of PLAs will promote economy and efficiency. Another respondent stated analysis based on information obtained via the Freedom of Information Act disproves the reasoning used in the E.O. that PLAs promote economy and efficiency.

*Response:* The E.O., as implemented in the final rule, reflects the President's judgment that large-scale construction projects may pose special challenges to efficient and timely procurement and that the increased use of PLAs may help address those challenges. (Section 1 of the E.O.) For example, because construction employers typically lack a permanent workforce, those employers may face difficulties predicting labor costs while bidding on contracts and securing a steady supply of skilled labor to complete those projects on time and on budget. Moreover, because construction projects typically involve multiple employers working on a single location, a labor dispute involving one employer can delay an entire project. A lack of coordination among various employers, or inconsistent or uncertain terms and conditions of employment among various groups of workers, can also create friction and disputes in the absence of an agreed-upon resolution mechanism. These problems tend to be especially pronounced on large-scale projects, which tend to be more complex and of longer duration. For these reasons, expanding the use of PLAs is expected to promote the economy and efficiency of Federal contracting by promoting efficient and timely completion of projects by skilled labor. Given these challenges, use of a PLA can further economy and efficiency in Federal contracting by increasing coordination amongst multiple employers and trade unions, preventing costly labor disputes, promoting labor management stability, improving reliable access to skilled labor (including by promoting equity), and bolstering contractors' compliance with employment law.

Expanding the use of PLAs on a large-scale Federal construction project can be particularly beneficial to the economy and efficiency of Federal contracting amidst a challenging construction labor market. As the Supreme Court explained in *Boston Harbor,* Congress expressly authorized PLAs in section 8(f) of the National Labor Relations Act (NLRA) "to accommodate conditions specific to that industry" including "the contractor's need for . . . a steady supply of skilled labor." *Bldg. & Constr. Trades Council* v. *Associated Builders & Contractors of Mass./R.I., Inc.* ("*Boston Harbor*"), 507 U.S. 218, 231(1993).

Today, the construction industry faces a significant nationwide labor shortage. See, *e.g.,* Garo Hovnanian, Ryan Luby, and Shannon Peloquin, Bridging the labor mismatch in US construction (2022). Meanwhile, demand for construction workers' skilled labor is only projected to grow. The Department of Labor projects, on average, that there will be 646,100 job openings in the construction and extraction occupations every year over the coming years. See, Bureau of Labor Statistics, Construction and Extraction Occupations, Dep't of Labor (Sept. 6, 2023). Measures that promote a steady supply of skilled labor are expected to improve the economy and efficiency of Federal contracting in the modern labor market.

PLAs can help reduce the effects of the construction labor shortage on Federal contractors' projects in several ways. First, PLAs can attract more high-skilled workers to Federal construction projects by providing higher compensation for craft positions. Although both union and non-union contractors reported difficulty filling job openings for craft workers in 2021, after the pandemic-related disruptions to the construction labor market, union contractors were 14 percent less likely to struggle to fill craft positions. See Frank Manzo IV, Larissa Petrucci, & Robert Bruno, Ill. Econ. Policy Inst., The Union Advantage During the Construction Labor Shortage (2022). Second, PLAs provide access to union hiring halls, which can help ensure a steady supply of skilled labor. The same study found that union contractors were 21 percent less likely than non-union contractors to experience delays in completing projects due to labor shortages. This recent data is consistent with the Department of Labor (DOL) 2011 study, Implementation of Project Labor Agreements in Federal Construction Projects: An Evaluation, which found that a PLA reached by New York City schools on a construction contract helped avert skilled labor shortages over the course of the 5-year construction program. The study found that there were "no instances of shortages in skilled labor on any of the" city schools' projects, "although such shortages occurred regularly elsewhere in the city during this same period." Non-union contractors are also more likely than union contractors to report struggling to hire qualified craft workers, suggesting that PLAs can promote high-quality, as well as on-time, construction of Federal projects. This final rule is expected to help the Federal Government efficiently complete important projects in a challenging construction labor market.

A study also found that using PLAs on Federal construction projects may reduce turnover and absenteeism. There is less turnover among craft workers working under CBAs than those that are not. See Frank Manzo IV, Larissa Petrucci, & Robert Bruno, Ill. Econ. Policy Inst., The Union Advantage During the Construction Labor Shortage (2022). Studies suggest that unionized workplaces may be safer than non-union workplaces, meaning that PLAs may promote productivity by preventing absenteeism or job losses due to workplace injuries. See, *e.g.,* Alison D. Morantz, Coal Mine Safety: Do Unions Make a Difference, Indus. & Labor Relations Review (2012).

Because all employers on a PLA are required to enter the same agreement with coordinated work rules, PLAs can streamline administration of large-scale construction projects. On complex projects without a PLA, contractors may work with multiple trade unions and, as a result, may struggle to coordinate multiple collective bargaining agreements providing for different start times, break times, rules governing overtime, holidays, and dispute resolutions procedures. Those differences can create undue costs, delays, and inefficiencies in Federal construction projects which can be effectively addressed through a PLA. As a study commissioned by the Department of Labor explained, uniform work rules on PLAs promote efficiency, productivity, and cost savings. See Dep't of Labor, Implementation of Project Labor Agreements in Federal Construction Projects: An Evaluation (2011). Moreover, the study concluded, by standardizing the terms and conditions of employment at the outset of a project, PLAs can promote predictability of project costs. Id. at 3– 4. For example, a four-year PLA used by the New York City School Construction Authority (NYCASA) to rehabilitate and renovate city schools saved $221 million dollars over a five-year PLA by standardizing construction workers' shifts. Id. at 4–5.

The E.O. requires PLAs on Federal construction projects to contain no-strike and no-lockout clauses. As a result, this requirement is expected to prevent costly delays associated with labor disputes. According to the 2011 DOL study, during the period covered by the NYCASA PLA, a strike by a trade union resulted "in a shutdown of numerous large construction projects across the City and substantial delay and related costs" to parties involved— while construction on the projects

covered by NYCASA's PLA continued uninterrupted. An audit analyzing the results of the NYCASA PLA found that there was "no disruption of work or threat of strike on any of the projects" covered by the PLA "at any time" that the PLA was in effect.

For these reasons and others, the final rule reflects the language provided in section 1 of the E.O., which states that the increased use of PLAs on large-scale construction projects can help address special challenges to efficient and timely Federal procurement. Finally, when an agency determines that a PLA requirement would not advance the Government's interests in achieving economy and efficiency, the agency may, on a case-by-case basis, utilize an exception provided in section 5 of the E.O.

3. Procurement Delays

*Comment:* Some respondents expressed concerns that mandatory PLAs will cause procurement delays, contradicting the rule's stated objective, to "promote economy and efficiency" in the administration and completion of Federal construction projects. These respondents assert that use of PLAs may result in costly bid protests, litigation, and other delays.

*Response:* While procurement delays may be caused by numerous other factors, there is no conclusive evidence to support that specifically requiring a PLA will be the sole reason for additional delays or litigation. Rather, the final rule reflects the judgment that the overall effect of PLAs is expected to promote timely construction of Federal projects. Section 1 of the E.O. states that expanding the use of PLAs will help prevent delays by preventing costly labor disputes on Federal construction projects, promote a reliable stream of skilled labor on Federal projects, and promote coordination across multiple employers and unions. For example, a PLA executed by the New York City School Construction Authority (NYCASA) to rehabilitate and renovate city schools helped avert substantial delays in construction. See Dep't of Labor, Implementation of Project Labor Agreements in Federal Construction Projects: An Evaluation (2011). During the period covered by the PLA, a strike by a trade union resulted "in a shutdown of numerous large construction projects across the City and substantial delay and related costs" to parties involved—while construction on the projects covered by NYCASA's PLA continued uninterrupted. An audit analyzing the results of the PLA found that there was "no disruption of work or threat of strike on any of the projects"

covered by the PLA "at any time" that the PLA was in effect and that "there were no instances of shortages in skilled labor on any of the NYCASA projects" covered by the PLA—although similar shortages "occurred regularly" on other projects in the same city during the same time period. Id. Another study of school construction projects in San Diego found that "project delays are considerably lower" on projects covered by a PLA. Richard Parker & Louis Rea, San Diego Unified School District, San Diego Unified School District Project Stabilization Agreement: A Review of Construction Contractor and Labor Considerations iii (2011).

One study found that union contractors were 14 percent less likely than non-union contractors to struggle to fill craft positions and 21 percent less likely than non-union contractors to experience delays in completing projects due to labor shortages. See Frank Manzo IV, Larissa Petrucci, & Robert Bruno, Ill. Econ. Policy Inst., The Union Advantage During the Construction Labor Shortage 5 (2022).

*Comment:* A respondent is concerned that there are no meaningful criteria to grant exceptions; therefore, agency decisions will be inherently arbitrary and capricious and will delay construction projects.

*Response:* The rule reflects specific criteria provided in section 5 of the E.O, under which an agency may grant an exception. The rule provides additional details to ensure agency decisions comply with the E.O.

4. Effects on Workforce

*Comment:* Many respondents commented on the rule's likely impact on non-unionized contractors. Some respondents asserted that PLAs don't discourage or prevent non-union contractors from participating on projects with PLAs. However, another respondent expressed concerns that non-union contractors will not bid on projects that mandate a PLA since it requires that they recognize the union as the representative of their employees (without their input) on that job, and could require them to use the union hiring hall to obtain most or all construction labor, exclusively hire apprentices from union programs, follow union work rules, and pay into union benefit and multi-employer pension plans. While not specifically stating that it would prevent bidding on work, several other respondents expressed similar concerns. Numerous respondents were concerned that non-union contractors represent the vast majority of construction contractors in the country and their unwillingness to

compete will potentially limit the Government's access to the best available contractors for a given construction project.

*Response:* Neither the E.O. nor the final rule preclude non-union contractors from bidding on projects requiring a PLA. Non-union contractors who choose to enter a project-specific PLA may do so without becoming a union employer for purposes of other projects. The E.O. expressly states that a PLA shall "allow all contractors and subcontractors on the construction project to compete for contracts and subcontracts without regard to whether they are otherwise parties to collective bargaining agreements." This language is reflected in the final rule. The DOL website contains useful information about the operation of PLAs. See *https://www.dol.gov/general/good-jobs/project-labor-agreement-resource-guide.*

Studies and court cases have shown that PLAs can have significant non-union contractor participation. One study noted that on the Boston Harbor project, the subject of the Supreme Court's decision in *Bldg. & Constr. Trades Council* v. *Associated Builders & Contractors of Mass./R.I., Inc.* 507 U.S. 230, 231 (1993), 102 of 257 subcontractors were nonunion, notwithstanding that as much as three quarters of Boston construction contractors were unionized. See Robert W. Kopp & John Gaal, The Case for Project Labor Agreements, Constr. Law., (1999); *see also Associated Builders & Contractors, Inc., S. California Chapter* v. *Metro. Water Dist. of S. California,* 69 Cal. Rptr. 2d 885, 888 (Ct. App. 1997).

The E.O. and the rule contain an exception for solicitations where a market analysis suggests that there will not be sufficient bidders so as to frustrate full and open competition.

*Comment:* Numerous respondents stated that the proposed rule discriminates against non-union employees, placing non-union general contractors and subcontractors at a significant competitive disadvantage. A respondent explained that the requirement for offerors to negotiate with labor unions—a party with which the offeror has no authority to compel negotiations—effectively grants labor unions the power to prevent certain offerors from submitting an acceptable offer.

*Response:* PLAs have been used successfully for decades in construction projects in all parts of the United States, and there is no data to suggest that parties have been systematically unable to negotiate PLAs because of bad-faith bargaining by unions. Since the final rule applies to large-scale Federal

construction projects, the Government assumes that there is a significant economic incentive for both the union and the prospective offeror to reach agreement on a PLA.

*Comment:* Numerous respondents expressed concerns that mandatory PLAs will exacerbate nationwide labor shortages in the construction industry because unions will only hire from union halls/union apprenticeship programs and the majority of the workforce has opted not to join unions. Numerous respondents were similarly concerned that PLAs prevent the use of a contractor's current workforce, requiring the use of union members hired out of local union halls.

*Response:* The Government does not expect PLAs to negatively impact the outcome of the current nationwide labor shortage. Research indicates that the skilled labor shortage is less severe among union contractors than non-union contractors. One report revealed that union contractors are 14 percent less likely to experience difficulty in filling craft worker positions and 21 percent less likely to experience delays in project completion times due to labor shortages than non-union contractors. See Frank Manzo IV, Larissa Petrucci, & Robert Bruno, Ill. Econ. Policy Inst., The Union Advantage During the Construction Labor Shortage 5 (2022). Use of PLAs is expected to help the Government efficiently complete projects in a tight construction labor market. While many PLAs do require contractors to use the union's hiring hall for referrals, they do not necessarily prevent the use of a contractor's workforce. The union hiring halls are legally required to refer workers to the project without regard to whether the workers are union members. Ultimately, the contractor retains the right to decide whom to hire.

*Comment:* Some respondents expressed concerns that unions negatively impact local labor markets by bringing in non-local union labor rather than hiring locally. Numerous respondents were concerned that PLA mandates will result in more contract awards to union-signatory contractors whose employees are union members at the expense of taxpayers, fair and open competition, and local workers and businesses. Alternately, some respondents indicated that PLAs can benefit local labor markets by including local recruitment and hiring goals specifically targeting historically marginalized workers intended to expand the pool of skilled workers and promote diverse economic development. Participation in registered apprenticeship programs and pre-

apprenticeship programs will also help to recruit women, people of color, and other underrepresented individuals into the construction industry.

