# EXHIBIT "3"

EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

THE DIRECTOR

December 18, 2023

M-24-06

MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

FROM: Shalanda D. Young

SUBJECT: Use of Project Labor Agreements on Federal Construction Projects

On February 4, 2022, President Biden signed Executive Order (E.O.) 14063, *Use of Project Labor Agreements for Federal Construction Projects*, to strengthen the federal labor construction market through the creation of a requirement, with enumerated exceptions, for the use of project labor agreements (PLAs) on large-scale construction contracts where the total estimated cost to the Government is $35 million or more. The agency members of the Federal Acquisition Regulatory Council -- the Department of Defense (DoD), the General Services Administration (GSA), and the National Aeronautics and Space Administration – issued a final rule amending the Federal Acquisition Regulation (FAR) to implement the E.O. The rule is temporarily available here and will be published shortly in the *Federal Register*.

Section 8(b) of E.O. 14063 requires the Office of Management and Budget (OMB) to issue guidance on the implementation of sections 5 and 6 of E.O. 14063, concerning exceptions to PLA requirements and reporting. This memorandum provides such guidance, and other relevant information, to federal agencies and the contracting workforce responsible for executing large-scale federal construction contracts throughout the Government.

**Background**

PLAs are pre-hire collective bargaining agreements with one or more labor organizations that establish the terms and conditions of employment for a specific construction project and are described in 29 U.S.C. § 158(f). *See* E.O. 14063 § 2(2); FAR 22.502. In accordance with section 4 of E.O. 14063 and FAR 22.504(b), PLAs are required to:

- bind contractors and subcontractors engaged in construction on the construction project to comply with the project labor agreement;

- allow all contractors and subcontractors on the construction project to compete for contracts and subcontracts without regard to whether they are otherwise parties to collective bargaining agreements;

- contain guarantees against strikes, lockouts, and similar job disruptions;
- set forth effective, prompt, and mutually binding procedures for resolving labor disputes arising during the term of the project labor agreement;
- provide other mechanisms for labor-management cooperation on matters of mutual interest and concern, including productivity, quality of work, safety, and health; and
- fully conform to all federal statutes, federal regulations, Executive Orders, and Presidential Memoranda.

E.O. 14063 states that large-scale construction projects pose special challenges to the efficient and timely procurement for the Federal Government—challenges that increased use of PLAs can help address. Section 1(a) of the E.O. explains that construction employers typically do not have a permanent workforce, which makes it difficult to predict labor costs when bidding on contracts and to ensure a steady supply of labor on contracts being performed. Challenges also arise because construction projects typically involve multiple employers at a single location, and a labor dispute involving one employer can delay the entire project. Moreover, a lack of coordination among various employers, or uncertainty about the terms and conditions of employment of various groups of workers, can create friction and disputes in the absence of an agreed-upon resolution mechanism.

Section 1(b) of the E.O. then explains that expanded use of PLAs can address these concerns by providing structure and labor-management stability to large-scale construction projects. In particular, PLAs standardize the work rules, compensation costs, and dispute settlement processes across multiple employers and unions to help avoid and resolve labor disputes and the attendant disruption they can cause.

As the preamble to the FAR rule explains, expanding federal use of PLAs can also help agencies cope more effectively with the nationwide skilled labor shortage in the construction industry.[1] By providing access to union hiring halls that will allow federal contractors to fill empty craft positions with skilled workers recruited from surrounding regions, PLAs help ensure a reliable stream of skilled labor. The preamble further explains that use of PLAs will help reduce the risk of noncompliance with labor laws in the construction industry under federal construction projects.

PLAs have been used on federal construction projects since the 1930s and have been expressly recognized in the FAR since 2010 with the implementation of E.O. 13502, *Use of Project Labor Agreements*. E.O. 13502 encouraged agencies to consider requiring the use of PLAs in connection with large-scale construction projects, which were defined as construction projects where the total cost to the Federal Government is $25 million or more. E.O. 14063 increases this threshold to $35 million and requires "every contractor or subcontractor engaged in construction on the project to agree, for that project, to negotiate or become a party to a project labor agreement with one or more appropriate labor organizations." E.O. 14063 § 3.

