# EXHIBIT "8"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| ASSOCIATED BUILDERS AND CONTRACTORS, FLORIDA FIRST COAST CHAPTER, AND ASSOCIATED BUILDERS AND CONTRACTORS,<br><br>Plaintiffs<br><br>vs.<br><br>WILLIAM F. CLARK, DIRECTOR, OFFICE OF GOVERNMENT-WIDE ACQUISITION POLICY, OFFICE OF ACQUISITION POLICY, Office of GOVERNMENT-WIDE Policy, GENERAL SERVICES ADMINISTRATION, et al.<br><br>Defendants. | § § § § § § § § § § § § § § § § § § § § § NO. _____ |

## AFFIDAVIT

I, Dave Yencarelli, being duly sworn, hereby state the following based on personal knowledge:

1. I am the President/CEO of American-Electrical Contracting, Inc. My firm is a public works subcontractor headquartered in Jacksonville, FL. We perform electrical work on federal and commercial construction projects in the Jacksonville area and elsewhere in the United States. My firm is a member of Associated Builders and Contractors ("ABC"), and ABC's Florida First Coast Chapter.

2. I am familiar with my firm's performance of construction work on government projects that exceed $35 million in value. The general contractors with which we typically work have a strong success rate with winning these types of contracts. My firm has performed electrical

1

subcontracts on government projects valued above $35 million. None of our previous successful subcontracts on federal projects imposed any project labor agreement ("PLA") mandates.

3. As a merit shop subcontractor, I am very concerned about the new Rule recently issued by the FAR Council. The Rule for the first time requires federal agencies to mandate project labor agreements ("PLAs") on federal construction projects that are $35 million or more in total value.

4. My firm will face irreparable harm from the Rule as it will make it more difficult for my firm to secure work. I am already aware of one upcoming project—construction work at B2480 Renovate Fourth Fleet Naval Station Mayport in Jacksonville, FL, that is expected to be advertised as requiring a PLA. My firm has had a strong success rate at similar federal installations and a documented track record of being a successful subcontractor in other similar projects. We anticipate that merit shop general contractors will plan to pursue the work at this project and many other federal projects valued above $35 million, and will ask us to participate as a subcontractor, if it were not for the PLA requirement.

5. Even though the FAR Rule and Office of Management and Budget (OMB) guidance makes reference to exemption from the mandate where the agency's market research indicates that a PLA will injure competition on federal construction projects, it is my understanding that Defense Department has either undertaken no meaningful market research to justify the PLA mandate on this project, or has ignored the results of such research which clearly shows dramatically reduced number of bidders for the prime contracts and subcontracts on projects imposing the PLA mandates and lack of available unionized firms to fill the workforce needs. That is certainly the case in the Jacksonville area but also in many other jurisdictions around the country.

2

6. I believe the PLA Rule will irreparably harm my firm. To start, I do not believe that the merit shop general contractors with which my firm normally works will bid for or successfully be awarded PLA-covered projects, which will make it difficult for my firm to obtain subcontracting work. I also do not believe union contractors would consider my firm as a subcontractor.

7. I understand that under the Rule, firms have to sign a PLA before they can submit a bid or after being awarded a contract. Either way, this would impose irreparable burdens on my firm. If a project required a PLA for bidding, my firm would not be able to meaningfully estimate how the PLA would impact our cost calculations, given that we do not typically enter into PLAs or work with unions. As a result, we would be unable to confidently submit accurate cost estimates to general contractors.

8. Even if a project did not require a PLA until after the bidding process completed, my firm would still be unable to submit accurate cost estimates to general contractors who may be considering my firm, knowing that a subsequent (and unnegotiated) PLA could alter the cost calculations. The situation would be particularly uncertain for my firm, because as a subcontractor, my firm would not play a role in PLA negotiations. Because of this challenge, I do not believe general contractors would select my firm as a subcontractor.

9. Further, my firm does not have a relationship with any unions. In fact, my firm has never worked with any union, and my employees have never voted to be represented by a union. I therefore do not think any unionized contractors would consider my firm as a subcontractor. Further, forcing our company to recognize and enter into a PLA with a union that does not represent our employees would irreparably infringe on our Constitutional right of freedom of association.

10. I understand that under typical PLAs, nonunion companies, such as mine, must obtain most or all their employees from union hiring halls and may not be able to use their existing nonunion workforce. Under some other PLAs, a nonunion subcontractor is permitted to use a small number of its existing nonunion workforce, but they must send these employees to the union hiring hall and hope the union dispatches the same workers back to the PLA jobsite. Either way, obtaining employees from union hiring halls, rather than using existing employees, would make it difficult for my firm to carry out its duties as a subcontractor or accurately provide cost estimates to general contractors who may consider selecting my firm as a subcontractor.

11. I further understand that PLAs typically require subcontractors to follow union work rules, such as those requiring work assignments by union craft jurisdictional boundaries defined in each craft's relevant collective bargaining agreement. That arrangement is different from the work arrangement that my firm typically employs. Usually, we achieve significant labor cost savings through multiskilling, in which workers possess a range of skills that are appropriate for more than one work process and are used flexibly across multiple trades on a project or within an organization.

12. I understand that PLAs also typically require nonunion companies to obtain apprentices exclusively from union apprenticeship programs on PLA projects. This would create another challenge for my firm, which typically uses apprentices from non-union apprenticeship programs provided by ABC chapters. My firm does not want to stop working with our current apprentices. Plus, it would be costly for my firm to stop using our current apprentices, and switch to using entirely different apprentices, as we have already invested time in our current apprentices' training.

13. Working on projects with PLAs would also make it more difficult for my firm to retain employees. As noted above, our employees have never voted to be represented by a union and many of my employees appear to have philosophical objections to union representation. Working on projects with PLAs would also increase my firm's costs relating to employee benefit payments. I understand that PLAs require nonunion companies to pay their workers' health and welfare benefits to union trust funds. However, my firm already has employee benefit plans. My firm's employees would not be able to obtain the union benefits unless they leave my firm. As noted above, I do not want my employees to leave my firm. To ensure that my employees do not leave (which again, is already a challenge in this labor market), my firm would need to pay into union trust funds while still maintaining current employee benefit plans.

14. The FAR Council and OMB, in publishing the PLA mandate, assert that the PLA Rule does not mandate PLAs containing all of the foregoing requirements. But nothing in the Rule prevents unions from insisting on these common provisions found in most PLAs, and the burden is on the contractor/bidder – not the union(s) - to negotiate the PLA in order to qualify for the work. This is an irreparable burden on our subcontracting on any project subject to the new PLA mandate. Further, as subcontractor, my firm would not be involved in negotiations, so my firm would be required to adhere to whatever deal the general contractor reaches with a union.

15. If any general contractors ask my firm to serve as a subcontractor for a PLA project, my firm would need to employ and train additional (un-reimbursable) staff to comply with the new administrative burdens and compliance risks imposed by the new Rule.

16. Imposing a PLA on federal construction projects will do nothing to increase government efficiency or economy, and will instead have the opposite effect, by reducing competition and increasing prices. My firm is ready, willing and able to serve as a subcontractor

for such projects, but the PLA mandate will irreparably harm our ability to perform work on such projects or be selected as a subcontractor in the first place.

17. I declare under penalty of perjury that the foregoing is true and correct.

Name: DAVID J. YENCARELLI

Date: 3/25/24

Date

SWORN TO AND SUBSCRIBED BEFORE ME THIS 25th DAY OF MARCH 2024.

SHARI ZIGICH
Notary Public - State of Florida
Commission # HH 407445
My Comm. Expires Jun 24, 2027
Bonded through National Notary Assn.