# EXHIBIT "9"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| ASSOCIATED BUILDERS AND CONTRACTORS, FLORIDA FIRST COAST CHAPTER, AND ASSOCIATED BUILDERS AND CONTRACTORS,<br><br>Plaintiffs<br><br>vs.<br><br>WILLIAM F. CLARK, DIRECTOR, OFFICE OF GOVERNMENT-WIDE ACQUISITION POLICY, OFFICE OF ACQUISITION POLICY, Office of GOVERNMENT-WIDE Policy, GENERAL SERVICES ADMINISTRATION, et al.<br><br>Defendants. | § § § § § § § § § § § § § § § § § § § § § NO. _____ |

### AFFIDAVIT

I, James Pattee, being duly sworn, hereby state the following based on personal knowledge:

1. I am a Vice President of M.C. Dean, Inc. in the Engineering & Construction Division focusing on federal construction opportunities for M.C. Dean. My firm performs electrical specialty contracting as a prime contractor and subcontractor on construction projects in the Virginia, Maryland, the District of Columbia, North Carolina, South Carolina, Georgia, Florida, Texas, and other locations throughout the United States for US Government clients, as well as large infrastructure and industrial commercial clients. My firm is a member of Associated Builders and Contractors ("ABC"), and ABC's Virginia Chapter. The firm is headquartered in Tysons, Virginia, and we have offices throughout the United States, to include Atlanta, Georgia and Oldsmar, Florida.

2.	I am familiar with my firm's performance of construction work on government projects that exceed $35 million in value. We, and the general contractors with whom we typically work, have a strong success rate with winning these types of contracts. Each year, we submit numerous proposals as a prime contractor or as a subcontractor on federal projects of this magnitude and my firm has served as a prime or subcontractor on several projects.

3.	As a merit shop contractor, I am very concerned about the new Rule recently issued by the FAR Council. The Rule requires federal agencies to mandate projects labor agreements ("PLAs") on federal construction projects that are $35 million or more in total value. My firm will face irreparable harm from the Rule as it will make it more difficult for my firm to secure work. I am already aware of several upcoming projects that may be of interest to our firm that have been advertised as requiring a PLA. Those projects include the Bureau of Printing and Engraving in Washington, DC with the United States Corps of Engineers; the Secret Service Training Facility in Laurel Maryland with the United States Park Service, and the FBI Headquarters in Greenbelt, MD. My firm has had a strong success rate with many of these customers, in these geographical areas, and a documented track record of being a successful subcontractor in other similar projects. We anticipate a general contractor would plan to pursue the work projects and ask us to participate as a subcontractor if it were not for the PLA requirement.

4.	Even though the FAR Rule and Office of Management and Budget (OMB) guidance makes reference to exemption from the mandate where the agency's market research indicates that a PLA will injure competition on the projects, we are not aware that any of the

contracting agencies have undertaken such market research to justify the PLA mandate on these projects.

5. I believe the PLA Rule will irreparably harm my firm. To start, I do not believe that the merit shop general contractors with which my firm normally works will bid for or successfully be awarded PLA-covered projects, which will make it difficult for my firm to obtain subcontracting work. I also do not believe union general contractors would consider my firm as a subcontractor.

6. I understand that, under the Rule, firms have to sign a PLA before they can submit a bid or after being awarded a contract. Either way, this would impose irreparable burdens on my firm. If a projects required a PLA for bidding, my firm would not be able to meaningfully estimate how the PLA would impact our cost calculations, given that we do not typically enter into PLAs or work with unions. As a result, we would be unable to confidently submit accurate cost estimates to general contractors.

7. Even if projects did not require a PLA until after the bidding process completed, my firm would still be unable to submit accurate cost estimates to general contractors who may be considering my firm, knowing that a subsequent (and unnegotiated) PLA could alter the cost calculations. The situation would be particularly uncertain for my firm, because as a subcontractor, my firm would not play a role in PLA negotiations. Because of this challenge, I do not believe general contractors would select my firm as a subcontractor.

8. Further, my firm does not have relationship with any union in the construction industry. While my firm has entered into collective bargaining agreements as a successor contractor to hire incumbent staff on certain federal projects, my firm has never entered a collective bargaining agreement with a union on a construction project, and my employees have never voted

to be represented by a union. I therefore do not think any unionized contractors would consider my firm as a subcontractor. Further, forcing our company to recognize and enter into a PLA with a union that does not represent our employees would irreparably infringe on our Constitutional right of freedom of association.

