**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ASSOCIATED BUILDERS AND
CONTRACTORS FLORIDA FIRST
COAST CHAPTER, *et al.*,

     *Plaintiffs*,

        v.

WILLIAM F. CLARK, *et al.,*

     *Defendants*.

**Civil Action No. 3:24-cv-00318-WWB-MCR**

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ..................................................................................................... 1

ARGUMENT .......................................................................................................... 3

I.     A Preliminary Injunction Is An Extraordinary Form Of Relief ................................ 3

II.    Plaintiffs Are Not Likely To Succeed On The Merits ............................................ 3

       A.     The PLA Order And Rule Are Not *Ultra Vires* ............................................. 3

       B.     The PLA Order and Rule Comply With CICA ........................................... 12

       C.     The PLA Rule Is Not Arbitrary And Capricious ....................................... 13

       D.     The OMB Memo Does Not Violate The OFPP Act ................................... 15

       E.     The PLA Order, PLA Rule, and OMB Memo Do Not Violate The
             First Amendment ..................................................................................... 15

       F.     The PLA Order, PLA Rule, and OMB Memo Do Not Violate The
             NLRA ....................................................................................................... 16

       G.     The PLA Rule Adequately Responded to Concerns Regarding
             Small Businesses ................................................................................... 17

III.   Plaintiffs Cannot Show Irreparable Harm ......................................................... 17

IV.   Enjoining The PLA Rule And PLA Order Prior To A Full Adjudication On
      The Merits Would Be Inequitable And Against The Public Interest .................... 20

CONCLUSION .................................................................................................... 20

## TABLE OF AUTHORITIES

**CASES**

*AFL-CIO v. Kahn*,
   618 F.2d 784 (D.C. Cir. 1979) ............................................................ 4, 5

*Alabama Ass'n of Realtors v. HHS*,
   594 U.S. 758 (2021) ........................................................................... 12

*Arkansas Times LP v. Waldrip*,
   37 F.4th 1386 (8th Cir. 2022)............................................................... 16

*Associated General Contractors of America* v. *Bi*den ("*AGC*"),
   --- F. Supp. 3d ----, 2024 WL 1078260 (W.D. La. Mar. 12, 2024) ................. 14, 18, 19

*Benisek v. Lamone*,
   585 U.S. 158 (2018) ....................................................................... 3, 20

*Biden v. Missouri*,
   142 S. Ct. 647 (2022) ........................................................................... 5

*Biden v. Nebraska*,
   143 S. Ct. 2355 (2023) ........................................................................ 11

*Biden v. Nebraska*,
   600 U.S. 477 (2023) ........................................................................... 12

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
   295 F.3d 28 (D.C. Cir. 2002) ......................................................... 7, 10, 11

*Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*,
   ("*Boston Harbor*")
   507 U.S. 218 (1993) ......................................................................... 1, 16

*Bradford v. U.S. Dep't of Lab.*,
   --- F.4th ----, 2024 WL 1866432 (10th Cir. Apr. 30, 2024)...................... 4, 12

*Chamber of Com. of U.S. v. Napolitano*,
   648 F. Supp. 2d 726 (D. Md. 2009) ....................................................... 4

*Christian Labor Ass'n v. City of Duluth*,
   No. 21-227, 2023 WL 3996240 (D. Minn. June 14, 2023) ......................... 16

*City of Albuquerque v. U.S. Dep't of Interior*,
   379 F.3d 901 (10th Cir. 2004)............................................................... 4

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................................ 20

*Dalton v. Specter*,
    511 U.S. 462 (1994) ................................................................................ 13

*Farkas v. Tex. Instrument, Inc.*,
    375 F.2d 629 (5th Cir. 1967)...................................................................... 4

*Feds for Med. Freedom v. Biden*,
    581 F. Supp. 3d 826, 835 (S.D. Tex. 2022),
    *aff'd*, 63 F.4th 366 (5th Cir.) (en banc),
    *vacated on other grounds*, 144 S. Ct. 480 (2023) .................................... 14

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ................................................................................ 13

*Georgia v. President of the U.S.*,
    46 F.4th 1283 (11th Cir. 2022)...........................................................*passim*

*H.K. Porter Co. v. N.L.R.B.*,
    397 U.S. 99 (1970) ................................................................................... 16

*Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*,
    585 U.S. 878 (2018) ................................................................................ 15

*Kentucky v. Biden*,
    571 F. Supp. 3d 715 (E.D. Ky. 2021)....................................................... 15

*Kinnett Dairies, Inc. v. Farrow*,
    580 F.2d 1260 (5th Cir. 1978).................................................................. 20

*Lockheed Missiles & Space Co. v. Bentsen*,
    4 F.3d 955 (Fed. Cir. 1993) ....................................................................... 9

*Lorillard v. Pons*,
    434 U.S. 575 (1978) ................................................................................... 5

*Mayes v. Biden*,
    67 F.4th 921 (9th Cir. 2023),
    *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023) ................................. 4, 11

*Myers v. United States*,
    272 U.S. 52 (1926) ................................................................................... 10

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
    583 U.S. 109 (2018) ................................................................... 9

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................... 3

*Oracle Am., Inc. v. United States*,
    975 F.3d 1279 (Fed. Cir. 2020) ................................................. 13

*Perkins v. Lukens Steel Co.*,
    310 U.S. 113 (1940) ................................................................. 12

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ................................................................... 16

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ................................................................. 16

*Sampson v. Murray*,
    415 U.S. 61 (1974) ................................................................... 18

