# EXHIBIT "2"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION

| | |
|---|---|
| ASSOCIATED BUILDERS AND CONTRACTORS, FLORIDA FIRST COAST CHAPTER, AND ASSOCIATED BUILDERS AND CONTRACTORS,<br><br>**Plaintiffs**<br><br>vs.<br><br>WILLIAM F. CLARK, DIRECTOR, OFFICE OF GOVERNMENT-WIDE ACQUISITION POLICY, OFFICE OF ACQUISITION POLICY, Office of GOVERNMENT-WIDE Policy, GENERAL SERVICES ADMINISTRATION, et al.<br><br>**Defendants.** | § § § § § § § § § § § § § § § § § § § § NO. _____ |

**DECLARATION OF PHIL YANCE**

I, Phil Yance, declare as follows:

1. I am a Senior Vice President of The Robins & Morton Group ("Robins & Morton"). Robins & Morton is a non-union general contractor headquartered in Birmingham, Alabama.

2. Robins & Morton pursues and has performed construction work in a majority of the lower 48 states of the United States. Robins & Morton is a member of Associated Builders and Contractors ("ABC"), and ABC's Florida First Coast Chapter, as well as the Alabama Chapter.

3. As Senior Vice President, I am responsible for Robins & Morton's construction work for the federal government. We have a strong history of working for the federal government. In recent years, we have performed several federal projects valued at more than $35M.

1

4. Robins & Morton currently holds several multiple award contracts with federal government agencies. Under these contracts, a limited group of contractors have been pre-selected for restricted competition for a select group of projects. We devoted considerable resources to winning the right to participate under these contracts and we have had good success winning project awards under programs such as these.

5. Robins & Morton has been pursuing several projects, in our multiple award contracts and otherwise, that will be requiring Project Labor Agreements (PLAs) because they are subject to the new Rules requiring PLAs on federal construction projects. These projects include: the B2080 Renovation of Galley, Emergency Department and Pharmacy, Naval Air Station, Jacksonville, Florida – N6945024R0057 ("JACKSONVILLE PROJECT"); the USDA-ARS Auburn Lab and Lab Annex, Auburn, Alabama – W9127824R0013 ("AUBURN PROJECT"); the Brownsville Gateway Modernization, Brownsville, Texas – 47PH0824R005 ("BROWNSVILLE PROJECT); and others.

6. Robins & Morton has invested many hours and many resources in pursuing JACKSONVILLE, AUBURN, BROWNSVILLE and other PROJECTS. Robins & Morton is particularly well suited for the JACKSONVILLE PROJECT and our investment in the pursuit of that project has been driven by a high expectation of winning the contract for construction.

7. I am informed that the new PLA Rules require all contractors and subcontractors to enter into a project-specific "pre-hire collective bargaining agreement" (i.e., PLA) with one or more construction trade unions as a condition of being awarded a covered project. The PLA must apply to all craft labor on the project, with no exceptions. The trade unions then become the exclusive bargaining representative of all workers on the project. The trade unions are thus empowered to negotiate all terms and conditions of employment for all labor on the project,

including worker classification, hiring hall procedures, wages, benefits, the ratio of apprentices to journeymen, work rules, disputes procedures and grievance procedures.

8. Because the terms and conditions of employment impact the cost of labor, and the cost of labor usually constitutes more than 50% of a pricing proposal to the government, contractors and subcontractors are, as a practical matter, required to negotiate a PLA with the trade unions prior to submission of bids or proposals. Otherwise, the cost and productivity of labor cannot be accurately known. Without this information, there can be no contractor and subcontractor confidence in the prices that comprise the bid or proposal to the government.

9. My understanding is that the new Rules do not require the trade unions to negotiate with all potential contractors and subcontractors submitting bids or proposals to the government. If a union does enter into negotiations for a particular project, there is nothing that requires the union to reach agreement prior to the date bids or proposals must be submitted. The contractors and subcontractors have a deadline for submission of their price, but the unions have no deadline.

10. In addition, I am informed that there is no requirement in the Rules that the unions offer the same terms and conditions to all contractors and subcontractors. They are at liberty to grant terms and conditions to union contractors and subcontractors with whom they have relationships that are different than the terms and conditions granted to non-union contractors and subcontractors.

