**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

ASSOCIATED BUILDERS AND
CONTRACTORS FLORIDA FIRST
COAST CHAPTER, *et al.*,

    *Plaintiffs*,

        v.

WILLIAM F. CLARK, *et al.,*

    *Defendants*.

**Civil Action No. 3:24-cv-00318-WWB-MCR**

**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 2

I.      Project Labor Agreements ................................................................... 2

II.     Past Presidential Directives Regarding The Use of PLAs ..................... 3

III.    The PLA Order, PLA Rule, And OMB Memo ........................................ 5

ARGUMENT .................................................................................................... 7

I.      The PLA Order, PLA Rule And OMB Memo Are Not *Ultra Vires* (Count I) ........... 7

        A.      FPASA Authorizes The President To Promulgate Directives That
                Increase Economy And Efficiency In Federal Contracting, And
                Article II Empowers The President To Superintend The Executive
                Branch's Proprietary Functions .................................................. 7

        B.      FPASA And Article II Of The Constitution Authorize The PLA Order
                And Rule .......................................................................... 11

        C.      Judge Grant's Lone Opinion In *Georgia* Does Not Support A
                Contrary Result .................................................................. 14

        D.      The Major Questions Doctrine Does Not Support A Contrary Result ....... 18

II.     The PLA Order and PLA Rule Comply With CICA (Count II) ................. 19

III.    The PLA Rule And OMB Memo Do Not Violate The APA, The OFPP Act,
        The RFA, Or The SBA (Counts III, VI) ................................................ 20

        A.      The PLA Rule And OMB Memo Are Not Reviewable Under The
                APA .................................................................................. 20

        B.      The PLA Rule and OMB Memo Are Not Arbitrary And Capricious
                (Count III) ........................................................................ 21

        C.      The PLA Rule And OMB Rule Do Not Violate The OFPP Act (Count
                III) ................................................................................... 22

        D.      Defendants Complied With The Small Business Act and the
                Regulatory Flexibility Act (Count VI) ....................................... 22

IV.     The PLA Order And PLA Rule Do Not Violate The First Amendment
        (Count IV) .......................................................................... 23

i

V.    The PLA Order, PLA Rule, and OMB Memo Do Not Violate The NLRA
      (Count V) ........................................................................................................... 24

CONCLUSION ............................................................................................................. 25

**TABLE OF AUTHORITIES**

**CASES**

*AFL-CIO v. Kahn,*
  618 F.2d 784 (D.C. Cir. 1979) ........................................................... 8, 9, 10

*Ala. Ass'n of Realtors v. HHS,*
  594 U.S. 758 (2021) ................................................................................ 19

*Alenco Commc'ns, Inc. v. FCC,*
  201 F.3d 608 (5th Cir. 2000) .................................................................. 23

*Ark. Times LP v. Waldrip,*
  37 F.4th 1386 (8th Cir. 2022) .................................................................. 23

*Bennett v. Spear,*
  520 U.S. 154 (1997) ................................................................................ 21

*Biden v. Missouri,*
  595 U.S. 87 (2022) .................................................................................. 10

*Biden v. Nebraska,*
  143 S. Ct. 2355 (2023) ...................................................................... 18, 19

*Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*
  *("Boston Harbor"),*
  507 U.S. 218 (1993) .......................................................................... 13, 25

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh,*
  295 F.3d 28 (D.C. Cir. 2002) ......................................................... 4, 11, 14

*Bradford v. DOL,*
  101 F.4th 707 (10th Cir. 2024),
  *petition for cert. docketed*, No. 24-232 (U.S. Aug. 30, 2024) .......... 8, 10, 18

*Chamber of Com. v. Napolitano,*
  648 F. Supp. 2d 726 (D. Md. 2009) ......................................................... 9

*Christian Labor Ass'n v. City of Duluth,*
  No. 21-227, 2023 WL 3996240 (D. Minn. June 14, 2023) ........................ 24

*Chrysler Corp. v. Brown,*
  441 U.S. 281 (1979) .......................................................................... 16, 17

*Contractors Ass'n of E. Pa. v. Sec. of Labor,*
  442 F.2d 159 (1971) ............................................................................... 10

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
  543 U.S. 157 (2004) .................................................................. 17

*CSX Corp. v. United States*,
  18 F.4th 672 (11th Cir. 2021) ..................................................... 8

*Dalton v. Specter*,
  511 U.S. 462 (1994) .................................................................. 20

*Farkas v. Tex. Instrument, Inc.*,
  375 F.2d 629 (5th Cir. 1967) ...................................................... 10

*Farmer v. Philadelphia Elec. Co.*,
  329 F.2d 3 (3d Cir. 1964) ........................................................... 10

*Feds for Med. Freedom v. Biden*,
  581 F. Supp. 3d 826 (S.D. Tex. 2022), *aff'd*, 63 F.4th 366 (5th Cir.) (en banc),
  *vacated on other grounds*, 144 S. Ct. 480 (2023) .................................... 20

*FMS Inv. Corp. v. United States*,
  144 Fed. Cl. 140 (2019) ............................................................. 19

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) .................................................................. 20

*Georgia v. President of the United States*,
  46 F.4th 1283 (11th Cir. 2022) ............................................*passim*

*H.K. Porter Co. v. NLRB*,
  397 U.S. 99 (1970) .................................................................... 25

*Hoever v. Marks*,
  993 F.3d 1353 (11th Cir. 2021) .................................................... 16

*In re MDL-1824 Tri-State Water Rights Litig.*,
  644 F.3d 1160 (11th Cir. 2011) ................................................... 21

*Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*,
  585 U.S. 878 (2018) .................................................................. 23

*Kentucky v. Biden*,
  23 F.4th 585 (6th Cir. 2022) ...................................................... 15

*Kentucky v. Biden*,
  57 F.4th 545 (6th Cir. 2023) ...................................................... 15

*Kentucky v. Biden*,
  571 F. Supp. 3d 715 (E.D. Ky. 2021) ............................................ 22

iv

*Loper Bright Enterprises v. Raimondo*,
  144 S. Ct. 2244 (2024) ................................................................. 19

*Lorillard v. Pons*,
  434 U.S. 575 (1978) ..................................................................... 10

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022).............................................. 8, 16, 17

*Mayes v. Biden*,
  67 F.4th 921 (9th Cir. 2023),
  *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023) ................... 8, 16, 18

*McGirt v. Oklahoma*,
  591 U.S. 894 (2020) ..................................................................... 17

*Metro. Life Ins. Co. v. Massachusetts*,
  471 U.S. 724 (1985) ..................................................................... 25

*Myers v. United States*,
  272 U.S. 52 (1926) ....................................................................... 11

*Perkins v. Lukens Steel Co.*,
  310 U.S. 113 (1940) ..................................................................... 18

*Robertson v. Riverstone Cmtys., LLC*,
  849 F. App'x 795 (11th Cir. 2021).............................................. 15

