**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | |
|---|---|
| ASSOCIATED BUILDERS AND CONTRACTORS FLORIDA FIRST COAST CHAPTER, AND ASSOCIATED BUILDERS AND CONTRACTORS, <br><br> Plaintiffs <br> v. <br><br> WILLIAM F. CLARK, DIRECTOR, OFFICE OF GOVERNMENT-WIDE ACQUISITION POLICY, OFFICE OF ACQUISITION POLICY, OFFICE OF GOVERNMENT-WIDE POLICY, GENERAL SERVICES ADMINISTRATION, *et al.* <br><br> Defendants. | **Case No. 24-cv-318-WWB-MCR** |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Associated Builders and Contractors Florida First Coast Chapter ("ABCFFC") and Associated Builders and Contractors ("ABC") (collectively "Plaintiffs"), by and through undersigned counsel, oppose the Motion for Summary Judgment filed by the Federal Acquisition Regulatory ("FAR") Council and Office of Management and Budget ("OMB") (collectively "Defendants").[1]

Contrary to Defendants' Motion, the PLA Mandate violates the Federal Property and Administrative Services Act ("FPASA"), 40 U.S.C. § 121, *et seq.*, Competition in Contracting Act ("CICA"), 41 U.S.C. § 3301, National Labor Relations Act ("NLRA"), 29

---

[1] Plaintiffs object to Defendants' filing a 36-page motion exceeding the page limits of Local Rule 3.01 ("no longer than twenty-five pages inclusive of all parts"), in violation of this Court's order denying the joint motion to extend the page limits (ECF 39).

U.S.C. § 158(d), First Amendment, Office of Federal Procurement Policy ("OFPP") Act, 41 U.S.C § 1301, *et seq*., Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, Regulatory Flexibility Act ("RFA"), as amended by the Small Business Regulatory Enforcement Act ("SBREFA"), 5 U.S.C. § 601, and the Small Business Act ("SBA"), 15 U.S.C. § 644. For these reasons, and as previously argued by Plaintiffs, the PLA Mandate is unlawful and should be set aside. As further explained in this Opposition, summary judgment should certainly not be granted in Defendants' favor.

## I.    RESPONSE TO DEFENDANTS' "BACKGROUND" STATEMENT OF FACTS[2]

Defendants' "Background" statement largely consists of argument and conclusions of law that do not require a response. To the extent such response is required, Plaintiffs do not dispute the first four sentences of the statement of facts in Defendants' Motion describing the PLA Rule. (*See* Def. Mot. 2). Plaintiffs dispute that the Comments from the United Brotherhood of Carpenters and Joiners of America about labor brokers, are in any way material to the present action, in that the PLA Rule never mentions labor brokers. (*See id.*). In response to sentences five through seven, Plaintiffs do not dispute that PLAs have sometimes been used in the past in entirely different circumstances, but PLAs have never before been mandated by the President. Plaintiffs dispute that the quoted comments of the Sheet Metal and Air Conditioning Contractors' National Association, Inc. are in any way material. (*See id.* at 2-3).

Plaintiffs dispute Defendants' eighth sentence, misstates Plaintiffs' position, and contains immaterial information. (*See id.* at 3). Plaintiffs do not dispute sentences nine

---

[2] Defendants' motion does not include a Statement of Undisputed Material Facts as required by FRCP 56. Plaintiffs therefore address below the un-numbered "Background" statement of facts in Defendants' motion.

through twenty-one, which summarize the history of executive orders, except that Defendants wrongly ignore the fact that 99 percent of all large federal contracts covered under President Obama's previous executive order (adhered to by President Trump) were successfully performed without any finding of need for a PLA in the interests of economy and efficiency. (Pl. Mot. at 3). In response to sentence twenty-two, Plaintiffs agree that Executive Order 14,063 establishes a presumption in favor of PLAs, but such a presumption is not lawful as discussed below. (*See* Def. Mot. at 5; Pl. Mot. 4). Regarding Defendants' concluding sentences describing the PLA Rule, Plaintiffs dispute that many non-union contractors will be able to negotiate the terms described in the Rule. (*See* Pl. Mot. 5-6). Plaintiffs deny that any meaningful exceptions from the PLA Rule's mandate are available, as evidenced by the undisputed fact that no such exemptions have been granted since the PLA Rule took effect. (*See* Def. Mot. at 6; Pl. Mot. 4).

