**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

ASSOCIATED BUILDERS AND
CONTRACTORS FLORIDA FIRST
COAST CHAPTER, *et al.*,

     *Plaintiffs*,

        v.

WILLIAM F. CLARK, *et al.,*

     *Defendants*.

**Civil Action No. 3:24-cv-00318-WWB-MCR**

<u>**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR EXPEDITED SUMMARY JUDGMENT AND
A PRELIMINARY INJUNCTION**</u>

## <u>TABLE OF CONTENTS</u>

I.    The EO, PLA Rule, And OMB Memo Are Authorized By FPASA ......................... 3

II.   The EO, PLA Rule, And OMB Memo Comply With CICA .................................... 8

III.  The PLA Rule And OMB Memo Comply With The APA And OFPP Act ............. 10

IV.   The EO, PLA Rule, And OMB Memo Do Not Violate The First Amendment ...... 14

V.    The EO, PLA Rule, And OMB Memo Do Not Violate The NLRA ....................... 15

VI.   The EO, PLA Rule, And OMB Memo Comply With The RFA And SBA .............. 16

VII.  The Court Cannot Provide The Relief Plaintiffs Seek In This Case .................... 17

CONCLUSION ......................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ABC of Southeast Texas v. Rung*,
No. 1:16-CV-425, 2016 WL 8188655 (E.D. Tex. Oct. 24, 2016)................................... 6

*AFL-CIO v. Kahn*,
618 F.2d 784 (D.C. Cir. 1979) ...................................................................................... 5

*Arkansas Times LP v. Waldrip*,
37 F.4th 1368 (8th Cir. 2022)...................................................................................... 15

*Benisek v. Lamone*,
585 U.S. 158 (2018) .................................................................................................... 17

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
781 F.3d 1271 (11th Cir. 2015)...................................................................... 18, 19, 20

*Bldg. & Constr. Trades Council of the Metro. Dist. v. Assoc. Builders & Contractors of
Mass./RI, Inc.*,
507 U.S. 218 (1993) .................................................................................................... 16

*Bradford v. DOL*,
101 F.4th 707 (10th Cir. 2024),
*petition for cert. docketed*, No. 24-232 (U.S. Aug. 30, 2024) ....................................... 5

*Building & Construction Trades Department, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) ........................................................................................ 8

*Chamber of Commerce v. Napolitano*,
648 F. Supp. 2d 726 (D. Md. 2009) .............................................................................. 6

*Chamber of Commerce v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ............................................................................... 6, 11

*Christian Labor Ass'n v. City of Duluth*,
No. 21-227, 2023 WL 3996240 (D. Minn. June 14, 2023) .......................................... 15

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) ...................................................................................................... 7

*City of Albuquerque v. U.S. Department of the Interior*,
379 F.3d 901 (10th Cir. 2004)....................................................................................... 5

*City of Carmel-by-the-Sea v. Dep't of Transp.*,
123 F.3d 1142 (9th Cir. 1997)..................................................................................... 10

*Feds for Med. Freedom v. Biden*,
   581 F. Supp. 3d 826 (S.D. Tex. 2022),
   *aff'd*, 63 F.4th 366 (5th Cir.) (en banc),
   *vacated on other grounds*, 144 S. Ct. 480 (2023) ..................................................... 10

*Ford Motor Co. v. NLRB*,
   305 U.S. 364 (1939) ................................................................................................. 18

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ................................................................................................. 10

*Friends of Everglades v. S. Fla. Water Mgmt. Dist.*,
   570 F.3d 1210 (11th Cir. 2009) ................................................................................. 5

*Georgia v. President*,
   46 F.4th 1238 (11th Cir. 2023) ..................................................................... 4, 8, 19

*Gill v. Whitford*,
   585 U.S. 48 (2018) ........................................................................................... 18, 19

*H.K. Porter v. NLRB*,
   397 U.S. 99 (1970) ................................................................................................. 16

*Hayes Int'l Corp. v. McLucas*,
   509 F.2d 247 (5th Cir. 1975) ................................................................................. 20

*In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*,
   853 F. Supp. 2d 138 (D.D.C. 2012) ....................................................................... 20

*Indigenous Envt'l Network v. Dep't of State*,
   No. CV-17-29, 2017 WL 5632435 (D. Mont. Nov. 22, 2017) ................................... 10

*Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*,
   585 U.S. 878 (2018) ............................................................................................... 14

*Kinnett Dairies, Inc. v. Farrow*,
   580 F.2d 1260 (5th Cir. 1978) ............................................................................... 20

*Knox v. Service Emps. Int'l Union, Local*,
   *1000*, 567 U.S. 298 (2012) ................................................................................... 14

*Lewis v. Casey*,
   518 U.S. 343 (1996) ............................................................................................... 18

*Louisiana v. Biden*,
   55 F.4th 1017 (5th Cir. 2022) ................................................................................... 4

*Marsh v. Ore. Nat. Res. Council*,
   490 U.S. 360 (1989) ................................................................ 11

*Mayes v. Biden*,
   67 F.4th 921 (9th Cir. 2023),
   *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023) ........................... 5

*N. Buckhead Civic Ass'n v. Skinner*,
   903 F.2d 1533 (11th Cir. 1990) ................................................ 11

*National Government Services, Inc. v. United States*,
   923 F.3d 977 (Fed. Cir. 2019) ............................................... 8, 9

*Ohio v. EPA*,
   144 S. Ct. 2040 (2024) ........................................................... 12

*Protect Our Cmtys. Found. v. Chu*,
   No. 12-cv-3062, 2014 WL 1289444 (S.D. Cal. Mar. 27, 2014) ................ 10

