"The whole purpose of the project labor agreement is to prevent interruption and prevent delay and have labor peace," he said. "So the question this strike raises is—and I don't know the answer to it—what impact will this strike have on the willingness of other building owners to engage in a project labor agreement?"

This government data on the scarcity of construction industry strikes and examples of strikes on PLA projects undermine the proposal and EO's assertions that PLAs are needed to prevent strikes and labor unrest on large-scale federal projects.

### H. PLAs Will Not Achieve Greater Efficiency in Terms of Safety, Quality or Project Delivery

There is no evidence to support claims that PLAs guarantee better safety, quality or construction project delivery. As demonstrated in Section II of these comments, ABC federal contractors have continued to win the majority of large-scale federal contracts and deliver quality work safely, on time and on budget without harmful government-mandated PLAs.

In addition, the majority of ABC's September 2022 survey respondents said PLA mandates would either result in construction projects that are less safe (65%) or have no impact on safety (34%). Three-quarters (75%) said PLAs would result in poorer quality or have no impact on quality (24%). Fully 85% said PLA mandates decrease the likelihood of completing a project on time and on budget, with 9% saying there would be no impact. [149]

Improved safety has been frequently cited as a justification for PLA mandates. However, there is no evidence to suggest that PLAs improve safety. Contractors are already required to follow all applicable federal, state and local safety regulations whether a project is built with or without a government-mandated PLA. Construction superintendents and others responsible for jobsite safety are required to comply with safety regulations that are constantly being issued and updated by the DOL's Occupational Safety and Health Administration.

Many states also have state and local workplace safety regulations that may be more expansive than federal OSHA regulations, and these also must be followed as a condition of complying with a government contract. These measures remain in place on jobs built with and without government-mandated PLAs.

Many construction contractors have additional internal company safety education programs, jobsite safety plans and in-house safety departments and rely on third-party experts and external safety professionals to bolster jobsite safety. ABC believes maintaining world-class safety is no accident and created the STEP Safety Management System, a program that helps industry contractors improve jobsite safety.[150] STEP measures how much leading indicators—proactive injury and hazard elimination tools on the jobsite—improve safety performance.

---

[149] Survey: 97% of ABC Contractors Say Biden's Government-Mandated Project Labor Agreement Policies Would Make Federal Construction More Expensive, ABC Newsline, Sept. 28, 2022.
[150] http://www.abcstep.org/.

AR0543

ABC's Safety Performance Report[151] captures data on nearly a billion hours of construction work from STEP participants and identifies the best practices and core leading indicators that had the biggest impact on safety performance. In 2021, those included the use of personal protective equipment, supervisor safety meetings, pre-planning for project safety and employee participation in safety reporting and processes, among others. The findings of ABC's 2022 Safety Performance Report show that safety processes and planning are the keys to project safety. Top-performing STEP companies achieved incident rates 645% safer than the BLS industry average in 2021 by focusing on safety through a companywide commitment to safety as a core value.

Creating an effective company safety culture and formal process for tracking these leading indicators and acting on them has produced positive and meaningful safety outcomes without the necessity for a government-mandated PLA.

In addition, BLS data suggests that government-mandated PLAs do not measurably improve safety. The 2019 BLS Survey Occupational Injuries and Illnesses and the BLS Census of Fatal Occupational Injuries show that states with laws prohibiting government-mandated PLAs had average of 2.4 total recordable construction incidents, while states that allow and encourage government-mandated PLAs had an average of 3.5 total recordable construction incidents.[152]

In fact, a government-mandated PLA can undermine a company's safety culture by replacing all or most of its existing workforce with construction workers from union hiring halls with unknown safety education and no familiarity with a company's existing safety program and culture.

Likewise, a government-mandated PLA can also undermine a project's quality by requiring that contractors get most or all of their labor from union hiring halls and follow inefficient union work rules. ABC contractors raise concerns that both factors are likely to result in the performance of a project that fails to meet a company's quality standards. ABC contractors say the use of existing employees and multiskilling helps ensure quality work and consistent labor costs, but those are undermined when a PLA is mandated.

Based on the lack of evidence for improvements to safety, quality or project delivery, there is no "efficiency"-based justification for mandating a PLA on federal construction projects.

---

[151] ABC 2022 Safety Performance Report: Top-Performing STEP Members Are Six Times Safer Than Industry Average, ABC, April 29, 2022.
[152] See www.TheTruthAboutPLAs.com, Setting the Record Straight: Do Government-Mandated Project Labor Agreements Really Improve Safety Performance? March 16, 2021, https://tinyurl.com/2fyyjkdm.

AR0544

## III. Based on the Facts Set Forth Above, the Executive Order and the Proposed Rule Implementing It Violate Numerous Federal Laws and Must Be Withdrawn

### A. The Proposed Rule Violates CICA's Mandate of "Full and Open Competition" in the Award of Federal Construction Contracts

The foundation for the federal government's procurement requirements is the Competition in Contracting Act of 1984.[153] CICA was enacted to assure that all interested and responsible parties have an equal opportunity to compete for and win federal government contracts. Full and open competition means that all responsible sources are permitted to submit competitive proposals on a procurement action, without favoritism or discrimination in the procurement process. CICA requires, with certain limited exceptions, that the federal government promote full and open competition in awarding contracts.[154]

Of particular significance to the proposed rule, CICA expressly bars federal agencies from using restrictive bid specifications to effectively discourage or exclude contractors from the pool of potential bidders or offerors. As the act states, agencies must solicit bids and offers "in a manner designed to achieve full and open competition" and "develop specifications in such a manner as is necessary to obtain full and open competition."[155]

As discussed above, the proposed rule conflicts directly with CICA by requiring federal agencies to impose PLAs which discriminate against and injure competition among potential bidders, i.e., those contractors who are not signatory to certain favored union labor unions and corresponding CBAs.[156] By demonstrating a preference toward a narrow class of contractors, this proposal and government-mandated PLAs clearly do not "obtain full and open competition" and are therefore unlawful under CICA.

### B. The Proposed Rule and Executive Order Exceed the President's Authority Under the Federal Property Administrative Services Act

The sole statutory authority for the proposed rule, and the president's EO 14063 cited therein, is the Federal Property and Administrative Services Act of 1949.[157] That FPASA is intended to "provide the Federal Government with an economical and efficient system" of government procurement. The act gives the president the authority to "prescribe policies and directives that [the President] considers necessary to carry out" the act, only so long as such policies are "consistent with" the act and with other laws, such as CICA. Unless President Biden has acted

---

[153] 40 U.S.C. §471 *et seq.* and 41 U.S.C. §251 *et seq.*
[154] For a full and recent discussion of CICA's requirements, *see* Manuel, *Competition in Federal Contracting: An Overview of the Legal Requirements* (Congressional Research Service April 2009).
[155] *Id.* at 18, citing 10 U.S.C. § 2305(a)(1)(A) and 41 U.S.C. § 253a(a)(1)(A-C); *see also* Cohen, *The Competition in Contracting Act,* 14 Pub. Con. L. J. 19 (1983/1984).
[156] More than 87% of the U.S. construction industry workforce do not belong to a union and are employed by contractors who are not signatory to any union agreements, according to U.S. Bureau of Labor Statistics Table 3, Union affiliation of employed wage and salary workers by occupation and industry, accessed Oct. 4, 2022, available at: https://www.bls.gov/news.release/union2.t03.htm.
[157] 40 U.S.C. § 101, *et seq.*

AR0545

in a manner consistent with this statutory authority, neither the proposed rule nor EO14063 is valid.[158]

No president has previously claimed the authority under the FPASA to mandate PLAs on federal construction projects throughout the government. Such an unprecedented arrogation of authority to the executive branch violates the Constitution in a manner squarely prohibited by the U.S. Supreme Court in West Virginia v. EPA.[159] In contrast, President Obama's EO 13502 only "encouraged" federal agencies to consider and, if appropriate, adopt PLAs if specific criteria were met. As discussed in ABC's comments, very few federal contracts were actually subjected to PLA mandates under the Obama EO 13502, which itself is proof that the government procurement officials recognized the harms caused by imposing PLAs on federal construction procurements across the board.

ABC's comments present overwhelming evidence of problems on projects subject to government-mandated PLAs which, in concert with the federal government's limited use and negative experiences with PLA mandates under President Obama's EO 13502 and related FAR regulations[160] since 2009, thoroughly undermines EO 14063 and the proposed rule's justifications for PLA mandates on federal construction contracts. As a result, the EO and the proposed rule cannot be found to be authorized by the FPASA.[161]

## C. By Overturning Previous Regulations Governing PLAs Without Adequate Justification, The Proposed FAR Rule Is Arbitrary and Capricious in Violation of the Administrative Procedure Act

The Supreme Court has repeatedly held that agencies act arbitrarily when they change course without dealing with the important aspects of the problem addressed by the rule they purport to reconsider.[162] Here, the proposed FAR Council rule fails to address the injuries to competition, discrimination, increased costs and greater likelihood of delays in construction caused by PLA mandates, as demonstrated throughout ABC's comments in this document.

Agency reversals of policy have also been vacated where they rely on factors that they should not have considered, and where they offer explanations for new rules that run counter to the evidence.[163] As shown throughout ABC's comments, the proposed FAR Council rule offers explanations for the PLA mandate that run counter to the evidence. The use of internally

---

[158] See Liberty Mut. Ins. Co. v. Friedman, 639 F. 2d 164, 169-171 (4th Cir. 1981) ("[A] court must reasonably be able to conclude that the grant of [legislative] authority contemplates the regulations issued.").

[159] 142 S. Ct. 2587, 2608 (2022) (refusing to permit the executive branch to exercise powers of vast economic and political significance unless Congress has spoken clearly to authorize the agency to exercise such powers.). See also Georgia v. President of the U.S., 46 F. 4th 1283 (11th Cir. 2022) (rejecting president's claimed authority to impose vaccine mandates on government contractors under the FPASA).

[160] See FAR Case 2009-005, Use of Project Labor Agreements for Federal Construction Projects, published April 13, 2020, effective May 13, 2010, and EO 13502, Use of Project Labor Agreements for Federal Construction Projects, signed Feb. 6, 2009, (https://www.govinfo.gov/content/pkg/FR-2009-02-11/pdf/E9-3113.pdf).

[161] Because of the president's failure to justify his executive order with facts demonstrating a close nexus between government-mandated PLAs and increase economy and efficiency of federal procurement, such cases as AFL-CIO v. Kahn, 618 F. 2d 784 (D.C. Cir. 1979) are distinguishable.

[162] See, e.g., DHS v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1910 (2020); State Farm, 463 U.S. at 43 (1983) ("An agency's action is arbitrary and capricious, … where it fails to consider important aspects of the problem.").

[163] Id.; see also FCC v. Fox TV Stations, Inc., 556 U.S. 502, 515 (2009).

AR0546

contradictory reasoning also indicates arbitrary action.[164] As shown throughout ABC's comments, the FAR Council's rationales plainly contradict themselves, as the PLA mandates do not promote greater efficiency or reduced cost but the exact opposite instead.

As the Supreme Court has also held, an agency that purports to be changing longstanding policies, as is certainly occurring here, must also consider costs to regulated parties, as well as the reliance interests of the regulated parties.[165] Government contractors in the construction industry have long relied on the principle of government neutrality in procurement to provide competitive, responsive and responsible bids. The proposed rule upends these longstanding principles without any consideration of the reliance interests of the regulated parties.[166]

In sum, the FAR Council's proposed PLA mandate rule is arbitrary and capricious because the agency has relied on factors which Congress did not intend it to consider, entirely failed to consider important aspects of the problem, offers explanations for its decision that run counter to the evidence before the agency and/or fails to address the costs and reliance interests of the regulated parties. For all of these reasons, the proposed PLA mandate rule violates the APA, as a federal court is likely to find, and the proposed rule should be immediately withdrawn.

### D. The Proposed Rule Discourages Small and Disadvantaged Businesses From Bidding on Federal Construction Projects, Thereby Violating the Small Business Act

The adverse economic impact of PLAs on small businesses in the construction industry directly contravenes Congress's repeatedly expressed intent to promote and encourage federal procurement to small businesses.[167] In 1978, Congress amended the Small Business Act to require all federal agencies to set percentage goals for the awarding of procurement contracts to small businesses.[168]

As referenced throughout these comments, the majority of ABC's contractor members are classified as small businesses. The companies represent the backbone of the construction industry. Unfortunately, the proposed rule would continue a trend of policies that have reduced small business participation in federal contracting. Small businesses have suffered a 60% decline in the number of firms awarded federal contracts from 2010-2020, according to SBA data.[169]

---

[164] *See Southwestern Elec. Power Co. v. EPA*, 920 F.3d 999, 1030 (5th Cir. 2019) ("[T]he agency's rationales contradict themselves...and therefore cannot stand.").

[165] *Encino Motorcars v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016); *Brackeen v. Haaland*, 994 F.3d 249 (5th Cir. 2021) (*en banc*).

[166] *See also Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 387 (5th Cir. 2021).

[167] See discussion in An Overview of Small Business Contracting, Congressional Research Service, updated July 29, 2022.

[168] P.L. 95-507 (1978), 15 U.S.C. 644 (g).

[169] Chart available at: https://thetruthaboutplas.com/wp-content/uploads/2022/09/60-percent-decline-of-small-businesses-awarded-federal-construction-contracts-2010-to-2020.png. The data was prepared by an SBA economist who said, "The charts represent data on vendors who have received obligations. The definition of 'small' comes from the contracting officer's determination when the contract was awarded. The COs follow the NAICS size standards." Data is from FPDS that can be publicly accessed through SAM.gov: https://sam.gov/reports/awards/standard.

AR0547



## Number of Construction Industry Small Businesses Awarded Federal Contracts Declined 60% From 2010-2020

Vendor Counts of Small Businesses in Construction

| FY | Small Business | SDB | SDVOSB | HUBZone | WOSB | 8A | SBGR |
|---|---|---|---|---|---|---|---|
| 2009 | 13960 | 3460 | 1268 | 1721 | 2245 | 2024 | 16186 |
| 2010 | 15114 | 3946 | 1555 | 1892 | 2473 | 2225 | 17644 |
| 2011 | 13803 | 3896 | 1491 | 1726 | 2333 | 2168 | 16335 |
| 2012 | 12400 | 3696 | 1400 | 1416 | 2156 | 2047 | 14510 |
| 2013 | 11000 | 3076 | 1292 | 1199 | 1903 | 1856 | 12690 |
| 2014 | 11147 | 4466 | 1216 | 1067 | 1936 | 1819 | 12706 |
| 2015 | 10115 | 4298 | 1163 | 995 | 1805 | 1707 | 11724 |
| 2016 | 9818 | 4429 | 1133 | 937 | 1838 | 1682 | 12465 |
| 2017 | 9583 | 4495 | 1160 | 946 | 1827 | 1631 | 12146 |
| 2018 | 9338 | 4592 | 1202 | 948 | 1817 | 1616 | 11424 |
| 2019 | 8596 | 4363 | 1202 | 975 | 1664 | 1528 | 10504 |
| 2020 | 8389 | 4451 | 1184 | 1012 | 1644 | 1486 | 10191 |

Source: Small Business Goaling Report, FY09 - FY20

The decline in small business participation in federal contracts directly correlates with increasing federal regulatory burdens. Small business contractors may choose to bid on private sector and state/local government contracts when increased regulatory clarity and lower regulatory burdens reduce costs related to the need for expertise from attorneys and compliance professionals.

The proposed rule's imposition of government-mandated PLAs represents another burden for small businesses, despite EO 14063's erroneous claim that "the use of project labor agreements is fully consistent with the promotion of small business interests."[170]

The truth is the discriminatory nature of government-mandated PLAs in the proposed rule will have a disparate impact on federal small business general contractors and subcontractors, many of whom are minority-, women-owned and disadvantaged businesses and employ a diverse workforce. The majority of these firms are not unionized and would be disenfranchised by the costly requirements of government-mandated PLAs, which larger construction firms are more capable of absorbing because a greater proportion of larger firms are unionized, although the majority of large contractors are not signatory to a union and would also be harmed by government-mandated PLAs and this proposal.

Responses to ABC's September 2022 survey of federal contractors support this point. Ninety-seven percent of respondents who self-identified as small business owners said they would be less likely to bid on contracts if the proposed rule is finalized, and 73% of these respondents stated that PLAs decrease the hiring of minority, women, veteran and disadvantaged business enterprises.

---

[170] See discussion in EO 14063: https://www.federalregister.gov/d/2022-02869/p-3.

### E. The Proposal's Expected Impact and Initial Regulatory Flexibility Analysis Vastly Underestimates the Economic Impact of the Proposed Rule

The proposed rule's Expected Impact section estimates an impact of only $549,136 annually,[171] and the rule's Initial Regulatory Flexibility Analysis states that the FAR Council "[does] not expect this rule to have a significant economic impact on a substantial number of small entities."[172] However, these assessments are based on a number of deeply flawed assertions, and the IRFA should be redone prior to any finalization of the proposed rule. This is especially important as a corrected analysis is likely to find that the proposed rule will have an impact on the economy greater than $100 million per year, qualifying the rule as a major rule under the Congressional Review Act.[173]

First, the analysis estimates that between 40 and 80 hours will be spent by each party involved in negotiating a PLA on behalf of a contractor.[174] Given the protracted nature of PLA negotiations, as demonstrated throughout ABC's comments, it is likely that this is a significant underestimation.

As well as relying on a flawed estimate of the hours spent on negotiations, the analysis also underestimates attorney fees by calculating attorney costs at $71.17 per hour.[175] Reports indicate that lawyers specializing in employment/labor matters charge an average of $319 to $341 per hour,[176] again indicating that the FAR Council has massively understated costs associated with PLA negotiations.

