# EXHIBIT "A"

# In the United States Court of Federal Claims

Nos. 24-1057, 24-1077, 24-1144, 24-1219, 24-1398, 24-1433, 24-1461
(Filed:  21 January 2025)[*]

```
******************************************
MVL USA, Inc., et al.,                    *
                                          *
              Plaintiffs,                 *
                                          *        Nos.  24-1057,
v.                                        *        24-1077, 24-1144,
                                          *        24-1219, 24-1398,
THE UNITED STATES,                        *        24-1433, 24-1461
                                          *
              Defendant.                  *
                                          *
******************************************
```

Dirk D. Haire, with whom were *Joseph L. Cohen*, *Payum Sean Milani-nia*, *David Timm*, *Jane Jung Hyoun Han*, and *Michael J. Brewer*, of Fox Rothschild, LLP, all of Washington, DC, for plaintiff MVL USA, Inc., and consolidated plaintiffs Environmental Chemical Corporation, JCCBG2, and Harper Construction Company, Inc.

*Jacob W. Scott*, with whom were *Allison G. Geewax*, and *Mark S. Abrajano*, of Smith Currie Oles LLP, all of Tysons, VA, for consolidated plaintiff Hensel Phelps Construction Co.

*William P. Rayel*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Natalee A. Allenbaugh*, Trial Attorney, Commercial Litigation, Civil Division, Department of Justice, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Douglas K. Mickle*, Assistant Director, *Tarrah M. Beavin*, Assistant Division Counsel, South Atlantic Division, USACE, *J. Alexandra Fitzmaurice*, Associate Counsel, NAVFAC Southeast, and *Angelina Calloway*, Assistant Regional Counsel, GSA Region 7, Greater Southwest, all of Washington, DC, for defendant.

## OPINION AND ORDER

**HOLTE, Judge.**

Twelve large construction companies—seven plaintiffs in this consolidated bid protest, and five plaintiffs with protests now stayed—challenge the legal authority of federal agencies to mandate prospective contractors to enter project labor agreements with unions for consideration

---

[*] This Opinion was originally filed under seal on 19 January 2025 pursuant to the protective order in this case.  The Court provided the parties an opportunity to review this Opinion for any proprietary, confidential, or other protected information and submit proposed redactions by 21 January 2025 at 10:00 a.m. (ET).  The parties proposed redactions.  The Court accepts the parties' proposed redactions and reissues the Opinion, with a few minor, non-substantive corrections and redacted language removed as follows:  "[XXXXXX]."

in federal construction projects exceeding $35 million.  For the past thirty years, executive orders
surrounding the use of project labor agreements in government construction have "ping-ponged"
from "banning" or "encouraging" to now an unprecedented 4 February 2022 Executive Order
(14063) "mandating" the use of such agreements.  Following the 2024 FAR Council
implementation of the mandate, agencies reversed course and required all solicitations to contain
a project labor agreement.  By way of example, the 2023 initial market research for one
solicitation determined "project labor agreements were not recommended" because "there was a
shortage of skilled labor in the region of the project," and project labor agreements would "not
contribute to the economy or efficiency of the project"—the agency nevertheless issued the
solicitation in 2024 with a project labor agreement requirement.  *See infra* Section VI.A.
Another agency "increased the price" of the contract "based on the [project labor agreement]
requirement being included" despite previously concluding a project labor agreement would
negatively affect both competition and price.  *See infra* Section VI.A.  Similarly, in another
solicitation, initial 2023 market research found project labor agreements "not suitable for the
project," but the agency ultimately determined in 2024 "no exception" applied and project labor
agreements would be required.  *See infra* Section I.E.  Most illustrative, however, was an
agency's decision to "delete" prior 2023 market data indicating a project labor agreement "would
reduce competition, increase costs, and create inefficiencies for contractors and procurement
officials," and "insert" a 2024 project labor agreement requirement simply because President
Biden and the FAR Council made "the policy judgment [that] project labor agreements are
generally good."  *See infra* Section VI.A.  Despite market research consistently showing project
labor agreements would "reduce adequate competition at a fair and reasonable price" for the
solicitations, the agencies' only support to justify reversal is the "policy determination that's
been made by the President and the FAR."  *See infra* Section VI.B.

The agencies' 2024 implementation of the mandate—ignoring the agencies' own market
research concluding project labor agreements would be anticompetitive—relying solely on
executive order presidential policy is arbitrary and capricious.  Specifically, the functionality of
the mandate as applied to the individual contracts in this case stifles competition and violates the
statutory directive that agencies must promote "full and open competition" in federal
procurements unless a statutory justification is properly invoked.  For the following reasons, the
Court grants consolidated plaintiffs' Motions for Judgment on the Administrative Record and
denies the government's Cross-Motion for Judgment on the Administrative Record.

## I.  Factual Background

The Court begins the factual background discussion with brief reference to redactions in
the parties' briefs—specifically whether redactions to market research on the inclusion of project
labor agreements ("PLA") was proper under the Protective Order—as it came up at oral
argument.  *See* 19 Sept. 2024 Protective Order, ECF No. 51.  The Court then provides a
chronology of approaches to PLAs in government construction contracts by Presidential
Administrations beginning in the early 1990's ending with the Biden Administration's Executive
Order ("EO") 14063.  Lastly, the Court provides background for each of the seven consolidated
bid protests in this case and the various agencies' decisions as to PLA requirements in each.

### A.  Redactions of the Parties' Briefing

As is standard in bid protest cases, parties file all briefs under seal, later redact protected information, and then refile public versions of the briefs with the redactions. Redactions ensure the protection of information included in a protective order. *See* U.S. Ct. Fed. Cl. R. ("RCFC") 5.2(e). The Court—in the "interest [of] open and public judicial proceedings, especially in bid protests"—ensures redactions are kept to a minimum and redacted material is truly protected information. *See* 16 Jan. 2025 Oral Arg. Tr. ("Tr.") at 33:1–15, ECF No. 95. When the redacted briefs were filed in this case, the redactions appeared excessive and primarily related to information "get[ting] to the heart of the issue of . . . these PLA requirements" and the Competition in Contracting Act ("CICA"). *See* Tr. at 38:3–17. At oral argument, the Court discussed various redactions with government and agency counsel. *See* Tr. at 27:13–39:19. In one example, the Court questioned whether certain information pertaining to a market study commissioned by the U.S. General Services Administration ("GSA") on the PLA requirement's potential impact was properly redacted. *See* Tr. at 28:3–12. To facilitate open discussion, the Court sealed the proceeding, *see* Tr. at 29:23–24, and inquired as to why the government redacted "many large DB firms interviewed have stated little to no interest in the project if PLAs are a requirement" and "more contractor interest and thus a more competitive bid environment." Tr. at 30:22–31:3. The government stated GSA's concern was "releasing the fact that there might be fewer bids with the PLA requirement . . . could alter how contractors choose to submit a proposal and maybe GSA [would not] get the best proposals." Tr. at 31:4–14. GSA counsel said it found the redactions to be "source selection information that could be a competitive advantage" because it was a part of GSA's "market research and really part of the planning of a procurement." Tr. at 35:6–14. Plaintiffs, however, disagreed with GSA and the government's conclusions regarding the necessity of the redactions. *See* Tr. at 32:2–24. Per plaintiffs, they even "alerted" the government during meet and confers over redactions they felt were a "bit of an overredaction." *See id.* To avoid making redaction discussions "conflict-rife," as it is usually "an expensive and often fruitless process," plaintiffs did not further challenge the redactions. *See* Tr. at 32:19–33:15.

Due to the parties' disagreement over the redactions' validity, the Court referred the parties to the Protective Order, *see* ECF No. 51, noting: "Protected information . . . as used in this order means information that must be protected to safeguard the competitive process . . . including source selection information," Tr. at 37:9–18. The Court indicated the redacted information appeared inapposite to information meant to be protected, *see* Tr. at 37:19–20 ("THE COURT: It sounds to [the Court] that [the redacted] information is the opposite of that [outlined in the protective order]."), but the government maintained its "[v]iew is that the market research going into preparation of the solicitation was something that is considered protected and under source selection information." *See* Tr. at 37:21–38:2. At the end of the sealed discussion, the government agreed the information was not properly protected and the dialogue could be unsealed. *See* Tr. at 38:3–39:2.

Though plaintiffs have no pending motion regarding the government's redactions, the Court agrees with plaintiffs—the government "overredacted" and the redacted information should have been available as part of public briefing. *See* Tr. 32:2–33:15. In reviewing the sealed and redacted briefs, the government, on numerous occasions, redacted information unrelated to protecting the competitive process or otherwise allowed by the Protective Order.

For instance, at oral argument, the government agreed the redacted information concluded a PLA requirement was likely to affect both competition and price.  *See* Tr. at 31:4–14, 39:23–40:15.  This information "get[s] to the heart of the issue of . . . these PLA requirements and CICA" and is "appropriate for what the gravamen of the case is about."  Tr. at 38:3–17; *see* Tr. at 39:3–19 ("[THE COURT:]  On [administrative record] page 48, as part of the briefing, there were unredacted notes about large firms stating little to no interest in the project if PLAs are a requirement.  So similar type language. . . .  [GOVERNMENT:] I missed that one, then.").  While the government agreed to unredact the information addressed at oral argument, *see* Tr. at 38:3–39:19, the Court will set a deadline for the government to revisit its redactions in the public briefing and re-file their MJAR briefs, *see* RCFC 5(d) ("The court may later unseal the filing or order the person who made the filing to file a redacted version for the public record."), 18(c)(2) (granting a wide discretion to the Court to deny motions for redaction), 18(d) ("In the absence of a motion to redact, the entire decision will be made public within a reasonable time after the 14-day redaction period has expired."); *see also McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1357 (Fed. Cir. 2001) ("Trial courts are given broad latitude in managing . . . cases.").  In ordering a review, the Court emphasizes the importance of redacting only information subject to the Protective Order.  Court filings are open and public by default—redactions are the exception.  *See, e.g.*, *Gilead Scis., Inc. v. Sigmapharm Lab'ys, LLC*, 584 F. App'x 929, 929–30 (Fed. Cir. 2014) (unpublished) (noting Federal Circuit law "requires the filing of briefs [be] accessible to the public," where "protective orders restricting the disclosure of information may only be issued for 'good cause,'" and further ordering defendant-appellant "to show cause why th[e] court should not impose sanctions" for "briefs . . . contain[ing] extensive confidentiality markings"); *Dialect, LLC v. Amazon.com, Inc.*, No. 23-cv-581-DJN-LRV, ECF No. 225 at 2 (E.D. Va. May 10, 2024) (denying blanket redactions of information not covered by the protective order and directing proposal of "*narrowly tailored* redactions" (emphasis original)); *see also* RCFC 5(d) ("The court may later unseal the filing or order the person who made the filing to file a redacted version for the public record."); *infra* Section VIII.

## B.  History of Presidential Administration's Treatment of PLAs

In 1984, Congress passed CICA, requiring all federal agencies awarding contracts for services—including construction contracts—to "obtain full and open competition through the use of competitive procedures."  41 U.S.C. § 253(a)(1)(A).  Congress passed CICA to increase the number of competitors for government contracts and to increase savings through lower, more competitive pricing.  *See* Kate M. Manuel, Competition in Federal Contracting: An Overview of the Legal Requirements, CONG. RSCH. SERV. (June 30, 2011).  Under CICA, agencies must solicit bids and offers "in a manner designed to achieve full and open competition" and "develop specifications in such a manner as is necessary to obtain full and open competition."  *See id.* at 18–20 (citing 10 U.S.C. § 2305(a)(1)(A); 41 U.S.C. § 253a(a)(1)(A–C)).

Following the passage of CICA, Presidents for the past 30 years have issued EOs related to the use of PLAs in government construction contracts and taken various policy stances.  Through EOs, Presidents have fluctuated between prohibiting PLAs, encouraging PLAs, taking a neutral stance on PLAs, and, most recently, mandating PLAs.  *See* Tr. at 9:15–19 ("[THE COURT:]  [L]ooking at the [] fluctuations [of EOs] over the years since at least the early 1990s

[directed to PLAs], they had gone back and forth between prohibiting, or generally encouraging, but never before mandating? [GOVERNMENT:] Correct.").

Beginning in 1992, President George H.W. Bush issued an EO prohibiting government agencies from requiring PLAs by any parties to federal construction projects. *See* EO No. 12818, 57 Fed. Reg. 48713 (Oct. 28, 1992). President Bush issued the EO to "(1) promote and ensure open bidding on Federal and federally funded construction projects; (2) increase competition in Federal construction contracts and contracts under Federal grants or cooperative agreements; (3) reduce construction costs; (4) expand job opportunities, especially for small businesses; and (5) uphold the associational rights of workers freely to select, or refrain from selecting, bargaining representatives and to decide whether or not to be union workers, so as to provide access to employment opportunities on Federal and federally funded construction projects for all workers . . . ." *Id.*

In 1993, President Clinton revoked President George H.W. Bush's EO, and in 1997, issued a Presidential Memorandum "encouraging . . . agencies . . . to consider [PLAs] as another tool, one with a long history in governmental contracting, to achieve economy and efficiency in Federal construction projects" on a "project-by-project basis." *See* Memorandum on Use of Project Labor Agreements for Federal Construction Projects, 1 PUB. PAPERS 705 (June 5, 1997). President Clinton encouraged the use of PLAs in federal procurements "where a [PLA] w[ould] advance the Government's procurement interest in cost, efficiency, and quality and in promoting labor-management stability as well as compliance with applicable legal requirements governing safety and health, equal employment opportunity, labor and employment standards, and other matters . . . ." *See id.*; *see also* Tr. at 10:17–11:11 ("[THE COURT:] So the FAR Council did not actually do anything with President Clinton's [EO]? [PLAINTIFF]: That's my understanding.").

In 2001, President George W. Bush issued two EOs enacting a new federal government policy of PLA neutrality. *See* EO No. 13202, 66 Fed. Reg. 11225 (Feb. 17, 2001); EO No. 13208, 66 Fed. Reg. 18717 (Apr. 6, 2001). These new EOs prohibited government-mandated PLAs on both federal and federally-assisted construction projects and made clear that contractors were free to enter into a PLA voluntarily without government interference. *See* EO No. 13202, 66 Fed. Reg. 11225 (Feb. 22, 2001); EO No. 13208, 66 Fed. Reg. 18717 (Apr. 11, 2001). Specifically, President Bush directed the government—or "any construction manager acting on behalf of the [g]overnment"—must not "[r]equire or prohibit bidders, offerors, contractors, or subcontractors to enter into or adhere to agreements with one or more labor organizations . . . [or] [o]therwise discriminate against bidders, offerors, contractors, or subcontractors for becoming or refusing to become or remain signatories or otherwise to adhere to agreements with one or more labor organizations, on the same or other related construction project(s)." EO No. 13202, 66 Fed. Reg. 11225 (Feb. 17, 2001).

In 2009, President Obama issued yet another new EO directed at PLAs. *See* EO No. 13502, 74 Fed. Reg. 6985 (Feb. 11, 2009). This EO revoked and replaced President George W. Bush's EOs and "encourage[d] [federal] executive agencies [on a project-by-project basis] to consider requiring the use of [PLAs] in connection with large-scale construction projects [for $25 million or more] to promote economy and efficiency in Federal procurement." *Id.*; *see* Tr. at

14:1–5 ("[GOVERNMENT]:  The Obama [EO] rescinded the Bush [EO].").  While the EO
encouraged agencies to consider mandating PLAs, the EO did not mandate federal agencies to
impose PLAs on federal projects.  *See id.*  The EO further directed the Federal Acquisition
Regulatory Council ("FAR Council") to implement the provisions of the EO.  *See* EO No.
13502, 74 Fed. Reg. 6985 (Feb. 6, 2009).  On 14 July 2009, the FAR Council rescinded FAR
36.202(d), which prohibited agencies from requiring PLAs.  *See* Federal Acquisition Regulation
("FAR"); Federal Acquisition Circular 2005-35; Introduction, 74 Fed. Reg. 34206-01 (July 14,
2009); FAR Case 2009-015, Revocation of EO 13202, 74 Fed. Reg. 34206-02 (July 14, 2009);
*see also* Tr. at 14:6–17 ("[THE COURT:]  [T]he FAR Council issued a final rule amending the
FAR to implement Obama's EO 13502, which encouraged agencies to use PLAs . . . and that
was the final Obama FAR Council amendment?  [GOVERNMENT]:  That sounds correct.").
Effective 13 May 2010, the FAR Council issued a final rule "amending the [FAR] to implement
[EO 13502] . . . encourage[ing] the use of [PLAs] for large-scale Federal construction
projects . . . to promote economy and efficiency in Federal procurement."  FAR: Use of PLAs for
Federal Construction Projects, 75 Fed. Reg. 19168-02 (May 13, 2010).  The rule provided:

> An agency may, if appropriate, require [a PLA] . . . if the agency decides that the
> use of [PLAs] will—
>
> > (1) advance the Federal Government's interest in achieving economy and
> > efficiency in Federal procurement, producing labor-management stability,
> > and ensuring compliance with laws and regulations governing safety and
> > health, equal employment opportunity, labor and employment standards,
> > and other matters; and
>
> > (2) Be consistent with law.

