UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ASSOCIATED BUILDERS AND
CONTRACTORS FLORIDA FIRST
COAST CHAPTER and ASSOCIATED
BUILDERS AND CONTRACTORS,

           Plaintiffs,

v.                                              Case No.: 3:24-cv-318-WWB-MCR

GENERAL SERVICES
ADMINISTRATION, OFFICE OF
MANAGEMENT AND BUDGET,
UNITED STATES DEPARTMENT OF
DEFENSE, NATIONAL AERONAUTICS
AND SPACE ADMINISTRATION,
GENERAL SERVICES
ADMINISTRATION and OFFICE OF
MANAGEMENT AND BUDGET,

           Defendants.
_____/

## ORDER

THIS CAUSE is before the Court on Plaintiffs' Motion for Preliminary Injunction (Doc. 18), Defendants' Memorandum in Opposition (Doc. 25), and Plaintiffs' Reply (Doc. 30), and the parties supplemental briefing (Doc. Nos. 54, 55). Also before the Court is Defendants' Unopposed Motion for Leave to File Sur-reply (Doc. 32). For the reasons stated below, Defendants' Unopposed Motion will be denied, and Plaintiffs' Motion will be denied.

**I.   BACKGROUND**

Plaintiff, Associated Builders and Contractors Florida First Coast Chapter ("**First Coast**"), is a group comprised of roughly 180 members of the construction industry and

is an affiliate of Plaintiff Associated Builders and Contractors ("**ABC**"), a national construction industry trade association. (Doc. 1, ¶ 7). Most of First Coast and ABC's members are not signatories to union collective bargaining agreements and their employees are not represented by unions. (*Id.* ¶ 10). Many have worked on federal construction contracts exceeding $35 million dollars in the past and wish to continue bidding and working on such projects in the future. (*Id.* ¶¶ 7, 9, 13, 15).

On February 4, 2022, President Biden issued Executive Order 14,063 ("**EO**"), which provides that "in awarding any contract in connection with a large-scale construction project, or obligating funds pursuant to such a contract, agencies shall require every contractor or subcontractor engaged in construction on the project to agree, for that project, to negotiate or become a party to a project labor agreement with one or more appropriate labor organizations." Exec. Order No. 14,063, 87 Fed. Reg. 7363 (Feb. 4, 2022); (*see also* Doc. 1, ¶¶ 56–57).[1] The requirement applies to federal construction

---

[1] President Biden was far from the first President to issue an executive order on this topic. The Court need not provide the over thirty-year history of executive orders on the use of PLAs in federal contracts but suffice to stay that beginning with President H.W. Bush in 1992, almost every sitting president has issued an executive order prohibiting, encouraging, or simply remaining neutral on the use of PLAs. *See MVL USA, Inc. v. United States*, 174 Fed. Cl. 437, 443–45 (Fed. Cl. 2025). During his first term, President Trump did not alter the executive order issued by President Obama, which encouraged consideration of PLA use but fell short of mandating their use. *See id.* at 445. Nevertheless, President Trump was not faced with the expansive EO currently under review. At the time of this Order, President Trump has not repealed the EO. However, on March 14, 2025, President Trump issued Executive Order 14,236 repealing Executive Order 14,126, which promoted the use of project labor agreements in federal contracts. *See* Exec. Order No. 14,236, 90 Fed. Reg. 13037 (Mar. 14, 2025). This calls into question the continued viability of the EO under review, but because it has not been directly rescinded and the parties have not otherwise informed the Court that this proceeding has been rendered moot, the Court will continue to the merits of Plaintiff's Motion absent direct guidance from the Executive Branch that it has abandoned the EO and related regulations and guidance at issue in this litigation.

2

projects with an estimated cost to the federal government of $35 million or more. Exec. Order No. 14,063, 87 Fed. Reg. 7363. However, "[a] senior official within an agency may grant an exception from the requirements . . . for a particular contract" under circumstances specified in section 5 of the EO. *Id.* at 7364. On December 22, 2023, following public comment, the Federal Acquisition Regulatory ("**FAR**") Council issued a final rule implementing the mandates of the EO (the "**PLA Rule**"). (Doc. 1, ¶ 59). On December 18, 2023, the Office of Management and Budget ("**OMB**") issued a Memorandum, without public notice or comment, to provide guidance to agencies regarding the exceptions to the PLA Rule and reporting. (*Id.* ¶ 73). The EO and PLA Rule require agencies to publish exemptions granted on a public website. Exec. Order No. 14,063, 87 Fed. Reg. 7364–65. No such exemptions have been published at this time. *See* Acquisition Gateway, *Project Labor Agreements* (*PLA*), https://acquisitiongateway.gov/additional-resources/resources/5014 (last visited Mar. 27, 2025).