*Response:* While unions have the ability to recruit skilled workers nationally to address local skilled labor shortages, the intent of the policy implemented in this rule is not to replace local workers for the sole purpose of employing union members. PLAs can offer opportunities to grow and train the local workforce, specifically targeting underrepresented individuals.

*Comment:* Numerous respondents expressed concerns that PLAs can interfere with existing CBAs that contractors have already negotiated with unions.

*Response:* Many PLAs include a "supremacy clause" that incorporates the individual CBAs of the trades by reference and supersedes any other labor agreement that might otherwise apply to the project. Use of the supremacy clause can be an important benefit of a PLA on long term projects because individual CBAs may expire and need to be re-negotiated during the project. The terms of the PLA would take over to prevent work stoppages and other jobsite delays.

*Comment:* A respondent asserted PLAs will mitigate increasing requests for equitable adjustments caused by workers walking off the job for higher pay.

*Response:* PLAs prevent work stoppages and other job disruptions. As a result, projects covered by PLAs can continue without additional costs or delays.

*Comment:* A respondent asserted that non-union entities produce better quality construction, pay employees, and provide benefits that are as good, or better than union shops. Another respondent asserted that employees do not want or need a union that will not give them additional benefits beyond what they have and will require them to pay dues. Alternatively, a respondent asserted that PLAs establish wages, benefits, and other terms of employment across an entire project and have been used in both the public and private sector for the better part of a century.

*Response:* Non-union contractors may negotiate with the union that is party to the PLA to opt out of certain terms, especially when current benefits are equivalent to those provided by the union. As a general matter, the U.S. Department of the Treasury report, Labor Unions and the U.S. Economy (2023) indicates that the costs of union dues or fair-share fees to workers is typically offset by increased wages and

fringe benefits. In addition, for both contractors and for unions, the benefits of a PLA go beyond wages and fringe benefits. A PLA establishes work schedules for all contractors, ensures efficient utilization of labor, prevents job disruptions, and provides mutually binding procedures for resolving disputes.

*Comment:* Several respondents indicated that expanded use of PLAs will support workforce quality, safety, and stability, and help guarantee on-target and on-budget completion of projects that employ thousands of workers across various trades and industries. PLAs promote safe, timely, cost-effective execution of the most complex and national security conscious construction projects yet designed. In contrast, a respondent asserted that in the period from 2001 to 2009 during which PLA requirements were prohibited for Federal contracts and grants, there were no reports of widespread cost overruns, delays, strikes, or poor-quality construction on Federal projects attributable to the lack of a government-mandated PLA, indicating that PLA mandates are not needed to ensure economy and efficiency in government contracting. Another respondent asserted there is no evidence to support claims that PLAs guarantee better safety, quality, or construction delivery.

*Response:* Expanded use of PLAs is expected to support safe, on-time, efficient, and high-quality construction, in part by helping to secure a skilled workforce for Federal construction projects. Ensuring compliance with workplace laws on Federal construction projects has many important benefits to economy and efficiency for covered projects, including attracting skilled workers, reducing labor conflict and disruption, reducing turnover, and preventing workplace injuries.

One study found that union contractors (who are more likely to work on PLA-covered projects) have stronger safety records than non-union contractors. The study looked at more than 37,000 Occupational Safety and Health Administration (OSHA) inspections in the construction industry and estimated that union worksites were 19 percent less likely to have OSHA violations than non-union worksites. When OSHA inspections do uncover OSHA violations at unionized worksites, those worksites have 34 percent fewer violations per inspection that non-unionized worksites. See Frank Manzo IV, Michael Jekot, and Robert Bruno, Ill. Econ. Policy Inst., The Impact of Unions on Construction Worksite Health & Safety (2021). PLAs

may improve workplace safety by ensuring that construction workplaces have more apprentice-trained journeyworkers with critical safety skills. A study conducted in California found that construction contractors employing more apprentice-trained journeyworkers experienced significantly lower rates of injuries. See Emma Waitzman & Peter Philips, UC Berkeley Labor Ctr., Project Labor Agreements and Bidding Outcomes: The Case of Community College Construction in California 10, 16 (2017). Improving worker safety is especially urgent in the construction industry, which has the second-highest number of occupational deaths of any industry in the United States. See Bureau of Labor Statistics, National Census of Occupational Injuries in 2021, USDL–22–2309 (2022).

*Comment:* A respondent asserted that PLAs are more advantageous than regular "pre-hire" agreements because they can systematize labor relations across multiple trades, contractors and subcontractors.

*Response:* While PLAs can cover large, multi-year projects with multiple unions, PLAs can also cover any construction project, regardless of size, when only one union is involved.

*Comment:* A respondent expressed concerns that PLAs can blur the line between employer and employee, which could result in "co-employment issues." The respondent also suggested that PLAs will remove an important differentiating factor between subcontractors and will deter their engagement when they cannot negotiate the terms and conditions for their own employees. The respondent asked whether prime contracts will include terms related to "co-employment risks" when utilizing a mandated PLA.

*Response:* In Federal contracts, prime contractors are already responsible for every subcontractor's performance and compliance with the requirement to pay workers a prevailing wage under the Davis-Bacon Act (see FAR clause 52.222–11). Contractors can and do select subcontractors based upon criteria other than wage rates, such as subcontractor's records of experience, quality, safety, timeliness, or any other metric deemed critical to the success of the project.

*Comment:* Numerous respondents expressed concerns that specialists in the construction field employed by foreign firms would be unwilling to sign a PLA.

*Response:* The E.O. and final rule apply equally to foreign firms participating on a project within the United States that requires a PLA. The

rule assumes that certain conditions that may impact the Government's interests in achieving economy and efficiency would be known prior to the performance of market research. Based upon those conditions and/or results of market research, the agency may determine that an exception would apply.

*Comment:* Numerous respondents expressed concerns that union apprenticeship requirements and completion rates would mean that it would take more than 14 years for all government-registered construction industry apprenticeship program completers to fill the estimated 650,000 vacant construction jobs needed just in 2022. These respondents argue that excluding the non-union workforce development practices and systems already in place exacerbates the skilled labor shortage by steering work to participants in union-affiliated, Government-registered apprenticeship programs at the expense of contractors that engage in alternative workforce development efforts. Alternatively, several respondents asserted that PLAs promote equitable development of a skilled workforce by supporting privately funded union training programs. Another respondent asserted higher skilled trades require the workforce development and skill training of the union-sector joint apprenticeship system to build and maintain the skill base of the industry.

*Response:* E.O. 14063 does not impose a requirement for union-affiliated apprenticeship programs, as both union and non-union contractors can participate on projects with a PLA. Neither the E.O. nor the rule require employers to use apprentices from union-affiliated and/or Government-registered apprenticeship programs. Non-union contractors may negotiate with the union that is party to the PLA to use their own apprenticeship programs during the project.

The number of apprenticeships programs and the number of apprentices graduating from those programs has been steadily increasing. In the ten-year period from 2013 to 2023, the number of workers enrolled in an apprenticeship program nearly doubled from 286,069 to 581,110. The number of women in these programs nearly quadrupled from 24,594 to 83,254. See Data and Statistics, *ETA.gov* (2023).

## 5. Compliance With Law

*Comment:* Several respondents asserted that PLAs are a deterrent to violations of various worker protection laws and protect against common workplace abuses to include worker

misclassification, employment status, and wage theft. They asserted that PLAs ensure workers receive fair wages and benefits, which includes participation in federally-mandated programs such as Social Security and Medicare.

*Response:* Use of PLAs may help reduce the risk of noncompliance with labor laws in the construction industry under Federal construction projects. The presence of unions on construction work sites is expected to result in increased oversight, protection against retaliation, and grievance procedures that promote compliance with such laws and protect workers who raise concerns about an employer's conduct. Empirical research shows that union coverage generally is associated with fewer violations of employment law and suggests that unionization fosters reporting violations of law to enforcement agencies. See Ioana Marinescu, Yue Qiu, & Aaron Sojourner, Wage Inequality & Labor Rights Violations (National Bureau of Economic Research., Working Paper No. 28475, February, 2021).

*Comment:* A respondent urged the Council to amend the proposal to explicitly confirm that parties involved in PLA negotiations shall never be required to reach an agreement with unions but should be required only to engage in good faith bargaining to impasse, consistent with the requirements of the NLRA.

*Response:* Unless an exception is authorized, section 3 of the E.O. requires every contractor or subcontractor engaged in construction on the project to agree, for that project, to negotiate or become a party to a PLA with one or more appropriate labor organizations. Agencies will consider all relevant circumstances in determining whether an exception is authorized.

*Comment:* A respondent expressed concern that the rule interferes and discriminates against the rights of construction contractors and employees under NLRA. That respondent also argued that the E.O. is preempted by the NLRA "because it is not limited in its scope to a single project." Similarly, another respondent is concerned that the PLA rule is subject to challenge under labor law conflict preemption principles because it conflicts with policies in the NLRA which protects the rights of employees to refrain from union representation. By contrast, other respondents noted that PLAs are expressly authorized by section 8(f) of the NLRA and were unanimously upheld by the Supreme Court in *Building & Constr. Trades Council* v. *Associated Builders & Contractors of*

Mass. (*Boston Harbor*), 507 U.S. 218,
227–30 (1990).

*Response:* The E.O. and final rule
are not preempted by the NLRA, nor do
they unlawfully interfere with or
discriminate against the rights of
contractors or employees. PLAs are
expressly authorized in section 8(f) of
the NLRA. Section 4(f) of the E.O.
expressly requires any PLA reached
under it to allow contractors and
subcontractors to compete for work on
the project without regard for their
union status. The E.O. also requires that
PLAs reached under its authority fully
conform to all statutes, including the
NLRA which prohibits the use of union
hiring halls in a manner that
discriminates against non-union
workers.

The E.O. as implemented in this final
rule is not preempted by the NLRA
because it reflects the Government's
interests in efficient procurement of
goods and services. The NLRA does not
preempt Government agencies from
reaching PLAs where the Government is
acting as a ''market participant''
protecting its proprietary interests,
rather than as a regulator. *Boston
Harbor,* 507 U.S. at 227–30. The
Government is acting in its role as a
market participant by establishing a
presumption in favor of PLAs to
advance the economical and efficient
use of Government funds—including, by
promoting quality assurance, efficient
and on-time completion, and stability.
Courts have repeatedly found that uses
of similar agreements in Government-
funded projects are not preempted
under the NLRA. For example, in
*Airline Service Providers Association* v.
*Los Angeles World Airports,* 873 F.3d
1074 (9th Cir. 2017), an appellate court
held that a requirement that contractors
enter labor peace agreements was not
preempted by the NLRA. In another
case, an appellate court held that a city
requirement that parties receiving
certain tax benefits use a neutrality
agreement and no-strike agreement was
not preempted by the NLRA because the
conditions were tailored to protect the
city's proprietary interest. *See Hotel
Employees & Restaurant Employees
Union* v. *Sage Hospitality,* 390 F.3d 206
(3rd Cir. 2004). In addition, the
Government may also prohibit Federal
agencies from requiring the use of PLAs
because the Government acts in its
proprietary capacity when it does so.
*See Bldg. and Constr. Trades Dep't,
AFL–CIO* v. *Allbaugh,* 295 F.3d 28, 34–
36) (D.C. Cir. 2002).

While the NLRA does not provide a
right to refrain from union
''representation,'' the NLRA does allow
employees to choose not to become

union members. Non-members may opt
not to pay union dues and instead pay
agency fees covering only the share of
dues used directly for representation,
such as for collective bargaining or
grievance procedures. However, under
Section 9(a) of the NLRA, a union is the
''exclusive'' representative for all
employees in that unit. Similarly, under
the NLRA, a union has a duty of fair
representation to all employees,
regardless of whether they are union
members or not. As a result, the NLRA
provides workers a right to opt out of
union membership, but not union
representation.

Although the E.O. and final rule
addresses more than one project, the
rule is not preempted by the NLRA.
Section 5 of the E.O. establishes a
presumption in favor of PLAs, but also
contemplates a case-by-case analysis in
which agencies may grant exceptions to
that presumption where a PLA would
not advance the Government's
proprietary interests.

*Comment:* A respondent expressed
concern that the rule interferes and
discriminates against the rights of
construction contractors and employees
under the Employee Retirement Income
Security Act of 1974 (ERISA) by ''taking
nonunion workers pay for the benefit of
union pension plans without just
compensation.'' The respondent also
suggested that the rule conflicted with
the National Apprenticeship Act, which
the respondent wrote prohibits ''union
versus non-union discrimination.''

*Response:* The final rule does not
interfere with employees' or contractors'
rights under ERISA or the National
Apprenticeships Act. PLAs reached
under the E.O. and the final rule must
conform to all applicable statutes,
including ERISA and the National
Apprenticeships Act. The possibility
that non-union workers may contribute
to benefit plans for which they may or
may not ultimately vest does not violate
ERISA, which permits and regulates
defined benefit plans that do not vest
immediately (29 U.S.C. 1053). In
addition, ERISA does not bar
government entities from establishing
bidding conditions, *e.g.,* requiring a
PLA, related to benefit programs when
those entities act as market participants.

The National Apprenticeship Act
does not prohibit PLAs or prohibit
contractors from entering into CBAs that
require the use of a particular
apprenticeship program, as long as that
program is appropriately registered
where required. Neither the E.O. or final
rule specify or limit PLA provisions
regarding apprenticeship programs,
which may be the subject of bargaining

between the parties to the agreement
within the bounds of applicable law.

*Comment:* A respondent suggested
that this final rule is unnecessary
because existing Federal law and
enforcement by agencies like the
Occupational Health and Safety
Administration is sufficient to guarantee
workers' rights, fair pay, and safety.