[1] *See* Rule preamble at __Fed. Reg. _______ (2023) (citing Garo Hovnanian, Ryan Luby, and Shannon Peloquin, Bridging the labor mismatch in US construction (2022)).

E.O. 14063 and the FAR rule do not require use of PLAs in three circumstances, namely, where: (1) requiring a PLA would not advance the Federal Government's interests in achieving economy and efficiency in federal procurement, (2) based on an inclusive market analysis, requiring a PLA on the project would substantially reduce the number of potential bidders so as to frustrate full and open competition; or (3) requiring a PLA on the project would otherwise be inconsistent with statutes, regulations, Executive Orders, or Presidential Memoranda.

**Guidance**

Agencies should ensure they are taking full advantage of PLAs on large-scale construction contracts, consistent with E.O. 14063 and the FAR rule. Specifically, in implementing the E.O. and FAR rule, agencies are required to: (1) conduct and document inclusive market research for all large-scale construction projects and require PLAs unless an exception applies, (2) ensure that any exception is approved by the senior procurement executive (SPE), and (3) report PLA activity and exceptions with supporting explanation of exceptions to OMB in accordance with this guidance. Agencies are encouraged, but not required, to consider use of PLAs for other than large-scale construction projects (i.e., those projects valued at less than $35 million). Factors for determining suitability of a PLA for these projects are set forth at FAR 22.503(c).

For indefinite-delivery indefinite-quantity (IDIQ) contracts, the agency may establish whether a PLA is required at the contract level ((i.e., for the basic IDIQ contract) or on an order-by-order basis. If the IDIQ contract is intended to support one large-scale construction project, the agency must require a PLA for the entire contract (i.e., all orders of any size), unless an exception applies.

1. ***Conducting inclusive market research***

   a. FAR requirement. Contracting officers conducting market research for construction contracts utilize the procedures at FAR part 10, Market Research, and those required in subpart 36.2, Special Aspects of Contracting for Construction. The FAR rule for PLAs augments these requirements at FAR 36.104(c)(2), which states that contracting officers conducting market research for federal construction contracts, valued at or above the threshold in FAR 36.104(c)(1), shall ensure that market research conducted pursuant to FAR part 10 involves "a current and proactive examination of the market conditions in the project area to determine national, regional, and local entity interest in participating on a project that requires a project labor agreement, and to understand the availability of unions, and unionized and non-unionized contractors. Contracting officers may coordinate with agency labor advisors, as appropriate."

   b. Additional management considerations.

      i. *Current and proactive determination*. The market analysis must be contemporaneous on a project-specific basis. A current and proactive examination will provide the most accurate reflection of the current market conditions present in the area for the prospective construction project. Agencies may use various tools to

examine market conditions described in FAR part 10, such as conferring with interested parties using sources sought notices and advance notices for construction contracts (see FAR 36.211 and 36.213-2). These notices are primarily published on the government-wide point of entry at www.sam.gov.

Consistent with FAR 10.002(b)(1), agencies may rely on market research conducted within 18 months of contract award, but only if the research was inclusive and met the requirements of FAR 36.104(c)(2). In addition, the fact that a PLA was not previously required does not, by itself, constitute inclusive market research to support exercise of an exception to the requirement for a PLA on a subsequent project.

ii. *Availability of unionized and nonunionized contractors*. As stated above, E.O. 14063 and the FAR rule provide that a PLA shall "allow all contractors and subcontractors on the construction project to compete for contracts and subcontracts without regard to whether they are otherwise parties to collective bargaining agreements." E.O. 14063 § 4(b); *see* FAR 22.504(b)(2).