9. I understand that under typical PLAs, nonunion companies, such as mine, must obtain most or all their employees from union hiring halls and may not be able to use their existing nonunion workforce. Under some other PLAs, a nonunion subcontractor is permitted to use a small number of its existing nonunion workforce, but they must send these employees to the union hiring hall and hope the union dispatches the same workers back to the PLA jobsite. Either way, obtaining employees from union hiring halls, rather than using existing employees, would make it difficult for my firm to carry out its duties as a subcontractor or accurately provide cost estimates to general contractors who may consider selecting my firm as a subcontractor.

10. I further understand that PLAs typically require subcontractors to follow union work rules, such as those requiring work assignments by union craft jurisdictional boundaries defined in each craft's relevant collective bargaining agreement. That arrangement is different from the work arrangement that my firm typically employs. Usually, we achieve significant labor cost savings through multiskilling, in which workers possess a range of skills that are appropriate for more than one work process and are used flexibly across multiple trades on a project or within an organization. Our firm's competitive edge relies on the investments that we have made in our workforce to train them in the manner in which we provide the most value to our customers. We spend considerable time, money, and company resources developing the processes and training our employees on our approach to safety, quality, performance, and customer relations. Our value to our general contractors and customers is enhanced by these investments and it is a market

differentiator. The requirement to use Union labor will disrupt our normal processes, undermine the investment we have placed in training and education of the workforce, and make us less likely to win work or perform within the pricing that we have proposed on a firm fixed price basis.

11. I understand that PLAs also typically require nonunion companies to obtain apprentices exclusively from union apprenticeship programs on PLA projects. This would create another challenge for my firm, which typically uses apprentices from non-union apprenticeship programs provided by ABC chapters. My firm does not want to stop working with our current apprentices. Plus, it would be costly for my firm to stop using our current apprentices, and switch to using entirely different apprentices, as we have already invested time in our current apprentices' training.

12. Working on projects with PLAs would also make it more difficult for my firm to retain employees. As noted above, our employees have never voted to be represented by a union and many of my employees appear to have philosophical objections to union representation. Working on projects with PLAs would also increase my firm's costs relating to employee benefit payments. I understand that PLAs require nonunion companies to pay their workers' health and welfare benefits to union trust funds. However, my firm already has employee benefit plans. My firm's employees would not be able to obtain the union benefits unless they leave my firm. As noted above, I do not want my employees to leave my firm. To ensure that my employees do not leave (which again, is already a challenge in this labor market), my firm would need to pay into union trust funds while still maintaining current employee benefit plans. We may also be required to supplement the pay of our employees in an effort to keep those individuals gainfully employed, or provide other incentive fees to our current employees to maintain our workforce.

13. Taking work with PLAs would also adversely affect our current employees. Our company has developed and retained thousands of employees with skills to provide construction services for complex industrial and government projects. These workers work on an hourly basis. Because of our ability to win work, those employees have the ability to work full work weeks, with overtime as needed, and with vacation and other benefits. Much of our workforce has been with the firm for several years. They benefit from our firm's ability to provide several options for projects that allow them to move from job to job as projects are completed. This provides many of them with a steady source of income on interesting projects, with teams of individuals with whom they have developed long-term working relationships. If we are required to use labor from unions under a PLA, we anticipate being unable to fully utilize our current employees for work, which will likely result in less pay for those employees, fewer opportunities for growth, and/or terminations and layoffs. In order to provide for themselves and their families, those individuals may be forced to leave the firm, lose the seniority and benefits that they have accrued while at the firm, and be required to take lesser paying jobs, with less certainty, in other localities far from home.

14. The FAR Council and OMB, in publishing the PLA mandate, assert that the PLA Rule does not mandate PLAs containing all of the foregoing requirements. But nothing in the Rule prevents unions from insisting on these common provisions found in most PLAs, and the burden is on the contractor/bidder – not the union(s) – to negotiate the PLA in order to qualify for the work. This is an irreparable burden on our subcontracting on any projects subject to the new PLA mandate. Further, as subcontractor, my firm would not be involved in negotiations, so my firm would be required to adhere to whatever deal the general contractor reaches with a union.

15. If any general contractors ask my firm to serve as a subcontractor for a PLA projects, my firm would need to employ and train additional (un-reimbursable) staff to comply with the new administrative burdens and compliance risks imposed by the new Rule, including the need to engage outside counsel to advise us and negotiate with the unions.

16. Imposing a PLA on federal construction projects such as the projects listed above will do nothing to increase government efficiency or economy, and will instead have the opposite effect, by reducing competition and increasing prices. My firm is ready, willing and able to serve as a subcontractor for projects, but the PLA mandate will irreparably harm our ability to perform work on these projects or be selected as a subcontractor in the first place.

17. I declare under penalty of perjury that the foregoing is true and correct.

_James Pattee_

James Pattee

3/25/2024
Date