*Sierra Club v. Van Antwerp*,
    526 F.3d 1353 (11th Cir. 2008) ................................................. 14

*Texas v. EPA*,
    983 F.3d 826 (5th Cir. 2020) ...................................................... 5

*Tulare Cnty. v. Bush*,
    185 F. Supp. 2d 18 (D.D.C. 2001) ............................................ 14

*UAW-Lab. Emp. & Training Corp. v. Chao*,
    325 F.3d 360 (D.C. Cir. 2003) ................................................ 4, 5

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ................................................................. 11

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ................................................................. 12

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) ................................................................. 3, 17

*Wreal, LLC v. Amazon.com, Inc.*,
    840 F.3d 1244 (11th Cir. 2016) ................................................. 20

**STATUTES**

5 U.S.C. § 704 ........................................................................................ 13

28 U.S.C. § 1295 ................................................................................... 19

28 U.S.C. § 1491 ................................................................................... 19

40 U.S.C. § 101 *et seq.* .................................................................... 3, 4

40 U.S.C. § 111 ....................................................................................... 3

40 U.S.C. § 121 ............................................................................ *passim*

41 U.S.C. § 107 ..................................................................................... 13

41 U.S.C. § 1707 ................................................................................... 15

41 U.S.C. § 3101 ..................................................................................... 9

41 U.S.C. § 3306 ................................................................................. 8, 9

41 U.S.C. § 3703(c) ............................................................................... 9

Pub. L. No. 107-217, 116 Stat. 1062 (2002) .................................... 5

**REGULATIONS**

4 C.F.R. § 21.0 ..................................................................................... 19

57 Fed. Reg. 48,713 (Oct. 28, 1992) .................................................. 1

58 Fed. Reg. 7,045 (Feb. 3, 1993) ..................................................... 1

66 Fed. Reg. 11,225 (Feb. 22, 2001) ................................................. 2

74 Fed. Reg. 6,985 (Feb. 11, 2009) ................................................... 2

FAR 22.504(d) ........................................................................................ 7

FAR 52.222-34(c)(3) ............................................................................ 7

FAR 52.222-34(2) ............................................................................... 13

*Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects,*
  88 Fed. Reg. 88,708 (Dec. 22, 2023) ("PLA Rule") ........................... *passim*

*Use of Project Labor Agreements for Federal Construction Projects*,
   Exec. Order No. 14,063, 87 Fed. Reg. 7,363 ("PLA Order")...............................*passim*

**OTHER AUTHORITIES**

*Memo. Re. Use of Project Labor Agreements on Federal Construction Projects to the
   Heads of Executive Departments and Agencies*, No. M-24-06 (Dec. 18, 2023) .......... 3

Presidential Memorandum of June 5, 1997, *Use of Project Labor Agreements for
   Federal Construction Projects* § 1................................................................................. 2

## INTRODUCTION

Plaintiffs moved for a preliminary injunction against a directive for federal agencies to require project labor agreements, or PLAs, in construction projects where the total estimated cost to the Government is over $35 million, unless one of three exceptions applies. *Use of Project Labor Agreements for Federal Construction Projects*, Exec. Order No. 14,063, 87 Fed. Reg. 7,363 ("PLA Order"). Public entities, no less than private ones, have the prerogative to require PLAs, *see Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.* ("*Boston Harbor*"), 507 U.S. 218, 231 (1993), and Presidents have directed the Government's policy towards PLAs in construction contracts for decades. Plaintiffs cannot show, contrary to decades of precedent, that the issuance of the PLA Order was unlawful; nor can they meet the equitable prerequisites for a preliminary injunction. Accordingly, the Court should deny Plaintiffs' motion.

## BACKGROUND

PLAs are a form of collective bargaining agreement negotiated between one or more construction unions and one or more construction employers that establish the terms and conditions of employment for a specific construction project. For over thirty years, Presidents have directed the Government's policy with respect to the use of PLAs on the Government's own construction projects. For example, President George H.W. Bush issued an Executive Order that prohibited the use of PLAs in federal construction projects. 57 Fed. Reg. 48,713 (Oct. 28, 1992). President Clinton revoked that order, 58 Fed. Reg. 7,045 (Feb. 3, 1993), and later issued a memorandum authorizing federal agencies to require the use of PLAs on "large and significant" construction projects where doing so would "advance the Government's procurement interest in cost, efficiency, and

quality and in promoting labor-management stability." Presidential Memorandum of June 5, 1997, *Use of Project Labor Agreements for Federal Construction Projects* § 1. President George W. Bush replaced that memorandum with an Executive Order barring agencies from either requiring or prohibiting the use of PLAs in federal construction projects. 66 Fed. Reg. 11,225 (Feb. 22, 2001) ("Bush Order"). And President Obama revoked and replaced the Bush Order with a new Executive Order "encourag[ing] executive agencies to consider requiring the use of [PLAs] in connection with large-scale construction projects," which was in effect until 2022. 74 Fed. Reg. 6985 (Feb. 11, 2009).