11. I am informed that the new Rules allow an agency three options for when an executed PLA must be submitted to the government: (1) submission of the executed PLA with the bid or proposal, (2) submission of the executed PLA after bids/proposals are received but before award, or (3) submission of the executed PLA after award. Options 2 and 3 imply that contractors and subcontractors can submit accurate bids/proposals without knowing the terms and conditions

governing employment of labor. This assumption might possibly be true for union contractors and subcontractors who have established relationships with the unions, but it is false for non-union contractors and subcontractors (such as Robins & Morton and its non-union subcontractors) who have no experience with the unions. Under Option 3, if the contractors and trade unions do not reach agreement on a PLA, it appears the contract must be terminated for default. The new Rules allow the government to exempt a project from the PLA requirement before the date bids/proposals are received, but the government is not permitted to exempt a project after pricing is received or after its contractor and the trade unions reach impasse on PLA negotiations. Option 3 might be appropriate for union contractors and subcontractors with existing collective bargaining agreements with the unions, but it is inappropriate for non-union contractors and subcontractors (such as Robins & Morton and its non-union subcontractors) who have no such relationship.

12. I am informed that there are narrow exceptions to the PLA mandate. Most of them (i.e., short duration, lack of operational complexity, involving only one trade, involving specialized construction work, need for compelling urgency) will never apply to the kind of work we do and would never have applied to any work we have ever done in the past for the government. The only exception that might apply to the projects we are pursuing now is the market research exception. I am informed that the new Rules allow a project to be excepted from the PLA requirement when market research indicates a PLA would substantially reduce the number of potential offerors such that adequate competition at a fair and reasonable price would not be achieved.

13. On projects we have been pursuing, such as the JACKSONVILLE PROJECT, we have informed the government that the market for construction in the area does not support imposition of a PLA because there are very few unionized workers and because most non-union contractors and subcontractors will not bid on a project that is subject to a PLA. Notwithstanding

the information we have provided indicating that the PLA will have the immediate effect of drastically reducing competition and increasing costs, the government has proceeded to impose PLA mandates, without any rational basis and with harmful impact on the economy and efficiency of the government's construction procurements.

14. As a non-union contractor, Robins & Morton is irreparably harmed by the new Rules requiring project labor agreements ("PLAs") on federal construction projects. Unless a court issues an injunction against the unlawful PLA mandate, Robins & Morton will be subjected to severe and irreparable risks of harm that in effect deprive us of the ability to submit a competitive bid on the JACKSONVILLE PROJECT and other PLA-mandated projects.

15. The unfair and discriminatory burdens and risks imposed on us by the PLA mandate on the JACKSONVILLE PROJECT and other projects include the following:

   A. We have no reliable database for the cost and productivity of union labor and labor that operates under union-driven terms and conditions. Cost databases are used to estimate construction costs and prepare pricing for bids and proposals. Labor is usually more than 50% of the cost of any construction project. Without this information, it is impossible to submit an accurate pricing proposal to the government.

   B. Even if we did have a historical database of union labor cost and productivity, we would have no way of knowing with any accuracy the current cost of labor until a PLA is negotiated and signed. The final signed PLA would govern the wages, benefits, work assignments, work rules, productivity and other factors affecting labor cost, and therefore our price to the government. We do not wish to be forced to submit inaccurate pricing to the government.

C. We cannot assume we will be able to negotiate and finalize a PLA before bids/proposals and pricing are due to be submitted to the government. There is nothing in the new Rules that requires the incumbent trade unions to talk to us, or negotiate with us, prior to the date bids/proposals are due. The cost associated with pursuing and estimating a project is significant, and it would be foolish to make such an investment if there is no confidence that we could simultaneously negotiate and finalize labor terms prior to submission of pricing.

D. We have very little experience with unions, and no experience negotiating PLA terms. The incumbent unions have experience, and to our knowledge they are the only "labor organization" that qualifies for any given project. The incumbent unions have all the power in negotiations and no deadline for completion of negotiations. We must comply with all deadlines dictated by the government, including deadlines for submission of a fully signed PLA.

E. There is nothing in the new Rules that requires the trade unions to give us the same terms and conditions offered to the union contractors that the unions already have a relationship with. We cannot invest in a pursuit where our competition has an unfair advantage.

F. Preparation and submission of a bid or proposal on a federal contract is an expensive and time-consuming undertaking. We do not have the resources, and there is not enough time, to negotiate a PLA with the labor unions while simultaneously preparing a bid or proposal. If we cannot reach agreement on a PLA, the time, cost and energy expended in preparing a bid or proposal is lost.