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
  547 U.S. 47 (2006) ....................................................................... 24

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ..................................................................... 24

*Savantage Fin. Servs., Inc. v. United States*,
  595 F.3d 1282 (Fed. Cir. 2010)................................................... 19

*Sierra Club v. Van Antwerp*,
  526 F.3d 1353 (11th Cir. 2008)................................................... 21

*Texas v. EPA*,
  983 F.3d 826 (5th Cir. 2020)......................................................... 8

*Tulare Cnty. v. Bush*,
  185 F. Supp. 2d 18 (D.D.C. 2001) .............................................. 20

*U.S. Cellular Corp. v. FCC*,
  254 F.3d 78 (D.C. Cir. 2001) ...................................................... 23

*UAW-Lab. Emp. & Training Corp. v. Chao*,
   325 F.3d 360 (D.C. Cir. 2003) ........................................................................ 8, 9

*United States v. Hurtado*,
   89 F.4th 881 (11th Cir. 2023)............................................................................. 15

*United States v. Miss. Power & Light Co.*,
   638 F.2d 899 (5th Cir. Unit A 1981)................................................................... 11

*United States v. New Orleans Pub. Service, Inc.*,
   553 F.2d 459 (5th Cir. 1977)............................................................................. 10

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ......................................................................................... 18

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ......................................................................................... 19

**STATUTES**

5 U.S.C. § 704...................................................................................................... 20

40 U.S.C. § 101 *et seq.*......................................................................................... 1

40 U.S.C. § 101 ................................................................................. 7, 8, 11, 16

40 U.S.C. § 111 .................................................................................................... 7

40 U.S.C. § 121 ................................................................................. 7, 8, 11, 16

41 U.S.C. § 1707.................................................................................................. 22

41 U.S.C. § 3101.................................................................................................. 17

41 U.S.C. § 3301.................................................................................................. 19

41 U.S.C. § 3306............................................................................................ 17, 19

41 U.S.C. § 3703.................................................................................................. 17

Pub. L. No. 107-217, 116 Stat. 1062 (2002).................................................... 11

**RULES**

Fed. R. Civ. P. 56................................................................................................... 7

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 86–741, at 19 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2318 ................. 13

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

Dep't of Def. et al., Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects, 87 Fed. Reg. 51,044 (Aug. 19, 2022) .................... 2

Dep't of Def. et al., Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects, 88 Fed. Reg. 88,708 (Dec. 22, 2023) .......................................................................... 1

Exec. Order No. 12,818, Open Bidding on Federal and Federally Funded Construction Projects, 57 Fed. Reg. 48,713 (Oct. 23, 1992) ....................................................... 3, 5

Exec. Order No. 12,836, Revocation of Certain Executive Orders Concerning Federal Contracting, 58 Fed. Reg. 7045 (Feb. 1, 1993).............................................................. 3

Exec. Order No. 13,202, Preservation of Open Competition and Government Neutrality Towards Government Contractors' Labor Relations on Federal and Federally Funded Construction Projects, 66 Fed. Reg. 11,225 (Feb. 17, 2001) ............................................. 4

Exec. Order No. 13,208, Amendment to Executive Order 13202, Preservation of Open Competition and Government Neutrality Towards Government Contractors' Labor Relations on Federal and Federally Funded Construction Projects, 66 Fed. Reg. 18,717 (Apr. 6, 2001) ................................................. 4

Exec. Order No. 13,502, Use of Project Labor Agreements for Federal Construction Projects, 74 Fed. Reg. 6985 (Feb. 6, 2009) ................................................. 5

Exec. Order No. 14,063, Use of Project Labor Agreements for Federal Construction Projects, 87 Fed. Reg. 7363 (Feb. 4, 2022) ................................................. 1

FAR 22.504 ........................................................................................ 14

FAR 52.222-34 ................................................................................... 12

## OTHER AUTHORITIES

*Black's Law Dictionary* ...................................................... 8

Dale Belman et al., *Project Labor Agreements' Effect on School Construction Costs in Massachusetts*, 49 INDUS. RELS. 44 (2010) ........................................... 22

Emma Waitzman & Peter Philips, *Project Labor Agreements and Bidding Outcomes* (2017) ................................................................ 22

*Helmsman Props., Inc.*,
  B-278965, 1998 WL 35999068 (Comp. Gen. Apr. 20, 1998)...................................20

Memo. Re. Use of Project Labor Agreements on Federal Construction Projects to the
  Heads of Executive Departments and Agencies, No. M-24-06 (Dec. 18, 2023) ..........1

Presidential Memorandum of June 5, 1997, Use of Project Labor Agreements for
  Federal Construction Projects ................................................................................ 3, 4

## **INTRODUCTION**

Following in the footsteps of his predecessors, President Biden issued an executive order ("EO")[1] to direct federal agencies regarding the use of project labor agreements, or PLAs, in government contracting. Plaintiffs do not dispute that agencies may require PLAs on individual construction projects; they dispute only the President's authority to direct agencies in their exercise of that power.[2] The challenged EO, and the regulatory guidance issued to help agencies implement it,[3] are authorized by the President's authority under the Federal Property and Administrative Services Act of 1949 ("FPASA"), 40 U.S.C. § 101 *et seq.*, because the President reasonably determined the directive will promote economy and efficiency in federal contracting; and as an exercise of the President's Article II power. The EO and implementing regulations also comply with the Competition in Contracting Act ("CICA") because agencies have broad discretion to determine their own needs as part of a competitive bidding process, including to comply with a valid presidential directive, and because it is appropriate for the President to direct agencies on a categorical basis about what they should consider to be needs. Plaintiffs' contrary arguments lack merit. Accordingly, the Court should grant the government's motion for summary judgment.

---

[1] Exec. Order No. 14,063, Use of Project Labor Agreements for Federal Construction Projects, 87 Fed. Reg. 7363 (Feb. 4, 2022) (AR0754-57).
[2] *See* Compl. ¶ 105 (approvingly citing the government's previous policy of "encouraging PLAs").
[3] Dep't of Def. et al., Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects, 88 Fed. Reg. 88,708 (Dec. 22, 2023) ("PLA Rule") (AR0010-31); Memo. Re. Use of Project Labor Agreements on Federal Construction Projects to the Heads of Executive Departments and Agencies, No. M-24-06 (Dec. 18, 2023) ("OMB Memo").