## II. ARGUMENT ON THE MERITS

### A. Defendants Are Not Entitled to Summary Judgment Because the EO, PLA Rule, and OMB Memo Exceed the Authority of the Executive Branch Under FPASA

At the outset, Defendants mistakenly rely on *Texas v. EPA*, 983 F.3d 826, 836-37 (5th Cir. 2020), for the assertion that the President can act as he "considers" necessary under FPASA. (Def. Mot. 7-8).[3] As the Eleventh Circuit has held, "[a]n executive order cannot rest merely on the 'policy objectives of [a statute]'" and instead must "be based on

---

[3] *Texas* relied on *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), which the Supreme Court recently overruled. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024). Defendants also contend the word "necessary" does not mean "strictly needed," citing *CSX Corp. v. United States*, 18 F.4th 672, 679 (11th Cir. 2021). But in *CSX*, this Court analyzed the meaning of "necessary" in a completely different statute, the Railroad Retirement Tax Act, 26 U.S.C. § 3231(e)(1)(iii). *See CSX*, 18 F.4th at 679.

a 'specific reference' in FPASA." *Georgia v. Biden*, 46 F.4th 1283, 1298 (11th Cir. 2022). And FPASA contains no specific language permitting a PLA mandate.

Defendants contend courts outside this Circuit have construed FPASA to grant Presidents broad authority (Def. Mot. 8), citing *Bradford*, 101 F.4th at 713-14; *AFL-CIO v. Kahn*, 618 F.2d 784 (D.C. Cir. 1979); *Mayes v. Biden*, 67 F.4th 921 (9th Cir. 2023); *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360 (D.C. Cir. 2003); *Chamber of Commerce v. Napolitano*, 648 F. Supp. 2d 726 (D. Md. 2009); and *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629 (5th Cir. 1967), but Plaintiffs' Motion has already explained why these cases are not controlling.[4] (Def. Mot. 8-10; Pl. Mot. 12-13).

Defendants further argue that Congress ratified a broad understanding of the President's powers under FPASA because it recodified FPASA following *Kahn*, as well as *Farmer v. Philadelphia Elec. Co.*, 329 F.2d 3 (3d Cir. 1964); *Contractors Ass'n of E. Pa. v. Sec. of Labor*, 442 F.2d 159 (1971); *United States v. New Orleans Pub. Serv., Inc.*, 553 F.2d 459 (5th Cir. 1977); *United States v. Miss. Power & Light Co.*, 638 F.2d 899 (5th Cir. 1981); and *Farkas*, 375 F.2d at 632 n.1. But the Eleventh Circuit, citing similar cases, explained in *Georgia* that *Farkas* and *Kahn* did not adopt a similar test, and "in light of these conflicts, no 'judicial consensus' existed when Title 40 was recodified, let alone one 'so broad and unquestioned that we must presume Congress knew of and endorsed it.'" *See Georgia*, 46 F.4th at 1300 n.11; *see also Louisiana*, 55 F.4th at 1025.

Defendants next contend FPASA and Article II somehow authorize the PLA Rule because it will advance the purposes of economy and efficiency, claiming PLAs are

---

[4] Defendants also cite *Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022). But in *Louisiana*, the Court concluded FPASA did not authorize the President's mandate. *See* 55 F.4th at 1031.

necessary to "prevent labor shortages, avoid labor disputes, and standardize work rules." (Def. Mot. 11-13). But the government has not met its burden of proving that any of these concerns have caused actual problems with federal construction contracts in previous decades. (*See* ABC Comments AR 532-33).[5] Nor have the Defendants proved that the PLA Rule prevents, rather than exacerbates, the alleged problems the Rule claims to address.[6] Thus, instead of advancing economy and efficiency, PLAs will discourage competitive bidding and increase costs, and indeed have already had this effect. (Pl. Mot. 4, 6). The Defendants' rulemaking record cites no sources indicating PLAs will reduce costs (*see* AR0012) and the government has not disputed PLAs may cause procurement delays (*see* AR0014) or create "unintended barriers to entry" (OMB Memo at 5).

In the absence of any statutory language authorizing the PLA Rule, and in light of the Defendants' failure to prove that PLAs are in any way needed to improve federal procurement economy and efficiency, it is evident that the PLA is a socioeconomic set-aside and an egregious act of political favoritism, well beyond the authority granted by

---

[5] The absence of any significant procurement problems under the Bush Executive Order prohibiting any federal PLAs from 2001 to 2008, followed by the Obama/Trump years in which PLAs were "encouraged" but nevertheless found to be unnecessary on 99 percent of applicable federal construction contracts, strongly refute the Defendants' unsupported claims. (Pl. Mot. 3).