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
   547 U.S. 47 (2006) ........................................................... 14, 15

*Rust v. Sullivan*,
   500 U.S. 173 (1991) .............................................................. 15

*Sierra Club v. Clinton*,
   689 F. Supp. 2d 1147 (D. Minn. 2010) ........................................ 10

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   464 F. Supp. 2d 1171 (M.D. Fla. 2006) .................................. 18, 19

*Southern Offshore Fishing Ass'n v. Daley*,
   55 F. Supp. 2d 1336 (M.D. Fla. 1999) ........................................ 17

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) ................................................... 20

*Taylor v. Sturgell*,
   553 U.S. 880 (2008) .............................................................. 19

*U.S. Cellular Corp. v. FCC*,
   254 F.3d 78 (D.C. Cir. 2001) ................................................... 17

*UAW-Labor Employment & Training Corp. v. Chao*,
   325 F.3d 360 (D.C. Cir. 2003) .................................................... 6

*United States v. Mendoza*,
   464 U.S. 154 (1984) .............................................................. 19

*United States v. Texas*,
   599 U.S. 670 (2023) ........................................................................ 18, 19

**Statutes**

5 U.S.C. § 706 .................................................................................... 18

28 U.S.C. § 1491(a)(1) ......................................................................... 9

29 U.S.C. § 158(d) .............................................................................. 16

40 U.S.C. § 121(a) ............................................................................... 3

41 U.S.C. § 3101(a) .............................................................................. 7

**Regulations**

4 C.F.R. § 21.0 *et seq.* ........................................................................ 9

Federal Acquisition Regulation: Use of Project Labor Agreements for Federal
   Construction Projects 88 Fed. Reg. 88,708 (Dec. 22, 2023) ....................... 1

Use of Project Labor Agreements for Federal Construction Projects,
   87 Fed. Reg. 7363 (Feb. 4, 2022)............................................................ 1

**Other Authorities**

Memo. Re. Use of Project Labor Agreements on Federal Construction Projects to the
   Heads of Executive Departments and Agencies, No. M-24-06 (Dec. 18, 2023),
   https://www.whitehouse.gov/wp-content/uploads/2023/12/M-24-06.pdf .................... 1

Project labor agreements, or PLAs, have been a feature of federal government contracting since the 1930s, and remain in active use today at all levels of government as well as in the private sector. AR0446, 465-99 (detailing examples). To maximize the benefits to the federal government of PLAs, Executive Order No. 14,063 ("EO")[1] creates a rebuttable presumption in favor of PLAs on federal construction contracts valued over $35 million. As directed by the EO, the agencies of the Federal Acquisition Regulatory Council ("FAR Council") promulgated regulations ("PLA Rule")[2] implementing the EO, and the Office of Management and Budget ("OMB") issued a guidance memorandum[3] to federal agencies regarding the use of PLAs. Plaintiffs, trade associations representing "merit shop" contractors, have employed a scattershot approach to challenging the EO. But all of their legal theories rest on significant conceptual errors.

Plaintiffs argue that this presumption is not authorized by the Federal Property and Administrative Service Act ("FPASA"), but their arguments flout FPASA's text and decades of consistent interpretation by all three branches of government. The President has long held the authority to direct Executive Branch agencies as to how they use PLAs in government contracting. While Plaintiffs do not deny this, and do not contend that federal agencies lack authority to require PLAs on particular construction projects, they nonetheless argue the President acted *ultra vires* here because there is no "specific

---

[1] Exec. Order No. 14,063, Use of Project Labor Agreements for Federal Construction Projects, 87 Fed. Reg. 7363 (Feb. 4, 2022) (AR0754-57).

[2] Dep't of Def. et al., Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects, 88 Fed. Reg. 88,708 (Dec. 22, 2023) ("PLA Rule") (AR0010-31).

[3] Memo. Re. Use of Project Labor Agreements on Federal Construction Projects to the Heads of Executive Departments and Agencies, No. M-24-06 (Dec. 18, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/12/M-24-06.pdf ("OMB Memo").

reference" in FPASA from which the presumption in favor of PLAs emanates. That standard is not the law of the Eleventh Circuit and cannot be reconciled with the statute, decades of precedent, or the history of presidential management of government contracting. Moreover, independent of FPASA, the President's directive was amply justified as an exercise of Article II authority to superintend the Executive Branch's internal operations, including its proprietary functions, within the limits established by Congress.

Plaintiffs' Competition in Contracting Act ("CICA") claim fails because Plaintiffs cannot dispute that their members are eligible to bid for construction contracts under the PLA Rule, and the rule permits case-by-case tailoring to each contract solicitation. Plaintiffs' concerns as to how the PLA Rule is being implemented by federal agencies are not relevant to this dispute because Plaintiffs have not challenged any actual solicitations in this case. Any allegedly improper application of the exceptions to the PLA Rule is a question for bid protest proceedings, not a challenge to an executive order, a rulemaking, and a guidance memorandum.

Plaintiffs raise a raft of challenges through the Administrative Procedure Act ("APA"), but ignore that it is the President who set the policy in this case. Agency actions implementing a determination made by the President, in the exercise of authority specifically delegated by statute to him, are reviewable under the APA only to the extent of determining whether the President's determination fell within his statutory authority. The President's determination, including as implemented by the agency, is not reviewable under the arbitrary-and-capricious standard because the President is not an agency under the APA. In any event, the actions challenged in this case complied with the APA and other federal statutes in all respects.