The FAR Council also estimates that each prime contractor submitting a PLA for a construction contract of $35 million or more is likely to have approximately two subcontractors.[177] It is highly unlikely that the vast majority of prime federal contractors at this scale would hire so few subcontractors. In ABC's 2022 survey, 93% of respondents disagreed with the proposed rule's inaccurate estimate. Respondents most frequently stated that such a project would require 10 to 15 subcontractors, illustrating that the estimate is seriously flawed.

Further, the proposed rule estimates that subcontractors will only take one to 10 hours to read, understand and implement PLAs negotiated by prime contractors.[178] Given the lengthy and complex nature of PLAs, this estimate is unrealistically low and further undermines the accuracy of the analysis.

Given the significant inaccuracies and underestimations outlined above, the FAR Council must reconduct its analysis of the rule's expected impact and its IRFA to obtain an accurate

---

[171] See preamble: https://www.federalregister.gov/d/2022-17067/p-34.
[172] See preamble: https://www.federalregister.gov/d/2022-17067/p-40.
[173] 5 USC § 804(2).
[174] See preamble: https://www.federalregister.gov/d/2022-17067/p-32
[175] Ibid.
[176] "2022 Legal Trends Report," Clio, Oct. 10, 2022.
[177] See preamble: https://www.federalregister.gov/d/2022-17067/p-48.
[178] See preamble: https://www.federalregister.gov/d/2022-17067/p-34.

AR0549

understanding of the impact this proposed rule will have on small businesses, federal procurement and the overall construction industry.

### F. The Proposed Rule Constitutes Regulatory Interference With Private Employment Rights Under the NLRA, ERISA and National Apprenticeship Act

Although the proposed rule purports to serve the federal government's proprietary interests, its establishment of a new governmentwide policy requiring PLAs constitutes unlawful regulation which interferes with private sector labor relations and fringe benefit programs in violation of the NLRA and ERISA. The proposed rule is not protected from challenge by the Supreme Court's limited holding in Building and Construction Trades Council of the Metropolitan District v. Associated Builders and Contractors of Massachusetts/Rhode Island, Inc. ("Boston Harbor"),[179] because it is not limited in its scope to a single project.[180]

In addition, the proposed rule violates Section 8(d) of the NLRA, which was not addressed in Boston Harbor, because it imposes labor agreements on construction contractors over their objection.[181] The proposed rule is also inconsistent with Sections 8(e) and 8(f) of the NLRA, which the Supreme Court referred to as exempting public entities from NLRA preemption, solely to the extent that such entities acted in a manner that was authorized for private construction users under the NLRA. Sections 8(e) and 8(f), however, only authorize PLAs to be entered into by "employers in the construction industry" and even then, only in the "context of collective bargaining" on a voluntary basis, uncoerced by either unions or governments.[182]

The proposed rule likewise violates ERISA[183] by encouraging federal agencies to mandate employer participation in union benefit programs covered by that act, which ERISA has long declared to be voluntary, not mandatory. In addition, the proposed rule discriminates against nonunion benefit programs that are supposed to be protected by ERISA, including nonunion apprenticeship training programs. Employees of nonunion contractors who are forced by federal agencies to sign PLAs will no longer receive credit toward their existing apprenticeship programs, and such employees will be forced to enroll in union apprenticeship programs (or alternatively, the nonunion contractors will be forced to hire existing union apprentices instead of their own). Such government-mandated discrimination violates the National Apprenticeship Act, which has been previously found to prohibit union versus nonunion discrimination.[184]

---

[179] 507 U.S. 218 (1993).
[180] See Chamber of Commerce v. Brown, 522 U.S 60 (2008) ("In finding that the state agency had acted as a market participant, we stressed [in Boston Harbor] that the challenged action "was specifically tailored to one particular job," and aimed "to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost."
[181] See 29 U.S.C. § 158(d), which expressly states that neither party to collective bargaining can be compelled by the government to agree to a proposal. See also H.K. Porter v. NLRB, 397 U.S. 99, 103 (1970).
[182] See Glen Falls Building and Construction Trades Council, 350 NLRB 417 (2007) (Invalidating a PLA imposed by an owner on construction contractors outside the context of the owner's collective bargaining).
[183] 29 U.S.C. § 1001, et seq.
[184] Associated Builders and Contractors, Inc. v. Reich, 963 F. Supp. 35, 38 (D.D.C. 1997).

AR0550

## G. The Proposed Rule Violates the Congressional Review Act

The proposed rule incorrectly states that "this rule is not a major rule under 5 U.S.C. 804."[185] ABC disagrees. The Congressional Review Act (as codified at 5 U.S.C. §804(2)) defines a major rule as including any rule likely to result in:[186]

> (A) an annual effect on the economy of $100,000,000 or more;
> (B) a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; or
> (C) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of the United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

As discussed above, the imposition of PLAs on federal agency construction projects will have significant adverse effects on competition, will cause major increases in construction costs for federal agencies and are likely to have an annual effect on the economy of $100 million or more. In addition to added regulatory costs to the federal contracting community discussed in ABC's comments in Section III. E., if federal agencies mandate PLAs on just 10 federal construction projects, the CRA's $100 million annual effect on the economy threshold will be reached.[187] This means that the FAR Council is required to conduct a proper cost benefit analysis of the proposed rule and government-mandated PLAs, and otherwise comply with the "major rule" requirements of the CRA.

For each of these reasons, ABC believes that the FAR Council must reclassify the proposed rule as a major rule and comply with all of the requirements of the Congressional Review Act.

## H. The Proposed Rule Fails to Establish Any Meaningful Criteria for Federal Agencies to Apply in Considering Whether to Impose PLAs

The proposed rule amends the FAR[188] to require federal agencies to mandate a PLA on all large-scale federal construction contracts of $35 million or more. This ABC-opposed blanket PLA requirement fails to establish any meaningful criteria or analysis about why a PLA is appropriate for a specific project. The proposal presumes that all government-mandated PLAs will lead to economy and efficiency in federal contracting, despite overwhelming evidence that PLA mandates injure competition and undermine economy and efficiency in federal contracting, as discussed in ABC's comments on the proposal. In addition, the proposal fails to

---

[185] See proposed rules' preamble VI. Congressional Review Act: https://www.federalregister.gov/d/2022-17067/p-39.
[186] See U.S. Government Accountability Office resource and FAQs on the CRA at: https://www.gao.gov/legal/other-legal-work/congressional-review-act and The Congressional Review Act (CRA): Frequently Asked Questions, Congressional Research Service, Updated Nov. 21, 2021.
[187] The FAR Council's proposal says the rule will cover roughly 120 projects annually, at an average cost of $114 million per project, totaling more than $13 billion worth of federal construction per year. The FAR Council's proposal says that not all of these projects are likely to have PLAs mandated on them. Academic research suggests that PLA mandates increase the cost of construction by between 12% and 20% per project. Therefore, it would take less than 10 federal construction projects—at an average of $114 million per project—to be subjected to PLA mandates to exceed the CRA's $100,000,000 major rule economic impact threshold if each of these PLA projects experienced a conservative 12% cost inflation resulting from the PLA mandate.
[188] See revisions to FAR 22.503 at: https://www.federalregister.gov/d/2022-17067/p-amd-8.

AR0551

assess the stronger likelihood that a PLA mandate will have a greater negative impact in certain regions and construction markets across America where union contractor market share and union labor membership is insignificant.

Instead, the onus is placed on federal contracting officers to plead with federal agency senior procurement officials to opt out of the PLA mandate for a particular construction project. The proposed rule's revisions to the FAR at 22.504[189] allows senior procurement officials to approve exceptions to the blanket PLA mandate policy[190] "by providing a specific written explanation of why at least one of the following conditions exists with respect to the particular contract":[191]

- Requiring a PLA would not achieve "economy and efficiency" in federal procurement;[192]
- Requiring a PLA would substantially reduce the number of potential bidders so as to frustrate full and open competition, i.e., where adequate competition at a fair and reasonable price could not be achieved;[193] or
- Requiring a PLA would be inconsistent with statutes, regulations, other EOs or presidential memoranda.

While ABC appreciates that the FAR Council's proposal may allow for some exceptions to inflationary and anti-competitive PLA mandates, the rationale for a blanket PLA requirement on all federal construction projects of $35 million or more—regardless of its schedule, complexity or location—is unfounded despite the existence of this exception procedure.

In addition, the proposed rule establishes five "factors in deciding whether the use of a project labor agreement is appropriate for a construction project where the total cost to the Federal Government is less than that for a large-scale construction project [$35 million]."[194] ABC strongly urges the FAR Council to remove this provision from the proposal as there is no evidence suggesting that PLA mandates are useful for projects below the $35 million project

---

[189] See the proposals amended FAR language particular to exceptions to project labor agreement requirements at: https://www.federalregister.gov/d/2022-17067/p-96.
[190] See discussion in the proposed rule here: https://www.federalregister.gov/d/2022-17067/p-21.
[191] See FAR language at: https://www.federalregister.gov/d/2022-17067/p-96.
[192] The revised FAR language says the exception for this factor shall be based on one or more of the following factors:
    (A) The project is of short duration and lacks operational complexity.
    (B) The project will involve only one craft or trade.
    (C) The project will involve specialized construction work that is available from only a limited number of contractors or subcontractors.
    (D) The agency's need for the project is of such an unusual and compelling urgency that a project labor agreement would be impracticable.
[193] The revisions to the FAR at 22.504 say "(ii) Market research indicates that requiring a project labor agreement on the project would substantially reduce the number of potential offerors to such a degree that adequate competition at a fair and reasonable price could not be achieved. (See 10.002(b)(1) and 36.104). A likely reduction in the number of potential offerors is not, by itself, sufficient to except a contract from coverage under this authority unless it is coupled with the finding that the reduction would not allow for adequate competition at a fair and reasonable price" at https://www.federalregister.gov/d/2022-17067/p-102 and "(2) When determining whether the exception in paragraph (d)(1)(ii) of this section applies, contracting officers shall consider current market conditions and the extent to which price fluctuations may be attributable to factors other than the requirement for a project labor agreement ( e.g., costs of labor or materials, supply chain costs). Agencies may rely on price analysis conducted on recent competitive proposals for construction projects of a similar size and scope," at https://www.federalregister.gov/d/2022-17067/p-104.
[194] https://www.federalregister.gov/d/2022-17067/p-86.

AR0552

threshold. Eliminating the option for PLA mandates on smaller federal construction projects—
including those procured under IDIQ—will support the inclusion of small and diverse
businesses pursuing federal contracts, among other cost and inclusion benefits of fair and
open competition discussed in these comments.

## I.   ABC Recommendations on PLA Inclusion and Exception Language

Of note, ABC supports the proposal's directive that such exceptions must be granted for a
particular contract by its solicitation date—as opposed to after the solicitation has been issued
with a PLA requirement. Submitting a bid on a federal construction contract costs federal
contractors' time and money and additional opportunity costs of not pursuing other contracting
opportunities. Compressing a bidding schedule to accommodate a project that is now free from
an anti-competitive PLA mandate will deter full and open competition, even if the PLA is
removed at some point in the solicitation process. For these reasons, ABC recommends that
the FAR Council's proposal explicitly state that a PLA cannot be required by a federal agency
after a project's solicitation date. ABC observed that federal agencies mandate PLAs at
various phases of the procurement process following the issuance of a federal construction
project's solicitation, which created a number of problems for contractors and was very
disruptive to the procurement process in general under the Obama pro-PLA policy.

In addition, ABC recommends that when federal agencies conduct market research through a
Request for Information advertised on SAM.gov to determine if a project should be exempt
from a PLA mandate that federal agencies use a governmentwide uniform survey or set of
questions with consistent formatting for federal contractors to respond to.

ABC also recommends that the FAR Council require contracting officers to give contractors at
least two weeks to respond to the survey. ABC members have completed thousands of
responses to hundreds of federal agency PLA surveys under the Obama PLA policy used to
determine if a PLA is appropriate for a federal construction project of $25 million or more. ABC
contractors broadly complain that each federal agency—and even regional offices within an
agency—asked different PLA assessment questions (as many as 23 questions) and had
different RFI formats. In most instances, federal agencies also gave contractors less than a
week to respond to the surveys once published on SAM.gov, which is not enough time to
respond to a survey with meaningful research and information.

Both of these factors undermine contractor participation and strategies to alleviate paperwork
burdens that can be gained by establishing a uniform process and response time to determine
if a PLA is appropriate or not appropriate for a project.

## Conclusion

For all of the reasons discussed in this comment letter, ABC strongly urges the FAR Council to
immediately withdraw the proposed rule. Instead of needlessly restricting the pool of eligible
bidders and construction workforce, increasing costs, causing delays and exposing the Biden
administration and individual federal construction projects to litigation, the federal government

AR0553

should seek fair and open competition to ensure all of the construction industry can continue to safely provide taxpayers with the best possible construction product at the best possible price.

Thank you for the opportunity to submit comments on this matter.

Respectfully submitted,


Ben Brubeck
Vice President of Regulatory, Labor and State Affairs
Associated Builders and Contractors
brubeck@abc.org

Of Counsel:  Maurice Baskin, Esq.
             Littler Mendelson, P.C.
             815 Connecticut Ave. NW
             Washington, DC 20006

AR0554

# PUBLIC SUBMISSION

**As of:** 10/19/22, 11:14 AM
**Received:** October 18, 2022
**Status:** Posted
**Posted:** October 18, 2022
**Tracking No.** l9e-f479-qee0
**Comments Due:** October 18, 2022
**Submission Type:** API

**Docket:** FAR-2022-0003
Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects (FAR Case 2022-003)

**Comment On:** FAR-2022-0003-0001
Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects

**Document:** FAR-2022-0003-8233
Comment on FR Doc # 2022-17067

---

## Submitter Information

**Email:** herrick@pscouncil.org
**Organization:** Professional Services Council

---

## General Comment

Please note - the attached document contains PSC's amended version of Comments on Use of Project Labor Agreements for Federal Construction Projects.

PSC respectfully submits that the Government's interests in
economy and efficiency would be best served by pausing the Proposed Rule, gathering and analyzing data to justify a reasonable threshold for requiring PLAs, and then revising any Proposed Rule. That said, based on member companies' prior experience with PLAs, PSC offers the following specific comments and recommendations for the FAR Council's consideration.
Industry Comments and Recommendations
I. Revise Definition of "Construction"
II. Revise Definition of "Labor Organizations"
III. Expected Impact of the Rule: Revise Upward the Total Impact for Establishing and Submitting PLAs in Response to a Government Contract
IV. Expected Impact of the Rule: Address the Days Taken to Negotiate a PLA Agreement and Modify FAR 52.222-33 Alternatives to Reflect Time Taken to Negotiate a PLA Agreement
V. Expected Impact of the Rule: Increase the Amount of Subcontractors Estimated Per Prime

---

## Attachments

PSC Amended Comments on Use of PLAs for Federal Construction Projects RIN 9000-AO40



October 18, 2022

Ms. Dana Bowman
Procurement Analyst
Regulatory Secretariat Division
United States General Services Administration
1800 F Street, NW
Washington, DC 20405

**Re: Professional Services Council Comments on the Use of Project Labor Agreements for Federal Construction Projects, 87 FR 51044 (RIN 9000-AO40)**

Dear Ms. Bowmam:

On behalf of the Professional Services Council (PSC), I am pleased to submit comments in response to the U.S. Government's Proposed Rule on "Use of Project Labor Agreements (PLAs) for Federal Construction Projects," published in the *Federal Register* on August 19, 2022, as RIN 9000-AO40. This Proposed Rule is intended to support implementation of *Executive Order 14063, Use of Project Labor Agreements for Federal Construction Projects* (EO).

As you may know, PSC is a trade association representing the government technology and professional services industry. PSC's 440+ member companies are small, medium, and large businesses that provide federal agencies with essential services including, but not limited to, construction, information technology, engineering, logistics, facilities management, sustainment, consulting, international development, and scientific, social, and environmental services.

Regarding requirements for PLAs for construction projects at or over a $35 million threshold, PSC is not aware of—and the Government has not provided—data on the costs or benefits of such a requirement. In fact, Government Accountability Office findings in 1998 remain true today: contract performance comparison between construction projects with / without PLAs are difficult as there is "no central or agency-specific data system with information about PLAs used on federal construction projects." [1] The Congressional Research Service echoed those findings in 2012, noting "it can be difficult to find similar projects where some use a PLA and the others do not."[2] Most recently, the Proposed Rule fails to identify instances of federal large-scale construction projects that were disrupted by labor disputes that would have been prevented by a PLA. Therefore, **the implementation of a PLA requirement for construction projects at or over a $35 million threshold appears to be a solution in search of a problem that does not, by evidence, exist.**

PSC also notes the underlying EO appears to presume employment conditions that could "threaten the efficiency and timely completion of construction projects undertaken by Federal Contractors" —for example, that disputes occur among multiple employers at a single location, various employers fail to coordinate, and there is uncertainty about terms and conditions of employment of various groups of workers.[3] However, available government data demonstrate the opposite. In

---

[1] [Project Labor Agreements: The Extent of Their Use and Related Information](#), Government Accountability Office, (May 1998).
[2] [Project Labor Agreements](#), Congressional Research Service, (June 28, 2012).
[3] [Executive Order 14063—Use of Project Labor Agreements for Federal Construction Projects](#), (February 4, 2022).

the last ten years, only five major construction work stoppages have been recorded, where 86.4 percent of workers are open-shop.[4]



*Source: U.S. Bureau of Labor and Statistics*

These data could be read as a comparison of PLA rulemaking eras: after implementation of EO 13502 (also titled *Use of Project Labor Agreements for Federal Contrsuction Projects*) in 2009 through regulations that encouraged agencies to "consider requiring" the use of PLAs on large-scale construction projects,[5] work stoppages decreased by 67.6 percent (2011-2021 versus prior ten years).[6] **However, the use of PLAs under this regulation over the last twelve years would not support this argument.** The Proposed Rule states:

> *between the years of 2009 and 2021, there were a total of approximately 2,000 eligible contracts and the requirement for a PLA was used (only) 12 times. Based on information, on average there are approximately 167 eligible awards annually and approximately one award that includes the PLA requirement.* [7]

Causality for these data is inconclusive and does not justify the use of PLAs to promote efficiency and economy in Government—much less the elevation to a mandate for all large-scale federal construction projects—when the Government chooses to apply this mandate <u>once</u> out of 167 eligible awards at the $25 million threshold. Furthermore, PSC believes mandating PLAs for large-scale federal construction projects would reflect a workforce transposition in which the minority stakeholder (i.e., affiliated construction, which represents 13.6 percent of the construction workforce)[8] would be the prevailing determinator of uniform wages, benefits, overtime, pay hours, working conditions and work rules.[9]

---

[4] Union Members, Bureau of Labor and Statistics, (January 20, 2022).
[5] Executive Order 13502 – Use of Project Labor Agreements for Federal Construction Projects, (February 11, 2009).
[6] TED: The Economics Daily, Bureau of Labor and Statistics (March 22, 2022).
[7] 87 Fed. Reg at 51046-7.
[8] Union Members, Bureau of Labor and Statistics, (January 20, 2022).
[9] Project Labor Agreements, Congressional Research Service, (June 28, 2012).