FAR 22.503(b) (2023); *see* Tr. at 12:9–19 ("[GOVERNMENT:]  [The FAR Council] issued
regulations implementing the [Obama EO] in . . . FAR Subpart 22.5.").

The Trump Administration did not modify President Obama's EO and maintained the
policy of encouraging agencies to consider requiring PLAs.  *See* FAR: Use of PLAs for Federal
Construction Projects, 87 Fed. Reg. 51044-01 (proposed Aug. 9, 2022); *see also* Tr. at 17:4–19
("[GOVERNMENT:]  In terms of a policy regarding [PLAs] . . . Obama's [EO] remained in
place, the FAR regulations remained in place, and those FAR regulations remained in place, and
those FAR regulations [are] what governed the agency's consideration of including [PLAs] in
their construction contracts up until January 2024 when the Biden [EO] was implemented
through the FAR.  THE COURT:  . . . [Plaintiff] agree[s] with that?  [PLAINTIFF]:  I do.").

On 4 February 2022, as explained *infra* Section I.C, President Biden issued EO 14063,
revoking the prior executive branch's PLA policy.  The FAR Council's final rule implementing
EO 14063 was the first executive mandate to use PLAs for all large-scale government contracts.
*See* FAR 22.503 (Jan. 2, 2024); *see also* FAR 22.501 (Jan. 2, 2024) ("This subpart prescribes
policies and procedures to implement [EO] 14063, Use of [PLAs] for Federal Construction
Projects . . . .").

### C.  President Biden's EO Mandating PLA Requirements

In 2022, President Biden issued EO 14063, Use of PLA for Federal Construction Projects.  *See* EO No. 14063, 87 Fed. Reg. 7363 (Feb. 9, 2022).  President Biden based the EO in "the Constitution and the laws of the United States of America, including [the Federal Property and Administrative Services Act" ("FPASA") "to promote economy and efficiency in the administration and completion of Federal construction projects . . . ."  *See id.*  The EO mandated agencies to include PLAs with "one or more appropriate labor organizations" in "large-scale" government construction projects exceeding $35 million.  *See id.* at 7363–64.  The EO mandated PLAs because they "are often effective in preventing . . . problems from developing" and "provide structure and stability to large-scale construction projects."  *See id.* at 7363.  Specifically, the EO stated PLAs should be mandated to "avoid labor-related disruptions on projects by using dispute-resolution processes to resolve worksite disputes and by prohibiting work stoppages, including strikes and lockouts."  *Id.*

The EO, despite mandating PLAs for all government construction projects over $35 million, provided for narrow exceptions to the PLA requirement under certain circumstances.  *See id.* at 7364.  Particularly, the EO instructed a "senior official within an agency may grant an exception from the [PLA] requirement . . . for a particular contract by, no later than the solicitation date" if the senior official provides "a specific written explanation of why at least one of the following circumstances exists" regarding the contract:  (1) "[r]equiring a [PLA] on the project would not advance the Federal Government's interests in achieving economy and efficiency in Federal procurement[;]" (2) "[b]ased on an inclusive market analysis, requiring a [PLA] on the project would substantially reduce the number of potential bidders so as to frustrate full and open competition;" and (3) "[r]equiring a [PLA] on the project would otherwise be inconsistent with statutes, regulations, [EOs], or Presidential Memoranda."  *See id.*  The "economy and efficiency" exception must be based upon the following factors:

> (i) [t]he project is of short duration and lacks operational complexity; (ii) [t]he project will involve only one craft or trade; (iii) [t]he project will involve specialized construction work that is available from only a limited number of contractors or subcontractors; (iv) [t]he agency's need for the project is of such an unusual and compelling urgency that a [PLA] would be impracticable; or (v) [t]he project implicates other similar factors deemed appropriate in regulations or guidance issued pursuant to section 8 of [EO 14063].

*Id.*  Section 8 of the EO required the FAR Council to propose regulations implementing the order within 120 days, evaluate comments, and promptly issue a final rule.  *See id.* at 7365.  On 22 December 2023, the FAR Council promulgated a final rule implementing EO 14063, mandating "every contractor and subcontractor engaged in construction on the project agree, for that project, to negotiate or become a party to a PLA with one or more labor organizations."  *See* Use of PLAs for Federal Construction Projects, 88 Fed. Reg. 88708, 88723 (Dec. 22, 2024) (incorporated in FAR pts. 1, 7, 22, 36, and 52); *see also* FAR 52.222-33 (Notice of Requirement for PLA); FAR 52.222-34 (PLA).

### D. MVL USA Inc.'s Protest:  USACE Consolidated Rigging Facility at Joint Base Lewis McChord in Washington

MVL USA Inc.'s protest arises from Request for Proposal ("RFP" or "solicitation") No. W912DW24R0024, issued by the United States Army Corps of Engineers ("USACE") for the construction of a consolidated rigging facility at Joint Base Lewis-McChord in Washington.  *See* MVL AR at 3610.  USACE issued the solicitation on 30 May 2024, and estimated the magnitude of construction to be between $25 million and $100 million.  *See* MVL AR at 144 (Working Cost Estimate), 361 (Solicitation).

The solicitation includes a PLA requirement by incorporating FAR 52.222-33 and 52-222-34.  *See* MVL AR at 4069 (Amendment 4 to the Solicitation).  The solicitation requires "[a]ny PLA submitted with the offer must comply with the requirements for the FAR Provision 52.222-33" and declares "[o]nly Offerors with a PLA that is acceptable and fully in compliance with the contract requirements will be considered eligible for award."  MVL AR at 4069 (Amendment 4 to the Solicitation).

In January 2023, USACE issued a sources sought notice for the project, *see* MVL AR at 1–3 (Sources Sought Notice), and then, in April 2023, USACE issued a special notice PLA survey, *see* MVL AR at 77 (2023 Special Notice PLA Survey).  On 23 May 2023, based on the PLA survey responses and regulations in force at the time (*i.e.*, the Obama EO and FAR 22.5), USACE did not recommend a PLA for this solicitation in its memorandum of finding.  *See* MVL AR at 109–14 (2023 PLA Decision Memorandum).  *See* Tr. at 43:6–22 ("THE COURT:  So [USACE] found, in short, looking at the conclusions here [the PLA mandate] would increase costs, it would not facilitate training of a skilled workforce, it would not contribute to economy or efficiency; all of that is correct? . . .  [GOVERNMENT:]  There was a determination it would not contribute to economy or efficiency for the project under consideration . . . . THE COURT:  And the final conclusion was that [USACE] concluded that a PLA was not recommended since the 'strengths of implementing the PLA are outweighed by the weaknesses and risks to the stakeholder of the project?'  [GOVERNMENT]:  That was the conclusion in 2023.").  Then on 22 January 2024, before USACE issued the solicitation, the solicitation was amended to implement the Biden EO.  *See* MVL AR at 4368 (2024 PLA Decision Memorandum).

On 12 July 2024, MVL filed this protest.  *See* Compl., ECF No. 1.  USACE then determined the market research and analysis of the PLA requirement was performed pursuant to the rescinded EO and FAR regulations.  *See* MVL AR at 4368 (2024 PLA Decision Memorandum).  USACE thus issued a special notice PLA survey on 25 July 2024.  *See* MVL AR at 4136 (2024 Special Notice PLA Survey).  The contracting officer ("CO") analyzed the Special Notice PLA Survey responses and found no exception applied, so the PLA requirement remains in the solicitation.  *See* MVL AR at 4373 (2024 PLA Decision Memorandum); *compare* Tr. at 86:23–87:7 ("[THE COURT:]  What was the [MVL] analysis based under, other than a new regulation? . . .  [GOVERNMENT:]  I think in the MVL case there was some additional market research . . . .  [W]e're not saying . . . that necessarily was the change.  The change was that there was a different analysis to be done of that data under the new . . . regulation . . . ."), *with* Tr. at 21:6–19 ("[THE COURT:]  Did anything change in the market conditions during the course of the time [from 2023 to] 2024?  [GOVERNMENT:]  Not that I am aware of.  THE

- 8 -

COURT:  So the only . . . reason the PLA requirement was placed was because of the regulation?  [GOVERNMENT]:  Right . . . .").

### E.  Harper Construction Company, Inc.'s Protest:  USACE KC-46 Two-Bay Maintenance/Fuel Cell Hangar at March Air Force Reserve Base in California

Harper Construction Company, Inc.'s protest arises from Solicitation No. W912QR24R0034, issued by USACE for the construction of a KC-46 two-bay maintenance/fuel cell hangar at March Air Reserve Base in California.  *See* Harper AR at 6021 (Solicitation).  The estimated magnitude of the project was anticipated to be between $100 million and $250 million.  *See* Harper AR at 6021 (Solicitation).  USACE issued the solicitation on 4 September 2024.  *See* Harper AR at 6021 (Solicitation).  The Solicitation stated USACE would award the contract to "the responsible offeror whose proposal conforms with all the terms and conditions of the solicitation . . . ."  *See* Harper AR at 6040 (Solicitation).  The Solicitation required all offerors to submit an executed PLA in accordance with FAR 52.222-33 and 52.222-34.  *See* Harper AR at 6053 (Solicitation).

In December 2022, before the FAR provisions implementing the Biden EO were issued, USACE conducted initial market research for this procurement.  *See* Harper AR at 5–13 (Original Sources Sought Notice), 14–18 (2022 Special Notice PLA Survey), 19–49 (2022 Market Research Report).  The market research included a survey seeking comments on whether to include a PLA requirement in the solicitation.  *See* Harper AR at 14–18 (2022 Special Notice PLA Survey).  USACE received no responses.  *See* Harper AR at 52 (2023 Market Research Report), 61 (2023 PLA Decision Memorandum).  USACE then performed additional market research, *see* Harper AR at 53 (2023 Market Research Report), and on 18 January 2023, determined a PLA should not be required for the project, *see* Harper AR at 60–62 (2023 PLA Decision Memorandum); *see also* Tr. at 23:5–17 ("[THE COURT:]  [B]ased on the record, [USACE] would not have included the PLA requirements [in the Harper solicitation] without the FAR PLA mandate, correct?  [GOVERNMENT]:  Correct.").  Specifically, USACE initially "determine[d] that inclusion of the [FAR] PLA clauses is not suitable for the project, and the use of a PLA will not be evaluated or approved as part of source selection / award."  Harper AR at 6061 (Solicitation).  But in March 2024, USACE made a new determination to include a PLA requirement, finding "no exception to use of a PLA applie[d]" to the project.  *See* Harper AR at 290.1 (2023 PLA Decision Memorandum).

On 9 September 2024, Harper filed this bid protest.  *See* Compl., *Harper Constr. Co., Inc. v. United States*, No. 24-1398 (Fed. Cl. Sept. 9, 2024), ECF No.1.  After the filing of this protest, USACE's review of the AR revealed the only market research for this solicitation was conducted before the Biden EO was implemented, causing USACE to issue another PLA survey on 17 September 2024.  *See* Harper AR at 6147 (2024 Memorandum for Record on Determination on Use of a PLA).  USACE received no responses by the 1 October 2024 deadline.  *See* Harper AR at 6147 (2024 Memorandum for Record on Determination on Use of a PLA).  The CO then analyzed whether any new Biden EO FAR exceptions to the PLA requirement applied to this procurement—none did.  *See* Harper AR at 6147–49 (2024 Memorandum for Record on Determination on Use of a PLA).  The PLA requirement therefore

remains in place in the solicitation.  *See* Harper AR at 6147–49 (2024 Memorandum for Record on Determination on Use of a PLA).

### F.  Hensel Phelps Construction Company, Inc's GSA Protest:  GSA Bridge of the Americas Land Port of Entry Modernization Act in Texas

Hensel Phelps Construction Company, Inc.'s ("Hensel" or "HPCC") GSA protest arises from Solicitation No. 47PH0824R0007 issued on 7 August 2024.  *See* HPCC GSA AR at 253, 256 (Phase I Solicitation).  The solicitation is for the design and construction of a Land of Port of Entry at the Bridge of the Americas, on the international border separating El Paso, Texas, from Juarez, Chihuahua, Mexico.  *See* HPCC GSA AR at 253, 256 (Phase I Solicitation).  GSA estimated the project cost to be between $500 and $550 million.  *See* Hensel GSA AR at 258 (Phase I Solicitation).

In April 2024, GSA issued a sources sought notice for the procurement, indicating a PLA requirement for the project, to which GSA received multiple responses.  *See* HPCC GSA AR at 99–101 (Market Analysis Record).  GSA received mixed responses regarding the PLA requirement:  (1) bidders expressed interest in the procurement and indicated concerns about the PLA requirement, but did not indicate the PLA requirement would prevent submission of a proposal, *see* HPCC GSA AR at 124–25 (2024 Sources Sought Responses); (2) bidders did not address the PLA requirement; *see* HPCC GSA AR at 129–32 (2024 Sources Sought Responses); and (3) other bidders indicated they were interested in submitting proposals, but would "make [] final determination[s] based on when the solicitation [was] actually released and available resources at that time," *see* HPCC GSA AR at 129 (2024 Sources Sought Responses); *see also* Tr. at 52:3–8 ("[GOVERNMENT:]  [R]emoving the PLA requirement would result in more contractor interest and, thus [a] more competitive bid environment . . ."); Tr. at 53:22–54:3 ("[THE COURT:]  [W]hat would the difference be between having a PLA requirement and not having a PLA requirement as to GSA's market study conclusion?  [GOVERNMENT]:  I mean, the expectation was that there might be less competition and potentially a higher price . . . .").

GSA then outsourced a market study to a third-party to determine a PLA requirement's potential impact, *see* Tr. at 24:17–25:2 ("THE COURT:  So [GSA] pay[s] an outside expert to analyze the marketplace of potential contractors?  [GOVERNMENT]:  I don't know if they're an expert or not, but at least an outside firm . . ."), resulting in the following recommendation:

> Selecting a Design-Build firm with experience working within a PLA or union environment will be of benefit to the project; however, many large . . . firms interviewed have stated little to no interest in the project if PLAs are a requirement. Removing the PLA requirement would result in more contractor interest and, thus, a more competitive bid environment.  If elimination of the requirement is not an option, we recommend shifting from FAR 52.222-33 Notice of Requirement for Project Labor Agreement (Jan 2024) Alternate I (Jan 2024) to FAR 52.222-33 Notice of Requirement for Project Labor Agreement (Jan 2024) Alternate II (Jan 2024) which allows for PLAs to be entered into following BD contract award, which could potentially increase response by one or more contractors.

HPCC GSA AR at 48 (Market Survey). GSA mandated PLAs for the procurement based on the totality of its market research, even though a PLA requirement was likely to affect both competition and price. *See* HPCC GSA AR at 176 (Acquisition Plan); *see also* Tr. at 40:18–41:15 ("[THE COURT:] [T]he GSA's conclusion, based on the market research report, was that the PLA requirement would 'affect both competition and price' . . . . [GOVERNMENT:] GSA determined that in doing its independent government estimate, [it would] increase[] the price . . . based on the PLA requirement . . . ."); *see also* Tr. at 140:8–11 ("THE COURT: So you agree that the agency concluded [the PLA mandate] would reduce competition and increase cost? [GOVERNMENT]: It would be likely to is what GSA concluded, I believe."). GSA indicated it would request an exception if there was no competition or unreasonable pricing. *See* HPCC GSA AR at 176 (Acquisition Plan). Hensel filed this bid protest on 18 September 2024. *See* Compl., *Hensel Phelps Constr. Co. v. United State*s, No. 24-1461 (Fed. Cl. Sept. 18, 2024), ECF No 1.

### G. Hensel Phelps Construction Company, Inc.'s NAVFAC Protest: Engineering Test Facility at Cape Canaveral Space Force Station in Florida

Hensel Phelps Construction Company Inc.'s Naval Facilities Engineering Systems Command ("NAVFAC") protest arises from Solicitation No. N6945024R0065 for the construction of an engineering test facility for the Trident II Life Extension 2 system at the Cape Canaveral Space Force Station in Brevard County, Florida. *See* HPCC NAVFAC AR at 235 (Solicitation). NAVFAC estimated the project magnitude is between $100 million to $250 million. *See* HPCC NAVFAC AR at 235 (Solicitation). The solicitation issued in August 2024. *See* HPCC NAVFAC AR at 235 (Solicitation).