As a result of the issuance and implementation of the EO, PLA Rule, and OMB Memorandum, Plaintiffs filed a six count Complaint (Doc. 1) alleging that the EO, PLA Rule, and OMB Memorandum, individually and in combination: (1) exceed the authority of the executive branch under the Federal Property and Administrative Services Act ("**Procurement Act**"), 40 U.S.C. § 101 *et seq.*; (2) violate the Competition in Contracting Act ("**CICA**"), 41 U.S.C. § 3301; (3) violates the Office of Federal Procurement Policy Act ("**OFPP**"), 41 U.S.C. § 1301 *et seq.*; (4) violate Plaintiffs' rights under the First Amendment; (5) violate the National Labor Relations Act ("**NLRA**"), 29 U.S.C. § 151 *et seq.*; and (6) violate the Administrative Procedure Act ("**APA**"), 5 U.S.C. § 551 *et seq.*

## II. LEGAL STANDARD

"The grant or denial of a preliminary injunction is within the sound discretion of the district court[.]" *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002). A district court may only grant injunctive relief if the moving party establishes: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). "In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion' as to each of the four prerequisites." *Id.* (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)).

## III. DISCUSSION

"An evidentiary hearing is required for entry of a preliminary injunction only where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue." *Cumulus Media, LLC v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1178 (11th Cir. 2002) (quotation omitted). The parties filed a Joint Notice (Doc. 24) in which they state that an evidentiary hearing is not required to resolve Plaintiffs' Motion. Accordingly, the Court will consider the Motion only on the parties' written submissions. Additionally, having reviewed the briefing currently before the Court, the Court does not require additional briefing to resolve the pending Motion for Preliminary Injunction, so Defendants' request to file a sur-reply will be denied.

Turning to the merits, Plaintiffs seek a nationwide[2] preliminary injunction to enjoin the implementation and enforcement of the EO, PLA Rule, and OMB Memorandum pending the resolution of this litigation on the merits.  Plaintiffs argue that they are likely to succeed on the merits of each of their six claims.  Defendants argue that Plaintiffs have failed to make any of the required showings sufficient to warrant the extraordinary relief requested.

### A. Likelihood of Success on the Merits

Plaintiffs argue that they are likely to succeed on the merits of each of the six claims set forth in the Complaint.  Defendants disagree.

### 1. Procurement Act

In Count I, Plaintiffs allege that the EO, PLA Rule, and OMB Memorandum exceed the authority of the executive branch under the Procurement Act.  As set forth in the statute, "[t]he purpose of [the Procurement Act] is to provide the Federal Government with an economical and efficient system for . . . [p]rocuring and supplying property and nonpersonal services, and performing related functions[.]"  40 U.S.C. § 101.  The Act

---

[2] The Court is skeptical that it has either the power or the authority to award such relief, particularly in a case such as this, which involves local contractors and subcontractors seeking work primarily on projects within this region and relying on arguments specific, at least in part, to the makeup and demographics of contractors in this District. *See Georgia v. President of the U.S.*, 46 F.4th 1283, 1303–07 (11th Cir. 2022) (noting that the Eleventh Circuit has grown "both weary and wary of" nationwide injunctions because they typically exceed the necessary scope of relief for the parties before the court and frustrate the proper function of the federal judicial system); *see also Trump v. Hawaii*, 585 U.S. 667, 713–21 (2018) (Thomas, J., concurring) (noting that he is "skeptical that district courts have the authority to enter universal injunctions" because they "are legally and historically dubious").  At the very least, Plaintiffs' arguments fall far short of explaining why, even if the Court could issue such relief, this case would fall into the exceedingly "rare" circumstances in which such an injunction would be appropriate. *See Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1281–82 (11th Cir. 2021).