*Response:* Ensuring compliance with
workplace laws on Federal construction
projects has many important benefits to
economy and efficiency for covered
projects, including attracting skilled
workers, reducing labor conflict and
disruption, reducing turnover, and
preventing workplace injuries. Despite
Federal and local protections for
construction workers and ongoing
enforcement efforts by the Department
of Labor and others, construction
remains one of the country's most high-
violation industries. See U.S.
Department of Labor, Wage & Hour
Division, Low-Wage, High-Violation
Industries (2022) at *https://
www.dol.gov/agencies/whd/data/charts/
low-wage-high-violation-industries.* For
example, a study (''An Empirical
Methodology to Estimate the Incidence
and Costs of Payroll Fraud in the
Construction Industry,'' dated January
2020, *http://www.nasrcc.org/wp-
content/uploads/2021/03/Wage-and-
Tax-Fraud-Report.pdf*) conducted on
this topic estimates that up to one in
five construction employees are
misclassified as independent
contractors, costing those workers at
least $811 million in unpaid overtime
and premium pay in 2017 alone.
Additionally, the U.S. Department of
Labor, Bureau of Labor Statistics News
Release USDL–22–2309 (*https://
www.bls.gov/news.release/pdf/cfoi.pdf*)
revealed that Construction workers are
also particularly vulnerable to health
and safety violations: the industry has
the second-highest number of
occupational deaths of any industry in
the United States.

6. Impact on Small Business

*Comment:* A respondent encouraged
the Council to re-evaluate the excessive
cost of compliance on small entities and
explore alternatives to this rulemaking
as it relates to small entities under the
Regulatory Flexibility Act. Numerous
respondents expressed concerns that the
rule does not adequately calculate the
disparate negative economic impact and
expensive compliance costs shouldered
by Federal small business general
contractors and subcontractors, noting
that the number of small businesses
awarded Federal construction contracts
declined 60 percent from 2010 to 2020.

*Response:* Unless an exception in section 5 of the E.O. applies, there are no alternatives that would reduce the impact on or exempt small entities from its requirements. The impact of the rule is updated to take into consideration the numerous public comments regarding the burden calculations. OMB and DOL will work with the Small Business Administration (SBA) to determine the best way to help small entities in understanding how to negotiate or participate in a construction project with a PLA.

*Comment:* Numerous respondents expressed concerns about the complexity and cost burdens associated with the rule. The respondents were concerned that PLAs will create a barrier to entry for many small, minority, and women-owned businesses, which will also negatively impact agency achievement of socio-economic and small business contracting goals. Some were concerned that these entities will choose to work on commercial projects rather than those that require PLAs.

*Response:* OMB and DOL intend to work with SBA to determine the best way to help small entities in understanding how to negotiate or participate in a construction project with a PLA.

*Comment:* A respondent recommended consideration of a requirement relieving a small business from having to join a union if it agrees to pay the prevailing wages and other benefits established in union negotiation. The respondent suggested that removal of this mandatory requirement would allow the Federal Government to achieve its objective with the PLA but at less cost to the small business.

*Response:* Neither the E.O. nor the final rule require any entity, regardless of size, to join a union. Contractors and subcontractors may negotiate with the union that is party to the PLA to opt out of certain terms, to include when current benefits are equivalent to those provided by the union.

*Comment:* A respondent recommended modifying the rule to reflect the diminishing cost-benefit to small firms by providing for a threshold contract value for covered subcontractors. The respondent stated that a proper cost-benefit analysis would show that a small firm that has only a few contracts per year will absorb a higher cost of compliance than a firm with multiple yearly contracts. Thus, this rule will have a negative economic impact on a substantial number of smaller firms, demonstrating why the mandatory flow down cutoff has merit.

The respondent expressed concerns that the rule requires small business subcontractors to comply with the mandatory flow down but does not allow the small business to utilize the contracting agency resources to resolve disputes that may occur during contract performance.

*Response:* The E.O. does not provide a threshold for subcontractor participation. The E.O. requires that all subcontractors agree to become a party to the PLA negotiated by the prospective offeror or prime contractor in order to participate on the project unless an exception applies. Providing relief above a certain threshold for smaller dollar subcontracts could unintentionally frustrate the benefits of a PLA, which depend on the participation of all contractors and subcontractors working on the contract being part of the PLA. The final rule assumes that subcontractors will work with prospective offerors or the prime contractor to ensure terms and conditions are negotiated into a PLA prior to deciding to participate on a project that requires a PLA. PLAs are intended to prevent disputes and provide an avenue for quick resolution.

*Comment:* A respondent was concerned that small entity annual receipts would increase due to increased labor costs, which will result in the small entity outgrowing the size standard for the North American Industry Classification System (NAICS) to qualify for small business set-asides and recommends that such set-asides be exempt from PLAs.

*Response:* While construction costs do fluctuate over time, there is no evidence to support that PLAs specifically will increase costs and cause a small entity to outgrow the size standard for the associated NAICS code. See section II. B. 2 of the Preamble for the discussion of Costs related to the use of PLAs.

*Comment:* A respondent asserted that unions require a bond and other types of requirements that eliminate small companies.

*Response:* This rule does not amend or impose new bond requirements. 40 U.S.C. chapter 31, subchapter III, Bonds (formerly known as the Miller Act) requires performance and payment bonds, or an alternative payment protection, for any Federal construction contract exceeding $150,000 unless an exception applies. The bonds protect the Government's interests but also contain payment protections that are beneficial for subcontractors.

*Comment:* A respondent was concerned that the rule will discourage small business from bidding on covered

Federal construction contracts and thereby impose obstacles on the use of small business preferences required by Federal agencies in violation of the Small Business Act (15 U.S.C. 637(d)).

*Response:* The final rule does not change the use of small business preferences in procurements subject to the Small Business Act. Implementation of the rule is not expected to impact the Government's ability to achieve its small business goals. For fiscal year 2022, the Federal Government reached 104.05 percent of its small business contracting goals. PLAs can be helpful to small businesses by providing them with a level playing field and access to expanded skilled labor pools, while streamlining project administration and the negotiation of workplace terms and conditions.

## 7. Alternative Approaches

*Comment:* A respondent recommended agencies include a provision to establish a Community Workforce Agreement (CWA) approach in 22.504(c) to promote diversity and inclusion, and local resident business opportunities.

*Response:* A CWA is an agreement that may be negotiated and incorporated as part of a PLA. A CWA may help agencies and prime contractors meet small business subcontracting goals and other objectives. The final rule permits, but does not require, CWAs. This is consistent with the language of the E.O. and provides appropriate flexibility for the parties to take unique local needs into consideration when negotiating PLAs on a project-by-project basis.

*Comment:* A respondent recommended requiring PLAs to include a "core employee" provision, which would allow non-union contractors to use their own employees without those employees registering with a union's hiring hall.

*Response:* Non-union contractors are currently able to negotiate core employee provisions in PLAs. Even when a PLA does not include a "core employee" provision, the PLA will not prevent using the contractor's workforce. If the union that is a party to a PLA operates an exclusive hiring hall, a non-union contractor's workers may register with that hiring hall for referrals to the project. If there is a non-exclusive hiring hall, contractors may hire their prior workers without those workers registering for a referral.

*Comment:* Some respondents requested that this final rule require that agencies use PLAs on projects that fall under the $35M threshold in certain circumstances. Alternatively, another respondent requested the rule eliminate

the option to use PLAs on small projects because of the respondent's concern about potential impacts on small and diverse businesses.

*Response:* The rule implements section 7 of the E.O., which allows an agency to require the use of a PLA in circumstances where the total cost to the Federal Government is less than that for a large-scale construction project if appropriate.

*Comment:* A respondent recommended that the rule consider exceptions for contractors regarding health and welfare plans if (1) a non-union contractor provides those benefits already and if less than the union benefits, the contractor should pay the employee the difference; (2) if the pension plan or healthcare fund is less than 70 percent funded based upon the most recent 5500 filings, the non-union contractor may pay the difference directly to employees; or (3) if a contractor would incur a pension withdrawal liability that exceeds the payments they are to make during the contract, exclude them from becoming a party to it and pay the employees instead.

*Response:* Non-union contractors may negotiate the recommended alternatives with the union that is party to the PLA.

*Comment:* Some respondents suggested there were other methods to ensure projects are completed on time and that there is no evidence that PLAs improve performance. Another respondent suggested that a series of alternative requirements would achieve the Government's goals such as: requiring contractors to reach agreements with private sector hiring agencies to meet workforce needs; requiring contractors to reach "labor compensation agreements" for the project; requiring contracts to use all non-union labor; or requiring contracts to have "dispute resolution agreements."

*Response:* The respondent's proposed alternatives would be inconsistent with the E.O., which reflects the President's judgment that PLAs are often effective in preventing special challenges to efficient and timely procurement related to large-scale construction contracts. This judgment is consistent with published research showing the benefits of PLAs and the long history of PLA use in the private and public sector. Federal agencies have used PLAs on large-scale Federal construction projects, dating back to the use of PLAs on Tennessee Valley Authority projects in the 1930s. PLAs can provide many advantages, including: eliminating risks of labor disruptions during the construction period; access to reliable skilled labor

through union hiring halls and additional procedures to meet workforce needs in a timely fashion; and uniform work rules promoting efficiency. Dep't of Labor, Implementation of Project Labor Agreements in Federal Construction Projects: An Evaluation (2011). Research has shown that there are advantages and potential drawbacks of PLAs, but supports the conclusion that PLAs can advance the Government's interest in efficient Federal contracting.

Many of the alternatives proposed by the respondent (such as a Federal Government requirement that contractors use non-union labor, requiring agreements with staffing agencies rather than union hiring halls to fill time-sensitive needs for limited skilled craft labor, or requiring contractors to reach "labor compensation agreements") are relatively untested and unstudied. Without additional research, there is no way to determine whether the respondent's proposed alternatives would provide benefits that exceed the benefits provided by this final rule. PLAs provide many demonstrated, mutually-reinforcing benefits to the Federal Government's ability to achieve its goals in large construction projects. The final rule is preferable to alternatives that, whether individually or together, only seek to achieve a subset of the goals provided by PLAs.

*Comment:* A respondent asserted that the Government's interests in economy and efficiency would be best served by pausing the proposed rule, gathering and analyzing data to justify a reasonable threshold for requiring PLAs, and then revising any proposed rule.

*Response:* The E.O. reflects the judgment that a presumption in favor of PLAs on projects with an estimated cost of $35 million or more would promote efficient Federal contracting. The final rule provides for a case-by-case analysis to determine whether an exception to the general PLA requirement is authorized, including where application of the requirement would not promote economy and efficiency. As a result, it is unnecessary to pause the publication of the final rule.

*Comment:* Some respondents requested that regulations and guidance afford states and localities maximum regulatory flexibility, free from anti-competitive and costly pro-PLA policies, in order to deliver more value to taxpayers and create opportunities for all, including small businesses.

*Response:* The final rule applies to FAR-based contracts awarded by the Federal Government. The rule does not

apply to grants or contracts awarded by states or localities.

*Comment:* A respondent urged the Council to implement regulations that include the best trade workers in the region to participate in Federal construction projects. Some respondents suggested maintaining the current policy established by E.O. 13502, which was issued in 2009 and authorized Federal agencies to require PLAs for large-scale construction projects on a case-by-case basis, considering factors like geographical location, construction market conditions, and the availability of skilled labor. One respondent asserted that the reliance interests of current contractors had not been adequately considered in adopting the change in policy under E.O. 14063. By contrast, some respondents argued that the current policy has led to an underutilization of PLAs and that the proposed rule, if finalized, would better advance the Federal Government's interests in achieving economy and efficiency in Federal procurement. Another respondent argued that E.O. 13502 has not achieved its goals because, under the current policy, some agencies do not sufficiently consider the benefits of adopting PLAs.

*Response:* Neither the E.O. nor the final rule prevent the best trade workers in the region from participating in any Federal construction project. Section 10 of the E.O. provides that, upon the effective date of this final rule, E.O. 13502 is revoked. The final rule reflects the language in section 1 of the E.O. which states that large-scale construction projects pose special challenges to the efficient and timely procurement for the Federal Government. Additionally, the increased use of PLAs can help address those challenges. The E.O. provides that expanding the use of PLAs will help prevent costly labor disputes that delay Federal construction projects, ensure a reliable stream of skilled labor, and promote coordination across multiple employers and unions.

While current policy permits agencies to use PLAs on construction projects, PLAs have only been used on a small number of Federal projects. According to data collected by OMB, under current policy approximately 2,000 contracts were eligible for a PLA between 2009 and 2021, but PLAs were only required 12 times. This E.O. now requires the use of PLAs in connection with large scale construction projects unless an exception applies to promote economy and efficiency in Federal procurement. This is expected to expand the use of PLAs by Federal agencies and help agencies achieve construction goals

more effectively in the context of the nationwide skilled labor shortage in the construction industry.

While the respondent asserted that contractors have reliance interests in "the principle of government neutrality in procurement," they did not explain why the prior policy generated legally cognizable reliance interests. The respondent did not specify what actions they may have taken in reliance on the prior policy under E.O. 13502 that they would not have taken if they had known the policy would change.

E.O. 14063 and the final rule apply prospectively and do not apply to or affect existing contracts already entered into by contractors. Both the E.O. and the rule apply only to new solicitations that are entered into on or after the effective date of this final rule. (See FAR 1.108(d) Application of FAR changes to solicitations and contracts.) Contractors will be able to decide whether or not to bid on contracts covered by the rule and to adjust their bidding strategy if necessary in response to any PLA requirement in the solicitation. Accordingly, while the Councils must implement the new requirements of the E.O. and do not have the discretion to depart from the mandate of the order, any reliance interests are outweighed by the benefits of this final rule.