Accordingly, agencies must make sure that their market research is conducted in a manner that seeks to identify *both* union and non-unionized contractors that may be interested in participating in the competition. The Department of Labor's (DOL) Good Jobs Initiative website provides information on use of PLAs, found here. Among other resources, the website includes a link to a list of potential contractors that have used PLAs. The website also provides links to information to help contracting officers and potentially interested sources that are not unionized better understand why participation in a competition with a PLA should not put them at a competitive disadvantage. Examples cited in the FAR rule preamble include the following:

- While many PLAs require contractors to use the union's hiring hall for referrals, they do not prevent the use of a contractor's workforce. The union hiring halls are legally required to refer workers to the project without regard to whether the workers are union members. Non-union employers also may negotiate "core employee" provisions that permit retaining some employees without those employees registering at a union's hiring hall. Ultimately, the contractor retains the right to decide whom to hire.[2]

- Neither the E.O. nor the FAR rule require non-union employees to pay union dues or join a union. Non-union contractors are free to negotiate provisions in PLAs to accommodate existing fringe benefits or union dues. For example, a PLA may allow non-union contractors to opt out of contributing to health and welfare funds designated under the PLA, if the benefits provided by the non-union contractor are equal in value to those provided under the PLA.[3]

[2] Rule preamble at __ Fed. Reg. _____ (2022).
[3] Rule preamble at ___ Fed. Reg. _____ (2022).

    iii. *National, regional and local interest*. The requirement to gauge national, regional, and local interest ensures that agencies can fully evaluate the extent to which sources in the marketplace, including new entrants, might compete. The FAR rule explains that, while unions have the ability to recruit skilled workers nationally to address local skilled labor shortages, its intent is not to replace local workers for the sole purpose of employing non-local union members. The E.O. and FAR rule provide flexibility for the parties to take unique local needs into consideration when negotiating PLAs on a project-by-project basis. As the FAR rule explains, PLAs can offer opportunities to grow and train the local workforce, specifically targeting underrepresented individuals. For example, the FAR rule permits, but does not require, Community Workforce Agreements, which may be negotiated and incorporated as part of a PLA to promote diversity and inclusion and local resident business opportunities, as well as to help agencies and prime contractors meet small business subcontracting goals and other objectives.

iv. *Timing for requirement*. Agencies are encouraged to use the results of their inclusive market research to help determine the best timing for requiring submission of the PLA. Pursuant to FAR 22.505, the contracting officer may require submission of the PLA by all offerors, by the apparent successful offeror prior to award, or by the awardee after contract award. If market research indicates that the prospective offerors have significant experience with PLAs, then it may be feasible for the solicitation to require that offerors submit their PLA with their proposal or bid. By contrast, if few of the prospective offerors have experience with PLAs (e.g., they are non-unionized contractors or small businesses that lack experience with PLAs), then permitting submission of the PLA after award may help to facilitate greater interest in the competition and avoid unintended barriers to entry. If submission is permitted post award, then the contracting officer should carefully consider establishing a deadline in the solicitation consistent with the Government's interest in ensuring timely performance on the project.

**2. *Exercising exceptions***

a. FAR requirement. FAR 22.504(d)(1) provides that the SPE may grant an exception to the requirement for the agency to use a PLA for a large-scale construction project by approving a documented written explanation, prepared by the contracting officer or other appropriate official, of why one of following three conditions exist:

i. Requiring a PLA on the project would not advance the Federal Government's interests in achieving economy and efficiency in federal procurement. The exception shall be based on one or more of the following factors:

(A) The project is of short duration and lacks operational complexity.
(B) The project will involve only one craft or trade.
(C) The project will involve specialized construction work that is available from only a limited number of contractors or subcontractors.
(D) The agency's need for the project is of such an unusual and compelling urgency that a PLA would be impracticable.

    ii. Market research indicates that requiring a PLA on the project would substantially reduce the number of potential offerors to such a degree that adequate competition at a fair and reasonable price could not be achieved. (See FAR 10.002(b)(1) and 36.104). A likely reduction in the number of potential offerors is not, by itself, sufficient to except a contract from coverage under this authority unless it is coupled with the finding that the reduction would not allow for adequate competition at a fair and reasonable price. Contracting officers shall consider current market conditions and the extent to which price fluctuations may be attributable to factors other than the requirement for a PLA (e.g., costs of labor or materials, supply chain costs). Agencies may rely on price analysis conducted on recent competitive proposals for construction projects of a similar size and scope.[4]

iii. Requiring a PLA on the project would otherwise be inconsistent with federal statutes, regulations, Executive orders, or Presidential memoranda.