In February 2022, President Biden issued the challenged Executive Order. Exec. Order No. 14,063, 87 Fed. Reg. 7,363 (Feb. 9, 2022) ("PLA Order"). The PLA Order creates a rebuttable presumption in favor of PLAs on Government construction projects with a total estimated construction cost of $35 million or more, subject to three exceptions. At the President's direction, the agency members of the Federal Acquisition Regulatory Council ("FAR Council")—a regulatory body headed by the Office of Management and Budget ("OMB") and composed of senior procurement officials from three federal agencies—proposed amendments to the Federal Acquisition Regulation (FAR) implementing this policy. *See* PLA Order § 8(a). After notice and comment, the agencies promulgated a final rule implementing those amendments in December 2023. *See* U.S. Dep't of Defense, et al., *Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects*, 88 Fed. Reg. 88,708 (Dec. 22, 2023) ("PLA Rule"). Contemporaneous with the publication of the final rule, OMB issued a memorandum for the heads of executive departments and agencies regarding implementation of the exceptions to the PLA directive. *Memo. Re. Use of Project Labor Agreements on Federal*

*Construction Projects to the Heads of Executive Departments and Agencies*, No. M-24-06 (Dec. 18, 2023).  The PLA Rule projects that ten to fifty percent of covered projects will be excepted. 88 Fed. Reg. at 88,724.  Plaintiffs filed this lawsuit on March 28, 2024. The lawsuit names the officials who compose the FAR Council as defendants.  Plaintiffs moved for a preliminary injunction on April 26, 2024.

## **ARGUMENT**

I.    A Preliminary Injunction Is An Extraordinary Form Of Relief

A preliminary injunction under Civil Rule 65 is an "extraordinary" remedy that is intended "'merely to preserve the relative positions of the parties until a trial on the merits can be held.'"  *Benisek v. Lamone*, 585 U.S. 158, 161 (2018) (per curiam) (citation omitted).  Plaintiffs must show (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent an injunction, and (3) the balance of equities tilts in their favor.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) (recognizing the balance of equities and public interest factors merge when Government is the non-moving party).

II.    Plaintiffs Are Not Likely To Succeed On The Merits

A.    The PLA Order And Rule Are Not *Ultra Vires*

The Federal Property and Administrative Services Act of 1949 ("FPASA"), 40 U.S.C. § 101 *et seq*., authorizes the President to "prescribe policies and directives that the President considers necessary to carry out this subtitle," provided such policies and directives are "consistent with this subtitle," 40 U.S.C. § 121(a); *see id.* § 111 (defining "this subtitle").  The statute also provides: "[t]he purpose of this subtitle is to provide the Federal Government with an economical and efficient system for . . . [p]rocuring and supplying property and nonpersonal services, and performing related functions including

3

contracting." *Id.* § 101(1).  Courts have long recognized that these provisions confer on the President "particularly direct and broad-ranging authority over those larger administrative and management issues that involve the Government as a whole."  *AFL-CIO v. Kahn*, 618 F.2d 784, 789 (D.C. Cir. 1979) (en banc).[1]  Presidents have exercised this authority to promulgate wide-ranging directives concerning the federal government's procurement policies, and courts have upheld such directives provided they bear "a sufficiently close nexus" to the statutory objectives of "'economy' and 'efficiency.'"  *Id.* at 792.[2]  Courts do so even when "[t]he link" asserted by the President might "seem

---

[1] *Accord Farkas v. Tex. Instrument, Inc.*, 375 F.2d 629, 632 n.1 (5th Cir. 1967); *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003); *City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 914 (10th Cir. 2004); *Mayes v. Biden*, 67 F.4th 921, 941 (9th Cir. 2023), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023); *Bradford v. U.S. Dep't of Lab.*, --- F.4th ----, 2024 WL 1866432, at *6 (10th Cir. Apr. 30, 2024); *Chamber of Com. of U.S. v. Napolitano*, 648 F. Supp. 2d 726, 738 (D. Md. 2009).

[2] *See, e.g.*, *Chao*, 325 F.3d at 366 (upholding an Executive Order directing that federal contracts require contractors to post notices of certain labor rights, including the right not to join a union or to pay certain union dues, based on President George W. Bush's judgment that "'[w]hen workers are better informed of their rights, . . . their productivity is enhanced,'" and that "'[t]he availability of such a workforce from which the United States may draw facilitates the efficient and economical completion of its procurement contracts'" (citations omitted)); *Bradford*, 2024 WL 1866432, at *2 (upholding the Biden Administration's order and implementing rule directing that federal contracts require contractors to pay at least a $15 minimum wage, based on the President's determination that "[r]aising the pay of low-wage workers increases their morale and the productivity and quality of their work, lowers turnover and its accompanying costs, and reduces supervisory costs," which the court held established a "sufficiently close nexus" to the values of economy and efficiency (citations omitted)); *Napolitano*, 648 F. Supp. 2d at 737-38 (upholding an Executive Order of President George W. Bush directing that federal contracts require contractors to use the E-Verify system to determine employment eligibility, and deferring to the President's explanation that "[c]ontractors that adopt rigorous employment eligibility confirmation policies are much less likely to face immigration enforcement actions, because they are less likely to employ unauthorized workers, and they are therefore generally more efficient and dependable procurement sources than contractors that do not employ the best available measures to verify the work eligibility of their workforce" (citation omitted)).

attenuated," and one could "with a straight face advance an argument claiming opposite effects" on the economy and efficiency of government procurement "or no effects at all." *Chao*, 325 F.3d at 366-67; *see Kahn*, 618 F.2d at 793 (deferring to President's judgment that certification of wage and price standards would slow inflation in the long run, even if leading to higher costs to the Government near-term). This standard of review flows from FPASA's text, which vests the President with authority to determine what *the President*— not litigants or courts—"*considers* necessary to carry out this subtitle," provided such policies and directives are "consistent with this subtitle," 40 U.S.C. § 121(a) (emphasis added); *see, e.g.*, *Texas v. EPA*, 983 F.3d 826, 837 (5th Cir. 2020) (in providing that EPA "'may' make changes that it 'deems necessary,'" Congress "delegated discretionary authority to EPA to determine when adjustments should be made").