G. The new Rules create an unfair advantage in favor of union contractors. They already have their collective bargaining agreements with the unions, with agreed-upon wage and benefit packages. They have data on union labor productivity. They can focus on their proposal and pricing, while we have to establish relations with the unions while simultaneously preparing our proposal and price. Under these circumstances, union contractors have an unfair advantage in submitting an accurate and lower bid than us. It would not be wise for us to make a large investment in estimating and preparing a bid or proposal when we are unlikely to win in competition with union contractors.

H. Most of the subcontractors Robins & Morton has a relationship with are non-union subcontractors. It is difficult to find subcontractors who are competent, financially strong and reliable. Our relationships with our subcontractors often go back many years, or decades. Our non-union subcontractors face the same challenges we do. If they decide not to pursue a project, we have to find new subcontractors with whom we do not have a history of business relations. Union contractors that we would compete with do not have this challenge and therefore have an unfair advantage.

I. It would be difficult or impossible for Robins & Morton and its non-union subcontractors to use their own craft labor employees to perform the work. We would have to hire union workers from union hiring halls. It is unrealistic to expect that our own employees would register with the union hiring halls en masse and be assigned back to us.

J. Most of the craft labor on a PLA project will have to be union labor. Even if non-union workers decide to be hired through union hiring halls, their wages, benefit, work rules and other conditions of employment will be the same as for union labor.

K. Our employees have freely chosen not to be represented by a union, and we and our employees should not be compelled to enter into a PLA with a non-representative union that infringes on our right of Freedom of Association.

16. The shift to union labor rules, and relations with unions, would be a severe hardship for Robins & Morton. Many of our regular non-union subcontractors feel the same way, and they have informed us they will not bid any projects that require a PLA.

17. If Robins & Morton did win a contract with a PLA, the impact would be destructive to the company and its relationship with its employees. Many of our employees would elect NOT to have a relationship with a union as its exclusive representative and would refuse to work on the PLA project. They would have to be replaced with other workers, and if we did not have other projects where they could be utilized, this would mean they would quit or would have to be laid off or terminated.

18. I understand that unions typically require contractors to obtain apprentices exclusively from union apprenticeship programs. Robins & Morton uses apprentices from non-union apprenticeship programs provided by ABC chapters. My firm does not want to stop working with our current apprentices. Plus, it would be costly for my firm to stop using our current apprentices, and switch to using entirely different apprentices, as we have already invested time in our current apprentices' training.

19. Working on projects with PLAs would also increase my firm's costs relating to employee benefit payments. I understand that unions require contractors to pay their workers' health and welfare benefits to union trust funds. However, Robins & Morton already has employee benefit plans. Our employees would not be able to vest in union benefits unless they leave Robins & Morton at the conclusion of the project and stay with the union. We do not want our employees

to leave Robins & Morton. To ensure that our employees do not leave, we would need to pay into union trust funds while still maintaining current employee benefit plans. This is a cost that union contractors do not have, and therefore, they will always have this unfair advantage when pursuing projects in competition with Robins & Morton.

20. It is my understanding that the new Rules allow room for negotiation between the contractors and the unions. But nothing in the new Rules constrains the unions in what they can demand. The burden is on the contractor/bidder, not the incumbent unions, to negotiate the PLA in order to get the work. This is an impossible burden on our bidding for work on any federal project subject to the new PLA mandate.

21. If Robins & Morton did obtain a contract on a PLA project, we would need to employ and train additional staff to negotiate with the unions and comply with the new administrative burdens and compliance risks imposed by the new Rules. This is an investment we do not wish to make because we are a non-union contractor. We believe that our non-union subcontractors feel the same way.

22. Robins & Morton is ready, willing and able to construct the JACKSONVILLE PROJECT and other federal projects that are being advertised for bids, but the PLA mandate makes that impracticable for us. We are hopeful that the PLA mandate will be lifted, so that we can compete fairly as a contractor for the federal government.

23. We are not aware of any federal projects where an agency has pursued and justified an exception from the PLA mandate. If the government did its duty to perform market research and exempt projects where competition at a fair price cannot be achieved, it would exempt JACKSONVILLE, AUBURN AND BROWNSVILLE. None of these locations has a significant union presence in the construction trades. There are trades in these locations where there is no

union, at all. There is a fairness in using competent local labor, but if workers are shipped in from other locations and displace competent local labor, the result is unfair to the workforce, would cost dramatically more and result in an unfair price to the government.

24.  I declare under penalty of perjury under the laws of the United States of America that the statements in this Declaration are true and correct.

Executed on this 25th day of March, 2024 in Birmingham, Alabama.

Phil Yance