## **BACKGROUND**

I.    Project Labor Agreements

A PLA is "a pre-hire collective bargaining agreement with one or more labor organizations that establishes the terms and conditions of employment for a specific construction project." AR0003 (Dep't of Def. et al., Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects, 87 Fed. Reg. 51,044 (Aug. 19, 2022) ("Proposed Rule")). When a PLA is required, it "means that every contractor and subcontractor engaged in construction on the project [must] agree, for that project, to negotiate or become a party to a project labor agreement with one or more labor organizations." *Id.*; *see also* AR0031 (PLA Rule). Typically, a PLA requires that contractors and subcontractors be allowed "to compete for contracts and subcontracts without regard to whether they are otherwise parties to collective bargaining agreements"; "[c]ontain[s] guarantees against strikes, lockouts, and similar job disruptions"; defines "procedures for resolving labor disputes arising during the term of the project labor agreement"; and "[p]rovides other mechanisms for labor-management cooperation" on issues like "productivity, quality of work, safety, and health." AR0031 (PLA Rule). PLAs also "ensure compliance with laws and regulations such as those governing safety and health, equal employment opportunity, labor and employment standards," and serve as a deterrent to fraud. AR0003 (Proposed Rule); *see also* AR0085-86 & n.8 (comments of United Brotherhood of Carpenters and Joiners of America) (noting incidents of fraud by "labor brokers" prosecuted in Florida, including in this Court).

PLAs have long been used in connection with federal and other publicly funded construction projects, including the NASA facilities at Cape Canaveral, Florida built during

2

the 1960s. AR0235-36 (comments of Sheet Metal & Air Conditioning Contractors' National Association ("SMACCNA")). The private sector also has relied on PLAs to facilitate large-scale construction projects. "[L]eading Fortune 100 and 500 companies, including Toyota, General Motors, Wal-Mart, Bank of America, CVS, Target, Sunoco, and Disney, have relied on PLAs to ensure the successful performance of large capital construction projects for decades." AR0246-49 (SMACCNA) (collecting examples); *see also* AR0246 ("[E]vidence suggests that use of PLAs in the private sector has long and far outpaced the federal public sector more than a hundred-fold.").

II.    Past Presidential Directives Regarding The Use of PLAs

Although Plaintiffs challenge what they perceive to be "an across-the-board mandate of PLAs on federal contracts," Compl. ¶ 50, Plaintiffs do not dispute that federal agencies have the authority to regulate PLAs and to require them on particular projects. For decades, Presidents have directed the government's policy with respect to the use of PLAs on the government's own construction projects. President George H.W. Bush issued an executive order that prohibited the use of PLAs in federal construction projects. Exec. Order No. 12,818, Open Bidding on Federal and Federally Funded Construction Projects, 57 Fed. Reg. 48,713 (Oct. 23, 1992) ("1992 Bush Order").

President Clinton revoked the 1992 Bush Order. Exec. Order No. 12,836, Revocation of Certain Executive Orders Concerning Federal Contracting, 58 Fed. Reg. 7045 (Feb. 1, 1993). He later issued a presidential memorandum authorizing federal agencies to require the use of PLAs on "large and significant" construction projects where a PLA would, among other things, "advance the Government's procurement interest in cost, efficiency, and quality and in promoting labor-management stability." Presidential

Memorandum of June 5, 1997, Use of Project Labor Agreements for Federal Construction Projects § 1 ("Clinton Memorandum"). The Clinton Memorandum also set forth minimum requirements for PLAs on federal construction projects, including that they bind all contractors and subcontractors on the project; allow all contractors and subcontractors to compete for the project, without regard to union status; include guarantees against strikes, lockouts, and similar disruptions; and establish procedures for resolving labor disputes arising during the project. *Id.* § 3.

President George W. Bush replaced the Clinton Memorandum with an executive order that required government "neutrality" regarding PLAs. Exec. Order No. 13,202, Preservation of Open Competition and Government Neutrality Towards Government Contractors' Labor Relations on Federal and Federally Funded Construction Projects, 66 Fed. Reg. 11,225 (Feb. 17, 2001) ("2001 Bush Order").[4] Unlike under the 1992 Bush Order, federal agencies could enter contracts in which the contractor and subcontractors chose to use a PLA, but agencies could not require a PLA as a condition of awarding the contract, as had been true under the Clinton Memorandum. *See id.* at 18,717. The D.C. Circuit upheld this order as a valid exercise of the President's Article II authority and determined that it was not preempted by the National Labor Relations Act ("NLRA"). *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002).

President Obama revoked the 2001 Bush Order, as amended, and replaced it with

---

[4] President George W. Bush later amended the order to exempt existing projects that already had awarded at least one contract and had either required or prohibited the use of PLAs as a condition of that contract. Exec. Order No. 13,208, Amendment to Executive Order 13202, Preservation of Open Competition and Government Neutrality Towards Government Contractors' Labor Relations on Federal and Federally Funded Construction Projects, 66 Fed. Reg. 18,717 (Apr. 6, 2001).

a new executive order "encourag[ing] executive agencies to consider requiring the use of [PLAs] in connection with large-scale construction projects." Exec. Order No. 13,502, Use of Project Labor Agreements for Federal Construction Projects, 74 Fed. Reg. 6985 (Feb. 6, 2009) ("Obama Order"). The Obama Order defined "large-scale construction projects" as those with a total cost to the government of at least $25 million. *Id.* It also required PLAs to contain the same essential terms as the Clinton Memorandum required. *Id.* at 6986. President Trump left the Obama Order in place during his presidency.

III.    The PLA Order, PLA Rule, And OMB Memo

In 2022, President Biden revoked the Obama Order and replaced it with the EO challenged here. AR0754-57. Like his predecessors, President Biden based his action on "the Constitution and the laws of the United States . . . , including [FPASA]." AR0754 (EO); *see* Obama Order, 74 Fed. Reg. at 6985; 1992 Bush Order, 57 Fed. Reg. at 48,713. The EO establishes a rebuttable "[p]resumption" that federal agencies should require the use of PLAs in connection with large-scale construction projects. AR0755 (EO). It defines "large-scale construction projects" as those with a total estimated cost of construction of at least $35 million. AR0754 (EO). When required, the PLA must contain the essential terms required by the Clinton Memorandum and Obama Order. AR0755 (EO). Otherwise, the EO leaves the details of PLAs to private negotiation. *See, e.g.*, AR0756 (EO) (EO "does not require contractors or subcontractors to enter into a project labor agreement with any particular labor organization"); AR0012 (PLA Rule) ("Non-union contractors are free to negotiate provisions in PLAs to accommodate existing fringe benefits"); *id.* ("Contractors can negotiate PLAs that include flexibility in how work is assigned."); AR0016 (PLA Rule) ("Non-union contractors may negotiate with the union that is party to

5

the PLA to use their own apprenticeship programs during the project.").