[6] As noted in ABC's AR comments (AR0516), the PLA Rule plainly exacerbates the labor shortage by effectively excluding 89% of all construction workers from performing federal work. Likewise, the claim that PLAs prevent labor disputes has been repeatedly debunked, as noted in ABC's AR comments. (ABC Comments AR0539-40). Defendants rely on supposed cost savings from eliminating union inefficiencies, ignoring comments in the Administrative Record and Plaintiff's affidavits showing that non-union contractors do not suffer from the same inefficiencies in the first place. (ABC Comments AR0528). Finally, Defendants have failed to engage with the numerous studies showing that PLA increase the costs of construction and cause delays. (ABC Comments AR0532, 0539).

FPASA. The Eleventh Circuit's decision under very similar circumstances in the *Georgia* mandate case plainly should govern the outcome here. Defendants spend several pages arguing against this conclusion, but their arguments are unavailing.

First, Defendants contend *Georgia* should not govern this Court's analysis because Judge Grant's opinion is not precedential, citing *Robertson v. Riverstone Cmtys., LLC*, 849 Fed. App'x 795 (11th Cir. 2021) and *United States v. Hurtado*, 89 F.4th 881 (11th Cir. 2023). (Def. Mot. 14-15). But in *Robertson*, the non-precedential case at issue involved two judges explicitly stating they "concur[red] *only in result*" and "*[did] not join*... [the] opinion." *See Wright v. Southland Corp.*, 187 F.3d 1287, 1306 (11th Cir. 1999). Similarly, in *Hurtado*, the two judges not writing the lead opinion expressed explicit disagreement with two paragraphs of the lead opinion's decision. *See Hurtado*, 89 F.4th at 900-01. In contrast, here, Judge Edmondson did not criticize Judge Grant's opinion or specifically state he concurred only in result: instead, he stated he "easily believe[d] plaintiffs ha[d] a reasonable chance to succeed on the merits;" and the sole issue on the merits before the appeals court was whether FPASA authorized the President's action. *See Georgia*, 46 F.4th at 1289, 1308. Judges Edmondson and Judge Grant further joined to affirm the district court's injunction to that same effect. *See id.* Thus, the Eleventh Circuit's decision constitutes binding precedent in this Circuit.

Defendants further outline purported errors in Judge Grant's analysis of FPASA; but none are persuasive. Defendants contend Judge Grant's holding was incorrect because she did not understand the relationship between the statute's operative provision at 40 U.S.C. § 121(a) and its purpose statement at 40 U.S.C. § 101. (Def. Mot. 15). But Defendants fail to explain what exactly Judge Grant's error was. (*See id.*). Defendants

contend Judge Grant erred in concluding Section 121(a) only allowed the President to carry out specific provisions of FPASA because her analysis did not "give effect" to the language that the President's directives must be "consistent with" FPASA. (*Id.* at 16). Once again, Defendants are incorrect, as Judge Grant did incorporate the terms "consistent with" into her interpretation: "The President must stay within the confines of the Act, of course; but his actions must also be consistent with the policies and directives that Congress included in the statute. Those explicit legislative policies, as we have described, include the rule that agencies must 'obtain full and open competition' through most procurement procedures." *See Georgia*, 46 F.4th at 1294.

Defendants also contend (Def. Mot. 16) Judge Grant relied too heavily on *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979), which noted presidential authority under FPASA must "be based on a 'specific reference' within [FPASA]." *See Georgia*, 46 F.4th at 1294 (quoting *Chrysler*, 441 U.S. at 304 n.34). Defendants argue that the language in *Chrysler Corp.* Judge Grant cited is dicta. (Def. Mot. 16-17).[7] The Eleventh Circuit, however, has recognized "Supreme Court dicta 'is not something to be lightly cast aside.'" *Reynolds v. Behrman Capital IV, L.P.*, 988 F.3d 1314, 1322 (11th Cir. 2021). Defendants further fault Judge Grant for relying on Congress's motivations at the time it enacted FPASA because courts should only use extratextual sources to clear up, not create, ambiguity. (Def. Mot. 17). Defendants, however, fail to explain how Judge Grant created ambiguity; rather, it

---

[7] In *Louisiana*, the Fifth Circuit concluded *Chrysler*'s use of the language "specific reference" should not be read as "a narrowing instruction" for FPASA because neither the rest of the footnote containing the language, nor the *Chrysler* opinion, supported that reading. *See Louisiana*, 55 F.4th at 1026 n.24. But in the footnote containing the "specific reference" language, the Supreme Court pointed to specific language in FPASA that constituted a nexus between FPASA and some executive orders. *See Chrysler*, 441 U.S. at 304 n.34.

makes sense Judge Grant would consult extratextual sources given the lack of Supreme Court precedent analyzing FPASA. *See Louisiana*, 55 F.4th at 1025.