2

As to Plaintiffs' First Amendment and National Labor Relations Act ("NLRA") claims, Plaintiffs have cited no case that directly supports either theory, and with good reason. Plaintiffs' First Amendment claim tries to constitutionalize routine bid requirements in government contracting that fall well short of the Supreme Court's criteria for expressive association. Meanwhile, no court has ever held that Section 8(d) of the NLRA prevents the government from requiring a PLA when the government is the contractor, just like an employer in the private sector.

Because none of Plaintiffs' claims have merit, the only proper remedy in this case is dismissal of the complaint, with prejudice. If the Court concludes otherwise, it should proceed with caution in crafting relief. Plaintiffs' demands that the PLA Rule be "set aside on a nationwide basis" cannot be reconciled with the text of the APA and are in tension with equitable principles that should inform this Court's choice of remedy.

I.    The EO, PLA Rule, And OMB Memo Are Authorized By FPASA

Defendants have previously explained that FPASA authorizes the President to "prescribe policies and directives that the President considers necessary to carry out th[e] subtitle" of the U.S. Code encompassing the federal government's procurement and property-management authorities, provided such policies and directives are "consistent with th[at] subtitle." 40 U.S.C. § 121(a); *see id.* § 111. Among the provisions with which the President's directives must be consistent is the provision defining "[t]he purpose" of the relevant subtitle to be "provid[ing] the Federal Government with an economical and efficient system for . . . [p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting." *Id.* § 101(1).

Plaintiffs' *ultra vires* claim fails as a matter of law. Plaintiffs do not even attempt to argue that the President could not have considered the PLA presumption necessary to

carry out the relevant subtitle, or that the presumption is inconsistent with the subtitle. Instead, Plaintiffs argue solely that the Eleventh Circuit has held that the President's authority under Section 121 of FPASA is limited to carrying out "specific reference[s]" elsewhere in the statute. That argument fails many times over.

As an initial matter, the Eleventh Circuit has not adopted the understanding of FPASA that Plaintiffs assert controls this case. Rather, that understanding reflects solely the views of Judge Grant and accordingly does not bind this Court. *See* Defs.' Mot. for Summ. J. 14-15, ECF No. 42 ("Defs.' MSJ"). In their motion, Plaintiffs conflate the holding of the Eleventh Circuit in *Georgia*—that the COVID-19 vaccination requirement for contractors at issue in that case likely exceeded the President's FPASA authority—with the analysis that led Judge Grant to that result, in which Judge Edmondson and Judge Anderson both declined to join. *See Georgia v. President*, 46 F.4th 1238, 1308 (11th Cir. 2023) (Edmondson, J., concurring only in the result); 46 F.4th at 1308 (Anderson, J., concurring only in Part V, which is not relevant here, and otherwise dissenting).[4]

Moreover, as Defendants have explained, Plaintiffs' interpretation of Section 121 is incompatible with the text of the statute; among other reasons, a directive that was necessary to carry out a specific provision of the subtitle would necessarily be consistent with the subtitle, rendering that proviso meaningless. *See* Defs.' MSJ at 16.

---

[4] Indeed, the Fifth Circuit reached the same conclusion as the Eleventh Circuit with respect to the COVID-19 vaccination requirement, while declining to adopt the "specific reference" interpretation that Judge Grant endorsed. *See Louisiana v. Biden*, 55 F.4th 1017, 1019, 1026 & n.24 (5th Cir. 2022). While the government respectfully disagrees with the conclusions of both courts, *Louisiana* further confirms that the bottom-line holding in *Georgia* did not depend on the reasoning set forth in Judge Grant's lone opinion.

Plaintiffs' interpretation also conflicts with the longstanding consensus of all three branches of the federal government. *See id.* at 8-11. Plaintiffs' contrary arguments are unpersuasive. For example, Plaintiffs assert that the PLA Order and PLA Rule "go far beyond" the directives upheld in *AFL-CIO v. Kahn*, 618 F.2d 784 (D.C. Cir. 1979), and *Bradford v. DOL*, 101 F.4th 707 (10th Cir. 2024), *petition for cert. docketed*, No. 24-232 (U.S. Aug. 30, 2024). Pls. MSJ at 13. But Plaintiffs do not explain why, in their view, a presumption in favor of adopting a project-specific PLA for all large-scale federal construction projects, which generally leaves the terms of such PLAs to negotiation, is an exercise of FPASA authority different in kind from the wage and price controls addressed in *Kahn* or the minimum wage requirement addressed in *Bradford*. Moreover, Plaintiffs do not suggest that FPASA includes a "specific reference" to either wage and price controls or to a minimum wage. They accordingly fail to reconcile their mistaken understanding of the statute with these persuasive authorities.

Plaintiffs also are wrong that *Mayes v. Biden*, 67 F.4th 921 (9th Cir. 2023), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023), is "inapposite." Pls.' Mot. for Summ. J. 13, ECF No. 41 ("Pls.' MSJ"). That the decision was vacated as moot does not diminish its persuasive value. *See, e.g.*, *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1218 (11th Cir. 2009). With respect to the Tenth Circuit's discussion of FPASA in *City of Albuquerque v. U.S. Department of the Interior*, 379 F.3d 901 (10th Cir. 2004), *see* Pls.' MSJ at 13, the Tenth Circuit itself has recognized that analysis as "precedent[ial]" and has reaffirmed that, "to fall within the authority granted, orders issued under FPASA must have a sufficiently close nexus to the values of economy and efficiency," *Bradford*, 101 F.4th at 719, 721 (cleaned up). The PLA Order and PLA Rule readily satisfy that

standard. *See* Defs.' MSJ at 11-14. And Plaintiffs make no effort to distinguish *UAW-Labor Employment & Training Corp. v. Chao*, 325 F.3d 360 (D.C. Cir. 2003), or *Chamber of Commerce v. Napolitano*, 648 F. Supp. 2d 726 (D. Md. 2009), on their facts. Instead, Plaintiffs once again mistakenly assert that Judge Grant's view of the legal standard applied in those cases reflects the law of the Eleventh Circuit. Pls.' MSJ at 13.