PSC also notes the EO assumes PLAs "advance the interests of project owners, contractors, and subcontractors, including small businesses." To preserve a vibrant industrial base, Government officials should acknowledge that contractor employees are private sector employees, who provide services to the Government through the cultures, capabilities, and capacities offered by the government contractor industry; this includes training, benefits, hiring plans and individual career paths. Under a mandatory PLA, contractors may not be able to leverage their existing workforce.[10] Furthermore, if a contractor *is* able to use their own workers, it would come at a cost, where their workforce would be required to remit union dues or contribute to a union pension plan, even if they are not on the project long enough to become vested in this plan.[11] The EO demonstrates awareness of this dynamic, noting "construction employers typically do not have a permanent workforce."[12] One small business owner summarized these concerns in a 2011 hearing before the House of Representative's Oversight and Government Reform Committee (Subcommittee on Technology, Information Policy, Intergovernmental Relations, and Procurement Reform):

> *PLA mandates place merit shop competitors at a disadvantage and promote discrimination based upon labor affiliation. PLAs have the practical effect of creating jobs exclusively for unionized construction tradespeople by forcing union representation or compulsory union membership, inefficient and archaic union work rules, payment of union dues, forced contributions to union pension and benefit plans, and a host of other problems on employees of merit shop contractors like my firm's employees that have freely decided not to join a union.[13]*

Several PSC members note construction organizations subcontract to small businesses in many areas of the country with nascent labor representation; such businesses are almost exclusively open-shop. In some cases, a PLA requirement will represent a losing situation: if the subcontractor signs onto a project, its workforce may be subject to unfamiliar rules, additional dues,[14] and unfulfilled pension contributions and may be the last employees the union refers to the job.[15] The Government could expect competition apprehension and vendor pool reduction from small business or subcontracting communities within the 86.4 percent of non-union workers.[16]

Therefore, this requirement may adversely impact competition. PSC members suggest construction companies, especially small businesses and subcontractors, may elect to focus bids on commercial projects rather than PLA-covered ones.

To be clear, PSC remains neutral on the use of PLAs on a case-by-case basis; they are a tool in the contracting toolkit. That said, mandating use of PLAs would establish a precedent of government preferences in instances in which the Government should remain competitively neutral to encourage the spirit of free and open competition and reduction of barriers to all marketplace entrants. This PLA mandate would place open shop competitors at a disadvantage and promote discrimination based on labor affiliation. Absent data about the costs and benefits of this mandate,

[10] *Id.*
[11] *Id.*
[12] Executive Order 14063—Use of Project Labor Agreements for Federal Construction Projects, (February 4, 2022).
[13] H.R. 735, and Project Labor Agreements, Restoring Competition and Neutrality to Government Construction, House of Representatives, Subcommittee on Technology, Information Policy, Intergovernmental Relations and Procurement Reform, Committee on Oversight and Government Reform, (Friday, June 3, 2011).
[14] Project Labor Agreements: The Extent of Their Use and Related Information, Government Accountability Office, (May 1998).
[15] McCallion, Gail, Project Labor Agreements in Federal Construction Contracts: An Overview and Analysis of Issues, Congressional Research Service, (August 24, 1999).
[16] Union Members, Bureau of Labor and Statistics, (January 20, 2022).

such a rule would diminish vendor selection and participation by both small and large businesses. To date, PSC has seen no evidence that mandated PLAs of over $35 million would enhance the efficiency or economy of the federal government.

**For the reasons cited above, PSC respectfully submits that the Government's interests in economy and efficiency would be best served by pausing the Proposed Rule, gathering and analyzing data to justify a reasonable threshold for requiring PLAs, and then revising any Proposed Rule.** That said, based on member companies' prior experience with PLAs, PSC offers the following specific comments and recommendations for the FAR Council's consideration.

## Industry Comments and Recommendations

    I.    Revise Definition of "Construction"
    II.    Revise Definition of "Labor Organizations"
    III.    Expected Impact of the Rule: Revise Upward the Total Impact for Establishing and Submitting PLAs in Response to a Government Contract
    IV.    Expected Impact of the Rule: Address the Days Taken to Negotiate a PLA Agreement and Modify FAR 52.222-33 Alternatives to Reflect Time Taken to Negotiate a PLA Agreement
    V.    Expected Impact of the Rule: Increase the Amount of Subcontractors Estimated Per Prime

## I.    Revise Definition of "Construction"

*Discussion:* The definition of "construction" should be adopted from the Davis-Bacon Act (DBA; 41 USC 3142(a) to avoid confusion between services and construction contracts. The DBA definition is: "construction, alteration, or repair, including painting and decorating, of public buildings and public works of the Government or the District of Columbia that are located in a State or the District of Columbia and which requires or involves the employment of mechanics or laborers." The definition used in the EO ("construction, reconstruction, rehabilitation, mondernization, alteration, conversion, extension, repair, or improvement of buildings, structures, highways, or other real properties") has similar if not identical scope, though the new definition increases opportunities for ambiguity. The DBA definition is widely accepted and understood.

*PSC Recommendation:* Replace the proposed rule definition of "construction" with the DBA definition of "construction."

## II.    Revise Definition of "Labor organization"

*Discussion:* The definition of "labor organization" should be revised to delete "building and" before "construction employees." PSC recognizes that the phrasing "building and construction" appears in the 29 USC 158(f) provision cited in the EO. However, the proposed rule does not define "building" and thus leaves room for ambiguity. In contrast, the term "construction" is defined and encompasses the trades that might reasonably fit under the term "building."

*PSC Recommendation:* Remove "building and" from the definition of "labor organization" as follows: *Labor organization means a labor organization as defined in 29 U.S.C. 152(5) of which construction employees are members.*

Case 3:24-cv-00318-WWB-MCR    Document 49-5    Filed 11/25/24    Page 18 of 60 PageID
747
PSC Comments on Use of Project Labor Agreements for
Federal Construction Projects (RIN 9000-AO40)—Page 5

### III.    Expected Impact of the Rule: Revise Upward the Total Impact for Establishing and Submitting PLAs in Response to a Government Contract

*Discussion:* The proposed rule estimates the "total impact for establishing and submitting PLAs in response to a Government contract is $2.92-$10.45 million (120-215 entities *((5 participants * **40-80 hours** * $121.40) + (1 person * 1 hour * $33.21)). Taking midpoints of each range implies a primary estimate of $6.69 million."[17] PSC member companies have found this time estimate to be inaccurate and without rationale. One member company, which has negotiated approximately 60 PLAs in the last two decades, said that on average, their company takes approximately 400 hours to negotiate a PLA. PSC member companies note that this estimate does not include the hours needed to draft and revise the PLA, negotiate economic terms, factor economic terms into proposal pricing, obtain legal review, coordinate with prospective subcontractors, or factor in hours spent by other parties to the PLA. For these reasons, the FAR Council should revise its hour estimate for establishing and submitting PLAs.

*PSC recommendation:* Revise upward the total hour estimate to negotiate a PLA to at least 500 hours to provide a more reflective cost estimate.

### IV.    Expected Impact of the Rule: Address the Days Taken to Negotiate a PLA Agreement and Modify FAR 52.222-33 Alternatives to Reflect Time Taken to Negotiate a PLA Agreement

*Discussion:* The Expected Impact of the Rule[18] does not address the amount of days taken (days taken being different from hours spent) to negotiate a PLA. GSA previously reported from its PLA pilot program that a project would move forward only because the vendor had spent 45 days in negotiaton and was at that point still unsuccessful in securing a PLA, [19] a reflection that indicates these agreements often take **prohibitively long amounts of time** to the detriment of project initiation. One PSC member company said PLA negotiations take on average 90 days. The days taken to negotiate a PLA should be addressed in the Expected Impact section, as this average would conflict with FAR 52.222-33(e), which requires offerors to submit a copy of the PLA with its offer.[20] In many cases, requests for proposals require proposal submission in 30-60 days, which would favor affiliated companies and disincentivize non-affiliated ones from participation. This would reduce efficiency and government selection in a fair bidding process.

Furthermore, FAR 52.222-33(e) would in the case of mandatory PLA implementation insert PLAs as a qualification for bidding, which PSC believes to contradict the spirit of fairness that governs the acquisition process. Other, post-award alternatives in FAR 52.222-33 would better suit and satisfy the reality of the days taken to negotiate these PLAs.

*PSC Recommendation*: Remove paragraph (e) from 52.222-33 and the Alt I, and substitute paragraph (b) of Alternate II.

---

[17] 87 Fed. Reg at 51046-7.

[18] 87 Fed. Reg at 51046-7.

[19] H.R. 735, and Project Labor Agreements, Restoring Competition and Neutrality to Government Construction, House of Representatives, Subcommittee on Technology, Information Policy, Intergovernmental Relations and Procurement Reform, Committee on Oversight and Government Reform, (Friday, June 3, 2011).

[20] FAR 52.222-33(e): The offeror shall submit to the Contracting Officer a copy of the project labor agreement with its offer.

**V.    Expected Impact of the Rule: Increase the Amount of Subcontractors Estimated Per Prime**

*Discussion:* PSC has concerns about the FAR Council's expected impact statement, "There is no data source that identifies the number of subcontractors per contract, however, based upon estimates from experts, it is estimated that for each contract there is an average of two subcontractors."[21] If subject matter experts advised an average of only two subcontractors per prime on large-scale construction projects, then what would be the purpose of this EO? Is the Government presuming disagreements between those subcontractors and their prime? Four or six subcontractors and their primes under an LLC or joint venture? These conditions simply do not track with evidence from teaming agreements that successfully fulfill government missions. This estimate undermines the entire purpose of the EO, and for credibility, should be increased. PSC members, who are also subject matter experts in this area, estimate that 8-10 subcontractors perform work under a prime in large-scale construction contracts.

*PSC Recommends:* Increase the estimate of subcontractors performing under a prime to 8-10 subcontractors instead of two.

*Conclusion*

While PSC recognizes the Government's goals of economy, efficiency, and timely completion of projects, we find the PLA requirement for large-scale construction projects would, without evidence or justification, favor labor affiliation over fairness in competition. We believe the GovernGment should remain a neutral party to maintain a diverse vendor pool and reduce barriers to opportunity.

Our recommendations focus on expected impacts, which underestimate the effort, time, and context that represent the burden to construction contractors that would modify their business practices to accommodate such a mandate. Therefore, the government would also face inefficiency and cost from delayed acquisitions and a disincentivized vendor pool. PSC strongly urges the Government to reconsider its justifications for this proposal.

Thank you for your attention to these comments. If you have any questions or need additional information, please do not hesitate to contact me. I can be reached at (703) 875-8059 or kostro@pscouncil.org.

Sincerely,

Stephanie S. Kostro
Executive Vice President for Policy

---

[21] 87 Fed. Reg at 51047.



# Project Labor Agreements

**-name redacted-**
Analyst in Labor Policy

June 28, 2012

Congressional Research Service

7-....

www.crs.gov

R41310

**CRS Report for Congress**
*Prepared for Members and Committees of Congress*

AR0606

# Summary

The National Labor Relations Act (NLRA) gives most private sector workers the right to join or form a labor union and to bargain collectively over wages, hours, and working conditions. The act allows workers in the construction industry to enter into a collective bargaining agreement before a project begins. A project labor agreement (PLA) is a collective bargaining agreement that applies to a specific construction project and lasts only for the duration of the project.

In February 2009, President Barack Obama signed an Executive Order (EO) that encourages federal agencies "to consider requiring" the use of PLAs on large-scale construction projects. The EO defines a large-scale project as one where the total cost to the federal government is $25 million or more. The order states that agencies are not required to use PLAs. Regulations implementing the EO went into effect in May 2010.

A PLA generally specifies the wages and fringe benefits to be paid on a project, and it usually includes procedures for resolving labor disputes. PLAs generally include a provision that unions agree not to strike and contractors agree not to lock out workers. A PLA may require contractors to hire workers through a union hiring hall. If not, it may require employees to become union members after being hired. A PLA applies to all contractors and subcontractors on a project.

Opponents and proponents of PLAs disagree on the economic effects of PLAs. Supporters argue that the agreements provide uniform wages, benefits, overtime pay, hours, working conditions, and work rules for work on major construction projects. They maintain that PLAs provide contractors with a reliable and uninterrupted supply of workers at predictable costs for wages and benefits, and they argue that a PLA makes it easier to manage a large project, which ensures that it will be completed on time and on budget. Supporters also say that PLAs help train workers, improve worker safety, and ensure compliance with labor and health and safety laws.

Opponents argue that PLAs have several disadvantages. They argue that PLAs increase construction costs. Nonunion contractors may not bid on projects that are covered by a collective bargaining agreement or, when they bid, they cannot win contracts on the basis of lower costs. If they have to hire workers through a union hiring hall, contractors may not be able to use their own workers. A nonunion contractor's workers may have to join a union and pay union dues. When a contractor has to pay into a union pension plan, employees may not be on the project long enough to vest in the plan. PLA opponents also argue that nonunion contractors can operate more efficient worker training programs and that evidence does not indicate that nonunion construction projects are less safe than union projects. Finally, opponents argue that federal and state agencies enforce labor and workplace health and safety laws.

Much of the research on the effect of PLAs on the costs of construction is inconclusive. In part, it can be difficult to find similar projects where some use a PLA and the others do not. Instead of comparing similar projects, economists often use statistical models that attempt to control for differences in the characteristics of the projects. It can be difficult, however, to control for all the factors that affect the costs of construction. For example, if the Davis-Bacon locally prevailing wage is the local union wage, contractors may pay workers the union wage whether or not the project is covered by a PLA. In addition, statistical models may not take into account the quality of construction, whether projects are finished on time, or the safety records of different projects. Finally, the relationship between PLAs and construction costs may be interdependent. PLAs may affect construction costs, but the size and cost of construction may also affect the use of PLAs.

# Contents

Project Labor Agreements ........................................................................................................... 1

The Use of PLAs ........................................................................................................................ 2

President Obama's Executive Order on PLAs ............................................................................ 2

    Number of Projects Affected by President Obama's Executive Order ..................................... 4

Advantages and Disadvantages of PLAs ................................................................................... 4

    PLAs and the Davis-Bacon Act ............................................................................................. 6

The Economic Effects of PLAs .................................................................................................. 6

    Research ................................................................................................................................. 7

## Contacts

Author Contact Information .......................................................................................................... 9

AR0608

The National Labor Relations Act of 1935 (NLRA) gives most private sector workers the right to join or form a labor union and to bargain collectively over wages, hours, and working conditions.[1] The act allows workers in the construction industry to enter into a collective bargaining agreement (CBA) before a project begins. A project labor agreement (PLA) is a collective bargaining agreement that applies to a specific construction project and lasts only for the duration of the project.

In February 2009, President Barack Obama signed Executive Order 13502, which encourages federal agencies "to consider requiring" the use of PLAs on large-scale construction projects. Regulations implementing the Executive Order (EO) went into effect in May 2010.

This report begins with a description of PLAs. It then describes President Obama's EO and summarizes regulations to implement it. The report then examines arguments for and against the use of PLAs and reviews research on the economic effects of the agreements.

# Project Labor Agreements

Most collective bargaining agreements are between an employer and a labor union and usually last for a specific period of time (e.g., for three years or five years). The NLRA allows employers and unions in the construction industry to enter into pre-hire agreements, which are CBAs between employers and unions that are reached before workers are hired for a project. Under one type of pre-hire agreement, one or more unions negotiate a contract with one or more building contractors. The agreement applies to projects before they arise and lasts for a specific period of time. A project labor agreement is another type of pre-hire agreement. A PLA applies to a specific construction project and lasts only for the duration of the project. All contractors and subcontractors on the project are bound by the agreement.[2]

A PLA generally specifies the wages and fringe benefits to be paid on a project. A PLA may require contractors to hire workers through a union hiring hall.[3] If not, it may require employees

---

[1] The NLRA is also known as the Wagner Act, after Senator Robert Wagner of New York who sponsored the bill in the Senate. Representative William Connery of Massachusetts sponsored the bill in the House of Representatives. The Railway Labor Act covers labor-management relations in the airline and railroad industries. The Federal Service Labor-Management Relations Statute governs labor-management relations for most federal workers. For more information on the NLRA, see CRS Report RL32930, *Labor Union Certification Procedures: Use of Secret Ballots and Card Checks*, by (name redacted).

[2] Section 8(f) of the National Labor Relations Act (NLRA) allows employers and unions in the construction industry to enter into pre-hire agreements. Section 8(e) of the act allows agreements that limit work on a project to contractors who agree to the terms of a PLA.