In March 2024, NAVFAC issued a sources sought notice and a request for information regarding PLA use. *See* HPCC NAVFAC AR at 30–37 (PLA Special Notice), 38 (PLA Questionnaire). NAVFAC received several responses, including responses from labor unions, large construction firms, and a small business. *See* HPCC NAVFAC AR at 39–56 (PLA Questionnaire Responses). The labor unions supported including a PLA requirement in the solicitations and noted they believed the PLA requirement would ensure the government received more proposals from national contractors while simultaneously promoting smaller contract involvement. *See* HPCC NAVFAC AR at 137–39 (Individual Streamlined Acquisition Plan with Services). The small business similarly supported the PLA requirement, indicating it would help local building trades. *See* HPCC NAVFAC AR at 136–37 (Individual Streamlined Acquisition Plan with Services). The large businesses, however, opposed the PLA requirement, indicating interest only if there was no PLA requirement or suggesting evaluation of the value and feasibility of PLA mandated projects would need to occur before bid submission. *See* HPCC NAVFAC AR at 55 (PLA Questionnaire Responses).

In its July 2024 acquisition plan, NAVFAC analyzed the PLA request-for-information responses and declined to pursue an exception to the Biden EO PLA mandate. *See* HPCC NAVFAC AR at 136–39 (Individual Streamlined Acquisition Plan with Services). NAVFAC recommended a PLA requirement because it could not "be definitively determined, based on the responders' comments that two proposals would not be received" and that the small business and labor unions supported a PLA requirement. *See* HPCC NAVFAC AR at 129 (Individual

Streamlined Acquisition Plan with Services). Of the proposals NAVFAC ultimately received, only Hensel protested the PLA requirement. *See* HPCC NAVFAC MJAR Ex. 1 (Declaration of Hensel's Regional VP). Hensel filed this bid protest on 13 September 2024. *See* Compl., *Hensel Phelps Constr. Co. v. United States*, No. 24-1433 (Fed. Cl. Sept. 13, 2024), ECF No. 1.

### H. Hensel Phelps Construction Company, Inc.'s Protest: USACE Consolidated Communications Facility at Patrick Space Force Base in Florida

Hensel Phelps Construction Company Inc.'s USACE protest arises from Solicitation No. W9127823R0115 for the construction of a consolidated communications facility at Patrick Space Force Base in Brevard County, Florida. *See* HPCC USACE AR at 4961 (Solicitation Amendment 01). The estimated magnitude of the construction was between $25 million to $100 million. *See* HPCC USACE AR at 4969 (Solicitation Amendment 01). USACE issued the solicitation in May 2024. *See* HPCC USACE AR at 4968 (Solicitation Amendment 01).

In July 2023, USACE conducted market research for the project, and on 31 July 2023, issued a sources sought notice and a PLA survey, to which nine firms, including Hensel, responded, expressing interest in the procurement. *See* HPCC USACE AR at 77–79 (2023 Sources Sought Notice). All respondents recommended USACE not require contractors to enter into a PLA. *See* HPCC USACE AR at 79.3–79.11 (PLA Responses). In August 2023, in accordance with the FAR PLA regulations under the Obama EO, USACE determined it would not mandate a PLA for this project as a "PLA would not contribute to the economy or efficiency for the project under consideration. *See* HPCC USACE AR at 155.1–155.3 (First PLA Memorandum).

In February 2024, after the FAR was amended to implement the Biden EO, USACE issued another PLA survey. *See* HPCC USACE AR at 253 (Second PLA Market Survey). In analyzing the responses, USACE concluded a "majority of respondents indicated that a PLA mandate would reduce competition, increase costs, and create inefficiencies for contractors and procurement officials." *See* HPCC USACE AR at 284 (Acquisition Plan Addendum 1). USACE, however, was unable to determine if requiring a PLA would "reduce the number of potential offerors to such a degree that adequate competition at a fair and reasonable price could not be achieved." *See* HPCC USACE AR at 284 (Acquisition Plan Addendum 1). Thus, based on the Biden EO, USACE found no exception to the use of PLAs applied. *See* HPCC USACE AR at 284 (Acquisition Plan Addendum 1). Hensel then filed a bid protest in this case on 15 July 2024. *See* Compl., *Hensel Phelps Construction Co. v. United States*, No. 24-1077 (Fed. Cl. July 15, 2024), ECF No. 1.

In August 2024, the CO issued a new determination regarding a PLA requirement for the project. *See* HPCC USACE AR at 311–15 (D&F PLA Addendum). The new determination was issued to comply with a July 2024 USACE policy clarification, which required the memorandum to include a discussion of any responses to the PLA survey and other information to determine whether an exception applies. *See* HPCC USACE AR at 314 (D&F PLA Addendum). The CO examined what he believed to be the relevant responses to the February 2024 market survey, which were mixed: some strictly opposed including a PLA requirement, some were neutral, and some were generally in favor. *See* HPCC USACE AR at 313–14 (D&F PLA Addendum). The

CO thus found none of the FAR exceptions applied to exempt the project from the PLA requirements. *See* HPCC USACE AR at 314–15 (D&F PLA Addendum). Specifically, the CO found "[g]iven the mixed results of the market survey" he could not "conclude that requiring a PLA on this project would substantially reduce the number of potential offerors to such a degree that adequate competition at a fair and reasonable price could not be achieved." HPCC USACE AR at 314 (D&F PLA Addendum). The CO further found the notice amending the FAR addressed some respondents' arguments that a PLA requirement would increase project costs by twelve to twenty percent; the notice found numerous studies finding no definitive and compelling evidence PLAs increase costs for federal construction projects. *See* HPCC USACE AR at 314–15 (D&F PLA Addendum). The CO also stated the PLA requirement would not be inconsistent with any law, regulation, or other executive policy declaration. *See* HPCC USACE AR at 313 (D&F PLA Addendum). The CO ultimately concluded "[l]ooking at the market survey results as a whole, along with feedback received from the union officials/trade councils, there is no basis to support an exception" to the PLA requirement. *See* HPCC USACE AR at 315 (D&F PLA Addendum).

In September 2024, the CO updated the PLA determination memorandum because Hensel's July 2023 PLA survey response was used instead of its February 2024 PLA survey response. *See* HPCC USACE AR at 338.1–338.6 (D&F PLA Addendum 2). The CO, however, determined Hensel's position had not changed between the two responses regarding PLAs, and thus, found no reason to alter its previous finding that no exception to the PLA requirement applied. *See* HPCC USACE AR at 338.6 (D&F PLA Addendum 2).

## I. Environmental Chemical Corporation's Protest:  USACE Cyber & DoD Information Network Facility (Signal School) at Fort Eisenhower in Georgia

Environmental Construction Company's ("ECC") protest arises from Solicitation No. W912HN24B4002, issued by USACE's Savannah District, for the construction of a cyber and Department of Defense Information Network Facility ("Signal School") at Fort Eisenhower, Georgia. *See* ECC AR at 400 (Solicitation). USACE issued the solicitation in May 2024. *See* ECC AR at 400 (Solicitation). The solicitation estimated the magnitude of the project to be between $100 million and $250 million. *See* ECC AR at 400 (Solicitation). Before issuing the solicitation, USACE conducted market research to determine if an exception to the PLA requirement under FAR 22.503(b) applied. ECC AR at 47 (Sources Sought Notice). On 8 January 2024, USACE issued a sources sought notice with questions related to the PLA requirement. *See* ECC AR at 47–49 (Sources Sought Notice), 62–63 (Sources Sought-Market Survey). Of the firms that responded to the PLA surveys:  (1) one stated a PLA would not advance the government's interests in this procurement, *see* ECC AR at 122–34 (Sources Sought Response); (2) one did not respond, *see* ECC AR at 68 (Sources Sought Response); and (3) one stated a "PLA could help transparency between the client and service provider," but noted the PLA could lead to a drastic miscalculation for cost, enormous growing pains, and future disruptions, *see* ECC AR at 138–39 (Sources Sought Response). Despite not responding to the market research survey, ECC later submitted a request urging USACE to find an exception to the PLA requirement. *See* ECC AR at 280–83 (CO Acknowledgement of ECC Request to Consider PLA Exception), 336 (Market Research Report). USACE, however, determined an exception did not apply. *See* ECC AR at 300–01 (PLA Decision Memorandum). In doing so, USACE

reasoned even if it took "at face value the assertions of the [] firms which expressed concerns about the inclusion of a PLA requirement" other bidders "did not express these concerns" and the "response from industry does not indicate the inclusion of a PLA would result in an unduly restricted pool of bidders" for the project. *See* ECC AR at 301 (PLA Decision Memorandum). ECC then filed this protest on 26 July 2024. *See* Compl., *Env't Chem. Corp. v. United States*, No. 24-1144 (Fed. Cl. July 26, 2024), ECF No. 1.

## J. JCCBG2's Protest: USACE Lab and Lab Annex Buildings for the Department of Agriculture in Alabama

JCCBG2's protest arises from Solicitation No. W9127824R0013, issued by USACE's Mobile Contracting Division, for the construction of the Department of Agriculture's Agriculture Research Service lab and lab annex buildings located in Auburn, Alabama. *See* JCCBG2 AR at 1044 (Solicitation). USACE estimated the magnitude of this project was about [XXXXXXX]. *See* JCCBG2 AR at 1029 (Independent Government Estimate–Market Research & Analysis). USACE issued the solicitation in February 2024. *See* JCCBG2 AR at 1044, 1066 (Solicitation). The deadline for proposals was set at 21 May 2024. *See* JCCBG2 AR at 1044, 4266 (Solicitation).

Since issuance, the solicitation has: (1) required offerors to submit an executed PLA with their proposal; (2) provided for evaluation of the PLA on an Acceptable/Unacceptable basis; and (3) incorporated FAR 52.222-33 and 53.222-34. *See* JCCBG2 AR at 1068, 1086–87, 1090, 1115 (Solicitation). In July 2024, USACE issued Amendment 8 to the solicitation, deleting the specific requirements for offeror PLAs and replacing those provisions with a reference to FAR 52.222-33(c) requirements. *See* JCCBG2 AR at 4846, 4858–59 (Amendment 8 to Solicitation).

In November 2023, USACE issued a sources sought notice for the procurement, expressly requesting respondents to address the anticipated impact to cost and schedule from the PLA requirement. *See* JCCBG2 AR at 157–59 (PLA Determination and Findings). All respondents expressed concern about the inclusion of a PLA requirement, with a majority indicating they would not submit a proposal if the solicitation mandated a PLA. *See, e.g.*, JCCBG2 AR at 155, 160–66, 170–74, 180–83 (PLA Determination and Findings); Tr. at 106:1–12 ("[PLAINTIFF:] [In] the JCCBG2 example, there were [] contractors who responded, and [] of the [] said . . . either they wouldn't propose on the project with a PLA, or they were unlikely to."). In a January 2024 memorandum, the CO summarized and considered the respondents' concerns and ultimately determined "none of these concerns provide an exception" to remove the PLA requirement from the solicitation. *See* JCCBG2 AR at 155 (PLA Determination and Findings); *see, cf.* Tr. at 106:18–107:11 ("[PLAINTIFF:] [I]n actuality, on the JCCBG2 [example], they did, in fact, only get [] offers."). The CO therefore "determined that use of a PLA is suitable for the subject project." *See* JCCBG2 AR at 156 (PLA Determination and Findings). The memorandum did, however, indicate USACE would not require a PLA until after the award of the contract. *See* JCCBG2 AR at 156 (PLA Determination and Findings). But in July 2024, the CO issued an addendum to the January 2024 memorandum explaining it based its decision to require offerors to submit an executed PLA with their proposals on an updated USACE policy issued shortly after the January 2024 memorandum was signed. *See* JCCBG2

AR at 1032 (New PLA Determination on the Use).  JCCBG2 filed this protest on 8 August 2024. *See* Compl., *JCCBG2 v. United States*, No. 24-1219 (Fed. Cl. August 8, 2024), ECF No. 1.

## II.    Procedural History

On 12 July 2024, MVL filed its Complaint in this pre-award bid protest.  *See* Compl., ECF No. 1.  On 15 July 2024, Hensel filed its Complaint in *Hensel Phelps Construction Co. v. United States*, No. 24-1077 (Fed. Cl. July 15, 2024), along with a notice the protest is directly related to *MVL USA, Inc.*, No. 24-1057.  *See* Compl., *Hensel Phelps Constr. Co.*, No. 23-1077, ECF No. 1; Notice of Directly Related Cases, ECF No. 10.  That day, Hensel also filed a Motion for Preliminary Injunction and Motion for Temporary Restraining Order.  *See* Mot. Prelim. Inj. and TRO, ECF No. 4.

On 18 July 2024, the parties filed a joint motion for protective order in the *MVL USA, Inc.* case, *see* Jt. Mot. for Protective Order, ECF No. 6, which the Court granted, *see* 19 July 2024 Order, ECF No. 13.  On 22 July 2024, the parties filed a joint status report ("JSR") proposing a case schedule.  *See* 22 July 2024 JSR at 1, ECF No. 16; 22 July 2024 JSR, *Hensel Phelps Constr. Co.*, No. 23-1675, ECF No. 16.

On 24 July 2024, the Court held a status conference with MVL and Hensel and the government.  *See* 19 July 2024 Order, *MVL USA, Inc.*, No. 24-1057, ECF No. 13; 19 July 2024 Order, *Hensel Phelps Constr. Co.*, No. 23-1077, ECF No. 14.  During the status conference, the parties agreed case Nos. 24-1057 and 24-1077 should be consolidated under RCFC 42.  *See* 24 July 2024 Consolidation Order at 1–2, *MVL USA, Inc.*, No. 24-1057, ECF No. 18.  On 24 July 2024, the Court issued an order consolidating the cases ("Consolidated Bid Protests") and designating *MVL USA, Inc.*, No. 24-1057, as the lead case in this matter.  *See id.* at 1–2.  On 26 July 2024, the Court issued a protective order.  *See* 26 July 2024 Protective Order, ECF No. 19.

On 26 July 2024, ECC filed its Complaint along with a Notice stating its protest is directly related to the Consolidated Bid Protests.  *See* Compl., *Env't Chem. Corp. v. United States*, No. 24-1144 (Fed. Cl. July 26, 2024), ECF No. 1; Notice of Directly Related Case, ECF No. 2.  On 30 July 2024, the Court consolidated EEC's bid protest with the previously consolidated cases—with *MVL USA, Inc.* serving as the lead case.  *See* 30 July 2024 Consolidation Order at 1–2, *MVL USA, Inc.*, No. 24-1057, ECF No. 28.  On 30 July 2024, the Court reissued the Protective Order with an updated case caption reflecting the newly consolidated case.  *See* 30 July 2024 Protective Order at 1, ECF No. 29.

On 8 August 2024, JCCBG2 filed its Complaint along with a Notice this protest is directly related to the Consolidated Bid Protests.  *See* Compl., *JCCBG2 v. United States*, No. 24-1219 (Fed. Cl. August 8, 2024), ECF No. 1; Notice of Directly Related Case, ECF No. 2.  On 12 August 2024, the Court consolidated JCCBG2's bid protest with the Consolidated Bid Protests per the parties' agreement.  *See* 12 Aug. 2024 Consolidation Order at 1–2, *MVL USA, Inc.*, No. 24-1057, ECF No. 30.  That day, Court also reissued the Protective Order with an updated case caption reflecting the newly consolidated case.  *See* 12 Aug. 2024 Protective Order at 1, ECF No. 31.

On 27 August 2024, the government filed notice of its filing the administrative record ("AR") in the Consolidated Bid Protests. *See* Gov't Notice of Filing the AR at 1, ECF No. 32. On 5 September 2024, the government filed a motion to amend the AR with USACE policy documents, which the Court granted the same day. *See* Gov't Unopposed Mot. to Amend the AR at 1, ECF No. 38.

On 9 September 2024, Harper filed its Complaint along with a Notice this protest is directly related to the Consolidated Bid Protests. *See* Compl., *Harper Constr. Co., Inc. v. United States*, No. 24-1398 (Fed. Cl. Sept. 9, 2024), ECF No. 1; Notice of Directly Related Case, ECF No. 2. Additionally, on 13 September 2024, Hensel launched a second bid protest, filing its Complaint along with a Notice its protest is directly related to the Consolidated Bid Protests. *See* Compl., *Hensel Phelps Constr. Co. v. United States*, No. 24-1433 (Fed. Cl. Sept. 13, 2024), ECF No. 1; Notice of Directly Related Case, ECF No. 7. On 16 September 2024, the Court consolidated Harper and Hensel's bid protests with the Consolidated Bid Protests per the parties' agreement. *See* 16 Sept. 2024 Consolidation Order at 1–2, *MVL USA, Inc.*, No. 24-1057 (Fed. Cl. July 19, 2024), ECF No. 41; 16 Sept. 2024 Consolidation Order at 1–2, ECF No. 42. The Court reissued the Protective Order with an updated case caption reflecting the newly consolidated case. *See* 16 Sept. 2024 Protective Order at 1, ECF No. 43.