5

further provides that "[t]he President may prescribe policies and directives that the President considers necessary to carry out this subtitle. The policies must be consistent with this subtitle." 40 U.S.C. § 121(a). As the Eleventh Circuit has recently stated, § 121(a) does not grant the President "free-wheeling authority to issue any order he wishes relating to the federal government's procurement system." *Georgia v. President of the United States*, 46 F.4th 1283, 1293 (11th Cir. 2022). Rather, it permits the President to issue orders to carry out the specific directives of subtitle I of Title 40 and the relevant portions of division C of subtitle I of Title 41. *Id.* Additionally, the President's "actions must also be consistent with the policies and directives that Congress included in the statute." *Id.* at 1294. "A presidential directive can stand only if those subordinate officials have the statutory authority that they are told to exercise." *Id.* at 1295.

As an initial matter, Defendants urge the Court to reject the test laid out in *Georgia* in favor of the more permissive standard established by the D.C. Circuit in *American Federation of Labor & Congress of Industrial Organizations v. Kahn*, 618 F.2d 784 (D.C. Cir. 1979). Writing for the court in *Georgia*, Judge Grant explicitly rejected the *Kahn* test. *Georgia*, 46 F.4th at 1299–1300. However, Defendants argue that this portion of the opinion lacks precedential value because Judge Anderson dissented as to this portion of the lead opinion and Judge Edmonson wrote a concurrence "in the result" of the case. *See id.* at 1308 (Edmondson, J., concurring), 1308–13 (Anderson, J., concurring in part and dissenting in part). Nevertheless, even assuming this holding is not binding, the Court finds the test announced in the lead opinion persuasive. Furthermore, while the holding in *Georgia* is inconsistent with the test announced in *Kahn*, other circuits have similarly rejected the *Kahn* test, and *Kahn* is also not binding on this Court. *See State v.*

6

*Su*, 121 F.4th 1, 7–11 (9th Cir. 2024); *Louisiana v. Biden*, 55 F.4th 1017, 1027–33 (5th Cir. 2022); *Kentucky v. Biden*, 23 F.4th 585, 603–06 (6th Cir. 2022).  Therefore, the Court will apply the test set forth in *Georgia*.

Thus, the Court must first determine if the agency action directed by the EO "was 'reasonably within the contemplation' of any 'statutory grants of authority' relied on by the regulating agency."  *Georgia*, 46 F.4th at 1295 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 306 (1979)).  Defendants argue that the PLA Order falls within the following specific provisions of the relevant subtitle: 41 U.S.C. § 3101(a); 41 U.S.C. § 3703(c); 41 U.S.C. § 3306(a)(1)(A), (a)(2)(B).  (Doc. 25 at 16–17).  Section 3101(a) states that "[a]n executive agency shall make purchases and contracts for property and services in accordance with this division and implementing regulations of the Administrator of General Services."  Section 3703(c) states that "the executive agency shall award a contract with reasonable promptness to the responsible source whose proposal is most advantageous to the Federal Government, considering only cost or price and the other factors included in the solicitation."  Finally, § 3306(a)(1)(A) states that "[i]n preparing for the procurement of property or services, an executive agency shall . . . specify its needs and solicit bids or proposals in a manner designed to achieve full and open competition for the procurement"; while § 3306(a)(2)(B) provides that "[e]ach solicitation under this division shall include specifications that . . . include restrictive provisions or conditions only to the extent necessary to satisfy the needs of the executive agency or as authorized by law."

Taken together, these provisions grant the authority to set and consider non-cost and price factors, as Defendants argue.  However, they do so only to the extent such requirements are: (1) included in the solicitation; (2) designed to achieve full and open

7

competition; and (3) necessary to satisfy the needs of the agency or authorized by law. Thus, contrary to Defendants' assertion, these provisions do not grant agencies—or the executive—specific authority to place *any* restriction or specification into bids. Nor is it clear how these provisions, individually or in combination, contemplate the PLA Rule. To be clear, under Defendants' argument these provisions may have also supported the vaccination requirement at issue in *Georgia* because it was arguable that a full and healthy workforce would increase productivity, but this was rejected by the *Georgia* court. *See Georgia*, 46 F.4th at 1296–98. Admittedly, the inclusion of PLA mandates is a closer call than an "all-encompassing vaccine requirement," and bears at least an arguably closer nexus to the aims of the Procurement Act. *Id.* at 1296. Still, the Court struggles to find that the cited provisions contemplate an across-the-board requirement that all solicitations include a PLA unless a specific finding is made that its inclusion would be improper.