### 8. Exclusion of Professional Engineering Services/Brooks Act

*Comment:* Several respondents expressed concern that the rule may be construed to require employees of professional engineering firms that perform various architectural and engineering professional services to become a party to a PLA. The respondents requested the rule exclude architectural and engineering services because such services are separate and distinct from construction services as recognized in 40 U.S.C. chapter 11, the Brooks Architect Engineer Act.

*Response:* Section 3 of the E.O. that applies the PLA requirement to contractors or subcontractors "engaged in construction on the project" excludes professional architecture and engineering services that are covered by the Brooks Architect Engineer Act. Given the distinction in FAR part 36 between construction and architect engineer contracts, architect engineer contracts issued under FAR subpart 36.6 are not covered by this rule.

### 9. Laws Associated With Rulemaking

*Comment:* Some respondents expressed concerns that the proposed rule fails to estimate the additional costs imposed on the public or the Government and claims that the lack of

more comprehensive cost estimates violates the Administrative Procedure Act (APA). Some respondents asserted the proposed rule violates the arbitrary and capricious standards of the APA.

*Response:* The procedural rulemaking requirements of the APA do not apply to matters relating to public property, loans, grants, benefits, or contracts (see 5 U.S.C. 553(a)). This rulemaking is instead governed by 41 U.S.C. 1707, the OFPP Act. The proposed rule requested input from the public in response to the burden estimates, and the recommendations provided by the public have been considered in developing the final rule.

*Comment:* A respondent challenged the sufficiency of the legal authority used in the preamble for the proposed rule, 40 U.S.C. 121(c), 10 U.S.C. chapter 137, and 51 U.S.C. 20113. The respondent claimed that as a result, the proposed rule does not comply with 5 U.S.C. 553(b)(2). The respondent claimed a statutory provision authorizing an agency head to engage in rulemaking does not give the agency the power to adopt a particular regulation.

*Response:* The APA (5 U.S.C. 553) does not apply to this rulemaking. The legal authority for the Federal Acquisition Regulations System is 40 U.S.C. 121(c), 10 U.S.C. chapter 4, and 10 U.S.C. chapter 137 legacy provisions (see 10 U.S.C. 3016), and 51 U.S.C. 20113 because Congress has specified that those are the authorities under which DoD, GSA, and NASA "shall jointly issue and maintain" the FAR (41 U.S.C. 1303(a)(1)).

*Comment:* A respondent stated that the rule exceeds the authority of the executive branch under the Federal Property and Administrative Services Act, Federal procurement and labor laws, and the major questions doctrine. Another respondent stated that these requirements should not be extended to other projects without an act of Congress.

*Response:* While DoD, GSA, and NASA do not believe that this rulemaking implicates major questions principles, the E.O. and this final rule are a proper exercise of the executive branch's authority under the Federal Property and Administrative Services Act of 1949 (the Act) in any event. The Act authorizes the President "to prescribe policies and directives that the President considers necessary to carry out" the Act, as long as those policies are "consistent" with the Act (40 U.S.C. 121(a)). The E.O. and this final rule "carry out" and are "consistent" with the Act, including, for example, its provisions directing GSA to "prescribe policies and methods for executive

agencies regarding the procurement and supply of personal property and nonpersonal services and related functions" (40 U.S.C. 501(b)(2)(A)); its requirements to "implement the [congressional] policy" that agencies "achieve, on average, 90 percent of the cost, performance, and schedule goals established for major acquisition programs of the agency" (41 U.S.C. 3103(a), (c)); its direction that agencies award contracts promptly to responsible sources whose proposals are most advantageous to the Federal Government, considering only cost or price and the other factors including in the solicitation (41 U.S.C. 3703; see 40 U.S.C. 111); and its stated objective of providing "the Federal Government with an economical and efficient system" for procurement activities, including "[p]rocuring and supplying property and nonpersonal services" (40 U.S.C. 101). Additionally, support for this rule is provided under the Act by provisions authorizing GSA to "prescribe policies and methods for executive agencies regarding the procurement and supply of personal property and nonpersonal services and related functions (40 U.S.C. 501(b)(2)(A); see also 40 U.S.C. 121(c); 41 U.S.C. 1303).

The E.O. is also consistent with the longstanding, early, and consistent interpretation of the Procurement Act by several Presidents. The E.O. and rule reflect a decades-long tradition of executive orders across multiple Administrations that have invoked the Act to "establish[ ] the policy of the Government with regard to the use of PLAs in Federal and federally funded construction contracts." *See Bldg. & Const. Trades Dept., AFL–CIO* v. *Allbaugh,* 295 F.3d 28, 30 (D.C. Cir. 2002). For example, E.O. 13302 (2001) provided that agencies could neither require nor prohibit the use of a PLA and was upheld on appeal by the D.C. Circuit. Presidents have also exercised their authority to prohibit agencies from using PLAs, see E.O. 12818 (1992), to revoke that prohibition, see E.O. 12836 (1993), and to encourage the use of PLAs, see E.O. 13502 (2009). "[L]ongstanding practice" is a strong indication that the E.O. as implemented in this final rule, like earlier applications of the President's authority, "falls within the authorities that Congress has conferred upon him." *See, e.g., Biden* v. *Missouri,* 142 S. Ct. 647, 652 (2022).

*Comment:* A respondent claimed the rule violates the Congressional Review Act because the rule will cost more than $100 million and asserted that the proposed rule incorrectly stated that

this is not a major rule under 5 U.S.C. 804. Another asserted the rule is subject to the Congressional Review Act, and questions why the rule is subject to E.O. 12866 but is not a major rule.

*Response:* The Congressional Review Act requires submission of all interim and final rules, regardless of dollar value, to each House of the Congress and to the Comptroller General of the United States, as provided in section VI of the proposed rule (87 FR 51044). This final rule will be submitted in accordance with the Congressional Review Act. The determination of whether a rule is a major rule is made by the Office of Management and Budget's Office of Information and Regulatory Affairs (OIRA) (see Section VI of this preamble). OIRA also makes the determination whether or not a rule meets the threshold at section 3(f) of E.O. 12866.

*Comment:* A respondent asserted that the rule violates the Regulatory Flexibility Act because the FAR Council failed to consider the proposed rule's deleterious effect on small businesses that are deprived of business because they refuse to enter, or cannot enter, a PLA.

*Response:* The rule complies with the Regulatory Flexibility Act. The proposed rule examined the impact of the proposed rule on small businesses, small governmental jurisdictions, and small organizations. The rule solicited comments from the public pertaining to the estimated burden which was used to inform the final rule. The rule allows all contractors and subcontractors to compete for contracts and subcontracts without regard to whether they are otherwise parties to a CBA.

10. Exceptions

*Comment:* Some respondents recommended that the final rule should insert "Federal" before statute and law to ensure state laws are not used to bypass PLA requirements.

*Response:* The final rule adopts this change because state and local statutes and regulations cannot regulate Federal procurement. *See United States* v. *Georgia Pub. Serv. Comm'n,* 371 U.S. 285, 292 (1963).

*Comment:* A respondent asserted that PLAs make several of the exceptions provided in the E.O. unnecessary. For example, the respondent recommended deleting the exception for a PLA not achieving economy and efficiency because economy and efficiency has been improved with PLAs on large industrial projects with many contractors and subcontractors. The respondent also asserted that the

exception for reduction in competition is also unnecessary.

*Response:* The final rule implements the exceptions provided in Section 5 of the E.O.

*Comment:* Some respondents recommended that the rule require agencies to post approved exemptions to public websites before the solicitation date and allow a limited time to request reconsideration of the exemption decision before the solicitation is issued.

*Response:* The final rule implements section 6 of the E.O., which requires agencies to publish data and descriptions of the waivers granted on a centralized public website by the solicitation date to the extent permitted by law and consistent with national security and executive branch confidentiality interests.

*Comment:* A respondent was concerned that the one-trade exception will be misapplied.

*Response:* The contracting workforce will be provided training to ensure accurate application of the regulations in accordance with section 9 of the E.O, including 22.504(d)(1)(i)(B).

*Comment:* Some respondents recommended that the exceptions be very narrow and only utilized after a transparent decision-making process. A respondent was concerned that senior procurement executives will simply check a box to avoid a PLA.

*Response:* Exceptions will only be authorized in accordance with the direction in section 5 of the executive order.

*Comment:* A respondent stated that the proposed rule does not contain an exception for when inclusion of a PLA demand would impede economy and efficiency; a PLA could well have such an effect without triggering any of the clauses of the proposed exceptions. For example, agencies could choose a PLA bid that is twice as expensive as an otherwise similar bid that does not include a PLA. An exception from the PLA mandate should apply if it can be demonstrated that the mandate would increase construction costs by a substantial amount, for example by 15 percent or more. The respondent recommended additional exceptions: (1) if one or more contractors cannot obtain a stable workforce, (2) if contractors show that a PLA would increase their price by 5 percent or more and that not using a PLA would not negatively impact quality, timeliness, and safety, (3) if all contractors can sign the agreement that meet 2 terms of the PLA mandate, including the non-strike and procedures for disputes, and (4) if requiring a PLA reduces the number of

qualifying bids below a certain threshold that would signal a lack of competition.

*Response:* The E.O. and final rule include several exceptions at FAR 22.504(d) that could be used to address the respondent's concerns. In addition to the exception specifically for economy and efficiency, market research will be used to determine whether a PLA would reduce competition to such a degree that it would not allow for a fair and reasonable price.

*Comment:* Some respondents requested the urgent and compelling limitation reflect that requiring a PLA on the project would result in serious injury, financial or other, to the Government.

*Response:* Agencies may grant an exception based upon a specific written explanation as provided under Section 5 of the E.O., including any exception based on unusual and compelling urgency.

*Comment:* A respondent requested that agencies find it inappropriate to characterize a project as short-term if data concerning the completion rates of similar Federal projects in terms of construction type (*e.g.,* work on GSA-managed buildings) and competing activities in the vicinity demonstrate that such projects are not generally completed in the calendar year in which the project commences.

*Response:* Each project is evaluated on a case-by-case basis to determine if the project duration or lack of operational complexity would qualify for an exception under section 5 of the E.O.

*Comment:* A respondent was concerned that the language omits key details of the E.O. with regard to potential exceptions, rendering them so broad that contracting officers can continue to disregard this guideline.

*Response:* The rule implements the exceptions provided in the E.O. The rule provides additional explanations to ensure agencies apply an exception appropriately.

*Comment:* A respondent requested the senior official referenced in section 5 of the E.O. to be the agency head and not the senior procurement executive.

*Response:* FAR 2.101 identifies the senior procurement executive as the responsible official for management direction of the acquisition system in an executive agency (41 U.S.C. 1702(c)).

*Comment:* A respondent expressed concerns that the lack of agency experience with PLAs will cause contractors to price additional risk into projects with PLAs.

*Response:* Agencies will receive training on the use of PLAs in accordance with section 9 of the E.O.

*Comment:* A respondent supported the requirement that exceptions must be granted by the solicitation date as opposed to after a solicitation has been issued with a PLA requirement. The respondent also wanted the FAR to expressly state that a PLA cannot be required after a solicitation has been issued.

*Response:* The rule requires agencies to grant an exception prior to the issuance of the solicitation (see 22.504(d)(3)) in accordance with section 5 of the E.O.

11. Definitions

*Comment:* A respondent recommended that the rule add a geographical definition of market because construction workers are mobile.

*Response:* Contracting officers will determine the applicable market based upon the project requirements.

*Comment:* A respondent recommended that the FAR clearly provide that whether the union with which a PLA has a membership or affiliation in a building trade construction council cannot be considered in bidding or the acceptance of bids on a PLA covered by E.O. 14063 or the proposed FAR rule.

*Response:* A union does not need to have membership or affiliation in a building trade construction council to become a party to a PLA when required for a construction project. Regardless of whether a PLA is required at the time of proposal submittal, award or postaward, all contractors working on the project are required to become a party to the PLA. However, the E.O. does require that the PLA be with a "labor organization," which is defined as one in which "building and construction employees are members, as described in 29 U.S.C. 158(f)."

*Comment:* A respondent requested removal of proposed text at FAR 22.504(c), which prevented agencies from requiring contractors and subcontractors to enter into a PLA with a particular labor organization when there were multiple labor organizations representing the same trade, because it is redundant, and the respondent recommended using the E.O. language. Another respondent stated that by its very nature, a PLA is an agreement through which the contractor requires subcontractors to enter into an agreement with a particular labor organization. By signing the PLA, the subcontractors enter into an agreement with all the signatories to the agreement,

not with any particular labor organization.

*Response:* The final rule text has been revised to adopt this recommendation at FAR 22.504(c) with conforming changes in FAR solicitation provision 52.222–33, Notice of Requirement for Project Labor Agreement and FAR contract clause 52.222–34, Project Labor Agreement. See section II, paragraph A of the preamble.

*Comment:* A respondent supported the final rule's alignment of the definition of the term "labor organization" in the rule with the discussion of PLAs in section 8(f) of the NLRA, which defines PLAs (pre-hire agreements) as agreements with "a labor organization of which building and construction employees are members." See 29 U.S.C. 158(f). The respondent, however, suggested that the final rule definition of "labor organization" should also require that the labor organization "itself, its parent, or parent's affiliates establish, maintain, or participate in a registered apprenticeship program in the construction industry." The respondent stated that this language reinforces the registered apprenticeship programs that are regulated by DOL or a state apprenticeship program. Another respondent recommended that the rule revise the definition of labor organization to delete the word "building" so that it reads a labor organization "of which construction employees are members" instead of "of which building and construction employees are members."