FAR 22.504(d)(3) states that an exception must be granted for a particular contract by the solicitation publication date. This includes IDIQ contracts if the basis for the exception cited would apply to all orders. Otherwise, exceptions shall be granted for each order by the time of the notice of the intent to place an order.

b. Additional management considerations.

i. *Exercising exception where the PLA would not promote economy and efficiency*. E.O. 14063 and the FAR rule recognize that projects of short duration, lacking of operational complexity or involving only one craft or trade should not present the same risks associated with the typical large-scale construction projects. If the agency concludes that use of a PLA would not promote economy and efficiency, the documentation should identify the rationales upon which the decision is based and document the information stated in the table below.

| **If the basis for the determination is . . .** | **The documentation should . . .** |
|---|---|
| Project is of short duration & lacks operational complexity | Describe the nature of the work and state the expected performance period.[5] |
| Project involves only one craft or trade | State that only one craft or trade is involved in the performance of the contract. |

[4] The direction to consider the source of price fluctuations is set forth at FAR 22.504(d)(2).
[5] For contracts which involve a design phase (e.g., design-build contracts), duration should be measured by the length of the construction portion of contract performance.

| | |
|---|---|
| Specialized construction available from limited contractors or subcontractors | Address the inclusive market research that was conducted to reach the conclusion that the specialized work is only available from a limited number of contractors or subcontractors. |
| Unusual and compelling urgency | Describe the procurement acquisition lead time for similar construction projects, the time available for this project and the urgency that has caused the need for an accelerated schedule. In general, most large-scale construction projects involve long-lead times and extensive advanced planning. However, the ability for the Federal Government to respond to natural disasters and pandemics or the agility required to meet national security needs may require expedited time lines that make mandatory use of a project labor agreement impracticable (e.g., insufficient time for the Federal Government to conduct the inclusive market research necessary to identify the national, regional, and local entity interest in participating on a project that requires a PLA and insufficient time for construction contractors and their subcontractors to negotiate PLAs). |

ii. *Exercising exception where PLA would inhibit competition*. In evaluating the anticipated impact of a PLA on the agency's ability to conduct a competition, the agency should focus on whether the results of inclusive market research point to a sufficient number of anticipated offerors to achieve fair and reasonable pricing. In general, two or more qualified offers is sufficient to provide adequate price competition for negotiated contracts (FAR 15.403-1(c)(1)) and three or more qualified bids is sufficient to provide adequate price competition for sealed bids (FAR 14.408-1(b)). If adequate price competition can be achieved, use of this exception would not be appropriate, even if the number of offerors who indicate they will not compete because of the PLA is significantly higher than the number of sources who have expressed an intent to compete. If, based on market research for a given project, an adequate number of offers may be submitted, but prices are expected to be higher than the government's budget, the agency should highlight the magnitude of the construction project in the solicitation, as required by FAR 36.204.

If an agency SPE determines through inclusive market research that a large-scale construction project can be set aside for two or more small business concerns but for the PLA requirement, the agency may grant an exception for the use of a PLA under this competition exception.[6] DOL and OMB will work with the Small Business

[6] Agencies have an obligation to set-aside acquisitions exclusively for small business participation if there is a reasonable expectation of obtaining offers from two or more responsible small business concerns that are competitive in terms of market prices, quality, and delivery. FAR 19.502-2. Set-asides are an important tool for advancing equity through procurement as called for by E.O. 13985 and E.O. 14091.

Administration and their development centers, as well as DoD and the APEX Accelerators, to determine the best way to help small entities in understanding how to navigate construction contracts with PLAs.