When, as here, "the President's view of his own authority under a statute . . . has been acted upon over a substantial period of time without eliciting congressional reversal, it is entitled to great respect" and "should be followed unless there are compelling indications that it is wrong." *Kahn*, 618 F.2d at 790 (citations omitted); *see also Biden v. Missouri*, 142 S. Ct. 647, 652 (2022) (similar). Additionally, Congress "is presumed to be aware of an administrative or judicial interpretation of a statute *and to adopt that interpretation* when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) (emphasis added). Here, Congress did just that when it recodified both FPASA's statement of purpose and its grant of authority to the President without substantive change. *See* Pub. L. No. 107-217, 116 Stat. 1062, 1063, 1068, 1303 (2002).

Applying this longstanding understanding of FPASA here, the PLA Order is authorized by FPASA because the President reasonably considered it necessary to carry

out the relevant subtitle, regardless of whether it carries out any particular provision of the subtitle.  The PLA Order and Rule cite ample empirical support for the President's determination that a presumption in favor of PLAs will promote economy and efficiency in federal contracting and thus that presumption falls within the scope of the President's FPASA authority.  In the PLA Order, the President explained that problems particular to large-scale construction projects "threaten the efficient and timely completion of construction projects undertaken by Federal contractors."  87 Fed. Reg. at 7363.  For example, "[c]onstruction employers typically do not have a permanent workforce, which makes it difficult to predict labor costs when bidding on contracts and to ensure a steady supply of labor on contracts being performed."  *Id.*  Additionally, "construction projects typically involve multiple employers at a single location."  *Id.*  Therefore, "a labor dispute involving one employer can delay the entire project," and "[a] lack of coordination among various employers, or uncertainty about the terms and conditions of employment of various groups of workers, can create friction and disputes in the absence of an agreed-upon resolution mechanism."  *Id.*  PLAs "are often effective in preventing these problems from developing because they provide structure and stability to large-scale construction projects."  *Id.*  In particular, PLAs "avoid labor-related disruptions on projects by using dispute-resolution processes to resolve worksite disputes and by prohibiting work stoppages, including strikes and lockouts."  *Id.*

The PLA Rule further supports the reasonableness of the President's judgment.  PLAs create efficiencies by standardizing "start times, break times, rules governing overtime, holidays, and dispute resolution procedures" across all workers on a project, without regard to their employer or union status.  PLA Rule, 88 Fed. Reg. at 88,711.  For

example, the Rule cites a 2011 study that found that a PLA for a project "to rehabilitate and renovate [New York City] schools saved $221 million . . . by standardizing construction workers' shifts." *Id.* (citation omitted). Additionally, because that PLA contained no-strike and no-lockout clauses—which the Rule at issue here also requires PLAs to include, FAR 52.222-34(c)(3)—the project "continued uninterrupted" even while "a strike by a trade union resulted 'in a shutdown of numerous [other] large construction projects across the City and substantial delay and related costs.'" PLA Rule, 88 Fed. Reg. at 88,711-12 (citation omitted); *see also id.* at 88,712 (citing a study of school construction projects in San Diego, which "found that 'project delays [we]re considerably lower' on projects covered by a PLA" (citation omitted)).

Moreover, the PLA Order and Rule expressly account for the possibility that, notwithstanding the general economy and efficiency advantages of a presumption in favor of PLAs, economy and efficiency may be better served in the context of certain projects by declining to impose a PLA requirement. Accordingly, the presumption established in the PLA Order is rebuttable, including where requiring a PLA "would not advance the Federal Government's interests in achieving economy and efficiency in Federal procurement." PLA Order, 87 Fed. Reg. at 7364; FAR 22.504(d). This exception authority further supports the reasonableness of the President's determination that the PLA Order will promote economy and efficiency in contracting.[3]

---

[3] To the extent Plaintiffs challenge the application of this exception authority by particular agencies, this challenge to the validity of the PLA Order and Rule themselves is not the appropriate vehicle. *See, e.g.*, *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 34 (D.C. Cir. 2002) (rejecting a challenge to a PLA order and observing that, for particular contracts, "an aggrieved party may seek redress through any of the procedures ordinarily available to it: a bid protest, a motion for administrative reconsideration, or an action in the district court challenging that specific decision").

The Eleventh Circuit's decision in *Georgia v. President of the United States* does not require the Court to abandon this well-supported understanding of FPASA.  In *Georgia*, a divided panel held that the plaintiffs were likely to succeed in challenging a requirement that employees of covered federal contractors generally be fully vaccinated against COVID-19, but found no basis for a nationwide injunction.  46 F.4th 1283, 1289 (11th Cir. 2022) (opinion of Grant, J.).  Part III of Judge Grant's opinion interpreted the President's FPASA authority as limited to instructing subordinates in how to exercise their authority pursuant to the relevant subtitle, provided the President's directives are consistent with other provisions of the subtitle, including the requirement to "'obtain full and open competition' through most procurement procedures."  *Id.* at 1292-95 (quoting 41 U.S.C. §§ 3301(a), 3306).  Judge Grant concluded the COVID-19 mandate did not withstand scrutiny because FPASA did not confer on executive agencies themselves "the authority to insert a clause into all of their procurement contracts and solicitations requiring contractors' employees to be vaccinated against Covid-19."  *Id.* at 1295.