This presumption can be rebutted if a senior agency official determines that a PLA "would not advance the Federal Government's interests in achieving economy and efficiency in Federal procurement"; "would substantially reduce the number of potential bidders so as to frustrate full and open competition"; or would otherwise be inconsistent with law. AR0755 (EO). A determination that requiring a PLA would not advance economy and efficiency must be based on one of the following factors: the project "is of short duration and lacks operational complexity"; "will involve only one craft or trade"; "will involve specialized construction work that is available from only a limited number of contractors or subcontractors"; or addresses an agency need "of such an unusual and compelling urgency that a project labor agreement would be impracticable." *Id.*

At President Biden's direction, the agencies that comprise the Federal Acquisition Regulatory Council ("FAR Council")—the General Services Administration ("GSA"), the Department of Defense ("DoD"), and the National Aeronautics and Space Administration ("NASA")—proposed amendments to the Federal Acquisition Regulation ("FAR") to implement the EO. AR0001-09 (Proposed Rule). The FAR Council agencies promulgated a final rule amending the FAR that was published on December 22, 2023. AR0010-31 (PLA Rule). The EO also directed OMB to "issue guidance" to agencies on implementation of the exceptions to the PLA requirement. AR0756 (EO). OMB issued a memorandum providing this guidance contemporaneous with the PLA Rule. The memorandum provides non-binding advice to agencies as to how to conduct the market research necessary to consider the exceptions and document their decision-making, as well as guidance on how to report exceptions to OMB as required by the EO.

Plaintiffs filed this lawsuit on March 28, 2024, ECF No. 1, and moved for a preliminary injunction on April 26, 2024, ECF No. 18. That motion remains pending. Defendants answered the complaint on July 15, 2024. ECF No. 36.

## ARGUMENT

Summary judgment is proper if a movant "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants are entitled to summary judgment on all Plaintiffs' claims.

I.    The PLA Order, PLA Rule And OMB Memo Are Not *Ultra Vires* (Count I)

A.    FPASA Authorizes The President To Promulgate Directives That Increase Economy And Efficiency In Federal Contracting, And Article II Empowers The President To Superintend The Executive Branch's Proprietary Functions

FPASA authorizes the President to "prescribe policies and directives that the President considers necessary to carry out this subtitle," provided such policies and directives are "consistent with this subtitle." 40 U.S.C. § 121(a). "This subtitle"—defined to include Subtitle I of Title 40 and most provisions of Division C of Subtitle I of Title 41, *see id.* § 111—encompasses the federal government's authorities for procurement and management of federal property. And it includes a provision defining "[t]he purpose" of the relevant subtitle to be "provid[ing] the Federal Government with an economical and efficient system for . . . [p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting." *Id.* § 101(1).

Thus, by its plain text, FPASA vests the President with broad authority to set the federal government's policies with respect to its own procurement decisions. Congress authorized the President to issue directives that he "*considers* necessary to carry out" the contracting and property-management functions covered by the provisions of "this subtitle," as long as the directives are "consistent with" those provisions, including the

7

purposes of economy and efficiency set forth in Section 101. *Id.* §§ 101, 121(a) (emphasis added); *cf. Texas v. EPA*, 983 F.3d 826, 837 (5th Cir. 2020) (explaining that, where a statute provided that the EPA "'may' make changes that it '*deems* necessary,'" it was "clear that Congress ha[d] delegated discretionary authority to EPA to determine when adjustments should be made" (emphasis added)). In this context, the word "'necessary' does not mean strictly needed but instead means only that the [policy or directive] is appropriate and helpful." *CSX Corp. v. United States*, 18 F.4th 672, 679 (11th Cir. 2021)[5] (citing, *inter alia*, *Black's Law Dictionary*). And "'[e]conomy' and 'efficiency' are not narrow terms"; "they encompass those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions." *Bradford v. DOL*, 101 F.4th 707 (10th Cir. 2024), *petition for cert. docketed*, No. 24-232 (U.S. Aug. 30, 2024).

Courts accordingly have long recognized that Section 121(a) confers on the President "particularly direct and broad-ranging authority over those larger administrative and management issues that involve the Government as a whole." *AFL-CIO v. Kahn*, 618 F.2d 784, 789 (D.C. Cir. 1979).; *see also Mayes v. Biden*, 67 F.4th 921, 941 (9th Cir. 2023) ("The broad language of [FPASA] purposefully gives the President both necessary flexibility and broad-ranging authority in setting procurement policies."), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023). Courts therefore "have generally landed on a 'lenient' standard" for determining whether a given executive order constitutes a valid exercise of the President's authority under the Act. *Louisiana v. Biden*, 55 F.4th 1017, 1026 (5th Cir. 2022) (quoting *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 367 (D.C. Cir.

---

[5] Internal quotation marks, citations, brackets, and ellipses have been omitted from quotations throughout this brief, except where otherwise indicated.

2003)). Under that standard, an executive order is valid if it bears "a sufficiently close nexus" to the statutory objectives "of 'economy' and 'efficiency.'" *Kahn*, 618 F.2d at 792.

Applying this standard, courts have upheld FPASA directives that have imposed wide-ranging requirements on federal agencies in deciding with which contractors to do business. In *Kahn*, for example, the en banc D.C. Circuit upheld an executive order of President Carter directing agencies "to require that all contractors certify . . . compliance with" recent "wage and price standards" created to reduce inflation. 618 F.2d at 785-86. The court noted that the order could cause contracts to be "diverted from low bidders who [were] not in compliance with the wage and price standards to higher bidders" who were in compliance, potentially causing "an unwarranted drain on the public fisc." *Id.* at 792; *see Chao*, 325 F.3d at 367 (observing that, "in the short run," the order at issue in *Kahn* would "plainly" have "increase[d] procurement costs"). But the D.C. Circuit deferred to the President's judgment that "if the voluntary restraint program [were] effective in slowing inflation in the economy as a whole," the government would "face lower costs in the future than it would have otherwise," and that those lower costs would "more than offset" any short-run "higher costs." *Kahn*, 618 F.2d at 793.

Courts have also upheld FPASA directives requiring federal agencies to contract only with employers that: post notices of certain labor rights, including the rights not to join a union or to pay certain union dues, *Chao*, 325 F.3d at 366; electronically verify that new employees are authorized to work in the United States, *Chamber of Com. v.*

*Napolitano*, 648 F. Supp. 2d 726, 738 (D. Md. 2009); and pay their employees a specified minimum wage, *Bradford*, 101 F.4th at 713-14,[6] among other policies.

In sum, both the Executive Branch and the courts have long interpreted FPASA to grant the President broad and flexible authority to determine what contracting practices are necessary, consistent with the purposes of economy and efficiency set forth in Section 101. Moreover, Presidents have exercised FPASA authority to set federal procurement policy with respect to PLAs, in particular, for more than thirty years. *See supra* pp.3-5. When, as here, "the President's view of his own authority under a statute . . . has been acted upon over a substantial period of time without eliciting congressional reversal, it is entitled to great respect" and "should be followed unless there are compelling indications that it is wrong." *Kahn*, 618 F.2d at 790; *see also Biden v. Missouri*, 595 U.S. 87, 94 (2022) (relying in part on "longstanding practice" to determine the scope of statutory authority).