Defendants next contend that even under the Eleventh Circuit's decision in *Georgia*, the PLA Mandate is somehow lawful because it directs agencies to carry out various specific FPASA provisions. (Def. Mot. 17). None of the provisions Defendants cited, however, have anything to do with PLAs. They offer no specific authorization for the President's unprecedented mandate, which abuses the procurement system by in effect setting aside billions of dollars for a politically favored group: construction industry labor unions.

Defendants nevertheless assert this case is unlike *Georgia* because Plaintiffs have not disputed government agencies can require PLAs on individual construction projects where special needs exist. (Def. Mot. 17). But whether agencies could require PLAs on specific individual contracts based upon a showing of need is not the issue in the case. The question here is whether any specific authorization in the FPASA allows the President to impose an across-the-board PLA mandate in the absence of any established need for such a requirement, including an unjustified presumption in favor of such a mandate on all covered projects. FPASA provides no such statutory authorization.

Finally, Defendants contend the major questions doctrine does not apply here because FPASA is an exercise of proprietary, not regulatory, authority and the President has "flexibility" to determine procurement policy, citing *Loper Bright*, 144 S. Ct. at 2263. (Defs. Mot. 18-19). But the Eleventh Circuit in *Georgia* applied the major questions

doctrine to an exercise of proprietary authority[8] and nothing in *Loper Bright* compels any different result.[9] *See also Georgia*, 46 F.4th at 1295-96. Next, Defendants contend the PLA Mandate is not "novel" (Def. Mot. 18), but Defendants do not (and cannot) dispute that no President has previously issued a PLA Mandate under FPASA – ever. (Pl. Mot. 2). Nor has any President imposed an effectively irrebuttable presumption in favor of PLAs on all large projects, regardless of proven special needs.

Undaunted, Defendants argue the impact of the PLA Rule is too small to constitute a major question (Def. Mot. 18-19) but their own (understated) impact analysis makes clear that billions of dollars of federal procurements are being impacted by the PLA Rule. In any event, the Supreme Court has not set any monetary limit for the major case doctrine. Indeed, *Nebraska*, 143 S. Ct. at 2368, *West Virginia v. EPA*, 597 U.S. 697 (2022) and *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021), which Defendants cite, set no such precise dollar amount for an agency action to qualify as a major question. In any event, even if the major questions doctrine does not apply, FPASA still, for the reasons discussed above and in Plaintiffs' Motion (Pl. Mot. 10-14), does not authorize the PLA Mandate.[10]

---

[8] *Georgia* distinguished *Perkins v. Lukens Steel Co.*, 310 U.S. 113 (1940), which Defendants cite (Defs.' Mot. 18). (Pls.' Mot. 13). And in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), which Defendants also cite, the Supreme Court did not discuss the President's proprietary authority.

[9] *Loper Bright* never mentions FPASA; and as the Supreme Court noted, "[w]hen the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court...is, as always, to independently interpret the statute and effectuate the will of Congress." *See id*.

[10] Defendants cite *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002) (Defs.' Mot. 11, 14). But *Allbaugh* dealt only with whether the President could choose <u>not</u>

**B.    Defendants Are Not Entitled to Summary Judgment Because the EO, PLA Rule, and OMB Memo Violate CICA**

Defendants contend (Def. Mot. 19-20) the PLA Mandate complies with CICA because CICA gives agencies broad power to determine what they need, citing *FMS Inv. Corp. v. United States*, 144 Fed. Cl. 140, 144 (2019), and *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010). But neither case is analogous to this one. In *FMS*, the court concluded the agency's restriction on competition was consistent with a Congressional directive and specific statutory language. *See FMS*, 144 Fed. Cl. at 145. No Congressional directive or specific statutory language supports the PLA Mandate. And in *Savantage*, the court concluded the agency had the right to assess its "minimum needs." *See Savantage*, 595 F.3d at 1286.[11] But the PLA Mandate here has nothing to do with agency "minimum needs," which were being fully served without any need for PLAs 99 percent of the time in the decade prior to the new Rule (and 100 percent of the time in the decade before that). (Pl. Mot. 16).

Defendants further claim CICA allows the President to direct agencies on what their needs should be via executive order, citing *Helmsman Props., Inc.*, B-278965, 1998 WL 35999068 (Comp. Gen. Apr. 20, 1998), where the Government Accountability Office ("GAO") concluded an agency could rely on an executive order to limit competition. In *Helmsman*, however, it appears the contractor challenged the agency's application of the

---

to permit imposition of a PLA mandate; and *Allbaugh* did not deal with any FPASA challenge.