Additionally, Plaintiffs attempt unsuccessfully to distinguish the PLA Order and PLA Rule from FPASA directives respecting the federal government's use of PLAs that other Presidents have adopted, Pls.' MSJ at 13 n.22, which Plaintiffs accept as consistent with FPASA, *see, e.g.*, Compl. ¶ 105, ECF No. 1. Under Plaintiffs' reasoning, FPASA would also not authorize the President to *prohibit* agencies from requiring PLAs; indeed, if FPASA does not include a "specific reference" authorizing the President to presumptively require the use of PLAs on large-scale federal construction projects, it likewise does not include a "specific reference" authorizing the President to prohibit the use of PLAs on such projects (or to encourage or discourage their use). *See* Defs.' MSJ at 3-5 (summarizing over three decades of executive actions exercising FPASA authority with respect to the federal government's use of PLAs).

*Chamber of Commerce v. Reich*, 74 F.3d 1322, 1324 (D.C. Cir. 1996), does not support Plaintiffs' *ultra vires* claim. *Contra* Pls.' MSJ at 12. There, the D.C. Circuit held that the challenged directive was preempted by the National Labor Relations Act and accordingly declined to decide whether the directive was authorized by FPASA or Article II of the Constitution. *See Reich*, 74 F.3d at 1332. *ABC of Southeast Texas v. Rung*, No. 1:16-CV-425, 2016 WL 8188655 (E.D. Tex. Oct. 24, 2016), also does not help Plaintiffs. In that case, the district court held that the challenged directive exceeded the scope of

the President's FPASA authority because the "Defendants ha[d] not demonstrated that implementation of the[] requirements [at issue] w[ould] promote economy and efficiency in government contracting," *id.* at *13—unlike the requirements at issue here, *see* Defs.' MSJ at 11-14. *Rung* does not support the "specific reference" theory on which Plaintiffs' *ultra vires* claim rests. A footnote of the Supreme Court's decision in *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979), which summarized lower-court dicta and was itself dicta, also does not support the weight that Plaintiffs assign to it, as Defendants have explained. *See* Pls.' MSJ at 12; Defs.' MSJ at 16-17.

In any event, even if this Court were to adopt Plaintiffs' atextual reading of Section 121, the PLA Order and PLA Rule carry out several specific provisions of FPASA, including 41 U.S.C. §§ 3101(a), 3703(c), and 3306(a)(1)(A). *See* Defs.' MSJ at 17. To the extent Plaintiffs suggest that these provisions are insufficiently specific because they do not expressly authorize the President to presumptively require the use of PLAs on large-scale federal construction projects, *see* Pls.' MSJ at 12 n.20, that argument fails to give any independent effect to Section 121. And contrary to Plaintiffs' cursory suggestion, the major questions doctrine does not support their claim, as Defendants have explained. *See* Pls.' MSJ at 11; Defs.' MSJ at 18-19.

Finally, Plaintiffs do not attempt to reconcile their *ultra vires* claim with the President's constitutional authority, which independently justifies the President's order, regardless of FPASA's scope. As Defendants have explained, Article II of the Constitution vests the President with authority to superintend the internal functions of the Executive Branch—including federal agencies' proprietary decisions about who to contract with—within the parameters set by Congress. *See* Defs.' MSJ at 11, 14. Because Plaintiffs do

not dispute that federal agencies may require PLAs, the President's constitutional authority as the head of the Executive Branch independently authorizes the President to direct agencies in the exercise of that authority through the PLA presumption. Indeed, the D.C. Circuit reached the same conclusion with respect to an analogous directive concerning the federal government's use of PLAs in *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002). *See* Defs.' MSJ at 14. And the President's Article II authority was not at issue in *Georgia*; indeed, Judge Grant emphasized that she did not address any other sources of potential authority for the challenged directive beyond FPASA. *See* 46 F.4th at 1298 n.9 (opinion of Grant, J.).

## II.    The EO, PLA Rule, And OMB Memo Comply With CICA

Plaintiffs also fail to establish that the PLA Order and PLA Rule violate CICA, which vests agencies with broad discretion to specify their needs as part of a competitive bidding process. *See* Defs.' MSJ at 19-20. Plaintiffs rely principally on *National Government Services, Inc. v. United States*, 923 F.3d 977 (Fed. Cir. 2019) ("*NGS*"), but that case is inapposite. The policy at issue in *NGS* capped the percentage of workload that the relevant agency could award to any particular contractor. *Id.* at 980. The Federal Circuit held that the policy precluded full and open competition because the cap "effectively ma[de] it impossible for certain offerors to win an award" if they would exceed the cap if awarded the contract, and that this exclusion was impermissible because the cap was unrelated to an offeror's "capability or experience" and because it was not "tailored to meet [the agency's] needs for a particular procurement." *Id.* at 983-86.

The PLA Order and PLA Rule are distinguishable in all three respects. Most significantly, they do not make it impossible for any bidder to win an award. Contrary to

Plaintiffs' suggestion, non-union contractors can and do enter into PLAs, without "giv[ing] up their non-union status." Pls.' MSJ at 14; *see* Defs.' MSJ at 2 (explaining that PLAs typically require that union and non-union contractors alike be eligible to compete). A PLA requirement is thus nothing like a cap that excludes certain contractors from competing.