This section of the report is based on out-of-print CRS Report 98-965, *Project Labor Agreements in Federal Construction Contracts: An Overview and Analysis of Issues*, by (name redacted) (available upon request); CRS General Distribution Memorandum, *Project Labor Agreements Under Federal and New York Law*, by Vince Treacy (available from the author of this report); John Lund and Joe Oswald, "Public Project Labor Agreements: Lessons Learned, New Directions," *Labor Studies Journal*, vol. 26, Fall 2001, pp. 1–2; and John T. Dunlop, *Project Labor Agreements*, Joint Center for Housing Studies, Harvard University, W02-7, September 2002, pp. 14–15. (Hereinafter cited as Dunlop, *Project Labor Agreements*.)

[3] Under union hiring hall procedures, a union refers members to jobs. Generally, members who have been out of work the longest are referred first. A PLA that requires contractors to hire through union hiring halls may allow nonunion contractors to hire a certain percentage of "core" employees outside of the union hall referral procedures. Fred B. Kotler, *Project Labor Agreements in New York State: In the Public Interest*, Cornell University, School of Industrial and Labor Relations, March 2009, p. 4.

---

to become union members after being hired. After they are hired, employees may petition the National Labor Relations Board (NLRB) to decertify the union or reject the requirement that they join the union.[4]

A PLA usually includes procedures for resolving labor disputes. For example, if there is a disagreement between management and the unions over the interpretation of the PLA, the dispute may go to mediation and then to arbitration. PLAs usually include a provision that unions agree not to strike and contractors agree not to lock out workers.

# The Use of PLAs

PLAs have been used in the United States since at least the 1930s. According to a 1998 report by the Government Accountability Office (GAO), PLAs were used in the construction of the Grand Coulee Dam in Washington in 1938, the Shasta Dam in California in 1940, the Trans-Alaska Pipeline, Walt Disney World and the Kennedy Space Center in Florida, and the cleanup of Boston Harbor.[5] PLAs were also used in the construction of nuclear power plants in Hanford, WA, and Oak Ridge, TN.[6]

According to the GAO report, the total number of PLAs is not known. The report states that there is no identifiable group in either the private or public sectors that keeps comprehensive data on the number of PLAs. Nevertheless, GAO's research concluded that most PLAs are in the private sector and that they have been used in all 50 states and the District of Columbia on both private and public projects.[7]

# President Obama's Executive Order on PLAs

On February 6, 2009, President Obama signed Executive Order 13502, which encourages federal agencies "to consider requiring" the use of PLAs on large-scale construction projects. The EO defines large-scale projects as those where the total cost to the federal government is $25 million or more. The order states that agencies are not required to use PLAs. It also states that agencies are not prevented from using PLAs on projects not covered by the order.

The EO states that agencies may require a PLA if it will

> advance the Federal Government's interest in achieving economy and efficiency in Federal
> procurement, producing labor-management stability, and ensuring compliance with laws and

---

[4] The NLRB administers and enforces the NLRA. The NLRB is an independent federal agency that consists of a five-member Board and a General Counsel. The General Counsel's office conducts secret ballot elections and investigates complaints of unfair labor practices. National Labor Relations Board, "Basic Guide to the National Labor Relations Act" (Washington, DC: U.S. Government Printing Office, 1997), p. 33, http://www.nlrb.gov.

[5] U.S. Government Accountability Office, *Project Labor Agreements: The Extent of Their Use and Related Information*, GGD-98-82, May 1998, pp. 4–5. (Hereinafter cited as GAO, *Project Labor Agreements*.)

[6] Dunlop, *Project Labor Agreements*, p. 2.

[7] GAO, *Project Labor Agreements*, pp. 6, 10.

regulations governing safety and health, equal employment opportunity, labor and employment standards, and other matters.[8]

On July 10, 2009, Peter Orszag, Director of the Office of Management and Budget (OMB), issued a memorandum requesting agencies to submit quarterly reports identifying all contracts awarded for large-scale construction projects and whether or not a PLA was required on the project.[9]

On April 13, 2010, the Administration issued final regulations that implement President Obama's EO. The regulations went into effect on May 13, 2010, and they include general requirements for PLAs. A PLA shall

- bind all contractors and subcontractors on a construction project to comply with the PLA;

- allow all contractors and subcontractors to compete for contracts and subcontracts whether or not they are otherwise a party to a collective bargaining agreement;

- contain guarantees against strikes, lockouts, and similar job disruptions;

- provide binding procedures for resolving labor disputes that may arise during the term of the PLA;

- provide other mechanisms for labor and management cooperation on matters of mutual interest and concern, such as productivity, quality of work, safety, and health; and

- include any additional requirements that an agency deems necessary.

The final rule encourages agencies to consider PLAs early in the acquisition process. The rule states that an agency may specify the terms and conditions of a PLA. In addition, the final rule identifies several factors that agencies may consider when deciding whether to use a PLA. These factors are

- the construction project will require multiple contractors or subcontractors who employ workers in multiple crafts or trades;

- a shortage of skilled workers exists in the area of the construction project;

---

[8] President Barack Obama, "Use of Project Labor Agreements for Federal Construction Projects," *Federal Register*, vol. 74, February 11, 2009, pp. 6985–6987. President Obama's EO revoked EOs issued by President George W. Bush in February and April 2001. On February 17, 2001, President Bush signed Executive Order 13202. The order said that federal agencies could not "require or prohibit" construction contractors from entering into PLAs. The EO did not prevent contractors from voluntarily entering into PLAs; President George W. Bush, "Preservation of Open Competition and Government Neutrality Towards Government Contractors' Labor Relations on Federal and Federally Funded Construction Projects," *Federal Register*, vol. 66, February 22, 2001, pp. 11225–11226. On April 6, 2001, the EO was amended to allow PLAs to continue if they were in effect on the date that EO 13202 was issued; President George W. Bush, "Amendment to Executive Order 13202, "Preservation of Open Competition and Government Neutrality Towards Government Contractors' Labor Relations on Federal and Federally Funded Construction Projects," *Federal Register*, vol. 66, April 11, 2001, pp. 18717–18718.

[9] Peter Orszag, Office of Management and Budget, *Memorandum for the Heads of Executive Departments and Agencies*, M-09-22, July 10, 2009, available at http://www.whitehouse.gov/omb/assets/memoranda_fy2009/m09-22.pdf.

---

- a project will last an extended period of time;

- PLAs have been used on comparable public or private projects in the area;

- a PLA will promote the agency's long-term program interests, such as training workers to meet the agency's future construction needs; and

- any other factors that an agency thinks are appropriate.[10]

## Number of Projects Affected by President Obama's Executive Order

The Administration has estimated that, annually, federal agencies may use PLAs on approximately 30 construction projects of $25 million or more. The estimate is based on federal construction data for FY2008 and FY2009.[11]

# Advantages and Disadvantages of PLAs

Proponents of PLAs argue that the agreements have several advantages, including the following:[12]

- A PLA provides uniform wages, benefits, overtime pay, hours, working conditions, and work rules for work on major construction projects.

- A PLA provides contractors with a reliable and uninterrupted supply of workers at predictable costs for wages and benefits. PLAs prohibit strikes and lockouts. Because local unions are generally members of a national union, a union can recruit workers both locally and nationally.[13]

- A large project is easier to manage if there is a PLA. Instead of dealing with several unions that may have different wages and benefits and whose contracts may have different expiration dates, contractors must deal with a single collective bargaining agreement.

---

[10] Department of Defense, General Services Administration, and the National Aeronautics and Space Administration, "Use of Project Labor Agreements for Federal Construction Projects," Final Rule, *Federal Register*, vol. 75, April 13, 2010, pp. 19168–19179.

[11] Ibid., p. 19176. Department of Defense, General Services Administration, and the National Aeronautics and Space Administration, "Use of Project Labor Agreements for Federal Construction Projects," Proposed Rule, *Federal Register*, vol. 74, July 14, 2009, p. 33955.

[12] Dunlop, *Project Labor Agreements,* pp. 15–17. U.S. Senate, Committee on Health, Education, Labor, and Pensions, *Examining if Project Labor Agreements and Their Use of Public Funds are Really in the Best Interest of Taxpayers*, Hearing, 106th Cong., 2nd Sess., June 5, 2000 (Washington, DC: U.S. Government Printing Office, 2000), p. 46. Also see *Project Labor Agreements on Public Construction Projects: The Case For and Against*, Worcester Municipal Research Bureau, Report No. 01-4, May 21, 2001, http://www.wrrb.org/files/downloads/reports/pub_admin/2001/01-4pla.pdf.

[13] PLAs typically include provisions that require local unions to provide an adequate number of workers when the workers are needed. If the unions cannot provide enough workers, the PLA may allow contractors to hire their own workers. Dale Belman and Matthew M. Bodah, *Building Better: A Look at Best Practices for the Design of Project Labor Agreements*, Economic Policy Institute Briefing Paper No. 274, August 11, 2010, available at http://epi.3cdn.net/179fd74170130cd540_ibm6ib3kd.pdf, p. 7.

- Because labor costs are predictable and because a PLA makes it easier to manage a large project, a PLA helps ensure that a project will be completed on time and on budget.

- A PLA may help train workers by requiring contactors to participate in apprenticeship and training programs.

- A PLA can improve worker safety by requiring contractors and workers to comply with project safety rules.

- A PLA can help ensure compliance with labor standards (e.g., wages and overtime) and workplace health and safety laws.

Opponents argue that PLAs have several disadvantages:[14]

- PLAs can increase costs. Because a PLA sets standard labor costs, nonunion contractors cannot win bids based on lower costs. Nonunion contractors may choose not to bid on projects that are covered by a PLA, resulting in fewer bids and higher costs.

- PLAs can impede efficiency. If a PLA requires contractors to hire workers through a union hiring hall, contractors may not be able to use their own workers. Standard work rules can prevent contractors from managing the project in the most efficient manner.

- If a contractor is able to use his own workers, the workers may have to join a union and pay union dues.[15] If a contractor has to pay into a union pension plan, the employees may not be on the project long enough to vest in the plan.

- Nonunion contractors may operate more efficient worker training programs. Instead of apprenticeship programs of a fixed duration, nonunion contractors can train workers for specific tasks.

- Evidence does not indicate that nonunion construction projects are less safe than union projects.

- The Wage and Hour Division (WHD) of the U.S. Department of Labor (DOL) enforces federal wage, overtime, and other labor standards and either the federal Occupational Safety and Health Administration (OSHA) or states with their own plans enforce workplace health and safety standards.

---

[14] Herbert R. Northrup and Linda E. Alario, "'Boston Harbor'– Type Project Labor Agreements in Construction: Nature, Rationales, and Legal Challenges," *Journal of Labor Research*, vol. 16, Winter 1998, pp. 1, 9, 12–14, 17–19; Maurice Baskin, "The Case Against Union-Only Project Labor Agreements on Government Construction Projects," *Journal of Labor Research*, vol. 16, Winter 1998, p. 117.

[15] In 22 right-to-work states, collective bargaining agreements cannot require workers to join a union or pay union dues. In other states, collective bargaining agreements may require employees to provide financial support to a union as a condition of employment. Workers who do not join the union pay the union an agency fee. Nonunion members are represented by the union, but do not participate in union activities. Nonmembers may choose to pay a reduced agency fee if they object to the use of their payments for political activities.

## PLAs and the Davis-Bacon Act

On some federal construction projects, workers may be paid a union wage whether or not the project is covered by a PLA. The Davis-Bacon Act requires employers to pay workers at least the locally prevailing wage and fringe benefits on construction projects of more than $2,000 to which the federal government is a party. Prevailing wages and fringe benefits are based on U.S. Department of Labor surveys of construction contractors, subcontractors, and building trades unions.

Under the Davis-Bacon Act, if more than 50% of workers in a job classification are paid the same wage, the *majority wage* is the prevailing wage. The majority wage may be a wage negotiated under a collective bargaining agreement. If a majority of workers in a job classification are not paid the same wage, the prevailing wage is the weighted *average wage* of workers in the job classification.

For some occupations in some areas, the Davis-Bacon locally prevailing wage may be the local union wage. Thus, on some federal construction projects, contractors may pay some, if not most, workers the local union wage, even if the project does not use a PLA.[16] On some projects, workers in certain crafts may be covered by a collective bargaining agreement even if the project does not use a PLA.

# The Economic Effects of PLAs

Opponents and proponents of PLAs disagree on the economic effects of PLAs. To some extent, projects that use PLAs may be different from projects that do not use them. Based on interviews it conducted, GAO observed that

> Proponents and opponents of the use of PLAs said it would be difficult to compare contractor performance on federal projects with and without PLAs because it is highly unlikely that two such projects could be found that were sufficiently similar in cost, size, scope, and timing.[17]

If projects that use PLAs are different from projects that do not use them, it may be difficult to isolate the economic effects of PLAs.

It may also be difficult to identify the economic effects of PLAs if contractors use PLAs because of the advantages that PLAs may provide. If, for example, contractors are more likely to use PLAs on large and expensive projects, it may be the size and cost of a project that determine the use of a PLA. Thus, it may be difficult to measure the economic effects of PLAs if the characteristics of a project determine whether a PLA is used.

---

[16] For more information on the Davis-Bacon Act, see CRS Report R40663, *The Davis-Bacon Act and Changes in Prevailing Wage Rates, 2000 to 2008*, by (name redacted).

[17] GAO, *Project Labor Agreements*, p. 12.

# Research

This section summarizes the findings of research on the economic effects of PLAs.

In a 1998 report, GAO summarized three studies on the effect of PLAs on project costs. The first study was conducted by the Associated Builders and Contractors. The study concluded that PLAs raised bids by 26% on two New York state projects. In the second study, the New York Thruway Authority hired a consultant to negotiate a PLA for a project to refurbish the Tappan Zee Bridge. The consultant concluded that the PLA reduced the cost of the project by $6 million (or 4.6%). Instead of 19 local CBAs (each of which would have expired during the project), the PLA standardized the terms and conditions of the project. The third study involved construction at the Department of Energy's Lawrence Livermore National Laboratory in Livermore, CA. An official from the laboratory provided GAO with documents that indicated that the project contractor estimated that the PLA lowered the cost of the project by about 0.4%. Most of the estimated savings were due to lower costs for overtime, shift differentials, and holiday pay, as well as the greater use of apprentices instead of higher-paid journeymen.[18]

More recent studies have reached different conclusions about the economic impact of PLAs. The Beacon Hill Institute at Suffolk University in Boston has published a series of studies on the effects of PLAs. The studies conclude that PLAs raise the costs of construction. In a study of 62 school construction projects in the Boston area from 1995 to 2003, researchers at the institute concluded that PLAs raised the cost of construction by $16.51 per square foot (in constant 2001 dollars), or 12%. The study controlled for the size of construction (i.e., square feet) and whether the project was new construction or renovation.[19]

The Beacon Hill Institute also published a study in 2004 of school construction projects in Connecticut. The study concluded that PLAs raised the cost of construction by $30.00 per square foot (in constant 2002 dollars), or 18%. The estimate controlled for the size of the project, whether the project was new construction or renovation, the number of stories, and whether the project was an elementary school.[20]

On the other hand, a study of 70 new school construction projects in Massachusetts from 1996 to 2002 concluded that, after controlling for several characteristics of the projects, the relationship between PLAs and school construction costs was not statistically significant. The study found that

---

[18] Ibid., pp. 13–14.

[19] The study included projects of $5 million or more and excluded small and large projects (defined as projects of less than 40,000 square feet and projects of more than 400,000 square feet, respectively). The $16.51 estimate is based on the actual cost of construction, as opposed to the bid cost, which is the initial price for a project reported by the successful bidder. The study concluded that PLAs raised the bid cost of 126 construction projects by $18.83 per square foot (or 14%). The study found that the effect of PLAs is smaller on new school construction than on renovations; Paul Bachman, Darlene C. Chisholm, Jonathan Haughton, and David G. Tuerck, *Project Labor Agreements and the Cost of School Construction in Massachusetts*, Beacon Hill Institute, September 2003, pp. 8–11.

[20] The study included 71 projects of more than $1 million from 1996 to 2004; Paul Bachman, Jonathan Haughton, and David G. Tuerck, *Project Labor Agreements and the Cost of Public School Construction in Connecticut*, Beacon Hill Institute, November 2004, pp. 9–11, 14. The Beacon Hill Institute also published a study in 2006 of school construction projects in New York state. The study concluded that PLAs raised the bid cost of construction by $26.98 per square foot (or 18%). The study included 117 projects of more than $1 million from 1996 to 2005. The $26.98 estimate controlled for size, number of stories, and whether the project was an elementary school; Paul Bachman and David G. Tuerck, *Project Labor Agreements and Public Construction Costs in New York State*, Beacon Hill Institute, April 2006, pp. 7–8, 10–11, 18.

projects with PLAs were larger and more expensive than projects that did not use PLAs. The authors concluded that their statistical model may not fully capture the relationship between construction costs and PLAs.[21] If PLAs are more common on larger and more expensive projects, PLAs may not raise the costs of construction. Instead, the size and cost of a project may cause a contractor to use a PLA to take advantage of the benefits it may provide.