On 18 September 2024, Hensel began a third bid protest, filing its Complaint along with a Notice its protest is directly related to the Consolidated Bid Protests. *See* Compl., *Hensel Phelps Constr. Co. v. United State*s, No. 24-1461 (Fed. Cl. Sept. 18, 2024), ECF No. 1; Notice of Directly Related Case, ECF No. 7. On 19 September 2024, the Court consolidated Hensel's bid protest with the Consolidated Bid Protests, *see* 19 Sept. 2024 Consolidation Order at 1–2, *MVL USA, Inc.*, No. 24-1057, ECF No. 50, and issued the Protective Order with an updated case caption reflecting the newly consolidated case, *see also* 19 Sept. 2024 Protective Order at 1, ECF No. 51.

On 23 September 2024, the government filed a motion for leave to amend the AR, which the Court granted. *See* Gov't Unopposed Mot. for Leave to Amend, ECF No. 54. On 24 October 2024, the government filed another motion for leave to amend the AR, which the Court granted. *See* Gov't Unopposed Mot. for Leave to Amend, ECF No. 62. On 25 October 2024, all seven consolidated plaintiffs filed their Motions for Judgment on the Administrative Record ("MJAR"). *See* MVL MJAR, ECF No. 64; ECC MJAR, ECF No. 65; JCCBG2 MJAR, ECF No. 66; Harper MJAR, ECF No. 67; HPCC GSA MJAR, ECF No. 68; HPCC NAVFAC MJAR, ECF No. 69; HPCC USACE MJAR, ECF No. 70. On 22 November 2024, the government filed its Cross-Motion and Response to plaintiffs' MJARs. *See* Gov't Cross-MJAR and Resp., ECF No. 73. On 9 December 2024, MVL, ECC, JCCBG2, and Harper filed their Reply in Support of their MJARs and Response to the government's Cross-MJAR. *See* Pls.' Reply and Resp., ECF No. 79. Contemporaneously, JCCBG2 filed a separate additional response addressing the government's arguments as to the timeliness of JCCBG2's protest. *See* JCCBG2 Resp. to Gov't Cross-MJAR at 1–4, ECF No. 78. That day, Hensel filed its combined Reply in Support of its three separate MJARs and Response to the government's Cross-MJAR. *See* HPCC Reply and Resp., ECF No. 80. On 23 December 2024, the government filed its Reply in Support of its Cross-MJAR. *See* Gov't Reply, ECF No. 84. On 16 January 2025, the Court held oral argument. *See* 16 Dec. 2024 Order, ECF No. 81.

- 16 -

Contemporaneous to the briefing schedule in the Consolidated Bid Protests, five additional directly related bid protests were filed:  (1) *Harper Constr. Co., Inc. v. United States*, No. 24-1532 (Fed. Cl. Sept. 30, 2024); (2) *W.M. Jordan Co., Inc. v. United States*, No. 24-1648 (Fed. Cl. Oct. 15, 2024); (3) *Harper Constr. Co., Inc. v. United States*, No. 24-2054 (Fed. Cl. Dec. 13, 2024), (4) *Harper Constr. Co., Inc. v. United States*, No. 24-2055 (Fed. Cl. Dec. 13, 2024); and (5)  *Harper Constr. Co., Inc. v. United States*, No. 25-36 (Fed. Cl. Jan. 1, 2025).  As these cases all challenged the inclusion of PLAs in the various cases' respective solicitations, the parties agreed to stay the cases pending the Court's resolution of the Consolidated Bid Protests and voluntarily stay award of the solicitations of the various procurements pending the resolution of this case.  *See* 7 Oct. 2024 Order Staying Case, *Harper*, No. 24-1532, ECF No. 10; 25 Oct. 2024 Order Staying Case, *W.M. Jordan*, No. 24-1648, ECF No. 11; 14 Jan. 2025 Order Staying Case, *Harper*, No. 24-2054, ECF No. 10; 14 Jan. 2025 Order Staying Case, *Harper*, No. 24-2055, ECF No. 10; 14 Jan. 2025 Order Staying Case, *Harper*, No. 25-36, ECF No. 9.

## III.    Parties' MJAR Arguments

### A.    Plaintiffs' Argument the PLA Requirements Violate CICA

Plaintiffs argue the PLA requirements in all solicitations violate CICA's "full and open competition" procedure by disqualifying otherwise responsible offerors who do not enter into a PLA with a labor union, even though the offerors may otherwise be determined to be the best value offeror.  *See* MVL MJAR at 15–16; ECC MJAR at 20; JCCBG2 MJAR at 19; Harper MJAR at 15; *see also* HPCC GSA MJAR at 8–13; HPCC NAVFAC MJAR at 7–12; HPCC USACE MJAR at 15–21.  Rather than specify an agency's needs for a solicitation's particular procurement, the PLA requirements regulate market-wide labor concerns by requiring every prospective responsible contractor on a large-scale construction project to enter into a PLA with a labor union although contractors may not use PLAs to supply labor to their projects.  *See* MVL MJAR at 17; ECC MJAR at 22; JCCBG2 MJAR at 21; Harper MJAR at 17; *see also* HPCC GSA MJAR at 15; HPCC NAVFAC MJAR at 14; HPCC USACE MJAR at 22.  Plaintiffs argue the PLA requirements must be expressly authorized by statute, concluding the PLA requirements are not evaluation criteria, but an exclusionary policy unlawfully restricting full and open competition MVL MJAR at 19; ECC MJAR at 24; JCCBG2 MJAR at 23; Harper MJAR at 20 *see also* HPCC GSA MJAR at 13–15; HPCC NAVFAC MJAR at 12–14; HPCC USACE MJAR at 21–23.  In turn, plaintiffs argue the agencies cannot rely on the Biden EO as the requisite statutory authorization and should therefore be deemed void and unenforceable.  *See* MVL MJAR at 20; ECC MJAR at 24; JCCBG2 MJAR at 23; Harper MJAR at 20.

The government responds, arguing "[a]n entity is not a 'responsible source' for a particular procurement if it cannot meet the [g]overnment's minimum capacity and experience requirements for that procurement."  Gov't Cross-MJAR and Resp. at 32–33 (quoting FAR § 9.104-1).  The government explains, "the solicitation's capability and experience requirements do not cause the solicitation to provide for less than full and open competition simply because those requirements render some prospective contractors ineligible for award."  *Id.* at 33.  The government characterizes the PLA requirement in each of the seven solicitations as "simply one of the many requirements that offerors must meet to perform the contract at issue."  *Id.* at 34.

- 17 -

Accordingly, the government concludes the plaintiffs' inability to meet the PLA requirements does not mean the solicitations provide for less than full and open competition, but it does mean plaintiffs are not "responsible sources" for the procurements. *See id.* at 35 (quoting 41 U.S.C. § 107).

In reply, plaintiffs argue the PLA requirements cannot qualify as mere performance specifications because the PLA requirements apply on a class-wide basis and exclude from competition all contractors unable or unwilling to enter into a PLA with one or more labor unions for projects over $35 million in value—irrespective of any procurement's specific needs. *See* Pls.' Reply at 4–5; HPCC Reply and Resp. at 3–8.

### B.   Plaintiffs' Argument the PLA Requirements Are an Unauthorized Socio-Economic Set-Aside in Violation of CICA

Plaintiffs argue "[t]he Court must hold that the PLA requirements . . . constitute statutorily unauthorized socioeconomic set-asides [that] are unlawful under CICA." MVL MJAR at 31. In particular, plaintiffs allege the PLA requirements contradict and nullify the seven individual solicitations' common "full and open" competition requirement. *See* MVL MJAR at 27; ECC MJAR at 42; JCCBG2 MJAR at 35; Harper MJAR at 33. Plaintiffs reason the PLA requirements arbitrarily and capriciously mandate plaintiffs—as entities, otherwise responsible offerors—enter a PLA agreement with a labor union to be eligible for award under the solicitation. *See* MVL MJAR at 27; Harper MJAR at 33. Plaintiffs note the FAR expressly prescribes policies and procedures for providing for full and open competition after excluding one or more sources, but the PLA requirements do not have a "set-aside" designation under the FAR or statute. *See* MVL MJAR at 28. According to plaintiffs, if the government intends to enforce the PLA requirements without violating CICA's full and open competition requirement, Congress must first enact a statute authorizing set-aside procurements for PLAs and then the FAR Council would have to create a specific set-aside requirement for PLAs. *See* MVL MJAR at 29–30.

The government counters, arguing "any responsible source who can satisfy the agencies' requirements, including the PLA requirements, may compete for contracts." Gov't Cross-MJAR at 37. "Moreover, the fact that the source of the PLA requirements are [FAR] provisions implementing an [EO] does not transform the procurements into restricted competitions or 'set asides.'" *Id.* at 2. The government boils this case down to choice: "the inability or unwillingness of a particular contractor to comply with a FAR clause incorporated into a solicitation does not mean that the solicitation provides for less than full and open competition." *See id.*

In reply, plaintiffs argue even if the PLA requirements were performance specifications, the government's argument must fail "because the PLA requirements are unauthorized by statute and are therefore unauthorized by law." Pls.' Reply at 13–14; *see also* HPCC Reply and Resp. at 3–8. Plaintiffs explain CICA expressly reserves set-aside authority for Congress, not the President, as possible exceptions to full and open competition must be mandated expressly by a statute. Pls.' Reply at 14; *see, e.g.,* 41 U.S.C. § 3304(a)(5); 41 U.S.C. § 3301(a); *see also* HPCC Reply and Resp. at 3–8. Plaintiffs argue the EO violates FPASA because Congress expressly

- 18 -

reserved to itself the right to create socioeconomic set-asides to CICA. *See* Pls.' Reply at 15; *see also* HPCC Reply and Resp. at 3–8. According to plaintiffs, "the President cannot implement policy through orders that contravene Congressional action and which are not otherwise authorized by Congress or the Constitution." *See* Pls.' Reply at 15; *see also* HPCC Reply and Resp. at 3–8. Plaintiffs argue the EO is unenforceable because the EO fails to cite the operative provision of FPASA. *See* Pls.' Reply at 15; *see also* HPCC Reply and Resp. at 3–8. Finally, even if the Court were to adopt the government's interpretation of FPASA, plaintiffs argue the AR contradicts the government's assertion the EO promotes economy and efficiency. *See* Pls.' Reply at 15; *see also* HPCC Reply and Resp. at 3–8.

### 1. Plaintiffs' Argument CICA Expressly Reserves Set-Aside Authority for Congress—Not the President

Plaintiffs argue Congress expressly reserved to itself the right to create socioeconomic set-asides to CICA "[b]ecause Congress specifically preserved its authority to legislate in CICA," and Congress "could not have delegated those same powers to the President in FPASA." *See* Pls.' Reply at 14. When an EO or FAR regulations violate a statute—as plaintiffs allege in this case—the EO and FAR provisions "are void and enforceable." *See id.* According to plaintiffs, a presidential directive can stand only if the subordinate officials have the authority that they are told to exercise. *See id.* at 15.

The government argues FPASA authorizes the President to "prescribe policies and directives that the President considers necessary to carry out this subtitle," so long as the policy and directives are "consistent with this subtitle." *See* Gov't Cross-MJAR at 47 (quoting 40 U.S.C. § 121(a)). The government argues the agencies here hold "broad discretion" in the "determination of [the government's] minimum needs," and the PLA requirements are necessary to satisfy the needs of the agencies. *See id.* at 42. According to the government, "[n]othing prohibits agencies from relying on Presidential policy and generally applicable FAR clauses in determining their needs for particular procurements." *Id.* The government argues "the President's duty [is] to 'take Care that the Laws be faithfully executed,'" quoting U.S. Const. art II, § 3, which "includes guidance and supervision of agencies in implementing [c]ongressional direction to specify their needs." *Id.*

### 2. Plaintiffs' Argument the EO Is Unauthorized Under Article II of the Constitution

Plaintiffs argue the President's authority to implement policy is not unlimited because the President is not a lawmaker. *See* Pls.' Reply at 15. "[T]he President cannot implement policy through EOs that contravene [c]ongressional action and which are not otherwise authorized by Congress or the Constitution." *Id.* According to plaintiffs, the EO violated CICA's "specified source" restriction because the mandate "excludes a specified source—offerors who are unwilling or unable to enter into a PLA with a labor union—from receiving a large-scale construction contract, and there is no [c]ongressional authorization for this restriction." *Id.* at 16. Plaintiffs broadly conclude the EO "is unauthorized under Article II of the Constitution." *Id.*

The government characterizes as "erroneous" plaintiffs' argument President Biden lacked the authority to issue the EO. *Id.* at 45. According to the government, the EO was authorized under both Article II of the Constitution and FPASA. *See* Gov't Cross-MJAR at 45. The government argues the PLA requirements are "authorized by law" under 10 U.S.C. § 3206(a)(2)(B) and 41 U.S.C. § 3306(a)(2)(B), because the PLA requirements are based on regulations having the force and effect of law. *See id.* at 44. The government argues "[t]he [EO] was authorized under both Article II of the Constitution and FPASA." *Id.* The government acknowledges the President's authority "is not without limits" as the President is not "a lawmaker," yet the President's "faithful execution of the laws enacted by Congress . . . ordinarily allows and frequently requires the President to provide guidance and supervision to his subordinates." *Id.* (citations omitted). Given the EO "contains an exception to the PLA requirements," the government concludes the EO was designed to "ensur[e] that its terms do not run afoul of statutes or regulations." *Id.* at 47.

### 3. Plaintiffs' Argument the FPASA Does Not Support Presidential Action of this Kind and Magnitude

Plaintiffs argue "the [g]overnment fails to cite to any *operative* provision of the FPASA that grants President Biden authority to enact the PLA [r]equirements." *See* Pls.' Reply at 20 (emphasis in original). Plaintiffs note the EO "does not cite to any specific operative provision of FPASA," but rather, "simply cites to the purpose section of FPASA to implement the PLA [r]equirements." *Id.* Plaintiffs assert a non-operative provision "cannot confer freestanding powers upon the President unbacked by operative language elsewhere in the statute." *See id.* (citations omitted). Accordingly, without relying on operative statutory language, the President—through the EO—"cannot use FPASA to exert a power that Congress has never conferred upon him." *Id.*

The government acknowledges FPASA includes a statement providing "the purpose of this subtitle is to provide the . . . [g]overnment with an economical and efficient system for the following activities . . . [p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting, inspection, storage, issue, [and] setting specifications." Gov't Reply at 21 (quoting 40 U.S.C. § 101(1)). The government argues this purpose statement "vests the President with broad authority to set . . . policies [respecting] its own procurement decisions." *Id.* Furthermore, "Congress authorized the President to issue directives that he '*considers* necessary to carry out this title.'" *See id.* (quoting 40 U.S.C. § 121(a) (emphasis added)). According to the government, the EO is valid if it "bears a sufficiently close nexus to the statutory objectives of economy and efficiency. *See id.* at 21 (citation omitted).

Plaintiffs, however, argue "the administrative record demonstrates that the PLA [r]equirements lack a nexus to economy and efficiency in federal procurements. *See* Pls.' Reply at 25. Plaintiffs point to the PLA market survey responses, where respondents all agree "a PLA would increase costs and scheduling while reducing the competition" and "would not contribute to the economy or efficiency of the project, not promote the agency's long term program interests." *See id.* (citations omitted).

### 4. Plaintiffs' Argument the PLA Requirements Impermissibly Delegate Procurement Responsibility Determinations to Private Labor Unions

Even if Congress had delegated to the President authority under FPASA to issue the EO , plaintiffs argue the PLA requirements impermissibly delegate procurement responsibility determinations to private labor unions. *See* Pls.' Reply at 26. By tasking third parties with the responsibility of selecting awardees, the government foregoes the direct competitive procurement process in violation of procurement law. *See id.* "The unions' ability to direct the pricing and prime contractor award decision by choosing which contractor it will execute a PLA with gives the unions control if an otherwise successful offeror will be held responsive or not, without any ability by the [g]overnment to take this control from the unions and make award to the otherwise responsible offeror who is either the low bidder or the best value." *Id.* at 27.

The government counters, arguing "if the President's authority under 40 U.S.C. § 121(a) was limited to merely carrying out some specific reference in the statute, it would render a portion of the statute superfluous." Gov't Cross-MJAR and Resp. at 52 (citation omitted). Finally, the government argues "Congress has implicitly ratified the . . . President's authority under FPASA" because, in 2002, Congress recodified both FPASA's purpose statement and Section 121. *See id.* at 50.