Nevertheless, because, at this stage of the proceedings, Plaintiffs bear a heavy burden of establishing likelihood of success on the merits, the Court is not satisfied that Plaintiffs have met their burden with respect to Count I. *See Siegel*, 234 F.3 at 1176 (noting that the court need not grant a preliminary injunction "unless the movant clearly established the burden of persuasion as to each of the four prerequisites" (quotation omitted)); *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974) ("The burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff."). While the Court is *highly* skeptical that Defendants' proffered justification is sufficient to overcome Plaintiff's challenge, Plaintiffs have failed to substantively respond to or address Defendants' argument or the specific provisions cited

8

in the Response. Instead, Plaintiffs only note, in a footnote, that the cited provisions are general provisions, not specific language authorizing the mandates. (Doc. 30 at 2 n.1). Even if the Court applies the major questions doctrine, as urged by Plaintiffs, the doctrine is one of statutory interpretation. *See Props. of the Vills., Inc. v. Fed. Trade Comm'n*, No. 5:24-cv-316, 2024 WL 3870380, at *6 (M.D. Fla. Aug. 15, 2024) (noting that "[t]he major questions doctrine is the name recently given to a long-standing principle governing the interpretation of statutes conferring power on administrative agencies"); *see also West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022). But Plaintiffs' failure to specifically address the text or meaning of the proffered provisions falls short of allowing the Court to conduct a proper and through analysis of the issue. Thus, although the Court finds Plaintiffs' likelihood of success on Count I to be rather high, the Court simply does not find that Plaintiffs have adequately briefed the issue to permit the Court to make such a finding at this juncture.

2. CICA

Next, Plaintiffs argue that the EO and PLA Rule violate the CICA because they effectively exclude potential bidders—non-union contractors—and do not promote full and open competition. In response, Defendants argue that the CICA does not prohibit full and open competition because non-union contractors are free to make bids and there was not a statistically significant difference in the number of bids between projects that required PLAs and those that did not.

Pursuant to § 3301, procuring agencies are generally required to "obtain full and open competition through the use of competitive procedures in accordance with the requirements of this division and the Federal Acquisition Regulation"; and "use the

9

competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement." 41 U.S.C. § 3301(a). The CICA defines "competitive procedures" as the "procedures under which an executive agency enters into a contract pursuant to full and open competition," 41 U.S.C. § 152, and "full and open competition . . . means that all responsible sources are permitted to submit sealed bids or competitive proposals on the procurement," 41 U.S.C. § 107.

A judge of the Court of Federal Claims recently considered a similar challenge to the PLA Rule in the context of specific bid protests. *MVL USA, Inc. v. United States*, 174 Fed. Cl. 437, 441, 453–54 (Fed. Cl. 2025). Upon review, the *MVL* court found that the PLA Rule violated the CICA's full and open competition requirement with respect to each bid protest because it excluded offerors regardless of their ability to perform the contract even when market research suggested that the inclusion of a PLA requirement in the solicitation would reduce competition, economy, and efficiency and increase price, based almost exclusively on the policy determinations of the Biden administration. *Id.* at 469–70. This Court ordered the parties to submit supplemental briefing addressing the holding in *MVL* and its applicability to the arguments raised in Plaintiffs' Motion. Plaintiffs argue that the procedural and factual differences between *MVL* and this case are without significance and that this Court should adopt the reasoning of the *MVL* court that the EO and PLA Rule violate the CICA. (Doc. 55 at 3–5). Defendants, however, argue that (1) because this case does arise in the context of specific bid protests, the *MVL* court's holding, which relied heavily on the failure to implement exceptions in the face of compelling evidence that exceptions should be used in those solicitations, has marginal

relevance; and (2) the *MVL* court's application of *National Government Services, Inc. v. United States*, 923 F.3d 977 (Fed. Cir. 2019) ("***NGS***") was incorrect. (Doc. 54 at 3–6).