*Response:* The rule implements the definition provided in the E.O., which is consistent with the description of PLAs in section 8(f) of the NLRA.

*Comment:* A respondent expressed support for the proposed rule's inclusion of the term "structures" in the rule's definition of "construction," as consistent with the language of the E.O. and the FAR generally. Another respondent recommended replacing the E.O. definition of construction with language from the coverage provisions of the Davis-Bacon Act (40 U.S.C. 3142(a)) because the scope of those coverage provisions is widely accepted and understood. The respondent stated that the new definition in the E.O. increases opportunities for ambiguity.

*Response:* The final rule implements the definition provided in the E.O. The scope of coverage of Federal construction projects under the E.O. and the Davis-Bacon Act are not identical, and there may be work that is not covered under the Davis-Bacon Act that is covered under the E.O. Agencies ultimately must make independent

determinations under the E.O. of whether a contract is for "construction" or whether a subcontractor is "engaged in construction" such that they are required to be a party to a PLA.

12. Market Research

*Comment:* A respondent recommended that labor organizations be consulted when applying the market exception because they can provide information on available contractors, workers, etc. The respondent also suggested adding "Construction labor organizations that have geographical jurisdiction where the project is to be located shall be consulted on current market conditions, including, but not limited to, the availability of contractors and labor, potential bidders and the degree of unlawful employment practices." Additional respondents recommended that agencies confer with union and non-union contractor associations and labor unions during market research to determine whether certain exceptions apply.

*Response:* The E.O. requires contracting officers to perform an inclusive market analysis. The FAR currently requires agencies to conduct market research in FAR part 10 and, specific to construction, in part 36.

Agencies may use various tools to examine market conditions described in FAR part 10. Agencies generally confer with interested parties using sources sought notices and advance notices for construction contracts (see FAR 36.211 and 36.213–2). These notices are primarily published on the Government-wide point of entry (GPE) at *www.sam.gov,* which is accessible from a computer or mobile device connected to the internet. Also, agencies may be required by statute to publicize contract opportunities to increase competition, broaden industry participation in meeting Government requirements, and to assist small business concerns in obtaining contracts and subcontracts (see 5.002 and FAR subparts 5.1 and 5.2).

The GPE is available to the public, including union and non-union contractor associations and labor unions, through the internet without having to register as a potential offeror. It is also used to reach as many interested parties as practicable and offers extensive search functionality which allows the user to identify Governmentwide business opportunities at all phases. Those interested in participating in market research for construction projects can simply select "sources sought" under notice type and proceed to filter on additional factors such as organization or place of

performance. The user may then respond directly to the contracting officer conducting market research.

*Comment:* A respondent did not support language requiring a contracting officer to ascertain interest and availability of union and non-union contractors during market research surveys. The respondent suggested that it would be inappropriate to analyze whether contractors are union or non-union given that the E.O. allows contractors and subcontractors to compete for contracts and subcontracts without regard to whether they are otherwise parties to collective bargaining agreements. The respondent stated that surveys taken as part of market research have been used to undermine the process of fairly ascertaining overall contractor interest. As a result, the respondent urged that contractor interest include all contractors with no requirement for a certain segment of the industry to be included in the responses. Some respondents asserted agency efforts for market research on PLAs have been flawed because standard methods of publicizing contract opportunities, such as Fedbizopps, only reach contractors seeking work opportunities and the contracting community and not unions. Further, historically, many of the market survey questions about PLAs were not aimed at the particular market but asked generic questions about general attributes of PLAs. Documentation regarding the consideration of a PLA was nothing more than checking a box. Another respondent expressed concern that an examination of contractors' ''interest'' in working under a PLA will not yield reliable information about whether there will be sufficient competition. The respondent claimed that non-union contractors consistently assert in responses to market research that they have no ''interest'' in participating in projects conducted under PLAs and that they will not bid for such work; however, when actually presented with the opportunity to work on a large public works project, non-union contractors step forward.

*Response:* The language in FAR 36.104(c)(2) referencing the availability of both union and non-union contractors is not intended to suggest that only union contractors can or will bid on projects where a PLA is required. Rather, it is intended to assist with implementing the E.O.'s requirement that an exception be based on an ''inclusive'' market analysis. Contractors may bid on projects subject to this final rule regardless of whether they are otherwise party to CBAs, and available evidence suggests that non-union

contractors do bid on projects with PLAs.

The goal of market research in the context of the E.O. and this final rule is to determine whether requiring a PLA would substantially reduce the number of potential offerors to such a degree that the Government could not meet its requirements at a fair and reasonable price. While the language of FAR 36.104(c)(2) seeks information about contractor ''interest,'' a potential bidder's claim that they are disinterested in bidding on projects with PLAs, alone, would not necessarily justify the exercise of an exception, in particular where other information suggests that a sufficient number of offers would be received.

Agencies conduct market research using the various tools and techniques in FAR 10.002, inclusive of direct communication with industry via online communication, interchange meetings, or pre-solicitation conferences, as needed and applicable. The final rule provides additional direction at FAR 36.104(c)(2) for projects that may require a PLA.

Use of the GPE at *www.sam.gov* to publish a sources sought notice is the primary method used and allows all interested parties equal access to the Government's market research efforts. All entities interested in contracting with the Government understand that the GPE is the statutory source for dissemination of contracting opportunities, to include notifications or announcements of future opportunities. Union and labor organizations are not precluded from searching and monitoring *www.sam.gov* as all other interested parties do, nor are unions prevented from responding to market research or sources sought notices. Union and labor organization utilization of the GPE at *www.sam.gov* to respond to market research or sources sought notices will help to inform contracting officer's determinations.

*Comment:* Some respondents recommended that the market research text under 36.104(c)(2) be revised to state that ''Contracting officers conducting market research for Federal construction contracts shall ensure that the procedures at 10.002(b)(1) involve a current and proactive examination of the market conditions in the project area to determine the availability of local, regional and national unions and contractors to participate in a project that requires a PLA. The contracting officer may use market research conducted within 18 months before the award of the construction contract only if the current and proactive examination of market conditions demonstrates that

the information is still current, accurate and relevant. Contracting officers may coordinate with agency labor advisors, as appropriate.''

*Response:* Market research is conducted during acquisition planning to establish the most suitable approach to meeting an agency's needs. The direction at 10.001 and 10.002 currently provide sufficient guidance to contracting officers on the conduct and use of market research to inform a particular procurement. The final rule, at FAR 36.104(c)(2), adds specific direction for contracting officers for use in conjunction with FAR part 10 guidance, when a large-scale construction contract is contemplated.

*Comment:* A respondent recommended market research and requests for information use a standard set of questions with consistent formatting for contractors to use and to give contractors at least 2 weeks to respond. Another respondent recommended that the rule standardize PLA surveys for interested parties to comment and an automated system to process the inputs.

*Response:* While the Government understands and appreciates the interest in consistency when conducting market research, it is not possible to create a standard set of questions that will result in sufficient information for every size and type of construction project. Also, while there may be some elements of PLA surveys that can be standardized, the Government believes the uniqueness of each project and other elements like locality does not lend itself to a standardized document.

## 13. Application to Indefinite Delivery Indefinite Quantity (IDIQ) Contracts

*Comment:* A respondent asserted that IDIQ contracts are unusual but agrees that the PLA requirement should be associated with the award of a particular order.

*Response:* Data indicates that IDIQ contracts for multiple projects, regions, and types of construction are more frequently used than definitive contracts Governmentwide. The rule acknowledges that orders are primarily project- and location-specific, making the application of a PLA requirement appropriate at the order level.

*Comment:* Some respondents requested that the $35 million value should be applied at the IDIQ base contract level, not to individual orders.

*Response:* IDIQ contracts are often used for multiple, distinct construction projects in varied markets. As a result, there may be differing markets within the scope of the IDIQ, which could make one overarching PLA

inappropriate. Agencies are not precluded from requiring one PLA, but they should do so based upon market research.

### 14. Burden Estimates

*Comment:* A respondent asserted that the rule overestimates the costs of negotiating PLAs under the rule because PLAs are standardized in many markets, so they may not need to be negotiated from scratch.

*Response:* The rule assumes that most PLAs will be negotiated from scratch because PLAs have not been mandated prior to this E.O. Historical data does not support any other assumption.

*Comment:* A respondent stated the statistical process followed by the Government is generally reasonable but stated that assumptions and outcomes cannot be effectively evaluated. The respondent stated that it would be surprising if the actual totals were an order of magnitude larger than provided in the proposed rule. The respondent supported the Government's assumption that there are 4 bidders. The respondent also believed that the focus on total costs versus additional costs is appropriate. The respondent questioned the 20 percent assumption for small businesses because the Government has historically awarded 15 percent of its contracts to small businesses, which would drop the estimate to 18 to 32 small businesses. The respondent offered that according to *USAspending.gov,* since 2008 9.7 percent of prime construction projects of $35 million or more went to small businesses. The respondent also stated that if the Government had used wage data from the construction industry, it would have reduced estimates.

*Response:* The rule uses the fiscal years 2019, 2020, and 2021 data from the Federal Procurement Data System (FPDS) to establish the estimates. The impact of the rule has been adjusted to reduce the percentage of large scale construction contracts awarded to small entities to 15 percent.

*Comment:* Several respondents questioned the number of subcontractors used in the estimated impact of the rule. Respondents recommended using ranges of 8 to 10 or 15 to 20 based upon the size of the project. The increase will likely reflect a greater negative impact on subcontractors and small businesses.

*Response:* The impact of the rule is revised to account for an increased number of subcontractors for each project subject to the PLA requirements.

*Comment:* A respondent stated that the cost review should have taken into account that some exceptions may be

denied, or it should be clarified that it only considers approved requests.

*Response:* The rule does not differentiate between the number of exceptions submitted, approved, or denied because the preparation, submittal, and review of an exception would occur regardless of whether an exception was approved or denied.

*Comment:* A respondent recommended that the total estimated costs be defined as "all estimated costs incurred for completion of the construction project, including, but not be limited to site acquisition, preconstruction environmental work, site preparation, design (including architectural, engineering, and other professional costs), labor costs, construction equipment, construction management, inspection, relocation, and refurbishing." The respondent asserted a standard definition would be beneficial to contracting agencies.

*Response:* Total estimated costs for purposes of this rule are only those associated with the PLA rule definition for construction at 22.502 and 52.222–3. While a construction estimate may include the cost of design for a project for which a design-build contract is contemplated, professional services provided by architecture and engineering firms are not subject to PLA requirements.

*Comment:* A respondent believed the estimate of the percentage of contracts that will be exempt appears to be a misconception of the mandate. Exemption of up to half the covered projects is clearly inconsistent with a requirement that contracting agencies use PLAs.

*Response:* The rule takes into account the potential exceptions that are provided in the E.O. DoD, GSA, and NASA have estimated the potential use of the exceptions with the knowledge that the market will influence whether a PLA is in the best interest of the Government.

*Comment:* Some respondents asserted the rule vastly underestimates the economic impact. Another respondent asserted the cost impact of the rule needs to be adjusted upwards. The respondent asserts that on average an experienced company takes 400 hours to negotiate a PLA, but that estimate does not include the hours needed to draft and revise the PLA, negotiate economic terms, factor economic terms into proposal pricing, obtain legal review, coordinate with prospective subcontractors, or factor in hours spent by other parties to the PLA. The respondent recommended the total hour estimates to negotiate a PLA be

increased to at least 500 hours to provide a more effective cost estimate.

*Response:* The final rule contains updated burden estimates in response to public comments.

*Comment:* A respondent expressed concern that the attorney hourly rate is underestimated.

*Response:* The rule uses Bureau of Labor Statistics (BLS) National Occupational Employment and Wage Estimates for May 2021 as the basis for the legal participants' hourly rates.

### 15. PLA Submittal

*Comment:* Several respondents recommended that the final rule require PLAs to be submitted before contract award, eliminating the third option which allows submittal after award. Another respondent recommended that PLAs be submitted before a final contract award so that contracting agencies can confirm bidder eligibility and influence PLA content. Another respondent was concerned that postaward submittals will not ensure that a project will be covered by a PLA.

*Response:* The final rule permits the submittal of PLAs with an offer, prior to award, or after award. Contracting officers have the discretion to select the most appropriate option for the particular procurement.

*Comment:* A respondent recommended that paragraph (e) be removed from 52.222–33 and the Alternate 1, and substitute para (b) of Alternate I. Because PLA negotiations take on average 90 days, an offeror would not be able to submit a PLA with its offer. This would favor affiliated companies and disincentivize non-affiliated ones from participation. This would reduce efficiency and Government selection in a fair bidding process. The respondent asserted postaward alternatives in 52.222–33 would better suit and satisfy the reality of the days taken to negotiate PLAs.

*Response:* The rule allows the contracting officer to determine, based upon market research, when to require the submittal of a PLA. The rule provides options for contracting officers to choose from.

### 16. Implementation

*Comment:* A respondent questioned whether the rule would be immediately implemented into all applicable construction contracts or only newly awarded applicable construction contracts.

*Response:* The final rule will be effective 30 days after publication. OIRA has determined that this rule is not a major rule. According to FAR 1.108(d), Application of FAR changes to

solicitations and contracts, FAR changes apply to solicitations on or after the effective date of the change, unless otherwise specified.

*Comment:* A respondent questioned how the rule will address different geographical locations within the United States where the construction industry does not use PLAs and where organized labor is less common.

*Response:* In addition to the market research conducted under FAR part 10, the final rule requires contracting officers to conduct an inclusive market analysis to evaluate whether a PLA requirement for any particular project would advance the Government's interests in accordance with the E.O. This inclusive market analysis must consider the market conditions in the project area and the availability of unions, and unionized and non-unionized contractors.