Where agencies are aware of potential offerors that would have interest but for the PLA requirement, the acquisition team should seek to engage with those sources to understand the nature of the concern (e.g., a misperception that nonunionized contractors must allow workers to organize in order to enter a PLA; a need for information or training on how PLAs work) and consider what steps might be taken to allay similar concerns on future construction projects with PLAs.[7]

**3. *Reporting on use of PLAs and exceptions***

Section 6(a) of E.O. 14063 requires agencies to publish, on a centralized public website, data showing the use of PLAs on large-scale construction projects, as well as descriptions of the exceptions granted, to the extent permitted by law and consistent with national security and executive branch confidentiality interests. Section 6(b) also requires this information to be reported to OMB.

In order to create a centralized repository and avoid duplicative reporting, agencies shall report information on a transactional basis for all exceptions granted and all contracts that use PLAs to OBX.OMB.OFPPv2@OMB.eop.gov.

Agencies shall complete the template at Attachment 1 for all exceptions granted and the template at Attachment 2 for all contracts awarded with a PLA requirement. When completing the template in Attachment 1 to report on use of an exception, agencies should ensure that the "basis for exception" field identifies which one of the three authorized exceptions was used (i.e., FAR 22.504(d)(4)(i), (ii), or (iii)) and provide a narrative explanation in accordance with the table below:

| If the basis for the exception is . . . | The explanation should . . . |
|---|---|
| FAR 22.504(d)(4)(i) | Identify the specific factor or combination of factors used and provide a summary of the documentation required by § 2.b.i., above. |
| FAR 22.504(d)(4)(ii) | Summarize the actions taken as part of the inclusive market research required by FAR 36.104(c)(2), and the results of the research in sufficient detail to understand the basis for exercising the exception. |

[7] The acquisition team should consider use of "Acquisition 360" surveys pursuant to FAR 1.102-3 to elicit voluntary feedback in a consistent and standardized manner to support continual improvement of the acquisition process.

| FAR 22.504(d)(4)(iii) | Cite the statute, regulation, Executive Order, or Presidential Memorandum that creates an inconsistency with use of a PLA. |
|---|---|

Exceptions should be reported to the Office of Federal Procurement Policy (OFPP), at the email address noted above, within three business days of the issuance of the solicitation. Contracts and orders awarded with PLA requirements should be reported within three business days of award. Agencies should designate any information they have submitted to OFPP for which public posting would be either inconsistent with law, national security, or executive branch confidentiality interests, and include a brief explanation for that designation. To fulfill the public-posting requirements of section 6 of the E.O., OFPP will work with GSA to make agency submissions available to the public here, to the extent permitted by law and consistent with national security and executive branch confidentiality interests.

**4. Training the workforce**

OMB and DOL are working with the Federal Acquisition Institute and the Defense Acquisition University on training for the acquisition workforce on PLAs, which will include coverage on the topics covered in this memorandum. In addition, agencies are encouraged to discuss with OMB and DOL resources they have developed to implement the E.O. and FAR rule, and share them with the Contract Labor Advisor Group established by OMB Memorandum M-23-08 so that agencies can learn from each other and work together in strengthening federal contractor compliance with federal labor laws.

Questions regarding this guidance may be sent to MBX.OMB.OFPPv2@OMB.eop.gov

.

**ATTACHMENT 1**

**TEMPLATE FOR REPORTING ON EXCEPTION TO PLA REQUIREMENTS**

| | |
|---|---|
| **CONTRACTING AGENCY** | |
| **SENIOR PROCUREMENT EXECUTIVE (SPE)** | |
| **DATE EXCEPTION GRANTED BY SPE** | |
| **SOLICITATION NUMBER** | |
| **SOLICITATION DATE** | |
| **MAGNITUDE OF CONSTRUCTION** | |
| **PROJECT DESCRIPTION** | |
| **PROJECT LOCATION** | |
| **BASIS FOR EXCEPTION*** | |

***** See § 3 for instructions on completing this field.

**ATTACHMENT 2**

**TEMPLATE FOR REPORTING ON USE OF PLAs**

| | |
|---|---|
| **CONTRACTING AGENCY** | |
| **PROCUREMENT INSTRUMENT IDENTIFIER (PIID)** | |
| **CONTRACT SIGNED DATE** | |
| **BASE AND ALL OPTION VALUE** | |
| **PROJECT LOCATION** | |
| **PROJECT DESCRIPTION** | |