Plaintiffs rely heavily on Judge Grant's opinion, but Judge Grant's views do not bind this Court.  The relevant part of Judge Grant's opinion spoke only for Judge Grant, not for any other judge.  Another member of the panel concurred only "in the result Judge Grant reache[d]," *id.* at 1308 (opinion of Edmondson, J.), without joining any of her reasoning, and the third member of the panel concurred only in Part V of the opinion— which is not relevant here—while dissenting from Part III, *see id.* at 1308 (opinion of Anderson, J.).  Moreover, Judge Grant's opinion is inconsistent with decades of case law interpreting FPASA, as explained above.  It also renders part of the statute superfluous.  If Judge Grant were correct to interpret 40 U.S.C. § 121(a) as limited to allowing the

President to direct agencies in their execution of particular statutory provisions within the relevant subtitle, there would have been no need for Congress to require exercises of the President's authority to be both "necessary to carry out this subtitle" *and* "consistent with this subtitle," because carrying out a statute's express provisions is always consistent with the statute. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128-29 (2018) (courts must "give effect, if possible, to every word Congress used" (citation omitted)).

In any event, even if Judge Grant's narrower interpretation of the President's FPASA authority were persuasive, the PLA Order still passes muster because it directs agencies in their exercise of existing contracting authority, including pursuant to several specific provisions of the relevant subtitle. One such provision, 41 U.S.C. § 3101(a), states that agencies "shall make purchases and contracts for property and services in accordance with [Division C of Subtitle I of Title 41] and implementing regulations of the Administrator of General Services." Another provision, 41 U.S.C. § 3703(c), states that agencies shall award contracts "to the responsible source whose proposal is most advantageous to the Federal Government, considering" the "cost or price" of the contract "and the other factors included in the solicitation." And 41 U.S.C. § 3306(a)(1)(A) gives agencies the authority to "specify [their] needs," while 41 U.S.C. § 3306(a)(2)(B) states that they can "include restrictive provisions or conditions" in solicitations "to the extent necessary to satisfy [those] needs."

These provisions grant federal agencies broad authority to negotiate contracts for property and services, including the authority to "determin[e] which bid is the most advantageous to the Government.'" *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 959 (Fed. Cir. 1993) (citation omitted). There, for example, the court upheld an

9

award that cost the government hundreds of millions of dollars more than a competitor's bid because the agency had found that the more expensive contractor would deliver higher "total productivity" and thus higher overall "value." *Id.* at 959-60. Likewise here, agencies may properly exercise their contracting authorities to require the use of PLAs on construction projects to deliver higher total productivity and thus higher overall value— even if increased cost to the government were expected, which it is not. *See, e.g.*, PLA Rule, 88 Fed. Reg. at 88,710 (citing studies finding no statistically significant increase in project costs from the use of PLAs). Thus, even under Judge Grant's understanding of the power set forth in 40 U.S.C. § 121(a), the President may properly exercise that power to direct agencies' use of their contracting authorities with respect to PLAs.

Because the PLA Order directs agencies in their exercise of existing contracting authority, it also is valid as an exercise of the President's inherent Article II authority. Plaintiffs do not appear to dispute the authority of individual federal agencies to require the use of PLAs in connection with particular federal construction projects, but only the President's authority to establish a government-wide presumption in favor of such requirements. Article II, Section 1, of the Constitution provides that the "executive Power shall be vested in a President of the United States of America." Relying on that authority, the D.C. Circuit upheld the 2001 Bush PLA order that President Bush issued concerning PLAs in 2001 as a valid exercise of "the President's [Article II] power," which "necessarily encompasses 'general administrative control of those executing the laws.'" *Allbaugh*, 295 F.3d at 32 (quoting *Myers v. United States,* 272 U.S. 52, 164 (1926)). To be sure, the President's authority over procurement "is not without limits," but because the 2001 order applied only "'[t]o the extent permitted by law,'" *id.* at 32–33, it did not require any agency

to transgress statutory constraints on its authority, *id.* at 33.  In similar fashion, the PLA Order at issue here excepts from its requirements any project where using a PLA would, in the opinion of a senior agency official, "be inconsistent with statutes, regulations, Executive Orders, or Presidential Memoranda."  PLA Order, 87 Fed. Reg. at 7363.  This case thus involves only presidential guidance of agencies in the exercise of their own undisputed proprietary authority.  Such guidance, as explained in *Allbaugh*, is lawful.  And the relevant agency PLA authority further distinguishes this case from *Georgia*.  *Cf. Georgia*, 46 F.4th at 1295 (opinion of Grant, J.) (identifying as the relevant question "whether Executive Order 14042 directs subordinates to carry out *their own lawful statutory authority*, or whether the Order instead exceeds the limitations imposed by [FPASA's] text" (emphasis added)).

Contrary to Plaintiffs' cursory suggestion, *see* ECF No. 18 ("Pls.' Mot.") at 15, the major questions doctrine does not call for a different result.  That interpretive canon concerns itself with agency actions that "would bring about an enormous and transformative expansion in [the agency's] regulatory authority without clear congressional authorization," *i.e.*, "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citation omitted).  It does not apply here for at least four reasons.