Moreover, Congress has implicitly ratified the same understanding of the President's authority under FPASA. Congress "is presumed to be aware of an administrative or judicial interpretation of a statute *and to adopt that interpretation* when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) (emphasis added). And Congress did exactly that when, in 2002, it recodified both FPASA's statement of purpose and its operative provision (now Section 121) against the backdrop of decisions construing FPASA broadly, including *Kahn*; *Farmer v. Philadelphia Elec. Co.*, 329 F.2d 3 (3d Cir. 1964); *Farkas v. Tex. Instrument, Inc.*, 375 F.2d 629 (5th Cir. 1967); *Contractors Ass'n of E. Pa. v. Sec. of Labor*, 442 F.2d 159, 163 (1971); *United*

---

[6] Challenges to the order at issue in *Bradford* are also before the Fifth and Ninth Circuits. *See Texas v. Biden*, No. 23-40671 (5th Cir.); *Nebraska v. Walsh*, No. 23-15179 (9th Cir.).

*States v. New Orleans Pub. Service, Inc.*, 553 F.2d 459 (5th Cir. 1977); and *United States v. Miss. Power & Light Co.*, 638 F.2d 899 (5th Cir. Unit A 1981). *See* Pub. L. No. 107-217, 116 Stat. 1062, 1063 (2002) (recodifying statement of purpose at 40 U.S.C. § 101); *id.* at 1068 (recodifying grant of authority at 40 U.S.C. § 121(a)); *id.* at 1303 ("[T]his Act makes no substantive change in existing law . . . .").

Article II of the Constitution also vests the President with "'general administrative control of those executing the laws' throughout the Executive Branch of government, of which he is the head." *Allbaugh*, 295 F.3d at 32 (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)). That is, the Constitution empowers the President to superintend the internal operations of the Executive Branch—the Executive's proprietary functions, including contracting—within parameters set by Congress, including through FPASA.

B.  FPASA And Article II Of The Constitution Authorize The PLA Order And Rule

The PLA Order and Rule fall well within the scope of the President's FPASA authority. The Order and Rule cite ample empirical support for President Biden's determination that this directive will advance the federal government's interest when contracting, consistent with the purposes of economy and efficiency. In the PLA Order, the President explained that problems particular to large-scale construction projects "threaten the efficient and timely completion of construction projects undertaken by Federal contractors." AR0754 (EO). For example, "[c]onstruction employers typically do not have a permanent workforce, which makes it difficult to predict labor costs when bidding on contracts and to ensure a steady supply of labor on contracts being performed." *Id.* Additionally, "construction projects typically involve multiple employers at a single location." *Id.* Therefore, "a labor dispute involving one employer can delay the

11

entire project," and "[a] lack of coordination among various employers, or uncertainty about the terms and conditions of employment of various groups of workers, can create friction and disputes in the absence of an agreed-upon resolution mechanism." *Id.* PLAs "are often effective in preventing these problems from developing because they provide structure and stability to large-scale construction projects." *Id.* In particular, PLAs "avoid labor-related disruptions on projects by using dispute-resolution processes to resolve worksite disputes and by prohibiting work stoppages, including strikes and lockouts." *Id.* In light of these advantages, President Biden directed "agencies to use [PLAs] in connection with large-scale construction projects to promote economy and efficiency in Federal procurement," except where an exception applies—*e.g.*, where project-specific factors dictate that requiring a PLA "would not advance the Federal Government's interests in achieving economy and efficiency in Federal procurement." AR0754-55 (EO).

The preamble to the PLA Rule cites evidence further supporting the reasonableness of the President's judgment. In particular, PLAs create efficiencies by standardizing "start times, break times, rules governing overtime, holidays, and dispute resolution[] procedures" across all workers on the project, without regard to their employer or union status, including by superseding any separate collective-bargaining agreements that would otherwise bind employers on the project. AR0013 (PLA Rule). For example, a 2011 study by the Department of Labor ("DOL") found that a PLA used by the New York City School Construction Authority "to rehabilitate and renovate city schools saved $221 million" over the course of the project "by standardizing construction workers' shifts." *Id.* Additionally, because the same PLA contained no-strike and no-lockout clauses—which the Rule at issue here also requires, FAR 52.222-34(c)(3)—"construction on the projects

12

covered by [the] PLA continued uninterrupted" even as "a strike by a trade union resulted in a shutdown of numerous large construction projects across the City and substantial delay and related costs to parties involved." AR0013-14 (PLA Rule). The Rule also cites a study of school construction projects in San Diego, which "found that 'project delays [we]re considerably lower' on projects covered by a PLA." AR0014 (PLA Rule).

PLAs also help prevent skilled labor shortages by providing "higher compensation for craft positions" across the entire project and access to union hiring halls, ensuring a steady supply of skilled labor for the duration of the project. AR0013 (PLA Rule). Once again, the DOL study cited in the Rule found that "there were 'no instances of shortages in skilled labor on any of the' [New York City] schools' projects" while the PLA was in effect, "although such shortages occurred regularly elsewhere in the city during this same period." *Id.* Accordingly, "[u]se of PLAs is expected to help the Government efficiently complete projects in a tight construction labor market." AR0015 (PLA Rule).

This analysis is consistent with the Supreme Court's recognition that PLAs address "conditions specific to [the construction] industry," including the "need for . . . a steady supply of skilled labor." *Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.* ("*Boston Harbor*"), 507 U.S. 218, 231 (1993). It likewise accords with considerations that motivated Congress to authorize the use of PLAs under the NLRA. In particular, Congress recognized that pre-hire agreements address unique circumstances in the construction industry, including short-term employment, the employer's need to know labor costs in advance of a project before making an accurate bid, and the employer's need for a steady supply of labor for referral. *See* H.R. Rep. No. 86–741 at 19 (1959); *reprinted in* 1959 U.S.C.C.A.N., 2318, 2442.

13

Moreover, and as noted, the PLA Order and Rule expressly account for the possibility that, notwithstanding the general economy and efficiency advantages of a presumption in favor of a PLA requirement, economy and efficiency may be better served in the context of certain projects by declining to impose such a requirement. Accordingly, the presumption established in the Order is rebuttable, including where requiring a PLA "would not advance the Federal Government's interests in achieving economy and efficiency in Federal procurement." AR0755 (EO); FAR 22.504(d). This exception authority further supports the reasonableness of President Biden's determination that the Order will promote economy and efficiency overall.

The PLA Order also is valid as an exercise of the President's Article II authority, for reasons the D.C. Circuit has explained. *See Allbaugh* 295 F.3d at 32 (upholding the 2001 Bush Order, *see supra* p.4, as a valid exercise of the President's Article II power). While the President's constitutional authority over procurement "is not without limits," the 2001 Bush Order passed muster because it applied only "'[t]o the extent permitted by law,'" *Allbaugh* 295 F.3d at 32-33, and it did not require any agency to transgress statutory constraints on its authority, *id.* at 33. In similar fashion, the PLA Order at issue here excepts from its requirements any project where using a PLA would, in the opinion of a senior agency official, "be inconsistent with statutes, regulations, Executive Orders, or Presidential Memoranda." AR0755 (EO). This case thus involves only presidential guidance of agencies in the exercise of their own undisputed proprietary authority. Such guidance, as explained in *Allbaugh*, is lawful.