[11] Further, in *Savantage*, the record revealed a failure in a prior program that supported the agency's solicitation requirements. *See Savantage*, 595 F.2d at 1286-88.

executive order, not its reliance on the executive order in the first place.[12] *See id.* In any event, as a GAO decision, *Helmsman* is "non-binding" and "serve[s] as [a] recommendation[] and [is] not subject to review in any court." *See Strategic Bus. Solutions, Inc. v. United States*, 129 Fed. Cl. 621, 626 (2016); *Advanced Sys. Dev., Inc. v. United States*, 72 Fed. Cl. 25 (2006) ("[T]he GAO has no enforcement powers.").

 Contrary to the Defendants' Opposition, none of the statutory exceptions from CICA's competition requirements apply here. *See* 41 U.S.C. § 3304(a); see also § 3303, § 3305. Instead, the PLA Rule amounts to an unauthorized socioeconomic set-aside for contractors who sign union agreements, in plain violation of the full and open competition requirements of CICA. Defendants are therefore not entitled to summary judgment; and the PLA Rule must be set aside.

### B.  Defendants Are Not Entitled to Summary Judgment Because the PLA Rule and OMB Memo Violate the APA and OFPP

 Defendants argue APA review is not available because the President is not an agency. (Def. Mot. 20). But numerous courts have held the APA remains available when agency action relates to a presidential directive. *See e.g.*, *Sierra Club v. Clinton*, 689 F. Supp. 2d 1147, 1156 (D. Minn. 2010); *Indigenous Envt'l Network v. Dep't of State*, 2017 U.S. LEXIS 193546, at *10-23 (D. Montana Nov. 22, 2017); *Protect Our Cmtys. Found. v. Chu*, 2014 U.S. Dist. LEXIS 42410, at *12-18 (S.D. Cal. Mar 27, 2014); *ABC SE Tex.*, 2016 WL 8188655, *12 (finding FAR Council action implementing Presidential EO to be

---

[12] The GAO also noted there was adequate competition based on a market survey. *See id.* In contrast, here, "necessary market research is simply not being performed to evaluate whether union agreements are necessary or counter-productive in areas of the country, like Jacksonville, where there are very few union contractors or workers." (Pls.' Mot. Ex. 1, Brubeck Aff. ¶ 6).

arbitrary and capricious under the APA); *see also Reich,* 74 F.3d at 1324.[13] Indeed, the APA applies to agency action stemming from executive orders where "there is 'law to apply.'" *See City of Carmel-by-the-Sea v. DOT*, 123 F.3d 1142 (9th Cir. 1997). Here, of course, FPASA and CICA regulate government procurement; accordingly, APA review remains available.

Defendants next contend the OMB Memo is unreviewable because it is not a final agency action, citing *Bennett v. Spear*, 520 U.S. 154 (1997).[14] But in *Bennett*, the Supreme Court found an agency opinion was final agency action because it was not "tentative or interlocutory" and "legal consequences" flowed from it. *See Bennett*, 520 U.S. at 178. Similarly, here, the OMB Memo is not "tentative or interlocutory": it has remained in place unchanged since the government issued it. *See id.* Further, "legal consequences" flow from the OMB Memo. *See id.* The OMB Memo goes beyond the PLA Rule or EO to set new requirements: for example, OMB arbitrarily declares "two...qualified offerors is sufficient to provide adequate price competition," instructions appearing nowhere in the EO or PLA Rule (or in CICA). (OMB Memo 2(b)(ii)); *see also Texas v. Becerra*, 89 F.4th 529, 539 (5th Cir. 2024) (agency guidance constituted final agency

---

[13] For their contrary view, Defendants cite (Defs.' Mot. 20-21) *Feds for Med. Freedom v. Biden*, 581 F. Supp. 3d 826, 835 (S.D. Tex. 2022), *aff'd*, 63 F.4th 366 (5th Cir.) (en banc), but that case is not good law, as it was vacated. Defendants also cite *Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 28-29 (D.D.C. 2001) for the assertion arbitrary and capricious review is unavailable when an agency carries out presidential directives, (Opp'n to PI 14), but other courts disagree.

[14] Defendants also cite *In re MDL-1824 Tri-State Water Rights Litig.*, 644 F.3d 1160 (11th Cir. 2011) but the case is plainly distinguishable. That case had nothing to do with a guidance document like the OMB Memo; there, the appellees challenged the government's decision to allow temporary water withdrawals, even though the government never made a formal reallocation of reservoir storage and instead, used ad hoc arrangements to accommodate water supply. *See id.* at 1181-85.

action where it did not "merely restate" statutory requirement). The OMB Memo further contains mandatory language, explaining how agencies "must" conduct market analysis and how they "must" require a PLA under certain circumstances. (OMB Memo); *see also Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) ("Courts have looked for mandatory language to determine whether an agency's action binds it and accordingly gives rise to legal consequences"); *Texas*, 89 F.4th at 539 (guidance constituted final agency action where it stated what regulated parties "must" do).