Moreover, PLA requirements rest on the President's judgment that PLAs presumptively are an appropriate way of ensuring that large-scale federal construction projects are completed economically and efficiently, including by standardizing certain terms of employment for all workers on the project; prohibiting strikes and other labor disruptions; and ensuring a steady supply of skilled labor for the duration of the project. *See* Defs.' MSJ at 11-13. PLA requirements thus serve functions similar to those of the experience and capability requirements discussed in *NGS*.

Finally, the PLA Order and PLA Rule provide for "tailor[ing] to each contract" through the authority to exempt contracts from a PLA requirement where such a requirement would not promote economy and efficiency as to that contract. *NGS*, 923 F.3d at 986. To the extent Plaintiffs challenge the application of that authority to particular contracts, *see* Pls.' MSJ at 15, that is not a valid basis for a facial challenge to the PLA Order and PLA Rule. Instead, Plaintiffs may file a bid protest to any solicitation that, in Plaintiffs' view, should have been exempted. *See* 28 U.S.C. §§ 1491(a)(1), 1295(a)(3); 4 C.F.R. § 21.0 *et seq.*[5] In any event, Plaintiffs' challenge to the application of the exception authority rests on the mistaken premise that PLAs require "union contractors . . . to

---

[5] This possibility is not merely theoretical; rather, eight bid protests to solicitations issued pursuant to the PLA Order and Rule are currently pending. *See MVL USA, Inc. et al. v. United States*, Nos. 24-CV-1057, 24-CV-1144, 24-CV-1077, 24-CV-1219, 24-CV-1461, 24-CV-1398, 24-CV-1433 (Fed. Cl.); *Harper Constr. Co., Inc. v. United States*, No. 24-CV-1532 (Fed. Cl.).

perform the work." Pls.' MSJ at 15.

III.    The PLA Rule And OMB Memo Comply With The APA And OFPP Act

Defendants' motion for summary judgment explained that to the extent the APA and OFPP Act apply to the PLA Rule and the OMB Memo, they easily pass muster. Defs.' MSJ at 20-22. Plaintiffs' arguments to the contrary lack merit.

To begin, Plaintiffs argue that APA review under the APA's arbitrary and capricious standard is "available" because the PLA Rule and OMB Memo are "agency action[s] stemming from executive orders where 'there is law to apply.'" Pls.' MSJ at 17. But most of the cases Plaintiffs rely upon challenged *discretionary* actions to implement executive orders.[6] Here, Defendants lacked such discretion. The only comparable case Plaintiffs cite is *Rung*, which did not even consider the argument Defendants raise here. Applying APA standards of reasoned decision-making to implementation of the President's policy directives in the EO "contravene[s] the thrust of the Supreme Court's holding in [*Franklin v. Massachusetts*, 505 U.S. 788 (1992)] by subjecting almost every executive order to APA review." *Feds for Med. Freedom v. Biden*, 581 F. Supp. 3d 826, 835 (S.D. Tex. 2022), *aff'd*, 63 F.4th 366 (5th Cir.) (en banc), *vacated on other grounds*, 144 S. Ct. 480 (2023).[7] Rather, APA review of an agency's implementation of a policy determined by the President (under authority delegated specifically to him) is reviewable only as to whether

---

[6] *City of Carmel-by-the-Sea v. Dep't of Transp.*, 123 F.3d 1142, 1166-67 (9th Cir. 1997) (concluding that federal agency complied with requirements of two executive orders); *Sierra Club v. Clinton*, 689 F. Supp. 2d 1147, 1156-58 (D. Minn. 2010) (reviewing compliance with National Environmental Policy Act in implementing authority delegated via executive order); *Indigenous Envt'l Network v. Dep't of State*, No. CV-17-29, 2017 WL 5632435, at *5-6 (D. Mont. Nov. 22, 2017) (same); *Protect Our Cmtys. Found. v. Chu*, No. 12-cv-3062, 2014 WL 1289444, at *6 (S.D. Cal. Mar. 27, 2014) (same).

[7] Plaintiffs' charge that *Feds for Medical Freedom* is "bad law" because it was "vacated" on mootness grounds, Pls.' MSJ at 17 n.27, is erroneous, *see supra* page 5.

the presidential determination was statutorily valid. *Reich*, 74 F.3d at 1326.

Regardless, the PLA Rule and OMB Memo (even assuming the Memo were final agency action, which it is not, *see* Defs.' MSJ at 21) would easily survive arbitrary and capricious review if it applied. The PLA Rule explains how PLAs "help mitigate challenges to the efficient completion of quality construction projects." AR0012 (PLA Rule); *see also* Defs.' MSJ at 11-14 (summarizing arguments contained in the administrative record that PLAs are beneficial). Unsurprisingly the administrative record contains evidence that supports the PLA Rule (such as studies showing PLAs did not discourage bidding when projects of comparable scope and complexity were compared, AR0657-0720) and evidence that points the opposite way (such as the surveys of Plaintiffs' members, AR0516). But if the agencies (as opposed to the President) made the final policy determination, the choice of how to weigh the evidence would have belonged to them. *See N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1539 (11th Cir. 1990) ("When specialists express contrary views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if . . . a court might find contrary views more persuasive." (quoting *Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 378 (1989))). The agencies were not at liberty to adopt a policy other than the one articulated in the EO (which is why the PLA Rule is not subject to arbitrary and capricious review), and they were certainly not required to adopt the policy preferred by Plaintiffs' members.