A study by the National University System Institute for Policy Research examined the effects of PLAs on the costs of school construction in California. The study collected information on 551 school construction projects, including 65 projects that used a PLA. The projects were built between 1996 and 2008 and were valued at $5 million or more. The study concluded that projects built using a PLA cost 13% to 15% more per square foot than projects not built with a PLA. But, 47 of the 67 projects built with a PLA were in the Los Angeles school district, where construction costs were higher. The overlap of high construction costs and the use of a PLA made it difficult to identify the unique contribution of PLAs to the costs of construction.[22]

A study conducted for the U.S. Department of Veteran Affairs (VA) concluded that the effect of PLAs on construction costs is strongly influenced by the degree of unionization in an area. In highly unionized cities, where most large construction projects use union workers, the study concluded that PLAs can have a beneficial effect. In these areas, a PLA can provide consistent wages and work rules. But, in cities with a low degree of unionization, PLAs can increase construction costs by 5% to 9%.[23]

Another study conducted for the U.S. Department of Veterans Affairs concluded that a PLA could raise the construction costs of a VA project in Pittsburgh, PA, by 3% to 5%.[24]

Qualitative research has been conducted on other aspects of PLAs. For instance, a group of researchers interviewed approximately 40 people experienced with PLAs to identify advantages and disadvantages of the agreements. Results from such a small sample may not be representative of all PLAs. Nevertheless, the researchers concluded that "interviewees seemed most convinced that the greatest benefit of a PLA was in assuring timely completion of a project. Foremost, PLAs nearly guarantee a steady flow of qualified labor."[25] One interviewee said, "Anything above five

---

[21] Of the 70 projects, 9 used a PLA. The study controlled for several characteristics, including area in square feet, number of stories, whether demolition work was performed, whether the project was an elementary or other type of school, whether the school was public or private, whether the school has a basement, whether athletic fields or tennis courts were built, whether a boiler or central air was installed, the type of roof, whether it was built in the Boston school district or elsewhere, and whether the project included science labs, vocational shops, a gymnasium, swimming pool, auditorium, kitchen, band room, or library. The study's authors found that the PLA variable and the control variable were not independent; there was multicollinearity. Dale Belman, Russell Ormiston, Richard Kelso, William Schriver, and Kenneth A. Frank, "Project Labor Agreements' Effect on School Construction Costs in Massachusetts, *Industrial Relations*, v. 49, January 2010, pp. 45, 49, 51.

[22] The study controlled for variables such as whether the school was an elementary or high school, the number of stories, square footage, whether the project included a gym or swimming pool, and whether the project involved the demolition of existing structures. Vince Vasquez, Dale Glaser, and W. Erik Bruvold, *Measuring the Cost of Project Labor Agreements on School Construction in California*, National University System Institute for Policy Research, La Jolla, CA, July 25, 2011, pp. 6-15.

[23] The 2009 study examined the potential effect of PLAs on construction costs in five cities where the VA was planning projects. The five cities were Denver, New Orleans, New York, Orlando, and San Francisco. Rider Levett Bucknall, *Project Labor Agreements: Impact Study for the Department of Veterans Affairs*, June 2, 2009, pp. 6, 32-33.

[24] Rider Levett Bucknall, *Project Labor Agreements: Impact Study Pittsburgh, Pennsylvania,* May 17, 2011, p. 22.

[25] Dale Belman, Matthew M. Bodah, and Peter Philips, *Project Labor Agreements*, ELECTRI International, 2007, p. 27. (ELECTRI International is a nonprofit organization that, among other things, funds research on issues important to (continued...)

to eight million dollars we will go to a project labor agreement because we find it a more
effective management tool.... Basically it's the labor pool, the supply of labor, [and] the quality of
the workmanship." Interviewees were also critical of PLAs, however. The main criticism was that
PLAs can increase the bargaining power of construction unions. According to the study, in areas
where a large share of jobs are covered by PLAs, construction unions may make greater demands
during negotiations over new union contracts. If one union is successful, other unions may make
similar demands.[26]

In short, much of the research on the effect of PLAs on the costs of construction is inconclusive.
In part, it can be difficult to find similar projects where some use a PLA and the others do not.
Instead of comparing similar projects, economists use statistical models that attempt to control for
differences in the characteristics of construction projects. It can be difficult, however, to control
for all the factors that affect the costs of construction. For example, if the Davis-Bacon locally
prevailing wage is the local union wage, contractors may pay workers the union wage whether or
not the project is covered by a PLA. In addition, statistical models may not take into account the
quality of construction, whether projects are finished on time, or the safety records of different
projects. Finally, the relationship between PLAs and construction costs may be interdependent.
PLAs may affect construction costs, but the size and cost of construction may also affect the use
of PLAs.

# Author Contact Information

(name redacted)
Analyst in Labor Policy
[redacted]@crs.loc.gov, 7-....

---

(...continued)

the electrical construction industry; ELECTRI International, *Facing the Future of Our Industry, Report to Stakeholders
2008*, Bethesda, MD, pp. 2, 18, 24.)

[26] Ibid., pp. 27, 31.

---

# EveryCRSReport.com

The Congressional Research Service (CRS) is a federal legislative branch agency, housed inside the Library of Congress, charged with providing the United States Congress non-partisan advice on issues that may come before Congress.

EveryCRSReport.com republishes CRS reports that are available to all Congressional staff. The reports are not classified, and Members of Congress routinely make individual reports available to the public.

Prior to our republication, we redacted names, phone numbers and email addresses of analysts who produced the reports. We also added this page to the report. We have not intentionally made any other changes to any report published on EveryCRSReport.com.

CRS reports, as a work of the United States government, are not subject to copyright protection in the United States. Any CRS report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS report may include copyrighted images or material from a third party, you may need to obtain permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

Information in a CRS report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to members of Congress in connection with CRS' institutional role.

EveryCRSReport.com is not a government website and is not affiliated with CRS. We do not claim copyright on any CRS report we have republished.

AR0618

# Project Labor Agreements' Effect on School Construction Costs in Massachusetts

DALE BELMAN, RUSSELL ORMISTON, RICHARD KELSO, WILLIAM SCHRIVER, and KENNETH A. FRANK*

This paper investigates the impact of Project Labor Agreements (PLAs) on school construction cost in Massachusetts. Although simple models exhibit a large positive effect of PLAs on construction costs, such effects are absent from more completely specified models. Further investigation finds sufficient dissimilarity in schools built with and without PLAs that it is difficult to distinguish the cost effects of PLAs from the cost effects of factors that underlie the use of PLAs.

## Introduction

CONSTRUCTION INDUSTRY PROJECT LABOR AGREEMENTS (PLAs) are collectively bargained pre-hire labor contracts negotiated between property owners and building trades unions. The essential features of PLAs are that successful bidders—even those operating non-union—must adhere to requirements for union referral, union security, and collectively bargained compensation. In exchange, unions assure timely access to labor and typically agree to harmonize work scheduling provisions among the trades, forego certain types of premium pay or pay increases, and give up the right to strike for the duration of the project. Building trades unions have increasingly used PLAs to protect and expand their position in construction markets. Open shop contractors and their trade organizations have responded with legal and political challenges to many publicly funded PLAs such as the Boston Harbor and New York State Thruway projects. The debate over PLAs has focused on project timeliness, quality, safety, training,

* The authors' affiliations are, respectively, School of Labor and Industrial Relations, Michigan State University, East Lansing, MI 48824; Department of Economics, The College of Wooster, Wooster, OH 44691; School of Architecture and Design, University of Tennessee, Knoxville, Knoxville, TN 37996-2400; Construction Industry Policy and Research Center, University of Tennessee, Knoxville, Knoxville, TN 37996-4150; College of Education, Michigan State University, East Lansing, MI 48824. E-mails: *drdale@ msu.edu*; *ormiston@msu.edu*; *rkelso1@utk.edu*; *schriver@utk.edu*; *kenfrank@msu.edu*. The authors thank Matthew Bodah, David Weil, Peter Berg, the members of the Construction Economics Research Network, and an anonymous referee for comments on earlier versions of this paper. Data collection was supported by a grant from the Center to Protect Workers' Rights. The data are available from the corresponding author, Dale Belman.

INDUSTRIAL RELATIONS, Vol. 49, No. 1 (January 2010). © 2009 Regents of the University of California
Published by Wiley Periodicals, Inc., 350 Main Street, Malden, MA 02148, USA, and 9600 Garsington Road, Oxford, OX4 2DQ, UK.

44

minority employment, employee benefits, and labor peace; however, the central
issue has been their effects on public construction costs. The zigzags in federal
policy on PLAs over the last 20 years reflect the intensity of this debate.[1]

The current research investigates the effect of PLAs on the cost of new school
construction in Massachusetts between 1996 and 2002. Using models with few
explanatory variables, prior research on school construction found that PLAs
increased bid price between $12.91 and $25.67 per square foot, or 14–17 per-
cent in the Greater Boston area (Bachman et al. 2003). A concern with leanly
specified models is that the PLA variable may proxy omitted characteristics that
also influence construction costs. To correct for this, the current authors col-
lected unique data on new school construction in Massachusetts. Using these
detailed data, we develop a more complete model of school construction costs
incorporating information on features such as swimming pools, mechanical sys-
tems, non-classroom space, and athletic facilities that architects and engineers
use to estimate project costs. Our initial estimates suggest that (1) much of the
PLA effect is attributable to the higher costs of building within the city of
Boston and (2) although PLAs are associated with substantially higher costs in
leanly specified models, there is not a statistically significant relationship
between the PLAs and construction costs in more complete models.

Although more completely specified models are preferred in establishing the
*ceteris paribus* effect of PLAs, our research finds substantial multi-collinearity
between the PLA variable and measures of school characteristics in the more
complete models. This is a product of the relationship between project com-
plexity and the decisions to use a PLA; more complex and expensive projects
are more likely to use PLAs. In combination with the relatively small number
of observations in construction data sets, this precludes accurate estimation of
cost effects of PLAs in an adequately specified model. In essence, using extant
data it is not possible to estimate the effect of PLAs *holding all else equal.*

## Background and Research on PLAs

Although nascent PLAs date to World War I, PLAs came into widespread
use following World War II on atomic energy, defense, and space projects

---

[1] PLAs were widely used as a federal contracting tool from the 1950s on. President George H. W. Bush
barred use of PLAs on new federal or federally funded projects immediately prior to the 1992 election
(Executive Order 12818). President Clinton revoked 12818, restoring the prior status quo, in early 1993
(Executive Order 12836). This was augmented in 1997 with a memorandum providing criteria for use of a
PLA and the minimum terms to be incorporated into an agreement. President George W. Bush banned the
use of PLAs on federal projects shortly after taking office in 2001 (Executive Order 13202). In turn,
President Obama revoked 13202 and restored the use of PLAs in federal contracting on February 6, 2009.

(Dunlop 2002; McCartin 1997). These agreements banned work stoppages and
provided uniform premium pay, shift, and holiday provisions across trades.
Project owners and contractors operating in the densely organized industrial
and heavy construction sector favored PLAs as they banned contract and juris-
dictional strikes and often provided more favorable terms than local agree-
ments (Belman, Bodah, and Phillips 2007). This began to change with the
increasing capacity of the open-shop sector in the 1970s and 1980s (Allen
1988; Linder 1999). Non-union contractors viewed PLA requirements as an
impediment to competing for work. Working through the Associated Builders
and Contractors, the open-shop sector has mounted legal, political, and media
challenges to public sector PLAs. The legal strategy foundered when the U.S.
Supreme Court (1993) allowed public bodies to sign PLAs in their role as con-
struction owners in its *Boston Harbor* decision. Parallel decisions by New
York and Massachusetts courts have upheld the right of public bodies to use
PLAs where they can be shown to provide advantages.

Conflict over PLAs then moved into the political arena of administrative
and legislative bodies. There, public debate has centered on the effect of PLAs
on construction costs. Opponents of PLAs argue that the requirement to follow
union employment practices raises costs by compelling open-shop contractors
to pay higher wages and benefits and adopt inefficient labor practices. PLAs
are also theorized to raise bid costs by reducing the number of competitors
bidding on projects when open-shop firms decide not to compete for work.
Proponents argue that PLAs improve projects' timeliness and reduce costs by
providing access to skilled labor on a timely basis, by improving labor produc-
tivity by harmonizing hours of work across trades, providing favorable over-
time rates, replacing strikes with dispute resolution procedures, and sometimes
providing wage concessions. These are theorized to reduce costs by shortening
time to completion, avoiding delays, and reducing labor input. The effects are
especially important on time-sensitive projects such as airports, hospitals, and
manufacturing facilities. Timely completion allows projects to begin earning
revenues sooner and avoid logistic problems such as those that occur when
schools are not completed on time.

## The Current Research

The current research is not, in construction parlance, a greenfield project.
Prior research found PLAs raised school construction costs by 14–17 percent
in the Greater Boston area (Bachman et al. 2003). These results were obtained
from leanly specified models: the favored specification included only a PLA
indicator, a measure of project size, and whether the project was a new

AR0642

construction or a renovation.[2] The current research extends this work by measuring the cost impact of PLAs within a more complete model of school construction costs, enlarging the area under study from Greater Boston to all of Massachusetts, limiting the sample to new construction, using final cost rather than bid price, and investigating the relationship between project complexities, use of PLAs, and cost measures. In developing a more complete model of school construction costs, we explore the claim made by Bachman et al. (2003) that PLA and non-PLA schools are similar and little is to be gained from extensive control for the characteristics of construction (Bachman et al. 2003: 8).

The principal source of data for project-based construction research has been the F. W. Dodge Construction Reports. Dodge Reports include virtually every project with a bid price of over one million dollars, with several reports issued during the course of a construction project. All provide the project name, location, type, size, owner, architect and, after the contract award, the general contractor. Depending on when a report is issued, successive reports will also provide an architect's estimate of project costs, the low bid, or the final offered cost. Although the Dodge Reports have long been used by contractors, they can be inadequate for construction research. The specification information is non-uniform and incomplete. Dodge Reports do not include the final cost of the project when completed or information on how the project changed after the final cost offer. The cost measures available from Dodge are then noisy proxies of completed cost—the true measure of concern to the public.[3]

Given these deficiencies in Dodge construction information, we identified factors believed to affect school construction costs from estimating guides and discussions with construction professionals.[4] The basic unit of a school is the classroom, which occupies the majority of school space and accounts for the bulk of school costs. In addition to classrooms, cost is affected by other types of spaces—including offices, libraries, cooking and dining areas, and athletic facilities. Gymnasiums and auditoriums are more costly than classrooms, and exterior appurtenances such as playing fields add to the bottom line. Site preparation, such as demolition and abatement, also increase project costs, as does

---

[2]  Other models included measures of whether the school was an elementary school, the number of floors, and the distance from Boston. The basic model was also estimated by type of school (elementary/non-elementary) and project size (Bachman et al. 2003).

[3]  As the primary Dodge audience uses reports to learn about opportunities to bid on projects, timeliness, rather than absolute accuracy, is an overriding concern. Comparisons of Dodge square footage with final size reported to our survey found that the Dodge Reports were within 1000 square feet for thirty-nine of the seventy schools, between 1000 and 5000 feet off for seven schools, between 5000 and 10,000 feet off for four schools, between 10,000 and 20,000 feet off for five schools, and more than 20,000 feet off for six schools.

[4]  See *Square Foot Costs* (R.S. Means Co. 2001) and *Building and Renovating Schools* (Macaluso, Lewek, and Murphy 2004).

extensive grading and foundation work. Mechanical systems typically comprise about 15–20 percent of project costs, and systems, such as boilers for heating and water-fed coolers for air conditioning, are more expensive than others. The number of floors in a building has an impact on cost, as does the quality of the construction materials selected. Finally, the educational level of the school is an important determinant of cost as high and middle schools include expensive amenities, such as science and computer laboratories, as well as more elaborate library facilities and auditoriums.

Given our focus on final cost, we used Dodge Reports to identify completed projects from the Dodge List of 2001–2002 starts as well as projects included in prior research. Our study was limited to new construction and projects where the costs of new construction could be separated from the cost of reno-vations.[5] We contacted architects, contractors, and school officials and, using a consistent list of potential school characteristics, surveyed these parties about project features including the final cost, type of school, type of contract, number of stories, roof pitch, particulars of each project (library, science labs, athletic fields, etc.), site grading, type of mechanical system(s) installed, mate-rials used, and bidding process, and whether there was a liquidated damage clause in the school construction contract. Our survey obtained information on seventy of the seventy-five new schools in Massachusetts for which construc-tion was completed by fall 2003.[6] Information regarding the presence of PLAs was obtained from the Massachusetts Building Trades Council.

## Characteristics of PLA and non-PLA Schools

Of the seventy schools in our sample, nine, or 12.9 percent, were built under a PLA (Table 1). PLA schools were larger than non-PLA schools, 172,000 feet against 118,000 square feet; taller, 3.3 against 2.6 stories; more likely to have vocational classrooms, 77.8 vs. 24.6 percent, and more likely to have science classrooms, 100 vs. 65.6 percent. Every PLA project involved demolition work against only half of the non-PLA schools. All nine schools built under a PLA-installed chillers against 45.9 percent of the non-PLA schools. Non-PLA schools were more likely to have tennis courts, 16.4 vs. 0.0 percent. PLA schools also had higher total final costs, $26.8 million against $17.4 million, and cost per square foot, $164.91 against $147.86. Given these

---

[5] Renovation projects were excluded because of their inherent heterogeneity and problems in defining and measuring key data such as the physical area of the renovation.

[6] We were unable to get responses from contractors or architects for five of the schools on our list.