### C. The Timeliness of JCCBG2's Protest

The government argues one plaintiff, JCCBG2, "forfeited its objections to the PLA requirements in the solicitation it challenges by failing to protest the PLA requirement before the deadline for the submission of proposals." *See* Gov't Cross-MJAR and Resp. at 31. According to the government, when a plaintiff can object to solicitation terms containing a patent error but fails to do so before the close of the bidding process, that plaintiff waives its ability to raise the same objection in a subsequent bid protest action. *See id.* (citations omitted). The government contends JCCBG2 should have formally protested *before* the close of bidding. *See id.* Given proposals were due by 21 May 2024, the government acknowledges JCCBG2 "submitted a timely proposal," but argues JCCBG2 "did not formally protest the solicitation's inclusion of the PLA requirements until August 2024," so JCCBG2 "forfeited its challenge to the solicitation's PLA requirements." *See id.* at 312.

In response, JCCBG2 argues its objection was timely made before the close of the bidding process. *See* JCCBG2 Resp. to Gov't Cross-MJAR at 1, ECF No. 78. JCCBG2 argues the relevant inquiry is whether JCCBG2 objected to the terms of the solicitation "*prior* to the close of the bidding process." *See id.* (citations omitted) (emphasis added). According to JCCBG2, the government's application of the "narrower timing requirements of GAO regulation 4 C.F.R. § 21.2(a)(1)" is inapplicable here as the GAO regulation imposes the wrong legal standard. *See id.* at 6. Further, the government has not awarded the solicitation and has agreed to suspend the award pending JCCBG2's protest, which JCCBG2 argues obviates any concern JCCBG2 could be attempting to obtain an unfair advantage. *See id.* at 7.

The government counters, arguing "JCCBG2's protest must be rejected regardless of the merits of its objections because JCCBG2 forfeited its challenge by failing to protest before the

deadline for submission of proposals." Gov't Reply at 2.  Rejecting JCCBG2's argument, the
close of the bidding process is the award of the contract, not the proposal submission deadline.
*See id.*  The government argues "this Court has held that protest grounds challenging solicitation
terms were waived in *pre-award* protests because the plaintiffs raised those protests grounds
after the deadline for the submission of proposals."  *See id.*  Further, "JCCBG2 acknowledges
that challenges to solicitation terms must generally be brought at GAO before the proposal
submission deadline," which "is further evidence that 'close of the bidding process' means the
deadline for the submission of bids, proposals, or quotes."  *Id.* at 3.

### D.      Plaintiffs' Argument the Court Should Issue a Permanent Injunction

Plaintiffs seek injunctive relief, asserting "the PLA Requirements that constitute . . .
unauthorized socioeconomic set-asides must be preliminarily and permanently enjoined as
arbitrary and capricious . . . ."  *See* MVL MJAR at 32; ECC MJAR at 47; JCCBG2 MJAR at 40;
Harper MJAR at 38; *see also* HPCC GSA MJAR at 18–20; HPCC NAVFAC MJAR at 17–19;
HPCC USACE MJAR at 25–27.  The government argues this request should be denied because
plaintiffs did not address their entitlement to an injunction and plaintiffs have not succeeded on
the merits.  *See* Gov't Cross-MJAR and Resp. at 78.  Plaintiffs counter, arguing the government
is incorrect because:  (1) the government emailed plaintiffs on 16 July 2024, stating the
"voluntary stay should obviate the need for proceedings regarding preliminary injunctive
relief[;]" (2) in each bid protest complaint, plaintiffs included a section titled "Basis for
Injunctive Relief" and requested an injunction; and (3) "it is not uncommon that a court will
enjoin the [g]overnment from awarding a contract based on a solicitation that has been
determined to violate procurement law . . . even where an injunction would prolong the
[g]overnment's procurement efforts."  Pls.' Reply at 30; *see also* HPCC GSA MJAR at 18–20;
HPCC NAVFAC MJAR at 17–19; HPCC USACE MJAR at 25–27.

## IV.    Legal Standards

### A.  Bid Protest Jurisdiction and APA Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act ("ADRA"),
provides this court jurisdiction over "action[s] by an interested party objecting to a solicitation by
a federal agency for bids or proposals for a proposed contract or to a proposed award or the
award of a contract or any alleged violation of statute or regulation in connection with a
procurement or a proposed procurement."  Administrative Dispute Resolution Act, Pub. L. No.
104-320, 28 U.S.C. § 1491(b)(1) (1996).  The term "interested party" means "actual or
prospective bidders or offerors whose direct economic interest would be affected by the award of
the contract or by failure to award the contract."  *Am. Fed'n of Gov't Emps. v. United States*, 258
F.3d 1294, 1302 (Fed. Cir. 2001).  "[T]o prevail in a protest the protester must show not only a
significant error in the procurement process, but also that the error prejudiced it."  *Data Gen.
Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996).

The Court evaluates bid protests under the framework laid out in Section 706 of the
Administrative Procedure Act.  28 U.S.C. § 1491(b)(4); *see also Impresa Construzioni Geom.
Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); MATTHEW H.

- 22 -

SOLOMSON, COURT OF FEDERAL CLAIMS: JURISDICTION, PRACTICE, AND PROCEDURE § 8-37 (2016) (footnote omitted) (first citing 28 U.S.C. § 1491(b)(4); and then quoting 5 U.S.C. § 706(A), (D)); 28 U.S.C. § 1491(b)(4) (2024) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.")). "[T]he proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004) (quoting *Adv. Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000)). An agency's action is arbitrary, capricious, or an abuse of discretion if "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or . . . is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Since the arbitrary and capricious standard is "highly deferential," a reviewing court must "sustain an agency action evincing rational reasoning and consideration of relevant factors." *Adv. Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). A court, therefore, will not "substitute its judgment" for the agency's so long as the agency's decision was reasonable. *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 998–99 (Fed. Cir. 2018) (quoting *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003)).

### B. Judgment on the Administrative Record in a Bid Protest

"[RCFC] 52.1(c) provides for judgment on the administrative record." *Huntsville Times Co. v. United States*, 98 Fed. Cl. 100, 104 (2011); *see also Bannum*, 404 F.3d at 1353–54. The court may set aside an agency action if plaintiff has proven "either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332. The rational basis test requires the court to ask "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Dell Fed. Sys., L.P.*, 906 F.3d at 992 (quoting *Banknote*, 365 F.3d at 1351). "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Impresa*, 238 F.3d at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)). "*[D]e minimis* errors do not require the overturning of an award." *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996). A bid protest plaintiff must establish alleged "errors in the procurement process significantly prejudiced" plaintiff by showing "there was a 'substantial chance' it would have received the contract award but for the errors." *Bannum*, 404 F.3d at 1353 (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

### C. Permanent Injunction

When deciding whether a permanent injunction is warranted, a court considers:

(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2)
whether the plaintiff will suffer irreparable harm if the court withholds injunctive
relief; (3) whether the balance of hardships to the respective parties favors the grant
of injunctive relief; and (4) whether it is in the public interest to grant injunctive
relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). If the Court awards
injunctive relief, it may fashion its own remedy to fit the contours of the decision. *See Turner
Constr. Co. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011) (explaining "the Court of
Federal Claims has broad equitable powers to fashion an appropriate remedy").

## V.    Executive Authority Under FPASA

As an initial matter, plaintiffs challenge the President's authority to issue PLA policies
under the Federal Property and Administrative Services Act ("FPASA"). *See* Pls.' Reply at 20;
*see also* Tr. at 120:6–19 ("THE COURT: So FPASA does not give the Executive Branch
authority to make directives related to project labor in this way? [PLAINTIFFS]: That is [our]
view. [We] don't think Congress has ever spoken to this either . . . . [T]his has been a ping-pong
. . . between different administrations, and never has Congress weighed in at all."). For the last
thirty years, presidential administrations since President George H.W. Bush have issued EO PLA
policies relying generally on FPASA as the source of their authority. *See, e.g.*, EO No. 14063,
87 Fed. Reg. 7363 (Feb. 9, 2022) (President Biden's EO); EO No. 13502, 74 Fed. Reg. 6985
(Feb. 11, 2009) (President Obama's EO); *See* EO No. 13202, 66 Fed. Reg. 11225 (Feb. 17, 2001)
(President George W. Bush's EO); EO No. 13208, 66 Fed. Reg. 18717 (Apr. 6, 2001) (President
George W. Bush's EO); EO No. 12818, 57 Fed. Reg. 48713 (Oct. 28, 1992) (President George
H.W. Bush's EO). Despite fluctuating PLA polices, every EO began with a common
introductory sentence: "By the authority vested in me as President by the Constitution and the
laws of the United States of America, including the Federal Property and Administrative
Services Act of 1949, 40 U.S.C. 471 *et seq*. . . . " *See id.* According to plaintiffs, merely citing
FPASA is not sufficient legal authority to ground presidential policy without specific statutory
reference. *See* Tr. at 125:4–15 ("[PLAINTIFFS:] [A] regulation must reasonably be able to
conclude that the grant of authority contemplates the regulations issued.").

In *Georgia v. President of the United States*, the Eleventh Circuit opined on the
President's authority under FPASA, explaining "[t]he President must stay within the confines of
[FPASA] of course; but his actions must *also* be consistent with the policies and directives that
Congress included in the statute." 46 F.4th 1283, 1294 (11th Cir. 2022) (emphasis added).
Applying this limitation to the CICA context, the Eleventh Circuit reasoned the "explicit
legislative polices" which cabin the President's authority "include the rule that agencies must
'obtain full and open competition' through most procurement procedures." *Id.* (quoting 41
U.S.C. §§ 3301(a), 3306). According to the Eleventh Circuit, the Supreme Court's decision in
*Chrysler Corp. v. Brown*, 441 U.S. 281 (1976), suggests "the President's authority should be
based on a 'specific reference' within [FPASA]" if the President is going to solely rely on
FPASA as his authority to implement policies. *Id.* (quoting *Chrysler*, 441 U.S. at 304 n. 34). In
*Chrysler*, the Supreme Court reviewed an EO prohibiting employment discrimination by federal
contractors based upon the Procurement Act. *See Chrysler*, 441 U.S. at 304–06. Though the

Supreme Court identified other potential statutory sources to support the President's policy, the Supreme Court observed in a footnote that while FPASA "explicitly authorizes Executive Orders 'necessary to effectuate [its] provisions,'" FPASA makes no "specific reference to employment discrimination." *See id.* at 304 n. 34 (quoting 40 U.S.C. 486(a)). The Eleventh Circuit interpreted the footnote as an indication the Supreme Court "doubted [] the Procurement Act on its own delegated sufficient authority" to support the EO. *Georgia*, 46 F.4th at 1294.

The government disagrees with the Eleventh Circuit's reading of *Chrysler* as a limitation on the President's authority under FPASA. *See* Tr. at 128:13–17 ("THE COURT: Do you agree with the . . . 2022 Georgia decision? [GOVERNMENT]: No."). The government agreed at oral argument, however, the President would need to identify a specific statutory reference to support the PLA mandate if the Court were to adopt the Eleventh Circuit's reading of *Chrysler*. *See id.* at 129:6–9 ([GOVERNMENT:] [I]f the Court were to agree with the analytical framework of Georgia . . . even if we need a specific reference . . . we do still have [Section] 3306, which . . . authorizes agencies to specify their needs . . . ."); *see also* 41 U.S.C. § 3306(2)(B) ("Each solicitation under this division shall include specifications that . . . include restrictive provisions or conditions only to the extent necessary to satisfy the needs of the executive agency or as authorized by law."). The government also acknowledged the FAR Council PLA mandate does not address CICA. *See infra* Section V.B. Still, the government argued the President holds broad authority to implement PLA policies as Congress has implicitly ratified its view of the President's authority under FPASA through decades of inaction. *See* Tr. at 131:4–14 ("[GOVERNMENT:] Congress hasn't done anything about it."). The government urged the Court to find the reauthorization of FPASA in 2002 as determinative here. *See* Tr. at 131:4–14 ("[GOVERNMENT:] Congress reauthorized FPASA in 2002 and it didn't reject the interpretation that Presidents have had . . . multiple administrations at that point, when it reauthorized it and when it . . . recodified the language.").

Though the parties offer little by way of precedential authority on this issue, the Court agrees with plaintiffs: the Eleventh Circuit's reasoning in *Georgia* is helpful here. *See* Tr. at 125:4 –126:4 (arguing the applicability of *Georgia*); *see also Georgia*, 46 F.4th at 1294–95. While the Court finds the Eleventh Circuit's reading of *Chrysler* persuasive, the Supreme Court and Federal Circuit have not addressed this issue, so the Court leaves to Congress the matter of addressing the President's authority under FPASA to issue expansive construction industry labor policies. *See* 41 U.S.C. § 3306.

## VI.     Whether the FAR Council's Regulations Violate CICA

When reviewing whether a regulation violates CICA's full and open competition requirement, the Court begins with the Federal Circuit's guidance in *National Government Services, Inc. v. United States* ("*NGS*").[1] 923 F.3d 977 (Fed. Cir. 2019). There, the Federal

---

[1] While the parties do not agree on the extent of the applicability of *National Government Services, Inc. v. United States* to the facts here, the Court finds the Federal Circuit's analysis in *NGS* instructive. 923 F.3d 977 (Fed. Cir. 2019); *see* Tr. 97:15–21 ("[GOVERNMENT:] NGS . . . was really a very unique situation where you had . . . an award limitations policy that was purely about the eligibility of the offeror to receive the contract. It didn't govern . . . contract performance in any way."); Tr. at 143:17–144:3 ("[PLAINTIFFS:] [I]n [our] read of [NGS], the [g]overnment's order to use union instead of nonunion labor is an exclusion of the source. It's specifically the exclusion of nonunion labor, simply because the [g]overnment administration speculates that union labor is going to

Circuit reviewed a pre-award bid protest challenging contract award limitations imposed in solicitations for proposals for the administration of Medicare claims and benefits as violative of CICA's full and open competition requirement. *See id.* at 981–82. As in *NGS*, the Court here must first "address whether the [] solicitation provided for full and open competition in light of [the PLA requirement] contained therein." *Id.* at 982. If the Court concludes the solicitation "did not provide for full and open competition," the Court must then "address whether the agency's approach was otherwise permissible." *Id.* When a case challenging a regulation's validity involves a federal contract, the Federal Circuit's recent decision in *Boeing Co. v. United States* instructs "the Court of Federal Claims has exclusive jurisdiction to review the validity of the challenged regulation."[2] 119 F.4th 17, 24–25 (Fed. Cir. 2024) ("[W]hen the action is a contract case—and more importantly, a contract case that is subject to the CDA—the Court of Federal Claims has exclusive jurisdiction to review the validity of the challenged regulation.").

Under CICA, Congress generally requires procuring agencies to "obtain full and open competition through the use of competitive procedures." 41 U.S.C. § 3301(a); *see NGS*, 923 F.3d at 982. In full, Section 3301 states:

> (a) IN GENERAL. Except as provided in sections 3303, 3304(a), and 3305 of this title and except in the case of procurement procedures otherwise expressly authorized by statute, an executive agency in conducting a procurement for property or services shall—
>
> > (1) obtain *full and open competition* through the use of *competitive procedures* in accordance with the requirements of this division and the [FAR]; and
> >
> > (2) use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.

41 U.S.C. § 3301(a) (emphasis added). CICA defines "competitive procedures" as "procedures under which an executive agency enters into a contract pursuant to full and open competition." 41 U.S.C. § 152. Regarding federal procurements regulated under CICA, "full and open

---

produce a preferred contract outcome. Much as the same as the capacity caps in NGS where assuming that a . . . better outcome would be desired by limiting competition to those who were below a certain amount of government contracts volume at the time of the procurement."); Tr. at 144:4–8 ("[GOVERNMENT:] NGS dealt with not a contract requirement, but simply an eligibility criterion for the . . . contract award. You know, it was completely a pre-award thing to determine . . . .").

[2] Although the Federal Circuit has yet to weigh in on the applicability of *Boeing* to bid protests challenging the validity of federal procurement regulations—like the seven consolidated bid protests here—plaintiffs read *Boeing* as recognizing the Court's exclusive jurisdiction to review the agencies' inclusion of the PLA requirement in each solicitation. *See* Tr. at 65:7–15 ("[PLAINTIFFS:] If the [g]overnment's position were correct, then you would never be able to file a bid protest challenging . . . a term of a solicitation if it was based on a regulation. If the regulation is what is causing the impropriety in the solicitation, then you have to be able to challenge that."). The Court notes the Federal Circuit's *Boeing* instruction may be read as acknowledging the Court of Federal Claims' exclusive jurisdiction to review agency regulations impacting federal contract cases just as the Federal Circuit has permitted within the tax context. *See, e.g.*, *Balestra v. United States*, 803 F.3d 1363 (Fed. Cir. 2015) (reviewing a Treasury Department tax regulation and conducting a full APA analysis).

competition . . . means that all responsible sources are permitted to submit sealed bids or competitive proposals on the procurement." 41 U.S.C. § 107.