Upon review of the parties' arguments, the relevant legal authority, and the record in this case, the Court finds the holding in *MVL* persuasive. First, although, as Defendants note, the *MVL* court's decision was heavily informed by the specific failure to utilize exceptions in the protests before it, the Court does not find that this significantly distinguishes it from the facts of this case. Although there are no specific findings with respect to particular solicitations in the record of this case, which is a facial challenge, the record is replete with evidence that Defendants have consistently declined to utilize the narrow exceptions set forth in the EO and the PLA Rule in making solicitations. Nor is the Court persuaded that this is outweighed by the actions of the Department of Defense and General Services Administration's voluntary cessation in limited cases. Simply put, the evidence before the Court is that Defendants' course of dealing has rendered the exceptions to the PLA Rule "functionally meaningless." *MVL USA, Inc.*, 175 Fed. Cl. at 469.

Additionally, the Court disagrees that *NGS* leads to a contrary conclusion or was misapplied by the *MVL* court. In *NGS*, the Federal Circuit determined that a blanket policy placing workload caps on contract awards violated the full and open competition requirement because, although companies that would exceed the caps—and therefore not be awarded the contract—were permitted to submit proposals, such submission was futile. *Nat'l Gov't Servs.*, 923 F.3d at 983–85. Additionally, the *NGS* court was unpersuaded that the workload caps were only evaluation criteria because they were used across the board in all solicitations without being tailored to the particular needs of

11

a solicitation and were "designed to address continuity concerns more generally by looking to the market as a whole." *Id.* at 985–86.

Defendants argue that this case is distinguishable because the PLA Rule is more akin to a capability or experience requirement than the workload caps at issue in *NGS*. This Court is not persuaded. The majority of the cases cited by the *NGS* court and Defendants did not involve across the board prohibitions with few, if any, exceptions, and that did not directly relate to the particular needs of a solicitation, as opposed to general market conditions or assumptions. To the extent the protest involving citizenship requirements was a more blanket requirement, that requirement is readily distinguishable as it dealt with matters of national defense and security that would not be readily impacted by the specifics of a given procurement to which they were likely to apply. Here, however, like the workload caps at issue in *NGS*, the PLA Rule applies across a wide swath of government contracts; has few exceptions and any exceptions are, at best, infrequently used; and is not directly tailored to the needs of a particular solicitation, including the ability of the offeror to effectively and competently complete the project. Thus, the Court does not find the PLA Rule is more akin to a permissible capability or experience requirement.

This Court is persuaded by the reasoning set forth by the courts in *MVL* and *NGS* and finds that Plaintiffs have established a likelihood of success on the merits of their CICA claim.[3]

---

[3] "When a plaintiff asserts multiple claims as a basis for a preliminary injunction, the plaintiff need only establish a substantial likelihood of success on one claim." *Sapphire Consulting Servs. LLC v. Anderson*, No. 6:20-cv-1724, 2021 WL 1053276, at *3 (M.D. Fla. Feb. 12, 2021) (quotation omitted). Accordingly, having determined that

### B. Irreparable Harm

Even if the moving party has established a likelihood of success on the merits, the party must show that "irreparable injury will be suffered unless the injunction issues." *Siegel*, 234 F.3d at 1176. Further, to warrant a preliminary injunction, a party's irreparable injury "must be neither remote nor speculative, but actual and imminent." *Id.* (quotation omitted). "An injury is irreparable if it cannot be undone through monetary remedies." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (quotation omitted).

Plaintiffs argue that they have established irreparable harm through unrecoverable monetary loss, including the costs associated with complying with a government requirement and lost contract opportunities. Courts have found such harms to be sufficient to support an award of injunctive relief. *See Georgia*, 46 F.4th at 1302–03; *State v. Nelson*, 576 F. Supp. 3d 1017, 1039 (M.D. Fla. 2021); *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1288 (11th Cir. 2013); *Mark Dunning Indus., Inc. v. Perry*, 890 F. Supp. 1504, 1517 (M.D. Ala. 1995). Plaintiffs have provided evidence that compliance with the PLA Rule will expose its members to costs and deter them from bidding for covered contracts. (*See, e.g.*, Doc. 18-6, ¶¶ 5–10; Doc. 18-7, ¶¶ 8–16; Doc. 18-8, ¶¶ 8–14; Doc. 18-11, ¶¶ 5–13, 15). Defendants have not disputed this evidence or argued that such costs and lost opportunities would be insufficient to support an award of injunctive relief in this case.

Instead, Defendants argue that Plaintiffs have not adequately established that exceptions will not apply to the projects that Plaintiffs wish to bid for or work on, that

---

Plaintiffs have shown a likelihood of success as to Count Two, the Court declines to address the merits of the remaining claims at this juncture.