*Comment:* A respondent recommended the council evaluate the need for a PLA on a project-by-project basis, prioritize flexibility, provide for standardized solicitations, general waivers, and keep the waiver authority at the current level and NOT raise it to the senior procurement executive.

*Response:* The rule requires agencies to evaluate the feasibility of a PLA based upon market research and other considerations on a project-by-project basis. Solicitations and contracts for construction are generally standardized using the procedures authorized in FAR part 36, however requirements are specific to the particular project. The rule interprets the senior official referenced in the E.O. to be the Senior Procurement Executive as the responsible official for management direction of the acquisition system (see 2.101).

### 17. Negotiations

*Comment:* A respondent was concerned that the rule does not clearly prohibit an agency from engaging in PLA negotiations. The respondent asserted that the PLA should be negotiated solely and directly by contractors with employees working on the PLA project and the labor unions representing workers on the PLA project, as they are the only parties explicitly authorized to enter into a PLA agreement under the NLRA. The respondent also requested that the rule clarify that a PLA may not be unilaterally written by a labor organization or negotiated by parties who will not be employing workers on the project.

*Response:* PLAs are pre-hire agreements negotiated solely between labor unions and contractors working on

a specific project. The Government does not participate nor is it a signatory to the PLA.

### 18. Out of Scope

*Comment:* A respondent recommended that the Government invest in workforce development training for the skilled trades at the high school level.

*Response:* This comment is outside the scope of this rule.

*Comment:* A respondent recommended formalizing the U.S. Army Corps of Engineer's PLA Survey process for all Federal agencies executing construction.

*Response:* This comment is outside of the scope of this rule because policy guidance will be developed separately by OMB.

*Comment:* A respondent requested the Council lessen barriers and increase opportunities for U.S.-owned and-operated construction firms to build with the Federal Government.

*Response:* This comment is out of scope of the rule.

*Comment:* A respondent requested the passage by Congress of the Fair and Open Competition Act (H.R. 1284) that would prohibit Federal construction contracts from requiring or prohibiting PLAs.

*Response:* This comment is out of scope of the rule.

*Comment:* A respondent assumed that agencies estimated their costs based on contracts that did not use a PLA because 99.4 percent of their projects did not use a PLA. The rule does not specify how agencies must estimate the cost of projects. Consequently, the agencies should either (1) require estimated project costs to be based on fair market costs or (2) apply an exception to bids of $35 million or less, regardless of the agencies initial estimated cost of the project.

*Response:* The development of independent Government cost estimates for construction contracts is out of scope of this rule.

### III. Applicability to Contracts at or Below the Simplified Acquisition Threshold (SAT) and for Commercial Products (Including Commercially Available Off-the-Shelf (COTS) Items), or for Commercial Services

This rule amends the provision at FAR 52.222–33 and the FAR clause at 52.222–34. However, this rule does not impose any new requirements on contracts at or below the SAT or for commercial products, commercial services, and COTS items. Since the provision and clause apply to large-scale Federal construction contracts,

neither would apply to acquisitions at or below the SAT or to acquisitions for commercial products, commercial services, and COTS items.

### IV. Expected Impact of the Rule

A PLA is defined as a pre-hire collective bargaining agreement with one or more labor organizations that establishes the terms and conditions of employment for a specific construction project and is an agreement described in 29 U.S.C. 158(f). PLAs are a tool that can be used to provide labor-management stability and ensure compliance with laws and regulations such as those governing safety and health, equal employment opportunity, labor and employment standards, and others. Requiring a PLA means that every contractor and subcontractor engaged in construction on the project agree, for that project, to negotiate or become a party to a PLA with one or more labor organizations.

Currently, the regulations at FAR subpart 22.5 encourage the use of PLAs for large-scale Federal construction projects, which is defined as projects with a total cost of $25 million or more. According to the data collected by OMB, between the years of 2009 and 2021, there was a total of approximately 2,000 eligible contracts and the requirement for a PLA was used 12 times. Based on the data, on average there are approximately 167 eligible awards annually and approximately one award that includes the PLA requirement.

This rule implements E.O. 14063, Use of Project Labor Agreements for Federal Construction Projects, which requires the use of PLAs in large-scale Federal construction projects unless an exception applies. In accordance with the E.O., the definition of "large-scale Federal construction projects" is amended from $25 million or more to $35 million or more. Based on FPDS data from fiscal year 2019 through fiscal year 2021, the average number of construction awards, including orders against IDIQ contracts valued at $35 million or more, were approximately 119 annually. The average value of each award is approximately $114 million.

In accordance with the E.O., this rule provides exceptions to the requirement to use PLAs for large-scale Federal construction projects. Exceptions must be based on at least one of the conditions listed at FAR 22.504(d). These conditions include when the requirement for a PLA would not advance the Federal Government's interests; where market research indicates a substantial reduction in competition to such a degree that adequate competition at a fair and

reasonable price could not be achieved; or where the requirement would be inconsistent with other statutes, regulations, E.O.s, or Presidential memoranda. There is no data on the number of exceptions that may be granted since the mandate and associated exceptions are new. It is possible there may be a higher usage of exceptions in the initial year as industry and the Government work to implement the requirement. Considering the lack of available data on the proposed exceptions, it is estimated that exceptions may be granted for 10 percent to 50 percent of covered contracts; in other words, an estimated 60 to 107 construction contract awards may require PLAs.

The current FAR provision at 52.222–33, Notice of Requirement for Project Labor Agreement, provides a basic provision and 2 alternative provisions from which the contracting officer can select. The provision selected identifies whether all offerors, the apparent successful offeror, or the awardee must provide a copy of the PLA. There is no historical data on the selection of alternatives. Therefore, it is assumed each alternative will apply one third of the time. This implies one third of affected solicitations will require all offerors to provide a PLA, and two thirds of affected solicitations will only require one entity (apparent successful offeror or awardee) to provide a PLA.

To estimate the number of offerors that would be required to provide a PLA, the Government estimates an average of 4 offers would be submitted per award; *i.e.*, an estimated 80 to 144 offerors (20 to 36 awards * 4 offers). Therefore, the total number of estimated entities that would be required to submit PLAs at the prime contract level is 120 to 215 entities (40 to 71 apparent successful offerors or awardees + 80 to 144 offerors). The final rule reduces the estimated percentage of entities assumed to be small entities from 20 to 15 percent in response to public comments and updated analysis of FPDS data. As a result, approximately 18 to 32 small entities and 102 to 183 large entities may be required to submit PLAs.

For the estimated 120 to 215 entities that will be required to have a PLA to submit an offer or perform a contract, generally the entity will negotiate the terms and conditions of the PLA with one or more union(s). It is assumed an entity will require a total of 5 participants, the owner or a senior executive, legal counsel, a project manager, and 1 to 2 labor advisors, depending on the size of the workforce, to support the negotiations. In response

to public comments, the final rule revises the scope and estimated hours required for each party involved in the negotiation of a PLA. Public comments indicated that, in addition to the negotiation of a PLA discussed in the proposed rule, entities performed several other requirements necessary to develop and ultimately implement a PLA. Taking those additional tasks into consideration, the final rule increases the estimated hours from 40 to 80 hours to 100 to 200 hours for each party involved in the development, negotiation, and implementation of a PLA between a prime contractor and a union.

According to the Bureau of Labor Statistics (BLS) National Occupational Employment and Wage Estimates for May 2021, the mean hourly wage for General and Operations Managers is $55.41/hour, $71.17 for Lawyers, and $102.41 for Chief Executives. To reflect the variety of labor categories necessary to estimate the impact, a mean hourly rate of $76.33 is used for this calculation. The current BLS factor of 42 percent is applied to the mean wage to account for fringe benefits and an additional 12 percent overhead factor is applied (see Attachment C of OMB Circular A–76 Revised issued May 29, 2003), for a total loaded wage of $121.40/hour ($76.33 * 142 percent * 112 percent).

It is estimated that 1 hour is required by one member of the contractor's workforce to submit the PLA to the Government on behalf of the contractor. Using the BLS wage estimates for Office and Administrative Support Occupations, the mean hourly rate for submitting the PLA is estimated to be $33.21 (20.88 * 142 percent * 112 percent). The total estimated impact for the development, negotiation, submission, and implementation of a PLA in response to a Government contract is $7.28 to $26.10 million (120 to 215 entities *((5 participants * 100 to 200 hours * $121.40) + (1 person * 1 hour * $33.21)). Taking midpoints of each range implies a primary estimate of $16.69 million.

The requirement for a PLA flows down to subcontractors through FAR clause 52.222–34, paragraph (c). There is no data source that identifies the number of subcontractors per contract; however, based upon public comments, the final rule increases the estimated number of subcontractors from 2 to an average of 14 for each contract. As a result, the final rule estimates that the requirements of a PLA will apply to approximately 1,680 to 3,010 subcontractors (120 to 215 * 14).

Subcontractors may, in certain circumstances, participate in discussions with a prospective offeror regarding desired PLA-specific conditions, such as core employee provisions or the opting out of certain union fees, prior to agreeing to perform as a subcontractor for a specific project. While subcontractors do not negotiate the PLA directly with the union, they will ultimately need to review the terms and sign on to the PLA negotiated by the prospective offeror or prime contractor in order to participate on the project. Based upon public comments, the final rule acknowledges that an attorney will most likely participate in any discussions with the prospective offeror and ultimately the review of the negotiated PLA. As a result, the number of participants on behalf of the subcontractor is increased from 2 to 3, the owner, project manager, and an attorney. In addition, the final rule increases the estimated number of hours required for the subcontractor's participants to review and implement the PLA. As a result, the estimated number of hours is increased to 2.5 to 25 hours.

Based upon the previously provided BLS data, a total loaded wage of $121.40 reflects the variety of labor categories necessary to estimate the impact of the proposed rule on subcontractors. The total estimated impact for subcontractors participating in discussions with prospective offerors, reviewing, implementing, and complying with a PLA in response to a government contract is estimated to be $1.53 to $27.41 million (1,680 to 3,010 subcontractors *(3 participants * 2.5 to 25 hours * $121.40). Taking midpoints of each range implies a primary estimate of $ 14.47 million. The total annual estimated impact for prime contractors and subcontractors to develop, review, negotiate, submit, implement, and comply with a PLA in response to a government contract is estimated to be $8.81 million to $53.51 million.

For the Government, contracting officers will continue to conduct market research and consider factors to support a decision to use, or not to use, PLAs in large-scale construction projects. There will continue to be instances in which the use of PLAs will benefit the Government and others where it is not feasible to use PLAs. This rule establishes new procedures for the contracting officer to request an exception to the requirement to use PLAs. The new procedures require the contracting officer to prepare a written explanation to request an exception and route the request for approval by the senior procurement executive. The act

of preparing and routing an exception request is typically performed by a contract specialist customarily at the GS–12 step 5 level and is estimated to take an average of 2 hours. The hourly rate of $65.77 is based upon the Office of Personnel Management (OPM) Table for the Rest of the United States, effective January 2022, for a GS–12 step 5 employee ($43.10 per hour) plus a 36.25 percent factor to account for fringe benefits in accordance with current OMB memorandum M–08–13 and a 12 percent overhead factor (see Attachment C of OMB Circular A–76 Revised issued May 29, 2003). As stated previously, the estimated number of exception requests per year is between 12 and 60; therefore, the anticipated cost for preparing and routing requests is $1,578 to $7,892 (12 to 60 exceptions * 2 hours * $65.77). Taking midpoints of each range implies a primary estimate of $4,735.

The review of the exception request is expected to be performed at the GS–15 level or higher and may involve more than one level of review prior to approval or rejection. This process is estimated to take approximately 4 hours. The hourly rate of $108.71 is based upon OPM Table for the Rest of the United States, effective January 2022, for a GS–15 step 5 employee ($71.24 per hour) plus the 36.25 percent factor to account for fringe benefits and a 12 percent factor for overhead. The estimated cost for review and approval is between $5,218 to 26,090 (12 to 60 exceptions * 4 hours * $108.71). Taking the midpoint of the range implies a primary estimate of $15,654. The total annual estimated cost to prepare, route, review, and approve requests for exceptions is estimated to be $6,796 to $33,982.

The annual total estimated impact of PLAs to the public and Government is estimated to be $8.87 million to $53.54 million.

## V. Executive Orders 12866 and 13563

Executive Orders (E.O.s) 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). E.O. 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This is a significant regulatory action and, therefore, was subject to review under section 6(b) of E.O. 12866, Regulatory Planning and Review, dated September 30, 1993.

## VI. Congressional Review Act

Pursuant to the Congressional Review Act, DoD, GSA, and NASA will send this rule to each House of the Congress and to the Comptroller General of the United States. The Office of Information and Regulatory Affairs (OIRA) in the Office of Management and Budget has determined that this rule does not meet the definition in 5 U.S.C. 804(2).

## VII. Regulatory Flexibility Act

DoD, GSA, and NASA have prepared a Final Regulatory Flexibility Analysis (FRFA) consistent with the Regulatory Flexibility Act, 5 U.S.C. 601–612. The FRFA is summarized as follows:

DoD, GSA, and NASA are amending the Federal Acquisition Regulation (FAR) to implement Executive Order (E.O.) 14063, Use of Project Labor Agreements for Federal Construction Projects, dated February 4, 2022, which mandates that Federal Government agencies require the use of project labor agreements (PLAs) for large-scale Federal construction projects (total estimated value of $35 million or more), unless an exception applies. Agencies still have the discretion to require PLAs for Federal construction projects that do not meet the $35 million threshold.