First, a FPASA directive is an exercise of "proprietary authority," *Mayes*, 67 F.4th at 935, as opposed to "an exercise of regulatory authority," *id.*, or of some other power of "'the administrative state,'" *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023). It binds only federal agencies in their exercise of contracting authority, imposing no obligations on

members of the public absent a voluntary decision to contract with the government. *See, e.g.*, *Bradford*, 2024 WL 1866432, at *12 (rejecting major questions challenge to minimum-wage provision for federal contractors in part because it was an exercise of "the government's proprietary authority"); *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940) ("Like private individuals and businesses, the Government enjoys the unrestricted power . . . to determine those with whom it will deal . . . ."). Second, as noted above, *see supra* at 1-2, Presidents have set the government's policy with respect to the use of PLAs on federal construction projects for over three decades, and the actions challenged here are thus not novel. Third, the expected impact of the PLA Rule is between $8.87 million and $53.54 million annually, PLA Rule, 88 Fed. Reg. at 88,725—orders of magnitude less than the economic effects at issue in cases that have triggered application of the major questions doctrine.[4] Fourth, a requirement to use a PLA on a federal construction project is limited in scope; it does not impose any requirements on employees of covered contractors and subcontractors beyond the context of the specific federal construction project that a PLA governs. *Cf. Georgia*, 46 F.4th at 1296 (opinion of Grant, J.) (observing that "[a]n all-encompassing vaccine requirement is different in nature than the sort of *project-specific restrictions* contemplated by [FPASA]" (emphasis added)).

B.    The PLA Order and Rule Comply With CICA

Plaintiffs also have not established a likelihood of success on their argument that the PLA Rule is invalid because it conflicts with the Competition in Contracting Act of 1984

---

[4] *See, e.g.*, *Biden v. Nebraska*, 600 U.S. 477, 494 (2023) (action in question "cancel[ed] $430 billion of student loan principal"); *West Virginia v. EPA*, 597 U.S. 697, 715 (2022) (Energy Information Administration projected that the Clean Power Plan "would reduce GDP by at least a trillion 2009 dollars by 2040"); *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam) ("$50 billion" was "a reasonable proxy of the … economic impact" of the eviction moratorium at issue).

("CICA"), which is part of the relevant subtitle with which FPASA directives must be consistent.  Pursuant to CICA, any agency solicitation requiring a PLA must "allow all contractors and subcontractors on the construction project to compete for contracts and subcontracts without regard to whether they are otherwise parties to collective bargaining agreements."  Order, 87 Fed. Reg. at 7364; FAR 52.222-34(2).  Thus, the rule satisfies CICA's definition of "full and open competition" to mean that "all responsible sources are permitted to submit sealed bids or competitive proposals on the procurement."  41 U.S.C. § 107.  Plaintiffs also are mistaken to suggest that the PLA Order conflicts with CICA because some contractors may choose not to bid on projects that include a PLA requirement.  *See* Pls.' Mot. at 16-17.  The Federal Circuit has held that the CICA's full-and-open-competition requirement can be satisfied "[e]ven if the agency expected that only certain firms would be able to satisfy the agency's minimum needs," as long as "the solicitation permitted all responsible sources to submit proposals."  *See Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1293 (Fed. Cir. 2020).  Plaintiffs' argument is particularly unconvincing here because, as the PLA Rule notes, commenters submitted research showing no statistically significant difference in the number of bids between projects that required PLAs and those that did not.  *See* PLA Rule, 88 Fed. Reg. at 88,709.

    C.    <u>The PLA Rule Is Not Arbitrary And Capricious</u>

The PLA Order is not reviewable under the Administrative Procedure Act ("APA") because the President is not an "agency."  5 U.S.C. § 704; *Dalton v. Specter*, 511 U.S. 462, 470 (1994); *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).  Plaintiffs instead seek to subject the PLA Rule to APA review.  Pls.' Mot. 17-21.  But agency rules are also not reviewable under the APA's arbitrary and capricious standard to the extent they simply adopt choices made by the President in the exercise of authority delegated

13

to him by Congress. *Feds for Med. Freedom v. Biden*, 581 F. Supp. 3d 826, 835 (S.D. Tex. 2022), *aff'd*, 63 F.4th 366 (5th Cir.) (en banc), *vacated on other grounds*, 144 S. Ct. 480 (2023) (President's determination was "not reviewable under the APA," and applying APA standards to the determination as implemented by an agency would be improper); *Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 28-29 (D.D.C. 2001) (arbitrary and capricious review not available when agency "is merely carrying out the directives of the President").

Moreover, even when available, arbitrary and capricious review is "exceedingly deferential"; the Court's role is to "ensur[e] that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the . . . agency's decision." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (citations omitted). The PLA Rule easily survives this review. In response to concerns that the PLA Rule will actually reduce economy and efficiency, Pls. Mot. 18-19, the PLA Rule explains how PLAs mitigate labor shortages, simplify the administration of large-scale construction projects, and prevent costly delays due to strikes and walkouts. 88 Fed. Reg. at 88,711. In response to concerns about competitiveness, and the deterrent effect PLAs would have on open-shop contractors participating in large-scale Government construction, Pls. Mot. 19-20, the PLA Rule cites evidence that projects governed by a PLA still enjoy high participation rates from open-shop labor, and that PLAs have had little observable impact on the number of bids on a particular project. *Id.* at 88,712 (noting that on the project at issue in the *Boston Harbor* case, just under 40% of subcontractors were non-union). And in response to Plaintiffs' concerns about the exceptions to the presumption in favor of PLAs, Pls. Br. 20-21, Plaintiffs have not shown "data" establishing that they are not being properly considered. *Associated General Contractors of America v. Biden* ("*AGC*"), --- F.