C.  Judge Grant's Lone Opinion In *Georgia* Does Not Support A Contrary Result

This Court need not and should not depart from the plain text of FPASA, as

14

consistently understood for decades by all three branches of government, to adopt the cramped view of the statute expressed by Judge Grant in her lone opinion in *Georgia v. President of the United States*, 46 F.4th 1283 (11th Cir. 2022). The Eleventh Circuit has explained that an opinion is "not precedential" when it is not joined by any other judge on the panel, even when it is styled as the "lead opinion" because it announces the court's bottom-line holding. *Robertson v. Riverstone Cmtys., LLC*, 849 F. App'x 795, 801 n.4 (11th Cir. 2021) ("[T]he *Wright* definition is not precedential. The two other judges on the panel concurred in judgment only; they did not join the lead opinion's articulation of the direct-evidence standard."); *see also United States v. Hurtado*, 89 F.4th 881, 885 (11th Cir. 2023) (similar). In *Georgia*, the part of Judge Grant's opinion addressing the scope of FPASA authority spoke only for Judge Grant, not for the court. Another member of the panel concurred only "in the result Judge Grant reache[d]," *Georgia*, 46 F.4th at 1308 (opinion of Edmondson, J.), without joining any of her reasoning. And the third member of the panel concurred only in Part V of the opinion—which is not relevant here—while otherwise dissenting, *see id.* (opinion of Anderson, J.). This Court thus is not required to apply Judge Grant's idiosyncratic view of FPASA. The Court similarly is not bound by the Sixth Circuit's decisions in *Kentucky v. Biden*, 23 F.4th 585, 606 (6th Cir. 2022), and *Kentucky v. Biden*, 57 F.4th 545, 552 (6th Cir. 2023).

Judge Grant was mistaken to reject the longstanding consensus understanding of FPASA and to conclude instead that the President is limited to directing his subordinates in carrying out specific provisions of FPASA, for at least four reasons. *First*, Judge Grant misunderstood the relationship between FPASA's operative provision, 40 U.S.C. § 121(a), and its statement of purpose, *id.* § 101. *See Georgia*, 46 F.4th at 1298 (opinion

of Grant, J.). A statute's statement of purpose does not confer authority, and the government has not argued otherwise. Rather, the President's authority is derived from FPASA's operative provision, Section 121(a), which empowers the President to "prescribe policies and directives that the President considers necessary to carry out this subtitle," provided they are "consistent with this subtitle." The statement of purpose in Section 101 gives content to that limitation, by establishing "a set of guidelines within which . . . policies" authorized by Section 121(a) "must reside." *Louisiana*, 55 F.4th at 1023 n.17; *accord Mayes*, 67 F.4th at 942.

*Second*, and relatedly, if Section 121(a) empowered the President only to direct subordinates in carrying out specific provisions of the statute, Congress would not have needed to specify that directives pursuant to Section 121(a) must be "consistent with" the statute. A directive that carries out a statute's provisions is necessarily consistent with the statute. Judge Grant's understanding of FPASA thus violates the canon against surplusage, which requires courts "to give effect, if possible, to every word Congress used" in a statute. *Hoever v. Marks*, 993 F.3d 1353, 1363 (11th Cir. 2021).

*Third*, a footnote in the Supreme Court's opinion in *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979), cannot bear the weight that Judge Grant assigned to it. *See Georgia*, 46 F.4th at 1294-95, 1300 (opinion of Grant, J.) (discussing *Chrysler*, 441 U.S. at 304 n.34). The question in *Chrysler* was whether the mandatory disclosure regulation at issue was "authorized by law" such that it did not violate the Trade Secrets Act. 441 U.S. at 285, 295. The Supreme Court held that it was "not necessary to decide whether" the executive order was authorized by FPASA or other statutes and observed in a footnote that lower court cases had addressed this question only in dicta. *Id.* at 304 n.34. Thus, the *Chrysler*

16

footnote's "specific reference" language was itself "dicta" and cannot be read as "a narrowing instruction for interpretation of" FPASA. *Louisiana*, 55 F.4th at 1025-26 & n.24.

*Fourth*, Judge Grant relied heavily on her understanding of the concerns that motivated Congress when it enacted FPASA in 1949, in response to administrative inefficiency in procurement during World War II. *See Georgia*, 46 F.4th at 1293-94 (opinion of Grant, J.). But "we are governed" by "the provisions of our laws rather than the principal concerns of our legislators." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 167 (2004). Thus, "extratextual sources," such as historical evidence of the purposes for which Congress enacted a statute, can only "help clear up[,] not create[,] ambiguity." *McGirt v. Oklahoma*, 591 U.S. 894, 916 (2020).

In any event, the PLA Order and Rule pass muster even under Judge Grant's understanding of FPASA. They direct agencies in carrying out several specific provisions of FPASA, including 41 U.S.C. §§ 3101(a) (requiring agencies to "make purchases and contracts for property and services in accordance with" FPASA); 3703(c) (requiring agencies to award contracts "to the responsible source whose proposal is most advantageous to the Federal Government, considering" the "cost or price" of the contract "and the other factors included in the solicitation"); and 3306(a)(1)(A) (authorizing agencies to "specify [their] needs"). As noted above, Plaintiffs do not appear to dispute that agencies themselves may require PLAs on their construction projects, but only the President's authority to direct agencies in their exercise of that authority. *See supra* p.1 & n.2. Agencies' own undisputed PLA authority distinguishes this case from *Georgia*, where the plaintiffs disputed that agencies had independent authority to adopt a COVID-19 vaccination requirement for contractors. *Cf.* 46 F.4th at 1295 (opinion of Grant, J.)

(identifying as the relevant question "whether Executive Order 14042 directs subordinates to carry out *their own lawful statutory authority*, or whether the Order instead exceeds the limitations imposed by [FPASA's] text" (emphasis added)).

    D.  <u>The Major Questions Doctrine Does Not Support A Contrary Result</u>

To the extent Plaintiffs invoke the major questions doctrine, it also does not call for a contrary result. That interpretive canon concerns itself with agency actions that "would bring about an enormous and transformative expansion in [the agency's] regulatory authority without clear congressional authorization," *i.e.*, "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). It does not apply here for at least five reasons.