Next, Defendants wrongly contend arbitrary and capricious review under the APA is "exceedingly deferential"[15] and claim the PLA Mandate passes muster under the APA because PLAs can somehow mitigate labor shortages, facilitate the administration of projects, and prevent delays, all without reducing the number of bids or increasing costs.[16] (Def. Mot. 21-22). But the Defendants' rulemaking ignores powerful evidence cited in ABC's comments and affidavits demonstrating the PLA mandate will have – indeed is already having - the *opposite* effect. Defendants' failure to consider and address facts inconsistent with their drastic change in policy constitutes classic arbitrary and capricious

---

[15] Defendants cite *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008), which was decided long before *Loper Bright* and is otherwise distinguishable. The case dealt with an agency's compliance with the National Environmental Policy Act, which "is procedural, setting forth no substantive limits on agency decision-making." Thus the sole question before the Eleventh Circuit was whether the agency followed procedure in taking an action, not whether the action itself was arbitrary or capricious. *See id.* at 1361.

[16] Defendants point to data from more than 20 years ago in concluding PLAs will not reduce the number of bids. (AR0014). Instead, the government should have relied on *current* data supplied by Plaintiffs indicating 99 percent of its members nationwide would be less likely to bid on federal construction contracts if the PLA Mandate went into effect. (AR0526); *see Sierra Club v. EPA*, 671 F.3d 955 (9th Cir. 2012) (government action may be arbitrary and capricious if it relies on "old data" without meaningful consideration of more recent data).

rulemaking. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41-43 (1983) ("An agency's action is arbitrary and capricious, … where it offers explanations counter to the evidence and fails to consider important aspects of the problem."); *see also Ohio v. EPA*, 144 S. Ct. 2040, 2055-56 (2024) (agency failure to address opposing comments in rulemaking is arbitrary and capricious).

As discussed above and in Plaintiffs' motion, Defendants have failed to address the many studies cited in ABC's comments showing how PLAs increase the costs and cause delays in construction. (See ABC Comments at AR0532). In any event, Defendants' motion does not point to sources that prove PLAs *reduce* costs or increase the number of bidders: the studies the government cites simply suggest (wrongly) that PLAs do not have a statistically significant impact. (AR0011-12). The government's studies also rely heavily on cost data from one of the most heavily unionized states— California—instead of data from across the country. (AR0012). *See Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 392 (D.C. Cir. 2018) (crediting reliance on nationwide data over state-specific data that was "not representative of the industry as a whole"). It must also be noted that the Defendants' claim that PLAs have not increased labor costs in California was recently contradicted by that state's Governor in a veto message issued on September 29, 2024.[17] The Governor vetoed a bill imposing PLA requirements on multiple state construction projects because, as he stated, the bill's PLA mandate would impose "additional cost pressures" on the State's budget.

---

[17] SB-984-Veto-Message.pdf (ca.gov)

In defending the PLA Rule here, Defendants focus heavily on the idea that PLAs reduce labor shortages, delays, and legal compliance issues in construction. (Def. Mot 21; AR0013-16). Missing from the Rule, however, is any contention that there have been any significant number of actual labor shortages, delays, or non-compliance with workplace and employment protection laws on large federal construction contracts in the absence of PLAs.[18] Rather, as noted above, the lack of PLAs in federal construction contracts in prior years demonstrates the government did not see any such issues. (Pl. Mot. 3). This case, accordingly, is analogous to *National Fuel Gas Supply v. FERC*, 468 F.3d 831 (D.C. Cir. 2006). There, the D.C. Circuit concluded the government's order was arbitrary and capricious because the government "provided no evidence of a real problem." *See id.* at 837, 841 (noting a commenter described the government's proposal as "perhaps a solution in search of a problem").

Also missing from Defendants' motion, and the PLA Rule itself, is any meaningful consideration of whether a PLA is at all beneficial in areas of the country, such as Florida and many others, where few if any unionized construction contractors perform work. To the contrary, imposing PLA mandates in such circumstances is inherently disruptive to the government's procurement process, causing the government to lose long-time highly qualified non-union providers of construction services. *See* Plaintiffs' Motion, Comments, and affidavits attached thereto. Defendants cited a source claiming to show a PLA

---

[18] Defendants cite one Department of Labor ("DOL") study, Implementation of Project Labor Agreements in Federal Construction Projects, for the assertion a PLA avoided a labor shortage because other projects in the city experienced shortages around the same time. (AR0013). The study does not indicate any delays occurred on federal contracts without PLAs. (*See id.*).

avoided delay by a trade union because it had a no-strike provision (AR0013); but without the trade union, there would have been no strike delay to avoid. Indeed, as one commenter noted, "[i]n the last ten years, only five major construction work stoppages have been recorded, where 86.4 percent of workers are open-shop," or non-union. (AR0556-57). In failing to consider the impact of a PLA where no union was previously involved in performing the work, the government failed to consider an important aspect of the problem. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41-43 (1983) ("An agency's action is arbitrary and capricious, … where it fails to consider important aspects of the problem.").