Plaintiffs' specific criticisms lack merit. They complain that the agencies did not take stock of contracting practice under the Obama- and Trump-era rule that merely encouraged the use of PLAs. Pls.' MSJ at 17-18. But the agency members of the FAR Council were well aware that agencies chose to require a PLA for only a small number of

eligible projects between 2009 and 2021. AR0019 (Final Rule). The point of the EO was to "expand the use of PLAs by Federal Agencies" beyond what was observed under the prior rule in order to "help agencies achieve construction goals more effectively." AR0019-20. The agencies of the FAR Council were thus "on notice of the [Plaintiffs'] concern[s]" and "address[ed] [it] adequately." *Ohio v. EPA*, 144 S. Ct. 2040, 2056 (2024). Contrary to Plaintiffs' assertion, Pls.' MSJ at 16, the agencies also adequately addressed any reliance interest Plaintiffs possessed in the prior policy, AR0019-20 (Final Rule).

Plaintiffs also assert that Defendants "miss the point" of complaints about the supposed leverage unions enjoy in negotiating PLAs with contractors. Pls.' MSJ at 18-19. But despite voluminous comments from across the construction industry, Plaintiffs still fail to identify any evidence in the administrative record that would suggest unions have "no corresponding incentive to reach agreement on any but their own terms," *id.* at 18. The argument is also counterintuitive. Agencies may opt out of the PLA requirement if it would "substantially reduce the number of potential offerors to such a degree that adequate competition at a fair and reasonable price could not be achieved." FAR 22.504. Unions cannot overplay their negotiating hand without running the risk that no one can assemble a viable project bid, which would give agencies a basis to waive the PLA requirement.

Plaintiffs also assert that the exceptions in the rule are "phantoms" that are "narrow" and "arbitrary" and lacking "meaningful criteria for agencies to use in determining whether an exemption is appropriate." Pls.' MSJ at 19. Plaintiffs fail to explain precisely what makes the current exceptions not "meaningful": projects can be excepted because (1) they fit one of four categories of projects where a PLA would not "[a]dvance the

Federal Government's interests in achieving economy and efficiency," (2) "[m]arket research indicates" that a PLA would so limit the number of bidders "that adequate competition at a fair and reasonable price could not be achieved," or (3) another source of federal law prevents a PLA from being imposed. AR0029-30 (PLA Rule). To the extent Plaintiffs believe that contracting agencies are not applying these exceptions properly because an exception has yet to be issued, that is an issue with the *application* of the PLA Rule to specific procurements. This case does not concern application of the PLA Rule by federal agencies. The Court has no record before it on how agencies have applied the exceptions and cannot award relief to Plaintiffs based solely on their speculation about the matter.

Finally, Plaintiffs contend that the OMB Memo violates the OFPP Act because it was not promulgated after notice and comment. Pls.' MSJ at 19-20. Even if the OMB Memo were reviewable final agency action (it is not, *see* Defs.' MSJ at 21), Plaintiffs acknowledge that if the OMB Memo is a guidance document that lacks legal force, then it did not need to go through notice and comment. But Plaintiffs' arguments that the OMB Memo is more than mere guidance fall flat. For example, Plaintiffs make much of the OMB Memo defining the number of offers required for adequate price competition, but the FAR already defines that term. OMB Memo at 7 (citing FAR 15.403-1(c)(1)). Regarding market research, it is the PLA Rule, not the OMB Memo, that augments the FAR's preexisting market research provisions by requiring them to make a "current and proactive examination of the market conditions in the project area." *Id.* at 3 (citing FAR 36.104(c)(2)). Indeed, all of the mandatory language in the OMB Memo (such as "shall" and "must") emanates from the EO, the PLA Rule, or other provisions of the FAR. The

OMB Memo is explicitly meant to provide "guidance on the implementation of" the EO for federal agencies, not to impose new obligations on the agencies. *Id.* at 1. It therefore did not need to go through notice and comment prior to issuance.

IV.    The EO, PLA Rule, And OMB Memo Do Not Violate The First Amendment

The authority of governments to require PLAs in construction contracts has been accepted for decades. Plaintiffs' novel First Amendment theory would require the Court to declare, for the first time, that PLA requirements are not simply contrary to statute, but unconstitutional, in all forms of government contracting. Plaintiffs cite not one case that supports this extraordinary theory, and this Court should not make this case the first.

Plaintiffs' argument attempts to stretch recent cases in which individuals were forced to subsidize the speech activities of a union, regardless of whether they wished the union to speak on their behalf. *See Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 585 U.S. 878 (2018); *Knox v. Service Emps. Int'l Union, Local 1000*, 567 U.S. 298, 302 (2012). Those cases did not concern PLAs, and unlike those cases, "[n]either the E.O. nor the [PLA Rule] require non-union employees to pay union dues or join a union." OMB Memo at 4. The Supreme Court rejected a similar effort to overstretch associational rights in *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) ("*FAIR*"). *FAIR* concerned a challenge to the Solomon Amendment, which conditioned federal funding to universities on permitting military recruiters to access campus on the same terms as other recruiters. The Court acknowledged that law schools might be said to "'associate' with military recruiters in the sense that they interact[ed] with them" by "allow[ing] [them] on campus and assist[ing] them in whatever way the school cho[se] to assist other employers." 547 U.S. at 69. But the Court nonetheless held that

14

the Solomon Amendment did not violate the law schools' expressive association rights because the recruiters were "outsiders who come onto campus for the limited purpose of trying to hire students" and "the schools are not speaking when they host interviews." *Id.* at 64, 69. Merely because "[t]he law schools [*said*] that allowing military recruiters equal access impair[ed] their own expression by requiring them to associate with the recruiters" did not bring those interactions within the First Amendment's reach. *Id.* at 69.