AR0644

TABLE 1

VARIABLE NAMES, DEFINITIONS, AND MEANS BY PROJECT LABOR AGREEMENT (PLA) STATUS,

MASSACHUSETTS

| Variable | Description | Minimum | Maximum | Mean all | Mean w/PLA | Mean non-PLA |
|---|---|---|---|---|---|---|
| PLA | Project built under a PLA | 0 | 1 | 0.129 | 1 | 0 |
| Dodge total cost | Total cost, Dodge Reports | $2.6 mil. | $42.0 mil. | $17.5 mil. | $24.4 mil. | $16.5 mil. |
| Dodge area (sq. ft.) | Square foot area from Dodge Reports | 20,000 | 284,000 | 125,337 | 172,093 | 117,955 |
| Dodge cost per square foot | dodgetotalcost/ dodgeareaft2 | $82.76 | $1099.54 | $155.34 | $141.67 | $157.40 |
| Adjusted total cost | Survey total cost, 2002 prices by Engineering News Record Cost Index | $2.9 mil. | $47.0 mil. | $18.6 mil. | $26.8 mil. | $17.4 mil. |
| Area (sq. ft.) | Survey square foot of the project | 23,000 | 284,000 | 127,109 | 162,724 | 121,855 |
| Cost/square foot, adjusted 2002 | totalcostadjusted2002/areaft2 | $96.68 | $293.15 | $150.05 | $164.91 | $147.86 |
| Elementary | Elementary school | 0 | 1 | 0.486 | 0.444 | 0.491 |
| Other | Other type of school | 0 | 1 | 0.171 | 0.333 | 0.148 |
| Private | Private school dummy | 0 | 1 | 0.043 | 0.000 | 0.049 |
| Story | Number of stories | 1 | 4 | 2.686 | 3.333 | 2.590 |
| Basement | Basement in school | 0 | 1 | 0.071 | 0.111 | 0.066 |
| Demolition | Demolition performed | 0 | 1 | 0.557 | 1.000 | 0.492 |
| Boiler | Boiler installed | 0 | 1 | 0.971 | 1.000 | 0.967 |
| Chiller | Chiller installed | 0 | 1 | 0.529 | 1.000 | 0.459 |
| Central air | Central air installed | 0 | 1 | 0.386 | 0.222 | 0.410 |
| Unit ventilators | Unit ventilators installed | 0 | 1 | 0.629 | 0.667 | 0.623 |
| Ground-coupled heat pump | Ground-coupled heat pump installed | 0 | 1 | 0.043 | 0.000 | 0.049 |
| Unitary package | Unitary package installed | 0 | 1 | 0.214 | 0.333 | 0.197 |
| Steep | Roof pitch—steep | 0 | 1 | 0.157 | 0.000 | 0.180 |
| Low | Roof pitch—low | 0 | 1 | 0.500 | 0.889 | 0.443 |
| Combination | Roof pitch—combination | 0 | 1 | 0.343 | 0.111 | 0.377 |
| Swimming pool | Swimming pool erected | 0 | 1 | 0.029 | 0.111 | 0.016 |
| Cafetorium | Cafetorium erected | 0 | 1 | 0.614 | 0.333 | 0.656 |
| Bandroom | Band room erected | 0 | 1 | 0.800 | 0.667 | 0.820 |
| Auditorium | Auditorium erected | 0 | 1 | 0.386 | 0.889 | 0.311 |
| Elevators | Elevators installed | 0 | 1 | 0.957 | 1.000 | 0.951 |
| Gymnasium | Gymnasium erected | 0 | 1 | 0.929 | 0.889 | 0.934 |
| Kitchen | Kitchen erected | 0 | 1 | 0.886 | 1.000 | 0.869 |
| Library | Library erected | 0 | 1 | 0.971 | 1.000 | 0.967 |
| Science labs | Science labs erected | 0 | 1 | 0.700 | 1.000 | 0.656 |
| Vocational rooms | Vocational shops and labs | 0 | 1 | 0.314 | 0.778 | 0.246 |
| Extensive grading | Leveling of hills, filling of valleys, or similar-scale work | 0 | 1 | 0.543 | 0.333 | 0.574 |
| Normal grading | Clearing urban site, grading a corn field, or similar | 0 | 1 | 0.457 | 0.667 | 0.426 |
| Athletic | Athletic field(s) created (football, soccer, track, etc.) | 0 | 1 | 0.686 | 0.667 | 0.689 |
| Tennis courts | Tennis courts erected | 0 | 1 | 0.143 | 0.000 | 0.164 |
| Boston | Boston School District | 0 | 1 | 0.057 | 0.333 | 0.016 |

AR0645

50  /  Belman, Ormiston, Kelso, Schriver, and Frank

differences, distinguishing the effect of differences in characteristics from the cost effects of a PLA *per se* is central to this research.

## Estimation Strategy and Results

We begin by comparing estimates of PLA effects from leanly and more fully specified models using both linear and log cost models. The second section investigates the sensitivity of estimates to controls for construction in the city of Boston as well as difficulties, related to multi-collinearity and over-determination, in distinguishing the effect of PLAs on school costs from the effects on cost-affecting factors that also affect the adoption of PLAs. Finally, we compare the current research with that of Bachman et al. (2003).

*Final Cost Models.* We estimate our final cost models with two dependent variables: final cost per square foot and log of total cost. Cost per square foot is widely used in construction research but requires costs to be proportional to project size. Although appropriate for characteristics such as classrooms, other features, such as athletic fields and demolition, may not be proportional. Log total cost models estimate the percent increase in total cost associated with a feature.

*Cost Per Square Foot Models.* Our initial specification is similar to prior work with cost per square foot determined by area in square feet, area-squared, and an indicator that takes a value of one when a school is built under a PLA (Table 2, Model 1). Project size has a negative convex relationship to cost per square foot. Larger projects cost less per square foot but the decline attenuates as project size increases. PLAs are estimated to increase construction costs by $28.57 per square foot; the null of no PLA effect is rejected in better than a 5-percent, one-tailed test. This model accounts for 24 percent of the variation in school costs.

Model 2 adds five characteristics that our interviews suggested should have a large effect on school costs: the number of stories, whether the school was an elementary school, a private school, had a basement, or involved demolition work. Elementary schools cost $25.85 less per square foot, the coefficient is significant in any conventional test. Basements add $13.46 per square foot to school cost, the coefficient is significant in a 10-percent one-tailed test. The private school, story, and demolition coefficients are correctly signed but are not individually statistically significant. $r^2$ increases, from 24.1 percent in Model 1 to 35.1 percent in Model 2. An *F*-test for the significance of the

AR0646

TABLE 2

ESTIMATION OF MASSACHUSETTS SCHOOL CONSTRUCTION COST, ACTUAL COST PER SQUARE FOOT

| | Model 1 | | Model 2 | | Model 3 | | Model 4 | | Model 5 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Coefficient | *t* | Coefficient | *t* | Coefficient | *t* | Coefficient | *t* | Coefficient | *t* |
| Project Labor Agreement | 28.57 | 2.18 | 24.10 | 1.53 | 23.28 | 1.19 | 13.80 | 1.18 | 13.88 | 0.81 |
| Area (sq. ft.) | −0.0008 | −2.30 | −0.0010 | −4.31 | −0.0006 | −1.19 | −0.0011 | −4.63 | −0.0008 | −1.59 |
| Area-squared | $2.02E{-}09$ | 2.20 | $2.42E{-}09$ | 3.68 | $1.11E{-}09$ | 0.71 | $2.76E{-}09$ | 4.00 | $1.75E{-}09$ | 1.12 |
| Elementary | | | −25.85 | −3.17 | −26.90 | −2.15 | −27.10 | −3.33 | −29.88 | −2.45 |
| Private | | | −20.97 | −0.54 | 9.10 | 0.30 | −39.34 | −0.82 | −12.45 | −0.35 |
| Story | | | 6.16 | 0.89 | −1.73 | −0.24 | 7.92 | 1.12 | −0.31 | −0.04 |
| Basement | | | 13.46 | 1.29 | 10.34 | 0.76 | 7.81 | 0.65 | 5.02 | 0.32 |
| Demolition | | | 5.47 | 0.74 | −0.22 | −0.02 | 3.69 | 0.50 | −1.67 | −0.18 |
| Boiler | | | | | 69.68 | 2.22 | | | 70.85 | 2.34 |
| Chiller | | | | | 9.11 | 0.95 | | | 6.76 | 0.72 |
| Central air | | | | | 1.56 | 0.21 | | | 0.39 | 0.05 |
| Unit ventilators | | | | | 0.38 | 0.04 | | | 1.26 | 0.13 |
| Ground coupled | | | | | 10.57 | 0.75 | | | 12.17 | 0.74 |
| Unitary packaged | | | | | 4.58 | 0.38 | | | −0.34 | −0.03 |
| Steep | | | | | 17.23 | 1.23 | | | 16.89 | 1.23 |
| Combination | | | | | 10.41 | 1.27 | | | 11.97 | 1.34 |
| Swimming pool | | | | | 33.02 | 1.85 | | | 19.02 | 1.23 |
| Cafetorium | | | | | 1.90 | 0.23 | | | 0.44 | 0.05 |
| Band room | | | | | −3.04 | −0.21 | | | −7.56 | −0.53 |
| Auditorium | | | | | 14.80 | 1.45 | | | 14.92 | 1.43 |
| Elevators | | | | | 12.51 | 0.84 | | | 13.68 | 0.89 |
| Gymnasium | | | | | −53.07 | −2.56 | | | −55.81 | −2.57 |
| Kitchen | | | | | 11.05 | 0.62 | | | 8.99 | 0.48 |
| Library | | | | | 29.70 | 0.74 | | | 42.30 | 1.01 |
| Science labs | | | | | 1.21 | 0.12 | | | −1.93 | −0.18 |
| Vocational rooms | | | | | −10.94 | −0.92 | | | −9.73 | −0.81 |
| Extensive grading | | | | | 0.56 | 0.04 | | | 1.63 | 0.12 |
| Athletic | | | | | −3.01 | −0.28 | | | −0.05 | 0.00 |
| Tennis courts | | | | | 18.02 | 1.01 | | | 16.51 | 0.91 |
| Boston | | | | | | | 34.11 | 2.10 | 39.65 | 2.78 |
| Constant | 197.51 | 7.57 | 213.23 | 9.22 | 132.17 | 2.21 | 219.57 | 9.27 | 140.25 | 2.22 |
| $r^2$ | 0.2409 | | 0.3513 | | 0.6259 | | 0.3878 | | 0.6512 | |
| *F*-statistic-1/ *p*-value | 3.11/0.0156 | | 3.39/0.0001 | | 3.39/0.0001 | | 8.59/0.0043 | | 17.02/0.0000 | |
| *F*-statistic-2/ *p*-value | | | 2.73/0.0017 | | 4.40/0.0407 | | 7.74/0.0075 | | | |

NOTES: All models are estimated with seventy observations. *F*-test-1 tests the current model's specification against Model 1. *F*-test-2 tests the current specification against the immediately prior specification. For Models 4 and 5, the prior specification is the model omitting the Boston variable. Estimates allow for random error components by school district where there is more than one project in a district and for heterogeneity in the error term with the Huber–White correction. Costs are deflated using the *Engineering News Record* construction cost index for Boston.

AR0647

additional variables rejects the null of all of the coefficients being zero in better than a 1-percent test.[7] With the addition of these variables, the effect of PLAs declines to $24.10 per square foot and is only significant in a one-tailed, 10-percent test.

Model 3 provides a more comprehensive model of school costs with the addition of school and project characteristics. With few exceptions, coefficients are correctly signed and are of moderate magnitude. For example, swimming pools, a particularly expensive amenity, are estimated to add $33.01 per square foot whereas auditoriums add $14.80 per square foot. Many variables are not statistically significant of themselves, but $r^2$ rises to 62.9 percent; an $F$-test that the coefficients on the additional variables are all equal to zero rejects the null in better than a 1-percent test. The PLA coefficient is smaller in Model 2 and is no longer significant in conventional tests.

Models 4 and 5 add a control for construction in the Boston School District to Models 2 and 3, respectively. Four schools were built in the Boston School District during the period under study; three were public schools built under PLAs and one was a private school. Urban construction is typically more expensive than construction in suburban or rural areas because of the difficulties of working in urban areas. For example, marshalling yards have to be established away from the construction site. Renting yards is costly in itself; moving materials and equipment from yards to the construction site also consumes time and resources. In addition, the more rigorous building standards of central cities also increase costs, as does the need to guard against theft and damage.[8]

Our estimates suggest that construction in Boston adds between $34.11 (Model 4, Table 2) and $39.65 (Model 5, Table 2) to the square foot cost of a school, the null is rejected in a 5-percent test in Model 4 and a 1-percent test in Model 5. Addition of the Boston variable improves the fit of the model; $r^2$ increases to 38.8 percent in Model 5 and 65.12 percent in Model 6. The Boston variable causes a marked decline in the PLA coefficient, from $23–$24 per square foot in Models 2 and 3 to $13.80–$13.90 in Models 4 and 5, the PLA coefficient is not significant in conventional tests. These results suggest that the PLA coefficient was proxying for the effect of construction in Boston in the leaner models.

---

[7] We provide two $F$-tests for group significance. As the ordering of the addition of variables to Model 1 is arbitrary, the upper test in Table 2 compares the specification for the column with Model 1 specification. The lower $F$-test is a comparison with the immediately previous specification. As we allow for non-independence and heterogeneity in our error structure we only calculate $r^2$ and do not calculate $\bar{r}^2$.

[8] The 24-hour protection of public building sites in Boston add about $3.00 per square foot to costs.

AR0648

*Log Total Cost Models.* Estimates from the log total cost models, Table 3, parallel those in the cost per square foot models, but the effect of PLAs is statistically weaker in all but the first specification. Results are consistent with the form of the model: total cost is convex in project size; there are economies of size in construction. An additional thousand square feet is estimated to increase school costs by 1.39 percent for a 50,000-square-foot school, by 1.26 percent for a 100,000-square-foot-school, and by 1.1 percent for a 150,000-square-foot school. Given the parallelism between the models, we focus discussion on the PLA measures.

In Model 1, which controls only for the size of the construction project, PLAs are estimated to increase the cost of construction by 16.6 percent, the coefficient is significant in better than a 5-percent, one-tailed test. Addition of controls for the type of school, ownership, and features including story, basement, and demolition (Model 2) reduces the magnitude of the PLA effect to 12.5 percent; it is no longer significant in even a 10-percent one-tailed test. The PLA coefficient declines to 9.7 percent in Model 3, the null hypothesis that PLAs do not affect school construction costs is not close to rejection in conventional tests.[9] Models 4 and 5 add the Boston variable to Models 2 and 3, respectively. The coefficient of Model 4 on PLA is 6.4 percent and that of Model 5 is 3.3 percent. Neither is close to statistical significance. In both these models, schools in Boston are estimated to have a large positive effect on school construction costs.

In summary, the large effects associated with PLAs in the leanly specified Model 1 are a consequence of omitted variable bias. Consistent with this explanation, the size, and particularly the statistical significance of the PLA variable decline in both sets of estimates as we move toward a specification that is more in keeping with that suggested by architects and engineers. There is however evidence of both multi-collinearity and over-determination in the more complete models. Despite the higher $r^2$ and the results of the *F*-tests, many of the variables in Models 2–5 are not individually statistically significant. The decline in the PLA coefficient in the cost per square foot model is smaller than the increase in the standard error of the coefficient. Given the relatively small sample, there is reason to be concerned that over-controlling for characteristics, and the consequent increase in standard errors, is the cause of the decline in the impact of the PLA variable.

---

[9] Some coefficients seem large, notably those on boiler and library. We suspect that they proxy for omitted characteristics associated with these features. In both cases, few schools were built without these features. The only school without a library was a private religious school for low-income students built at a low cost per square foot. The library indicator may proxy for all of the low-cost features of this school.

54 / Belman, Ormiston, Kelso, Schriver, and Frank

TABLE 3

Estimation of Massachusetts School Construction Cost, ln(Total Cost), Actual Cost

| | Model 1 | | Model 2 | | Model 3 | | Model 4 | | Model 5 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Coefficient | $t$ | Coefficient | $t$ | Coefficient | $t$ | Coefficient | $t$ | Coefficient | $t$ |
| Project Labor Agreement | 0.1539 | 2.38 | 0.1181 | 1.20 | 0.0928 | 0.76 | 0.0620 | 0.77 | 0.0313 | 0.29 |
| Area (sq. ft.) | 1.52$E$–05 | 6.29 | 1.11$E$–05 | 5.95 | 1.25$E$–05 | 3.69 | 1.05$E$–05 | 5.48 | 1.11$E$–05 | 3.35 |
| Area-squared | –2.58$E$–11 | –3.60 | –1.60$E$–11 | –2.96 | –2.15$E$–11 | –2.18 | –1.41$E$–11 | –2.56 | –1.74$E$–11 | –1.79 |
| Elementary | | | –0.0988 | –1.90 | –0.0897 | –1.23 | –0.1056 | –2.05 | –0.1092 | –1.56 |
| Private | | | –0.5083 | –2.30 | –0.2317 | –1.46 | –0.6083 | –2.23 | –0.3728 | –2.09 |
| Story | | | 0.0651 | 1.44 | 0.0038 | 0.08 | 0.0747 | 1.62 | 0.0131 | 0.28 |
| Basement | | | 0.0270 | 0.59 | 0.0705 | 0.73 | –0.0038 | –0.07 | 0.0356 | 0.32 |
| Demolition | | | 0.0444 | 0.90 | 0.0295 | 0.49 | 0.0347 | 0.70 | 0.0201 | 0.32 |
| Boiler | | | | | 0.4749 | 2.24 | | | 0.4826 | 2.38 |
| Chiller | | | | | 0.0358 | 0.59 | | | 0.0204 | 0.34 |
| Central air | | | | | –0.0203 | –0.36 | | | –0.0280 | –0.49 |
| Unit ventilators | | | | | –0.0019 | –0.03 | | | 0.0039 | 0.07 |
| Ground coupled | | | | | 0.0362 | 0.29 | | | 0.0467 | 0.34 |
| Unitary packaged | | | | | 0.0390 | 0.44 | | | 0.0068 | 0.08 |
| Steep | | | | | 0.1278 | 1.44 | | | 0.1255 | 1.43 |
| Combination | | | | | 0.0541 | 1.02 | | | 0.0643 | 1.08 |
| Swimming pool | | | | | 0.2234 | 2.06 | | | 0.1317 | 1.48 |
| Cafetorium | | | | | 0.0440 | 0.82 | | | 0.0345 | 0.60 |
| Band room | | | | | –0.0544 | –0.57 | | | –0.0840 | –0.91 |
| Auditorium | | | | | 0.1548 | 2.17 | | | 0.1556 | 2.14 |
| Elevators | | | | | 0.0865 | 0.75 | | | 0.0942 | 0.78 |
| Gymnasium | | | | | –0.2742 | –2.39 | | | –0.2922 | –2.45 |
| Kitchen | | | | | 0.0595 | 0.49 | | | 0.0461 | 0.36 |
| Library | | | | | 0.5024 | 1.72 | | | 0.5849 | 2.01 |
| Science labs | | | | | 0.0413 | 0.58 | | | 0.0208 | 0.30 |
| Vocational rooms | | | | | –0.0957 | –1.22 | | | –0.0879 | –1.10 |
| Extensive grading | | | | | 0.0287 | 0.35 | | | 0.0357 | 0.43 |
| Athletic | | | | | –0.0243 | –0.36 | | | –0.0049 | –0.07 |
| Tennis courts | | | | | 0.1041 | 0.96 | | | 0.0942 | 0.86 |
| Boston | | | | | | | 0.1856 | 1.98 | 0.2597 | 2.93 |
| Constant | 15.1747 | 156.0 | 15.3622 | 81.35 | 14.5063 | 34.70 | 15.3967 | 80.68 | 14.5592 | 33.74 |
| $r^2$ | 0.8849 | | 0.9015 | | 0.9421 | | 0.9055 | | 0.9461 | |
| $F$-statistic-1/ $p$-value | | | 3.46/0.0088 | | 7.42/0.0000 | | 3.03/0.0127 | | 13.47/0.000 | |
| $F$-statistic-2/ $p$-value | | | | | 5.45/0.0000 | | 3.94/0.0524 | | 8.66/0.0050 | |

Notes: All models are estimated with seventy observations. $F$-test-1 tests the current model's specification against Model 1. $F$-test-2 tests the current specification against the immediately prior specification. For Models 4 and 5, the prior specification is the model omitting the Boston variable. All estimates allow for random error components by school district where there is more than one project in a district and for heterogeneity in the error term with the Huber–White correction. Costs are deflated using the *Engineering News Record* construction cost index for Boston.