President Biden's EO instructed the "agencies *shall require* every contractor or subcontractor engaged in construction on the project to agree, for that project, to negotiate or become a party to a [PLA] with one or more appropriate labor organizations." EO 14063, 87 Fed. Reg. 7363, 7364 (Feb. 9, 2022) (Section 3. PLA Presumption) (emphasis added). Effective 22 January 2024, the FAR Council implemented Biden's EO, mandating: "When awarding a contract in connection with a large-scale construction project . . . agencies *shall require* use of [PLAs] for contractors and subcontractors engaged in construction on the project." 48 C.F.R. § 22.503(b) (Dec. 22, 2023) (emphasis added). Quoting Biden's EO verbatim, the FAR Council's PLA mandate enumerates narrow exceptions to the PLA requirement:

> (i) Requiring a [PLA] on the project would not advance the Federal Government's interests in achieving economy and efficiency in Federal procurement. The exception shall be based on one or more of the following factors:
>
>> (A) The project is of short duration and lacks operational complexity.
>>
>> (B) The project will involve only one craft or trade.
>>
>> (C) The project will involve specialized construction work that is available from only a limited number of contractors or subcontractors.
>>
>> (D) The agency's need for the project is of such an unusual and compelling urgency that a [PLA] would be impracticable.

*Compare* 48 C.F.R. § 22.504(d)(i), *with* EO 14063, 87 Fed. Reg. 7363 (Feb. 9, 2022). Also, FAR 22.504 contemplates two additional exceptions—which do not directly quote Biden's EO but generally track its language—permitting an agency to forego a PLA when:

> (ii) Market research indicates that requiring a [PLA] on the project would substantially reduce the number of potential offerors to such a degree that adequate competition at a fair and reasonable price could not be achieved . . . A likely reduction in the number of potential offerors is not, by itself, sufficient to except a contract from coverage under this authority unless it is coupled with the finding that the reduction would not allow for adequate competition at a fair and reasonable price.
>
> (iii) Requiring a [PLA] on the project would otherwise be inconsistent with Federal statutes, regulations, [EOs], or Presidential memoranda.

48 C.F.R. § 22.504(d)(1)(ii)–(iii).

Each of the solicitations at issue in this case incorporate the PLA mandate by referencing the FAR provisions implementing Biden's EO.[3]  For example, in USACE's solicitation for the construction of a two-bay maintenance/fuel cell hangar at March Air Reserve Base in California, the solicitation stated USACE would award the contract to "the responsible offeror whose proposal conforms with all the terms and conditions of the solicitation . . . ."  *See* Harper AR at 6040 (Harper Solicitation).  Specifically, the solicitation mandated:  "**ALL OFFERORS ARE REQUIRED TO SUBMIT AN EXECUTED PROJECT LABOR AGREEMENT**.  All offerors shall submit a [PLA] in accordance with FAR Solicitation Provision 52.222-23 and FAR Clause 52.222-34."  Harper AR at 6053 (Solicitation) (emphasis in original).  As to MVL's protest related to the consolidated rigging facility at Joint Base Lewis McChord in Washington, the USACE solicitation stated:  "[i]n compliance with [EO] 14063, the [PLA] FAR Provision 52.222-33 and FAR Clause 52.222-34 are included in the solicitation."  MVL AR at 364 (MVL Solicitation).  With this background information in mind, the Court now turns to whether the individual solicitations provide for full and open competition "in light of" the PLA requirements mandated by the FAR Council and Biden's EO.  *See NGS*, 923 F.3d at 982.

Consistent with the Federal Circuit's approach in *NGS*, the Court addresses whether the solicitations here provided for full and open competition.  *See id.* ("We first address whether the [] solicitation provided for full and open competition in light of the [regulatory policy] contained therein. . . .  [If not,] we then address whether the agency's approach was otherwise permissible.").  First, the Court examines the unique operation of how Biden's EO FAR regulations function as compared to prior administrations' PLA policies.  *See id.*  The Court then examines whether the agencies' decision to include the PLA requirement in the solicitation despite previously deciding not to was arbitrary and capricious.  *See id.*  As exemplars, the Court reviews the market survey responses and agency determinations related to USACE's consolidated rigging facility project in Washington and NAVFAC's engineering test facility project in Florida.  Finally, the Court examines the applicability of CICA's § 3301 express statutory authorization exception to the PLA mandate.  *See id.*  For the following reasons, the Court finds the FAR requirements in the solicitations violate CICA as applied to the contracts at issue here.  *See id*.

## A.    New Operation of the FAR Council's Regulations as Compared to Prior PLA Requirements

---

[3] Under the final FAR regulation, the solicitation must include the "basic [PLA] provision" and two alternative PLA provisions may be selected by the CO in certain circumstances.  *See* FAR 52.222-33 (2024) (Notice of Requirement for PLA).  Specifically, the FAR permits the "basic provision" language to be substituted by the "Alternate I" language as prescribed in FAR 22.505(a)(2), and "Alternate II" language can replace the "basic provision" under FAR 22.505(a)(3).  *See id.*  At oral argument, plaintiffs' counsel explained, "[t]he new FAR provisions repeat the requirements of [] Biden['s] [EO] and make it a requirement that the [g]overnment place a PLA . . . one of the two PLA provisions from the FAR, into each solicitation for a large-scale construction contract that's greater than $35 million."  Tr. at 104:4–9.  The government described the application of this requirement at oral argument, explaining the recommendation GSA received to shift from using "Alternate I" language to "Alternate II" language in the Land Port of Entry project solicitation.  *See* Tr. at 25:17–26:6 ("[GOVERNMENT:]  [The market survey author] made a recommendation that . . . if elimination [of the PLA] is not an option, [they] recommend[ed] shifting to the . . . alternate 1 of FAR 52.222-33 to the alternate 2 of that regulation to allow the . . . awardee to enter into the PLA after the contract is awarded.").

While President Biden's EO shares some formal similarities with prior PLA EOs, it is substantively and operationally different. By way of example, under the Obama-era PLA policy, the FAR regulations *encouraged*, but did not require, federal agencies to mandate PLAs on a case-by-case basis for large-scale federal construction projects. *See* Tr. at 12:1–19 ("THE COURT: [Obama's EO] did direct the FAR Council to implement the provisions of the [EO] which encouraged agencies to consider requiring the use of PLAs on large-scale construction projects on a case-by-case basis . . . . [GOVERNMENT]: Yes . . . [the FAR Council] issued regulations implementing the [EO] in at least FAR [s]ubpart 22.5, and I believe 52.22-34 and 24 as well."). The Biden EO policy supplanted the Obama EO policy, raised the applicable contract threshold for PLA requirements from $25 million to $35 million, and removed agency discretion. *See* Tr. at 104:11–14 ("[PLAINTIFFS:] The old rule was discretionary, encouraging them to consider it for -- at the time they considered large-scale construction projects to be those with an estimated value of $25 million or greater.").

In fundamental operation, the Biden EO flipped the status quo from giving agencies broad discretion to apply PLAs on a case-by-case basis, to *mandating* PLAs as the new default requirement subject to exceptions. *See* Tr. at 101:3–4 ("[GOVERNMENT:] [Biden's EO] did give more discretion to agencies than [Obama's EO] did."); Tr. at 103:21–104:1 ("[PLAINTIFFS:] [T]he mandatory nature of [Biden's EO] and the implementing regulations . . . is different from the discretionary nature of the prior FAR rules."); Tr. at 176:24–177:9 ("THE COURT: But here it's stated, oddly, the rule swallows the exception in large part, whereas before, the rule was weaker? [GOVERNMENT]: I guess you could say the rule was weaker before . . . . THE COURT: In short, there was more discretion before this FAR Council rule? [GOVERNMENT]: Yes."). Under the Obama and Trump Administrations, agencies enjoyed discretion to "opt in" to using a PLA in a solicitation, whereas, under the Biden Administration, the FAR regulations enumerate only narrow exceptions the agencies may apply to "opt out" of the PLA requirement. *See* Tr. at 101:2–11 ("[GOVERNMENT:] [Under Obama's EO] it was still discretionary whether to include the PLA. . . . [Biden's EO] said . . . you have to include the PLA requirement unless one of these exceptions applies . . . ."). Even then, to apply an exception to the current PLA regulations, the agency's senior procurement executive must provide a specific written explanation of why at least one of the enumerated conditions exists for the particular contract. *See* EO 14063, 87 Fed. Reg. 7363, 7364 (Feb. 9, 2022) (Section 3. PLA Presumption) ("A senior official within an agency may grant an exception . . . providing a specific written explanation of why at least one of the following circumstances exists with respect to that contract . . . ."). In sum, the government said it best: "the President made the policy determination that . . . generally, [PLAs] can help resolve some of the issues that can occur with these large-scale construction contracts, so he set up a framework so that you include the requirement for a PLA unless certain exceptions apply." Tr. at 82:15–21.

Functionally, the FAR Council's new PLA framework produces entirely different outcomes than those achieved under the previous Obama Administration's discretionary PLA policy. To illustrate, before the PLA mandate, USACE conducted its initial market research in 2023 for the consolidated rigging facility at Joint Base Lewis McChord in Washington—the contract specialist found "a PLA was not recommended because . . . 'there was a shortage of skilled labor in the region of the project,' and a PLA would 'not contribute to the economy or efficiency of the project.'" *See* Tr. at 18:1–12 (quoting MVL AR at 113–14 (2023 USACE PLA

Determination Tool)). USACE determined not to include a PLA under the Obama-era FAR regulations based on data and market analysis. *See* Tr. at 85:9–22 ("[GOVERNMENT]: When it was determined under the . . . regulations implementing [Obama's EO] . . . . [t]he agency used data and market analysis . . . it did consider those things."). Nothing in the administrative record indicates whether USACE intended to include a PLA requirement in the solicitation before the new FAR provisions. *See* Tr. at 18:13–17 ("[THE COURT:] Is there anything in the record indicating whether [USACE] intended to include a PLA requirement in the solicitation prior to the new FAR provisions? [GOVERNMENT]: Prior to the new FAR provisions, no."). Nevertheless, when USACE issued its solicitation in 2024, USACE included a PLA requirement by incorporating FAR 52.222-33 and 52-222.34 in the solicitation. *See* MVL AR at 4069 (Amendment 4 to the Solicitation).

When pressed at oral argument about USACE's decision to include a PLA requirement after the market survey recommendation against it, the government agreed the agency based its reversal on nothing more than the new PLA mandate alone. *See* Tr. at 19:2–14 ("[THE COURT:] [M]y question is what's different between 2023 and 2024 other than 12 months? [GOVERNMENT]: Just in terms of the . . . timeline really . . . there w[ere] new regulations in place implementing the new [EO] . . . it was appropriate to conduct additional market research to determine whether any of the exceptions apply under FAR 22.504(d). THE COURT: So the difference was the new regulations? [GOVERNMENT]: Yes."). At oral argument, government counsel was not aware of any market changes between 2023 and 2024 to warrant the agency's reversal. *See* Tr. at 21:11–13 ("[THE COURT:] Did anything change in the market conditions during the course of the time in 2024? [GOVERNMENT]: Not that I'm aware of."). The government clarified, the new PLA mandate was the only reason the solicitation included the PLA requirement. *See* Tr. at 21:14–13 ("THE COURT: So the only . . . reason the PLA requirement was placed was because of the regulation? [GOVERNMENT]: Right, because there was a new regulation and that the agency rationally determined that those exceptions were not met."). The government explained, "[t]here was a determination made [a PLA] would not contribute to economy or efficiency for the project under consideration, under the factors considered in [Obama's EO], or the regulations implementing [Obama's EO]." *See* Tr. at 43:6–16.

According to the government, USACE's only justification for its reversal on the inclusion of the PLA "is the policy determination that's been made by the President and the FAR." *See* Tr. at 81:8–12 ("[THE COURT:] [W]hat does the PLA do for this particular project? . . . [GOVERNMENT:] [T]his is the policy determination that's been made by the President and the FAR."). Without additional support undergirding USACE's decision, the government speculated a PLA could require terms to prevent lockouts and strikes and would provide a mechanism for dispute resolution. *See generally* Tr. at 81:19–82:12. The government, however, was not aware of any issues related to strikes or lockouts in Washington that may apply to *this* solicitation. *See* Tr. at 82:12–21 ("THE COURT: Is there anything in the record that notes there's a specific problem with respect to strikes and lockouts in Washington State, in that area? [GOVERNMENT]: I don't know that there is, but the President made a policy determination . . . that generally, [PLAs] can help resolve some of the issues that can occur with these large-scale construction contracts, so he set up a framework so that you include the requirement for a PLA unless certain exceptions apply."). Aside from the President's "policy determination," the

- 30 -

government could not point to any record evidence supporting the PLA's inclusion. *See* Tr. at 82:12–83:16. The Court therefore finds USACE's decision to disregard the market survey results indicating a PLA would be anticompetitive and to include a PLA requirement against the recommendations of the agency's hired outside industry specialist "runs counter to the evidence before the agency," makes a PLA effectively mandatory, and is arbitrary and capricious. *See Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) ("Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* ("*MVM*"), 463 U.S. 29, 43 (1983))).

In another illustration of the functional effect of the FAR Council's PLA mandate, USACE's 4 March 2024 Acquisition Plan Addendum ("Addendum") related to the consolidated communications center at Patrick Space Force Base in Florida outlined the agency's intention to "DELETE" and "INSERT" language in the Acquisition Plan. *See* HPCC USACE AR at 283–84 (2024 Acquisition Plan Addendum). At oral argument, the government explained the Addendum made several amendments to the prior Acquisition Plan's language following the PLA mandate. *See* Tr. at 45:16–46:5. USACE issued the Addendum after determining the market analysis conducted under the previous EO was effectively obsolete under the new FAR PLA mandate. *See* Tr. at 85:18–86:5. Though USACE concluded a PLA would neither contribute to economy nor efficiency, USACE amended the Acquisition Plan to include a PLA simply because of the PLA mandate. *See* Tr. at 86:14–87:7 ("[THE COURT:] [USACE] concluded on its own, based under the processes of [Obama's EO], the PLA would not contribute to the economy or efficiency, then it was not new data or new market research, it was only a new regulation that came to a different conclusion? [GOVERNMENT]: That provided for a different analysis, correct. Yes."). At oral argument, the government clarified USACE then undertook new market analysis to support the new regulation. *See* Tr. at 87:4–7 ("[GOVERNMENT:] The change was that there was a different analysis to be done of that data under the new . . . regulation that the FAR [rules] . . . implementing [Biden's EO].").

In the "Acquisition Considerations" portion of the Space Force Base Addendum, USACE determined to "DELETE" three paragraphs from the project labor market survey summarizing USACE's prior findings a PLA would be anticompetitive and ought to be included. *See* HPCC USACE AR at 283 (2024 Acquisition Plan Addendum). The Addendum then directed to "INSERT" two new paragraphs related to Biden's EO and industry concerns. *See* HPCC USACE AR at 284 (2024 Acquisition Plan Addendum). Specifically, the previous "DELETE" market research found "a PLA mandate on the project would reduce competition, increase costs, and create inefficiencies for contractors and procurement officials." *See* HPCC USACE AR at 283 (2024 Acquisition Plan Addendum). The new "INSERT" analysis, by contrast, determined USACE was "unable to determine if waiving the PLA w[ould] reduce the number of potential offerors to such a degree that adequate competition at a fair and reasonable price could not be achieved as outlined in FAR 22.504(d)(1)(ii)." *See* HPCC USACE AR at 284 (2024 Acquisition Plan Addendum). USACE determined to include a PLA even though "[t]he *majority* of respondents indicated that a PLA mandate would *reduce* competition, *increase* costs, and create

inefficiencies for contractors and procurement officials." *See* HPCC USACE AR at 284 (2024 Acquisition Plan Addendum) (emphasis added). At oral argument, the government attempted to justify this confounding decision by arguing the prior market survey results would be irrelevant as to the new PLA requirements and exceptions, and should be deleted. *See* Tr. at 47:2–17 ("[GOVERNMENT]: [T]hat particular statement isn't particularly relevant to the exceptions under . . . the current version of FAR 22.504(d). THE COURT: Not relevant to the new FAR Council rule? [GOVERNMENT]: Exactly, yes."). When asked whether USACE has reliable evidence suggesting PLAs promote on-time completion of federal construction projects, the government could only point to "[t]he policy judgment as to whether PLAs are generally good . . . made by the President and then implemented by the FAR Council." *See* Tr. at 50:2–51:13. In support of this conclusion, the government cited generally to Biden's EO and FAR Council's regulations as evidence "PLAs are helpful." *See* Tr. at 50:17–19. The Court finds USACE's decision to *require* a PLA, relying solely on the President's "policy judgment" as implemented by the FAR Council, rather than actual market survey data supporting USACE's prior determination to not include a PLA is arbitrary and capricious. *See Ala. Aircraft*, 586 F.3d at 1375 ("Courts have found an agency's decision to be arbitrary and capricious when the agency . . . 'offered an explanation for its decision that runs counter to the evidence before the agency . . . .'") (quoting *MVM*, 463 U.S. at 43).