13

bidding members have recourse through bid protests to the Court of Federal Claims, and that subcontractor members' claims are speculative because they do not directly bid on projects. Defendants also argue that Plaintiffs' delay of four months after the PLA Rule was issued in seeking an injunction should weigh against a finding of harm.

First, the Court does not find that Plaintiff unnecessarily delayed in seeking injunctive relief in this case. "[A] party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (citations omitted). "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Id.*; *see also Tiber Lab'ys, LLC v. Hawthorn Pharms., Inc.*, 527 F. Supp. 2d 1373, 1381 (N.D. Ga. 2007) ("Where the movant 'unduly delayed in bringing suit,' however, 'thereby negating the idea of irreparability,' a preliminary injunction should not issue." (quoting *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996)). "As such, it is not uncommon for courts to deny a preliminary injunction in the face of unexplained delays of more than two months." *InVue Sec. Prods. Inc. v. Vanguard Prods. Grp., Inc.*, No. 8:18-cv-2548-T, 2019 WL 4671143, at *6 (M.D. Fla. July 1, 2019), *report and recommendation adopted*, 2019 WL 4673755 (M.D. Fla. Aug. 15, 2019).

The PLA Rule implementing the EO was issued on December 22, 2023, and took effect on January 22, 2024. (Doc. 1, ¶¶ 3, 59). Plaintiffs filed this lawsuit on March 28, 2024, and the Motion for Preliminary Injunction on April 26, 2024. (*See generally* Doc. Nos. 1, 18). Thus, as Defendants argue, Plaintiffs' Motion was filed roughly four months after the final rule was issued and three months after it became effective. Plaintiffs argue,

however, that any delay was justified because they would have arguably lacked standing absent evidence of how the Rule would be implemented and the exceptions used. In this respect, Plaintiffs direct the Court to the dismissal of similar claims by the Western District of Louisiana in *Associated General Contractors of America, Inc. v. Federal Acquisition Regulatory Council*, 720 F. Supp. 3d 461 (W.D. La. 2024) ("***AGC***"). In *AGC*, a nationwide organization of contractors and its regional affiliates filed suit against various federal actors alleging that the PLA Rule exceeded the President's statutory and constitutional authority. *Id.* at 466. The defendants moved to dismiss the complaint for lack of Article III standing, and the court held that the plaintiffs lacked standing because they did not point to specific projects that included or would include PLAs under the new rules, had not recently been awarded federal contracts or any contracts with costs close to $35 million, and did not present evidence of how the exceptions to the PLA Rule would be utilized. *Id.* at 469–72.

Plaintiffs' delay in seeking injunctive relief, although not ideal, is "not necessarily fatal" to their irreparable harm claims in this case. *Wreal*, 840 F.3d at 1248. As Plaintiffs note, the factual and legal implications of the PLA Rule were not clear until it had been placed into practice and solicitations could be issued with or without exceptions. Defendants concede that the final rule projected "that ten to fifty percent of covered projects will be excepted." (Doc. 25 at 10). Thus, Plaintiffs likely could not have been aware of the scope and magnitude of any possible harm before the Rule was placed into practice. Furthermore, courts have been reluctant to extend *Wreal* to cases where the harm is not fully realized until the passing of future events or where the burden to establish the harm is particularly heavy. *See Gegas v. St. Matthew's Univ. Sch. of Med.*, No. 6:22-

cv-2299, 2023 WL 6294410, at *6 (M.D. Fla. Sept. 4, 2023); *GRACE, Inc. v. City of Mia.*, 674 F. Supp. 3d 1141, 1223–24 (S.D. Fla. 2023). Accordingly, although Plaintiffs likely could have filed the Motion at least at or near the time of filing the Complaint, the Court finds that any delay has been reasonably justified and is not fatal to a finding of irreparable harm in this case.

Next, Defendants argue that Plaintiffs' have failed to present evidence that the exceptions outlined in the EO and PLA Rule will not be applied to projects on which they wish to bid or work. The Court finds that Plaintiffs have submitted ample evidence that exceptions to the mandate have been limited, if not non-existent, in the year since the Rule took effect. Thus, the Court is not persuaded that Plaintiffs have offered nothing more than speculation that a significant number of the projects on which they wish to bid or work would be subject to PLA requirements.