The objective of the rule is to implement the E.O. 14063 change in policy from discretionary use to requiring the use of PLAs for Federal construction projects valued at $35 million or more, unless an exception applies.

Significant issues raised by the public in response to the IRFA are as follows:

*Comment:* Numerous respondents expressed concerns about the burden on small entities associated with the use of PLAs. Several respondents indicated that the burden estimates were significantly understated in terms of the number of subcontractors impacted and the hours necessary to negotiate and establish a PLA. The respondents were also concerned that the additional complexity and costs associated with a PLA would create a barrier to entry for small entities.

*Response:* In response to public comments, the burden estimates are revised for all entities, to include the number of subcontractors and hours required to implement a PLA at both the prime contractor and subcontractor level. Additional analysis of subcontractor data also resulted in an increase in the estimated number of subcontractors assumed to be small entities.

The Office of Management and Budget (OMB) and the Department of Labor (DOL) intend to work with the Small Business Administration (SBA) to determine the best way to help small entities in understanding how to negotiate or participate in a construction project with a PLA.

*Comment:* Several respondents are concerned that PLAs will create a barrier to entry for many small, minority, and women-owned businesses. The respondents are also concerned that the rule will discourage small businesses from bidding on covered Federal construction contracts and thereby impose obstacles on the use of small business preferences required by Federal agencies in violation of the Small Business Act (15 U.S.C. 637(d)).

*Response:* The final rule does not change the use of small business preferences in procurements subject to the Small Business Act. PLAs may help small businesses by providing them with a level playing field and access to expanded skilled labor pools, while streamlining project administration and the negotiation of workplace terms and conditions. The E.O. and final rule provides an exception if a PLA requirement would be inconsistent with statutes and regulations. OMB and DOL intend to work with SBA to determine the best way to help small entities in understanding how to negotiate or participate in a construction project with a PLA.

DoD, GSA, and NASA considered the public comments in the development of the final rule; however, no changes were made to the FAR text in response to the comments.

The Chief Counsel for Advocacy of the Small Business Administration submitted comments dated October 18, 2022, in response to the proposed rule published August 19, 2022, implementing Executive Order 14063, Use of Project Labor Agreements for Federal Construction Projects.

The following were the Office of Advocacy's chief concerns:

*Comment:* The Office of Advocacy encouraged the Council to re-evaluate the excessive cost of compliance of this mandatory rule on small entities and encouraged the FAR Council to explore alternatives to this rulemaking as it relates to small entities.

*Response:* An analysis of the rule's impact on small entities was conducted and updated for the final rule, the results are included in the preamble under section IV, Expected Impact of the Rule. The E.O. requires the use of PLAs on large scale Federal construction projects unless an exception applies. The exceptions in section 5 of the E.O. do not include entity size, therefore there are no alternatives available that would reduce the impact on or exempt small entities from its requirements. However, the E.O. and final rule do provide an exception if a PLA requirement would be considered inconsistent with statutes and regulations.

OMB and DOL intend to work with SBA to determine the best way to help small entities in understanding how to negotiate or participate in a construction project with a PLA.

*Comment:* The Office of Advocacy encouraged the Council to consider a requirement relieving a small business from having to join a union if it agrees to pay the prevailing wages and other benefits established in union negotiation. The Office of Advocacy also suggested that removal of this mandatory requirement would allow the Federal Government to achieve its objective with the PLA but at less cost to the small business.

*Response:* Neither the E.O. nor the final rule require any entity, regardless of size, to join a union. Contractors and subcontractors

may negotiate with the union that is party to the PLA to opt out of certain fees, to include when current benefits are equivalent to those provided by the union.

*Comment:* The Office of Advocacy contended that the mandatory requirement for a PLA means that every contractor on a Federal construction contract, regardless of size, must agree to negotiate or become a party to a PLA with one or more labor organizations. This creates a mandatory flow down requiring all affected small businesses to join a union, regardless of size or dollar value of the subcontract. This flow down will have a detrimental cost impact on those small entities. The rule requires small business subcontractors to comply with the mandatory flow down but does not allow the small business to utilize the contracting agency resources to resolve disputes.

*Response:* The E.O. requires all contractors and subcontractors to agree to become a party to a PLA to participate on a large scale Federal construction project, unless an exception applies. Neither the E.O. nor the final rule requires any entity, regardless of size, to join a union. Contractors and subcontractors may negotiate terms and conditions with the union on a range of topics to include dispute resolution procedures, fringe benefits, and union dues.

*Comment:* The Office for Advocacy encouraged modifying the rule to reflect the diminishing cost-benefit to small firms by providing for a threshold contract value for covered subcontractors because additional analysis would show that a small firm that has only a few contracts per year will absorb a higher cost of compliance than a firm with multiple yearly contracts.

*Response:* The E.O. requires the use of PLAs on large scale Federal construction projects unless an exception applies. The E.O. does not provide a threshold for subcontractor participation, therefore there is no legal authority to provide such a threshold. The E.O. applies the PLA requirements to all contractors and subcontractors, regardless of size.

An analysis of the rule's impact on all entities was conducted and updated for the final rule, and the results are included in the preamble under section IV, Expected Impact of the Rule. Corresponding updates are made to the burden estimates for small entities.

*Comment:* The Office of Advocacy contends that the rule conflicts with the Administration's goal to reduce economic barriers for small businesses that wish to enter the Federal marketplace as provided in its announcement on December 2, 2021, "Biden-Harris Administration Announces Reforms to Increase Equity and Level the Playing Field for Underserved Small Business Owners." If this rule is finalized, it will place a greater burden on Federal agencies to meet their annual statutorily required small business goals.

*Response:* To support the administration's goals to increase small entity participation in the Federal marketplace, and in this particular market, OMB and DOL intend to work with SBA to determine the best way to help small entities in understanding how to negotiate or participate in a construction project with a PLA.

*Comment:* The Office of Advocacy requests that the rule include burden estimates for hiring an additional recordkeeper for each small entity subcontractor, similarly to the additional recordkeeper for small entity prime contractors.

*Response:* The burden estimates do not provide for the hiring of additional recordkeepers at the prime or subcontractor level, regardless of business size. The rule assumes that each entity will utilize existing employees.

DoD, GSA, and NASA considered the Office of Advocacy comments and conducted a thorough analysis of the authorities provided in the E.O. As a result, no changes were made to the final rule in response to the comments.

This final rule applies the requirement for PLAs to all construction projects valued at \$35 million or more, unless an exception applies. However, it does not change the discretionary use of PLAs for projects that do not meet the \$35 million threshold. As a result, small entities may be required to negotiate and become a party to a PLA, as a prime or subcontractor.

Data generated from the Federal Procurement Data System for fiscal years 2019, 2020, and 2021 has been used as the basis for estimating the number of unique small entities expected to be affected by the change from discretionary to mandatory use of PLAs for large-scale construction projects. An examination of this data reveals that the Government issued an average of 119 large-scale construction awards annually. Of those 119 awards, an average of 15 percent were awarded to an average of 16 unique small entities annually.

It is estimated that 60 to 107 of the 119 large-scale construction awards will require a PLA. An estimated one third of affected solicitations will require all offerors to provide a PLA, and two thirds of affected solicitations will only require one entity (apparent successful offeror or awardee) to provide a PLA. Therefore, the total number of estimated entities that would be required to submit PLAs at the prime contract level is 120–215 entities (40–71 apparent successful offerors or awardees + 80–144 offerors).

It is estimated, that under the new PLA requirements, the number of small entities impacted by the rule is 15 percent of the 120–215 entities. Therefore, it is estimated that approximately 18–32 small entities will be required to submit a PLA.

DoD, GSA, and NASA acknowledge there is no data source that identifies the number of subcontractors per contract; however, based upon public comments, the final rule estimates that each of the entities required to submit PLAs may have approximately 14 subcontractors; *i.e.,* 1,680 to 3,010 subcontractors (120 \* 14) to (215 \* 14). In addition, the final rule increases the percentage of subcontractors estimated to be small entities to 80 percent. As a result, it is estimated that 80 percent or 1,344 to 2,408 of the subcontractors are small entities (1,680 \* 0.80) (3,010 \* 0.80).

Based upon this updated analysis, the number of small entities that may be required to negotiate or become a party to a PLA is approximately 1,362 to 2,440 annually (18 + 1,344) (32 + 2,408). These numbers may fluctuate based on the use of discretionary PLAs, any exceptions granted to the required use of a PLA, or whether the PLA is required for all offerors, the apparent successful offeror, or the awardee.

When a PLA is required, the successful offerors are required to maintain the PLA in a current state throughout the life of the contract. Each of the estimated 18 to 32 small entities awarded prime contracts may require 1 recordkeeper to maintain a PLA through the life of the contracts.

There are no alternative approaches that are consistent with the stated objectives of the executive order.

Interested parties may obtain a copy of the FRFA from the Regulatory Secretariat Division. The Regulatory Secretariat Division has submitted a copy of the FRFA to the Chief Counsel for Advocacy of the Small Business Administration.

## VIII. Severability

If any provision of this rule, or the application of such provision to any person or circumstance, is stayed or held to be invalid, the remainder of this rule and its application to any other person or circumstance shall not be affected thereby. If this rule or E.O. 14063 is stayed or held invalid in its entirety, DoD, GSA, and NASA intend that provisions of the FAR implementing E.O. 13502 as those provisions existed prior to issuance of this final rule (*i.e.,* subpart 22.5, and sections 52.222–33 and –34) would remain in effect.

## IX. Paperwork Reduction Act

The Paperwork Reduction Act (44 U.S.C. 3501–3521) applies to the information collection described in this rule. Changes to the FAR resulted in an increase to the paperwork burden previously approved under Office of Management and Budget (OMB) Control Number 9000–0066, Certain Federal Acquisition Regulation Part 22 Labor Requirements.

## List of Subjects in 48 CFR Parts 1, 7, 22, 36, and 52

Government procurement.

**William F. Clark,**
*Director, Office of Government-wide Acquisition Policy, Office of Acquisition Policy, Office of Government-wide Policy.*

Therefore, DoD, GSA, and NASA amend 48 CFR parts 1, 7, 22, 36, and 52 as set forth below:

■ 1. The authority citation for 48 CFR parts 1, 7, 22, 36, and 52 continues to read as follows:

**Authority:** 40 U.S.C. 121(c); 10 U.S.C. chapter 4 and 10 U.S.C. chapter 137 legacy provisions (see 10 U.S.C. 3016); and 51 U.S.C. 20113.

## PART 1—FEDERAL ACQUISITION REGULATIONS SYSTEM

■ 2. In section 1.106 amend the table by:
■ a. Removing the entry for FAR segment "22.5"; and
■ b. Adding in numerical order entries for "52.222–33" and "52.222–34".
    The additions read as follows:

### 1.106   OMB approval under the Paperwork Reduction Act.

\*      \*      \*      \*      \*

| FAR segment | | OMB control No. |
|---|---|---|
| \* | \* | \* |
| 52.222–33 | .............................. | 9000–0066 |
| 52.222–34 | .............................. | 9000–0066 |
| \* | \* | \* |

\*      \*      \*      \*      \*

## PART 7—ACQUISITION PLANNING

■ 3. Amend section 7.103 by revising paragraph (x) to read as follows:

### 7.103   Agency-head responsibilities.

\*      \*      \*      \*      \*

    (x) Ensuring that agency planners use project labor agreements when required (see subpart 22.5 and 36.104).

\*      \*      \*      \*      \*

## PART 22—APPLICATION OF LABOR LAWS TO GOVERNMENT ACQUISITIONS

■ 4. Revise section 22.501 to read as follows:

### 22.501   Scope of subpart.

    This subpart prescribes policies and procedures to implement Executive Order 14063, Use of Project Labor Agreements for Federal Construction Projects, dated February 4, 2022 (3 CFR, 2023 Comp., pp 335–338).
■ 5. Amend section 22.502 by revising the definitions of "Construction", "Labor organization", and "Large-scale construction project" to read as follows:

### 22.502   Definitions.

\*      \*      \*      \*      \*

    *Construction* means construction, reconstruction, rehabilitation, modernization, alteration, conversion, extension, repair, or improvement of buildings, structures, highways, or other real property.
    *Labor organization* means a labor organization as defined in 29 U.S.C. 152(5) of which building and construction employees are members.
    *Large-scale construction project* means a Federal construction project

within the United States for which the total estimated cost of the construction contract to the Federal Government is $35 million or more.

\*      \*      \*      \*      \*

■ 6. Revise section 22.503 to read as follows.