14

Supp. 3d ----, 2024 WL 1078260, at *5-6 (W.D. La. Mar. 12, 2024); *see also infra* at 18-19.  Plaintiffs are not likely to succeed on this claim.

      D.    <u>The OMB Memo Does Not Violate The OFPP Act</u>

Plaintiffs assert that Defendants violated the Office of Federal Procurement Policy ("OFPP") Act by not making the OMB Memo available for comment thirty days prior to it taking effect.  41 U.S.C. § 1707(a).  Not so.  The OMB Memo provides guidance to agencies as to how they should comply with the PLA Rule and technical assistance to agencies seeking to apply the exceptions, but has no independent legal force.  Therefore, it is "nonbinding guidance that does not rise to the level of a 'procurement policy, regulation, procedure, or form,"' as required by the statute to trigger the notice-and-comment provisions of the OFPP Act.  *See Kentucky v. Biden*, 571 F. Supp. 3d 715, 731 (E.D. Ky. 2021) (quoting § 1707(a)).

      E.    <u>The PLA Order, PLA Rule, and OMB Memo Do Not Violate The First Amendment</u>

Plaintiffs next argue that the choice of their members not to enter a PLA is "a type of expressive association," and that the challenged directives violate the First Amendment because they "require Plaintiffs' members to associate with unions in order to bid on and/or perform" certain contracts.  Pls.' Mot. at 21-22.  Even assuming that the PLA Rule required a PLA to be imposed on large-scale construction contracts in every instance (it does not), the argument fails.  This case is not, as Plaintiffs claim, analogous to those that address union membership or mandatory support fees required of those that do not wish to join a union.  *See Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 585 U.S. 878, 891-95 (2018).  Rather, the PLA Rule directs agencies as to the terms under which they are to enter their own contracts.  Such "commercial decisions are

invisible to observers unless explained" and "are not inherently expressive." *Arkansas Times LP v. Waldrip*, 37 F.4th 1386, 1394 (8th Cir. 2022); *see also Rust v. Sullivan*, 500 U.S. 173, 197 (1991) ("[A] decision not to subsidize the exercise of a fundamental right does not infringe that right[.]").  Because contractors remain "free to associate to voice their disapproval of" unions and to operate on open-shop principles on other contracts, there is no forced association problem with the challenged directives. *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 70 (2006) (upholding Solomon Amendment tying federal funding to acceptance of military recruiters by law schools); *see also Christian Labor Ass'n v. City of Duluth*, No. 21-227, 2023 WL 3996240, at *10 (D. Minn. June 14, 2023) (rejecting First Amendment association rights challenge to the referral provisions in a PLA because "nothing in the PLAs prevents any employee from stating disapproval of the unions or the PLAs, or . . . opposition to collective bargaining[.]").

F.    The PLA Order, PLA Rule, and OMB Memo Do Not Violate The NLRA

Plaintiffs contend that the challenged directives violate section 8(d) of the National Labor Relations Act ("NLRA"), which, as interpreted by the Supreme Court, prevents the Government from "compel[ling] a company or a union to agree to any substantive contractual provision of a collective-bargaining agreement." *See H.K. Porter Co. v. N.L.R.B.*, 397 U.S. 99, 102 (1970). *H.K. Porter* is inapposite for at least two reasons. First, the PLA Rule concerns the Government's power to require PLAs as a term of its own contracts, not the National Labor Relations Board's power to coerce a company or union to accept a contract term.  The Supreme Court has squarely affirmed that the authority of governments to require PLAs is not preempted by the NLRA. *Boston Harbor*, 507 U.S. at 232-33.  Second, the Rule does not give agencies the authority to compel contractors to accept a substantive term of the sort that was at issue in *H.K. Porter* (*i.e.*,

16

that the company permit union dues to be periodically deducted from employee wages).
397 U.S. at 100-01.  Rather, the Rule creates a short list of minimum standards that a
qualifying PLA must include to meet project needs, leaving the details to private
negotiation.  *Cf. Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 754–55 (1985)
(NLRA does not preempt imposition of minimum standards that may affect contract
terms).  Because "[t]he government does not participate in nor is it a signatory to the PLA,"
there is no NLRA issue.  PLA Rule, 88 Fed. Reg. at 88,723.

G.    The PLA Rule Adequately Responded to Concerns Regarding Small
Businesses

Finally, Plaintiffs allege Defendants violated the APA because the PLA Rule did
not account for purported concerns about harm to small businesses, in violation of the
Small Business Act ("SBA").  Pls.' Mot. at 23.  Again, APA review of the PLA Rule to the
extent it merely implements the President's exercise of authority in the PLA Order is not
available.  *See supra* at 13-14.  In any event, the Rule acknowledged concerns about
small businesses and responded to them by stating that, because the PLA Order creates
a presumption in favor of requiring PLAs on large-scale construction projects absent an
exception,  "there are no alternatives available that would reduce the impact on or exempt
small entities from its requirements." PLA Order, 88 Fed. Reg. at 88,725.  Defendants'
consideration of the concerns of small businesses met the APA's minimal requirements.