*First*, a FPASA directive is an exercise of "proprietary authority," *Mayes*, 67 F.4th at 935, as opposed to "an exercise of regulatory authority," *id.*, or of some other power of "the administrative state," *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023). It binds only federal agencies in their exercise of contracting authority, identifying the conditions under which they may enter into contracts. *See, e.g.*, *Bradford*, 101 F.4th at 726 (rejecting major questions challenge to minimum-wage provision for federal contractors in part because it was an exercise of "the government's proprietary authority"); *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940) ("Like private individuals and businesses, the Government enjoys the unrestricted power . . . to determine those with whom it will deal . . . ."). *Second*, as noted above, *see supra* pp.3-5, Presidents have set the government's policy with respect to the use of PLAs on federal construction projects for over three decades, and the actions challenged here are thus not novel. *Third*, the expected impact of the PLA

Rule is between $8.87 million and $53.54 million annually, AR0027 (PLA Rule)—orders of magnitude less than the economic effects at issue in cases that have triggered application of the major questions doctrine.[7] *Fourth*, a requirement to use a PLA on a federal construction project is limited in scope; it does not impose any requirements on employees of covered contractors and subcontractors beyond the context of the specific federal construction project that a PLA governs. *Cf. Georgia*, 46 F.4th at 1296 (opinion of Grant, J.) (observing that "[a]n all-encompassing vaccine requirement is different in nature than the sort of *project-specific restrictions* contemplated by [FPASA]" (emphasis added)). *Fifth*, FPASA expressly vests the President with "flexibility" to determine federal procurement policy as the President considers necessary. *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2263 (2024); *see supra* pp.7-8.

## II.    The PLA Order and PLA Rule Comply With CICA (Count II)

The PLA Order and PLA Rule also comply with the government's obligations under CICA, which generally requires agencies to use competitive procedures in conducting procurement, *see* 41 U.S.C. § 3301. CICA empowers agencies to "specify [their] needs" and to "include restrictive provisions or conditions" when necessary to satisfy those needs. *Id.* § 3306(a)(1)(a), (a)(2)(B). These provisions vest agencies with "broad discretion to determine [their] own needs," *FMS Inv. Corp. v. United States*, 144 Fed. Cl. 140, 144 (2019) (citing *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286

---

[7] *See, e.g.*, *Nebraska*, 143 S. Ct. at 2368 (action in question "cancel[ed] $430 billion of student loan principal"); *West Virginia v. EPA*, 597 U.S. 697, 715 (2022) (Energy Information Administration projected that the Clean Power Plan "would reduce GDP by at least a trillion 2009 dollars by 2040"); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam) ("$50 billion" was "a reasonable proxy of the . . . economic impact" of the eviction moratorium at issue).

(Fed. Cir. 2010)), and they allow for the President to direct agencies as to what specifications they should consider to be needs, *see Helmsman Props., Inc.*, B-278965, 1998 WL 35999068 (Comp. Gen. Apr. 20, 1998). In *Helmsman*, the Comptroller General concluded that a FPASA directive requiring agencies to prioritize central business areas ("CBAs") to meet federal real estate needs in cities was consistent with CICA because the directive "provide[d] a reasonable basis to limit competition for space acquisitions to an urban area's CBA"—namely, "to encourage economic growth in 'major' central cities." *Id.* "Stated another way, based on the Executive Order, an agency properly may define its needs for a particular space acquisition as including a location within an urban area CBA." *Id.* Likewise, here, CICA permits an agency to define its needs for a construction project, based on the PLA Order and Rule, to require the use of a PLA.

III. **The PLA Rule And OMB Memo Do Not Violate The APA, The OFPP Act, The RFA, Or The SBA (Counts III, VI)**

A. **The PLA Rule And OMB Memo Are Not Reviewable Under The APA**

The EO is not reviewable under the Administrative Procedure Act ("APA") because the President is not an "agency." 5 U.S.C. § 704; *Dalton v. Specter*, 511 U.S. 462, 470 (1994); *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). Plaintiffs instead seek to subject the PLA Rule and OMB Memo to APA review. Compl. ¶¶ 91-97. Rules and guidance are not reviewable under the APA's arbitrary and capricious standard to the extent they adopt choices made by the President in the exercise of his own authority. *See, e.g.*, *Feds for Med. Freedom v. Biden*, 581 F. Supp. 3d 826, 835 (S.D. Tex. 2022) (President's determination "not reviewable under the APA," and applying APA standards to the determination as implemented by an agency would be improper), *aff'd*, 63 F.4th 366 (5th Cir. 2003) (en banc), *vacated on other grounds*, 144 S. Ct. 480 (2023); *Tulare*

*Cnty. v. Bush*, 185 F. Supp. 2d 18, 28-29 (D.D.C. 2001) (APA review not available when agency "merely carr[ies] out" President's directives), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002).

The OMB Memo is also unreviewable because it is not a "final agency action" as required by Section 704 of the APA. A final agency action is one from "which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Because the OMB Memo does not represent the "consummat[ion]" of any agency's decision-making process, and does not determine whether or not a particular project will be exempted from a PLA, it is unreviewable. *In re MDL-1824 Tri-State Water Rights Litig.*, 644 F.3d 1160, 1181-85 (11th Cir. 2011).

B.   The PLA Rule and OMB Memo Are Not Arbitrary And Capricious (Count III)

Arbitrary and capricious review under Section 706(2)(A) of the APA is "exceedingly deferential"; the Court's role is to "ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the . . . agency's decision." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008). As explained above, APA review of the implementation of the EO is highly circumscribed. But even if that were not the case, the PLA Rule and OMB Memo meet Section 706(2)(A)'s minimal standard of rationality. The PLA Rule explains how PLAs can help mitigate labor shortages, simplify the administration of large-scale construction projects, and prevent costly delays due to strikes and walkouts. AR0013. The PLA Rule cites evidence that projects governed by a PLA still enjoy high participation rates from open-shop labor, and that PLAs have had little observable impact on the number of bids on a particular project. AR0014 (on the project at issue in *Boston Harbor*, just under 40% of subcontractors were non-union). The academic literature relied upon in the PLA Rule also dispels fears that PLAs will necessarily reduce competitive bids for projects or increase costs, concerns

21

that are alleviated by the limited scope of the PLA Rule and the various exceptions to the presumption in favor of PLAs.[8] Because OMB and the FAR Council agencies reached a "rational conclusion" about the use of PLAs in large scale construction projects (to the extent they were doing anything other than implementing the President's judgment), summary judgment on Count III is warranted should the Court reach this issue.

      C.      <u>The PLA Rule And OMB Rule Do Not Violate The OFPP Act (Count III)</u>

Plaintiffs also contend that the OMB Memo violates the Office of Federal Procurement Policy ("OFPP") Act. Compl. ¶ 96. The OFPP Act requires that any "procurement policy, regulation, procedure, or form . . . may not take effect until 60 days after it is published for public comment in the Federal Register." 41 U.S.C. § 1707(a)(1). The OMB Memo provides guidance as to how agencies should conduct market research in accordance with the FAR, as well as technical assistance to agencies seeking to apply the exceptions found in the PLA Rule (which was subjected to notice and comment as required by the OFPP Act). On its own, the document lacks legal force. Because it is "nonbinding guidance that does not rise to the level of a procurement policy, regulation, procedure, or form," the OMB Memo did not trigger the OFPP Act's notice requirement. *Kentucky v. Biden*, 571 F. Supp. 3d 715, 731 (E.D. Ky. 2021) (quoting Section 1707(a)).