In their Motion, Defendants further contend the OMB Memo did not violate the OFPP because it lacks legal force, citing *Kentucky v. Biden*, 571 F. Supp. 3d 715, 731 (E.D. Ky. 2021). (Def. Mot. 23). Plaintiffs, however, have already explained why this case is distinguishable from *Kentucky*. (Pl. Mot. 19-20). Accordingly, the PLA Mandate violates the APA and OFPP and Defendants are not entitled to summary judgment.

### C.    Defendants Are Not Entitled to Summary Judgment Because the PLA Rule, EO, and OMB Memo Violate Plaintiffs' First Amendment Free Association Rights

In their Motion, Defendants contend the PLA Mandate is not First Amendment-protected expressive activity, citing *Ark. Times LP v. Waldrip*, 37 F.4th 1386, 1394 (8th Cir. 2022), *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 70 (2006), *Rust v. Sullivan*, 500 U.S. 173 (1991), and *Christian Labor Ass'n v. City of Duluth*, No. 21-227, 2023 WL 3996240 (D. Minn. Jun. 14, 2023). (Def. Mot. 21). But *Ark. Times* and *Rust* are "free speech" cases, and thus inapposite to Plaintiffs' free *association* challenge. (Pl. Mot. 21). *Rumsfeld* and *Christian Labor* are no more persuasive. In *Rumsfeld*, the Supreme Court rejected a free association challenge relating to the presence of military

recruiters on law school campuses. *See Rumsfeld*, 547 U.S. at 69. The relationship between a union and an employer under a PLA is far more intrusive, requiring mutual agreement to various employment terms.[19] (Pl. Mot. 21-22). Accordingly, the PLA Mandate violates Plaintiffs' First Amendment rights to free association and Defendants are not entitled to summary judgment.

### D.    Defendants Are Not Entitled to Summary Judgment Because the PLA Rule, EO, and OMB Memo Violate Section 8(d) of the NLRA

In their Motion, Defendants contend Section 8(d) of the NLRA does not apply when the government sets contract terms with private parties, citing *Bldg. & Constr. Trades Council v. ABC*, 507 U.S. 218 (1993) [hereafter *Boston Harbor*]. (Def. Mot. 25). But as Plaintiffs have noted, the Supreme Court in *Boston Harbor* did not reach the question of whether Section 8(d) applied in that case. (Pl. Mot. 22) (citing *Boston Harbor*, 507 U.S. at 232, n.2). Defendants next argue no Section 8(d) issue exists because the government does not itself sign the PLA under the PLA Rule. (Def. Mot. 25). But the government does not need to sign a contract for a Section 8(d) issue to exist: in *H.K. Porter Co. v. NLRB*, 397 U.S. 99 (1970), the government ordered an employer to agree to a certain contract term, and it was the government's order that the Supreme Court found violated the NLRA. *See id.* at 102. There as here, the government was not a party to the contract at issue but nevertheless was found to have unlawfully compelled the collective bargaining agreement between an employer and union. *See id.* at 100.

Defendants next contend if Section 8(d) applies, *H.K. Porter* is distinguishable

---

[19] Thus, while the District of Minnesota in *Christian Labor* applied *Rumsfeld* (and other inapposite Eighth Circuit cases) to reject a free association challenge to a provision in a project labor agreement, it was wrong to do so. *See Christian Labor*, 2023 WL 3996240, at *10. As of the date of this filing, *Christian Labor* has not been cited by any other court.

because there, the NLRB required an employer to agree to dues checkoff, whereas the PLA Rule supposedly allows private parties to negotiate substantive terms. (Def. Mot. 25). Defendants' contention, however, is contrary to the plain language of the PLA Rule, which expressly "require[s] PLAs to contain various terms that guarantee against strikes, lockouts, and similar job disruptions" (PLA Rule, AR0011), all of which are substantive terms. The PLA Rule also expressly grants agencies the power to "ensure that the PLA includes any additional terms that the agency deems necessary to satisfy its needs" so that an agency "will know the material terms of any resulting PLA when it issues a solicitation that requires a PLA." (*See id.*). In other words, the PLA Rule already dictates certain contract terms, and authorizes agencies to dictate *additional* contract terms, all contrary to Section 8(d) of the NLRA.