Here, too, the interactions that unions would have with Plaintiffs in negotiating a PLA do not constitute protected expressive association. Nor is the relevant benchmark the "intrusiveness" of the requirement, a term *FAIR* never uses. Pls.' MSJ at 21. Rather, the requirement to reach an arms-length agreement with "outsiders . . . for the limited purpose" of meeting the government's contracting requirements is not tantamount to the unions becoming "members of the [Plaintiffs'] expressive association." *FAIR*, 547 U.S. at 69. That is why cases such as *Arkansas Times LP v. Waldrip*, 37 F.4th 1368 (8th Cir. 2022), and *Rust v. Sullivan*, 500 U.S. 173 (1991), are relevant here. The fact that these cases dealt with speech does not negate the point that "commercial decisions," whether as to speech *or* association, lack the "inherently expressive" quality that distinguishes true "expressive" association from conduct the government may freely regulate. *Waldrip*, 37 F.4th at 1394. Tellingly, Plaintiffs make no effort to distinguish *Christian Labor Ass'n v. City of Duluth*, No. 21-227, 2023 WL 3996240 (D. Minn. June 14, 2023), where the court correctly applied *FAIR* to conclude that PLAs do not coerce expressive association.

V.    <u>The EO, PLA Rule, And OMB Memo Do Not Violate The NLRA</u>

Similar to their First Amendment claim, Plaintiffs' NLRA claim relies on a category error to argue for a sweeping and novel reinterpretation of the law entirely lacking in

15

precedent. The section of the NLRA at issue, 29 U.S.C. § 158(d), obligates employers to collectively bargain, and specifies that "such obligation does not compel either party to agree to a proposal or require the making of a concession." By contrast, *H.K. Porter v. NLRB*, 397 U.S. 99 (1970), did involve compulsion. In that case, the National Labor Relations Board ordered an employer to agree to automatic deduction of union dues from employee paychecks as a remedy for bad-faith bargaining. 397 U.S. at 102-09. The Supreme Court invalidated that order, holding that the NLRA "never intended that the Government would . . . step in, become a party to the negotiations" between a union and an employer "and impose its own views of a desirable settlement" on them. *Id.* at 103-04.

This case is not like *H.K. Porter* because the presumption in favor of PLAs regulates the conduct of agencies as *employers* negotiating their own contracts, rather than imposing terms between other employers and unions. In the *Boston Harbor* case, the Supreme Court unanimously held that when a state government acted in its capacity as contractor to require a PLA, there was no NLRA preemption. *Bldg. & Constr. Trades Council of the Metro. Dist. v. Assoc. Builders & Contractors of Mass./RI, Inc.*, 507 U.S. 218 (1993). True, *Boston Harbor* did not reach the Section 8(d) issue. 507 U.S. at 232 n.2. But in the thirty years since *Boston Harbor* was decided, Plaintiffs have not identified a single case applying *H.K. Porter* or similar decisions to the government's use of PLAs in its own contracting. Such cases do not exist because, properly understood, Section 8(d) has no application when the government is the contractor.

VI.    The EO, PLA Rule, And OMB Memo Comply With The RFA And SBA

The Court should grant summary judgment to Defendants on Plaintiffs' Regulatory Flexibility Act ("RFA") and Small Business Act claims. The PLA Rule acknowledged and

addressed the concerns of the Small Business Administration Office of Advocacy ("SBA"), explaining that while the agencies of the FAR Council lacked the ability to alter the policy articulated by the President, they would work with SBA "to determine the best way to help small entities in understanding how to negotiate or participate in a construction project with a PLA." AR0027-28. That was all the agencies had to do. *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001). Because the PLA Rule originated from an executive order, the agencies lacked the power to respond to the SBA's concerns by changing the underlying policy. *See, e.g.*, AR0027 (PLA Rule) ("The exceptions in section 5 of the E.O. do not include entity size, therefore there are no alternatives available that would reduce the impact on or exempt small entities from the requirements."). That distinguishes this case from *Southern Offshore Fishing Ass'n v. Daley*, 55 F. Supp. 2d 1336 (M.D. Fla. 1999), where the agency applied inconsistent standards of analysis to the "more realistic and constructive alternatives" it could have chosen. 55 F. Supp. 2d at 1340. By contrast, the agencies of the FAR Council had to adopt the policy outlined in the EO.

VII.    <u>The Court Cannot Provide The Relief Plaintiffs Seek In This Case</u>

Because none of Plaintiffs' legal claims has merit, the Court should grant Defendants' motion and dismiss Plaintiffs' complaint, with prejudice.[8] To the extent the Court rules in Plaintiffs' favor, it should tailor any remedy appropriately. Any remedy "must be 'limited to the inadequac[ies] that produced [Plaintiffs'] injury in fact'" because the constitutional role of the Court "is to vindicate the individual rights of the people appearing

---

[8] Plaintiffs also continue to seek preliminary injunctive relief. Pls.' MSJ at 2, 25. With merits briefing nearly complete, a preliminary motion is no longer necessary to "preserve the relative positions of the parties until a trial on the merits can be held." *Benisek v. Lamone*, 585 U.S. 158, 161 (2018) (per curiam). The Court should therefore deny Plaintiffs' motion for a preliminary injunction as moot.

before it," not the resolution of generalized grievances. *Gill v. Whitford*, 585 U.S. 48, 66, 72 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

The Court should not order "vacatur" of the PLA Rule, as Plaintiffs suggest. Pls.' MSJ at 24. Plaintiffs contend that 5 U.S.C. § 706 of the APA authorizes vacatur, but it establishes the rule of decision in agency review cases, not the available remedies. *See United States v. Texas*, 599 U.S. 670, 695-98 (2023) (Gorsuch, J., concurring in the judgment). It is Section 703 of the APA that "most clearly discusses remedies," and it does not mention vacatur at all. *Id.* at 698. Defendants recognize the Eleventh Circuit has held that "vacatur" of agency action "is the ordinary . . . remedy" in an APA case. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015). But vacatur is still an exercise of equitable power, and the Court may "adjust its relief to the exigencies of the case in accordance with equitable principles governing judicial action." *Id.* (quoting *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373 (1939)).