Issues with Estimates

The prior estimates bring out two distinct issues: the effect of controlling for construction in the city of Boston and over determination. With respect to the Boston variable, we need to determine whether its apparent impact on the PLA coefficient is due to attributing special properties to one-third of our sample of PLAs. With respect to the issue of over-determination, we face a trade-off between sufficient specification and reducing the degrees of freedom for standard errors and statistical significance (Johnston 1984: 259–264).

*Control for Construction in Boston.* Although central city construction is more expensive than other construction, Boston construction costs may be particularly high as projects may require pilings; much of Boston is built on fill, and requires 24-hour security. Boston Public Schools are also more expensive than their suburban counterparts as they are permanent buildings.[10] The small data set and the complexity of the interaction between public schools, PLAs, and construction in Boston make separating the effects of PLAs from those of construction in Boston challenging. Three of the nine PLAs in our data are Boston schools. The only non-PLA school built in Boston was one of three private schools in our sample. To better distinguish the effects of location and PLA, we estimate two additional versions of the models that include Boston variables: one with a Boston Public School variable but without the Boston variable and one with both a Boston Public School and Boston variable. We estimate these models for the specifications of the cost per square foot and log total cost for Models 1, 2, and 3 (Table 4). Although these models will not be able to distinguish a Boston Public School and Boston School PLA effect, it will measure PLA effects outside Boston.

Considering the models with just the Boston Public School variable, the PLA coefficient in Models 1′, 2′, and 3′ is about half the size of the estimate obtained in models reported in Tables 2 and 3 and is never statistically significant. The decline in significance is not the result of an increase in the standard error of PLA. The PLA coefficient is estimated with greater precision, a smaller standard error, in models including the Boston Public School variable, but the decline in the standard error is smaller than the decline in the PLA coefficient. Estimates of the PLA effect in models with both the Boston and Boston Public School variable—the lower half of Table 4—are qualitatively similar to models with just the Boston Public School variable. In all models the cost of Boston Public School construction is substantially higher than other schools. In sum, these

---

[10] Because of these differences, Boston schools, fire stations, and police stations are designed by a city bureau.

AR0651

TABLE 4

Project Labor Agreement (PLA) Effects of Controlling for Boston Public School Construction

| | Model 1′ | | Model 2′ | | Model 3′ | |
|---|---|---|---|---|---|---|
| | Coefficient | t | Coefficient | t | Coefficient | t |
| *Model with PLA and Boston Public School indicator* | | | | | | |
| Cost per square foot | | | | | | |
|   PLA | 12.00 | 0.94 | 8.34 | 0.88 | 8.40 | 0.47 |
|   Boston Public | 50.51 | 2.42 | 48.37 | 6.66 | 48.69 | 4.16 |
| log total cost | | | | | | |
|   PLA | 0.079 | 0.92 | 0.027 | 0.40 | 0.0158 | 0.14 |
|   Boston Public | 0.228 | 1.63 | 0.2779 | 5.67 | 0.2521 | 2.94 |
| *Model with PLA, Boston and Boston Public School indicator* | | | | | | |
| Cost per square foot | | | | | | |
|   PLA | 12.24 | 0.95 | 8.11 | 0.86 | 5.50 | 0.29 |
|   Boston | −30.77 | −0.98 | −9.71 | −0.15 | −47.73 | −0.82 |
|   Boston Public | 81.90 | 2.14 | 58.03 | 0.91 | 95.24 | 1.69 |
| log total cost | | | | | | |
|   PLA | 0.083 | 0.99 | 0.025 | 0.36 | 0.032 | 0.27 |
|   Boston | −0.463 | −2.26 | −0.097 | −0.28 | 0.269 | 0.69 |
|   Boston Public | 0.700 | 2.81 | 0.375 | 1.08 | −0.104 | −0.03 |

models indicate that PLAs do not affect school costs outside the Boston area, but it is not possible to distinguish between the Boston Public School cost effect and any effect that PLAs have on the cost of Boston Public Schools.

*Sorting Out Multi-Collinearity and Over-Determination.* There is evidence of multi-collinearity and over-determination in our more complete specifications. Although the $R^2$ for the models are reasonable, and $F$-tests consistently reject the null that additional coefficients are zero, many coefficients are not significant in $t$-tests and some effects seem large. The variance inflation factor for PLA for Models 2 and 3 were 1.73 and 3.19, respectively, suggesting multi-collinearity between the PLA and other variables. Further, the loss of degrees of freedom in models with large numbers of explanatory variables may inflate standard errors (Johnston 1984: 259–64). The concern then is that the decline in the significance of the PLA coefficient in more complete models is driven more by collinearity and the reduced degrees of freedom in a regression with a modest-sized data set than by the elimination of omitted variable bias.

Although even our most complete model would be viewed as inadequate by a contractor bidding on a school project, the statistical issue differs from such concerns. Our goal is to determine whether a more completely specified model improves our PLA estimates. As our direct approach, adding a reasonable set of variables, has proven problematic, we explore the data by defining a set of

PLA and non-PLA schools that are sufficiently similar that we can compare their costs with few controls.[11] This is implemented using a two-stage propensity score methodology. We first estimate a discrete dependent variable model of the factors determining the use of a PLA on school projects. This model generates the predicted probability, $\ni(Z)$, that the school will be built with a PLA and this is used to weight the second-stage cost regression.[12] Schools that are almost certain to use or not use a PLA have propensity weights of 1, weights for schools for which there is less certainty about using a PLA are larger. In essence, schools that are strongly dissimilar in their likelihood of using a PLA, are given less importance than those that, but for the PLA, are reasonably similar. The latter schools form the "region of common support" (Morgan and Harding 2006).

The first stage was estimated with a logistic model. An issue in estimating discrete choice models on small data sets is that explanatory variables may predict success or failure perfectly, and the perfectly predicted observations are removed from the estimate. For example, as only non-PLA schools were built without demolition, the demolition variable predicted not having a PLA perfectly for thirty-one schools and these observations were eliminated. We initially used the very complete set of explanatory variables for our estimates but, because so many variables were perfect predictors, this specification eliminated all observations. Shorter specifications were also tried with a similar outcome. Finally, we used our prior logistic models to remove variables that were perfect predictors from the logistic model and were able to estimate a model which retained all observations.[13] Even in this greatly simplified model, sixty-two of the seventy observations were predicted perfectly, having probabilities of 0 (non-PLA) or 1 (PLA). Of the eight remaining, only one PLA school had a probability lower than that of some non-PLA schools. PLA and non-PLA schools are then strongly dissimilar and there is no region of common support.

Although this approach did not obtain a set of weights useful for second-stage estimates, it provided insights into the limits of the regression models. PLA and non-PLA schools have different and largely non-comparable characteristics. As the characteristics of PLA and non-PLA schools tend to cluster, there is inherent multi-collinearity and, at least in small data sets, regression

---

[11] See Rosenbaum and Rubin (1983), Morgan and Harding (2006), Hirano and Imbens (2001), or Robins (1987).

[12] The weight, known as a propensity score, is $100/\ni(Z)$ for schools with PLAs, $100/(1-\ni(Z))$ for non-PLA schools.

[13] The explanatory variables included in this logistic model were size in square feet, story, elementary school unit ventilators, unitary packaged, combination, cafetorium, band room, vocational shops, labs, extensive grading, athletic, ibctype2a, ibctype2b. Comparison of this list with the variable list in Table 1 shows that, once features uniquely associated with PLAs were eliminated from the model, the remaining variables tended to be less important construction characteristics.

58 / BELMAN, ORMISTON, KELSO, SCHRIVER, AND FRANK

analysis cannot distinguish the PLA effect on costs from the effect of characteristics that affect both whether a PLA is used for a school and school costs. It is not possible to make a PLA/non-PLA comparison *other things equal* without expanding the size and variability of the data.[14]

Our results are consistent however with emerging legal doctrine on the use of PLAs. The New York Court of Appeals and the Rhode Island Supreme Court have required that there be an adequate reason to apply a PLA to a project and that sufficient analysis is done to determine whether a PLA advances the purposes of the state's competitive bidding statute. Our finding that PLA projects are fundamentally different from non-PLA projects is consistent with this requirement, countering the view that PLAs are used principally to exclude competitors.

## Comparison with Prior Research

How do our results compare with that of <u>Bachman et al. (2003)</u>? Bachman considers the effect of PLAs on the bid price for school construction for 126 schools built in the Boston area between 1995 and 2001 allowing for the effects of project size, the number of stories, and whether the project was a new construction or a renovation. The study was limited to schools with a construction price of at least $5 million and between 40,000 and 400,000 square feet. Seventeen percent of the 126 construction projects were bid with PLAs.[15] Regressing Dodge cost per square foot against area, whether the project was a new construction, and whether the school was built under a PLA, PLAs were estimated to increase the cost of school projects by $18.83 per square foot (Table 5). This estimate suggests that the typical PLA project of 132,000 square feet would cost $2.6 million, 14.0 percent, more than had it been built without a PLA. Models limited to the eighty-five new schools in

---

[14] The problem may be illustrated with an example from our cost estimates. In some of our work we estimated Model 2 in two stages, first adding elementary and private and then story, basement, and demolition variables. Contrary to expectations by our experts, a referee, and ourselves, it was not possible to reject a null of zero coefficients in an *F*-test of the latter three variables; two out of three of the coefficients were not close to significant individually. Nevertheless, addition of these variables to Model 2 caused a substantial decline in the coefficient on PLA, from about $32 to $24 a square foot. In models that omitted demolition, story and basement had large positive coefficients. The logistic estimates indicate that each of these variables is, in our data set, strongly related to whether a school adopts a PLA. In the final version of the model, story had a coefficient of $6 \times 10^{23}$, indicating a strong relationship with adoption of a PLA. There is then an issue of "fundamental" multi-collinearity; our problem in getting clear estimates is not caused by chance correlations but rather by underlying causal relationships.

[15] Bachman et al. report that PLA projects averaged 151,000 square feet against 134,000 square feet for non-PLA projects. PLA schools cost $152 per square foot against $134 for non-PLA schools. The average bid price was $22.92 and $16.95 million for PLA and non-PLA schools, respectively.

AR0654

TABLE 5

COMPARISON OF BACHMAN ET AL. WITH SIMILARLY SPECIFIED MODEL USING CURRENT DATA

| Variable | Bachman et al. | | Current research Dodge bid cost sample |
|---|---|---|---|
| | Preferred model | New school sample | |
| Project Labor Agreement | 18.83 (4.79) | 14.90 (significant at 1 percent) | 16.77 (1.32) |
| New | −17.89 (6.6) | | |
| Square feet (100,000s) | −12.36 (2.5) | a | −30.0 (1.24) |
| Sq. ft.–squared (100,000) | | a | 7.87E−09 (1.20) |
| Constant | 138.7 (28.0) | a | 358.70 (2.03) |

NOTES: ªVariable included but estimates not reported.
SOURCE: Bachman et al. 2003. *Project Labor Agreements and the Cost of School Construction in Massachusetts.* Boston: Beacon Hill Institute; http://www.beaconhill.org/BHIStudies/PLApolicystudy12903.pdf

the sample find that PLAs increase the cost of construction by $14.90 per square foot (Table 5, column 2).

How do our estimates compare with these? The PLA coefficient in the most comparable model in our research, Model 1 in Table 2, is $28.77, twice that of Bachman et al. However, our dependent variable is final cost, not bid cost. Substituting costs from the Dodge Reports for final cost for the sixty-one schools for which we have this data, we find that PLAs increase cost per square foot by $16.77, similar to Bachman et al.'s new school estimates.[16] These results provide reasonable assurance that the differences between our work and that of Bachman et al. is not driven by differences in samples or estimation techniques; our finding on the conflation of PLA effects with those of school characteristics associated with the use of PLAs in lean specification extends to prior research.

## Conclusion

The effect of PLAs on the performance of school construction has become increasingly controversial. Prior work has found that PLAs substantially increase the cost of school construction. The current research extends this earlier work by examining the effect of more complete specifications and considers the interaction between school characteristics, adoption of PLAs, and distinguishing the cost of characteristics from the cost of PLAs. Our estimates suggest that, although lean specifications find that PLAs raise the cost of school construction, this does not characterize more complete specifications that better fit the data. However, the more complete specifications suffer from

[16] The estimated effect of the PLA variable for the final cost of new schools is $23.28, about $5.00 per square foot lower, in the sample of sixty-one schools for which we have the Dodge bid price.

60 / B<small>ELMAN</small>, O<small>RMISTON</small>, K<small>ELSO</small>, S<small>CHRIVER</small>, <small>AND</small> F<small>RANK</small>

multi-collinearity and over-determination. Detailed analysis of the data suggests that the measured PLA effect is because of the three public schools in Boston and that PLAs do not affect school costs outside of the Boston School District. Further, propensity analysis suggests it is not possible to disentangle the effect of PLAs on school costs from the effects of school characteristics that underlay the decision to adopt a PLA. Although it should be possible to disentangle these cost effects with a substantially larger data set, assembling such a data set would be challenging.

This study does not provide a certain answer to the question "why PLAs?" Belman, Bodah, and Phillips (2007) suggest that PLAs are often used where there are hard deadlines for the completion of projects, where the success of a construction project depends on timely access to qualified labor, and where delay has large costs.[17] It may then be that PLAs are neutral on direct construction costs, but are advantageous to owners for whom timeliness is paramount.

R<small>EFERENCES</small>

Allen, Steven G. 1988. "Declining Unionization in Construction: The Facts and the Reasons." *Industrial and Labor Relations Review* 41(3): 343–59.

Bachman, Paul, Darlene C. Chisholm, Jonathan Haughton, and David G. Tuerck. 2003. *Project Labor Agreements and the Cost of School Construction in Massachusetts*. Boston: Beacon Hill Institute.

Belman, Dale, Matthew M. Bodah, and Peter Phillips. 2007. *Project Labor Agreements*. Washington, DC: ELECTRI International.

Dunlop, John T. 2002. *Project Labor Agreements*. Working Paper Series, W02-7. Boston: Joint Center for Housing Studies, Harvard University.

Engineering News Record. "Cost Indexes by City." Various issues between 1996 and 2003.

Hirano, Keisuke, and Guido W. Imbens. 2001. "Estimation of Causal Effects Using Propensity Score Weighting: An Application to Data on Right Heart Catheterization. *Health Services and Outcomes Research Methodology* 2: 259–78.

Johnston, Jack. 1984. *Econometric Methods*, 3rd ed. New York: McGraw-Hill Publishing.

Linder, Marc. 1999. *Wars of Attrition*. Iowa City: Fanihau Press.

Macaluso, Joseph, David J. Lewek, and Brian C. Murphy. 2004. *Building & Renovating Schools: Design, Construction Management, Cost Control*. Atlanta: Reed Construction Data.

McCartin, Joseph A. 1997. *Labor's Great War: The Struggle for Industrial Democracy and the Origins of Modern Labor Relations, 1912–1921*. Chapel Hill, NC: The University of North Carolina Press.

Morgan, Stephen L., and David J. Harding. 2006. "Matching Estimators of Causal Effects: Prospects and Pitfalls in Theory and Practice." *Sociological Methods and Research* 35: 3–60.

Robins, James M. 1987. "A Graphical Approach to the Identification and Estimation of Causal Parameters in Mortality Studies with Sustained Exposure Periods." *Journal of Chronic Diseases* 40(2): 139S–61S.

Rosenbaum, Paul R., and Donald B. Rubin. 1983. "The Central Role of the Propensity Score in Observational Studies for Causal Effects." *Biometrika* 70(1): 41–55.

R.S. Means Co. 2001. *Square Foot Costs*. Kingston, MA: R.S. Means Co.

U.S. Supreme Court. 1993. *Building & Construction Trades Council of the Metropolitan District v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc*. (507 US 218, 142 LRRM 2649, U.S. Supreme Court, March 8).

---

[17] Toyota has used PLAs on all of its major construction projects, more than 38 million hours of construction labor, since the mid-1980s.

# Project Labor Agreements and Bidding Outcomes

The Case of Community College Construction in California

By Emma Waitzman and Peter Philips

AR0657

# Executive Summary

This is a study of the effects of using Project Labor Agreements (PLAs) in the construction of community college projects in California. We divide the study into two parts.