The Land Port of Entry project solicitation's history offers yet another example of the functional effect of the FAR Council's PLA mandate. After the PLA mandate was in place, GSA hired an outside specialist to conduct a market survey related to PLAs. *See* Tr. at 24:8–25:11 ("THE COURT: So [GSA] pay[s] an outside expert to analyze the marketplace of potential contractors? [GOVERNMENT]: I don't know if they're an expert or not, but at least an outside firm that would . . . . do this survey for them. THE COURT: So GSA paid money for the survey? [GOVERNMENT]: That's my understanding."). As the government explained at oral argument, "[t]he general conclusion" of the post-PLA mandate market survey was "removing the PLA requirement would result in more contractor interest, and thus, [a] more competitive bid environment." *See* Tr. at 52:3–8. If the PLA requirement could not be removed, then the specialist recommended the use of "Alternate II" in the solicitation. *See* Tr. at 52:8–13 ("[GOVERNMENT:] [B]ut alternatively, switching to . . . alternate version 2 of [52.222-]33 would be good . . . ."). "Alternate II" required offerors to submit only a draft PLA at the time of proposal and then later finalize the PLA post-award. *See* Tr. 26:2–6 ("[GOVERNMENT:] And so that's reflected in the solicitation that in stage 2 of that procurement, the offerors are required to submit a draft PLA only . . . . [T]he actual PLA comes after award."). The government acknowledged, however, the market research primarily recommended "there would *be a more competitive bid environment* if there was no PLA requirement in this particular procurement." *See* Tr. at 26:16–24 (emphasis added). Specifically, "the study's author made the following recommendation: Selecting a design build firm with experience working with a PLA or union environment will be of benefit to the project; however many large [design build] firm[s] interviewed have stated *little to no interest* in the project if PLAs are a requirement. Removing the PLA requirement would result in more contractor interest, and . . . *a more competitive bid environment*." Tr. at 40:5–22 (emphasis added). "GSA concluded the PLA requirement was likely to affect *both* competition and price, but found no basis for an exception to the PLA requirement in [Biden's EO]." Tr. at 40:14–22 (emphasis added). After conducting "its independent government estimate," GSA "increased the price" of the contract "based on the PLA

requirement being included" but determined including a PLA would not "reduce the number of potential offerors to such a degree that adequate competition and a fair and reasonable price could not be achieved . . . under [Biden's EO] exception." *See* Tr. at 41:1–15. At oral argument, when the government could not point to evidentiary support of an agency's decision to proceed with a PLA despite the recommendations a PLA would increase costs and decrease interest, the government generally concluded the "determination of economy and efficiency was made . . . by the President and the FAR Council." Tr. at 99:11–18. While the government recognized "agencies determine their own needs," *see* Tr. at 87:8–11, and the agencies enjoyed more discretion under prior administrations' PLA policies, *see infra* Section V.B., the government remarked "agencies are subject to the President. The President is the head of the Executive agency," *see* Tr. at 87:11–16. The Court finds GSA's decision to proceed with the Alternative II PLA requirement as a mandate based solely on the President's policy—wholly disregarding the post-PLA market survey recommendation to remove the PLA entirely because a PLA would increase price and reduce competition—is arbitrary and capricious as it runs counter to any evidence presented to the agency. *See Ala. Aircraft*, 586 F.3d at 1375 ("[A]n agency's decision [is] arbitrary and capricious when the agency . . . 'offered an explanation for its decision that runs counter to the evidence before the agency . . . .'") (quoting *MVM*, 463 U.S. 43).

### B. Whether the FAR's New PLA Mandate Violates CICA's Full and Open Competition Requirement

Consistent with the Federal Circuit's approach in *NGS*, the Court now addresses whether the solicitations here provided for "full and open competition" generally in accordance with CICA. *See NGS*, 923 F.3d at 982 ("We first address whether the [solicitation] provided for full and open competition in light of the [regulatory policy] contained therein. . . . [If not,] we then address whether the agency's approach was otherwise permissible."). As an initial matter, plaintiffs agreed at oral argument if the Court were to find the solicitations' PLA mandates violate CICA's full and open competition requirement, the Court need not address plaintiffs' alternative theories. *See* Tr. at 115:24–116:8 ("[PLAINTIFFS: [We] believe that if the Court rules that CICA has been violated and, therefore, the solicitations are invalid, then I don't think you would have to address any of the other arguments . . . . If it violates CICA, for whatever reason, and there is not an enumerated exception that it falls under, then I don't believe you have to go any further."). As helpful background, the Court notes the FAR Council's final rules implementing Biden's EO PLA mandate did not address CICA or how the new regulations relate to CICA. *See generally* FAR pts. 1, 7, 22, 36, 52. The FAR Council did address, however, "numerous" public comments expressing concerns the regulations violate CICA's full and open competition requirement.[4] *See* Tr. at 133:2–19 ("THE COURT: So just to confirm, it's not in the FAR Council regulations? [GOVERNMENT:] It's not in the regulation itself, it's in the promulgation of the final rule. [THE COURT]: Just comments? [GOVERNMENT]: Yes."). Given the PLA mandate itself does not address CICA, and the FAR Council has only weighed in

---

[4] In response to the FAR Council's notice and comment period before promulgating the PLA mandate, "[n]umerous respondents asserted that the rule violates the requirement for full and open competition in CICA because PLAs discriminate and injure competition among potential bidders who are not signatories to CBAs." *See* Tr. at 132:20–24.

on the issue insofar as quoting CICA's definition of "full and open competition,"[5] the Court begins with the Federal Circuit's CICA-analysis steps in *NGS*. 923 F.3d at 982.

In *NGS*, the Federal Circuit considered whether a pre-award protest challenge to an agency's inclusion of "workload caps" violated CICA's "full and open competition" requirement because the policy "preclude[d] a successful best value offeror from receiving [an] award where the contract award would cause that offeror to exceed the . . . workload caps." *Id.* at 981. The Federal Circuit reasoned, "a responsible offeror that would exceed the workload caps is not given the same opportunity to win an award as other offerors that submitted awardable proposals." *Id.* at 985. The government argued an offeror's "submission may not always be meaningless because offerors that would exceed the workload caps at the time of submission [could] nonetheless win an award in two scenarios." *Id.* at 984. The Federal Circuit concluded neither scenario "demonstrate[d] that it would not be futile for an offeror that would exceed the workload caps to submit a proposal." *See id.* Given "a responsible offeror that would exceed the workload caps is not given the same opportunity to win an award as other offerors that submitted awardable proposals," the mere "fact that an offeror that would exceed those caps was able to *submit* a proposal [did] nothing to address [the Federal Circuit's] concern." *Id.* at 985 (emphasis in original). The Federal Circuit ultimately held the workload caps imposed by the agency violated CICA's full open and competition requirement. *See NGS*, 923 F.3d at 978.

The government argues under *NGS*, "[w]here a solicitation permits all prospective contractors to submit bids or proposals, the solicitation's capability and experience requirements do not cause the solicitation to provide for less than full and open competition simply because those requirements render some prospective contractors ineligible for award." Gov't Cross-MJAR at 33 (citing *NGS*, 923 F.3d at 985). According to the government, "the solicitations at issue in these consolidated cases permit *all responsible sources* to compete for the contracts." *Id.* at 34 (emphasis added). The government emphasizes, "[t]o the extent that plaintiffs are unable to meet the PLA requirements, that does not mean that the solicitations provide for less than full and open competition; rather, it means that the plaintiffs are not 'responsible sources' for the procurements." *Id.* at 35 (quoting 41 U.S.C. § 107). The argument continues, "[i]f a prospective contractor cannot enter into a PLA to perform the contracts at issue, then it lacks the ability to 'perform all contract requirements.'" *Id.* (quoting FAR 9.104-1 (2024)). Distilling this case to mere *choice*, the government argues plaintiffs' "unwillingness" "to compete for the contracts on the terms set forth by the [g]overnment . . . does not change the fact that 'all responsible sources are permitted to submit sealed bids or competitive proposals on the procurement.'" *Id.* (quoting 41 U.S.C. § 107). According to the government, *NGS* cannot be instructive here because the PLA requirements are essentially contract requirements that

---

[5] In response to market respondents' concerns about the new regulations violating CICA, the FAR Council comments quoted CICA's definition of full and open competition and concluded neither the regulations nor the EO bar responsible sources from submitting sealed bids or competitive proposals. *See* Tr. at 133:20–134:10 ("THE COURT: What does it say? Go ahead and read it? [GOVERNMENT]: 'The EO and final rule do not violate CICA, which generally requires full and open competition through competitive procedures that are best suited under the circumstances of the procurement. CICA defines full and open competition as meaning 'that all responsible sources are permitted to submit sealed bids or competitive proposals on the procurement.' *See* 41 U.S.C. 107. Neither the EO nor final rule bar any responsible sources from submitting sealed bids or competitive proposals, nor do they provide a preference for contractors already a party to a CBA. Section 4 of the EO requires a PLA to allow all contractors and subcontractors to compete without regard to whether they are otherwise party CBAs.'").

"govern[] how the contract will be *performed*." *Id.* at 36 (emphasis added). Yet the record indicates a PLA requirement has no bearing on whether plaintiffs can *perform* the contract at issue. *See* Tr. at 87:25–88:8 ("[THE COURT:] [I]s there anything in the record indicating that [p]laintiffs were unable to comply with the required or proposed performance schedule or any technical skills and ability to obtain them? [PLAINTIFFS]: No, Your Honor. THE COURT: So why the change, then? [PLAINTIFFS]: I mean, the [g]overnment says the change was solely on the basis of the regulation being issued and not on any performance requirements."). Indeed, at oral argument, plaintiffs confirmed the actual building specifications did not change—the only change was the inclusion of the mandatory FAR PLA language. *See* Tr. at 88:15–18 ("[PLAINTIFFS:] [We] think it's important to note that not a single word in the building specifications for how that building gets built changes at all whether there's a PLA requirement or not a PLA requirement."); Tr. at 93:2–94:20 ("[GOVERNMENT:] [T]he PLA requirement doesn't require that . . . employees be members of the union."); Tr. 139:25–140:11 ("[GOVERNMENT:] GSA did determine that it was likely . . . [a PLA requirement] would reduce competition and increase cost[s].").

The record evidence for these solicitations clarify agencies will exclude an otherwise responsible offeror under the PLA mandate regardless of that offeror's capability to *perform* the contract. *See, e.g.*, Tr. at 74:18–75:17("[GOVERNMENT:] [W]e're not even saying MVL is not capable of entering into the contract with a PLA. To the extent that they're not, they would not be . . . a responsible source for the procurement at issue because the procurement at issue requires a -- to be performed with a [PLA] . . . . To the extent that . . . the offeror would have otherwise been responsible to perform . . . this contract . . . that doesn't mean that full and open competition is violated. That doesn't mean that there's a violation of CICA."); *see also supra* Section V.A. *NGS* instructs the mere ability to submit an offer is not sufficient to demonstrate a regulation does not violate full and open competition when the record shows a non-PLA offeror's proposal submission would be meaningless. *See NGS*, 923 F.3d at 985 (explaining when an anticompetitive regulation excludes otherwise responsible offerors for non-compliance with the regulation, merely permitting an offeror to "submit a proposal does nothing to address t[he] concern").

The government further argues, "because the PLA requirements did not cause the solicitations to provide for less than full and open competition, there was no need for the agencies to invoke an exception . . . and comply with any procedural requirements for such an exception." *See* Gov't Cross-MJAR at 37. Yet when the agencies ignore the PLA exceptions, the agencies make those exceptions effectively meaningless. *See* Tr. at 105:8–106:4 ("THE COURT: So if we look at the exception that [the government] pointed to, 504(d)(ii), 'Market research indicates that requiring a [PLA] on the project would substantially reduce the number of offerors to such a degree that adequate competition at a fair and reasonable price could not be achieved.' . . . . Is that exception just meaningless? . . . [PLAINTIFFS]: The way it's being implemented by the agency makes it meaningless, because they're ignoring the exceptions . . . . [I]t's a discretionary evaluation as to what would . . . reduce adequate competition at a fair and reasonable price."); *see also supra* Section VI.A. By way of example in *supra* Section VI.A, even when the market research indicated "*a significant reduction*" in the number of offerors if the PLA requirement remained—the agency included the PLA requirement and only received two offerors. *See* Tr. at 106:4–23 (emphasis added). Plaintiffs argue the "likely reduction in the

number of potential offerors" contained in the FAR 22.504 exception is not only made meaningless by agency inaction, but the exception itself violates CICA by permitting the reduction of competition amongst an entire class without statutory support. *See* Tr. at 107:6–11 ("[PLAINTIFFS]: We believe that it's a violation of competition because there's no statute that specifically says that you can reduce competition to create a class of offerors that is limited to [PLA-contractors]."); *see also* FAR 22.504(d)(1)(ii) (2024).

When compared to the prior administration's discretionary policy, the PLA mandate's exceptions—though theoretically discretionary—are rendered functionally meaningless if the agencies take the uniform approach of never seeking an exception regardless of the strength of the market survey data recommending against the inclusion of a PLA. *See supra* Section VI.A. Indeed, agencies now look only to "studies supporting the use of PLAs" cited by Biden's EO and the FAR Council, rather than tailoring their decisions to the market data evidence for each specific project specification. *See*, *e.g.*, Tr. at 48:4–16 ("[THE COURT:] So the conclusion . . . is 'there is no reliable evidence suggesting PLAs promote on-time completion of federal construction projects and significant reliable evidence to the contrary.' Would you agree with that, based on . . . the [administrative record] that the [g]overnment itself had conducted . . . ? [GOVERNMENT]: No, Your Honor, because the FAR Council looked at this question and determined that there w[ere] . . . studies supporting the use of [PLAs] on large-scale construction contracts."); *see also* Tr. at 91:25–92:10 ("[THE COURT:] [I]n your briefing, where is the discussion of a PLA mandate being tailored to the needs of an agency or the needs of a procurement? [GOVERNMENT]: Well . . . *it's tailored in the sense that there's exceptions*, and so agencies can look at those exceptions and determine not to apply it." (emphasis added)).

Even when presented with data supporting an exception by third-party market researchers the agencies themselves commissioned, the agencies declined to pursue an exception. *See*, *e.g.*, Tr. at 24:18–25:21 ("[GOVERNMENT:] GSA went and . . . basically contracted with someone to . . . take a look at the market, they interviewed various . . . construction firms . . . [to] help determine how to proceed with the procurement . . . . THE COURT: So GSA paid money for the survey? [GOVERNMENT:] That's my understanding. THE COURT: And what did the outside specialists conclude related to PLAs? . . . . [GOVERNMENT:] [T]hey made a recommendation that . . . removing the PLA requirement would result in *more contractor interest* and thus a *more competitive* bid environment." (emphasis added)); *see also supra* Section VI.A. The functional application of FAR 22.504 *requires* a PLA regardless of market data, *declines* to seek an exception regardless of market data, and generally justifies those decisions by citing the President and the FAR Council's policy judgment. *See* Tr. at 49:1–15 ("[THE COURT:] [W]e've looked at third-party reports that the [g]overnment has paid for and we have looked at [USACE] and GSA conclusions regarding projects. Now this is an offeror who's submitting their own review of a PLA requirement. It seems like everything that we've seen supports what they're saying here. You're disagreeing with that? [GOVERNMENT]: Right. Yeah, we are disagreeing . . . the President made a different judgment and so did the FAR Council."); *see also* Tr. at 50:9–16 ("[GOVERNMENT:] [T]hat policy judgment was made by the President and the FAR Council already . . . .").