Defendants also argue that bidding members have adequate relief through individual bid protests before the Court of Federal Claims. In their Reply, Plaintiffs state, in a footnote, that they are not confined to bid protests to challenge "systemic barriers to competition for government contracts." (Doc. 30 at 6 n.7). However, the case Plaintiffs cite addresses standing, not the adequacy of relief that can be afforded through individual bid protests. *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Plaintiffs do not otherwise address this argument or provide any evidence, argument, or legal authority for the proposition that individual protests would be inadequate to remedy the harms in this case. While the Court recognizes that other courts have found this remedy inadequate in certain circumstances, *see Nelson*, 576 F. Supp. 3d at 1039; *Mark Dunning Indus.*, 890 F. Supp. at 1517, the

16

burden to establish irreparable harm rests firmly with the moving party. *See Siegel*, 234 F.3d at 1176. In the absence of an adequate response from Plaintiffs, the Court finds that the bidding contractors have fallen short of showing irreparable harm absent a preliminary injunction.

With respect to the subcontractor members, Defendants argue that any harm is speculative because they do not directly bid on projects that would be within the scope of the PLA Rule. In response, in a footnote, Plaintiffs argue that many of their subcontractor members have worked on large-scale projects in the past as evidence that the members' harm is actual and imminent. However, the affidavits attached to Plaintiffs' Motion contain only speculative and conclusory statements that past work on similar projects would result in being hired to subcontract on projects in the future but for the PLA Rule, that contractors they have worked with in the past will not bid on or win such contracts, and that union contractors will not contract with them. (*See, e.g.*, Doc. 18-10, ¶¶ 4, 6, 9; Doc. 18-11, ¶¶ 3, 5, 8; Doc. 18-12, ¶¶ 4–5). In fact, at least one subcontractor states that it has successfully worked with union contractors in the past. (Doc. 18-12, ¶ 8). Another subcontractor states that most contractors enter agreements with a union it is not affiliated with, but then makes the unsupported leap that this would preclude work on all PLA-mandated projects without any support for the proposition that contractors with which it could work have not and will not enter agreements with its affiliate union. (Doc. 18-14, ¶ 3). The subcontractor acknowledges, however, that the Rule does not require that the PLAs be with any particular union. (*Id.* ¶ 6). Based on this evidence, the Court is required to speculate that these subcontractors would be able and willing to perform on projects subject to the PLA Rule and would be selected by a successful general contractor to do

so, but will not be able to obtain such work because: (1) the wrong union will be used to negotiate the PLA or the PLA's terms will otherwise make performance impossible on the project; (2) the contractor that would have selected them, to the exclusion of other subcontractors, if awarded the contract, will not bid for or be awarded any such contracts; or (3) the contractor that wins the bid will be unionized and, therefore, unwilling to work with this subcontractor. Within this chain of events, there simply exists a number of future contingencies that may or may not occur. Absent more concrete evidence that subcontractors will not be able to seek or obtain work on PLA covered projects in the future that does not rely on speculation regarding the actions or inactions of third-parties, the Court finds that Plaintiffs have also fallen short of meeting their burden with respect to their subcontractor members. *See Elec. Priv. Info. Ctr. v. U.S. Off. of Pers. Mgmt.*, No. 1:25-cv-255, 2025 WL 580596, at *6–7 (E.D. Va. Feb. 21, 2025); *Figg Bridge Eng'rs, Inc. v. Fed. Highway Admin.*, No. 20-2188, 2020 WL 4784722, at *7 (D.D.C. Aug. 17, 2020); *CreditMax Holdings, LLC v. Kass*, No. 11-81056-Civ, 2011 WL 13108061, at *3 (S.D. Fla. Dec. 5, 2011), *report and recommendation adopted*, 2012 WL 12854878 (S.D. Fla. Mar. 7, 2012). Therefore, strictly because Plaintiffs have failed to come forward with sufficient evidence and argument to permit the Court to make the determination that irreparable harm exists in this case, the Motion for Preliminary Injunction must be denied. *See Siegel*, 234 F.3d at 1176.

### IV.    CONCLUSION

Accordingly, it is **ORDERED** and **ADJUDGED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 18) is **DENIED** and Defendants' Unopposed Motion for Leave to File Sur-reply (Doc. 32) is **DENIED**.

**DONE AND ORDERED** in Jacksonville, Florida on March 28, 2025.

_____
WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record