### 22.503   Policy.

    (a) Executive Order (E.O.) 14063, Use of Project Labor Agreements for Federal Construction Projects, requires agencies to use project labor agreements in large-scale construction projects to promote economy and efficiency in the administration and completion of Federal construction projects.
    (b) When awarding a contract in connection with a large-scale construction project (see 22.502), agencies shall require use of project labor agreements for contractors and subcontractors engaged in construction on the project, unless an exception at 22.504(d) applies.
    (c) An agency may require the use of a project labor agreement on projects where the total cost to the Federal Government is less than that for a large-scale construction project, if appropriate.
    (1) An agency may, if appropriate, require that every contractor and subcontractor engaged in construction on the project agree, for that project, to negotiate or become a party to a project labor agreement with one or more labor organizations if the agency decides that the use of project labor agreements will—
    (i) Advance the Federal Government's interest in achieving economy and efficiency in Federal procurement, producing labor-management stability, and ensuring compliance with laws and regulations governing safety and health, equal employment opportunity, labor and employment standards, and other matters; and
    (ii) Be consistent with law.
    (2) Agencies may consider the following factors in deciding whether the use of a project labor agreement is appropriate for a construction project where the total cost to the Federal Government is less than that for a large-scale construction project:
    (i) The project will require multiple construction contractors and/or subcontractors employing workers in multiple crafts or trades.
    (ii) There is a shortage of skilled labor in the region in which the construction project will be sited.
    (iii) Completion of the project will require an extended period of time.
    (iv) Project labor agreements have been used on comparable projects

undertaken by Federal, State, municipal, or private entities in the geographic area of the project.
    (v) A project labor agreement will promote the agency's long term program interests, such as facilitating the training of a skilled workforce to meet the agency's future construction needs.
    (vi) Any other factors that the agency decides are appropriate.
    (d) For indefinite-delivery indefinite-quantity (IDIQ) contracts the use of a project labor agreement may be required on an order-by-order basis rather than for the entire contract. For an order at or above $35 million an agency shall require the use of a project labor agreement unless an exception applies. See 22.504(d)(3) and 22.505(b)(3).
■ 7. Amend section 22.504 by—
■ a. Removing from paragraph (b) introductory text the words "The project" and adding the words "A project" in their place;
■ b. Revising paragraph (c); and
■ c. Adding paragraph (d).
    The revision and addition read as follows.

### 22.504   General requirements for project labor agreements.

\*      \*      \*      \*      \*

    (c) *Labor organizations.* An agency may not require contractors or subcontractors to enter into a project labor agreement with any particular labor organization.
    (d) *Exceptions to project labor agreement requirements*—(1) *Exception.* The senior procurement executive may grant an exception from the requirements at 22.503(b), providing a specific written explanation of why at least one of the following conditions exists with respect to the particular contract:
    (i) Requiring a project labor agreement on the project would not advance the Federal Government's interests in achieving economy and efficiency in Federal procurement. The exception shall be based on one or more of the following factors:
    (A) The project is of short duration and lacks operational complexity.
    (B) The project will involve only one craft or trade.
    (C) The project will involve specialized construction work that is available from only a limited number of contractors or subcontractors.
    (D) The agency's need for the project is of such an unusual and compelling urgency that a project labor agreement would be impracticable.
    (ii) Market research indicates that requiring a project labor agreement on the project would substantially reduce the number of potential offerors to such

a degree that adequate competition at a fair and reasonable price could not be achieved. (See 10.002(b)(1) and 36.104). A likely reduction in the number of potential offerors is not, by itself, sufficient to except a contract from coverage under this authority unless it is coupled with the finding that the reduction would not allow for adequate competition at a fair and reasonable price.

(iii) Requiring a project labor agreement on the project would otherwise be inconsistent with Federal statutes, regulations, Executive orders, or Presidential memoranda.

(2) *Considerations.* When determining whether the exception in paragraph (d)(1)(ii) of this section applies, contracting officers shall consider current market conditions and the extent to which price fluctuations may be attributable to factors other than the requirement for a project labor agreement (*e.g.,* costs of labor or materials, supply chain costs). Agencies may rely on price analysis conducted on recent competitive proposals for construction projects of a similar size and scope.

(3) *Timing of the exception*—(i) *Contracts other than IDIQ contracts.* The exception must be granted for a particular contract by the solicitation date.

(ii) *IDIQ contracts.* An exception shall be granted prior to the solicitation date if the basis for the exception cited would apply to all orders. Otherwise, exceptions shall be granted for each order by the time of the notice of the intent to place an order (*e.g.,* 16.505(b)(1)).

■ 8. Revise section 22.505 to read as follows.

**22.505  Solicitation provision and contract clause.**

When a project labor agreement is used for a construction project, the contracting officer shall—

(a)(1) Insert the provision at 52.222–33, Notice of Requirement for Project Labor Agreement, in solicitations containing the clause 52.222–34, Project Labor Agreement.

(2) Use the provision with its Alternate I if the agency will require the submission of a project labor agreement from only the apparent successful offeror, prior to contract award.

(3) Use the provision with its Alternate II if an agency allows submission of a project labor agreement after contract award except when Alternate II is used.

(4) Use the provision with its Alternate III when Alternate II of 52.222–34 is used.

(b)(1) Insert the clause at 52.222–34, Project Labor Agreement, in solicitations and contracts associated with the construction project.

(2) Use the clause with its Alternate I if an agency allows submission of the project labor agreement after contract award except when Alternate II is used.

(3) Use the clause with its Alternate II in IDIQ contracts when the agency will have project labor agreements negotiated on an order-by-order basis and anticipates one or more orders may not use a project labor agreement.

## PART 36—CONSTRUCTION AND ARCHITECT-ENGINEER CONTRACTS

■ 9. Amend section 36.104 by adding paragraph (c) to read as follows:

**36.104  Policy.**

\*    \*    \*    \*    \*

(c)(1) Agencies shall require the use of a project labor agreement for Federal construction projects with a total estimated construction cost at or above $35 million, unless an exception applies (see subpart 22.5).

(2) Contracting officers conducting market research for Federal construction contracts, valued at or above the threshold in paragraph (c)(1) of this section, shall ensure that the procedures at 10.002(b)(1) involve a current and proactive examination of the market conditions in the project area to determine national, regional, and local entity interest in participating on a project that requires a project labor agreement, and to understand the availability of unions, and unionized and non-unionized contractors. Contracting officers may coordinate with agency labor advisors, as appropriate.

## PART 52—SOLICITATION PROVISIONS AND CONTRACT CLAUSES

■ 10. Amend section 52.222–33 by—
■ a. Revising the date of the provision;
■ b. Revising paragraphs (a) and (b);
■ c. Removing from paragraph (c) introductory text "Consistent with applicable law, the project" and adding "The project" in its place;
■ d. Removing from paragraph (c)(1) "offeror and all" and adding "Offeror and" in its place;
■ e. Removing from paragraph (c)(2) "offeror" and adding "Offeror" in its place;
■ f. Removing from paragraph (d) "this contract" and adding "the resulting contract" in its place;
■ g. Removing from paragraph (e) "offeror" and adding "Offeror" in its place;
■ h. In Alternate I:

■ i. Revising the date;
■ ii. Removing from the introductory text "22.505(a)(1)" and "clause" and adding "22.505(a)(2)" and "provision" in their places, respectively; and
■ iii. Revising paragraph (b);
■ i. In Alternate II:
■ i. Revising the date;
■ ii. Removing from the introductory text "22.505(a)(2)" and "clause" and adding "22.505(a)(3)" and "provision" in their places, respectively; and
■ iii. Revising paragraph (b); and
■ j. Adding Alternate III.

The revisions and addition read as follows:

**52.222–33  Notice of Requirement for Project Labor Agreement.**

\*    \*    \*    \*    \*

**Notice of Requirement for Project Labor Agreement (Jan 2024).**

(a) *Definitions.* As used in this provision, the following terms are defined in clause 52.222–34, Project Labor Agreement, of this solicitation "construction," "labor organization," "large-scale construction project," and "project labor agreement."

(b) Offerors shall—

(1) Negotiate or become a party to a project labor agreement with one or more labor organizations for the term of the resulting construction contract; and

(2) Require its subcontractors to become a party to the resulting project labor agreement.

\*    \*    \*    \*    \*

*Alternate I* (Jan 2024) \* \* \*

(b) The apparent successful offeror shall—

(1) Negotiate or become a party to a project labor agreement with one or more labor organizations for the term of the resulting construction contract; and

(2) Require its subcontractors to become a party to the resulting project labor agreement.

\*    \*    \*    \*    \*

*Alternate II* (Jan 2024) \* \* \*

(b) If awarded the contract, the Offeror shall—

(1) Negotiate or become a party to a project labor agreement with one or more labor organizations for the term of the resulting construction contract; and

(2) Require its subcontractors to become a party to the resulting project labor agreement.

*Alternate III* (Jan 2024). As prescribed in 22.505(a)(4), substitute the following paragraph (b) in lieu of paragraphs (b) through (e) of the basic provision:

(b)(1) If awarded the contract, the Offeror may be required by the agency to negotiate or become a party to a project labor agreement with one or more labor organizations for the term of

**88729**

the order. The Contracting Officer will require that an executed copy of the project labor agreement be submitted to the agency—

(i) With the order offer;

(ii) Prior to award of the order; or

(iii) After award of the order.

(2) The Offeror shall require its subcontractors to become a party to the resulting project labor agreement for the term of the order.

■ 11. Amend section 52.222–34 by—

■ a. Revising the date of the clause;

■ b. Adding in alphabetical order definitions for ''Construction'' and ''Large-scale construction project'' and revising the definition ''Labor organization'' in paragraph (a);

■ c. Removing from paragraph (b) ''this contract in accordance with solicitation provision 52.222–33, Notice of Requirement for Project Labor Agreement'' and adding ''the contract'' in its place;

■ d. Removing from paragraph (c) ''all subcontracts'' and adding ''subcontracts'' in its place;

■ e. In Alternate I:

■ i. Revising the date and paragraph (b);

■ ii. Removing from paragraph (c) introductory text ''Consistent with applicable law, the project'' and adding ''The project'' in its place;

■ iii. Removing from paragraph (c)(1) ''and all'' and adding ''and'' in its place;

■ iv. Removing from paragraph (c)(4) ''the project'' and adding ''the term of the project'' in its place; and

■ v. Removing from paragraph (f) ''clause in all subcontracts'' and adding ''clause in subcontracts'' in its place; and

■ f. Adding Alternate II.

The revisions and additions read as follows:

### 52.222–34   Project Labor Agreement.

\*     \*     \*     \*     \*

#### Project Labor Agreement (Jan 2024)

(a) \* \* \*

*Construction* means construction, reconstruction, rehabilitation, modernization, alteration, conversion, extension, repair, or improvement of buildings, structures, highways, or other real property.

*Labor organization* means a labor organization as defined in 29 U.S.C. 152(5) of which building and construction employees are members.

*Large-scale construction project* means a Federal construction project within the United States for which the total estimated cost of the construction contract(s) to the Federal Government is $35 million or more.

\*     \*     \*     \*     \*

*Alternate I* (Jan 2024) \*  \*  \*

(b) The Contractor shall—

(1) Negotiate or become a party to a project labor agreement with one or more labor organizations for the term of this construction contract; and

(2) Submit an executed copy of the project labor agreement to the Contracting Officer as required in the solicitation.

\*     \*     \*     \*     \*

*Alternate II* (Jan 2024). As prescribed in 22.505(b)(3), substitute the following paragraphs (b) through (f) for paragraphs (b) through (f) of the basic clause:

(b) When notified by the agency (*e.g.,* by the notice of intent to place an order under 16.505(b)(1)) that this order will use a project labor agreement, the Contractor shall negotiate or become a party to a project labor agreement with one or more labor organizations for the term of the order. The Contracting Officer shall require that an executed copy of the project labor agreement be submitted to the agency—

(1) With the order offer;

(2) Prior to award of the order; or

(3) After award of the order.

(c) The project labor agreement reached pursuant to this clause shall—

(1) Bind the Contractor and subcontractors engaged in construction on the construction project to comply with the project labor agreement;

(2) Allow all contractors and subcontractors to compete for contracts and subcontracts without regard to whether they are otherwise parties to collective bargaining agreements;

(3) Contain guarantees against strikes, lockouts, and similar job disruptions;

(4) Set forth effective, prompt, and mutually binding procedures for resolving labor disputes arising during the term of the project labor agreement;

(5) Provide other mechanisms for labor-management cooperation on matters of mutual interest and concern, including productivity, quality of work, safety, and health; and

(6) Fully conform to all statutes, regulations, Executive orders, and agency requirements.

(d) Any project labor agreement reached pursuant to this clause does not change the terms of this contract or provide for any price adjustment by the Government.

(e) The Contractor shall maintain in a current status throughout the life of the order any project labor agreement entered into pursuant to this clause.

(f) *Subcontracts.* For each order that uses a project labor agreement, the Contractor shall—

(1) Require subcontractors engaged in construction on the construction project

to agree to any project labor agreement negotiated by the prime contractor pursuant to this clause; and

(2) Include the substance of paragraphs (d) through (f) of this clause in subcontracts with subcontractors engaged in construction on the construction project.

[FR Doc. 2023–27736 Filed 12–21–23; 8:45 am]

**BILLING CODE 6820–EP–P**

---

## DEPARTMENT OF DEFENSE

## GENERAL SERVICES ADMINISTRATION

## NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

### 48 CFR Chapter 1

[Docket No. FAR–2023–0051, Sequence No. 7]

### Federal Acquisition Regulation; Federal Acquisition Circular 2024–02; Small Entity Compliance Guide

**AGENCY:** Department of Defense (DoD), General Services Administration (GSA), and National Aeronautics and Space Administration (NASA).

**ACTION:** Small Entity Compliance Guide (SECG).

---

**SUMMARY:** This document is issued under the joint authority of DoD, GSA, and NASA. This *Small Entity Compliance Guide* has been prepared in accordance with section 212 of the Small Business Regulatory Enforcement Fairness Act of 1996. It consists of a summary of the rule appearing in Federal Acquisition Circular (FAC) 2024–02, which amends the Federal Acquisition Regulation (FAR). Interested parties may obtain further information regarding this rule by referring to FAC 2024–02, which precedes this document.

**DATES:** December 22, 2023.

**ADDRESSES:** The FAC, including the SECG, is available at *https:// www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** For clarification of content, contact the analyst whose name appears in the table below. Please cite FAC 2024–02 and the FAR Case number. For information pertaining to status or publication schedules, contact the Regulatory Secretariat Division at 202–501–4755 or *GSARegSec@gsa.gov.* An asterisk (\*) next to a rule indicates that a regulatory flexibility analysis has been prepared.