III.    Plaintiffs Cannot Show Irreparable Harm

A movant must show that irreparable harm is likely in order for a preliminary
injunction to issue; the Court should not issue one "simply to prevent the possibility of
some remote future injury."  *Winter*, 555 U.S. at 22 (citation omitted). And even if injury is
likely, not every present inconvenience justifies the extraordinary remedy of a preliminary

17

injunction. Rather, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Plaintiffs are trade associations representing "open shop" contractors and subcontractors. Their members allege that they will be irreparably harmed by pending or future contract solicitations that require execution of a PLA, placing them at a disadvantage to entities that can more easily enter the requisite agreement with a construction union. *See, e.g.*, Ferguson Decl. ¶¶ 5-6, ECF No. 18-6 (federal contractor); Yencarelli Decl. ¶ 4, ECF No. 18-10 (subcontractor). Some of Plaintiffs' members have a history of bidding for large-scale federal construction projects, while others are subcontractors that merely intend to work on such projects. Although Defendants do not dispute the assertions of Plaintiffs' affiants for purposes of this motion, these assertions do not demonstrate irreparable harm.

For starters, Plaintiffs assume, without proof, that the exceptions outlined in the PLA Order will not be applied to projects awaiting solicitation, or that they were not applied when they should have been to contract solicitations that already have a PLA requirement. Declarants claim that "it is their understanding" that contracting agencies have "either undertaken no meaningful market research to justify the PLA mandate on . . . project[s], or ha[ve] ignored the results of such research." Yencarelli Decl. ¶ 5. But that is unsupported speculation. There is no record before the Court as to what agencies considered before deciding not to apply the exceptions to any particular solicitation. The FAR Council is a regulatory body, not an agency soliciting contract bids.

The court's decision in *AGC*, a lawsuit challenging the same federal directives at

issue here, is instructive on this point. In an order granting a motion to dismiss on venue and standing grounds, the court explained that the PLA Rule requires "an 'inclusive market analysis' to evaluate whether a PLA requirement for any particular project would advance the Government's interests," which provides "a built-in mechanism for determining whether the project at issue is one that is aligned with the [rule's] purposes and benefits." 2024 WL 1078260, at *5. The court rejected plaintiffs' arguments that exceptions would be issued sparingly as "highly speculative and, without any statistical data given the newness of the Rule, completely unsupported." *Id.* at *5-6. Plaintiffs offer no stronger basis for impugning the Government's application of the exceptions.

For Plaintiffs' members that are engaged in bidding on large-scale federal construction projects, Plaintiffs fail to acknowledge the availability of other forms of relief to address an allegedly improper PLA requirement. Contractors may challenge a PLA requirement in a particular bid solicitation through a bid protest, with judicial review available in the Court of Federal Claims and subsequently in the Federal Circuit. *See* 28 U.S.C. §§ 1491(a)(1), 1295(a)(3); 4 C.F.R. § 21.0 *et seq*. Bid protests over contractual requirements are routine, particularly for large solicitations such as those that are the focus of the PLA Order. Unlike this action, a bid protest would involve the contracting agency that actually issued the solicitation and permit review of the administrative record of how the agency reached the decision to require a PLA on a particular project.

As to Plaintiffs' subcontractor members, they do not bid for large-scale construction contracts themselves. *See AGC*, 2024 WL 1078260, at *4-5 (noting speculative nature of injuries as to contractors that do not bid directly for large-scale construction projects). This adds further "[s]peculation about the decisions of independent actors" to Plaintiffs'

assertions of irreparable harm.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).

The weakness of Plaintiffs' assertions of irreparable harm is underscored by their "failure to act with speed or urgency."  *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).  Plaintiffs waited over four months after the release of the final PLA Rule to seek a preliminary injunction against it.  In *Wreal*, the Eleventh Circuit found a similar, months-long delay in seeking a preliminary injunction "militate[d] against a finding of irreparable harm."  *Id.* at 1248 (five-month delay).  As in *Wreal*, Plaintiffs "fail[] to offer any explanation" for not moving promptly.  *Id.*  This lack of urgency confirms Plaintiffs will not be prejudiced by waiting for a resolution of this case on the merits.  Because a preliminary injunction is unnecessary "to preserve the relative positions of the parties," Plaintiffs' motion should be denied.  *Benisek*, 585 U.S. at 161 (citations omitted).

IV.    <u>Enjoining The PLA Rule And PLA Order Prior To A Full Adjudication On The Merits Would Be Inequitable And Against The Public Interest</u>

There is a "strong public interest in avoiding disruption in procurement, and for withholding judicial intervention" in all but extreme situations, because "judges are ill-equipped to settle the delicate questions involved in procurement decisions" as compared to the executive branch. *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1270-71 (5th Cir. 1978).  Moreover, Plaintiffs have sought a nationwide injunction, but courts are increasingly "weary and wary" of such injunctions because they "push against the boundaries of judicial power."  *Georgia*, 46 F.4th at 1303.  Plaintiffs fail to meet their burden of showing that such a dramatic judicial intervention would be equitable.

## CONCLUSION

For these reasons, the Court should deny the motion for a preliminary injunction.

Dated: May 17, 2024                Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

LESLEY FARBY
*Assistant Branch Director, Federal Programs Branch*

*/s/ Michael J. Gerardi*
MICHAEL J. GERARDI (D.C. Bar No. 1017949)
*Senior Trial Counsel*
TAISA M. GOODNATURE (N.Y. Bar No. 5859137)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
Tel: (202) 616-0680
michael.j.gerardi@usdoj.gov

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 17th day of May, 2024, I electronically filed the foregoing with the Clerk of the Court by using the ECF system, which will send a notice electronically to all registered users of ECF.

*/s/Michael J. Gerardi*

Michael J. Gerardi
Senior Trial Counsel