      D.      <u>Defendants Complied With The Small Business Act and the Regulatory Flexibility Act (Count VI)</u>

Plaintiffs allege Defendants violated the APA because they did not account for

---

[8] *See* AR0659 (Emma Waitzman & Peter Philips, *Project Labor Agreements and Bidding Outcomes* (2017)) (no statistically significant difference in number of bidders on PLA projects as compared to non-PLA projects); AR0641 (Dale Belman et al., *Project Labor Agreements' Effect on School Construction Costs in Massachusetts*, 49 INDUS. RELS. 44, 45 (2010)) ("it is not possible to estimate the effect of PLAs *holding all else equal*" because "more complex and expensive projects are more likely to use PLAs").

purported concerns about harm to small businesses, in violation of the Regulatory Flexibility Act ("RFA") and the Small Business Act ("SBA"). Compl. ¶¶ 109-20. However, the agencies of the FAR Council did conduct such an analysis, as required by law. AR0027-28. The agencies of the FAR Council were not required to come to a particular conclusion in their analysis, but merely to "demonstrat[e] a 'reasonable, good-faith effort to carry out [RFA's] mandate.'" *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001) (quoting *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 625 (5th Cir. 2000)). Because the PLA Rule explains why "there are no alternatives available that would reduce the impact on or exempt small entities," the RFA and SBA have been satisfied. AR0027.

IV.    The PLA Order And PLA Rule Do Not Violate The First Amendment (Count IV)

Plaintiffs next allege that the "PLA Rule infringes on Plaintiffs' freedom of association by requiring [their] members to associate with unions as a prerequisite to bidding on and/or performing contracts that the PLA Rule covers," in violation of the First Amendment. Compl. ¶ 103. They rely primarily upon *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 585 U.S. 878 (2018). In *Janus*, the Supreme Court held that mandatory payments imposed on state employees who were not a part of a union in order to support the union's collective bargaining activities were a form of "compelled subsidization of private speech," 585 U.S. at 894, and therefore unconstitutional.

This case is distinguishable from *Janus* because, unlike the compelled subsidy at issue there, the requirement to enter a PLA is not expressive activity protected by the First Amendment. While a PLA requirement in a bid specification may "require[] contractors to agree to a contract provision they would otherwise not include," it "does not require them to publicly endorse or disseminate a message" about PLAs. *Ark. Times LP*

*v. Waldrip*, 37 F.4th 1386, 1394 (8th Cir. 2022) (upholding requirement that contractors certify they will not boycott Israel while under contract); *cf. Rust v. Sullivan*, 500 U.S. 173, 193 (1991) (a "decision not to subsidize the exercise of a fundamental right does not infringe the right"). Absent some accompanying speech by contractors that the EO does not require, entering a PLA does not communicate anything to outsiders about the beliefs or values of the entity entering the contract. Thus, the challenged requirements have no "effect . . . on [the] associational rights" of Plaintiffs and their members. *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 70 (2006) (upholding Solomon Amendment, which required academic institutions to accept military recruiters on campus as a condition of receiving federal funding).

A district court correctly applied this framework to PLAs in *Christian Labor Ass'n v. City of Duluth*, No. 21-227, 2023 WL 3996240 (D. Minn. June 14, 2023), *appeal filed*, No. 23-2450 (8th Cir. June 16, 2023). In that case, plaintiffs challenged a PLA that required them to "participat[e] in the Building Trades affiliated unions' job referral systems" on First Amendment grounds because it "implicate[d] nonmembers' freedom not to associate with a union and amounts to compelled speech." *Id.* at *9. The district court, applying *Rumsfeld*, held that these provisions did not violate the First Amendment because "nothing in the PLAs prevents any employee from stating disapproval of the unions or the PLAs, or . . . opposition to collective bargaining[.]" *Id.* at *11. Similarly, requiring contractors to enter a PLA as a condition of government contracting does not diminish their ability to speak out against PLAs or associate with others who oppose them.

V.   The PLA Order, PLA Rule, and OMB Memo Do Not Violate The NLRA (Count V)

Plaintiffs allege that the challenged directives violate Section 8(d) of the NLRA,

which, in their view, "prohibits the federal government from requiring employers to agree to any CBA with a union." Compl. ¶ 107 (citing *H.K. Porter Co. v. NLRB*, 397 U.S. 99, 102-09 (1970)). Government agencies run afoul of Section 8(d) when they use their regulatory authority to impose substantive terms between private employers and unions. *See, e.g.*, *H.K. Porter*, 397 U.S. at 103-04 ("[I]t was never intended that the Government would . . .step in, become a party to the negotiations" between a union and an employer "and impose its own views of a desirable settlement" on them).

But Section 8(d) is not implicated when the government is setting the terms under which it will enter contracts with private parties. The Supreme Court has affirmed that the NLRA does not preempt the authority of governments to require PLAs. *Boston Harbor*, 507 U.S. at 232-33. Because the PLA Rule is an exercise of contracting authority and "[t]he [g]overnment does not participate nor is it a signatory to the PLA," there is no section 8(d) issue. AR0025 (PLA Rule). And even if Section 8(d) were applicable, the EO does not "impose its own views of a desirable settlement" between the parties. In *HK Porter*, the NLRB forced an employer to allow union dues be periodically deducted from employee wages. 397 U.S. at 100-01. That is not the government's role when it imposes a contract requirement. Rather, the PLA Rule explains what issues a PLA should address, and leaves the substantive terms of the PLA to the negotiation of private parties. *Cf. Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 754-55 (1985) (NLRA does not preempt minimum standards that may affect contract terms).

## <u>CONCLUSION</u>

Accordingly, the Court should grant Defendants' motion for summary judgment.

25

Dated: September 9, 2024                    Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            *Principal Deputy Assistant Attorney General*

                                            LESLEY FARBY
                                            *Assistant Branch Director, Federal Programs
                                            Branch*

                                            */s/ Taisa M. Goodnature*
                                            MICHAEL J. GERARDI (D.C. Bar No. 1017949)
                                            *Senior Trial Counsel*
                                            TAISA M. GOODNATURE (N.Y. Bar No.
                                            5859137)
                                            *Trial Attorney*
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street, NW
                                            Washington D.C. 20005
                                            (202) 514-3786
                                            Taisa.M.Goodnature@usdoj.gov

                                            *Attorneys for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 9th day of September, 2024, I electronically

filed the foregoing with the Clerk of the Court by using the ECF system, which will send

a notice electronically to all registered users of ECF.

<u>*/s/ Taisa M. Goodnature*</u>

Taisa M. Goodnature
Trial Attorney