Defendants cite to *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 754-55 (1985), for the assertion the NLRA does not preempt minimum standards impacting contracting terms. (Def. Mot. 25). But that case dealt with "state laws of general application," which the Supreme Court defined as standards that "affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA [and] [n]or do they have any but the most indirect effect on the right of self-organization established in the Act." *See Massachusetts*, 471 U.S. at 753, 735. A PLA Mandate, accordingly, cannot be a minimum labor standard: it "encourage[s]" collective bargaining by *mandating* it and requires union representation without consideration of employee sentiment, which directly impacts "the right of self-organization." *See id.* Given the dissimilarity between PLAs and minimum labor standards, it is unsurprising that *Massachusetts* never mentions PLAs. *See*

*generally id.* Accordingly, the PLA Mandate violates Section 8(d) of the NLRA and Defendants are not entitled to summary judgment.

Finally, even in those states that have relied on *Boston Harbor* to impose PLA requirements on individual construction projects, state courts have made it clear that the government bears the burden of proving the specific need for a PLA on each individual project, pursuant to the states' competitive bidding laws. *See, e.g., Associated Gen. Contrs. v. N.Y. State Thruway Auth.*, 88 N.Y.2d 56 (N.Y. 1996) ("The [public] authority bears the burden of showing that the decision to enter into the PLA had as its purpose and likely effect the advancement of the interests embodied in the competitive bidding statues."). The challenged PLA Rule in the present case reverses the burden of proving the need for PLAs on federal construction projects, and improperly relieves the government from its rightful burden of establishing need for PLAs on specific projects, again contrary to the NLRA (and contrary to CICA, as discussed above).

     **F.**    **Defendants Are Not Entitled to Summary Judgment Because the PLA Rule, EO, and the OMB Memo Fail to Comply with the RFA and SBA, in Violation of the APA**

In their Motion, Defendants claim the government accounted for small business concerns as required by the RFA, because all they needed to do to was make a "good-faith effort" to comply. (Def. Mot. 22-23), citing *U.S. Cellular Corp. v. FCC*, 254 F.3d 78 (D.C. Cir. 2001), and *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 625 (5th Cir. 2000). In *U.S. Cellular Corp.*, the government properly "found insufficient record evidence to support commenters' claims that the costs...in rural areas would, in fact, be higher." *See id.* at 88-89. Similarly, in *Alenco*, the Fifth Circuit rejected an RFA challenge where the government engaged in "substantial discussion and deliberation, including consideration

and reasoned rejection of significant alternatives." *See Alenco*, 201 F.3d at 625.

Neither case is comparable to this one. Unlike in *U.S. Cellular*, 254 F.3d at 88-89, the government here has acknowledged PLAs may create "unintended barriers to entry" for offerors like small businesses. (OMB Memo at 5). And unlike in *Alenco*, where the government engaged in "consideration and reasoned rejection of significant alternatives," *see Alenco*, 201 F.3d at 625, the government here did not do so. Instead, in rejecting commenters' concerns about small business interests, the government pointed to the PLA Mandate's exception (which is inherently unworkable and no exemptions granted, *see* Pl. Mot. 19), and ignored the inability of small contractors and subcontractors to negotiate terms with a union. *See* Pl. Mot. 18-19).

The government further did not meaningfully explain why it rejected alternatives. In particular, Defendants did not explain why they rejected the alternative of allowing small businesses to avoid the PLA requirement if they agreed to pay prevailing wages or other benefits. (PLA Rule, AR0027-28). And although the government rejected one suggestion—including a "threshold for subcontractor participation"—because the EO did not authorize the suggestion (PLA Rule, AR0028), the RFA becomes meaningless if the government can use executive orders to circumvent the RFA's requirements. Accordingly, the PLA Mandate violates the RFA and Defendants are not entitled to summary judgment.

## V.    CONCLUSION

Plaintiffs request that the Court deny the government's Motion and proceed to vacate the PLA Rule.

Dated this 9th day of October, 2024.          Respectfully submitted,

**_/s/Kimberly J. Doud_**
Kimberly J. Doud
LITTLER MENDELSON, P.C.
111 N Orange Ave.,
Suite 1750
Orlando, FL 32801
407-393-2951
407-641-9263 (Fax)
kdoud@littler.com

Maurice Baskin (_pro hac vice_)
LITTLER MENDELSON, P.C.
815 Connecticut Ave., N.W.
Ste. 400
Washington, D.C. 20006
(202) 772-2526
(202) 842-0011 (Fax)
mbaskin@littler.com

_ATTORNEYS FOR PLAINTIFFS_

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of October, 2024, I electronically filed the

foregoing with the Clerk of the Court by using the ECF system, which will send a notice

electronically to Defendants' counsel of record.

**_/s/Kimberly J. Doud_**
Kimberly J. Doud