Depending on the Court's conclusions, the proper relief may be a remand (without vacatur) to the agencies of the FAR Council for further consideration. In APA cases, courts must take "due account . . . of the rule of prejudicial error" in crafting relief. 5 U.S.C. § 706. Many of Plaintiffs' claims—such as the alleged violations of the APA—would likely not, even if successful, result in a meaningful change to the challenged policy in this case. The Court may remand an issue to the agency for further consideration, without vacatur, if "it is not at all clear that the agency's error incurably tainted the agency's decisionmaking process." *Black Warrior*, 781 F.3d at 1290; *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 464 F. Supp. 2d 1171, 1182-83, 1219 (M.D. Fla. 2006) (finding error was not prejudicial where agency had "made the necessary evaluations to warrant use of a

general permit"). Here, both the substance and procedure the agencies of the FAR Council and OMB employed in promulgating the PLA Rule and the OMB Memo were prescribed by the EO itself, which is not subject to APA review. Any relief ordered to remedy injuries arising from these claims "would be an unnecessary exercise in 'wordsmithing.'" *Sierra Club*, 464 F. Supp. 2d at 1219. Alternatively, the Court could order a remand to either the agencies of the FAR Council or OMB to address any issues without vacating the PLA Rule. *See Black Warrior*, 781 F.3d at 1289-90.

The Court should also tailor its remedy to the agency action that has actually been challenged in this case. Plaintiffs have not challenged any actual contract solicitations or contract awards in this case. Questions regarding the impact of a judgment in this case on any pending or completed procurement actions will need to be resolved in future cases, applying standard rules of issue and claim preclusion. *See Taylor v. Sturgell*, 553 U.S. 880, 892-93 (2008); *United States v. Mendoza*, 464 U.S. 154, 162-63 (1984). Extending relief in this case to cover unchallenged contracting actions would raise all of the concerns with nationwide injunctions that have made courts "weary and wary" of them. *Georgia*, 46 F.4th at 1303 (opinion of Grant, J.). So while the Court could order Defendants to "disregard" the PLA Rule as to Plaintiffs,[9] *see Texas*, 599 U.S. at 695 (Gorsuch, J., concurring in the judgment), they are not entitled to relief from every government contracting action that has been taken in reliance on the PLA Rule.

Also "clearly relevant to [the Court's] equitable balancing calculus" is the

---

[9] Although *Georgia* recognized the challenges of crafting plaintiff-specific relief in the context of contract solicitations, 46 F. 4th at 1307-08, such challenges are not a basis for awarding relief that goes beyond addressing the injuries to the named Plaintiffs in this case, which is an Article III limitation on the Court's authority, *Gill*, 585 U.S. at 66, 72.

"disruptive" potential of broader relief for federal agencies, bidders, and contractors. *Black Warrior*, 781 F.3d at 1290-91. The Eleventh Circuit's predecessor court has "recognized [a] 'strong public interest in avoiding disruptions in procurement'" arising from its "awareness that judges are ill-equipped to settle the delicate questions involved in procurement decisions, where long and complex factual histories, subtle economic factors, and the need for expeditious buying decisions require assessments 'better left to the expertise of an executive agency.'" *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1270-71 (5th Cir. 1978) (quoting *Hayes Int'l Corp. v. McLucas*, 509 F.2d 247, 258 (5th Cir. 1975)).  Other courts have similarly limited the scope of relief from an APA claim based on administrative and practical difficulties that would arise from broader remedies. *See Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 98-99 (D.C. Cir. 2002) (exercising discretion not to vacate an agency action where "there [was] no apparent way to restore the status quo ante"); *In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 853 F. Supp. 2d 138, 144-45 (D.D.C. 2012) (limiting relief to prospective vacatur of IRS notice where retrospective vacatur would "cast[] doubt" on prior refund payments).

 For these reasons, Plaintiffs' request for a "set aside on a nationwide basis," or a nationwide injunction, is without merit. Pls.' MSJ at 24-25. If the Court concludes that any relief is merited, it should craft relief that reflects the actual injuries Plaintiffs demonstrate and adhere to well-understood equitable principles. But because Defendants have complied with the law in all relevant respects, no relief is warranted in this case.

## CONCLUSION

 Accordingly, the Court should deny Plaintiffs' motion for summary judgment.

Dated: October 9, 2024                Respectfully submitted,

                                      BRIAN M. BOYNTON
                                      *Principal Deputy Assistant Attorney General*

                                      LESLEY FARBY
                                      *Assistant Branch Director, Federal Programs
                                      Branch*

                                      */s/ Taisa M. Goodnature*
                                      MICHAEL J. GERARDI (D.C. Bar No. 1017949)
                                      *Senior Trial Counsel*
                                      TAISA M. GOODNATURE (N.Y. Bar No.
                                      5859137)
                                      *Trial Attorney*
                                      U.S. Department of Justice
                                      Civil Division, Federal Programs Branch
                                      1100 L Street, NW
                                      Washington D.C. 20005
                                      (202) 514-3786
                                      Taisa.M.Goodnature@usdoj.gov

                                      *Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 9th day of October, I electronically filed the

foregoing with the Clerk of the Court by using the ECF system, which will send a notice

electronically to all registered users of ECF.

*/s/ Taisa M. Goodnature*

Taisa M. Goodnature
Trial Attorney