The first part is a case study of seven projects built by the College of Marin, three with PLAs and four without PLAs. The upshot of this case is that the PLAs in comparison to the nonPLAs attracted a similar number of bidders, came in at a slightly lower price point compared to the engineer's estimate, had about the same or fewer construction problems and trained more young, local workers due to the social justice component of the PLAs. We also find that local contractors were eager to bid on both PLA and nonPLA projects while bidders coming from afar preferred to bid on either the PLA or nonPLA projects but not both.

The second part is a statistical study of 88 community college PLAs and 175 community college nonPLAs representing $501 million in PLA work and $206 million in nonPLA work. controlling for when and where these projects were built, and how large each project was, we found that the PLA projects had slightly more bidders compared to nonPLA projects. We also found that PLA low-bids came in slightly lower compared to nonPLA projects. From these results, our conclusion is that PLAs do not reduce the number of bidders nor do they raise costs on California community college projects.

## Case Study

In June 2004, bond measure C passed in Marin County, California, providing $249.5 million to modernize the facilities of the local community college, the College of Marin. The modernization of the College included the construction of 7 new buildings, 3 of the projects were completed under a Project Labor Agreement (PLA) and 4 were not. All construction occurred between 2008 to 2015 providing a useful opportunity to compare bidding and construction on similar PLA and non-PLA projects

The PLA included common stipulations including sections outlining grievance procedure, management rights, and work rules. Like many PLAs, the College of Marin PLA included a social justice component encouraging the hiring of local workers, veterans, and disadvantaged workers, such as those with a criminal record. The PLA also stipulated that contractors were to hire students enrolled at the College to work on the project.

All seven new buildings were finished on time. A study of the first two PLA projects by Dannis, Woliver, and Kelley, Attorneys at Law concluded that "the two PSA [Project Stabilization Agreement—a synonym for a PLA] projects had fewer problems than some non-PSA projects." The College's satisfaction with the two PLA projects approved in 2008 led the College to assign a third project to be administered under the PLA in 2013.

Initially, each project was completed under budget. However, alterations following completion of two of the four nonPLA projects imposed cost overruns leading to final amounts that exceeded their original budgets. Nonetheless, it appears the cost overruns were related to architectural design errors rather than faulty construction.

2

Five College of Marin students were hired on PLA projects. Each student was trained by a different trade—sheet metal, carpenters, electricians, laborers, and plumbers. A recent study of apprenticeship training concluded that apprentices that complete their programs earn about $300,000 more over their work-lives compared to workers without apprenticeship training. One student, Julian Stone stated: "My whole life I've wanted to be a carpenter....The PLA project gave me the opportunity I needed to get my life together and going in the right direction"

In all cases, the lowest bid (excluding subsequent cost-overruns in two cases mentioned above) came in under the engineer's estimate. For the four nonPLA projects, the sum of the lowest bids was $38 million or about $10 million per project. The sum of the engineer's estimates for these four nonPLA projects was $50 million or about $12.25 million per project. The average number of bidders was 9.5 per project, and the average nonPLA project came in at 79% of the engineer's estimate.

In the case of the 3 PLA projects, the sum of the lowest bids was $66 million or about $22 million per project. The sum of the engineer's estimates for these three PLA projects was $88 million or about $29 million per project. The average number of bidders was 7.3 per project and the average PLA project came in at 75% of the engineer's estimate.

On average, those contractors who bid only on nonPLA projects were located 51 miles from the College of Marin's Kentfield Campus. Those who bid only on the College's PLA projects were located 63 miles from Kentfield. However, those contractors who bid on both PLA and nonPLA projects at the College of Marin were located much closer to the Kentfield Campus—on average they were found about 25 miles from the College of Marin.

This "U" shaped relationship seems to reflect that those contractors interested only in bidding on nonPLAs or only on PLAs were willing to look far afield for such opportunities. Those interested specifically in College of Marin projects, regardless of whether they were PLAs or not, were located closer to the Kentfield Campus in the first place.

## Statistical Study

We supplement our case study of the College of Marin with a statistical analysis of 88 PLA and 175 nonPLA community college projects representing $501 million in PLA work and $206 million in nonPLA work. Built in 10 California community college districts over the period 2007 to 2016, using statistical analysis controlling for when and where these projects were built, and how large each project was, we found that the PLA projects had slightly more bidders compared to nonPLA projects, but that this difference was not statistically significant. Our findings rejected the hypothesis that PLAs reduced the number of bidders compared to nonPLA projects.

In a second statistical analysis of low bids on 105 projects where the engineer's estimate was available, controlling for when and where the project was built, and how large the project was envisioned to be based on the engineer's estimate, we found that PLA low-bids

3

came in slightly lower compared to nonPLA projects, but that this difference was not statistically significant.  Our analysis rejected the hypothesis that PLAs raised the cost of projects relative to the engineer's estimate compared to nonPLA projects.

**Errata**

An earlier version of this report mistakenly identified the winner of the Main Building Complex PLA project for the College of Marin as Gonsalves and Stronck when it fact, Di Giorgio Contracting won this bid.  This mistake has been corrected.

4

## About the Authors

**Peter Philips** is a Professor of Economics at the University of Utah and Visiting Scholar at the Institute for Research on Labor and Employment at the University of California, Berkeley.  He received his BA from Pomona College and his MA and PhD from Stanford University. Philips has written extensively on the construction industry and the construction labor market.

**Emma Waitzman** received her BA from Swarthmore College, was a visiting intern at the Institute for Research on Labor and Employment at the University of California, Berkeley and currently is a law student at the University of Michigan.

## Acknowledgements and Disclaimers

The authors wish to thank David Blatter and Elird Haxhiu for their comments as this research progresses. We also thank Dale Belman, Jeffrey Waddoups and Annette Bernhardt who reviewed this paper.  Additional thanks goes to College of Marin Director of Modernization Laura McCarty, and her administrative assistant Maridel Barr, for providing informational documents and discussing the construction projects at Marin. We are grateful to the community college officials who answered our Public Records Act requests and other informational requests; thank you to officials at Contra Costa, Hartnell, Rancho Santiago, Peralta, Rio Hondo, Ohlone, Chabot-Las Positas, San Jose/Evergreen, and Solano Community Colleges. We would also like to thank Scott Littlehale, Bill Scott, and Jack Buckhorn for supplying union-related data for this project. Thank you to Tom Lemmon and Murtaza Baxamusa for sharing clarifying information regarding California law. Our appreciation also goes to Sharon Seidenstein and Minsu Longiaru for their guidance in the process of requesting public records and providing a template request. Finally, we would like to thank the Institute for Research on Labor and Employment for offering workspace and support throughout this study, in particular, Megan Collins, Betony Jones, Carol Zabin, Robert Hiramoto, and Janice Kimball.

The original data gathered for this study was sponsored by a grant from the Marin County Building Trades Council (MCBTC).  Because this Council has an interest in PLA policy, the following research protocol was established.  The authors have full scientific and editorial control of the research design and content of this study.  The MCBTC was not permitted to review this research prior to publication.  The authors are solely responsible for the content and conclusions of this report.

AR0661

## Table of Contents

**Executive Summary**................................................................................................................2

About the Authors....................................................................................................................5

Acknowledgements and Disclaimers .....................................................................................5

List of Tables and Figures.......................................................................................................7

**Introduction**...........................................................................................................................9

**Construction Context**.........................................................................................................10

   Construction Volatility Hampers Training and Experience.................................................11

   Training a Safe and Qualified Labor Force in the Face of Turbulence...............................14

   The Importance of Training to Workers ............................................................................15

      Safety.............................................................................................................................15

      Income...........................................................................................................................17

   The Importance of Training to Owners ..............................................................................18

   The Role of PLAs in Obtaining a Trained and Qualified Labor Force................................19

**The Hypothesis that Public PLAs Restrict the Number of Bidders** .................................19

**Project Labor Agreements** ................................................................................................20

   What Is a Project Labor Agreement?.................................................................................20

   Critics of Project Labor Agreements .................................................................................21

   Questions to Be Asked ......................................................................................................22

**College of Marin Case Study** ...........................................................................................22

   The Decision to Modernize Marin.....................................................................................22

   Slow Start to Construction ................................................................................................24

   Adopting a PLA at Marin...................................................................................................25

   The Marin PLA...................................................................................................................28

   Bidding, Construction, Results..........................................................................................28

   Bidding on College of Marin Projects ...............................................................................30

      The Pattern of Bidding..................................................................................................30

      Where Bidders Came From...........................................................................................31

      The Relationship Between the Engineer's Estimate and The Lowest Bid........................36

   Aftermath and Future Course............................................................................................37

**Statistical Analysis of 263 Community College Construction Projects** ...........................38

   Description of Data ...........................................................................................................38

   Regression Model Predicting the Number of Bids on a Project .........................................41

      Size of Project...............................................................................................................42

6

Year Project Was Let to Bid ................................................................................................ 43

Month the Project Was Let to Bid ...................................................................................... 45

The Effect of Location on Bids ........................................................................................... 46

Project Labor Agreement Effect on Bid Participation ................................................... 46

Regression Model Predicting the PLA Effect on the Lowest Bid ................................ 48

**Conclusions and Limitations** ................................................................................................ 51

Appendix I: REGRESSION PREDICTING NUMBER OF BIDS .......................................... 53

Appendix II: REGRESSION PREDICTING LOW BID ......................................................... 55

Appendix III: COLLEGE OF MARIN BID DATA .................................................................. 56

APPENDIX IV: DATA COLLECTION METHODS ................................................................. 58

# List of Tables and Figures

Table 1: Summary bid information by contractor for College of Marin projects ..................... 30
Table 2: Towns from which bidding contractors came, bids by town and percent won by town and PLA/nonPLA .................................................................................................................. 32
Table 3: Each bid result by nonPLA and PLA projects ............................................................. 34
Table 4: College of Marin summary statistics for 4 nonPLA and 3 PLA ................................ 35
Table 5: Predicting number of bids by project size, year, month, college district and PLA/non-PLA status .................................................................................................................... 53
Table 6: Predicting log of lowest bid with engineer's estimate PLAs/non-PLAs, year and college district ......................................................................................................................... 55

Figure 1: California annual construction employment as a percent of total California employment, 1990 to 2015 ......................................................................................................... 12
Figure 2: 2015 California construction employment by sectors as a percent of peak California construction employment in 2006 .......................................................................... 13
Figure 3: Comparing California's construction business and seasonal employment cycles to overall California employment, 2000 to 2016 ..................................................................... 14
Figure 4: California workplace fatality rate by industry, 2014 ............................................... 15
Figure 5: California workplace total recordable injury rate for selected industries and construction sub-industries ...................................................................................................... 16
Figure 6: Comparing the career paths of rooftop solar installer to union electrician pre-apprentice, apprentice, Journeyworker ................................................................................. 17
Figure 7: Contractor distance from Kentfield Campus by percent of all of that contractor's bids that were PLA bids ............................................................................................................ 33
Figure 8: Contractor distance from Kentfield Campus by whether the contractor bid on 3 or fewer projects or more than three projects by PLA and nonPLA projectsRelationship between Bids and Engineer's Estimate ................................................................................... 34

AR0663

Figure 9:  Engineer's estimate and lowest bid on 4 nonPLA and 3 PLA projects with straight line showing where engineer's estimate would exactly equal the lowest bid (number of bids shown beside the project market) ........................................................................................................ 37

Figure 10: Distribution of projects by PLA and nonPLA status ..................................................... 38

Figure 11: Distribution of lowest bid on projects by PLA and nonPLA status ........................... 39

Figure 12: Value of PLA and nonPLA projects in sample by percentage of total value and sum of value (in millions of dollars) ........................................................................................................ 40

Figure 13: Percent of all projects in sample bid by year .................................................................. 40

Figure 14: Percent distribution of number and value of community college projects ........... 41

Figure 15: Predicting the number of bidders based on the size of the project ......................... 43

Figure 16: Predicted number of bidders based on the year when the project was let ........... 44

Figure 17: Predicted number of bidders based on the month the bid was opened ................. 45

Figure 18: Predicting the effect of PLA provisions on the number of bidders .......................... 48

Figure 19: Predicting the value of the lowest bid: model 3 ............................................................. 50

AR0664

## Introduction

Project labor agreements (PLAs) are pre-hire contracts between project-owner representatives and local construction unions. PLAs account for an ever increasing amount of both public and private construction projects. PLAs become a public policy issue when there are differing views on how best to manage public works construction. Proponents of PLAs argue that these contracts facilitate both efficient construction and the attainment of related public policy objectives such as local hire or the training of local youth and/or other targeted groups in construction skills. Critics of PLAs contend that these contracts increase the cost of public construction primarily through a hypothesized reduction in the number of bidders on public works. The assertion is that PLAs discourage some contractors from bidding on these projects. This, in turn, reduces competition which in turn raises construction costs. In this study, we will directly address this hypothesis both in a case study and in a statistical analysis of bidding on 263 community college projects.

A 2001 study of California PLAs by the California Research Bureau, California State Library found that

> ...private construction projects in California are much more likely to use PLAs than are public projects. Of the 82 project labor agreements reviewed for the content analysis in this report, nearly three-quarters (72 percent) were private sector agreements. In addition, 22 out of 23 private cogeneration electricity plants recently built or under construction in California used PLAs.[i]

Since this study, the use of PLAs has been growing in California. There are no comprehensive data on the growth of private PLAs, but in the California public sector data show clear growth in the use of PLAs. In the 1990s, on average, 3 new public sector PLAs were signed per year; in the 2000s, on average, 11 new government PLAs were signed per year; and between 2010 and 2016, on average 16 new public sector PLAs in California were signed per year. Of the 234 public PLAs signed since 1993, 26 (11%) have been community college PLAs.[ii] Counting up signed project labor agreements gives only a rough measure of the growth and distribution of public sector PLAs in California because a project labor agreement can entail one building project or many separate building projects; and the size of these projects can vary.

PLAs serve many purposes in both the private and public sectors, but a common purpose is to ensure the supply of a trained and qualified labor force. Other purposes sometimes include a process to customize work schedules or work rules to the project's needs, and the channeling of local workers (or workers from a targeted group such as veterans or at-risk youth) into registered apprenticeship or pre-apprenticeship programs and a career in the construction trades.

Despite these potential benefits, PLAs are controversial because critics assert that PLAs raise construction costs. In states such as California where public construction is governed by prevailing wage regulations, PLA critics assert that on public works, PLAs raise costs primarily by restricting the number of contractors willing to bid on PLA projects.

9

This study is the first to test this hypothesis.  We do this in two ways.  First we provide a detailed case study of 7 projects, 3 PLA and 4 nonPLA jobs, built by the College of Marin between 2007 and 2015. Then, we test the reduced-number-of-bids hypothesis using data for 88 PLA and 175 nonPLA community college projects in California representing $501 million in PLA work and $206 million in nonPLA work.  In both cases, we ask the question, did the use of PLAs raise public construction costs by restricting the number of contractors bidding on these PLA projects compared to their nonPLA counterparts?

We begin this report by describing the distinctive turbulence that characterizes the construction industry and makes the creation and retention of a qualified and safe construction labor force particularly challenging.  Understanding the broader challenges of construction and the training of skilled labor contextualizes the issues surrounding project labor agreements.  The basic point here is that construction turbulence makes it difficult to train and to retain skilled workers in this industry.  PLAs are one mechanism for addressing the challenge of obtaining a skilled and qualified labor force to build a public or private project.

## Construction Context[1]

Construction is an extraordinarily turbulent industry which makes it difficult to train and retain a skilled and experienced blue collar workforce.  Yet, primarily through obligations enforced by collectively bargained contracts, in California, construction is continually being refreshed by the supply of newly trained workers graduating from registered construction apprenticeship programs.  Roughly every five years, 15% of the California construction workforce is newly trained journeyworkers graduating from registered apprenticeship programs.   This reflects an annual investment of around $250 million with 97% of the graduating apprentices coming from jointly sponsored contractor/union programs.[iii]

Construction is a dangerous and deadly industry.  In California, construction has the third highest injury and fatality rates of any major industry behind only agriculture and transportation.[iv]  Training and experience help construction workers be safer.  For example, residential construction which has few apprenticeship-trained journeyworkers has twice the industry average injury rate.  Nonresidential construction and heavy-and-highway work which have many more apprenticeship-trained journey workers have half the construction-industry average injury rate.[v]  Registered apprenticeship training helps create the skills and knowledge that keep construction workers safe.

Registered apprenticeship training also pours the foundation for a lifetime of better earnings.  Mathematica estimates that registered-apprentice graduates earn over their

---

[1] This section may be skipped by readers who are familiar with the unique challenges of the construction industry and how apprenticeship programs address the problems of skill development and worksite safety.   The next major section addresses the hypothesis that public PLAs restrict the number of bidders.

10

work lives $300,000 more than their comparable counterparts who do not attend registered apprenticeship programs.[vi]

But a trained and experienced workforce is also important to owners. While systematic data are not available measuring the effects of the lack of training and experience on delayed work-schedules and workmanship defects, few practitioners in the construction industry would maintain that skill and experience are not important ingredients in construction success.

## Construction Volatility Hampers Training and Experience

Constituting, on average, about 4.5% of the California labor force, construction is the most turbulent of the major California industries. At the peak of the last business cycle, in 2006, 933,000 workers were employed in California construction. This was 5.6% of all California workers. (Figure 1) At the trough of the business cycle, in 2010, 560,000 were employed in California construction amounting to 3.5% of the overall workforce. By 2015, construction employment was back up to 725,000 and 4.1% of the total California labor force. From peak in August 2006 to trough in March 2011, California construction lost 45% of all its jobs and by July 2015, California construction jobs were still 20% below the 2006 peak. This means almost 1 out of every 2 workers in construction in 2006 was gone in 2011 while by 2016 half of those who left had to return after an absence of up to 5 years or be replaced by new workers. Construction is like a giant sponge, constantly sucking in and squeezing out workers. This underscores the challenge of retaining trained and experienced workers in construction.

11

AR0667