"[D]espite the government's efforts to show that it would be meaningful for [a non-PLA] offeror . . . to submit a proposal," the Court is not persuaded. *See NGS*, 923 F.3d at 985. Under

the PLA mandate, the Court finds "a responsible offeror that [declines to enter a PLA] is not given the same opportunity to win an award as other offerors that submitted awardable proposals."  *See id.*  As discussed *supra*, the record teems with examples of how the Biden EO PLA mandate excludes non-PLA offerors on that basis alone:  (1) the terms of the contract do not change if a PLA is included or excluded; (2) the government recognizes plaintiffs are likely otherwise capable of performing the contracts; (3) the agencies can point only to the PLA mandate to justify including PLAs in the solicitations; (4) the agencies declined to seek an exception even after the agencies commissioned market research recommending against the use of PLAs; and (5) even when the agencies received overwhelming data indicating PLAs would increase price, reduce economy and efficiency, and stifle competition—the agencies declined to pursue an exception.  *See supra* Section VI.A; *see also supra* Section I.D–J.  In sum, the PLA mandate "precludes full and open competition by effectively excluding [a non-PLA] offeror from winning an award"—both in the function of the mandatory rule itself and in the apparent policy to deny exceptions even when the agency itself commissions data indicating an exception should be made.  *See NGS*, 923 F.3d at 990.  Accordingly, the Court finds the PLA mandates have no substantive performance relation to the substance of the solicitations at issue and violate CICA's requirement that procuring agencies "obtain full and open competition through the use of *competitive* procures."  41 U.S.C. § 3301(a) (emphasis added); *see also NGS*, 923 F.3d at 982.

### C.  Whether Exceptions to CICA's Full and Open Competition Requirement Apply to the PLA Mandate

The Court now turns to whether an exception to CICA's full and open competition requirement may apply to the anticompetitive PLA mandate.  Absent the limited statutory exceptions enumerated by Congress in CICA, *see generally* 41 U.S.C. §§ 3303, 3304(a), 3305, "Congress specifically outlined the circumstances under which an agency may avoid CICA's full and open competition requirement," *NGS*, 923 F.3d at 986 (citing 41 U.S.C. § 3301(a)).  One such possible exception to CICA's full and open competition requirement occurs in the case of "procurement procedures otherwise expressly authorized by statute."  *See id.* (quoting 41 U.S.C. § 3301(a)).  If an agency seeks to violate CICA's full and open competition requirement, the government must demonstrate express statutory authority to do so.  *See* 41 U.S.C. § 3301(a) ([E]xcept in the case of procurement procedures otherwise *expressly authorized by statute*, an executive agency in conducting a procurement . . . shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this division and [FAR] . . . ." (emphasis added).  Instructively, the Federal Circuit noted that "broad provisions" of statutory text "cannot serve as the express authority necessary to meet [Ssection 3301] exception," otherwise "seemingly any requirement could be justified regardless of its effect on full and open competition."  *NGS*, 923 F.3d at 988.

The government conceded at oral argument if the Court were to find the PLA requirements violate CICA, the government has not invoked Section 3301 or any other statutory exceptions.  *See* Tr. at 113:11–23 ("[GOVERNMENT:]  [I]f the Court were to find the solicitations didn't provide . . . for full and open competition, the agencies haven't invoked a statutory exception to full and open competition from that.  I mean, I wouldn't necessarily say that [Section 3301] doesn't apply . . . our position is that it's providing . . . for full and open competition.  If it's not full and open competition, then we haven't invoked those statutory

exceptions."). The government further acknowledged if it were required to identify a specific statutory reference to support its PLA mandate, it would rely on Section 3306, which "authorizes agencies to specify their needs." Tr. at 129:6–9 ("[GOVERNMENT:] [I]f the Court were to agree with the analytical framework of Georgia . . . even if we need a specific reference . . . we do still have 3306, which . . . authorizes agencies to specify their needs . . . ."); *see also* 41 U.S.C. § 3306(2)(B) ("Each solicitation under this division shall include specifications that . . . include restrictive provisions or conditions only to the extent necessary to satisfy the needs of the executive agency or as authorized by law."). When pressed, however, the government argued the President—not the agencies—ultimately determines the agencies' needs under the PLA mandate. *See* Tr. at 129:3–20 ("[GOVERNMENT:] I mean, we do still have [Section] 3306, which . . . authorizes agencies to specify their needs . . . . So, I mean, there is a specific reference to contract specifications in FPASA. You know, there is not a specific reference to PLAs, I suppose, but still, FPASA clearly talks about . . . the ability to set specifications of contracts. And again, . . . it's the President's . . . duty and authority to supervise his subordinates."). By arguing the FAR provisions are "authorized by law" because the FAR provisions are "properly promulgated, substantive agency regulations," Gov't Cross-MJAR at 44, the government, in effect, is asking the Court to take a red pen to § 3301 and add a caret to read as "expressly authorized by statute *or Federal Acquisition Regulation*." The Court, however, is tasked with interpreting statutes, not rewriting them. *See Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1340 (Fed. Cir. 2015) ("But our task is to apply the language of the statute, not to rewrite it."); *Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1290 (Fed. Cir. 2012) ("Our task is to interpret the statute as written, as we have, not to rewrite it."). Without invoking any other statutory authority, the government's argument the PLA mandate is "authorized by law" falls short of the express statutory authorization mandated by Congress in § 3301(a) of CICA. *See NGS*, 923 F.3d at 988 ("[T]he broad provisions cited by the government cannot serve as the express authority necessary to meet [Section 3301] exception. If these provisions could suffice to show such express authorization, seemingly any requirement could be justified regardless of its effect on full and open competition.").

## VII.  The Timeliness of JCCBG2's Challenge Under *Blue & Gold*

The government separately argues JCCBG2 cannot demonstrate success on the merits "because JCCBG2 forfeited its challenge by failing to protest before the deadline for submission of proposals." *See* Gov't's Reply at 2; Gov't Cross-MJAR at 31–32. Although "JCCBG2 submitted a timely proposal" before the 21 May 2024 deadline, the government argues JCCBG2 "did not formally protest the solicitation's inclusion of [the] PLA requirements until August 2024." *See* Gov't Cross-MJAR at 31–32. JCCBG2 counters, arguing the relevant inquiry under *Blue & Gold* is whether JCCBG2 objected to the terms of the solicitation "*prior to the close of the bidding process.*" *See* JCCBG2's Resp. to Gov't Cross-MJAR at 1, ECF No. 78 (quoting *Blue & Gold Fleet, LP v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2004)) (emphasis added).

Under the Federal Circuit's *Blue & Gold* precedent, "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so *prior to the close of the bidding process* waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *See id.* at 1313 (emphasis added). The Federal Circuit applied the doctrine of patent ambiguity—"an exception to the general rule of

- 38 -

*contra proferentem*"—used by courts "to construe ambiguities against the drafter." *See id.* (quoting *E.L. Hamm & Assocs., v. England*, 379 F.3d 1334, 1342 (Fed. Cir. 2004)). The Federal Circuit explained "a government contractor has a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation in a subsequent action against the government." *See id.* (quoting *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000)) The Federal Circuit's analysis instructed the doctrine of patent ambiguity was established to: (1) "prevent contractors from taking advantage of the government;" (2) "protect other bidders by assuring that all bidders bid on the same specifications;" and (3) "materially aid the administration of government contracts by requiring that ambiguities be raised before the contract is bid, thus avoiding costly litigation after the fact." *See id.* at 1313–14 (quoting *Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1580 (Fed. Cir. 1993)).

Quoting the language of *Blue & Gold*, the government argues JCCB2 should have filed its protest "prior to the close of bidding" to be timely. *See* Gov't Cross-MJAR at 31 (quoting *Blue & Gold*, 494 F.3d at 1313). The government argues "this Court has held that protest grounds challenging solicitation terms were waived in pre-award protests because the plaintiffs raised those protests grounds after the deadline for the submission of proposals." *See* Gov't Reply at 2 (citing *Oracle America, Inc. v. United States*, 144 Fed. Cl. 88, 117 (2019), *aff'd*, 975 F.3d 1279 (Fed. Cir. 2020); *Northeast Constr., Inc. v. United States*, 119 Fed. Cl. 596, 608–12 (2015); *Alamo Travel Grp., LP v. United States*, 108 Fed. Cl. 224, 230–32 (2012). The government also argues Federal Circuit precedent "demonstrates that 'close of the bidding process' means the deadline for the submission of bids, proposals, or quotes, not the award of a contract." *See id.* at 2–3 (citing *COMINT Sys. Corp. v. United States*, 700 F.3d 1377 (Fed. Cir. 2012). The government notes "JCCBG2 cites to no decisions where a court has denied a *Blue & Gold* forfeiture objection on the basis that the plaintiff's protest of the original solicitation terms was submitted after the proposal submission deadline, but before award." *See id.* at 4. Thus, according to the government, "JCCBG2 has forfeited its challenge to the solicitation's PLA requirements." *See id.* at 5.

The Court, however, finds the language of the *Blue & Gold* decision most instructive here. At oral argument, the parties agreed the operative language of *Blue & Gold* is "close of the bidding process." *See* Tr. at 163:10–17 ("[THE COURT:] Your conclusion is that the language that's operative of Blue & Gold is 'close of the bidding process,' and 'close of the bidding process' [occurs] when the award is made? [PLAINTIFFS]: Yes. THE COURT: And, you agree . . . that's the language, 'close of the bidding process?' [GOVERNMENT]: Right."). Furthermore, plaintiffs confirmed, under their analysis, the "bidding process" has not yet concluded because no solicitation award has been made. *See* Tr. at 161:3–12 ("[PLAINTIFFS:] [T]he bidding process has not concluded yet. I would also point out that the Blue and Gold [C]ourt relief heavily on the doctrine of patent ambiguity, and held that the policy behind that is they don't want offerors to wait until the selection of another contractor to raise the challenge . . . . [T]here has been no award made here, so they brought the challenge months before an award decision. To my knowledge, it hasn't affected anything in the procurement."). The government itself even recognized JCCBG2 unlikely gained no unfair advantage as to information about the number or identity of other bidders as a result of the timing of its protest. *See* Tr. at 159:25–160:2 ("[GOVERNMENT:] [T]ypically even the number of offerors is not

disclosed until the award is made . . . I don't see how the Plaintiff here would be aware of the other offerors at this time."); *see also* Tr. at 160:19–25 ("THE COURT: So you agree that there's no unfair advantage? . . . . [GOVERNMENT]: I don't know that there is an unfair advantage of whether it's filed in August or May, but . . . they didn't comply with the rule under Blue & Gold. They didn't file by the close of bidding, and that's the waiver rule.").

The government then relies on the Federal Circuit's holding in *COMINT* to bolster its argument. *COMINT*, however, is dicta at best. In *COMINT*, an unsuccessful bidder brought a bid protest challenge after failing to file its protest before the agency awarded the contract. 700 F.3d at 1383–84. The Federal Circuit was not persuaded by the protester's timeliness argument, because the protestor sought to restart the bidding process *after* the agency had awarded the contract—a scenario *Blue & Gold* forbids and not is neither the procedure nor request by JCCBG2 in this case. *See id.* at 1384. JCCBG2's protest is a different matter entirely as the parties agree no contract has been awarded—further indicating the "bidding process" has not closed. *See supra* Sections I.J, III.C, V.–VI. In fact, as of the date of oral argument, ten amendments to the solicitation had been issued. Tr. at 158:21–159:4 ("[PLAINTIFFS:] As of yesterday, there have now been 10 amendments to that solicitation that have been issued, and so, you know, the protest was filed shortly after the initial submissions. There has been . . . five or six months of continuing procurement activity without an award in that particular procurement."). Even if the Court were persuaded by the government's speculations, *COMINT* explained "the reasoning of *Blue & Gold* [to prevent unfair advantage] applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the *award* and failed to do so." *See* Tr. at 161:13–162:23; *see also COMINT*, 700 F.3d at 1382–84; *Blue & Gold*, 492 F.3d at 1313–14. Indeed, the parties agree JCCBG2's bid protest was filed *before* the award of the contract—and amendments to the solicitations appear to be ongoing—so *COMINT* is not applicable here. *See Blue & Gold*, 492 F.3d at 1313–14. Given the language of *Blue & Gold* permits a bid protest challenge prior to the close of bidding (*i.e.*, before the award of a contract), and the government agrees JCCBG2 is gaining no competitive advantage through manipulation of the bid protest process, the Court reads the phrase "close of the bidding process" to include JCCBG2's pre-award protest as timely, even though the protest was filed after the bid's submission. *See id.* at 13 ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so *prior to the close of the bidding process* waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." (emphasis added)).

## VIII.   Injunctive Relief

The Court finally considers the following factors when determining whether to issue a permanent injunction: "(1) whether . . . the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). If the Court awards injunctive relief, it may fashion its own remedy to fit the contours of the decision. *See Turner Constr. Co. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011) (explaining "the Court of Federal Claims has broad equitable powers to fashion an appropriate remedy").

At oral argument, the parties disputed what relief was appropriate and how the Court should tailor the injunctive relief if it were to find the PLA requirements violated CICA. *See* Tr. 167:14–175:11. By way of example, plaintiffs assert the Court could issue "a general injunction against the PLA being used in each of the[] solicitations" and the agencies "could take action to . . . remove the PLA from the requirement and . . . the agencies [c]ould send out a best and final offer," Tr. at 168:24–169:19, or the Court could issue a "specific injunction" of "blanket applicability" which is "specific about the effects" of "PLAs violat[ing] CICA" and "not allow the agenc[ies] to go back, re-evaluate, decide if it would still like to keep the PLA in, and then decide if it wants to continue with the procurement with a new type of justification," 170:15–171:14. The government, however, asserts the Court should "enjoin the awards[s] unless and until the agencies justify the PLA requirements consistent with the Court's view of the law in the opinion." Tr. at 167:23–168:6.

As the Court already determined plaintiffs have succeeded on the merits of their case, the first factor weighs in their favor. *See supra* Section VI. The Court, however, need not analyze the other factors as the parties agree the procurements in this case are still ongoing and the government's agreement that each individual agency should be afforded an opportunity to review their solicitations and reconsider the PLA determinations. Tr. at 178:12–23 ("[GOVERNMENT:] [I]f the Court's holding were that this regulation violates CICA . . . I think the agency could still make a determination that, yes, a PLA is necessary to meet our needs without . . . applying the rebuttable presumption . . . I'm not saying whether the agencies would, in fact, make that determination in these cases, but they should be given the opportunity to consider that, if that's how they wanted to proceed."). At oral argument, the parties also raised a number of unique differences for each individual solicitation when discussing an appropriate injunction. For instance, the government indicated the "current state of where [one of the NAVFAC cases is] in the procurement [likely means] that there wouldn't be any basis for a[ PLA] exception at this time," Tr. at 166: 18–167:4, and the GSA solicitation, which is a "two phased process" with only "three offerors [] mov[ing] forward . . . to submit proposals for phase 2," phase 1 decision is "expected to be made [] next week" and "caus[ing] a mootness issue or perhaps a challenge from [Hensel] to the decision," Tr. at 180:15–181:12. Accordingly, the Court in its "broad equitable powers to fashion an appropriate remedy" finds the circumstances surrounding the individual solicitations and the varying needs of three different agencies (USACE, NAVFAC, and GSA) warrants the agencies be afforded a short period of time to reassess their PLA decision on an individual basis. *Input/Output Tech., Inc. v. United States*, 44 Fed. Cl. 65, 72 n.9 (1999) (Firestone, J.) ("[T]his court's role is not to second guess what the [procuring agency] has determined to be its needs."); *Off. Design Grp. v. United States*, 951 F.3d 1366, 1373 (Fed. Cir. 2020). The parties therefore shall file a joint status report explaining the agencies plan for each solicitation moving forward on or by 3 February 2025. *See Turner Constr. Co. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011) (explaining "the Court of Federal Claims has broad equitable powers to fashion an appropriate remedy").

## IX.    Conclusion

For the foregoing reasons, the Court (1) **GRANTS** plaintiff MVL's Motion for Judgment on the Administrative Record, ECF No. 64; (2) **GRANTS** plaintiff ECC's Motion for Judgment

on the Administrative Record, ECF No. 65; (3) **GRANTS** plaintiff JCCBG2's Motion for Judgment on the Administrative Record, ECF No. 66; (4) **GRANTS** plaintiff Harper's Motion for Judgment on the Administrative Record, ECF No. 67; (5) **GRANTS** plaintiff Hensel's Motions for Judgment on the Administrative Record, ECF Nos. 68, 69, 70; and (6) **DENIES** the government's Cross-Motion for Judgment on the Administrative Record, ECF No. 73.  The parties **SHALL FILE** revised versions of the parties' briefs removing redactions from the information discussed at oral argument **on or before 3 February 2025**.  Finally, the government, in consultation with the agencies, **SHALL FILE** a joint status report within **on or before 3 February 2025** detailing the agencies' proposed timeframe required to properly address *each* contract.

       **IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge
